## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
## CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)

**1. SEE NOTICE ON REVERSE**     **2. PLEASE TYPE OR PRINT**     **3. STAPLE ALL ADDITIONAL PAGES**

| Case Caption: | District Court or Agency: | Judge: |
|---|---|---|
| Lynne Freeman v. Tracy Deebs-Elkenaney, et al; | Southern District NY | Judge Colleen McMahon |

| | Date the Order or Judgment Appealed from was Entered on the Docket: | District Court Docket No.: |
|---|---|---|
| | See Additional Page 1 | 548, 549, 362, 398, |
| | Date the Notice of Appeal was Filed: | Is this a Cross Appeal? |
| | 04/15/2026 | ☐ Yes   ✔ No |

| **Attorney(s) for Appellant(s):** ✔ Plaintiff  ☐ Defendant | Counsel's Name:   Address:   Telephone No.:   Fax No.:   E-mail: <br><br> Stephen M. Doniger, 603 Rose Ave., Venice, California 90291, (310) 590-1820, stephen@donigerlawfirm.com <br> Mark D. Passin, 11766 Wilshire Boulevard Suite 1470, Los Angeles, CA 90025, (310) 861-2475, mark@reedermccreary.com; See Additional Page 1 |
|---|---|
| **Attorney(s) for Appellee(s):** ☐ Plaintiff  ✔ Defendant | Counsel's Name:   Address:   Telephone No.:   Fax No.:   E-mail: <br><br> Amy Lee Nashon, 1801 Century Park East, Suite 1600, Los Angeles, CA 90067 anashon@troygould.com, (310) 553-4441 <br> Dwayne K. Goetzel, 1120 S. Capital of Texas Hwy, Building 2, Suite 300, Austin, TX 78746, dgoetzel@intprop.com, (512) 853-8800; See Additional Page 1 |

| Has Transcript Been Prepared? <br><br> Yes | Approx. Number of Transcript Pages: <br><br> 51 | Number of Exhibits Appended to Transcript: | Has this matter been before this Circuit previously?  ☐ Yes  ✔ No <br><br> If Yes, provide the following: <br><br> Case Name: <br><br> 2d Cir. Docket No.:        Reporter Citation: (i.e., F.3d or Fed. App.) |
|---|---|---|---|

***ADDENDUM "A":*** **COUNSEL MUST ATTACH TO THIS FORM: (1) A BRIEF, BUT NOT PERFUNCTORY, DESCRIPTION OF THE NATURE OF THE ACTION; (2) THE RESULT BELOW; (3) A COPY OF THE NOTICE OF APPEAL AND A CURRENT COPY OF THE LOWER COURT DOCKET SHEET; AND (4) A COPY OF ALL RELEVANT OPINIONS/ORDERS FORMING THE BASIS FOR THIS APPEAL, INCLUDING TRANSCRIPTS OF ORDERS ISSUED FROM THE BENCH OR IN CHAMBERS.**

***ADDENDUM "B":*** **COUNSEL MUST ATTACH TO THIS FORM A LIST OF THE ISSUES PROPOSED TO BE RAISED ON APPEAL, AS WELL AS THE APPLICABLE APPELLATE STANDARD OF REVIEW FOR EACH PROPOSED ISSUE.**

### PART A: JURISDICTION

| 1. Federal Jurisdiction | 2. Appellate Jurisdiction |
|---|---|
| ☐ U.S. a party          ☐ Diversity <br> ✔ Federal question (U.S. not a party)      ☐ Other (specify): _____ | ✔ Final Decision        ☐ Order Certified by District Judge (i.e., Fed. R. Civ. P. 54(b)) <br> ☐ Interlocutory Decision Appealable As of Right      ☐ Other (specify): _____ |

**IMPORTANT. COMPLETE AND SIGN REVERSE SIDE OF THIS FORM.**

**FORM C** (Rev. October 2025)

**PART B:  DISTRICT  COURT DISPOSITION    (Check as many as apply)**

**1. Stage of Proceedings**

- ✔ Pre-trial
- ☐ During trial
- ☐ After trial

**2. Type of Judgment/Order Appealed**

- ☐ Default judgment
- ☐ Dismissal/FRCP 12(b)(1) lack of subject matter juris.
- ☐ Dismissal/FRCP 12(b)(6) failure to state a claim
- ☐ Dismissal/28 U.S.C. § 1915(e)(2) frivolous complaint
- ☐ Dismissal/28 U.S.C. § 1915(e)(2) other dismissal
- ☐ Dismissal/other jurisdiction
- ☐ Dismissal/merit
- ✔ Judgment / Decision of the Court
- ✔ Summary judgment
- ☐ Declaratory judgment
- ☐ Jury verdict
- ☐ Judgment NOV
- ☐ Directed verdict
- ✔ Other (specify):   Exclusion of expert testimony

**3.  Relief**

- ☐ Damages:
  - ☐ Sought: $ _____
  - ☐ Granted: $ _____
  - ☐ Denied: $ _____
- ☐ Injunctions:
  - ☐ Preliminary
  - ☐ Permanent
  - ☐ Denied

**PART C:  NATURE OF SUIT   (Check as many as apply)**

**1.  Federal Statutes**

- ☐ Antitrust
- ☐ Bankruptcy
- ☐ Banks/Banking
- ☐ Civil Rights
- ☐ Commerce
- ☐ Energy
- ☐ Commodities
- ☐ Other (specify): _____
- ☐ Communications
- ☐ Consumer Protection
- ✔ Copyright ☐ Patent
- ☐ Trademark
- ☐ Election
- ☐ Soc. Security
- ☐ Environmental
- ☐ Freedom of Information Act
- ☐ Immigration
- ☐ Labor
- ☐ OSHA
- ☐ Securities
- ☐ Tax

**2.  Torts**

- ☐ Admiralty/ Maritime
- ☐ Assault / Defamation
- ☐ FELA
- ☐ Products Liability
- ☐ Other (Specify):

**3.  Contracts**

- ☐ Admiralty/ Maritime
- ☐ Arbitration
- ☐ Commercial
- ☐ Employment
- ☐ Insurance
- ☐ Negotiable Instruments
- ☐ Other Specify

**4.  Prisoner Petitions**

- ☐ Civil Rights
- ☐ Habeas Corpus
- ☐ Mandamus
- ☐ Parole
- ☐ Vacate Sentence
- ☐ Other

**5.  Other**

- ☐ Hague Int'l Child Custody Conv.
- ☐ Forfeiture/Penalty
- ☐ Real Property
- ☐ Treaty (specify): _____
- ☐ Other (specify): _____

**6.  General**

- ☐ Arbitration
- ☐ Attorney Disqualification
- ☐ Class Action
- ☐ Counsel Fees
- ☐ Shareholder Derivative
- ☐ Transfer

**7.  Will appeal raise constitutional issue(s)?**

- ☐ Yes    ✔ No

Will appeal raise a matter of first impression?

- ☐ Yes    ✔ No

1.  Is any matter relative to this appeal still pending below? ✔ Yes, specify:  Motion for Attorny's Fees    ☐ No

2.  To your knowledge, is there any case presently pending or about to be brought before this Court or another court or administrative agency which:

  (A)    Arises from substantially the same case or controversy as this appeal?    ✔ Yes    ☐ No

  (B)    Involves an issue that is substantially similar or related to an issue in this appeal?    ✔ Yes    ☐ No

If yes, state whether ☐ "A," or ☐ "B," or ☐ both are applicable, and provide in the spaces below the following information on the *other* action(s):

| Case Name: | Docket No. | Citation: | Court or Agency: |
|---|---|---|---|
| See Additional Page 1 | See Additional Page 1 | See Additional Page 1 | See Additional Page 1 |

Name of Appellant:  Lynne Freeman

| Date: 04/29/2026 | Signature of Counsel of Record:  /s/ Stephen M. Doniger |
|---|---|

# NOTICE TO COUNSEL

**Once you have filed your Notice of Appeal with the District Court or the Tax Court, you have only 14 days in which to complete the following important steps:**

1. Complete this Civil Appeal Pre-Argument Statement (Form C); serve it upon all parties, and file it with the Clerk of the Second Circuit in accordance with LR 25.1.

2. File the Court of Appeals Transcript Information/Civil Appeal Form (Form D) with the Clerk of the Second Circuit in accordance with LR 25.1.

3. Pay the $605 docketing fee to the United States District Court or the $600 docketing fee to the United States Tax Court unless you are authorized to prosecute the appeal without payment.

**PLEASE NOTE: IF YOU DO NOT COMPLY WITH THESE REQUIREMENTS WITHIN 14 DAYS, YOUR APPEAL WILL BE DISMISSED.** *SEE* LOCAL RULE 12.1.

**FORM C**  (Rev. October 2025)

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)**

**ADDITIONAL PAGE 1**

**Date the Order or Judgment Appeal from was Entered on the Docket:** 3/16/26; 3/31/26; 1/12/26; 11/21/24; 08/1/24.

**Attorneys for Appellants:** David Michael Stuart Jenkins, 247 Water Street, First Floor, New York, NY 10038, (310) 590-1820, djenkins@donigerlawfirm.com

**Attorneys for Appellees:** Jennifer L. Pariser, 461 Fifth Avenue, 19th Floor, New York, New York 20017, (212) 951-1874, jpariser@oandzlaw.com

**Cases pending that arise from substantially the same case or controversy as this appeal / involve an issue that is substantially similar to an issue in this appeal**

1. Lynne Freeman v. Barnes & Noble Booksellers, Inc.; et al. / No. 2:23-cv-04145-CM / Southern District of New York
2. Lynne Freeman v. Apple, Inc.; et al. / No. 1 :23-cv-07051-CM / Southern District of New York
3. Lynne Freeman v. Amazon.com, Inc.; et al. / No. 1:23-cv-04796-CM / Southern District of New York

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)**

**ADDENDUM "A"**

**(1) Description of the Nature of the Action**

Plaintiff, Lynne Freeman ("Freeman") filed an action for copyright infringement against her former literary agent, Defendant Emily Kim ("Kim"), Kim's friend and client, author Tracy Deebs-Elkenaney p/k/a Tracy Wolff ("Wolff"), publisher Entangled Publishing LLC ("Entangled") and distributor Holtzbrinck Publishers, LLC d/b/a Macmillan ("Macmillan"). Freeman alleged that after she provided Kim with numerous versions of her Young-Adult Paranormal Romance and Fantasy novel manuscript entitled *Blue Moon Rising* and later *Masqued* (collectively, "*BMR*") over a three-year course of their agency relationship, Kim worked with Wolff and others to copy original material from *BMR* to create the *Crave* series of the young-adult Paranormal Romance and Fantasy novels, and that the first four novels of which are substantially similar to *BMR* owing to this copying. Freeman further alleged that Entangled and Macmillan infringed on her exclusive rights under the Copyright Act by publishing and distributing the infringing *Crave* books, respectively.

Defendants each answered and pled affirmative defenses to Freeman's Complaint. After years of litigation, Freeman and Defendants filed cross motions for summary judgment regarding the claims at issue. Freeman argued that it was beyond genuine dispute that Defendants had access to *BMR* as not only did Kim indisputably receive Freeman's manuscripts and provide them to individuals working at Entangled and working with Kim and Wolff, but also because the works bear at minimum probative and potentially striking similarity. Freeman further argued that the *Crave* books are substantially similar to *BMR* as they appropriate significant and original plotlines, characters, scenes, themes, and settings from *BMR* and in certain cases copy near

1

verbatim excerpts, moments, dialogue and language from *BMR*. Defendants argue that although Kim had access to Freeman's manuscripts, the other Defendants did not, that Wolff created the *Crave* series independently, and that the works are not substantially similar.

Both sides also retained expert witnesses to testify on topics, including whether and to what extent elements common to both *BMR* and the *Crave* books stem from literary tropes and genre convention. Specifically, Freeman retained young adult writer and English Professor Kathryn Reiss while Defendants retained Emily Easton. Freeman also retained forensic linguist Dr. Carole Chaski to conduct a forensic analysis of the texts to show similarities probative of copying. Defendants thereafter moved to exclude the testimony of Freeman's experts, including Professor Reiss and Dr. Chaski.

**(2) The Result Below**

Magistrate Judge Netburn reviewed the parties' submissions and issued a Report and Recommendation to Judge Stanton recommending that both motions be denied as to Freeman's copyright infringement claims, while also finding probative similarity between the works. Specifically, she found that after review of the *BMR* manuscripts from 2010-2014 and the first four books of the *Crave* series, that "*BMR 2010, 2011, 2012, 2013 and 2014* each share probative similarities with the *Crave* series and no reasonable juror could find otherwise" and that the similarities "rais[ed] an inference that *Crave's* authors copied these Freeman works" and that "[a]bsent copying, one would not expect two works to share these kinds of similarities." As to the issue of substantial similarity, the Magistrate Judge found a genuine dispute of material fact because "[w]here, as here, the similarities fall somewhere between probative and striking, substantial similarity presents a particularly close question of fact and should be decided by a

2

jury." Judge Netburn also entered an Order and Opinion granting Defendants' motion to exclude the testimony of Professor Reiss and Dr. Chaski.

After both sides filed objections to the Magistrate's Report and Recommendation and Opinion and Order, Judge Stanton adopted the Report and Recommendation but determined that all questions related to Freeman's copyright infringement claims must be preserved for resolution by a jury. Defendants moved for reconsideration of this order, and Judge Stanton rejected this effort stating "There is a genuine dispute as to whether a defendant copied parts, large or small, of Freeman's work. There is a genuine dispute as to similarities between Freeman and Wolff's work, particularly in a degree indicative of infringement and copying. There is a a genuine dispute as to whether defendant Kim aided Wolff write the [Crave] series…". Judge Stanton further confirmed Judge Netburn's Order and Opinion, including as to the exclusion of Reiss and Chaski.

Judge Stanton later reassigned the case to Judge Colleen McMahon to set the case for trial. Judge McMahon did not agree with Judge Stanton's decision that all questions as to Freeman's copyright infringement claims be reserved for resolution by a jury, and determined that there had not been a decision specifically on the issue of substantial similarity on summary judgment. She thus reopened summary judgment proceedings to allow the parties to again move for summary judgment limited to the issue of substantial similarity between *BMR* and the *Crave* books. Freeman and Defendants accordingly submitted cross motions for summary judgment, and Judge McMahon granted summary judgment in favor of the Defendants, finding that *BMR* and the *Crave* books were not substantially similar as a matter of law. Freeman thereafter timely filed this appeal.

3

# EXHIBIT 1
# Notice of Appeal and Docket Sheet, Southern District of New York

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Lynne Freeman | Civil Action No.: 1:22-cv-02435-CM-SN |
| Plaintiff, | **PLAINTIFF'S NOTICE OF APPEAL** |
| v. | |
| Tracy Deebs-Elkenaney, et al., | |
| Defendants. | |

TO THE HONORABLE COURT, PARTIES, AND COUNSEL OF RECORD:

Notice is hereby given that Plaintiff Lynne Freeman hereby appeals to the United States Court of Appeals for the Second Circuit from a Summary Judgment Decision and Order [Dkt. 548], and Judgment [Dkt. No. 549] thereon. The Summary Judgment Decision and Order Granting Defendants' Motion for Summary Judgment and Denying Plaintiff's Cross-Motion for Summary Judgment was entered on March 16, 2026, and docketed at No. 548. The Judgment was entered on March 31, 2026, and docketed at No. 549. Plaintiff's appeal shall include, in addition to the Summary Judgment Decision and Order and Judgment thereon, an appeal of all interlocutory orders and rulings that merge into that Decision and Order and Judgment thereon, including but not limited to the November 21, 2024 Order of Judge Stanton regarding Magistrate Judge Netburn's Report and Recommendation for Summary Judgment [ECF 361] docketed at No. 398, the August 1, 2024 Opinion and Order docketed at No. 362 and the minute order dated January 12, 2026.

1

PLAINTIFF'S NOTICE OF APPEAL

Dated: April 15, 2026                          Respectfully submitted,

                                By:    */s/ Stephen M. Doniger*
                                       Stephen M. Doniger, Esq.
                                       David M.S. Jenkins, Esq.
                                       DONIGER / BURROUGHS
                                       247 Water Street, First Floor
                                       New York, New York 10038
                                       (310) 590 – 1820
                                       stephen@donigerlawfirm.com
                                       djenkins@donigerlawfirm.com

                                       **Reeder McCreary, LLP**
                                       Mark D. Passin
                                       11766 Wilshire Boulevard
                                       Suite 1470
                                       Los Angeles, CA 90025
                                       310-861-2475
                                       mark@reedermccreary.com

2

PLAINTIFF'S NOTICE OF APPEAL

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2026, I served a true and correct copy of the foregoing

PLAINTIFF'S NOTICE OF APPEAL on Defendants' counsel of record via email, as follows:

Amy L. Nashon
anashon@troygould.com

John C. Ulin
Julin@troygould.com

Dwayne K. Goetzel
dgoetzel@intprop.com

Jennifer L. Pariser
JPariser@oandzlaw.com

Lacy Herman Koonce, III
lance.koonce@klarislaw.com

*Attorneys for Defendants*

Dated: April 15, 2026

By:     */s/ Stephen M. Doniger*
        Stephen M. Doniger, Esq.
        *Attorney for Plaintiff*

PLAINTIFF'S NOTICE OF APPEAL

CLOSED,APPEAL,CASREF,ECF

# U.S. District Court
## Southern District of New York (Foley Square - Suspense)
## CIVIL DOCKET FOR CASE #: 2:22-cv-02435-CM-SN

Freeman v. Deebs-Elkenaney et al
Assigned to: Judge Colleen McMahon
Referred to: Magistrate Judge Sarah Netburn
Related Cases: 2:23-cv-04145-CM
                1:23-cv-07051-CM
                1:25-cv-09345-CM
                1:23-cv-04796-CM
Cause: 17:101 Copyright Infringement

Date Filed: 03/25/2022
Date Terminated: 03/31/2026
Jury Demand: Both
Nature of Suit: 820 Copyright
Jurisdiction: Federal Question

**Plaintiff**

**Lynne Freeman**
*an individual*

represented by   **Mark D. Passin**
Reeder McCreary
11766 Wilshire Blvd.
Suite 1470
Los Angeles, CA 90025
310-861-2475
Fax: 310-861-2476
Email: mark@reedermccreary.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul V. LiCalsi**
Reitler Kailas & Rosenblatt LLC
885 Third Avenue
Ste 20th Floor
New York, NY 10022
212-209-3090
Email: plicalsi@reitlerlaw.com
*TERMINATED: 05/22/2023*
*LEAD ATTORNEY*

**Brett Van Benthysen**
Reitler Kailas & Rosenblatt LLP
885 Third Avenue, 20th Floor
Ste 20th Floor
New York, NY 10022
212-209-3045
Email: bvanbenthysen@reitlerlaw.com
*TERMINATED: 05/22/2023*

**David Jenkins**
Doniger / Burroughs
247 Water Street, First Floor
10038
New York, NY 10038

847-999-8585
Email: djenkins@donigerlawfirm.com
*ATTORNEY TO BE NOTICED*

**Laura Zaharia Marion**
Doniger/Burroughs
247 Water Street
Ste First Floor
New York, NY 10038
310-590-1820
Email: laura.marion@jcrew.com
*ATTORNEY TO BE NOTICED*

**Scott Burroughs**
Doniger / Burroughs
247 Water Street
Ste First Floor
New York, NY 10038
310-590-1820
Email: scott@donigerlawfirm.com
*ATTORNEY TO BE NOTICED*

**Stephen M. Doniger**
Doniger Burroughs Apc
603 Rose Avenue
Venice, CA 90291
310-590-1820
Email: stephen@donigerlawfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| **Tracy Deebs-Elkenaney** | represented by | **Benjamin Samuel Halperin** |
| *an individual* | | Cowen, DeBaets, Abrahams & Sheppard |
| *personally known as* | | LLP |
| Tracy Wolff | | 60 Broad Street |

Floor 30
New York, NY 10004
212-974-7474
Fax: 212-974-8474
Email: bhalperin@cdas.com
*TERMINATED: 04/01/2025*
*LEAD ATTORNEY*

**Nancy Evelyn Wolff**
Cowan, DeBaets, Abrahams & Sheppard
LLP
60 Broad Street
30th Floor
New York, NY 10004
212-974-7474
Fax: 212-974-8474
Email: nwolff@cdas.com

*TERMINATED: 04/01/2025*
*LEAD ATTORNEY*

**Scott Jonathan Sholder**
Cowan DeBaets Abrahams & Sheppard LLP
60 Broad St
30th Floor
New York, NY 10004
212-974-7474
Fax: 212-974-8474
Email: ssholder@cdas.com
*TERMINATED: 04/01/2025*
*LEAD ATTORNEY*

**Amy Lee Nashon**
TroyGould
Litigation Department
1801 Century Park East
Suite 1600
Los Angeles, CA 90067
310-789-1245
Email: anashon@troygould.com
*ATTORNEY TO BE NOTICED*

**CeCe Cole**
Cowan, DeBaets, Abrahams & Sheppard
LLP
60 Broad Street
30th Floor
New York
New York, NY 10004
212-974-7474
Email: ccole@cdas.com
*TERMINATED: 04/01/2025*

**Dwayne K. Goetzel**
Kowert, Hood, Munyon, Rankin & Goetzel,
P.C.
1120 S. Capital of TX Hwy.
Bldg. 2, Ste. 300
Austin, TX 78746
512-853-8800
Fax: 512-853-8801
Email: dgoetzel@intprop.com
*ATTORNEY TO BE NOTICED*

**Jennifer L. Pariser**
Oppenheim & Zebrak, LLP
461 5th Avenue
Ste 19th Floor
New York, NY 10017
212-951-1156
Email: jpariser@oandzlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Emily Sylvan Kim**
*an individual*

represented by  **Lacy Herman Koonce , III**
Klaris Law, PLLC
Klaris Law, PLLC
161 Water Street
Suite 904
NY, NY 10038
917-612-5861
Email: lance.koonce@klarislaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Lee Nashon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer L. Pariser**
(See above for address)

**Zachary M. Press**
Vance Center for International Justice
Lawyers for Reporters
42 West 44th Street
New York, NY 10036
718-974-8717
Email: zpress@nycbar.org
*TERMINATED: 06/09/2025*

**Defendant**

**Prospect Agency, LLC**
*a New Jersey limited liability company*

represented by  **Lacy Herman Koonce , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Lee Nashon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary M. Press**
(See above for address)
*TERMINATED: 06/09/2025*

**Defendant**

**Entangled Publishing, LLC**
*a Delaware limited liability company*

represented by  **Benjamin Samuel Halperin**
(See above for address)
*TERMINATED: 04/01/2025*
*LEAD ATTORNEY*

**Nancy Evelyn Wolff**
(See above for address)
*TERMINATED: 04/01/2025*
*LEAD ATTORNEY*

**Scott Jonathan Sholder**
(See above for address)
*TERMINATED: 04/01/2025*
*LEAD ATTORNEY*

**Amy Lee Nashon**
TroyGould
1801 Century Park East
Suite 1600
Los Angeles, CA 90067
310-789-1245
Email: anashon@troygould.com
*ATTORNEY TO BE NOTICED*

**CeCe Cole**
(See above for address)
*TERMINATED: 04/01/2025*

**Jennifer L. Pariser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Universal City Studios, LLC**
*a Delaware limited liability company*

represented by **Amy Lee Nashon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Samuel Halperin**
(See above for address)
*TERMINATED: 03/27/2025*
*LEAD ATTORNEY*

**Nancy Evelyn Wolff**
(See above for address)
*TERMINATED: 03/27/2025*
*LEAD ATTORNEY*

**Scott Jonathan Sholder**
(See above for address)
*TERMINATED: 03/27/2025*
*LEAD ATTORNEY*

**CeCe Cole**
(See above for address)
*TERMINATED: 03/27/2025*

**Defendant**

**Macmillan Publishers, LLC**
*TERMINATED: 05/23/2022*

represented by **Nancy Evelyn Wolff**
(See above for address)
*TERMINATED: 04/01/2025*
*LEAD ATTORNEY*

**Amy Lee Nashon**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer L. Pariser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Crazy Maple Studio, Inc.**
*a California Corporation*
*TERMINATED: 09/07/2022*

represented by **Jack Shaw**
Cherry Johnson Siegmund James PC
8140 Walnut Hill Lane
Suite 105
Dallas, TX 75231
254-732-2242
Fax: 866-627-3509
Email: jshaw@cjsjlaw.com
*TERMINATED: 05/15/2025*
*LEAD ATTORNEY*

**Eric Plourde**
Procopio, Cory, Hargreaves & Savitch LLP
525 B Street
Ste 2200
San Diego, CA 92101
619-238-1900
Email: eaplourde@gmail.com
*TERMINATED: 05/15/2025*

**Defendant**

**Holtzbrinck Publishers, LLC**
*a New York limited liability company*
*doing business as*
Macmillan

represented by **Benjamin Samuel Halperin**
(See above for address)
*TERMINATED: 03/27/2025*
*LEAD ATTORNEY*

**Nancy Evelyn Wolff**
(See above for address)
*TERMINATED: 03/27/2025*
*LEAD ATTORNEY*

**Scott Jonathan Sholder**
(See above for address)
*TERMINATED: 03/27/2025*
*LEAD ATTORNEY*

**Amy Lee Nashon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CeCe Cole**
(See above for address)
*TERMINATED: 03/27/2025*

**Jennifer L. Pariser**
(See above for address)

| Date Filed | # | Docket Text |
|---|---|---|
| 03/25/2022 | 1 | COMPLAINT against Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC. (Filing Fee $ 402.00, Receipt Number BNYSDC-25915074)Document filed by Lynne Freeman..(LiCalsi, Paul) (Entered: 03/25/2022) |
| 03/25/2022 | 2 | **FILING ERROR - DEFICIENT PLEADING - PDF ERROR -** CIVIL COVER SHEET filed..(LiCalsi, Paul) Modified on 3/28/2022 (pc). (Entered: 03/25/2022) |
| 03/28/2022 | | **\*\*\*NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Paul V. LiCalsi. The party information for the following party/parties has been modified: Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC, Lynne Freeman. The information for the party/parties has been modified for the following reason/reasons: party text was omitted; alias party name was omitted;. (pc)** (Entered: 03/28/2022) |
| 03/28/2022 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Paul V. LiCalsi re: Document No. 1 Complaint. The filing is deficient for the following reason(s): all of the parties listed on the pleading were not entered on CM ECF;. Docket the event type Add Party to Pleading found under the event list Complaints and Other Initiating Documents... (pc)** (Entered: 03/28/2022) |
| 03/28/2022 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT CIVIL COVER SHEET. Notice to attorney Paul V. LiCalsi to RE-FILE Document No. 2 Civil Cover Sheet. The filing is deficient for the following reason(s): civil cover sheet was not signed. (pc)** (Entered: 03/28/2022) |
| 03/28/2022 | | **\*\*\*NOTICE TO ATTORNEY TO SUBMIT AO 121 FORM COPYRIGHT. Notice to Attorney Paul V. LiCalsi to submit a completed AO 121 Form Copyright to court for review. Use the event type AO 121 Copyright - Notice of Submission by Attorney found under the event list Other Documents. (pc)** (Entered: 03/28/2022) |
| 03/28/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Analisa Torres. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(pc) (Entered: 03/28/2022) |
| 03/28/2022 | | Magistrate Judge Sarah Netburn is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (pc) (Entered: 03/28/2022) |
| 03/28/2022 | | Case Designated ECF. (pc) (Entered: 03/28/2022) |
| 03/28/2022 | 3 | CIVIL COVER SHEET filed..(LiCalsi, Paul) (Entered: 03/28/2022) |
| 03/28/2022 | 4 | **FILING ERROR - DEFICIENT AO 121 FORM COPYRIGHT - PDF ERROR** AO 121 FORM COPYRIGHT - NOTICE OF SUBMISSION BY ATTORNEY. AO 121 Form Copyright for case opening submitted to court for review..(LiCalsi, Paul) Modified on 3/29/2022 (sj). (Entered: 03/28/2022) |

| 03/28/2022 | 5 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Mark D. Passin to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25923915. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Lynne Freeman. (Attachments: # 1 Affidavit Affidavit of attorney requesting admission pro hac vice, # 2 Text of Proposed Order Draft order).(LiCalsi, Paul) Modified on 3/29/2022 (vba). (Entered: 03/28/2022) |
| --- | --- | --- |
| 03/28/2022 | | ADD PARTY FOR PLEADING. Defendants/Respondents Macmillan Publishers, LLC added. Party added pursuant to 1 Complaint.Document filed by Lynne Freeman. Related document: 1 Complaint..(LiCalsi, Paul) (Entered: 03/28/2022) |
| 03/29/2022 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT COPYRIGHT FORM. Notice to Attorney Paul V. LiCalsi to RE-FILE re: Document No. 4 AO 121 Form Copyright - Notice of Submission by Attorney. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the AO 121 Copyright form is not correct; all Defendants not listed on PDF. Re-file the document using the event type AO 121 Form Copyright - Notice of Submission by Attorney found under the event list Other Documents and attach the correct AO 121 Copyright PDF form. (sj)** Modified on 4/1/2022 (sj). (Entered: 03/29/2022) |
| 03/29/2022 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 5 MOTION for Mark D. Passin to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25923915. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of CA;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order. (vba)** (Entered: 03/29/2022) |
| 03/29/2022 | 6 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Mark D. Passin to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Lynne Freeman. (Attachments: # 1 Affidavit Affidavit of attorney seeking admission, # 2 Text of Proposed Order Proposed order, # 3 Certificate of Good Standing from Supreme Court of California).(LiCalsi, Paul) Modified on 3/30/2022 (vba). (Entered: 03/29/2022) |
| 03/30/2022 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 6 MOTION for Mark D. Passin to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of CA;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order. (vba)** (Entered: 03/30/2022) |
| 04/01/2022 | 7 | AO 121 FORM COPYRIGHT - NOTICE OF SUBMISSION BY ATTORNEY. AO 121 Form Copyright for case opening submitted to court for review..(LiCalsi, Paul) (Entered: 04/01/2022) |
| 04/04/2022 | 8 | AO 121 FORM COPYRIGHT - CASE OPENING - SUBMITTED. In compliance with the provisions of 17 U.S.C. 508, the Register of Copyrights is hereby advised that a court action has been filed on the following copyright(s) in the U.S. District Court Southern District of New York. Form e-mailed to Register of Copyrights. (vf) (Entered: 04/04/2022) |

| | | |
|---|---|---|
| 04/19/2022 | 9 | ORDER: To protect the public health, while promoting the "just, speedy, and inexpensive determination of every action and proceeding," Fed. R. Civ. P. 1, it is ORDERED pursuant to Rules 30(b)(3) and 30(b)(4) of the Federal Rules of Civil Procedure that all depositions in this action may be taken via telephone, videoconference, or other remote means. It is further ORDERED pursuant to Rule 30(b)(5) that a deposition will be deemed to have taken place "before an officer appointed or designated under Rule 28" if such officer attends the deposition using the same remote means used to connect all other participants, so long as all participants (including the officer) can clearly hear and be heard by all other participants. The parties are encouraged to engage in discovery through remote means at every available opportunity. SO ORDERED. (Signed by Judge Analisa Torres on 4/19/2022) (kv) (Entered: 04/19/2022) |
| 04/19/2022 | 10 | INITIAL PRETRIAL SCHEDULING ORDER: Counsel for all parties are directed to submit a joint letter and a jointly proposed Case Management Plan and Scheduling Order by May 24, 2022, in accordance with Rule 16 of the Federal Rules of Civil Procedure and the instructions set forth below. (Signed by Judge Analisa Torres on 4/19/2022) (kv) (Entered: 04/19/2022) |
| 04/19/2022 | 11 | ORDER: To conserve resources, to promote judicial efficiency, and in an effort to achieve a faster disposition of this matter, it is hereby ORDERED that the parties discuss whether they are willing to consent, under 28 U.S.C. § 636(c), to conducting all further proceedings before the assigned Magistrate Judge. (as further set forth herein). SO ORDERED. (Signed by Judge Analisa Torres on 4/19/2022) (kv) (Entered: 04/19/2022) |
| 04/26/2022 | 12 | MOTION for Mark D. Passin to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Lynne Freeman. (Attachments: # 1 Text of Proposed Order Draft order, # 2 Affidavit Affidavit of Attorney Seeking Admission, # 3 Certificate of Good Standing from Supreme Court of California). (LiCalsi, Paul) (Entered: 04/26/2022) |
| 04/27/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 12 MOTION for Mark D. Passin to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (vba)** (Entered: 04/27/2022) |
| 04/28/2022 | 13 | ORDER granting 12 Motion for Mark D. Passin to Appear Pro Hac Vice (HEREBY ORDERED by Judge Analisa Torres)(Text Only Order) (JB) (Entered: 04/28/2022) |
| 05/10/2022 | 14 | WAIVER OF SERVICE RETURNED EXECUTED. Macmillan Publishers, LLC waiver sent on 3/28/2022, answer due 5/27/2022. Document filed by Lynne Freeman..(LiCalsi, Paul) (Entered: 05/10/2022) |
| 05/10/2022 | 15 | WAIVER OF SERVICE RETURNED EXECUTED. Tracy Deebs-Elkenaney waiver sent on 3/28/2022, answer due 5/27/2022. Document filed by Lynne Freeman..(LiCalsi, Paul) (Entered: 05/10/2022) |
| 05/10/2022 | 16 | WAIVER OF SERVICE RETURNED EXECUTED. Universal City Studios, LLC waiver sent on 3/28/2022, answer due 5/27/2022. Document filed by Lynne Freeman..(LiCalsi, Paul) (Entered: 05/10/2022) |
| 05/10/2022 | 17 | WAIVER OF SERVICE RETURNED EXECUTED. Emily Sylvan Kim waiver sent on 3/28/2022, answer due 5/27/2022. Document filed by Lynne Freeman..(LiCalsi, Paul) (Entered: 05/10/2022) |
| 05/10/2022 | 18 | WAIVER OF SERVICE RETURNED EXECUTED. Prospect Agency, LLC waiver sent on 3/28/2022, answer due 5/27/2022. Document filed by Lynne Freeman..(LiCalsi, Paul) (Entered: 05/10/2022) |

| 05/10/2022 | 19 | NOTICE OF APPEARANCE by Mark D. Passin on behalf of Lynne Freeman..(Passin, Mark) (Entered: 05/10/2022) |
|---|---|---|
| 05/11/2022 | 20 | WAIVER OF SERVICE RETURNED EXECUTED. Entangled Publishing, LLC waiver sent on 3/28/2022, answer due 5/27/2022. Document filed by Lynne Freeman..(LiCalsi, Paul) (Entered: 05/11/2022) |
| 05/11/2022 | 21 | JOINT MOTION for Extension of Time to File Answer re: 1 Complaint . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Macmillan Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 05/11/2022) |
| 05/13/2022 | 22 | JOINT STIPULATION EXTENDING TIME TO ANSWER, THEREFORE, it is hereby stipulated, by the parties hereto through their respective counsel, as follows: That Defendants' time to respond to the Complaint is extended to and including June 27, 2022. SO ORDERED. Motions terminated: 21 JOINT MOTION for Extension of Time to File Answer re: 1 Complaint . filed by Universal City Studios, LLC, Macmillan Publishers, LLC, Entangled Publishing, LLC, Tracy Deebs-Elkenaney. (Signed by Judge Analisa Torres on 5/13/2022) (kv) (Entered: 05/13/2022) |
| 05/13/2022 | | Set/Reset Deadlines: Tracy Deebs-Elkenaney answer due 6/27/2022; Entangled Publishing, LLC answer due 6/27/2022; Emily Sylvan Kim answer due 6/27/2022; Macmillan Publishers, LLC answer due 6/27/2022; Prospect Agency, LLC answer due 6/27/2022; Universal City Studios, LLC answer due 6/27/2022. (kv) (Entered: 05/13/2022) |
| 05/23/2022 | 23 | **FILING ERROR - DEFICIENT PLEADING - FILED AGAINST PARTY ERROR -** FIRST AMENDED COMPLAINT amending 1 Complaint against Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC, Crazy Maple Studio, Inc. with JURY DEMAND.Document filed by Lynne Freeman. Related document: 1 Complaint. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3).(Passin, Mark) Modified on 5/23/2022 (vf). (Entered: 05/23/2022) |
| 05/23/2022 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Mark D. Passin to RE-FILE re: Document No. 23 Amended Complaint,. The filing is deficient for the following reason(s): all of the parties listed on the pleading were not entered on CM ECF; wrong party/parties whom the pleading is against were selected. Docket the event type Add Party to Pleading found under the event list Complaints and Other Initiating Documents. Re-file the pleading using the event type Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (vf)** (Entered: 05/23/2022) |
| 05/23/2022 | 24 | FIRST AMENDED COMPLAINT amending 1 Complaint against Crazy Maple Studio, Inc., Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC, Holtzbrinck Publishers, LLC d/b/a Macmillan with JURY DEMAND.Document filed by Lynne Freeman. Related document: 1 Complaint. (Attachments: # 1 Exhibit Ex 1, # 2 Exhibit Ex 2, # 3 Exhibit Ex 3).(Passin, Mark) (Entered: 05/23/2022) |
| 05/23/2022 | 25 | LETTER addressed to Judge Analisa Torres from Mark D. Passin dated May 23. 2022 re: Subject Matter Jurisdiction. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 05/23/2022) |
| 05/23/2022 | 26 | AO 121 FORM COPYRIGHT - NOTICE OF SUBMISSION BY ATTORNEY. AO 121 Form Copyright for case opening submitted to court for review..(Passin, Mark) (Entered: |

| | | |
|---|---|---|
| | | 05/23/2022) |
| 05/24/2022 | 27 | AO 121 FORM COPYRIGHT - CASE OPENING - SUBMITTED. In compliance with the provisions of 17 U.S.C. 508, the Register of Copyrights is hereby advised that a court action has been filed on the following copyright(s) in the U.S. District Court Southern District of New York. Form e-mailed to Register of Copyrights..(pc) (Entered: 05/24/2022) |
| 05/24/2022 | 28 | LETTER addressed to Judge Analisa Torres from Mark D. Passin, Paul V. LiCalsi, Nancy E. Wolff, Lacy H. Koonce, III dated May 24, 2022 re: Civil Case Management Plan and Scheduling Order. Document filed by Lynne Freeman. (Attachments: # 1 Text of Proposed Order Civil Case Management Plan and Proposed Order).(Passin, Mark) (Entered: 05/24/2022) |
| 06/01/2022 | 29 | ORDER: The Court has reviewed the parties' joint letter and proposed case management plan. ECF No. 28. The Court shall permit 120 days for fact discovery and 45 days for expert discovery. By June 8, 2022, the parties shall submit a revised proposed case management plan. SO ORDERED. (Signed by Judge Analisa Torres on 6/1/2022) (jca) (Entered: 06/01/2022) |
| 06/02/2022 | 30 | WAIVER OF SERVICE RETURNED EXECUTED. Crazy Maple Studio, Inc. waiver sent on 6/2/2022, answer due 8/1/2022. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 06/02/2022) |
| 06/02/2022 | 31 | NOTICE OF APPEARANCE by Jack Shaw on behalf of Crazy Maple Studio, Inc... (Shaw, Jack) (Entered: 06/02/2022) |
| 06/03/2022 | 32 | NOTICE OF APPEARANCE by Eric Plourde on behalf of Crazy Maple Studio, Inc... (Plourde, Eric) (Entered: 06/03/2022) |
| 06/08/2022 | 33 | JOINT LETTER addressed to Judge Analisa Torres from Nancy E. Wolff dated June 8, 2022 re: Civil Case Management Plan and Scheduling Order. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Macmillan Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Text of Proposed Order Proposed Civil Case Management Plan).(Wolff, Nancy) (Entered: 06/08/2022) |
| 06/08/2022 | 34 | NOTICE OF APPEARANCE by CeCe Cole on behalf of Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC.. (Cole, CeCe) (Entered: 06/08/2022) |
| 06/08/2022 | 35 | NOTICE OF APPEARANCE by Lacy Herman Koonce, III on behalf of Emily Sylvan Kim, Prospect Agency, LLC..(Koonce, Lacy) (Entered: 06/08/2022) |
| 06/08/2022 | 36 | NOTICE OF APPEARANCE by Zachary M. Press on behalf of Emily Sylvan Kim, Prospect Agency, LLC..(Press, Zachary) (Entered: 06/08/2022) |
| 06/10/2022 | 37 | CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER: All parties do not consent to conducting all further proceedings before a magistrate judge, including motions and trial. 28 U.S.C. § 636(c). This case is to be tried to a jury. Deposition due by 10/25/2022. Fact Discovery due by 10/25/2022. Expert Discovery due by 12/9/2022. Case Management Conference set for 11/15/2022 at 10:00 AM before Judge Analisa Torres. Counsel for the parties have conferred and their present best estimate of the length of trial is: 7 days. SO ORDERED. (Signed by Judge Analisa Torres on 6/10/2022) (ks) (Entered: 06/10/2022) |
| 06/27/2022 | 38 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Entangled Publishing, LLC..(Wolff, Nancy) (Entered: 06/27/2022) |

| | | |
|---|---|---|
| 06/27/2022 | 39 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Macmillan Holdings, LLC for Holtzbrinck Publishers, LLC. Document filed by Holtzbrinck Publishers, LLC..(Wolff, Nancy) (Entered: 06/27/2022) |
| 06/27/2022 | 40 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Comcast Corporation for Universal City Studios, LLC. Document filed by Universal City Studios, LLC..(Wolff, Nancy) (Entered: 06/27/2022) |
| 06/27/2022 | 41 | ANSWER to 24 Amended Complaint, with JURY DEMAND. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 06/27/2022) |
| 06/27/2022 | 42 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Prospect Agency, LLC..(Koonce, Lacy) (Entered: 06/27/2022) |
| 06/27/2022 | 43 | ANSWER to 24 Amended Complaint,. Document filed by Emily Sylvan Kim, Prospect Agency, LLC..(Koonce, Lacy) (Entered: 06/27/2022) |
| 07/08/2022 | 44 | JOINT LETTER MOTION for Conference *Re Stipulated Protective Order* addressed to Judge Analisa Torres from Mark D. Passin, Paul V. LiCalsi dated July 8, 2022. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit Ex A - Protective Order (Redlined), # 2 Exhibit Ex B - Protective Order (Signed by Defs)).(Passin, Mark) (Entered: 07/08/2022) |
| 07/11/2022 | 45 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for General Pretrial (includes scheduling, discovery, non-dispositive pretrial motions, and settlement). Referred to Magistrate Judge Sarah Netburn. SO ORDERED. Motions referred to Sarah Netburn. (Signed by Judge Analisa Torres on 7/11/2022) (jca) (Entered: 07/11/2022) |
| 07/12/2022 | 46 | JOINT LETTER MOTION for Conference *Re Stipulated Protective Order* addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, Paul V. LiCalsi dated July 12, 2022. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit Ex A - Protective Order (Redlined), # 2 Exhibit Ex B -Protective Order (Signed by Defs)).(Passin, Mark) (Entered: 07/12/2022) |
| 07/13/2022 | 47 | ORDER granting 46 Letter Motion for Conference. A call is scheduled for Wednesday, July 20, 2022, at 4:00 p.m. to discuss the dispute regarding the parties' proposed protective orders. ECF No. 44. At that time the parties should dial into the Court's dedicated teleconferencing line at (877) 402-9757 and enter Access Code 7938632, followed by the pound (#) key. If this date is unavailable for any party, they must contact Courtroom Deputy Rachel Slusher immediately at (212) 805-0286. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 07/13/2022) |
| 07/13/2022 | | Set/Reset Hearings: Telephone Conference set for 7/20/2022 at 04:00 PM before Magistrate Judge Sarah Netburn. (ras) (Entered: 07/14/2022) |
| 07/20/2022 | 48 | ORDER: On Wednesday, July 20, 2022, a conference was held to discuss the dispute regarding the parties' proposed protective orders. ECF No. 47. Defendants' motion for an "Attorney's Eyes Only" provision is DENIED unless agreement is reached as discussed at the conference. The parties are ORDERED to meet and confer and propose a joint protective order for the Court's approval by Monday, July 25, 2022. The parties are directed to contact Courtroom Deputy Rachel Slusher by email at Rachel_Slusher@nysd.uscourts.gov to schedule a settlement conference if it would be productive at this time. Due to the Court's busy calendar, settlement conferences must generally be scheduled at least four to six weeks in advance. The Court will likely be unable to accommodate last-minute requests for settlement conferences, and the parties should not anticipate that litigation deadlines will be adjourned in response to late |

| | | |
|---|---|---|
| | | requests for settlement conferences. (Signed by Magistrate Judge Sarah Netburn on 7/20/2022) (ras) (Entered: 07/20/2022) |
| 07/25/2022 | 49 | PROPOSED PROTECTIVE ORDER. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC.. (Wolff, Nancy) (Entered: 07/25/2022) |
| 07/26/2022 | 50 | STIPULATED PROTECTIVE ORDER...regarding procedures to be followed that shall govern the handling of confidential material...(See document.) SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 7/26/2022) (ras) (Entered: 07/26/2022) |
| 07/28/2022 | 51 | PROPOSED STIPULATION AND ORDER. Document filed by Crazy Maple Studio, Inc...(Plourde, Eric) (Entered: 07/28/2022) |
| 07/29/2022 | 52 | STIPULATION AND ORDER, IT IS HEREBY STIPULATED AND AGREED, by and between Plaintiff Lynne Freeman ("Plaintiff") and Defendant Crazy Maple Studio, Inc. ("Crazy Maple"), that Crazy Maple's time to answer or move with regard to Plaintiffs First Amended Complaint (ECF No. 24) is hereby extended to August 22, 2022. SO ORDERED. Crazy Maple Studio, Inc. answer due 8/22/2022. (Signed by Judge Analisa Torres on 7/29/2022) (kv) (Entered: 07/29/2022) |
| 08/11/2022 | 53 | LETTER MOTION for Extension of Time *to Respond to Certain Discovery* addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated August 11, 2022. Document filed by Lynne Freeman. (Attachments: # 1 Supplement Enclosure).(Passin, Mark) (Entered: 08/11/2022) |
| 08/12/2022 | 54 | ORDER granting 53 Letter Motion for Extension of Time. Plaintiff shall respond to Defendants' Discovery Requests by August 22, 2022. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 08/12/2022) |
| 08/17/2022 | 55 | PROPOSED STIPULATION AND ORDER. Document filed by Crazy Maple Studio, Inc...(Plourde, Eric) (Entered: 08/17/2022) |
| 08/18/2022 | 56 | STIPULATION AND ORDER:NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and between Plaintiff and Crazy Maple that Crazy Maple's time to answer or move with regard to Plaintiff's First Amended Complaint (ECF No. 24) is hereby extended to September 7, 2022. Crazy Maple Studio, Inc. answer due 9/7/2022. (Signed by Judge Analisa Torres on 8/18/2022) (tro) (Entered: 08/18/2022) |
| 09/06/2022 | 57 | PROPOSED STIPULATION AND ORDER. Document filed by Crazy Maple Studio, Inc...(Plourde, Eric) (Entered: 09/06/2022) |
| 09/07/2022 | 58 | STIPULATION OF DISMISSAL AND ORDER THEREON: NOW, THEREFORE, subject to the Court ordering this Stipulation, in consideration of the mutual promises set forth herein, the sufficiency of which are hereby acknowledged, the Parties hereby agree as follows: 1. Freeman hereby dismisses the claims in the Action alleged against Crazy Maple Studio, and Crazy Maple Studio only, without prejudice. SO ORDERED. The Clerk of Court is directed to terminate Crazy Maple Studio, Inc. as a Defendant in this action. (And as further set forth herein.) Crazy Maple Studio, Inc. (a California Corporation) terminated. (Signed by Judge Analisa Torres on 9/7/2022) (jca) (Entered: 09/07/2022) |
| 09/07/2022 | 59 | LETTER MOTION for Conference *Re Discovery* addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated September 7, 2022. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit Ex A - 22.07.07 - Prospect-Klaris Law RFP Resp, # 2 Exhibit Ex B - Search Term List, # 3 Exhibit Ex C, # 4 Exhibit Ex D - Prospect Acy |

| | | |
|---|---|---|
| | | Domain Redacted, # 5 Exhibit Ex E -22.07.15 Prospect-Klaris Law ROG1 Resp).(Passin, Mark) (Entered: 09/07/2022) |
| 09/08/2022 | 60 | LETTER MOTION for Conference *Re Discovery* addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated September 8, 2022. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit Ex A - Defs Wolff Entangled Universal Macmillans ROs to Plt 2nd Amd RFPs, # 2 Exhibit Ex B - Wolffs Resp to Plt ROGS, # 3 Exhibit Ex C - Entangleds Resp to Plt ROGS, # 4 Exhibit Ex D - Macmillans Resp to Plt ROGS).(Passin, Mark) (Entered: 09/08/2022) |
| 09/09/2022 | 61 | ORDER granting 59 LETTER MOTION for Conference *Re Discovery* addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated September 7, 2022., 60 LETTER MOTION for Conference *Re Discovery* addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated September 8, 2022; granting 60 Letter Motion for Conference re: 59 LETTER MOTION for Conference *Re Discovery* addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated September 7, 2022, 60 LETTER MOTION for Conference *Re Discovery* addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated September 8, 2022. On September 7 and September 8, 2022, Plaintiff filed letter motions for a discovery conference. ECF Nos. 59 & 60. Defendants shall respond to the issues raised in both letters no later than September 14, 2022. A conference is scheduled for Thursday, September 15, 2022, at 3:00 p.m. The conference will be held in person in Courtroom 219, Thurgood Marshall Courthouse, 40 Foley Square, New York, New York. The parties are required to comply with the Court's most recent COVID-19 safety guidance, including courtroom and entry protocols. Information about the Court's protocols is available at: https://nysd.uscourts.gov/covid-19-coronavirus. The parties should plan to arrive at least 30 minutes in advance to complete the entry screening process. If this date is unavailable for any party, they must contact Courtroom Deputy Rachel Slusher immediately at (212) 805-0286. The Clerk of Court is respectfully directed to close the gavel at ECF Nos. 59 & 60. SO ORDERED. Status Conference set for 9/15/2022 at 03:00 PM in Courtroom 219, 40 Centre Street, New York, NY 10007 before Magistrate Judge Sarah Netburn. (Signed by Magistrate Judge Sarah Netburn on 9/9/2022) (mml) (Entered: 09/09/2022) |
| 09/09/2022 | | Set/Reset Deadlines: Responses due by 9/14/2022. (mml) (Entered: 09/09/2022) |
| 09/12/2022 | 62 | NOTICE OF APPEARANCE by Benjamin Samuel Halperin on behalf of Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 09/12/2022) |
| 09/13/2022 | 63 | ORDER: In light of Plaintiff's counsel's request to appear by telephone, the conference scheduled for Thursday, September 15, 2022 at 3:00 p.m. will be conducted telephonically rather than in person. At that time the parties should dial into the Court's dedicated teleconferencing line at (877) 402-9757 and enter Access Code 7938632, followed by the pound (#) key. (Telephone Conference set for 9/15/2022 at 03:00 PM before Magistrate Judge Sarah Netburn.) (Signed by Magistrate Judge Sarah Netburn on 9/13/2022) (ras) (Entered: 09/13/2022) |
| 09/14/2022 | 64 | NOTICE OF APPEARANCE by Brett Van Benthysen on behalf of Lynne Freeman..(Van Benthysen, Brett) (Entered: 09/14/2022) |
| 09/14/2022 | 65 | LETTER RESPONSE to Motion addressed to Magistrate Judge Sarah Netburn from Lacy H. Koonce, III dated 9/14/2022 re: 59 LETTER MOTION for Conference *Re Discovery* addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated September 7, 2022. . Document filed by Emily Sylvan Kim, Prospect Agency, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Koonce, Lacy) (Entered: 09/14/2022) |

| | | |
|---|---|---|
| 09/14/2022 | 66 | LETTER RESPONSE to Motion addressed to Magistrate Judge Sarah Netburn from Nancy E. Wolff dated September 14, 2022 re: 60 LETTER MOTION for Conference *Re Discovery* addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated September 8, 2022. . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 09/14/2022) |
| 09/15/2022 | | Minute Entry for proceedings held before Magistrate Judge Sarah Netburn: Telephone Conference held on 9/15/2022. (ras) (Entered: 10/05/2022) |
| 09/16/2022 | 67 | ORDER: By September 30, 2022, Plaintiff's counsel shall advise Defendants how he is conducting the search for responsive documents. Defendants shall propose search terms to Plaintiff's counsel as soon as possible. The deadline for the substantial completion of document discovery is October 14, 2022. In addition, by October 14, 2022, Plaintiff must identify with specificity which manuscripts were infringed and provide metadata to Defendants. The parties shall file a joint letter on the status of discovery by no later than October 21, 2022. Fact discovery shall close on December 31, 2022. Disclosure of expert evidence as required by Rule 26(a)(2)(A), (B) or (C), including the identities and reports of experts, if any, shall be made by Monday, January 30, 2023. The disclosure of expert evidence intended by a party solely to contradict or rebut expert evidence on the same subject matter disclosed by the opposing party shall be made by Monday, February 20, 2023. All expert discovery shall be completed by Monday, March 20, 2023. Any party that wishes to file a motion for summary judgment shall file a pre-motion letter with the Hon. Analisa Torres by no later than April 3, 2023. (Signed by Magistrate Judge Sarah Netburn on 9/16/2022) (ras) (Entered: 09/16/2022) |
| 09/19/2022 | 68 | ORDER re: 67 Order. Accordingly, the case management conference scheduled for November 15, 2022, is ADJOURNED to January 31, 2023, at 11:40 a.m. Additionally, the parties are reminded that they must file a joint status report not later than one week in advance of the case management conference. See ECF No. 37, paragraph 16. And, pre-motion letters for any motions for summary judgment must be submitted within fourteen days of the close of fact discovery. Id. SO ORDERED. ( Case Management Conference set for 1/31/2023 at 11:40 AM before Judge Analisa Torres.) (Signed by Judge Analisa Torres on 9/19/2022) (kv) (Entered: 09/19/2022) |
| 09/27/2022 | 69 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Dwayne K. Goetzel to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-26739918. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Tracy Deebs-Elkenaney. (Attachments: # 1 Affidavit Dwayne K. Goetzel, # 2 Text of Proposed Order Proposed Order).(Goetzel, Dwayne) Modified on 9/28/2022 (sgz). (Entered: 09/27/2022) |
| 09/28/2022 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 69 MOTION for Dwayne K. Goetzel to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-26739918. Motion and supporting papers to be reviewed by Clerk's Office staff. The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of Texas;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order. (sgz)** (Entered: 09/28/2022) |
| 09/28/2022 | 70 | MOTION for Dwayne K. Goetzel to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Tracy Deebs-Elkenaney. (Attachments: # 1 Affidavit Dwayne K. Goetzel, # 2 Text of Proposed Order Proposed Order).(Goetzel, Dwayne) Modified on 9/29/2022 (aea). (Entered: 09/28/2022) |

| | | |
|---|---|---|
| 09/29/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 70 MOTION for Dwayne K. Goetzel to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (aea)** (Entered: 09/29/2022) |
| 09/29/2022 | 71 | ORDER granting 70 Motion for Dwayne K. Goetzel to Appear Pro Hac Vice. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 09/29/2022) |
| 10/11/2022 | 72 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, Paul V. LiCalsi dated October 11, 2022 re: Extension to Meet Deadline for Completion of Document Production. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 10/11/2022) |
| 10/13/2022 | 73 | MEMO ENDORSEMENT on re: 72 Letter filed by Lynne Freeman. ENDORSEMENT: The deadline for the substantial completion of document discovery is October 21, 2022. The parties shall file a joint letter on the status of discovery by no later than October 28, 2022. (Signed by Magistrate Judge Sarah Netburn on 10/13/2022) (ras) (Entered: 10/13/2022) |
| 10/28/2022 | 74 | JOINT LETTER addressed to Magistrate Judge Sarah Netburn from All Parties dated October 28, 2022 re: Joint Status Report. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC.. (Wolff, Nancy) (Entered: 10/28/2022) |
| 10/31/2022 | 75 | ORDER: On October 28, 2022, the parties filed a joint letter updating the Court on the status of discovery. ECF No. 74. In the letter, the parties indicated that there is ongoing disagreement about whether each party has satisfied the requirements of the October 13, 2022 order and that they plan to meet and confer in the near future. ECF No. 73. The parties are reminded that fact discovery ends December 31, 2022. Any disputes should be raised with the Court in time to meet that deadline. The parties are reminded that if they wish to schedule a settlement conference, they should contact Rachel Slusher at Rachel_slusher@nysd.uscourts.gov. In light of the Court's calendar, settlement conferences are typically scheduled six to eight weeks from when they are requested. (Signed by Magistrate Judge Sarah Netburn on 10/31/2022) (ras) (Entered: 10/31/2022) |
| 11/07/2022 | | NOTICE OF CASE REASSIGNMENT to Judge Louis L. Stanton. Judge Analisa Torres is no longer assigned to the case. (aea) (Entered: 11/07/2022) |
| 11/18/2022 | 76 | TRANSCRIPT of Proceedings re: CONFERENCE held on 9/15/2022 before Magistrate Judge Sarah Netburn. Court Reporter/Transcriber: Carole Ludwig, (212) 420-0771. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/9/2022. Redacted Transcript Deadline set for 12/19/2022. Release of Transcript Restriction set for 2/16/2023..(js) (Entered: 11/18/2022) |
| 11/18/2022 | 77 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 9/15/2022 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(js) (Entered: 11/18/2022) |
| 12/05/2022 | 78 | LETTER MOTION for Conference *re discovery dispute on behalf of all Defendants in response to Plaintiff's December 1 letter email to the Court* addressed to Magistrate Judge |

| | | |
|---|---|---|
| | | Sarah Netburn from Nancy E. Wolff dated December 5, 2022. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E).(Wolff, Nancy) (Entered: 12/05/2022) |
| 12/05/2022 | 79 | TRANSCRIPT of Proceedings re: CONFERENCE held on 9/15/2022 before Magistrate Judge Sarah Netburn. Court Reporter/Transcriber: Carole Ludwig, (212) 420-0771. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/27/2022. Redacted Transcript Deadline set for 1/5/2023. Release of Transcript Restriction set for 3/6/2023. (js) (Entered: 12/05/2022) |
| 12/05/2022 | 80 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 9/15/2022 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(js) (Entered: 12/05/2022) |
| 12/07/2022 | 81 | LETTER MOTION for Conference *re discovery dispute on behalf of all Defendants in response to Plaintiff's December 7 letter email to the Court* addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated December 7, 2022. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 12/07/2022) |
| 12/07/2022 | 82 | LETTER MOTION to Seal *ECF Nos. 78 and 78-3* addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated December 7, 2022. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 12/07/2022) |
| 12/07/2022 | 83 | REDACTION to 78 LETTER MOTION for Conference *re discovery dispute on behalf of all Defendants in response to Plaintiff's December 1 letter email to the Court* addressed to Magistrate Judge Sarah Netburn from Nancy E. Wolff dated December 5, 2022. *Redacted version of ECF No. 78* by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC.(Halperin, Benjamin) (Entered: 12/07/2022) |
| 12/07/2022 | 84 | REDACTION to 78 LETTER MOTION for Conference *re discovery dispute on behalf of all Defendants in response to Plaintiff's December 1 letter email to the Court* addressed to Magistrate Judge Sarah Netburn from Nancy E. Wolff dated December 5, 2022. *Redacted version of ECF No. 78-3* by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC.(Halperin, Benjamin) (Entered: 12/07/2022) |
| 12/07/2022 | 85 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark Passin & Paul V. LiCalsi dated December 7, 2022 re: Lynne Freeman v. Tracy Deebs-Elkenaney et. al. 22 Civ 2435 (LLS). Document filed by Lynne Freeman..(Passin, Mark) (Entered: 12/07/2022) |
| 12/07/2022 | 86 | ORDER granting 82 Letter Motion to Seal. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 12/07/2022) |
| 12/08/2022 | 87 | ***SELECTED PARTIES*** LETTER MOTION for Extension of Time to Complete Discovery addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 12/1/2022. Document filed by Lynne Freeman, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, |

| | | |
|---|---|---|
| | | LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit Ex. 1 Wolff Texts, # 2 Exhibit Ex. 2 Kim Texts, # 3 Exhibit Ex. 3 Text List, # 4 Exhibit Ex. 4 Kim Texts)Motion or Order to File Under Seal: 86 .(Passin, Mark) (Entered: 12/08/2022) |
| 12/08/2022 | 88 | LETTER MOTION for Extension of Time to Complete Discovery *Exhibits 1-4 Redacted and Filed Under Seal Pursuant to Doc. 86* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 12/1/2022. Document filed by Lynne Freeman. (Attachments: # 1 Supplement Supplemental Letter Regarding Redactions).(Passin, Mark) (Entered: 12/08/2022) |
| 12/08/2022 | 89 | NOTICE of Errata re: 88 LETTER MOTION for Extension of Time to Complete Discovery *Exhibits 1-4 Redacted and Filed Under Seal Pursuant to Doc. 86* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 12/1/2022., 87 LETTER MOTION for Extension of Time to Complete Discovery addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 12/1/2022.. Document filed by Lynne Freeman.. (Passin, Mark) (Entered: 12/08/2022) |
| 12/08/2022 | 90 | ***SELECTED PARTIES***LETTER RESPONSE in Opposition to Motion addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 12/6/2022 re: 78 LETTER MOTION for Conference *re discovery dispute on behalf of all Defendants in response to Plaintiff's December 1 letter email to the Court* addressed to Magistrate Judge Sarah Netburn from Nancy E. Wolff dated December 5, 2022. . Document filed by Lynne Freeman, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit Ex. 1 Doctor's Note, # 2 Exhibit Ex. 2 Excerpted Transcript)Motion or Order to File Under Seal: 86 .(Passin, Mark) (Entered: 12/08/2022) |
| 12/08/2022 | 91 | REDACTION to 90 Response in Opposition to Motion,, *Exhibits 1-2 Redacted and Filed Under Seal Pursuant to Doc. 86* by Lynne Freeman.(Passin, Mark) (Entered: 12/08/2022) |
| 12/08/2022 | 92 | ORDER terminating 78 Letter Motion for Conference *re discovery dispute on behalf of all Defendants in response to Plaintiff's December 1 letter email to the Court* addressed to Magistrate Judge Sarah Netburn from Nancy E. Wolff dated December 5, 2022, 81 LETTER MOTION for Conference *re discovery dispute on behalf of all Defendants in response to Plaintiff's December 7 letter email to the Court* addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated December 7, 2022, 87 LETTER MOTION for Extension of Time to Complete Discovery addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 12/1/2022, 88 LETTER MOTION for Extension of Time to Complete Discovery *Exhibits 1-4 Redacted and Filed Under Seal Pursuant to Doc. 86* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 12/1/2022.The parties have filed numerous letters related to discovery disputes and Plaintiff's request to extend the discovery deadline. Related to these disputes, the parties request a conference; Defendants request that the conference be held in person, whereas Plaintiff requests it be held telephonically. In light of Plaintiff's counsel's residence (California), the crush of work to be conducted in December, and the public health concerns, the Court will conduct its conference remotely. Accordingly, the parties are ORDERED to appear by telephone on Monday, December 12, 2022, at 3:00 p.m., E.S.T. At that time, the parties should call the Court's dedicated teleconferencing line at (877) 402-9757 and enter Access Code 7938632, followed by the pound (#) key. The Court further ORDERS that (1) it will grant a reasonable extension of the discovery deadline, to be discussed at the conference; (2) despite a presumption that Plaintiff should be deposed in the forum district, Plaintiff may be deposed by video technology or in person at an agreed upon location other than the forum (e.g., California or Texas); and (3) depositions of defendants or defendant witnesses shall be deposed remotely or in the state of their residence. All other issues will be addressed at the conference. The Clerk of Court is |

| | | |
|---|---|---|
| | | requested to terminate the motions at ECF Nos. 78, 81, 87 & 88. (Signed by Magistrate Judge Sarah Netburn on 12/8/2022) (ras) (Entered: 12/08/2022) |
| 12/08/2022 | | Set/Reset Hearings: Telephone Conference set for 12/12/2022 at 03:00 PM before Magistrate Judge Sarah Netburn. (ras) (Entered: 12/08/2022) |
| 12/12/2022 | | Minute Entry for proceedings held before Magistrate Judge Sarah Netburn: Telephone Conference held on 12/12/2022. (ras) (Entered: 12/27/2022) |
| 12/13/2022 | 93 | ORDER: It is ORDERED that: By Friday, December 16, 2022, the parties shall file a joint letter indicating whether there has been an agreement on the review of redacted text messages. If not, the Plaintiff is directed to identify ten redacted passages, which the Court will review in camera. By Friday, December 23, 2022, Plaintiff and the Defendants collectively shall each file a five-page letter brief describing, with as much particularity as possible, the alleged infringement and how the parties intend to prove it. By Friday, December 23, 2022, Plaintiff shall submit to Defendants a revised privileged log and produce any documents identified through an electronic search of Plaintiff's computer files. If Plaintiff intends to file a motion for leave to amend, she must first provide Defendants with a draft amended complaint. Thereafter, the parties shall meet and confer to discuss if the Defendants consent to the amended complaint. If Defendants do not consent, Plaintiff is directed to file a motion for leave to amend the complaint. The Court does not set a deadline for this action and discovery is not stayed. The deadline to complete discovery is extended until Wednesday, March 15, 2023. SO ORDERED. ( Discovery due by 3/15/2023.) (Signed by Magistrate Judge Sarah Netburn on 12/13/2022) (va) (Entered: 12/14/2022) |
| 12/14/2022 | 94 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, Paul V. LiCalsi dated December 8, 2022 re: Continuance of Discovery Deadlines. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 12/14/2022) |
| 12/15/2022 | 95 | LETTER MOTION for Extension of Time to Complete Discovery *Response letter to ECF No. 94* addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated December 15, 2022. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 12/15/2022) |
| 12/15/2022 | 96 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, Paul V. LiCalsi dated December 15, 2022 re: Order. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 12/15/2022) |
| 12/16/2022 | 97 | JOINT LETTER addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated December 17, 2022 re: Redactions. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 12/16/2022) |
| 12/17/2022 | 98 | ORDER granting in part and denying in part 95 Letter Motion for Extension of Time to Complete Discovery. The Court modifies its December 13, 2022 Order as follows: the deadline for Plaintiff to produce responsive electronically stored documents, including from Plaintiff's computer, is extended to December 30, 2022; the deadline to file the "infringement letters" is extended to January 4, 2023; and the deadline for Plaintiff to serve a privilege log is extended to January 6, 2023. Plaintiff's request to modify the scope of the infringement letters is denied. With respect to the privilege log's disclosures of names of attorneys and "consultants" with whom Plaintiff communicated, absent a showing of exceptional circumstances, the Court will not require Plaintiff to disclose the identity of an informal consulting expert, so long as such individual qualifies as an expert, rather than a friend or trusted advisor. Absent a showing of exceptional circumstances, Plaintiff is required to disclose the identity of any attorney with whom she communicated. |

| | | |
|---|---|---|
| | | Any other requests for relief are denied. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 12/17/2022) |
| 12/27/2022 | 99 | TRANSCRIPT of Proceedings re: CONFERENCE held on 12/12/2022 before Magistrate Judge Sarah Netburn. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/17/2023. Redacted Transcript Deadline set for 1/27/2023. Release of Transcript Restriction set for 3/27/2023..(McGuirk, Kelly) (Entered: 12/27/2022) |
| 12/27/2022 | 100 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 12/12/2022 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 12/27/2022) |
| 01/04/2023 | 101 | FIRST LETTER MOTION for Extension of Time addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 01.04.23. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 01/04/2023) |
| 01/04/2023 | 102 | LETTER addressed to Magistrate Judge Sarah Netburn from Nancy E. Wolff dated January 4, 2023 re: Letter Brief From All Defendants Pursuant to the Court's December 13, 2022 Order (ECF No. 93). Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 01/04/2023) |
| 01/04/2023 | 103 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, Paul V. LiCalsi dated January 4, 2023 re: Infringement and Proof. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2).(Passin, Mark) (Entered: 01/04/2023) |
| 01/05/2023 | 104 | ORDER granting 101 Letter Motion for Extension of Time. Plaintiff's request for a one-week extension to serve a revised privilege log on Defendants is GRANTED. Plaintiff must serve this log no later than January 13, 2023. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 01/05/2023) |
| 01/11/2023 | 105 | ORDER: Plaintiff is ORDERED to identify two manuscripts to serve as the primary works that establish her copyright claim. Plaintiff must do so by January 20, 2023. (Signed by Magistrate Judge Sarah Netburn on 1/11/2023) (ras) (Entered: 01/11/2023) |
| 01/18/2023 | 106 | TRANSCRIPT of Proceedings re: Telephone Conference held on 7/20/2022 before Magistrate Judge Sarah Netburn. Court Reporter/Transcriber: Carole Ludwig, (212) 420-0771. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/8/2023. Redacted Transcript Deadline set for 2/21/2023. Release of Transcript Restriction set for 4/18/2023. (js) (Entered: 01/18/2023) |

| 01/18/2023 | 107 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TELEPHONE CONFERENCE proceeding held on 7/20/2022 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(js) (Entered: 01/18/2023) |
|---|---|---|
| 01/18/2023 | 108 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark Passin & Paul V. LiCalsi dated 01.18.23 re: Lynne Freeman v. Tracy Deebs-Elkenaney et. al., 22 Civ 2435 (LLS)(NS). Document filed by Lynne Freeman..(Passin, Mark) (Entered: 01/18/2023) |
| 01/18/2023 | 109 | LETTER MOTION to Stay re: 105 Order addressed to Magistrate Judge Sarah Netburn from Mark Passin & Paul V. LiCalsi dated 01.18.23. Document filed by Lynne Freeman.. (Passin, Mark) (Entered: 01/18/2023) |
| 01/20/2023 | 110 | ORDER denying 109 LETTER MOTION to Stay re: 105 Order addressed to Magistrate Judge Sarah Netburn from Mark Passin & Paul V. LiCalsi. Plaintiff's motion for a stay of the January 11, 2023 order pending resolution of his forthcoming objection is DENIED. Plaintiff will not be prejudiced by identifying two primary manuscripts while also seeking leave to identify more. To the extent Plaintiff's objections are sustained, Plaintiff will be able to rely on additional transcripts in the future. (Signed by Magistrate Judge Sarah Netburn on 1/20/2023) (ras) (Entered: 01/20/2023) |
| 01/20/2023 | 111 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, Paul V. LiCalsi dated January 20, 2023 re: January 11, 2023 Order. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 01/20/2023) |
| 01/25/2023 | 112 | BRIEF re: 105 Order *Objection Pursuant to FRCP 72*. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 01/25/2023) |
| 01/25/2023 | 113 | DECLARATION of Mark D. Passin re: 112 Brief . Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1 - January 11, 2023 Order, # 2 Exhibit 2 - Complaint, # 3 Exhibit 3 - July 11, 2022 Order, # 4 Exhibit 4 - December 5, 2022 redacted letter, # 5 Exhibit 5 - December 6, 2022 redacted letter, # 6 Exhibit 6 - Filed Under Seal, # 7 Exhibit 7 - Plaintiff's January 4, 2023 letter, # 8 Exhibit 8 - Defendants' January 4, 2023 letter). (Passin, Mark) (Entered: 01/25/2023) |
| 01/25/2023 | 114 | ***SELECTED PARTIES***NOTICE of Exhibit 6 filed under seal re: 113 Declaration,. Document filed by Lynne Freeman, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC. Motion or Order to File Under Seal: 100 .(Passin, Mark) (Entered: 01/25/2023) |
| 01/27/2023 | 115 | JOINT LETTER MOTION for Extension of Time *to Disclose Expert Evidence as Required by Rule 26(a)(2)(A), (B), or (C), including the identities and reports of experts, if any* addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated January 27, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 01/27/2023) |
| 01/30/2023 | 116 | ORDER granting 115 Letter Motion for Extension of Time. The parties' request to extend the disclosure of expert evidence as required by Rule 26(a)(2)(A), (B) or (C) until April 14, 2023, is GRANTED. The parties shall file a status letter by March 31, 2023, with a proposed schedule for the completion of expert discovery or, if none is contemplated, for motions for summary judgment. The parties are further ORDERED to meet and confer to discuss whether a settlement conference would be productive. If so, the parties shall |

| | | contact Courtroom Deputy Rachel Slusher at rachel_slusher@nysd.uscourts.gov to schedule one. The Court typically schedules settlement conferences for six to eight weeks from the time they are sought, and litigation deadlines will not be adjourned to accommodate late requests. (HEREBY ORDERED by Magistrate Judge Sarah Netburn) (Text Only Order) (Netburn, Sarah) (Entered: 01/30/2023) |
|---|---|---|
| 01/30/2023 | 117 | LETTER MOTION for Extension of Time to Complete Discovery addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, Paul V. LiCalsi dated January 30, 2023. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 01/30/2023) |
| 01/31/2023 | 118 | ORDER denying without prejudice 117 Letter Motion for Extension of Time to Complete Discovery. The current deadline to complete fact discovery is March 15, 2023, which is 45 days away. Plaintiff has not established that she cannot complete discovery under that schedule given the current circumstances. The parties should schedule depositions for March and, if necessary, may seek limited additional time on a more developed record. Any motion to compel discovery should be filed no later than February 17, 2023. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 01/31/2023) |
| 02/08/2023 | 119 | LETTER MOTION to Seal addressed to Judge Louis L. Stanton from Benjamin S. Halperin dated February 8, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 02/08/2023) |
| 02/08/2023 | 120 | OPPOSITION BRIEF *DEFENDANTS RESPONSE TO PLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGE NETBURNS JANUARY 11, 2023 ORDER*. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 02/08/2023) |
| 02/08/2023 | 121 | DECLARATION of BENJAMIN S. HALPERIN re: 120 Opposition Brief, . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A - Book excerpt, # 2 Exhibit B - Filed Under Seal, # 3 Exhibit C - Filed Under Seal, # 4 Exhibit D - Filed Under Seal).(Halperin, Benjamin) (Entered: 02/08/2023) |
| 02/08/2023 | 122 | ***SELECTED PARTIES***NOTICE of Exhibits B to D filed under seal re: 121 Declaration,. Document filed by Universal City Studios, LLC, Tracy Deebs-Elkenaney, Holtzbrinck Publishers, LLC, Entangled Publishing, LLC, Lynne Freeman, Emily Sylvan Kim, Prospect Agency, LLC. (Attachments: # 1 Exhibit B - Book excerpt, # 2 Exhibit C - Email, # 3 Exhibit D - Registration)Motion or Order to File Under Seal: 119 .(Halperin, Benjamin) (Entered: 02/08/2023) |
| 02/13/2023 | 123 | LETTER MOTION for Extension of Time to Complete Discovery addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, Paul V. LiCalsi dated February 13, 2023. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 02/13/2023) |
| 02/13/2023 | 124 | LETTER MOTION for Extension of Time to File *a Discovery Motion* addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, Paul V. LiCalsi dated February 13, 2023. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 02/13/2023) |

| | | |
|---|---|---|
| 02/13/2023 | 125 | ORDER granting 119 Letter Motion to Seal. Plaintiff may, on or before 5pm EST on Monday February 27, 2023, apply for sealing of some or all of Exhibits B, C, and D of Benjamin S. Halperin's Declaration (Dkt. No. 122). All parties are cautioned that designating items as "confidential" in agreed protective orders during discovery does not support their sealing when submitted to a court to affect a judicial result. In order to be sealed (and thus withheld from public view) the items must comply with the standards of Lugosch v. Pyramid Co. of Onondaga, 435 F. 3d 110 (2d Cir. 2006) and its progeny. (Signed by Judge Louis L. Stanton on 2/13/2023) (rro) (Entered: 02/14/2023) |
| 02/14/2023 | 126 | ORDER granting 123 Letter Motion for Extension of Time to Complete Discovery. Plaintiff's request to extend the discovery deadline from March 15, 2023, until March 31, 2023, is GRANTED. The Court understands that this extension is for the purpose of completing the parties' depositions. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 02/14/2023) |
| 02/14/2023 | 127 | ORDER granting 124 Letter Motion for Extension of Time to File. Plaintiff's request to allow the parties to file discovery motions until March 15, 2023, is GRANTED. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 02/14/2023) |
| 02/15/2023 | 128 | MOTION for Protective Order *re Plaintiff's 4th Set of Requests for Production*. Document filed by Emily Sylvan Kim, Prospect Agency, LLC. (Attachments: # 1 Exhibit A). (Koonce, Lacy) (Entered: 02/15/2023) |
| 02/21/2023 | 129 | LETTER RESPONSE in Opposition to Motion addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, Paul V. LiCalsi dated February 21, 2023 re: 128 MOTION for Protective Order *re Plaintiff's 4th Set of Requests for Production*. . Document filed by Lynne Freeman..(Passin, Mark) (Entered: 02/21/2023) |
| 02/22/2023 | 130 | LETTER MOTION to Seal *Letter Motion to Compel* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/22/2023. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 02/22/2023) |
| 02/22/2023 | 131 | ***SELECTED PARTIES*** LETTER MOTION to Compel Defendants to produce *documents and hard drives* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/22/2023. Document filed by Lynne Freeman, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC.Motion or Order to File Under Seal: 130 . (Passin, Mark) (Entered: 02/22/2023) |
| 02/22/2023 | 132 | LETTER MOTION to Compel Defendants to produce *documents and hard drives, Redacted Letter,* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/22/2023. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 02/22/2023) |
| 02/23/2023 | 133 | ORDER granting 130 Letter Motion to Seal. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 02/23/2023) |
| 02/24/2023 | 134 | LETTER MOTION for Extension of Time to File Response/Reply as to 131 LETTER MOTION to Compel Defendants to produce *documents and hard drives* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/22/2023. addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated February 24, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 02/24/2023) |
| 02/24/2023 | 135 | ORDER granting 134 Letter Motion for Extension of Time. Defendants' request for an extension to respond to Plaintiff's motion to compel is GRANTED. Defendants shall file a |

| | | |
|---|---|---|
| | | letter no later than Friday, March 3, 2023. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 02/24/2023) |
| 02/24/2023 | 136 | ORDER granting 128 Motion for Protective Order. Please visit the Court's Website at www.nysd.uscourts.gov for Sealed Records Filing Instructions. Plaintiff has not presented facts that would clearly entitle Plaintiff to punitive damages at trial. Accordingly, the Court balances the need to protect the Prospect Defendants' privacy from invasive disclosures in their favor. Prospect's motion for a protective order is granted at this time. Plaintiff may file a motion to compel at a later stage of the litigation but not before a decision is issued on any summary judgment motion. See Copantitla, 2010 WL 1327921, at *16 (deferring any discovery on punitive damages until after summary judgment). The Clerk of Court is respectfully requested to grant the motion at ECF No. 128. SO ORDERED.. (Signed by Magistrate Judge Sarah Netburn on 2/24/2023) (kv) (Entered: 02/24/2023) |
| 02/27/2023 | 137 | LETTER MOTION to Seal *Items in ECF 122* addressed to Judge Louis L. Stanton from Mark D. Passin, Paul V. LiCalsi dated February 27, 2023. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 02/27/2023) |
| 02/27/2023 | 138 | LETTER MOTION to Seal addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/27/2023. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 02/27/2023) |
| 02/27/2023 | 139 | ***SELECTED PARTIES*** LETTER MOTION for Discovery addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/27/2023. Document filed by Lynne Freeman, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit Wolff Text Messages, # 2 Exhibit Kim Text Messages)Motion or Order to File Under Seal: 138 .(Passin, Mark) (Entered: 02/27/2023) |
| 02/27/2023 | 140 | LETTER MOTION for Discovery *REDACTED* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/27/2023. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit Redacted Text Messages, # 2 Exhibit Redacted Text Messages). (Passin, Mark) (Entered: 02/27/2023) |
| 02/27/2023 | 141 | ORDER: Accordingly, Magistrate Judge Netbum directed plaintiffs production of two of her works which would allow comparisons and determination of whether those listed common items contain some special use or effect, or reveal whether the parties' works contain similarities of plot, theme, dialogue, mood, setting, pace and sequence. Relying on a primary version of the manuscripts allows the fact finder to be able to effectively make those necessary determinations. See Dean v. Cameron, 53 F. Supp. 3d 641, 647 (S.D.N.Y. 2014) ("[A] court must not 'aggregate' a plaintiffs work, but must consider each allegedly infringed work independently."). Magistrate Judge Netburn did not make trial rulings. She did not admit or exclude evidence. Because of the importance of the work in which they appear ("manuscript") as related to the claimed infringing work, she required plaintiff to "identify two manuscripts to serve as the primary works that establish her copyright claim." (Order, p. 4). The Order is commonsense and pragmatic, and neither erroneous nor contrary to law. The selection of the two test examples is not a ruling on the remainder of plaintiff's evidence. Plaintiffs objections are overruled. (Signed by Judge Louis L. Stanton on 2/27/2023) (rro) (Entered: 02/27/2023) |
| 02/28/2023 | 142 | ORDER granting 138 Letter Motion to Seal. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 02/28/2023) |
| 03/02/2023 | 143 | LETTER MOTION to Seal addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated March 2, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan |

| | | |
|---|---|---|
| | | Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit B - Text with redacted portions).(Halperin, Benjamin) (Entered: 03/02/2023) |
| 03/02/2023 | 144 | LETTER RESPONSE to Motion addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated March 2, 2023 re: 139 LETTER MOTION for Discovery addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/27/2023. . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 03/02/2023) |
| 03/02/2023 | 145 | DECLARATION of BENJAMIN S. HALPERIN in Opposition re: 139 LETTER MOTION for Discovery addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/27/2023.. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A - email chain re text messages, # 2 Exhibit B - email chain re deposition scheduling).(Halperin, Benjamin) (Entered: 03/02/2023) |
| 03/03/2023 | 146 | ORDER granting 143 Letter Motion to Seal. Defendants' motion to file under seal is GRANTED. (HEREBY ORDERED by Magistrate Judge Sarah Netburn) (Text Only Order) (ras) (Entered: 03/03/2023) |
| 03/03/2023 | 147 | NOTICE OF APPEARANCE by Scott Alan Burroughs on behalf of Lynne Freeman.. (Burroughs, Scott) (Entered: 03/03/2023) |
| 03/03/2023 | 148 | NOTICE OF APPEARANCE by Laura Maria Zaharia on behalf of Lynne Freeman.. (Zaharia, Laura) (Entered: 03/03/2023) |
| 03/03/2023 | 149 | LETTER RESPONSE in Opposition to Motion addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated March 3, 2023 re: 131 LETTER MOTION to Compel Defendants to produce *documents and hard drives* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/22/2023. . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 03/03/2023) |
| 03/03/2023 | 150 | DECLARATION of Tracy Deebs-Elkenaney p/k/a Tracy Wolff in Opposition re: 131 LETTER MOTION to Compel Defendants to produce *documents and hard drives* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/22/2023.. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 03/03/2023) |
| 03/03/2023 | 151 | DECLARATION of Benjamin Rose in Opposition re: 131 LETTER MOTION to Compel Defendants to produce *documents and hard drives* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/22/2023.. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E). (Halperin, Benjamin) (Entered: 03/03/2023) |
| 03/03/2023 | 152 | DECLARATION of CeCe M. Cole in Opposition re: 131 LETTER MOTION to Compel Defendants to produce *documents and hard drives* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/22/2023.. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A (Filed Under Seal), # 2 Exhibit B (Filed Under Seal), # 3 Exhibit C (Filed Under Seal), # 4 Exhibit D (Filed Under Seal), # 5 Exhibit E (Filed Under Seal), # 6 Exhibit F (Filed Under Seal), # 7 Exhibit G (Filed Under Seal), # 8 Exhibit H (Filed Under Seal)).(Halperin, Benjamin) (Entered: 03/03/2023) |

| | | |
|---|---|---|
| 03/03/2023 | 153 | LETTER MOTION to Seal *Exhibits to the Declaration of CeCe M. Cole* addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated March 3, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 03/03/2023) |
| 03/03/2023 | 154 | ***SELECTED PARTIES***DECLARATION of CeCe M. Cole in Opposition re: 131 LETTER MOTION to Compel Defendants to produce *documents and hard drives* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/22/2023., 153 LETTER MOTION to Seal *Exhibits to the Declaration of CeCe M. Cole* addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated March 3, 2023.. Document filed by Universal City Studios, LLC, Tracy Deebs-Elkenaney, Holtzbrinck Publishers, LLC, Entangled Publishing, LLC, Lynne Freeman, Emily Sylvan Kim, Prospect Agency, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)Motion or Order to File Under Seal: 153 .(Halperin, Benjamin) (Entered: 03/03/2023) |
| 03/06/2023 | 155 | ORDER granting 153 Letter Motion to Seal. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 03/06/2023) |
| 03/06/2023 | 156 | LETTER MOTION for Leave to File Reply with Declarations addressed to Magistrate Judge Sarah Netburn from Laura M. Zaharia dated March 6, 2023. Document filed by Lynne Freeman..(Zaharia, Laura) (Entered: 03/06/2023) |
| 03/06/2023 | 157 | ORDER granting 156 Letter Motion for Leave to File Document. Plaintiff may file any reply submissions by March 10, 2023. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 03/06/2023) |
| 03/06/2023 | 158 | ORDER granting in part and denying in part 137 Letter Motion to Seal. The clerk's office is directed to unseal Exhibits C and D to the Halperin declaration, Dkt. No. 122. SO ORDERED.. (Signed by Judge Louis L. Stanton on 3/6/2023) (kv) (Entered: 03/07/2023) |
| 03/07/2023 | 159 | MOTION for Reconsideration *of ECF Nos. 141 and 105*. Document filed by Lynne Freeman..(Zaharia, Laura) (Entered: 03/07/2023) |
| 03/07/2023 | 160 | MEMORANDUM OF LAW in Support re: 159 MOTION for Reconsideration *of ECF Nos. 141 and 105*. . Document filed by Lynne Freeman..(Zaharia, Laura) (Entered: 03/07/2023) |
| 03/07/2023 | 161 | LETTER MOTION to Compel Emily Sylvan Kim, Prospect Agency, LLC, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC d/b/a Macmillan, and Tracy Deebs-Elkenancy p/k/a Tracy Wolff to produce *certain documents* addressed to Magistrate Judge Sarah Netburn from Laura M. Zaharia dated March 7, 2023. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit Defendants' Discovery Responses, # 2 Exhibit Prospect Responses to Interrogatories, # 3 Exhibit Prospect Responses to Requests for Production, # 4 Exhibit Defendants' Discovery Responses).(Zaharia, Laura) (Entered: 03/07/2023) |
| 03/07/2023 | 162 | LETTER MOTION to Compel Entangled Publishing LLC and Tracy Deebs-Elkenancy p/k/a Tracy Wolff to respond to additional interrogatory addressed to Magistrate Judge Sarah Netburn from Laura M. Zaharia dated March 7, 2023. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit Wolff and Entangled Responses to Plaintiff's Interrogatories, # 2 Exhibit Plaintiff's Interrogatories to Wolff and Entangled).(Zaharia, Laura) (Entered: 03/07/2023) |
| 03/08/2023 | 163 | ORDER terminating 139 Letter Motion for Discovery; terminating 140 Letter Motion for Discovery. The scheduled depositions shall go forward as agreed to and Plaintiff's request for another extension of fact discovery is DENIED. The Defendants are ORDERED to |

| | | |
|---|---|---|
| | | make the AEO platform available through March 31 and shall review their redactions consistent with this order. Only communications that reveal sensitive personal information or concern other works should be redacted. Plaintiff's request to allow Plaintiff and her spouse to review the AEO materials is DENIED. The Clerk of Court is respectfully requested to terminate the motions at ECF Nos. 139 and 140. (Signed by Magistrate Judge Sarah Netburn on 3/8/2023) (ras) (Entered: 03/08/2023) |
| 03/09/2023 | 164 | NOTICE OF APPEARANCE by Scott Jonathan Sholder on behalf of Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Sholder, Scott) (Entered: 03/09/2023) |
| 03/10/2023 | 165 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Stephen M. Doniger to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27455408. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Lynne Freeman. (Attachments: # 1 Affidavit of Stephen M. Doniger, # 2 Exhibit Cert of Good Standing, # 3 Text of Proposed Order Proposed Order).(Doniger, Stephen) Modified on 3/13/2023 (aea). (Entered: 03/10/2023) |
| 03/10/2023 | 166 | LETTER RESPONSE to Motion addressed to Magistrate Judge Sarah Netburn from Lacy H. Koonce, III dated 3/10/2023 re: 162 LETTER MOTION to Compel Entangled Publishing LLC and Tracy Deebs-Elkenancy p/k/a Tracy Wolff to respond to additional interrogatory addressed to Magistrate Judge Sarah Netburn from Laura M. Zaharia dated March 7, 2023., 161 LETTER MOTION to Compel Emily Sylvan Kim, Prospect Agency, LLC, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC d/b/a Macmillan, and Tracy Deebs-Elkenancy p/k/a Tracy Wolff to produce *certain documents* addressed to Magistrate Judge *Netburn*. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC..(Koonce, Lacy) (Entered: 03/10/2023) |
| 03/10/2023 | 167 | REPLY MEMORANDUM OF LAW in Support re: 131 LETTER MOTION to Compel Defendants to produce *documents and hard drives* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/22/2023. . Document filed by Lynne Freeman.. (Zaharia, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | 168 | DECLARATION of Lynne Freeman in Support re: 131 LETTER MOTION to Compel Defendants to produce *documents and hard drives* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/22/2023.. Document filed by Lynne Freeman.. (Zaharia, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | 169 | DECLARATION of Kevin Cohen in Support re: 131 LETTER MOTION to Compel Defendants to produce *documents and hard drives* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/22/2023.. Document filed by Lynne Freeman.. (Zaharia, Laura) (Entered: 03/10/2023) |
| 03/12/2023 | 170 | DECLARATION of Lynne Freeman in Support re: 131 LETTER MOTION to Compel Defendants to produce *documents and hard drives* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated 2/22/2023.. Document filed by Lynne Freeman.. (Zaharia, Laura) (Entered: 03/12/2023) |
| 03/13/2023 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 165 MOTION for Stephen M. Doniger to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27455408. Motion and supporting papers to be reviewed by Clerk's Office staff. The filing is deficient for the following reason(s): Affidavit is not notarized;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order. (aea)** (Entered: 03/13/2023) |

| 03/13/2023 | 171 | MOTION for Stephen M. Doniger to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Lynne Freeman. (Attachments: # 1 Affidavit of Stephen M. Doniger, # 2 Exhibit Cert of Good Standing, # 3 Text of Proposed Order Proposed Order).(Doniger, Stephen) (Entered: 03/13/2023) |
|---|---|---|
| 03/14/2023 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 171 MOTION for Stephen M. Doniger to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (aea)** (Entered: 03/14/2023) |
| 03/14/2023 | 172 | ORDER granting 171 Motion for Stephen M. Doniger to Appear Pro Hac Vice. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 03/14/2023) |
| 03/14/2023 | 173 | LETTER MOTION to Compel Emily Sylvan Kim and Prospect Agency, LLC to produce addressed to Magistrate Judge Sarah Netburn from Stephen M. Doniger dated March 14, 2023. Document filed by Lynne Freeman..(Zaharia, Laura) (Entered: 03/14/2023) |
| 03/15/2023 | 174 | LETTER MOTION to Seal addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated March 15, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 03/15/2023) |
| 03/15/2023 | 175 | LETTER MOTION to Compel LYNNE FREEMAN to PRODUCE CERTAIN COMMUNICATIONS IMPROPERLY WITHHELD AS PRIVILEGED addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated March 15, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 03/15/2023) |
| 03/15/2023 | 176 | ***SELECTED PARTIES***DECLARATION of BENJAMIN S. HALPERIN in Support re: 175 LETTER MOTION to Compel LYNNE FREEMAN to PRODUCE CERTAIN COMMUNICATIONS IMPROPERLY WITHHELD AS PRIVILEGED addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated March 15, 2023.. Document filed by Universal City Studios, LLC, Tracy Deebs-Elkenaney, Holtzbrinck Publishers, LLC, Entangled Publishing, LLC, Lynne Freeman, Emily Sylvan Kim, Prospect Agency, LLC. (Attachments: # 1 Exhibit A - Corrected Privilege log, # 2 Exhibit B - Letter, # 3 Exhibit C - Email, # 4 Exhibit D - Plaintiff's Supplemental Privilege Log, # 5 Exhibit E - Plaintiff's Redaction Log, # 6 Exhibit F - Letter, # 7 Exhibit G - Email)Motion or Order to File Under Seal: 174 .(Halperin, Benjamin) (Entered: 03/15/2023) |
| 03/15/2023 | 177 | DECLARATION of BENJAMIN S. HALPERIN in Support re: 175 LETTER MOTION to Compel LYNNE FREEMAN to PRODUCE CERTAIN COMMUNICATIONS IMPROPERLY WITHHELD AS PRIVILEGED addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated March 15, 2023.. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A - Filed Under Seal, # 2 Exhibit B - Letter, # 3 Exhibit C - Email, # 4 Exhibit D - Filed Under Seal, # 5 Exhibit E - Filed Under Seal, # 6 Exhibit F - Letter, # 7 Exhibit G - Filed Under Seal).(Halperin, Benjamin) (Entered: 03/15/2023) |
| 03/15/2023 | 178 | ORDER denying 161 Letter Motion to Compel; denying 162 Letter Motion to Compel. Plaintiff's motions are DENIED. The Clerk of Court is requested to terminate the motions at ECF Nos. 161 & 162. (Signed by Magistrate Judge Sarah Netburn on 3/15/2023) (ras) (Entered: 03/15/2023) |

| | | |
|---|---|---|
| 03/16/2023 | 179 | ORDER granting 174 Letter Motion to Seal. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 03/16/2023) |
| 03/16/2023 | 180 | ORDER denying 131 Letter Motion to Compel; denying 132 Letter Motion to Compel. Plaintiff's motion is DENIED, and the Court of Clerk is respectfully directed to terminate the motions at ECF Nos. 131 and 132. (Signed by Magistrate Judge Sarah Netburn on 3/16/2023) (ras) (Entered: 03/16/2023) |
| 03/17/2023 | 181 | CLARIFYING MEMO ENDORSEMENT on re: 159 MOTION for Reconsideration *of ECF Nos. 141 and 105.* filed by Lynne Freeman. ENDORSEMENT: Whatever particular process of comparing defendants' books with plaintiff's "combination of creative works" (her motion for clarification, p. 3) is used, its purpose is to reveal and define substantial similarities between the two bodies of work. The process must start somehow. Since the ultimate judgment of "substantial similarity" refers only to protectable matter, a fair place to start the comparison process is defendants' allegedly infringing books against two of the final manuscripts embodying plaintiff's drafts, to allow the parties a preliminary view of the works' similarities of "total concept and feel, theme, character, plot, sequence, pace and setting of the works," without sifting through thirty iterations. Allen v. Scholastic Inc., 739 F. Supp. 2d 642, 655 (S.D. N.Y. 2011). Keep in mind that when comparing the books to the two test manuscripts the goal is only to determine in a preliminary degree "whether a lay observer would consider the works as a whole substantially similar to one another." Williams v. Crichton, 84 F.3d 581, 590 (2d Cir. 1996). All discovery and claims remain available with regard to the other iterations of plaintiff's work. The job is to produce, in an orderly and pragmatic way, a manageable understanding of the relationship between the two bodies of work. Examining their most salient characteristics through two sample iterations of the plaintiff's work is a practical way to start. It supplies a method of organizing some of the evidence. It does not imply or suggest exclusionary rulings. It is not designed to bring the case to a precipitate end; it is designed to increase the understanding of the subject matter. (Signed by Judge Louis L. Stanton on 3/17/2023) (rro) (Entered: 03/17/2023) |
| 03/20/2023 | 182 | LETTER RESPONSE in Opposition to Motion addressed to Magistrate Judge Sarah Netburn from Laura M. Zaharia dated March 20, 2023 re: 175 LETTER MOTION to Compel LYNNE FREEMAN to PRODUCE CERTAIN COMMUNICATIONS IMPROPERLY WITHHELD AS PRIVILEGED addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated March 15, 2023. . Document filed by Lynne Freeman..(Zaharia, Laura) (Entered: 03/20/2023) |
| 03/20/2023 | 183 | DECLARATION of Lynne Freeman in Opposition re: 175 LETTER MOTION to Compel LYNNE FREEMAN to PRODUCE CERTAIN COMMUNICATIONS IMPROPERLY WITHHELD AS PRIVILEGED addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated March 15, 2023.. Document filed by Lynne Freeman.. (Zaharia, Laura) (Entered: 03/20/2023) |
| 03/20/2023 | 184 | LETTER RESPONSE in Opposition to Motion addressed to Magistrate Judge Sarah Netburn from Lacy H. Koonce, III dated 3/20/2023 re: 173 LETTER MOTION to Compel Emily Sylvan Kim and Prospect Agency, LLC to produce addressed to Magistrate Judge Sarah Netburn from Stephen M. Doniger dated March 14, 2023. *and Request for Leave To File Late Response.* Document filed by Emily Sylvan Kim, Prospect Agency, LLC. (Attachments: # 1 Exhibit A - Email from M. Passin dated 1/23/23, # 2 Exhibit B - Email from Z. Press dated 2/23/23).(Koonce, Lacy) (Entered: 03/20/2023) |
| 03/22/2023 | 185 | ORDER denying 173 Letter Motion to Compel. The Court DENIES Plaintiff's motion to compel native formats of Word and Word Perfect documents. Plaintiff may renew her application if she can demonstrate that the metadata load files that she requested and that were produced excluded material evidence. The Clerk of Court is requested to terminate |

| | | |
|---|---|---|
| | | the motion at ECF No. 173. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 3/22/23) (yv) (Entered: 03/22/2023) |
| 03/23/2023 | 186 | ORDER: Defendants move to compel Plaintiff to produce communications they allege have been improperly withheld as privileged. ECF No. 175. Plaintiff opposes this relief. ECF No. 182. Accordingly, a discovery conference to discuss this motion is scheduled for Friday, March 24, 2023, at 11:30 a.m. At that time, the parties should dial into the Court's dedicated teleconferencing line at (877) 402-9757 and enter Access Code 7938632, followed by the pound (#)key. If this date is unavailable for any party, they must contact Courtroom Deputy Rachel Slusher immediately at Rachel_Slusher@nysd.uscourts.gov SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 3/23/2023) ( Telephone Conference set for 3/24/2023 at 11:30 AM before Magistrate Judge Sarah Netburn.) (ks) (Entered: 03/23/2023) |
| 03/24/2023 | 187 | ORDER denying without prejudice 175 Letter Motion to Compel. As discussed on the record today, Defendants' motion is DENIED without prejudice to renewal following Plaintiff's deposition and further review of Plaintiff's privilege log. To the extent Defendants believe judicial intervention is required, they may refile their application challenging those entries that appear material to the claims and defenses in this case. To the extent discovery is targeted only for a possible fee application following a judgment entered in favor of Defendants, the Defendants may seek leave for post-judgment discovery at that time. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 03/24/2023) |
| 03/24/2023 | | Minute Entry for proceedings held before Magistrate Judge Sarah Netburn: Telephone Conference held on 3/24/2023. (ras) (Entered: 04/06/2023) |
| 03/31/2023 | 188 | JOINT LETTER addressed to Magistrate Judge Sarah Netburn from Nancy E. Wolff dated March 31, 2023 re: Orders dated January 30 (ECF No. 116); January 31 (ECF No. 118); February 14 (ECF No. 126); and March 15 (ECF No. 178). Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 03/31/2023) |
| 04/04/2023 | 189 | MEMO ENDORSEMENT on re: 188 Letter, filed by Universal City Studios, LLC, Entangled Publishing, LLC, Tracy Deebs-Elkenaney, Holtzbrinck Publishers, LLC. ENDORSEMENT: SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 4/4/2023) (ras) (Entered: 04/04/2023) |
| 04/07/2023 | 190 | NOTICE of Change of Firm Name. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 04/07/2023) |
| 04/26/2023 | 191 | JOINT LETTER MOTION for Extension of Time addressed to Magistrate Judge Sarah Netburn from Nancy E. Wolff dated April 26, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 04/26/2023) |
| 04/27/2023 | 192 | ORDER granting 191 Letter Motion for Extension of Time. The parties' request to extend expert discovery deadlines is GRANTED. Expert disclosures and opening reports must be made by May 5, 2023. Disclosure of any expert rebuttal experts must be made by May 19, 2023. (HEREBY ORDERED by Magistrate Judge Sarah Netburn) (Text Only Order) (ras) (Entered: 04/27/2023) |
| 05/01/2023 | 193 | LETTER MOTION to Stay / *Letter Motion to Enjoin Duplicative Lawsuit* addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated May 1, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 05/01/2023) |

| | | |
|---|---|---|
| 05/01/2023 | 194 | DECLARATION of Benjamin S. Halperin in Support re: 193 LETTER MOTION to Stay / *Letter Motion to Enjoin Duplicative Lawsuit* addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated May 1, 2023.. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E).(Halperin, Benjamin) (Entered: 05/01/2023) |
| 05/02/2023 | 195 | LETTER MOTION for Leave to File Reply Brief addressed to Magistrate Judge Sarah Netburn from Stephen M. Doniger dated May 2, 2023. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 05/02/2023) |
| 05/02/2023 | 196 | LETTER addressed to Magistrate Judge Sarah Netburn from Stephen M. Doniger dated May 2, 2023 re: Response to Defendants Letter Motion to Stay. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 05/02/2023) |
| 05/03/2023 | 197 | LETTER MOTION for Leave to File Reply Letter In Further Support of Defendants' Letter Motion at ECF No. 193 addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated May 3, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC.. (Halperin, Benjamin) (Entered: 05/03/2023) |
| 05/03/2023 | 198 | LETTER addressed to Magistrate Judge Sarah Netburn from Stephen M. Doniger dated May 3, 2023 re: Extension of Opening & Rebuttal Expert Disclosures. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 05/03/2023) |
| 05/04/2023 | 199 | ORDER granting 197 Letter Motion for Leave to File Document. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 05/04/2023) |
| 05/05/2023 | 200 | MEMO ENDORSEMENT on re: 198 Letter filed by Lynne Freeman. ENDORSEMENT: SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 5/5/2023) (ras) (Entered: 05/05/2023) |
| 05/08/2023 | 201 | REPLY MEMORANDUM OF LAW in Support re: 193 LETTER MOTION to Stay / *Letter Motion to Enjoin Duplicative Lawsuit* addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated May 1, 2023. . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 05/08/2023) |
| 05/12/2023 | 202 | ORDER terminating 193 Letter Motion to Stay; terminating 195 Letter Motion for Leave to File Document. By May 16, 2023, Plaintiff is directed to file a motion to stay the California Action. Plaintiff is further directed to meet and confer with the Retail Defendants to seek their consent. The Clerk of Court is requested to terminate the motions at ECF Nos. 193 & 195. (Signed by Magistrate Judge Sarah Netburn on 5/12/2023) (ras) (Entered: 05/12/2023) |
| 05/19/2023 | 203 | PROPOSED STIPULATION AND ORDER. Document filed by Lynne Freeman..(Van Benthysen, Brett) (Entered: 05/19/2023) |
| 05/22/2023 | 204 | LETTER MOTION to Seal addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated May 22, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 05/22/2023) |
| 05/22/2023 | 205 | ***SELECTED PARTIES*** LETTER MOTION for Conference addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated May 22, 2023. Document filed by Universal City Studios, LLC, Tracy Deebs-Elkenaney, Holtzbrinck Publishers, LLC, Entangled Publishing, LLC, Lynne Freeman, Emily Sylvan Kim, |

| | | |
|---|---|---|
| | | Prospect Agency, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)Motion or Order to File Under Seal: 204 .(Halperin, Benjamin) (Entered: 05/22/2023) |
| 05/22/2023 | 206 | LETTER MOTION for Conference re: 205 LETTER MOTION for Conference addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated May 22, 2023. addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated May 22, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H).(Halperin, Benjamin) (Entered: 05/22/2023) |
| 05/22/2023 | 207 | STIPULATION AND ORDER TO WITHDRAW AS COUNSEL TO PLAINTIFF: Upon the stipulation of undersigned counsel for Plaintiff Lynne Freeman ("Plaintiff"), Plaintiff, and the above-named Defendants, the law firm of Reitler Kailas & Rosenblatt LLP ("RKR") shall no longer represent Plaintiff and shall have no further responsibility for Plaintiff in this action. The law firms of Reeder McCreary and Doniger/Burroughs will continue to represent Plaintiff in this action. No further pleadings, correspondence or other documents are required to be filed or served in this action on RKR. (Attorney Paul V. LiCalsi and Brett Van Benthysen terminated.) (Signed by Magistrate Judge Sarah Netburn on 5/22/2023) (ras) (Entered: 05/22/2023) |
| 05/23/2023 | 208 | ORDER granting 204 Letter Motion to Seal. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 05/23/2023) |
| 05/23/2023 | 209 | LETTER addressed to Magistrate Judge Sarah Netburn from Stephen M. Doniger dated May 23, 2023 re: Objection to Defendants Request for Conference. Document filed by Lynne Freeman..(Burroughs, Scott) (Entered: 05/23/2023) |
| 05/25/2023 | 210 | ORDER granting 205 Letter Motion for Conference. Having reviewed the parties' letters, the Court believes that a conference to discuss these issues would be productive. Accordingly, the parties are ORDERED to appear on Friday, June 2, 2023, at 11:30 a.m., in Courtroom 219, Thurgood Marshall Courthouse, New York, New York. At this conference, the Court intends to discuss whether the goals of a "just, speedy, and inexpensive determination" of this case would be advanced by staying all expert discovery other than as related to the issue of substantial similarity, and then to schedule summary judgment briefing on the copyright claim. All deadlines are stayed pending further order of the Court. (HEREBY ORDERED by Magistrate Judge Sarah Netburn) (Text Only Order) (Netburn, Sarah) (Entered: 05/25/2023) |
| 05/25/2023 | 211 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, Stephen Doniger dated May 25, 2023 re: Telephonic Appearance, Dkt 210. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 05/25/2023) |
| 05/25/2023 | | Set/Reset Hearings: Status Conference set for 6/2/2023 at 11:30 AM in Courtroom 219, 40 Centre Street, New York, NY 10007 before Magistrate Judge Sarah Netburn. (ras) (Entered: 05/30/2023) |
| 05/26/2023 | 212 | LETTER addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated May 26, 2023 re: Telephonic Appearance, Dkt 210; Plaintiff's Letter, Dkt 211. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 05/26/2023) |
| 05/26/2023 | 213 | MEMO ENDORSEMENT on re: 211 Letter filed by Lynne Freeman. ENDORSEMENT: Plaintiff's request to appear at the June 2, 2023 conference by telephone is GRANTED. The Court will provide dial-in information in advance of the conference. All other parties shall appear in person. The Court notes that a New York attorney has appeared in this case on behalf of Plaintiff. If feasible, the Court believes it would be productive for an attorney |

| | | |
|---|---|---|
| | | to appear in person at this conference on Plaintiff's behalf. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 5/26/2023) (mml) (Entered: 05/26/2023) |
| 05/26/2023 | 214 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, Stephen Doniger dated May 26, 2023 re: Reconsideration of Dkt 210. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 05/26/2023) |
| 05/30/2023 | 215 | LETTER addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated May 30, 2023 re: Request to bring Personal Electronic Devices. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A - Personal Electronic Devices).(Halperin, Benjamin) (Entered: 05/30/2023) |
| 06/02/2023 | | Minute Entry for proceedings held before Magistrate Judge Sarah Netburn: Status Conference held on 6/2/2023. (ras) (Entered: 07/07/2023) |
| 06/07/2023 | 216 | LETTER addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated June 7, 2023 re: Post Conference Update Letter. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 06/07/2023) |
| 06/08/2023 | 217 | LETTER MOTION for Leave to File Response Letter addressed to Magistrate Judge Sarah Netburn from Stephen M. Doniger dated June 7, 2023. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 06/08/2023) |
| 06/14/2023 | 218 | **Vacated as per Judge's Order dated 7/19/2023, Doc. #253** ORDER: In light of defendants' request to streamline this litigation (Dkt. No. 205), the Court orders, pursuant to Federal Rule of Civil Procedure Rule 42(b), a separate jury trial on whetherthe Crave series and plaintiffs manuscripts are substantially similar. The parties may have a reasonable time to complete their discovery with respect to that single issue, and I solicit their views, before June 28, 2023, on how long that should take. On all other procedures, counsel isdirected to Section 4 of my individual practices. (Signed by Judge Louis L. Stanton on 6/14/2023) (rro) Modified on 7/19/2023 (rro). (Entered: 06/14/2023) |
| 06/16/2023 | 219 | LETTER MOTION to Seal addressed to Judge Louis L. Stanton from Benjamin S. Halperin dated June 16, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 06/16/2023) |
| 06/16/2023 | 220 | ***SELECTED PARTIES*** LETTER MOTION for Conference re: 219 LETTER MOTION to Seal addressed to Judge Louis L. Stanton from Benjamin S. Halperin dated June 16, 2023., 218 Order,, *Premotion Conference Letter in Response to ECF No. 218* addressed to Judge Louis L. Stanton from Benjamin S. Halperin dated June 16, 2023. Document filed by Universal City Studios, LLC, Tracy Deebs-Elkenaney, Holtzbrinck Publishers, LLC, Entangled Publishing, LLC, Lynne Freeman, Emily Sylvan Kim, Prospect Agency, LLC. (Attachments: # 1 Exhibit A-1, # 2 Exhibit A-2, # 3 Exhibit A-2, # 4 Exhibit A-4, # 5 Exhibit A-5, # 6 Exhibit B-1, # 7 Exhibit B-2, # 8 Exhibit B-3, # 9 Exhibit B-4)Motion or Order to File Under Seal: 219 .(Halperin, Benjamin) (Entered: 06/16/2023) |
| 06/16/2023 | 221 | LETTER MOTION for Conference re: 219 LETTER MOTION to Seal addressed to Judge Louis L. Stanton from Benjamin S. Halperin dated June 16, 2023., 218 Order,, *Premotion Conference Letter in Response to ECF No. 218* addressed to Judge Louis L. Stanton from Benjamin S. Halperin dated June 16, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B-1, # 3 Exhibit B-2, # 4 Exhibit B-3, # 5 Exhibit B-4).(Halperin, Benjamin) (Entered: 06/16/2023) |

| | | |
|---|---|---|
| 06/20/2023 | 222 | TRANSCRIPT of Proceedings re: CONFERNECE held on 6/2/2023 before Magistrate Judge Sarah Netburn. Court Reporter/Transcriber: Kristen Carannante, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/11/2023. Redacted Transcript Deadline set for 7/21/2023. Release of Transcript Restriction set for 9/18/2023..(McGuirk, Kelly) (Entered: 06/20/2023) |
| 06/20/2023 | 223 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 6/2/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 06/20/2023) |
| 06/20/2023 | 224 | MOTION for Reconsideration re; 218 Order,, . Document filed by Lynne Freeman. (Attachments: # 1 Text of Proposed Order Proposed Order).(Doniger, Stephen) (Entered: 06/20/2023) |
| 06/20/2023 | 225 | MEMORANDUM OF LAW in Support re: 224 MOTION for Reconsideration re; 218 Order,, . . Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 06/20/2023) |
| 06/20/2023 | 226 | DECLARATION of Lynne Freeman in Support re: 224 MOTION for Reconsideration re; 218 Order,, .. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 06/20/2023) |
| 06/20/2023 | 227 | DECLARATION of Stephen M. Doniger in Support re: 224 MOTION for Reconsideration re; 218 Order,, .. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1 - Reiss Report, # 2 Exhibit 2 - Juola Report, # 3 Exhibit 3 - Chaski Report (Redacted)).(Doniger, Stephen) (Entered: 06/20/2023) |
| 06/20/2023 | 228 | LETTER MOTION to Seal *(Exhibit 3 to Doniger DL)* addressed to Judge Louis L. Stanton from Stephen M. Doniger dated June 20, 2023. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 3 - Chaski Report (Redacted)).(Doniger, Stephen) (Entered: 06/20/2023) |
| 06/20/2023 | 229 | ***SELECTED PARTIES*** LETTER addressed to Judge Louis L. Stanton from Stephen M. Doniger dated June 20, 2023 re: Motion to Seal. Document filed by Universal City Studios, LLC, Emily Sylvan Kim, Tracy Deebs-Elkenaney, Holtzbrinck Publishers, LLC, Prospect Agency, LLC, Entangled Publishing, LLC, Lynne Freeman. (Attachments: # 1 Exhibit 3 - Chaski Report (Unredacted))Motion or Order to File Under Seal: 228 . (Doniger, Stephen) (Entered: 06/20/2023) |
| 06/20/2023 | 230 | LETTER MOTION for Conference *re Plaintiff's Contemplated Motion for Summary Judgment* addressed to Judge Louis L. Stanton from Stephen M. Doniger dated June 20, 2023. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 06/20/2023) |
| 06/20/2023 | 231 | LETTER MOTION for Conference *re Plaintiff's Contemplated Motion for Summary Judgment (Corrected with Exhibits 2-3)* addressed to Judge Louis L. Stanton from Stephen M. Doniger dated June 20, 2023. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 2 - Juola Report, # 2 Exhibit 3 - Chaski Report (redacted)). (Doniger, Stephen) (Entered: 06/20/2023) |

| 06/20/2023 | 232 | LETTER MOTION to Seal *Letter to Judge Stanton* addressed to Judge Louis L. Stanton from Mark D. Passin, Stephen Doniger dated June 20, 2023. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit Ex 1 - Redacted Letter to Judge Stanton).(Passin, Mark) (Entered: 06/20/2023) |
|---|---|---|
| 06/20/2023 | 233 | ***SELECTED PARTIES*** LETTER addressed to Judge Louis L. Stanton from Mark D. Passin, Stephen Doniger dated June 20, 2023 re: Objection to Defendants' request to MSJ before Expert Discovery is Completed. Document filed by Lynne Freeman.Motion or Order to File Under Seal: 232 .(Passin, Mark) (Entered: 06/20/2023) |
| 06/22/2023 | 234 | LETTER addressed to Judge Louis L. Stanton from Stephen M. Doniger dated June 22, 2023 re: In Support of Defendants' Letter Motion to Seal 219 . Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 06/22/2023) |
| 06/23/2023 | 235 | LETTER MOTION to Seal addressed to Judge Louis L. Stanton from Benjamin S. Halperin dated June 23, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 06/23/2023) |
| 06/23/2023 | 236 | ***SELECTED PARTIES***LETTER RESPONSE to Motion addressed to Judge Louis L. Stanton from Benjamin S. Halperin dated June 23, 2023 re: 231 LETTER MOTION for Conference *re Plaintiff's Contemplated Motion for Summary Judgment (Corrected with Exhibits 2-3)* addressed to Judge Louis L. Stanton from Stephen M. Doniger dated June 20, 2023. *and* 233 *LETTER addressed to Judge Louis L. Stanton from Mark D. Passin, Stephen Doniger dated June 20, 2023 re: Objection to Defendants' request to MSJ before Expert Discovery is Completed*. Document filed by Universal City Studios, LLC, Tracy Deebs-Elkenaney, Holtzbrinck Publishers, LLC, Entangled Publishing, LLC, Lynne Freeman, Emily Sylvan Kim, Prospect Agency, LLC. (Attachments: # 1 Exhibit A-1, # 2 Exhibit A-2, # 3 Exhibit A-3, # 4 Exhibit A-4, # 5 Exhibit B)Motion or Order to File Under Seal: 235 .(Halperin, Benjamin) (Entered: 06/23/2023) |
| 06/23/2023 | 237 | LETTER RESPONSE to Motion addressed to Judge Louis L. Stanton from Benjamin S. Halperin dated June 23, 2023 re: 231 LETTER MOTION for Conference *re Plaintiff's Contemplated Motion for Summary Judgment (Corrected with Exhibits 2-3)* addressed to Judge Louis L. Stanton from Stephen M. Doniger dated June 20, 2023. *and* 233 *LETTER addressed to Judge Louis L. Stanton from Mark D. Passin, Stephen Doniger dated June 20, 2023 re: Objection to Defendants' request to MSJ before Expert Discovery is Completed*. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Macmillan Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A (Filed Under Seal), # 2 Exhibit B).(Halperin, Benjamin) (Entered: 06/23/2023) |
| 06/26/2023 | 238 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, Stephen Doniger dated June 26, 2023 re: Recusal. Document filed by Lynne Freeman. (Attachments: # 1 Supplement Declaration of Lynne Freeman, # 2 Exhibit Exhibit 1, # 3 Exhibit Exhibit 2).(Passin, Mark) (Entered: 06/26/2023) |
| 06/27/2023 | 239 | LETTER addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated June 27, 2023 re: 238 Plaintiff's June 26, 2023, Recusal letter. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 06/27/2023) |
| 06/27/2023 | 240 | LETTER addressed to Judge Louis L. Stanton from Stephen M. Doniger dated June 27, 2023 re: Opposition to Defendants' Letter Requesting the Unsealing of Plaintiff's Unpublished Manuscripts. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 06/27/2023) |

| 06/28/2023 | 241 | LETTER addressed to Judge Louis L. Stanton from Benjamin S. Halperin dated June 28, 2023 re: 240 Plaintiffs July 27, 2023 letter regarding sealing. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 06/28/2023) |
|---|---|---|
| 06/29/2023 | 242 | OPINION & ORDER: Thus, I have not recused myself and will not. Judge Stanton's referral for general pretrial matters remains. See ECF No. 45. Because this referral does not include dispositive motions or trial, Judge Stanton issued his June 14, 2023 Order in response to Defendants' request to expedite a ruling on whether Plaintiff's works establish a substantial similarity with the Crave book series. Accordingly, all pretrial matters remain under my mandate. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 6/29/2023) (mml) (Entered: 06/29/2023) |
| 07/05/2023 | 243 | LETTER MOTION to Seal addressed to Judge Louis L. Stanton from Benjamin S. Halperin dated July 5, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 07/05/2023) |
| 07/05/2023 | 244 | ***SELECTED PARTIES*** MEMORANDUM OF LAW in Opposition re: 224 MOTION for Reconsideration re; 218 Order,, . . Document filed by Universal City Studios, LLC, Tracy Deebs-Elkenaney, Holtzbrinck Publishers, LLC, Entangled Publishing, LLC, Lynne Freeman, Emily Sylvan Kim, Prospect Agency, LLC. (Attachments: # 1 Exhibit A - Freeman Deposition Excerpts, # 2 Exhibit B - Baer Deposition Excerpts)Motion or Order to File Under Seal: 243 .(Halperin, Benjamin) (Entered: 07/05/2023) |
| 07/05/2023 | 245 | MEMORANDUM OF LAW in Opposition re: 224 MOTION for Reconsideration re; 218 Order,, . . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A - Freeman Deposition Excerpts, # 2 Exhibit B - Baer Deposition Excerpts).(Halperin, Benjamin) (Entered: 07/05/2023) |
| 07/06/2023 | 246 | LETTER MOTION for Extension of Time to File Response/Reply as to 244 Memorandum of Law in Opposition to Motion, addressed to Judge Louis L. Stanton from Mark D. Passin dated July 6, 2023. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 07/06/2023) |
| 07/07/2023 | 247 | LETTER addressed to Judge Louis L. Stanton from Mark D. Passin, Stephen Doniger dated July 7, 2023 re: Defendants' filing, ECF 243. Document filed by Lynne Freeman.. (Passin, Mark) (Entered: 07/07/2023) |
| 07/07/2023 | 248 | ORDER granting 246 Letter Motion for Extension of Time to File Response/Reply re 246 LETTER MOTION for Extension of Time to File Response/Reply as to 244 Memorandum of Law in Opposition to Motion, addressed to Judge Louis L. Stanton from Mark D. Passin dated July 6, 2023. Granted. Replies due by 7/18/2023. (Signed by Judge Louis L. Stanton on 7/7/2023) (rro) (Entered: 07/07/2023) |
| 07/10/2023 | 249 | ORDER granting 219 Letter Motion to Seal; denying 228 Letter Motion to Seal; denying 232 Letter Motion to Seal; granting 235 Letter Motion to Seal; granting in part and denying in part 243 Letter Motion to Seal. The parties have made several motions to seal in connection with their letter motions for a pre-motion conference for a motion for summary judgment on the issue of substantial similarity. The motions to seal are resolved as follow: Defendants' Motion to Seal plaintiff's 2011 manuscripts is granted. Dkt. No. 219. The manuscripts are submitted contemporaneously with defendants' request to seek leave to file a motion for summary judgment, but they are not relevant to whether defendants are procedurally entitled to seek summary judgment, as further set forth. Plaintiff's Motion to Seal Dr. Chaski's expert report is denied. Dkt. No. 228. The report |

| | | |
|---|---|---|
| | | was submitted in support of plaintiff's Motion for Reconsideration of the Court's June 14, 2023 Order, as further set forth. Plaintiff's Motion to Redact a portion of her letter opposing the close of discovery is denied. Dkt. No. 232. The existence of a protective order does not trump the right to public access. Defendants' Motion to Seal plaintiff's 2013 manuscripts is granted. Dkt. No. 235. For the reasons stated above, they are to remain under seal until the filing of the summary judgment motions, at which time the presumption of public access to them will be reassessed. Defendants' Motion to file redacted versions of its Opposition to plaintiff's Motion for Reconsideration and supporting exhibits is granted, in part, and denied, in part. Dkt. No. 243. The documents are judicial documents to which the weight of public access attaches because they were filed to influence the Court's determination of the Motion for Reconsideration, as further set forth. Dkt. Nos. 220 and 236 can remain sealed pending the filing of the parties' Motions for Summary Judgment. The Clerk of Court is directed to unseal Dkt. Nos. 229 and 232. Defendants are directed to unseal references to plaintiff's attorneys ' compensation in Dkt. No. 244 and file an updated version on the docket. So Ordered. (Signed by Judge Louis L. Stanton on 7/7/2023) (mml) (Entered: 07/10/2023) |
| 07/10/2023 | 250 | MEMORANDUM OF LAW in Opposition re: 224 MOTION for Reconsideration re; 218 Order,, . *Refile per Judge Stanton Order 249 dated July 10, 2023*. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A - Freeman Deposition Excerpts, # 2 Exhibit B - Baer Deposition Excerpts).(Halperin, Benjamin) (Entered: 07/10/2023) |
| 07/18/2023 | 251 | REPLY MEMORANDUM OF LAW in Support re: 224 MOTION for Reconsideration re; 218 Order,, . . Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 07/18/2023) |
| 07/18/2023 | 252 | DECLARATION of Lynne Freeman in Support re: 224 MOTION for Reconsideration re; 218 Order,, .. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2).(Doniger, Stephen) (Entered: 07/18/2023) |
| 07/19/2023 | 253 | ORDER: The Order dated June 14, 2023 is vacated and withdrawn. (Signed by Judge Louis L. Stanton on 7/19/2023) (rro) (Entered: 07/19/2023) |
| 07/19/2023 | 254 | AMENDED ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for General Pretrial (includes scheduling, discovery, non-dispositive pretrial motions, and settlement) and Dispositive Motion (i.e., motion requiring a Report and Recommendation) All such motions: as they arise. Referred to Magistrate Judge Sarah Netburn. (Signed by Judge Louis L. Stanton on 7/19/2023) (rro) (Entered: 07/19/2023) |
| 07/20/2023 | 255 | ORDER: A conference is scheduled for Monday, July 24, 2023, at 11:00 a.m. to set remaining pretrial deadlines. At that time the parties should call the Court's dedicated teleconferencing line at (877) 402-9757 and enter Access Code 7938632, followed by the pound (#) key. The parties are ORDERED to meet and confer in advance of the conference with a goal of jointly proposing a schedule. If the parties are able to propose a reasonable schedule, the Court may adjourn the conference. (Signed by Magistrate Judge Sarah Netburn on 7/30/2023) (ras) (Entered: 07/20/2023) |
| 07/20/2023 | | Set/Reset Hearings: Scheduling Conference set for 7/24/2023 at 11:00 AM before Magistrate Judge Sarah Netburn. (ras) (Entered: 07/20/2023) |
| 07/20/2023 | 256 | MEMO ENDORSEMENT granting 224 Motion for Reconsideration re 224 MOTION for Reconsideration re; 218 Order . filed by Lynne Freeman. ENDORSEMENT: Granted. (Signed by Judge Louis L. Stanton on 7/20/2023) (rro) (Entered: 07/20/2023) |

| 07/23/2023 | 257 | ORDER: Due to a conflict in the Court's calendar, the scheduling conference currently scheduled for Monday, July 24, 2023, is RESCHEDULED to Tuesday, July 25, 2023, at 2:30 p.m. At that time, the parties should call the Court's dedicated teleconferencing line at (877) 402-9757 and enter Access Code 7938632, followed by the pound (#) key. (HEREBY ORDERED by Magistrate Judge Sarah Netburn) (Text Only Order) (ras) Modified on 7/23/2023 (ras). (Entered: 07/23/2023) |
| --- | --- | --- |
| 07/23/2023 | | Set/Reset Hearings: Scheduling Conference set for 7/25/2023 at 02:30 PM before Magistrate Judge Sarah Netburn. (ras) (Entered: 07/23/2023) |
| 07/25/2023 | | Minute Entry for proceedings held before Magistrate Judge Sarah Netburn: Scheduling Conference held on 7/25/2023. (ras) (Entered: 08/06/2023) |
| 07/26/2023 | 258 | SCHEDULING ORDER: All expert discovery shall be completed by Friday, September 29, 2023. The Court stays compliance of Rule 4(a) of Judge Louis L. Stanton's Individual Rules until further order of the Court. The parties are encouraged to contact Courtroom Deputy Rachel Slusher, rachel_slusher@nysd.uscourts.gov, with three mutually convenient dates to schedule a settlement conference for a time when they believe it would be productive. (Expert Discovery due by 9/29/2023.) (Signed by Magistrate Judge Sarah Netburn on 7/26/2023) (ras) (Entered: 07/27/2023) |
| 08/16/2023 | 259 | JOINT MOTION FOR CLARIFICATION/MODIFICATION re: 258 Scheduling Order,, . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Proposed Order Redline, # 2 Proposed Order Clean).(Halperin, Benjamin) (Entered: 08/16/2023) |
| 08/21/2023 | 260 | AMENDED SCHEDULING ORDER granting 259 Motion re: 259 JOINT MOTION FOR CLARIFICATION/MODIFICATION re: 258 Scheduling Order. Discovery. The disclosure of Defendants' expert evidence intended to contradict or rebut expert evidence on the same subject matter (other than damages), shall be made by Thursday, August 31, 2023. All expert discovery other than as to damages shall be completed by Friday, September 29, 2023. All further expert discovery on the issue of damages shall be deferred sine die until after the Court has ruled on the parties' motions for summary judgment and Defendants have responded to Plaintiff's outstanding discovery on damages. Accordingly, By Friday, October 20, 2023, Plaintiff shall file one motion for summary judgment against all Defendants. The brief in support of the motion shall not exceed 30 pages. By Wednesday, November 22, 2023, the Publishing Defendants and the Prospect Defendants shall each file a brief constituting their opposition to Plaintiff's motion and their affirmative motion for summary judgment. Each such brief shall not exceed 50 pages. By Friday, December 22, 2023, Plaintiff shall file one brief constituting her reply brief in further support of her motion against the Publishing Defendants and in opposition to these defendants' motion. Plaintiff shall file a second brief constituting her reply brief in further support of her motion against the Prospect Defendants and in opposition to these defendants' motion. Each brief shall not exceed 40 pages. By Friday, January 12, 2024, the Publishing Defendants and the Prospect Defendants shall each file a brief constituting their reply in further support of their motion. Each such brief shall not exceed 15 pages. Accordingly, By Friday, October 20, 2023, Plaintiff shall file her Daubert motion. Her brief in support shall not exceed 20 pages. By Wednesday, November 22, 2023, all Defendants shall file their Daubert motion. Their brief in support of their motion and in opposition to Plaintiff's motion shall not exceed 40 pages. By Friday, December 22, 2023, Plaintiff shall her brief in opposition to Defendants' Daubert motion. Her brief shall not exceed 20 pages. No reply briefs will be accepted with respect to the Daubert motions. Accordingly, the parties are encouraged to contact Courtroom Deputy Rachel Slusher, rachel_slusher@nysd.uscourts.gov, with three mutually convenient dates to schedule a settlement conference for a time when they believe it |

| | | |
|---|---|---|
| | | would be productive. SO ORDERED.. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 8/21/2023) (mml) (Entered: 08/21/2023) |
| 08/21/2023 | | Set/Reset Deadlines: Expert Discovery due by 9/29/2023. Motions due by 11/22/2023. Responses due by 12/22/2023 Replies due by 1/12/2024. (mml) (Entered: 08/21/2023) |
| 10/02/2023 | 261 | LETTER MOTION for Extension of Time to File *motion for summary judgment and Daubert motions* addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, Stephen Doniger dated October 2, 2023. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 10/02/2023) |
| 10/03/2023 | 262 | ORDER granting 261 Letter Motion for Extension of Time to File. Plaintiff's request to extend the summary judgment and Daubert motion briefing deadlines by 30 days is GRANTED. By October 7, 2023, Plaintiff is directed to file a proposed revised briefing schedule setting forth the new dates. The parties are ordered to meet and confer and agree upon dates to the extent the 30-day extension might conflict with upcoming holidays. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 10/03/2023) |
| 10/06/2023 | 263 | LETTER addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated October 6, 2023 re: Schedule for Summary Judgement and Daubert Briefing. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B). (Halperin, Benjamin) (Entered: 10/06/2023) |
| 10/06/2023 | 264 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, Stephen Doniger dated October 6, 2023 re: Briefing Schedule. Document filed by Lynne Freeman.. (Passin, Mark) (Entered: 10/06/2023) |
| 10/09/2023 | 265 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated October 9, 2023 re: Objection to Defendants Kim and Wolff's Letters. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 10/09/2023) |
| 10/09/2023 | 266 | ***SELECTED PARTIES*** LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated October 9, 2023 re: Objection to Defendants Kim and Wolff's Letters. Document filed by Universal City Studios, LLC, Emily Sylvan Kim, Tracy Deebs-Elkenaney, Holtzbrinck Publishers, LLC, Lynne Freeman, Prospect Agency, LLC, Entangled Publishing, LLC.Motion or Order to File Under Seal: 264 .(Doniger, Stephen) (Entered: 10/09/2023) |
| 10/09/2023 | 267 | LETTER MOTION to Seal *re ***SELECTED PARTIES*** LETTER* 266 addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated October 9, 2023. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 10/09/2023) |
| 10/11/2023 | 268 | ORDER granting 267 Letter Motion to Seal. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 10/11/2023) |
| 10/11/2023 | 269 | SECOND AMENDED SCHEDULING ORDER: Accordingly, with respect to the motions for summary judgment:By Monday, November 20, 2023, Plaintiff shall file two motions for summary judgment against the Publishing Defendants and the Prospect Defendants. Each brief in support of the motion shall not exceed 25 pages. By Friday, December 22, 2023, the Publishing Defendants and the Prospect Defendants shall each file a brief constituting their opposition to Plaintiff's motion and their affirmative motion for summary judgment. Each such brief shall not exceed 50 pages. By Wednesday, January 31, 2024, Plaintiff shall file one brief constituting her reply brief in further support of her motion against the Publishing Defendants and in opposition to these defendants' motion. Plaintiff shall file a second brief constituting her reply brief in further support of her motion against the Prospect Defendants and in opposition to these |

| | | |
|---|---|---|
| | | defendants' motion. Each brief shall not exceed 40 pages. By Wednesday, February 21, 2024, the Publishing Defendants and the Prospect Defendants shall each file a brief constituting their reply in further support of their motion. Each such brief shall not exceed 15 pages.With respect to the Daubert motions: By Friday, December 22, 2023, Plaintiff shall file her Daubert motion. Her brief in support shall not exceed 20 pages. By Wednesday, January 31, 2024, all Defendants shall file their Daubert motion. Their brief in support of their motion and in opposition to Plaintiff's motion shall not exceed 40 pages. By Wednesday, February 21, 2024, Plaintiff shall her brief in opposition to Defendants' Daubert motion. Her brief shall not exceed 20 pages. No reply briefs will be accepted with respect to the Daubert motions.No further extensions will be granted. Separately, Plaintiff's motion to strike the letters attached to ECF No. 263 is DENIED. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 10/11/2023) (dsh) (Entered: 10/11/2023) |
| 10/18/2023 | 270 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, Stephen Doniger dated October 18, 2023 re: Second Amended Scheduling Order. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 10/18/2023) |
| 10/19/2023 | 271 | MEMO ENDORSEMENT on re: 270 Letter filed by Lynne Freeman. ENDORSEMENT: Plaintiff's request to modify the language in the Second Amended Scheduling Order is GRANTED. Each motion for summary judgment shall not exceed 30 pages. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 10/19/2023) (dsh) (Entered: 10/19/2023) |
| 11/15/2023 | 272 | LETTER addressed to Magistrate Judge Sarah Netburn from Stephen M. Doniger dated November 15, 2023 re: Request to extend summary judgment filing date by two days. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 11/15/2023) |
| 11/16/2023 | 273 | MEMO ENDORSEMENT on re: 272 Letter filed by Lynne Freeman. ENDORSEMENT: Plaintiff's request to extend the deadline to file her motion for summary judgment to November 22, 2023, is GRANTED. The Court wishes Plaintiff a speedy recovery. SO ORDERED (Signed by Magistrate Judge Sarah Netburn on 11/16/2023) (dsh) Modified on 11/16/2023 (dsh). (Entered: 11/16/2023) |
| 11/22/2023 | 274 | MOTION for Summary Judgment . Document filed by Lynne Freeman. (Attachments: # 1 Proposed Order Proposed Order).(Doniger, Stephen) (Entered: 11/22/2023) |
| 11/22/2023 | 275 | LETTER MOTION to Seal *Certain Documents in Connection with Plaintiff's Motion for Summary Judgment* addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated November 22, 2023. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 11/22/2023) |
| 11/22/2023 | 276 | DECLARATION of Lynne Freeman in Support re: 274 MOTION for Summary Judgment .. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1 - Filed Under Seal, # 2 Exhibit 2 - Filed Under Seal, # 3 Exhibit 3 - Filed Under Seal, # 4 Exhibit 4 - Filed Under Seal, # 5 Exhibit 5 - Filed Under Seal, # 6 Exhibit 6 - Filed Under Seal, # 7 Exhibit 7 - Filed Under Seal, # 8 Exhibit 8 - Filed Under Seal, # 9 Exhibit 9 - Filed Under Seal, # 10 Exhibit 10 - Filed Under Seal, # 11 Exhibit 11 - Filed Under Seal, # 12 Exhibit 12 - Filed Under Seal, # 13 Exhibit 13 - Filed Under Seal, # 14 Exhibit 14 - Filed Under Seal, # 15 Exhibit 15 - Filed Under Seal, # 16 Exhibit 16 - Filed Under Seal, # 17 Exhibit 17 - Filed Under Seal, # 18 Exhibit 18 - Filed Under Seal, # 19 Exhibit 19 - Filed Under Seal, # 20 Exhibit 20 - Filed Under Seal, # 21 Exhibit 21 - Filed Under Seal, # 22 Exhibit 22 - Filed Under Seal, # 23 Exhibit 23 - Filed Under Seal, # 24 Exhibit 24 - Filed Under Seal, # 25 Exhibit 25 - Filed Under Seal, # 26 Exhibit 26 - Filed Under Seal, # 27 Exhibit 27 - Filed Under Seal, # 28 Exhibit 28 - Filed Under Seal, # 29 Exhibit 29 - Filed Under Seal, # 30 Exhibit 30 - Filed Under Seal, # 31 Exhibit 31 - Crave Book (Part 1 of 3), # 32 Exhibit 31 - Crave Book (Part 2 of 3), # 33 Exhibit 31 - Crave Book (Part 3 of 3), # 34 Exhibit 32- |

| | | |
|---|---|---|
| | | Summary Index, # 35 Exhibit 33 - Crush Book (Part 1 of 3), # 36 Exhibit 33 - Crush Book (Part 2 of 3), # 37 Exhibit 33 - Crush Book (Part 3 of 3), # 38 Exhibit 34- Covet Book (Part 1 of 3), # 39 Exhibit 34- Covet Book (Part 2 of 3), # 40 Exhibit 34- Covet Book (Part 3 of 3), # 41 Exhibit 35- Court Book (Part 1 of 3), # 42 Exhibit 35- Court Book (Part 2 of 3), # 43 Exhibit 35- Court Book (Part 3 of 3), # 44 Exhibit 36- First Voice Index, # 45 Exhibit 37- Second Voice Index, # 46 Exhibit 38- Heroine Index, # 47 Exhibit 39- Heroine's Female Nemesis Index, # 48 Exhibit 40- Romantic Lead Index, # 49 Exhibit 42- Heroine's Male Friend Index, # 50 Exhibit 43- The Villain Index, # 51 Exhibit 44- Aunt Uncle Index, # 52 Exhibit 45- Grandma Index, # 53 Exhibit 46- Crave Language Index, # 54 Exhibit 47- Crush Language Index, # 55 Exhibit 48- Covet Language Index, # 56 Exhibit 49- Court Langauge Index, # 57 Exhibit 50- Copyright Registrations). (Doniger, Stephen) (Entered: 11/22/2023) |
| 11/22/2023 | 277 | ***SELECTED PARTIES***NOTICE of Sealed Exhibits 1-30 re: 276 DECLARATION of Lynne Freeman. Document filed by Lynne Freeman, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 7, # 7 Exhibit 8, # 8 Exhibit 9, # 9 Exhibit 10, # 10 Exhibit 11, # 11 Exhibit 12, # 12 Exhibit 13, # 13 Exhibit 14, # 14 Exhibit 15, # 15 Exhibit 16, # 16 Exhibit 17, # 17 Exhibit 18, # 18 Exhibit 19, # 19 Exhibit 20 (Part 1 of 2), # 20 Exhibit 20 (Part 2 of 2), # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30)Motion or Order to File Under Seal: 275 . (Doniger, Stephen) (Entered: 11/22/2023) |
| 11/22/2023 | 278 | DECLARATION of Stephen M. Doniger in Support re: 274 MOTION for Summary Judgment .. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55 Exhibit 55, # 56 Exhibit 56, # 57 Exhibit 57, # 58 Exhibit 58, # 59 Exhibit 59, # 60 Exhibit 60, # 61 Exhibit 61, # 62 Exhibit 62, # 63 Exhibit 63, # 64 Exhibit 64, # 65 Exhibit 65, # 66 Exhibit 66, # 67 Exhibit 67, # 68 Exhibit 68).(Doniger, Stephen) (Entered: 11/22/2023) |
| 11/22/2023 | 279 | ***SELECTED PARTIES***NOTICE of Sealed Exhibits 1, 3-22, 25-28, 30, 32-33, 39, 61-68 re: 278 DECLARATION of Stephen M. Doniger. Document filed by Lynne Freeman, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit 3, # 2 Exhibit 4, # 3 Exhibit 5, # 4 Exhibit 6, # 5 Exhibit 7, # 6 Exhibit 8, # 7 Exhibit 9, # 8 Exhibit 10, # 9 Exhibit 11, # 10 Exhibit 12, # 11 Exhibit 13, # 12 Exhibit 14, # 13 Exhibit 15, # 14 Exhibit 16, # 15 Exhibit 17, # 16 Exhibit 18, # 17 Exhibit 19, # 18 Exhibit 20, # 19 Exhibit 21, # 20 Exhibit 22, # 21 Exhibit 25, # 22 Exhibit 26, # 23 Exhibit 27, # 24 Exhibit 28, # 25 Exhibit 30, # 26 Exhibit 32, # 27 Exhibit 33, # 28 Exhibit 39, # 29 Exhibit 61, # 30 Exhibit 62, # 31 Exhibit 63, # 32 Exhibit 64, # 33 Exhibit 65, # 34 Exhibit 66, # 35 Exhibit 67, # 36 Exhibit 68)Motion or Order to File Under Seal: 275 .(Doniger, Stephen) (Entered: 11/22/2023) |

| 11/22/2023 | 280 | RULE 56.1 STATEMENT. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 11/22/2023) |
|---|---|---|
| 11/22/2023 | 281 | ***SELECTED PARTIES***RULE 56.1 STATEMENT. Document filed by Lynne Freeman, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC. Motion or Order to File Under Seal: 275 .(Doniger, Stephen) (Entered: 11/22/2023) |
| 11/22/2023 | 282 | NOTICE of REQUEST FOR JUDICIAL NOTICE IN SUPPORT re: 274 MOTION for Summary Judgment .. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1, # 2 Proposed Order Proposed Order).(Doniger, Stephen) (Entered: 11/22/2023) |
| 11/22/2023 | 283 | MEMORANDUM OF LAW in Support re: 274 MOTION for Summary Judgment . . Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 11/22/2023) |
| 11/22/2023 | 284 | ***SELECTED PARTIES*** MEMORANDUM OF LAW in Support re: 274 MOTION for Summary Judgment . . Document filed by Lynne Freeman, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC. Motion or Order to File Under Seal: 275 . (Doniger, Stephen) (Entered: 11/22/2023) |
| 11/22/2023 | 285 | PROPOSED STIPULATION AND ORDER. Document filed by Lynne Freeman.. (Doniger, Stephen) (Entered: 11/22/2023) |
| 11/27/2023 | 286 | ORDER granting 275 Letter Motion to Seal. The Court grants the sealing relief on an interim basis and will reconsider the application when it addresses the motions for summary judgment. Defendants are ORDERED to file a separate letter setting forth its legal and factual grounds for sealing those documents for which it is the requesting party. This letter shall be filed by December 22, 2023. Plaintiff is advised that some or all portions of her manuscript may not be properly sealed under the governing legal standards given the compelling common law and First Amendment concerns, and that the Court may require unsealing. (HEREBY ORDERED by Magistrate Judge Sarah Netburn) (Text Only Order) (Netburn, Sarah) (Entered: 11/27/2023) |
| 11/28/2023 | 287 | NOTICE of ERRATA re: 280 Rule 56.1 Statement, 281 Rule 56.1 Statement, 274 MOTION for Summary Judgment .. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 11/28/2023) |
| 11/28/2023 | 288 | MOTION for Summary Judgment *(Corrected)*. Document filed by Lynne Freeman.. (Doniger, Stephen) (Entered: 11/28/2023) |
| 11/28/2023 | 289 | ***SELECTED PARTIES***RULE 56.1 STATEMENT. Document filed by Lynne Freeman, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC. Motion or Order to File Under Seal: 275 .(Doniger, Stephen) (Entered: 11/28/2023) |
| 11/28/2023 | 290 | RULE 56.1 STATEMENT. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 11/28/2023) |
| 12/08/2023 | 291 | JOINT LETTER addressed to Magistrate Judge Sarah Netburn from Benjamin S. Halperin dated December 8, 2023 re: Joint request to modify page limits and allocations for the remainder of summary judgment briefing. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Halperin, Benjamin) (Entered: 12/08/2023) |
| 12/11/2023 | 292 | MEMO ENDORSEMENT on re: 291 Letter, filed by Universal City Studios, LLC, Entangled Publishing, LLC, Tracy Deebs-Elkenaney, Holtzbrinck Publishers, LLC. ENDORSEMENT: The parties' joint request to modify page limits is DENIED. The |

| | | |
|---|---|---|
| | | parties shall abide by the page limits specified in the Second Amended Scheduling Order. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 12/11/2023) (mml) (Entered: 12/11/2023) |
| 12/12/2023 | 293 | JOINT LETTER MOTION for Leave to File Excess Pages *(to reduce total summary judgment briefing page count)* addressed to Magistrate Judge Sarah Netburn from Lacy H Koonce III dated 12/12/2023. Document filed by Emily Sylvan Kim, Prospect Agency, LLC..(Koonce, Lacy) (Entered: 12/12/2023) |
| 12/14/2023 | 294 | ORDER granting 293 Letter Motion for Leave to File Excess Pages. In light of the parties' clarifications, the joint request to modify the Second Amended Scheduling Order is GRANTED. The Defendants shall file one consolidated brief on the copyright issues no longer than 60 pages, and the Prospect Defendants shall file a separate brief on the state law issues no longer than 20 pages. The Plaintiff's opposition brief on the copyright issues shall not exceed 50 pages, and her opposition brief on the state law issues shall not exceed 20 pages. The Defendants' consolidated reply brief on the copyright issues shall not exceed 20 pages. The Prospect Defendants' reply brief on the state law issues shall not exceed 10 pages. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (dsh) (Entered: 12/14/2023) |
| 12/18/2023 | 295 | NOTICE of Withdrawal of Appearance of Laura M. Zaharia. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 12/18/2023) |
| 12/22/2023 | 296 | MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment.* Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Proposed Order Proposed Order).(Wolff, Nancy) (Entered: 12/22/2023) |
| 12/22/2023 | 297 | LETTER MOTION to Seal *Certain Documents in Connection with Defendants' Motion for Summary Judgment and in Response to Plaintiff's Letter Motion to Seal at ECF No. 275* addressed to Magistrate Judge Sarah Netburn from Nancy E. Wolff dated December 22, 2023. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 12/22/2023) |
| 12/22/2023 | 298 | MEMORANDUM OF LAW in Support re: 296 MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment.* . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 12/22/2023) |
| 12/22/2023 | 299 | RULE 56.1 STATEMENT. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Macmillan Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 12/22/2023) |
| 12/22/2023 | 300 | DECLARATION of CeCe M. Cole in Support re: 296 MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment..* Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC-1, # 30 Exhibit CC-2, # 31 Exhibit CC-3, # 32 |

| | | |
|---|---|---|
| | | Exhibit CC-4, # 33 Exhibit DD, # 34 Exhibit EE, # 35 Exhibit FF).(Cole, CeCe) (Entered: 12/22/2023) |
| 12/22/2023 | 301 | ***SELECTED PARTIES***NOTICE of of Sealed Exhibits re: 300 Declaration in Support of Motion,,,,. Document filed by Universal City Studios, LLC, Tracy Deebs-Elkenaney, Holtzbrinck Publishers, LLC, Entangled Publishing, LLC, Lynne Freeman, Emily Sylvan Kim, Prospect Agency, LLC. (Attachments: # 1 Exhibit E, # 2 Exhibit F, # 3 Exhibit G, # 4 Exhibit H, # 5 Exhibit I, # 6 Exhibit K, # 7 Exhibit CC-1, # 8 Exhibit CC-2, # 9 Exhibit CC-3, # 10 Exhibit CC-4)Motion or Order to File Under Seal: 297 . (Cole, CeCe) (Entered: 12/22/2023) |
| 12/22/2023 | 302 | DECLARATION of Tracy Deebs-Elkenaney p/k/a Tracy Wolff in Support re: 296 MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment*.. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 12/22/2023) |
| 12/22/2023 | 303 | DECLARATION of Elizabeth Pelletier in Support re: 296 MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment*.. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 12/22/2023) |
| 12/22/2023 | 304 | DECLARATION of Lacy H. Koonce III in Support re: 296 MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment*.. Document filed by Emily Sylvan Kim, Prospect Agency, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG, # 34 Exhibit HH, # 35 Exhibit II, # 36 Exhibit JJ, # 37 Exhibit KK, # 38 Exhibit LL, # 39 Exhibit MM, # 40 Exhibit NN, # 41 Exhibit PP, # 42 Exhibit QQ).(Koonce, Lacy) (Entered: 12/22/2023) |
| 12/22/2023 | 305 | ***SELECTED PARTIES***NOTICE of Sealed Exhibits re: 304 Declaration in Support of Motion,,,,. Document filed by Emily Sylvan Kim, Prospect Agency, LLC, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Lynne Freeman, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit JJ, # 4 Exhibit KK, # 5 Exhibit LL, # 6 Exhibit MM)Motion or Order to File Under Seal: 297 . (Koonce, Lacy) (Entered: 12/22/2023) |
| 12/22/2023 | 306 | DECLARATION of Emily Sylvan Kim in Support re: 296 MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment*.. Document filed by Emily Sylvan Kim, Prospect Agency, LLC..(Koonce, Lacy) (Entered: 12/22/2023) |
| 12/22/2023 | 307 | ***SELECTED PARTIES***NOTICE of Sealed Declaration re: 296 MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment*.. Document filed by Emily Sylvan Kim, Prospect Agency, LLC, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Lynne Freeman, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. Motion or Order to File Under Seal: 297 .(Koonce, Lacy) (Entered: 12/22/2023) |

| | | |
|---|---|---|
| 12/22/2023 | 308 | NOTICE of Request for Judicial Notice re: 298 Memorandum of Law in Support of Motion, 299 Rule 56.1 Statement, 296 MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment.*. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC.. (Wolff, Nancy) (Entered: 12/22/2023) |
| 12/22/2023 | 309 | MOTION to Strike Document No. [284, 280, 289] / *Defendants' Objections to and Motion to Strike Evidence Submitted with Plaintiff's Summary Judgment Motion and Related Local Rule 56.1 Statements*. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC.. (Wolff, Nancy) (Entered: 12/22/2023) |
| 12/22/2023 | 310 | COUNTER STATEMENT TO 289 Rule 56.1 Statement, 280 Rule 56.1 Statement, 281 Rule 56.1 Statement, 290 Rule 56.1 Statement. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 12/22/2023) |
| 12/22/2023 | 311 | MOTION for Summary Judgment *Prospect Defendants' Notice of Motion for Summary Judgment on Plaintiff's State Law Claims*. Document filed by Emily Sylvan Kim, Prospect Agency, LLC. (Attachments: # 1 Proposed Order Proposed Order).(Koonce, Lacy) (Entered: 12/22/2023) |
| 12/22/2023 | 312 | MEMORANDUM OF LAW in Support re: 311 MOTION for Summary Judgment *Prospect Defendants' Notice of Motion for Summary Judgment on Plaintiff's State Law Claims*. . Document filed by Emily Sylvan Kim, Prospect Agency, LLC..(Koonce, Lacy) (Entered: 12/22/2023) |
| 12/22/2023 | 313 | NOTICE of PLAINTIFFS DAUBERT MOTION TO EXCLUDE A PORTION OF THE TESTIMONY OF MALCOLM COULTHARD AND THE TESTIMONY OF ROSE HILLIARD IN ITS ENTIRETY. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 12/22/2023) |
| 12/22/2023 | 314 | MOTION in Limine *PLAINTIFFS DAUBERT MOTION TO EXCLUDE A PORTION OF THE TESTIMONY OF MALCOLM COULTHARD AND THE TESTIMONY OF ROSE HILLIARD IN ITS ENTIRETY*. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 12/22/2023) |
| 12/22/2023 | 315 | DECLARATION of Stephen Doniger in Support re: 314 MOTION in Limine *PLAINTIFFS DAUBERT MOTION TO EXCLUDE A PORTION OF THE TESTIMONY OF MALCOLM COULTHARD AND THE TESTIMONY OF ROSE HILLIARD IN ITS ENTIRETY*.. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5). (Passin, Mark) (Entered: 12/22/2023) |
| 12/22/2023 | 316 | DECLARATION of CAROLE CHASKI in Support re: 314 MOTION in Limine *PLAINTIFFS DAUBERT MOTION TO EXCLUDE A PORTION OF THE TESTIMONY OF MALCOLM COULTHARD AND THE TESTIMONY OF ROSE HILLIARD IN ITS ENTIRETY*.. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit Exhibit 1). (Passin, Mark) (Entered: 12/22/2023) |
| 12/22/2023 | 317 | NOTICE of PLAINTIFFS NOTICE OF REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF HER MOTION TO EXCLUDE A PORTION OF THE TESTIMONY OF MALCOLM COULTHARD AND THE TESTIMONY OF ROSE HILLIARD IN ITS ENTIRETY re: 314 MOTION in Limine *PLAINTIFFS DAUBERT MOTION TO EXCLUDE A PORTION OF THE TESTIMONY OF MALCOLM COULTHARD AND* |

| | | |
|---|---|---|
| | | *THE TESTIMONY OF ROSE HILLIARD IN ITS ENTIRETY*.. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit Exhibit 1).(Passin, Mark) (Entered: 12/22/2023) |
| 01/22/2024 | 318 | LETTER MOTION to Continue *Deadline to Submit Summary Judgment Briefs* addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated January 22, 2024. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 01/22/2024) |
| 01/23/2024 | 319 | ORDER granting 318 Letter Motion to Continue. Each side is granted a one-week extension of the existing deadlines. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 01/23/2024) |
| 02/07/2024 | 320 | NOTICE of of Defendants' Daubert Motion to Exclude Plaintiff's Liability Experts and Opposition to Plaintiff's Daubert Motion. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC.. (Wolff, Nancy) (Entered: 02/07/2024) |
| 02/07/2024 | 321 | MOTION in Limine / *Defendants' Daubert Motion to Exclude Plaintiff's Liability Experts and Opposition to Plaintiff's Daubert Motion*. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC.. (Wolff, Nancy) (Entered: 02/07/2024) |
| 02/07/2024 | 322 | DECLARATION of Benjamin S. Halperin in Support re: 321 MOTION in Limine / *Defendants' Daubert Motion to Exclude Plaintiff's Liability Experts and Opposition to Plaintiff's Daubert Motion*.. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A-1, # 2 Exhibit A-2, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D-1, # 6 Exhibit D-2, # 7 Exhibit D-3, # 8 Exhibit D-4, # 9 Exhibit D-5, # 10 Exhibit D-6, # 11 Exhibit D-7, # 12 Exhibit D-8, # 13 Exhibit D-9, # 14 Exhibit D-10, # 15 Exhibit E, # 16 Exhibit F-1, # 17 Exhibit F-2, # 18 Exhibit G, # 19 Exhibit H, # 20 Exhibit I). (Halperin, Benjamin) (Entered: 02/07/2024) |
| 02/07/2024 | 323 | DECLARATION of Emily Sylvan Kim in Support re: 321 MOTION in Limine / *Defendants' Daubert Motion to Exclude Plaintiff's Liability Experts and Opposition to Plaintiff's Daubert Motion*.. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 02/07/2024) |
| 02/07/2024 | 324 | PROPOSED ORDER. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. Related Document Number: [320, 321]..(Wolff, Nancy) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 02/07/2024) |
| 02/07/2024 | 325 | LETTER MOTION to Seal *Documents Associated with Plaintiffs Opposition to Defendants Motions for Summary Judgment* addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated February 7, 2024. Document filed by Lynne Freeman.. (Doniger, Stephen) (Entered: 02/07/2024) |
| 02/07/2024 | 326 | MEMORANDUM OF LAW in Opposition re: 311 MOTION for Summary Judgment *Prospect Defendants' Notice of Motion for Summary Judgment on Plaintiff's State Law Claims*. . Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 02/07/2024) |
| 02/07/2024 | 327 | ***SELECTED PARTIES*** MEMORANDUM OF LAW in Opposition re: 311 MOTION for Summary Judgment *Prospect Defendants' Notice of Motion for Summary Judgment on Plaintiff's State Law Claims*. . Document filed by Lynne Freeman, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC. Motion or Order to File Under Seal: 325 .(Doniger, Stephen) (Entered: 02/07/2024) |

| 02/07/2024 | 328 | MEMORANDUM OF LAW in Opposition re: 309 MOTION to Strike Document No. [284, 280, 289] / *Defendants' Objections to and Motion to Strike Evidence Submitted with Plaintiff's Summary Judgment Motion and Related Local Rule 56.1 Statements*. . Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 02/07/2024) |
|---|---|---|
| 02/07/2024 | 329 | DECLARATION of Lynne Freeman in Opposition re: 296 MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment*.. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1 to Freeman DL, # 2 Exhibit 2 to Freeman DL). (Doniger, Stephen) (Entered: 02/07/2024) |
| 02/07/2024 | 330 | COUNTER STATEMENT TO 299 Rule 56.1 Statement. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 02/08/2024) |
| 02/08/2024 | 331 | DECLARATION of Mark D. Passin in Opposition re: 296 MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment*.. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1 to Declaration of Mark Passin, # 2 Exhibit 2 to Declaration of Mark Passin, # 3 Exhibit 3 to Declaration of Mark Passin, # 4 Exhibit 4 to Declaration of Mark Passin, # 5 Exhibit 5 to Declaration of Mark Passin, # 6 Exhibit 6 to Declaration of Mark Passin, # 7 Exhibit 7 to Declaration of Mark Passin, # 8 Exhibit 8 to Declaration of Mark Passin, # 9 Exhibit 9 to Declaration of Mark Passin, # 10 Exhibit 10 to Declaration of Mark Passin, # 11 Exhibit 11 to Declaration of Mark Passin, # 12 Exhibit 12 to Declaration of Mark Passin, # 13 Exhibit 13 to Declaration of Mark Passin, # 14 Exhibit 14 to Declaration of Mark Passin, # 15 Exhibit 15 to Declaration of Mark Passin, # 16 Exhibit 16 to Declaration of Mark Passin, # 17 Exhibit 17 to Declaration of Mark Passin, # 18 Exhibit 18 to Declaration of Mark Passin, # 19 Exhibit 19 to Declaration of Mark Passin).(Doniger, Stephen) (Entered: 02/08/2024) |
| 02/08/2024 | 332 | ***SELECTED PARTIES***COUNTER STATEMENT TO 299 Rule 56.1 Statement. Document filed by Lynne Freeman, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC. Motion or Order to File Under Seal: 325 .(Doniger, Stephen) (Entered: 02/08/2024) |
| 02/08/2024 | 333 | DECLARATION of Ron Kaplan in Opposition re: 296 MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment*.. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 02/08/2024) |
| 02/08/2024 | 334 | DECLARATION of Kathryn Reiss in Opposition re: 296 MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment*.. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 02/08/2024) |
| 02/08/2024 | 335 | MEMORANDUM OF LAW in Opposition re: 296 MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment*. . Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 02/08/2024) |
| 02/08/2024 | 336 | DECLARATION of Carole Chaski in Opposition re: 296 MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment*.. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1 to Declaration of Carole Chaski, # 2 Exhibit 2 to Declaration of Carole Chaski, # 3 Exhibit 3 to Declaration of Carole Chaski, # 4 Exhibit 4 to Declaration of Carole Chaski, # 5 Exhibit 5 to Declaration of Carole Chaski, # 6 |

| | | |
|---|---|---|
| | | Exhibit 6 to Declaration of Carole Chaski, # 7 Exhibit 7 to Declaration of Carole Chaski). (Doniger, Stephen) (Entered: 02/08/2024) |
| 02/08/2024 | 337 | ***SELECTED PARTIES*** BRIEF re: 331 Declaration in Opposition to Motion,,,, -- *(Sealed) Exhibit 4 to the Declaration of Mark D. Passin.* Document filed by Lynne Freeman, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC.Motion or Order to File Under Seal: 325 .(Doniger, Stephen) (Entered: 02/08/2024) |
| 02/08/2024 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 324 Proposed Order, was reviewed and approved as to form. (tp) (Entered: 02/08/2024) |
| 02/08/2024 | 338 | ORDER granting 325 Letter Motion to Seal. Plaintiff's motion to seal is GRANTED on an interim basis. The Court may reconsider the application when it addresses the motions for summary judgment. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 02/08/2024) |
| 02/08/2024 | 339 | LETTER addressed to Magistrate Judge Sarah Netburn from Stephen M. Doniger dated February 8, 2024 re: Request to extend summary judgment filing date by two days. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 02/08/2024) |
| 02/08/2024 | 340 | AMENDED MEMORANDUM OF LAW in Opposition re: 296 MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment. -- AND REPLY TO DEFENDANTS OPPOSITION TO PLAINTIFFS MOTION FOR SUMMARY JUDGMENT.* Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 02/08/2024) |
| 02/09/2024 | 341 | MEMO ENDORSEMENT on re: 339 Letter filed by Lynne Freeman. ENDORSEMENT: Plaintiff will not be prejudiced by the untimely summary judgment filings. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 2/9/2024) (dsh) (Entered: 02/09/2024) |
| 02/28/2024 | 342 | REPLY MEMORANDUM OF LAW in Support re: 296 MOTION for Summary Judgment / *Defendants' Notice of Motion for Summary Judgment on the Copyright Claims and in Opposition to Plaintiff's Motion for Summary Judgment.* . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 02/28/2024) |
| 02/28/2024 | 343 | DECLARATION of CeCe M. Cole in Support re: 342 Reply Memorandum of Law in Support of Motion,. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit GG, # 2 Exhibit HH, # 3 Exhibit II).(Cole, CeCe) (Entered: 02/28/2024) |
| 02/28/2024 | 344 | MEMORANDUM OF LAW / *Defendants Supplemental Motion Regarding Evidentiary Issues.* Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Macmillan Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 02/28/2024) |
| 02/28/2024 | 345 | RESPONSE / *Defendants Response to Plaintiffs Additional Statement of Facts.* Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 02/28/2024) |
| 02/28/2024 | 346 | MEMORANDUM OF LAW in Opposition re: 321 MOTION in Limine / *Defendants' Daubert Motion to Exclude Plaintiff's Liability Experts and Opposition to Plaintiff's Daubert Motion.* . Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 02/28/2024) |

| 02/28/2024 | 347 | DECLARATION of Stephen M. Doniger in Opposition re: 321 MOTION in Limine / *Defendants' Daubert Motion to Exclude Plaintiff's Liability Experts and Opposition to Plaintiff's Daubert Motion.*. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1 - JuolaCV, # 2 Exhibit 2 - Juola Transcript Excerpt, # 3 Exhibit 3 - Chaski Transcript Excerpt).(Doniger, Stephen) (Entered: 02/28/2024) |
|---|---|---|
| 02/28/2024 | 348 | REPLY MEMORANDUM OF LAW in Support re: 311 MOTION for Summary Judgment *Prospect Defendants' Notice of Motion for Summary Judgment on Plaintiff's State Law Claims*. . Document filed by Emily Sylvan Kim, Prospect Agency, LLC.. (Koonce, Lacy) (Entered: 02/28/2024) |
| 03/04/2024 | 349 | LETTER MOTION for Leave to File motion to strike *Defendants Supplemental Motion Regarding Evidentiary Issues* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated march 4, 2024. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 03/04/2024) |
| 03/05/2024 | 350 | LETTER RESPONSE to Motion addressed to Magistrate Judge Sarah Netburn from Nancy E. Wolff dated 3/05/2024 re: 349 LETTER MOTION for Leave to File motion to strike *Defendants Supplemental Motion Regarding Evidentiary Issues* addressed to Magistrate Judge Sarah Netburn from Mark Passin dated march 4, 2024. . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 03/05/2024) |
| 03/05/2024 | 351 | ORDER denying 349 Letter Motion for Leave to File Document. Plaintiff's request for the Court to strike Defendants' supplemental motion regarding discovery issues is DENIED. By March 12, 2024, Plaintiff may file a response to Defendants' motion. Plaintiff's response shall not exceed 10 pages. Separately, by March 15, 2024, the parties are ORDERED to meet and confer to discuss whether a settlement conference would be productive. If the parties agree that a settlement conference would be productive, they should immediately email Courtroom Deputy Diljah Shaw at diljah_shaw@nysd.uscourts.gov to schedule the conference. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 03/05/2024) |
| 03/12/2024 | 352 | MEMORANDUM OF LAW in Opposition re: 309 MOTION to Strike Document No. [284, 280, 289] / *Defendants' Objections to and Motion to Strike Evidence Submitted with Plaintiff's Summary Judgment Motion and Related Local Rule 56.1 Statements*. . Document filed by Lynne Freeman..(Passin, Mark) (Entered: 03/12/2024) |
| 03/12/2024 | 353 | DECLARATION of Mark D. Passin in Opposition re: 309 MOTION to Strike Document No. [284, 280, 289] / *Defendants' Objections to and Motion to Strike Evidence Submitted with Plaintiff's Summary Judgment Motion and Related Local Rule 56.1 Statements*.. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 03/12/2024) |
| 03/12/2024 | 354 | NOTICE of ERRATA and WITHDRAWAL of DKT Nos. 352 and 353 re: 352 Memorandum of Law in Opposition to Motion, 353 Declaration in Opposition to Motion,. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 03/12/2024) |
| 03/12/2024 | 355 | OPPOSITION BRIEF re: 344 Memorandum of Law *Plaintiff's Opposition to Defendants' Supplemental Motion Regarding Evidentiary Issues*. Document filed by Lynne Freeman.. (Passin, Mark) (Entered: 03/12/2024) |
| 03/12/2024 | 356 | DECLARATION of Mark D. Passin in Opposition re: 344 Memorandum of Law. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 03/12/2024) |
| 03/25/2024 | 357 | NOTICE of Supplemental Authority re: 298 Memorandum of Law in Support of Motion,. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck |

| | | |
|---|---|---|
| | | Publishers, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit A).(Wolff, Nancy) (Entered: 03/25/2024) |
| 06/18/2024 | 358 | NOTICE OF CHANGE OF ADDRESS by Nancy Evelyn Wolff on behalf of Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC. New Address: Cowan, DeBaets, Abrahams & Sheppard LLP, 60 Broad Street, 30th Floor, New York, New York, 10004,..(Wolff, Nancy) (Entered: 06/18/2024) |
| 07/29/2024 | 359 | LETTER addressed to Magistrate Judge Sarah Netburn from Lacy H. Koonce, III dated July 29, 2024 re: Plaintiff's Motion to Seal (ECF No. 275). Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Emily Sylvan Kim, Prospect Agency, LLC..(Koonce, Lacy) (Entered: 07/29/2024) |
| 07/31/2024 | 360 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated July 31, 2024 re: Lynne Freeman v. Tracy Deebs-Elkenaney et. al., Case No. 22 Civ 2435 (LLS) (SN). Document filed by Lynne Freeman..(Passin, Mark) (Entered: 07/31/2024) |
| 08/01/2024 | 361 | REPORT AND RECOMMENDATION re: 311 MOTION for Summary Judgment 274 MOTION for Summary Judgment 288 MOTION for Summary Judgment 296 MOTION for Summary Judgment. I recommend that the Court DENY the parties' cross-motions for summary judgment on Freeman's direct copyright infringement claim. I further recommend that the Court GRANT the Defendants' motion for summary judgment on Freeman's state law claims. Objections to R&R due by 8/15/2024. (Signed by Magistrate Judge Sarah Netburn on 8/1/2024). (dsh) (Entered: 08/01/2024) |
| 08/01/2024 | 362 | OPINION & ORDER re: 309 MOTION to Strike 314 MOTION in Limine 297 LETTER MOTION to Seal 321 MOTION in Limine. The Court STRIKES the affirmative expert testimony of Dr. Patrick Juola, Dr. Carole E. Chaski, Professor Kathryn Reiss, and the rebuttal testimony of Dr. Malcolm Coulthard, Emily Easton, and Ron Kaplan. The Court reserves decision with respect to the parties' requests to exclude the testimony of Christine Witthohn, Eric Ruben, Marlene Stringer, and Rose Hilliard, pending the Court's decision on whether to adopt my recommendations regarding Freeman's state law claims. Additionally, the Court GRANTS the Defendants' motion to strike Freeman's similarity indexes and additional statement of facts, DENIES Freeman's motion to seal her manuscripts, notes, text messages, and Wolff's deposition transcript, and otherwise GRANTS the parties' motions to seal. By August 9, 2024, the parties shall file unredacted versions of Freeman's manuscripts and notes, Wolff's deposition transcript, and the relevant text messages (currently under seal at: ECF No. 277, Freeman Exhibits 3-11 and 14-19; ECF No. 301, Cole Exhibits E, F, and CC; and ECF No. 279, Doniger Exhibits 4-6, 11, 15, 18, and 20). The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 297, 309, 314, and 321. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 8/1/2024) (dsh) (Entered: 08/01/2024) |
| 08/01/2024 | 363 | ORDER: In light of the decisions issued today, the parties are ORDERED to meet and confer regarding whether a settlement conference would be productive at this time. By August 9, 2024, the parties shall file a letter indicating whether they would like to schedule a settlement conference. If yes, the parties should indicate whether they request to stay litigation deadlines pending the settlement conference. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 8/1/2024) (dsh) (Entered: 08/01/2024) |
| 08/07/2024 | 364 | JOINT LETTER MOTION for Extension of Time addressed to Judge Louis L. Stanton from Stephen M. Doniger dated August 7, 2024. Document filed by Lynne Freeman.. (Doniger, Stephen) (Entered: 08/07/2024) |
| 08/08/2024 | 365 | ORDER granting 364 Letter Motion for Extension of Time. The Clerk of the Court is respectfully requested to stay this matter pending the resolution of this matter relating to |

| | | |
|---|---|---|
| | | the unsealing of Plaintiff's manuscripts. SO ORDERED. (Signed by Judge Louis L. Stanton on 8/8/2024) (ks) (Entered: 08/08/2024) |
| 08/08/2024 | | Case Stayed (ks) (Entered: 08/08/2024) |
| 08/09/2024 | 366 | LETTER addressed to Magistrate Judge Sarah Netburn from CeCe M. Cole dated August 9, 2024 re: Update on Meet & Confer re Settlement per the Court's 8/1/24 Order (ECF 363). Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Cole, CeCe) (Entered: 08/09/2024) |
| 08/15/2024 | 367 | BRIEF re: 362 Memorandum & Opinion,,,,, *PLAINTIFFS OBJECTIONS TO THE MAGISTRATE JUDGES AUGUST 1, 2024 OPINION AND ORDER*. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 08/15/2024) |
| 08/15/2024 | 368 | LETTER MOTION to Seal addressed to Judge Louis L. Stanton from CeCe M. Cole dated August 15, 2024. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Cole, CeCe) (Entered: 08/15/2024) |
| 08/15/2024 | 369 | LETTER MOTION to Seal *Certain Texts in Doniger Exhibits 6 & 15* addressed to Judge Louis L. Stanton from CeCe M. Cole dated August 15, 2024. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Cole, CeCe) (Entered: 08/15/2024) |
| 08/15/2024 | 370 | ***SELECTED PARTIES*** LETTER addressed to Judge Louis L. Stanton from CeCe M. Cole dated August 15, 2024 re: Sealed Version of Letter Motion to Seal Certain Texts in Doniger Exhibits 6 & 15 [ECF 369]. Document filed by Universal City Studios, LLC, Emily Sylvan Kim, Tracy Deebs-Elkenaney, Holtzbrinck Publishers, LLC, Lynne Freeman, Prospect Agency, LLC, Entangled Publishing, LLC.Motion or Order to File Under Seal: 368 .(Cole, CeCe) (Entered: 08/15/2024) |
| 08/20/2024 | 371 | ORDER granting 369 Letter Motion to Seal. These exhibits may be redacted. So Ordered. (Signed by Judge Louis L. Stanton on 8/20/2024) (sgz) (Entered: 08/20/2024) |
| 08/29/2024 | 372 | OPPOSITION BRIEF re: 367 Brief / *Defendants' Response to Plaintiffs Objections to Judge Netburns August 1, 2024 Opinion & Order Unsealing Plaintiffs Manuscripts & Notes*. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 08/29/2024) |
| 08/29/2024 | 373 | LETTER MOTION to Seal *Plaintiff's August 29, 2024 Letter* addressed to Judge Louis L. Stanton from Mark D. Passin dated August 29, 2024. Document filed by Lynne Freeman.. (Doniger, Stephen) (Entered: 08/29/2024) |
| 08/29/2024 | 374 | ***SELECTED PARTIES*** LETTER addressed to Judge Louis L. Stanton from Mark D. Passin dated August 29, 2024 re: Response to Ms. Cole's Letter dated August 15, 2024 (ECF 363). Document filed by Universal City Studios, LLC, Emily Sylvan Kim, Tracy Deebs-Elkenaney, Holtzbrinck Publishers, LLC, Lynne Freeman, Prospect Agency, LLC, Entangled Publishing, LLC.Motion or Order to File Under Seal: 373 .(Doniger, Stephen) (Entered: 08/29/2024) |
| 08/29/2024 | 375 | LETTER addressed to Judge Louis L. Stanton from Mark D. Passin dated August 29, 2024 re: Response to Ms. Cole's Letter dated August 15, 2024 (ECF 363). Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 08/29/2024) |

| 08/30/2024 | 376 | JOINT LETTER MOTION for Extension of Time *to file Objections* addressed to Judge Louis L. Stanton from Lacy H. Koonce, III dated August 30, 2024. Document filed by Emily Sylvan Kim, Prospect Agency, LLC..(Koonce, Lacy) (Entered: 08/30/2024) |
|---|---|---|
| 08/30/2024 | 377 | ORDER granting 376 Letter Motion for Extension of Time. Granted. Objections to R&R due by 9/5/2024. (Signed by Judge Louis L. Stanton on 8/30/2024) (tro) (Entered: 08/30/2024) |
| 09/05/2024 | 378 | MEMO ENDORSEMENT on re: 375 Letter filed by Lynne Freeman ENDORSEMENT I have already ruled on this matter, on August 20, 2024. See Document 371. (Signed by Judge Louis L. Stanton on 9/5/2024) (jca) (Entered: 09/05/2024) |
| 09/10/2024 | 379 | LETTER MOTION for Extension of Time *to File Objections* addressed to Judge Louis L. Stanton from Mark D. Passin dated September 10, 2024. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 09/10/2024) |
| 09/10/2024 | 380 | ORDER granting 379 Letter Motion for Extension of Time. SO ORDERED. Objections to R&R due by 9/20/2024. (Signed by Judge Louis L. Stanton on 9/10/2024) (jca) (Entered: 09/10/2024) |
| 09/20/2024 | 381 | LETTER addressed to Judge Louis L. Stanton from Nancy E. Wolff dated September 20, 2024 re: Requesting Oral Argument Regarding Defendants' Objection to Judge Netburn's Report and Recommendation on the Parties' Summary Judgment Motions. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 09/20/2024) |
| 09/20/2024 | 382 | BRIEF re: 361 Report and Recommendations,, / *Defendants' Objection to August 1, 2024 Summary Judgment Report and Recommendation*. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 09/20/2024) |
| 09/20/2024 | 383 | BRIEF re: 362 Memorandum & Opinion,,,,, / *Defendants' Objection to August 1, 2024 Opinion & Order*. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 09/20/2024) |
| 09/20/2024 | 384 | BRIEF re: 361 Report and Recommendations,, / *Plaintiff's Objection to August 1, 2024 Summary Judgment Report and Recommendation*. Document filed by Lynne Freeman.. (Doniger, Stephen) (Entered: 09/20/2024) |
| 09/20/2024 | 385 | BRIEF re: 362 Memorandum & Opinion,,,,, / *Plaintiff's Objection to August 1, 2024 Opinion & Order*.. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 09/20/2024) |
| 10/15/2024 | 386 | LETTER MOTION for Extension of Time *to file Responses to Objections* addressed to Judge Louis L. Stanton from Mark D. Passin dated October 15, 2024. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 10/15/2024) |
| 10/15/2024 | 387 | RESPONSE re: 386 LETTER MOTION for Extension of Time *to file Responses to Objections* addressed to Judge Louis L. Stanton from Mark D. Passin dated October 15, 2024. . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 10/15/2024) |
| 10/16/2024 | 388 | ORDER granting 386 Letter Motion for Extension of Time. Granted. (Signed by Judge Louis L. Stanton on 10/15/2024) (sgz) (Entered: 10/16/2024) |
| 10/24/2024 | 389 | ORDER: Plaintiff had the advantages of using the Unpublished Material in regard to the summary judgment applications, and cannot now be heard to argue that it should be |

| | | |
|---|---|---|
| | | withdrawn from public inspection. Those exhibits may be as yet unpublished, but they became open to public inspection when they were submitted as evidence in a contested matter in a federal court, and they cannot now be withdrawn and re-sealed to diminish a perceived risk of copying, or misuse against her in a "social media campaign." As further set forth in this Order. The time by which the unredacted material must be filed is extended to November 15, 2024. So Ordered. (Signed by Judge Louis L. Stanton on 10/24/2024) (sgz) (Entered: 10/24/2024) |
| 10/29/2024 | 390 | BRIEF re: 384 Brief *Defendants' Response to Plaintiff's Objection to the August 1, 2024 Summary Judgment Report and Recommendation*. Document filed by Holtzbrinck Publishers, LLC, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 10/29/2024) |
| 10/29/2024 | 391 | BRIEF re: 385 Brief *Defendants' Response to Plaintiff's Objection to the August 1, 2024 Opinion and Order*. Document filed by Holtzbrinck Publishers, LLC, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Universal City Studios, LLC..(Wolff, Nancy) (Entered: 10/29/2024) |
| 10/29/2024 | 392 | BRIEF re: 383 Brief, *Plaintiff's Response to Defendants' Objection to the August 1, 2024 Opinion and Order*. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 10/29/2024) |
| 10/29/2024 | 393 | BRIEF re: 382 Brief, *Plaintiff's Response to Defendants' Objection to the August 1, 2024 Summary Judgment Report and Recommendation*. Document filed by Lynne Freeman.. (Doniger, Stephen) (Entered: 10/29/2024) |
| 10/29/2024 | 394 | NOTICE of ERRATA re: 385 Brief. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1 - Corrected Brief re Objections to the Magistrates Opinion & Order).(Doniger, Stephen) (Entered: 10/29/2024) |
| 11/01/2024 | 395 | NOTICE of ERRATA re: 384 Brief. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1 - Corrected Brief re Objections to the Magistrate's Report and Recommendation).(Doniger, Stephen) (Entered: 11/01/2024) |
| 11/15/2024 | 396 | NOTICE of Plaintiff's Unsealed Manuscripts re: 389 Order,, 301 Notice (Other),,. Document filed by Holtzbrinck Publishers, LLC, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit Cole Decl. Ex. E (BMR), # 2 Exhibit Cole Decl. Ex. F (Masqued), # 3 Exhibit Cole Decl. Ex. CC-1 (side-by-side comparison), # 4 Exhibit Cole Decl. Ex. CC-2 (side-by-side comparison), # 5 Exhibit Cole Decl. Ex. CC-3 (side-by-side comparison), # 6 Exhibit Cole Decl. Ex. CC-4 (side-by-side comparison)).(Cole, CeCe) (Entered: 11/15/2024) |
| 11/15/2024 | 397 | NOTICE of Plaintiffs Unsealed Exhibits 3-11 and 14-19 and Doniger Exhibits 4-6, 11, 15, 18, and 20 re: 389 Order,, 279 Notice (Other),,,, 277 Notice (Other),,,. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 3 to Freeman Decl., # 2 Exhibit 4 to Freeman Decl., # 3 Exhibit 5 to Freeman Decl., # 4 Exhibit 6 to Freeman Decl., # 5 Exhibit 7 to Freeman Decl., # 6 Exhibit 8 to Freeman Decl., # 7 Exhibit 9 to Freeman Decl., # 8 Exhibit 10 to Freeman Decl., # 9 Exhibit 11 to Freeman Decl., # 10 Exhibit 14 to Freeman Decl., # 11 Exhibit 15 to Freeman Decl., # 12 Exhibit 16 to Freeman Decl., # 13 Exhibit 17 to Freeman Decl., # 14 Exhibit 18 to Freeman Decl., # 15 Exhibit 19 to Freeman Decl., # 16 Exhibit 4 to Doniger Decl., # 17 Exhibit 5 to Doniger Decl., # 18 Exhibit 6 to Doniger Decl., # 19 Exhibit 11 to Doniger Decl., # 20 Exhibit 15 to Doniger Decl., # 21 Exhibit 18 to Doniger Decl., # 22 Exhibit 20 to Doniger Decl.).(Doniger, Stephen) (Entered: 11/15/2024) |
| 11/21/2024 | 398 | ORDER adopting 361 Report and Recommendations for 311 Motion for Summary Judgment, filed by Prospect Agency, LLC, Emily Sylvan Kim, 274 Motion for Summary Judgment filed by Lynne Freeman, 288 Motion for Summary Judgment filed by Lynne |

| | | |
|---|---|---|
| | | Freeman, 296 Motion for Summary Judgment, filed by Universal City Studios, LLC, Entangled Publishing, LLC, Tracy Deebs-Elkenaney, Holtzbrinck Publishers, LLC. After a review of the R&R and the parties' objections, the Court adopts both of Magistrate Judge Netburn's conclusions, but narrows the scope of her direct copyright infringement rulings. The cross-motions for summary judgment on direct copyright infringement are denied, and all related questions are preserved for trial. dismissed. The Court adopts Magistrate Judge Netburn's decision to exclude Mr. Kaplan's affidavit on metadata but not Ms. Cole's. It also affirms all of Magistrate Judge Netburn's rulings on the motions to strike. The Court has already addressed sealing in a separate order (Dkt. No. 389). (Signed by Judge Louis L. Stanton on 11/21/2024) (sgz) (Entered: 11/21/2024) |
| 11/22/2024 | 399 | ORDER: On November 21, 2024, Judge Stanton adopted the Report and Recommendation denying the parties' cross-motions for summary judgment on Plaintiff's direct copyright infringement and granting Defendants' motion for summary judgment on Plaintiff's state law claims. In light of these decisions, if the parties believe that a settlement conference would be productive, they are directed to contact Courtroom Deputy Diljah Shaw with both parties on the e-mail, at diljah_shaw@nysd.uscourts.gov, to schedule a settlement conference. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 11/22/2024) (dsh) (Entered: 11/22/2024) |
| 12/04/2024 | 400 | NOTICE OF APPEARANCE by Jennifer L. Pariser on behalf of Entangled Publishing, LLC..(Pariser, Jennifer) (Entered: 12/04/2024) |
| 12/04/2024 | 401 | NOTICE of Substitution of Attorney. Old Attorney: Nancy Wolff, Benjamin Halperin, Scott Sholder, and CeCe Cole, New Attorney: Jennifer L. Pariser, Address: Oppenheim + Zebrak, LLP, 461 Fifth Avenue, 19th Floor, New York, New York, United States 20017, (212) 951-1156..(Pariser, Jennifer) (Entered: 12/04/2024) |
| 12/04/2024 | 402 | LETTER MOTION for Extension of Time *to file Motion for Reconsideration* addressed to Judge Louis L. Stanton from Jennifer L. Pariser dated December 4, 2024. Document filed by Entangled Publishing, LLC..(Pariser, Jennifer) (Entered: 12/04/2024) |
| 12/04/2024 | 403 | LETTER addressed to Judge Louis L. Stanton from Stephen M. Doniger dated December 4, 2024 re: Response to Defendant's Letter 402 and Joinder to Request to Extend Reconsideration Deadline. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1 - Email Chain).(Doniger, Stephen) (Entered: 12/04/2024) |
| 12/05/2024 | 404 | ORDER granting 402 Letter Motion for Extension of Time. For all parties. Motions due by 12/2/2024. (Signed by Judge Louis L. Stanton on 12/5/2024) (rro) (Entered: 12/05/2024) |
| 12/11/2024 | 405 | LETTER MOTION for Conference *re: Contemplated Motion for Leave to Disclose Rebuttal Expert Witness* addressed to Judge Louis L. Stanton from Stephen M. Doniger dated December 11, 2024. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 12/11/2024) |
| 12/12/2024 | 406 | NOTICE OF APPEARANCE by Jennifer L. Pariser on behalf of Macmillan Publishers, LLC..(Pariser, Jennifer) (Entered: 12/12/2024) |
| 12/12/2024 | 407 | MOTION for Reconsideration re; 398 Order Adopting Report and Recommendations,,,, . Document filed by Holtzbrinck Publishers, LLC, Tracy Deebs-Elkenaney, Macmillan Publishers, LLC, Emily Sylvan Kim, Entangled Publishing, LLC..(Pariser, Jennifer) (Entered: 12/12/2024) |
| 12/12/2024 | 408 | MEMORANDUM OF LAW in Support re: 407 MOTION for Reconsideration re; 398 Order Adopting Report and Recommendations,,,, . . Document filed by Holtzbrinck Publishers, LLC, Tracy Deebs-Elkenaney, Macmillan Publishers, LLC, Emily Sylvan Kim, Entangled Publishing, LLC..(Pariser, Jennifer) (Entered: 12/12/2024) |

| 12/13/2024 | 409 | LETTER addressed to Magistrate Judge Sarah Netburn from Amy L. Nashon dated December 13, 2024 re: Settlement Position. Document filed by Holtzbrinck Publishers, LLC, Tracy Deebs-Elkenaney, Macmillan Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Entangled Publishing, LLC..(Pariser, Jennifer) (Entered: 12/13/2024) |
|---|---|---|
| 12/16/2024 | 410 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated December 16, 2024 re: Response to Amy L. Nashon's Letter Doc #409. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 12/16/2024) |
| 12/16/2024 | 411 | LETTER addressed to Judge Louis L. Stanton from Amy L. Nashon dated December 16, 2024 re: Response to Plaintiff's letter to re-designate Rebuttal Expert Witness. Document filed by Holtzbrinck Publishers, LLC, Tracy Deebs-Elkenaney, Macmillan Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Entangled Publishing, LLC..(Pariser, Jennifer) (Entered: 12/16/2024) |
| 12/19/2024 | 412 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Amy L. Nashon to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-30360267. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Holtzbrinck Publishers, LLC, Macmillan Publishers, LLC, Entangled Publishing, LLC. (Attachments: # 1 Affidavit of Amy L. Nashon, # 2 Exhibit A - Certificate of Good Standing, # 3 Proposed Order Text of Proposed Order).(Nashon, Amy) Modified on 12/19/2024 (rju). (Entered: 12/19/2024) |
| 12/19/2024 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 412 MOTION for Amy L. Nashon to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-30360267. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of California;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (rju)** (Entered: 12/19/2024) |
| 12/19/2024 | 413 | MEMORANDUM OF LAW in Opposition re: 407 MOTION for Reconsideration re; 398 Order Adopting Report and Recommendations,,,, . . Document filed by Lynne Freeman.. (Doniger, Stephen) (Entered: 12/19/2024) |
| 12/26/2024 | 414 | REPLY to Response to Motion re: 407 MOTION for Reconsideration re; 398 Order Adopting Report and Recommendations,,,, . . Document filed by Holtzbrinck Publishers, LLC, Tracy Deebs-Elkenaney, Macmillan Publishers, LLC, Emily Sylvan Kim, Entangled Publishing, LLC..(Pariser, Jennifer) (Entered: 12/26/2024) |
| 01/08/2025 | 415 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Amy L. Nashon to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Holtzbrinck Publishers, LLC, Macmillan Publishers, LLC, Entangled Publishing, LLC. (Attachments: # 1 Affidavit of Amy L. Nashon, # 2 Exhibit A - Certificate of Good Standing, # 3 Proposed Order Text of Proposed Order).(Nashon, Amy) Modified on 1/8/2025 (rju). (Entered: 01/08/2025) |
| 01/08/2025 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 415 MOTION for Amy L. Nashon to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): Wrong date on Proposed Order;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (rju)** (Entered: 01/08/2025) |

| | | |
|---|---|---|
| 01/08/2025 | 416 | MOTION for Amy L. Nashon to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Holtzbrinck Publishers, LLC, Macmillan Publishers, LLC, Entangled Publishing, LLC. (Attachments: # 1 Affidavit of Amy L. Nashon, # 2 Exhibit A - Certificate of Good Standing, # 3 Proposed Order Text of Proposed Order).(Nashon, Amy) (Entered: 01/08/2025) |
| 01/08/2025 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 416 MOTION for Amy L. Nashon to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 01/08/2025) |
| 01/10/2025 | 417 | ORDER granting 416 Motion for Amy L. Nashon to Appear Pro Hac Vice. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (dsh) (Entered: 01/10/2025) |
| 01/14/2025 | 418 | ORDER for 361 Report and Recommendations. Contrary to the apparent conceptions of the parties, questions of non-infringement havetraditionally been reserved for the trier of fact. See Warner Bros. Inc. v. Arn. Broad. Companies,Inc., 720 F.2d 231, 239 (2d Cir. 1983) (the issue of substantial similarity "is frequently a factissue for jury resolution"); Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir.1980) ("[S]ummary judgment has traditionally been frowned upon in copyright litigation."). Notwithstanding the fevered expectations and arguments of counsel, I find no error or omission inMagistrate Judge Netbum's August 1, 2024 Report and Recommendation, which is careful,competent and thorough. In this case, one of the counsel for defendants recently colorfully proclaimed that her client would not join any settlement. Presumably it will only accept unconditional surrender. Trial by jury, following the steps set forth in section four of my individual rules of practice, is a time-tested, neutral, fact-based process for resolving disputes. At bottom, that is the choice of the parties. The Court approves it, as the proper choice for this case. (Signed by Judge Louis L. Stanton on 1/14/2025) (rro) Transmission to Orders and Judgments Clerk for processing. (Entered: 01/14/2025) |
| 01/14/2025 | 419 | LETTER MOTION to Compel Defendants Emily Sylvan Kim, Prospect Agency, LLC, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, and Tracy Deebs-Elkenaney to produce supplemental financial information discovery *; and for Sanctions* addressed to Magistrate Judge Sarah Netburn from Stephen M. Doniger dated January 14, 2025. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2).(Doniger, Stephen) (Entered: 01/14/2025) |
| 01/16/2025 | 420 | LETTER addressed to Magistrate Judge Sarah Netburn from Jennifer L. Pariser dated January 16, 2025 re: Request for Extension to Respond to Letter Motion. Document filed by Holtzbrinck Publishers, LLC, Tracy Deebs-Elkenaney, Emily Sylvan Kim, Entangled Publishing, LLC..(Pariser, Jennifer) (Entered: 01/16/2025) |
| 01/17/2025 | 421 | MEMO ENDORSEMENT on re: 420 Letter. ENDORSEMENT: Defendants' request for an extension is GRANTED. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 1/17/2025) (dsh) (Entered: 01/17/2025) |
| 01/17/2025 | 422 | MEMO ENDORSEMENT on re: 411 Letter: This matter is respectfully referred to Magistrate Judge Netbum. (Signed by Judge Louis L. Stanton on 1/17/25) (ml) (Entered: 01/17/2025) |
| 01/23/2025 | 423 | LETTER RESPONSE in Opposition to Motion addressed to Magistrate Judge Sarah Netburn from Amy Nashon dated 01/23/2025 re: 419 LETTER MOTION to Compel Defendants Emily Sylvan Kim, Prospect Agency, LLC, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, and Tracy Deebs-Elkenaney to produce supplemental financial information discovery *; and for Sanctions* addres . Document filed by Holtzbrinck Publishers, LLC, Tracy Deebs-Elkenaney, Macmillan Publishers, LLC, |

| | | Emily Sylvan Kim, Prospect Agency, LLC, Entangled Publishing, LLC, Universal City Studios, LLC..(Nashon, Amy) (Entered: 01/23/2025) |
|---|---|---|
| 01/27/2025 | 424 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark Passin dated January 26, 2025 re: in response to Amy Nashons letter ECF 423. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 01/27/2025) |
| 01/30/2025 | 425 | ORDER denying 405 . This case has been pending for nearly three years. Further delay under these circumstances is unwarranted and unreasonable. Plaintiff's request for leave to offer Ms. Reiss as an expert witness to rebut the testimony of Ms. Easton is DENIED. The Clerk of Court is requested to terminate the motion at ECF No. 405. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 1/30/2025) (dsh) (Entered: 01/30/2025) |
| 02/06/2025 | 426 | ORDER denying 419 Letter Motion to Compel. Plaintiff's motion to compel is denied without prejudice. Plaintiff's motion for fees and costs is denied as unwarranted. Defendants' January 23 letter indicates that they intend to comply with the Court's prior order. The parties are ORDERED to meet and confer and file a letter by February 14, 2025, confirming that the parties have agreed on the scope and deadline for production or setting forth the parties' open disputes. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 02/06/2025) |
| 02/12/2025 | 427 | Objection re: 425 Order on Motion for Conference, . Document filed by Lynne Freeman.. (Doniger, Stephen) (Entered: 02/12/2025) |
| 02/12/2025 | 428 | DECLARATION of Mark D. Passin in Support re: 427 Objection (non-motion). Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1).(Doniger, Stephen) (Entered: 02/12/2025) |
| 02/14/2025 | 429 | LETTER addressed to Magistrate Judge Sarah Netburn from Stephen M. Doniger and Amy Nashon dated February 13, 2025 re: Update regarding scope and deadline for production of supplemental discovery responses. Document filed by Lynne Freeman.. (Doniger, Stephen) (Entered: 02/14/2025) |
| 02/26/2025 | 430 | OPPOSITION BRIEF re: 428 Declaration in Support, 427 Objection (non-motion) . Document filed by Holtzbrinck Publishers, LLC, Tracy Deebs-Elkenaney, Macmillan Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Entangled Publishing, LLC, Universal City Studios, LLC..(Nashon, Amy) (Entered: 02/26/2025) |
| 03/06/2025 | 431 | PROPOSED STIPULATION AND ORDER. Document filed by Lynne Freeman.. (Doniger, Stephen) (Entered: 03/06/2025) |
| 03/10/2025 | 432 | AMENDMENT TO STIPULATION OF DISMISSAL WITHOUT PREJUDICE AS TO DEFENDANT CRAZY MAPLE STUDIO, INC. AND ORDER THEREON. NOW, THEREFORE, in consideration of the mutual promises set forth herein, the sufficiency of which are hereby acknowledged, the Parties hereby agree as follows: 1. The Tolling Period (as defined in the Stipulation of Dismissal) is hereby extended to, and including, February 18, 2028. 2. Except as expressly provided in this Amendment, all of the terms and conditions of the Amendment shall remain unchanged and in full force and effect. SO ORDERED. (Signed by Judge Louis L. Stanton on 3/10/25) (yv) (Entered: 03/10/2025) |
| 03/26/2025 | 433 | NOTICE of Substitution of Attorney. Old Attorney: Nancy Wolff, Benjamin Halperin, Scott Sholder, and CeCe Cole, New Attorney: Jennifer L. Pariser, Address: Oppenheim + Zebrak, LLP, 461 5th Ave, 19th Floor, New York, NY, United States 10017, (212) 951-1156. Document filed by Universal City Studios, LLC..(Pariser, Jennifer) (Entered: 03/26/2025) |
| 03/26/2025 | 434 | NOTICE of Substitution of Attorney. Old Attorney: Nancy Wolff, Benjamin Halperin, Scott Sholder, and CeCe Cole, New Attorney: Jennifer L. Pariser, Address: Oppenheim + |

| | | |
|---|---|---|
| | | Zebrak, LLP, 461 5th Ave, 19th Floor, New York, NY, United States 10017, (212) 951-1156. Document filed by Holtzbrinck Publishers, LLC..(Pariser, Jennifer) (Entered: 03/26/2025) |
| 03/27/2025 | 435 | CONSENT ORDER GRANTING SUBSTITUTION OF ATTORNEY re: 433 Notice of Substitution of Attorney, filed by Universal City Studios, LLC, Attorney Scott Jonathan Sholder; Nancy Evelyn Wolff; CeCe Cole and Benjamin Samuel Halperin terminated.The substitution of attorney is hereby approved and so ORDERED. (Signed by Judge Louis L. Stanton on 3/27/2025) (ar) (Entered: 03/27/2025) |
| 03/27/2025 | 436 | CONSENT ORDER GRANTING SUBSTITUTION OF ATTORNEY re: 434 Notice of Substitution of Attorney, filed by Holtzbrinck Publishers, LLC, Attorney Scott Jonathan Sholder; Nancy Evelyn Wolff; CeCe Cole and Benjamin Samuel Halperin terminated. The substitution of attorney is hereby approved and so ORDERED. (Signed by Judge Louis L. Stanton on 3/27/2025) (ar) (Entered: 03/27/2025) |
| 03/31/2025 | 437 | MOTION for Nancy Evelyn Wolff to Withdraw as Attorney . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC..(Wolff, Nancy) (Entered: 03/31/2025) |
| 03/31/2025 | 438 | MOTION for Scott Jonathan Sholder to Withdraw as Attorney . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC..(Sholder, Scott) (Entered: 03/31/2025) |
| 03/31/2025 | 439 | MOTION for CeCe Cole to Withdraw as Attorney . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC..(Cole, CeCe) (Entered: 03/31/2025) |
| 03/31/2025 | 440 | MOTION for Benjamin Samuel Halperin to Withdraw as Attorney . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC..(Halperin, Benjamin) (Entered: 03/31/2025) |
| 04/01/2025 | 441 | ORDER granting 437 Motion to Withdraw as Attorney. Attorney Scott Jonathan Sholder; Nancy Evelyn Wolff; CeCe Cole and Benjamin Samuel Halperin terminated; granting 438 Motion to Withdraw as Attorney. Attorney Scott Jonathan Sholder; Nancy Evelyn Wolff; CeCe Cole and Benjamin Samuel Halperin terminated; granting 439 Motion to Withdraw as Attorney. Attorney Scott Jonathan Sholder; Nancy Evelyn Wolff; CeCe Cole and Benjamin Samuel Halperin terminated; granting 440 Motion to Withdraw as Attorney. Attorney Scott Jonathan Sholder; Nancy Evelyn Wolff; CeCe Cole and Benjamin Samuel Halperin terminated (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (dsh) (Entered: 04/01/2025) |
| 05/08/2025 | 442 | LETTER addressed to Judge Louis L. Stanton from Stephen M. Doniger dated May 8, 2025 re: Request to Lift Stay on Pretrial Rules. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 05/08/2025) |
| 05/14/2025 | 443 | LETTER MOTION for Conference re: 442 Letter addressed to Judge Louis L. Stanton from Amy Nashon on Behalf of All Defendants dated 05/14/2025. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC..(Nashon, Amy) (Entered: 05/14/2025) |
| 05/14/2025 | 444 | MEMO ENDORSEMENT on re: 442 Letter filed by Lynne Freeman. ENDORSEMENT: Respectfully referred to Magistrate Judge Netburn. (Signed by Judge Louis L. Stanton on 5/14/2025) (rro) (Entered: 05/14/2025) |
| 05/14/2025 | 445 | ORDER with respect to 443 Letter Motion for Conference. Respectfully referred to Magistrate Judge Netburn. (Signed by Judge Louis L. Stanton on 5/14/2025) (rro) (Entered: 05/14/2025) |
| 05/14/2025 | 446 | MOTION for Eric A. Plourde to Withdraw as Attorney . Document filed by Crazy Maple Studio, Inc.. (Attachments: # 1 Affidavit Certificate of Service).(Plourde, Eric) (Entered: |

| | | |
|---|---|---|
| | | 05/14/2025) |
| 05/15/2025 | 447 | ORDER granting 446 Motion to Withdraw as Attorney. Attorney Eric Plourde and Jack Shaw terminated. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (dsh) (Entered: 05/15/2025) |
| 05/16/2025 | 448 | LETTER addressed to Magistrate Judge Sarah Netburn from Stephen M. Doniger dated May 16, 2025 re: Response to Defendants' Letter. Document filed by Lynne Freeman.. (Doniger, Stephen) (Entered: 05/16/2025) |
| 05/21/2025 | 449 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated May 21, 2025 re: Request for Informal Discovery Conference. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1 - Entangled Interrogatory Answers, # 2 Exhibit 2 - Macmillan Interrogatory Answers, # 3 Exhibit 3 - Prospect Interrogatory Answers, # 4 Exhibit 4 - Wolff Interrogatory Answers).(Doniger, Stephen) (Entered: 05/21/2025) |
| 05/21/2025 | 450 | LETTER MOTION to Seal *Certain Documents* addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated May 21, 2025. Document filed by Lynne Freeman.. (Doniger, Stephen) (Entered: 05/21/2025) |
| 05/21/2025 | 451 | ***SELECTED PARTIES***NOTICE of Sealed Exhibits 1-4 re: 449 Letter,. Document filed by Lynne Freeman, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit 2 - Macmillan Interrogatory Answer (Unredacted), # 2 Exhibit 3 - Prospect Interrogatory Answers (Unredacted), # 3 Exhibit 4 - Wolff Interrogatory Answers (Unredacted))Motion or Order to File Under Seal: 450 . (Doniger, Stephen) (Entered: 05/21/2025) |
| 05/22/2025 | 452 | ORDER granting 450 Letter Motion to Seal on an interim basis. The Court may reconsider this ruling upon resolution of the underlying motion. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 05/22/2025) |
| 05/22/2025 | 453 | ORDER: In this case, no mistake has been made, and Magistrate Judge Netburn's Order is in full compliance with the law. In her August 1, 2024 Opinion and Order (Dkt. No. 3 62), Reiss' s proposed testimony was found to be inadmissible because it considered only the similarities between the parties' works, and not their differences, and thus failed to address "highly relevant" evidence. Id. at 15-16. That ground has since been revisited, with the finding that "Reiss enumerates many similarities that are plainly genre conventions and tropes but fails to identify them as such... significantly reducing the reliability of her report." Id. at 17. Plaintiff urges that Reiss's testimony would be acceptable and useful, within limitations. On the contrary, its exclusion is prudent and is supported by a thorough knowledge of Reiss's offerings. Plaintiffs objections are overruled and Magistrate Judge Netburn's January 30, 2025 Order (Dkt. No. 425) is affirmed. (Signed by Judge Louis L. Stanton on 5/22/2025) (rro) (Entered: 05/22/2025) |
| 05/22/2025 | 454 | ORDER: A telephone conference is scheduled for Friday, May 30, 2025, at 12:30 p.m. At that time, the parties should call the Court's dedicated teleconferencing line at (855) 244-8681 and enter Access Code 23142707008. The purpose of the conference is to discuss (1) Defendants' May 14, 2025 letter request for a copyrightability hearing, and (2) Plaintiff's May 21, 2025 request for a discovery conference. Defendants shall file a response to Plaintiffs May 21 letter no later than Wednesday, May 28, 2025. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 5/22/2025) (Telephone Conference set for 5/30/2025 at 12:30 PM before Magistrate Judge Sarah Netburn.) (ar) (Entered: 05/22/2025) |
| 05/22/2025 | 455 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, esq. dated May 22, 2025 re: Lynne Freeman v. Tracy Deebs-Elkenaney et. al., Case No. 22 Civ 2435 |

| | | (LLS) (SN). Document filed by Lynne Freeman..(Passin, Mark) (Entered: 05/22/2025) |
|---|---|---|
| 05/23/2025 | 456 | MEMO ENDORSEMENT on re: 455 Letter filed by Lynne Freeman. ENDORSEMENT: The telephone conference scheduled for Friday, May 30, 2025, is ADJOURNED to Thursday, June 5, 2025, at 10:00 a.m. At that time, the parties should call the Court's dedicated teleconferencing line at (855) 244-8681 and enter Access Code 23142707008. SO ORDERED. (Telephone Conference set for 6/5/2025 at 10:00 AM before Magistrate Judge Sarah Netburn.) (Signed by Magistrate Judge Sarah Netburn on 5/23/2025) (mml) (Entered: 05/23/2025) |
| 05/28/2025 | 457 | LETTER addressed to Magistrate Judge Sarah Netburn from Amy Nashon Esq. dated 05/28/2025 re: Order at Docket 454. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC..(Nashon, Amy) (Entered: 05/28/2025) |
| 06/04/2025 | 458 | ***SELECTED PARTIES***NOTICE of Sealed Exhibits 1-4 re: 449 Letter,. Document filed by Lynne Freeman, Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC. (Attachments: # 1 Exhibit 2 - Macmillan Interrogatory Answer (Unredacted), # 2 Exhibit 3 - Prospect Interrogatory Answers (Unredacted), # 3 Exhibit 4 - Wolff Interrogatory Answers (Unredacted))Motion or Order to File Under Seal: 452 . (Doniger, Stephen) (Entered: 06/04/2025) |
| 06/05/2025 | | Minute Entry for proceedings held before Magistrate Judge Sarah Netburn: Telephone Conference held on 6/5/2025. (dsh) (Entered: 06/06/2025) |
| 06/05/2025 | 459 | ORDER denying 443 Letter Motion for Conference. On June 5, 2025, the parties appeared for a telephone conference to discuss (1) Defendants' May 14, 2025 letter request for a copyrightability hearing, and (2) Plaintiff's May 21, 2025 request for a discovery conference. Defendants' request for a copyrightability hearing is DENIED. The Defendants are further ORDERED to provide updated verified responses to their interrogatories within 14 days. Plaintiff shall file a letter regarding the status of MacMillian Publisher's document production by June 13, 2025. The stay on Rule 4(a) of Judge Stanton's Individual Rules is lifted, and Plaintiff shall comply with Rule 4(a) within 45 days of this Order. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 443. SO ORDERED.(Signed by Magistrate Judge Sarah Netburn on 6/5/2025) (dsh) (Entered: 06/06/2025) |
| 06/06/2025 | 460 | MOTION for Zachary Press to Withdraw as Attorney . Document filed by Emily Sylvan Kim, Prospect Agency, LLC..(Koonce, Lacy) (Entered: 06/06/2025) |
| 06/09/2025 | 461 | ORDER granting 460 Motion to Withdraw as Attorney. Attorney Zachary M. Press terminated. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (dsh) (Entered: 06/09/2025) |
| 06/13/2025 | 462 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, esq. dated June 13, 2025 re: regarding the status of Macmillan publishers document production (See ECF 459) and the rest of Defendants production of supplemental damages documents.. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 06/13/2025) |
| 06/16/2025 | 463 | MEMO ENDORSEMENT on re: 462 Letter, filed by Lynne Freeman. ENDORSEMENT: Plaintiff shall file a letter with the Court no later than July 1, 2025 providing an update on: (1) the expert's review of the Macmillan document production, and (2) Defendants' damages document production. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 6/16/2025) (dsh) (Entered: 06/16/2025) |

| | | |
|---|---|---|
| 07/01/2025 | 464 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, esq. dated July 1, 2025 re: June 13, 2025 Order to update the Court no later than July 1, 2025, regarding (a) the experts review of the Macmillan document production, and (b) Defendants damages document production (ECF 463) and (2) to update the Court regarding Defendants supplemental interrogatory responses regarding damages that Defendants were ordered to provide to Plaintiff no later than June 19, 2025 (ECF 459).. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 07/01/2025) |
| 07/02/2025 | 465 | MEMO ENDORSEMENT on re: 464 Letter, filed by Lynne Freeman. ENDORSEMENT: Defendants are directed to respond to Plaintiff's June 27, 2025, meet and confer request no later than July 10, 2025. Plaintiff shall file a status letter no later than July 29, 2025, providing the Court with an update regarding the meet and confer process and any outstanding issues relatedto the Macmillan document production, and Defendants' updated damages document production and interrogatory responses. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 7/2/2025) (dsh) (Entered: 07/02/2025) |
| 07/29/2025 | 466 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated July 29, 2025 re: (1) pursuant to Your Honors July 2, 2025 Order (ECF 465) to provide Your Honor with a status report updating the Court (a) on the meet and confer process; and (b) any outstanding issues related to the Macmillan document production and Defendants updated damages document production and interrogatory responses; and (2) to request that a pretrial conference date be set.. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 07/29/2025) |
| 07/30/2025 | 467 | MEMO ENDORSEMENT on re: 466 Letter. ENDORSEMENT: Plaintiff shall file a letter regarding the status of the supplemental damages discovery no later than August 13, 2025. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 7/30/2025) (dsh) (Entered: 07/30/2025) |
| 07/31/2025 | | Set/Reset Hearings: Final Pretrial Conference set for 11/20/2025 at 02:30 PM in Courtroom 21C, 500 Pearl Street, New York, NY 10007 before Judge Louis L. Stanton. (ml) (Entered: 07/31/2025) |
| 08/13/2025 | 468 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin, ESQ. dated August 13, 2025 re: pursuant to the Courts July 30, 2025 Order (ECF 467) to provide Your Honor with a letter regarding the status of the supplemental damages discovery.. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 08/13/2025) |
| 09/16/2025 | 469 | LETTER addressed to Magistrate Judge Sarah Netburn from Mark D. Passin dated September 16, 2025 re: Follow-up to Letter 468 . Document filed by Lynne Freeman.. (Doniger, Stephen) (Entered: 09/16/2025) |
| 09/17/2025 | 470 | PROPOSED STIPULATION AND ORDER. Document filed by Lynne Freeman. (Attachments: # 1 Proposed Order).(Doniger, Stephen) (Entered: 09/17/2025) |
| 09/17/2025 | 471 | PROPOSED ORDER. Document filed by Lynne Freeman. Related Document Number: 470 ..(Doniger, Stephen) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 09/17/2025) |
| 09/17/2025 | | **\*\*\*NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 471 Proposed Order was reviewed and approved as to form. (tp)** (Entered: 09/17/2025) |
| 09/17/2025 | | NOTICE OF CASE REASSIGNMENT to Judge Colleen McMahon. Judge Louis L. Stanton is no longer assigned to the case. (vba) (Entered: 09/17/2025) |
| 09/18/2025 | 472 | ORDER GRANTING JOINT STIPULATION RE SCHEDULE FOR EXPERT DISCOVERY: Having considered the parties' Joint Stipulation re Schedule for Expert Discovery, and for good cause shown, it is hereby ORDERED that: (i) Plaintiff will serve |

| | | an updated damages expert report on Defendants by October 6, 2025; (ii) Defendants shall have until November 5, 2025 to serve a rebuttal damages expert report; (iii) The parties will complete expert depositions by no later than November 20, 2025. SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 9/18/2025) (dsh) (Entered: 09/18/2025) |
|---|---|---|
| 09/30/2025 | 473 | LETTER addressed to Judge Colleen McMahon from Stephen M. Doniger dated September 30, 2025 re: Status Letter. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 09/30/2025) |
| 10/01/2025 | 474 | MEMO ENDORSEMENT on re: 473 Status Letter filed by Lynne Freeman. ENDORSEMENT: I think perhaps it would be better if we met sooner rather than later. Can the parties come up with a good date and time next week and communicate same to my Deputy Mariela De Jesus. (Signed by Judge Colleen McMahon on 10/1/25) (yv) (Entered: 10/01/2025) |
| 10/01/2025 | 475 | LETTER addressed to Judge Colleen McMahon from Amy Nashon dated 10/01/2025 re: Status of Transferred Case. Document filed by Crazy Maple Studio, Inc., Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC.. (Nashon, Amy) (Entered: 10/01/2025) |
| 10/02/2025 | 476 | MEMO ENDORSEMENT on re: 475 Letter, filed by Crazy Maple Studio, Inc., Emily Sylvan Kim, Entangled Publishing, LLC, Tracy Deebs-Elkenaney, Holtzbrinck Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC, Macmillan Publishers, LLC. ENDORSEMENT: Can we make a date next week - Wednesday preferred, Tuesday next best. (Signed by Judge Colleen McMahon on 10/2/2025) (jjc) (Entered: 10/02/2025) |
| 10/02/2025 | 477 | LETTER addressed to Judge Colleen McMahon from Amy L. Nashon dated October 2, 2025 re: Defendants' Response to Request for Initial Meeting. Document filed by Entangled Publishing, LLC..(Nashon, Amy) (Entered: 10/02/2025) |
| 10/02/2025 | 478 | MEMO ENDORSEMENT on re: 477 Letter filed by Entangled Publishing, LLC. ENDORSEMENT: Conference scheduled for Tuesday, October 7th, 2025 at 2:00 PM EST. ( Status Conference set for 10/7/2025 at 02:00 PM before Judge Colleen McMahon.) (Signed by Judge Colleen McMahon on 10/2/2025) (jjc) (Entered: 10/02/2025) |
| 10/02/2025 | 479 | LETTER addressed to Judge Colleen McMahon from Stephen M. Doniger and Mark Passin dated October 2, 2025 re: Request for Telephonic Appearance at Status Conference. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 10/02/2025) |
| 10/06/2025 | | MEMO ENDORSEMENT on re: 479 Letter, filed by Lynne Freeman. ENDORSEMENT: The Court will allow Plaintiffs counsel to appear telephonically for the status conference scheduled tomorrow, October 7, 2025. This accommodation is a one-time exception. Counsel are advised that, going forward, the Court will require in-person appearances at all proceedings unless otherwise ordered. (HEREBY ORDERED by Judge Colleen McMahon) (Zahn, Arnold) (Entered: 10/06/2025) |
| 10/07/2025 | 480 | TRANSCRIPT of Proceedings re: CONFERENCE held on 6/5/2025 before Magistrate Judge Sarah Netburn. Court Reporter/Transcriber: Marissa Lewandowski, (631) 813-9335. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/28/2025. Redacted Transcript Deadline set for 11/7/2025. Release of Transcript Restriction set for 1/5/2026. (js) (Entered: 10/07/2025) |

| 10/07/2025 | 481 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 6/5/2025 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(js) (Entered: 10/07/2025) |
| --- | --- | --- |
| 10/07/2025 | | Minute Entry for proceedings held before Judge Colleen McMahon: Initial Pretrial Conference held on 10/07/2025. Decision: Initial conference held. Submitted by Arnold Zahn. (Court Reporter Amy Walker). (Entered: 10/07/2025) (Entered: 10/07/2025) |
| 10/20/2025 | 482 | NOTICE TO COUNSEL : I was wondering how your consultations with your respective clients were doing with respect to the possibility of trying this case to the court rather than to a jury. Just to clarify my position (and because it might help if your clients were able to read what I told you at our recent conference): If you try the case to the court, we will start the trial no later than the second week of March 2026. I promise I will read everything that either side wants to submit to a trier of fact --all the books, all the notes and all the drafts. A bench trial would obviate the need for you to make selections about what material you will present to the trier of fact, because I will consider literally everything. It would also obviate the need for you to make lots of in limine motions, because I generally don't worry about such things in connection with bench trials -I just listen to whatever the parties want me to hear, evaluate your arguments, and filter out anything that is unpersuasive or incompetent. Finally, I will give you a final decision on all issues no later than summer 2026 -which, given the age of this matter, is obviously important to all of you. It does seem to me that a bench trial is far and away the easiest way to deal with the complexities of this very unwieldy matter and get to a comprehensive final decision as soon as possible. The fact that I have no experience with this case and have had no opportunity to form any opinions about any of the merits issues affords you a tremendous advantage -as I said to counsel at the conference, I am a "virgin" where the merits of this case are concerned. If, however, we are going jury rather than non-jury, we will need to decide on a format and set parameters and a pre-trial proceedings schedule for an opening (bellwether) jury trial by November 14. So I need a final decision from each side on the bench/ jury issue by the beginning of next week (October 27). (Signed by Judge Colleen McMahon on 10/20/25) BY ECF TO ALL COUNSEL (yv) (Entered: 10/20/2025) |
| 10/20/2025 | 483 | LETTER addressed to Judge Colleen McMahon from Amy Nashon on Behalf of All Defendants dated October 20, 2025 re: Bench Trial. Document filed by Crazy Maple Studio, Inc., Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC..(Nashon, Amy) (Entered: 10/20/2025) |
| 10/27/2025 | 484 | LETTER addressed to Judge Colleen McMahon from Mark D. Passin dated October 27, 2025 re: to advise the Court that Ms. Freeman elects to exercise her right to a jury trial. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 10/27/2025) |

| 11/03/2025 | 485 | ORDER : The Parties are hereby ordered to deliver to the Court, in hard copy, two true and correct copies of each of the following within forty-eight hours of this Order: (1) Tracy Wolff's Crave, Crush, Covel, and Court; (2) Blue Moon Rising (2011) ("BMR 2011"); (3) Masqued (2013) ("BMR 2013"); and (4) the nine sets of notes previously produced under Bates Nos. LF 089448, LF 261014, LF 089440, LF 175058, LF 089442, LF 140567, LF 089412, LF 089445, and LF 174135. The Parties shall further include any additional texts at issue that are relevant to the alleged copyright violations. (Signed by Judge Colleen McMahon on 11/3/25) BY ECF TO ALL COUNSEL. (yv) (Entered: 11/03/2025) |
|---|---|---|
| 11/04/2025 | 486 | SECOND NOTICE TO COUNSEL : I will be sending out notices like this one to you periodically. I prefer this to frequent in person conferences, especially when counsel for one side is a continent and three time zones away. I have received the plaintiff's letter of October 27, 2025, and I see that we are having a jury trial. So I need to figure out a way to make this case manageable for a jury. But first, I need to dispel the notion that anything Judge Stanton said about how he would try the case remains pertinent. I am now the trial judge. And while I am second to none in my admiration for Judge Stanton, nothing he said about how he would try the case is in any way binding on me as the new trial judge. We are going to do this trial my way; you folks will simply have to accept that. The fact that Judge Stanton decided that he would not bifurcate the trial is not binding on me, and from the perspective of keeping things as simple as possible for the jury, I don't think it is the best way to try the case. So I will not be doing it that way. I will be segmenting the trial of this action in the manner I first indicated I would: you will be presenting your evidence on the issues of probative similarity and access, after which I will charge the jury on those issues. If the jury finds for the plaintiff on both probative similarity and access, you will put in any additional evidence you might have on substantial similarity and make a second closing argument, after which I will deliver the charge on that standard. And if the plaintiff prevails on substantial similarity, we will hear evidence on damages and I will charge the jury on damages. That decision has been made and will not be changed. Where the defendant wants/needs to try the affirmative defense of independent creation remains to be discussed. Judge Stanton was of the opinion that competent trial counsel should be able to argue from that evidence in the manner set out in, say, pages 7 through 21 of the plaintiff's brief at Docket No. 393. I don't disagree with his basic premise, which is that we can (and must) find a manageable way to try this case. But Judge Stanton did not address what to me is the critically important issue: whether summaries of underlying evidence (and that is what pages 7 through 21 of the brief at Dkt. No. 393 are) can be (1) shown to the jury at all; and (2) given to the jury to assist jurors during deliberations. I am looking for guidance about how other courts have handled this issue - if indeed any other courts have confronted a jury trial in a copyright case that involves over 10,000 pages of allegedly infringed and infringing material. To that end, each side must provide me, by close of business next Friday, November 14, 2025, with a brief pointing me to copyright cases that, like this one, have gone to trial and involve voluminous amounts of allegedly infringed and infringing material. I am interested in what procedures court have adopted in previous copyright cases to expose the jury to voluminous allegedly infringed and infringing materials that must be compared in their original, not summary, form. If you cannot find copyright cases that deal with this problem but can locate analogous cases, I would be interested in seeing them as well. And if you have suggestions about how we might deal with this problem - and I do consider it to be a problem, rather more of one than Judge Stanton apparently did - I would like to hear them. I need to set the rules soon, so that your trial preparation does not go off in the wrong direction. Each side must also provide me, by close of business on November 25, 2025, with the following information as further set forth in this Order. Be warned that I will admit no more than 100 such exhibits from each side, so don't go overboard. I will deal with objections later, but prior to jury selection, at the final pretrial conference. I |

| | | |
|---|---|---|
| | | want to figure out how I am going to try this case before Christmas, so we can get started in March, as I told you I hoped to do. So please do not ask for an extension of time for any of these submissions. As far as I am concerned, you are already on trial, and I need to move this case along. (Signed by Judge Colleen McMahon on 11/4/25) BY ECF TO ALL COUNSEL (yv) (Entered: 11/04/2025) |
| 11/07/2025 | 487 | LETTER addressed to Judge Colleen McMahon from Stephen M. Doniger dated November 7, 2025 re: Clarification on 486 Order. Document filed by Lynne Freeman.. (Doniger, Stephen) (Entered: 11/07/2025) |
| 11/10/2025 | 488 | MEMO ENDORSEMENT on re: 487 Letter Clarification on 486 Order filed by Lynne Freeman. ENDORSEMENT : No - all three phases. (Signed by Judge Colleen McMahon on 11/10/25) (yv) (Entered: 11/10/2025) |
| 11/12/2025 | 489 | LETTER addressed to Judge Colleen McMahon from Dwayne K. Goetzel dated 11/12/2025 re: clarification of exhibits. Document filed by Tracy Deebs-Elkenaney.. (Goetzel, Dwayne) (Entered: 11/12/2025) |
| 11/13/2025 | 490 | MEMO ENDORSEMENT on re: 489 Letter clarification of exhibits filed by Tracy Deebs-Elkenaney. ENDORSEMENT: I am sure all defendants have some exhibits in common. They should be listed as "Joint Defense Exhibits" and are limited to 100. Each defendant should give me an estimate of the number. (Signed by Judge Colleen McMahon on 11/13/25) (yv) (Entered: 11/13/2025) |
| 11/14/2025 | 491 | BRIEF re: 486 Order,,,,,,,,,,,,,,,, *Plaintiff's Response Brief re Voluminous Trial Materials*. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 11/14/2025) |
| 11/14/2025 | 492 | BRIEF re: 486 Order,,,,,,,,,,,,,,,, *Filed by Defendants*. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC.. (Nashon, Amy) (Entered: 11/14/2025) |
| 11/17/2025 | 493 | Objection re: 492 Brief, . Document filed by Lynne Freeman..(Jenkins, David) (Entered: 11/17/2025) |
| 11/18/2025 | 494 | LETTER addressed to Judge Colleen McMahon from Mark D. Passin, ESQ. dated November 18, 2025 re: brief extension of the November 25, 2025 deadline to submit the requested list of exhibits other than the alleged infringed and infringing material.. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 11/18/2025) |
| 11/19/2025 | 495 | MEMO ENDORSEMENT on re: 494 Letter brief extension of the November 25, 2025 deadline to submit the requested list of exhibits other than the alleged infringed and infringing material, filed by Lynne Freeman. ENDORSEMENT : Extension granted. (Signed by Judge Colleen McMahon on 11/19/25) (yv) (Entered: 11/19/2025) |
| 11/25/2025 | 496 | WITNESS LIST. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 11/25/2025) |
| 11/25/2025 | 497 | Exhibit List *PLAINTIFF'S LIST OF MATERIALS AT ISSUE*. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 11/25/2025) |
| 11/25/2025 | 498 | WITNESS LIST. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC..(Nashon, Amy) (Entered: 11/25/2025) |
| 11/25/2025 | 499 | PRETRIAL MEMORANDUM. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC..(Nashon, Amy) (Entered: 11/25/2025) |

| 11/25/2025 | 500 | WITNESS LIST. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 11/25/2025) |
| 11/25/2025 | 501 | WITNESS LIST. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC..(Nashon, Amy) (Entered: 11/25/2025) |
| 12/02/2025 | 502 | Objection re: 499 Pretrial Memorandum . Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 12/02/2025) |
| 12/05/2025 | 503 | REQUEST FOR SUBMISSIONS : I thank the parties for their carefully thought out ideas for how to proceed in this case. I, too, have been thinking a lot about this - and while I have been thinking, I have been reading. And reading. And reading. I have completed all four volumes of the Crave series, 1 and I have read Masqued and am well into the BMR manuscripts. As a result of all this reading - which will continue until I have consumed the entirety of plaintiff's unpublished oeuvre - I am in a far better position to understand the issues in this case and the prior decisions, and to address how I would like to proceed. My experience with copyright cases is not extensive, and with cases where there is this volume of material, it is non-existent. But I do not understand that there is any rule precluding consideration of a potentially dispositive issue just because someone's idea of "best practices" counsels dealing with Issue 2 only after disposing of Issue 1. That seems particularly true here. There is no need for a trial on the disputed issue of access if summary judgment is granted on the issue of substantial similarity. Access is not an element of substantial similarity - for that matter, neither is probative similarity - so summary judgment can be granted on substantial similarity even if there is a genuine issue of fact as to those issues. Put otherwise, it is possible that a case can be dismissed for want of substantial similarity even if there is some dispute about any aspect of actual copying. My conviction that failing to address the parties' arguments on substantial similarity was unwise, from a purely case management standpoint, has grown as I have immersed myself in the allegedly infringed and infringing material. I cannot possibly say today how I would rule on that ultimate issue. But at a minimum, it seems to me that the court should have used the summary judgment motions to parse out what aspects of the works at issue are copyrightable and what aspects are not. That is a job for the court, not for the trier of fact. See Bollfrass v. Warner Music Grp. Corp., 2013 WL 1300986, at *1 (S.D.N.Y. Apr. 2, 2013). In a case that will present the trier of fact with voluminous material - in which the court will have to charge the jury that it must compare the copyrightable elements of the parties' works in order to find substantial similarity, see Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1002 (2d Cir. 1995) - sound case management suggests that at least that issue should be explored and disposed of well in advance of trial. So I respond favorably to defendants' suggestion that we hold a hearing on the issue of copyrightability as soon as may be practicable - likely early January. Defendants also suggest that I revisit their motion for summary judgment on the issue of copyrightability- the issue that Judge Netbum declined to reach. That, too, makes sense to me. Even if the case could not be disposed of altogether, the issues for decision by a trier of fact might be narrowed and sharpened by a decision on such a motion. Having read over 3000 pages of material already, I am more convinced than ever that the court must make every effort to see whether the case can be made more manageable for the jury and less expensive for the parties - which means giving serious consideration to the parties' complex and competing arguments about substantial similarity. Prior to reviewing your submissions, I had raised this possibility with my law clerks, and we did some research to see whether there was any bar to my considering a renewed motion for summary judgment on the issue of substantial similarity. Our research established that there was no such bar. It is well settled that interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to judgment. Moreover, the Second Circuit has held that such orders and rulings may be modified to |

the same extent if the case is reassigned to another judge, as this one has been. See In re US., 733 F.2d 10, 13 (2d Cir. 1984); Fed. R. Civ. P. 54(b). The only question that occurred to me was whether anything in the "law of the case" doctrine counseled that such a course of action was either disallowed or unwise. Our research suggests that the answer to that question is no. In this particular case, I am not proposing to reopen anything that has actually been decided on the merits. Indeed, it is my belief that there is no "law of the case" on the issue of substantial similarity, because that issue has never been addressed and decided on the merits. I acknowledge that decisions on summary judgment are often considered to be the law of the case. See, e.g., Great Lakes Reinsurance (UK) SEv. Herzig, 764 F. Supp. 3d 164, 184 (S.D.N.Y. 2025). But the law of the case doctrine "presumes a hearing on the merits," and thus applies only to "issues that have actually been decided by the Court." Ocasio v. City of Canandaigua, 2024 WL 3218254, at *2 (W.D.N.Y. June 28, 2024). Where, as here, there has been no reasoned analysis of an issue raised on a motion for summary judgment, there can be no finding that the issue was "actually decided by the court." For the reason I have explained - the refusal to engage with the issue of copyrightability - there not only was not, but there could not have been, any decision on the merits of substantial similarity. Therefore, it seems to me that there is no law of the case as to that issue at all. But even if the prior summary judgment decision did implicate law of the case, I have "cogent and compelling" reasons, see In re Peters, 642 F.3d at 386, for accepting defendants' invitation that I revisit the issue of substantial similarity. However, it is not clear to me whether the parties are satisfied with the state of the record as to copyrightability. And I would like to better understand how Judge Netburn's Daubert rulings might impact the record on that issue - so that I can decide whether or not to revisit those rulings. It is entirely possible that I would admit expert testimony in connection with deciding copyrightability, even though I have read enough to appreciate that lay jurors will not require expert testimony to decide whether there is either probative or substantial similarity in this case. I would appreciate some guidance from the parties before I make any final decision as to that. I should also hear from the plaintiff before making a final decision on whether to accept defendants' request that I readdress the summary judgment motion on substantial similarity. But I thought it only fair to let her and her counsel know what my thinking presently is on that issue, which is why I have outlined it fulsomely here. There is, however, absolutely no question that I must decide what aspects of the works are copyrightable before the parties finish their trial preparation, and I am quite content to hold a hearing on that issue. The hearing could probably be limited to oral argument, since you have submitted the relevant expert testimony in written form and if it be proper to consider it, I can read it closely over the holidays. Meanwhile, I will continue plowing through Ms. Freeman's works. I would like to complete that task before addressing copyrightability on the merits. If the parties could get back to me with (1) dates when they would be available during January for a hearing on copyrightability (and possibly argument on renewed summary judgment motions); (2) a schedule for additional briefing if you want to submit additional briefs on either or both of those issues; and (3) whether the court should consider expert testimony on the issue of what is copyrightable - even though I can well understand that a jury does not need to hear from experts in order to decide similarity. The end of next week would be fine for these submissions and as further set forth in this Order. (Signed by Judge Colleen McMahon on 12/5/25) BY ECF TO ALL COUNSEL (yv) (Entered: 12/05/2025)

| | | |
|---|---|---|
| 12/08/2025 | 504 | LETTER addressed to Judge Colleen McMahon from Mark D. Passin, ESQ. dated December 8, 2025 re: Request for Extension of Time. Document filed by Lynne Freeman.. (Passin, Mark) (Entered: 12/08/2025) |
| 12/09/2025 | 505 | MEMO ENDORSEMENT on re: 504 Letter Request for Extension of Time filed by Lynne Freeman. ENDORSEMENT: There is no need for any briefing. I asked for (1) date availability (which requires no adjournment); (2) a briefing schedule if the parties can agree on one (which requires no adjournment); and (3) your views on one limited issue - |

| | | |
|---|---|---|
| | | whether I should revisit the Daubert ruling for purposes of ascertaining copyright ability. You should not be submitting briefs on these points. This issue too does not require much in the way of briefing, if any. No adjournments. (Signed by Judge Colleen McMahon on 12/9/25) (yv) (Entered: 12/09/2025) |
| 12/09/2025 | 506 | Exhibit List *re: Other Material*. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 12/09/2025) |
| 12/09/2025 | 507 | Exhibit List . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC..(Nashon, Amy) (Entered: 12/09/2025) |
| 12/12/2025 | 508 | LETTER addressed to Judge Colleen McMahon from Amy Nashon on Behalf of All Defendants dated December 12, 2025 re: Estimated Time for Cross-Examination. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC..(Nashon, Amy) (Entered: 12/12/2025) |
| 12/12/2025 | 509 | LETTER addressed to Judge Colleen McMahon from Amy Nashon on Behalf of All Defendants dated 12/12/2025 re: Request for Submission re: Briefing on Copyrightability and Substantial Similarity. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC..(Nashon, Amy) (Entered: 12/12/2025) |
| 12/12/2025 | 510 | BRIEF -- *Plaintiff's Best Estimate of Time Required for Cross Examination*. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 12/12/2025) |
| 12/12/2025 | 511 | BRIEF re: 503 Order,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, *Plaintiff's Submission Re: Scheduling and Consideration of Expert Testimony Re: What Is Copyrightability*. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 12/12/2025) |
| 12/22/2025 | 512 | MEMO TO COUNSEL AND NOTICE OF PRE-TRIAL CONFERENCE : I apologize for the amount of time it has taken to get back to you following your recent submissions. Several matters that required my immediate attention diverted me from this case. But I am back. I have finished reading all four Crave novels and both BMR (2011) and Masqued (2013), plus whatever Freeman notes Judge Netburn had in her files. Jordyn Manly has sent you an email asking you to email back to us certain materials that we cannot seem to find anywhere in the courthouse - either on file or in Judge Netburn's chambers. The sooner we get that material, the better. As I promised you, I am reading every word. But before I dive into anything else, we need to set aside time for a trial. Rather than abide intervening events, I suggest that you reserve the period beginning on April 27 and May 22 - four weeks, ending with Memorial Day weekend. I think that should be more than enough time. But since I am determined not to confuse the jury, we will be trying this case in tranches, and that will undoubtedly cause the trial to go longer than it otherwise might. Of course, we will only go as far as we need to go in order to dispose of the case - for example, if the jury concludes at the end of Phase 1 that there was no access, the trial will be over. That is another reason why trying the case in tranches makes sense. Please also reserve Wednesday, April 29, for a final pre-trial conference here in New York. So having done that: I want to schedule a conference here in New York - attendance mandatory, the California lawyers will have to fly in here - for the week of January 12. Any day, Monday through Thursday, is fine with me; consult among yourselves and pick a day that is mutually convenient to you. I will be sure my deputy clerk (Mariela de Jesus) reserves a full half day, because we will doubtless have a great deal to discuss. She is away until after the first of the year., during the week of January 5, I would like to receive from each side your proposed jury instructions. I don't mean general instructions - the ones given during every trial - I will use the ones I use at every civil trial, so there is little |

| | | |
|---|---|---|
| | | point in your submitting "proposals" to me. Nor do I mean instructions about damages. I mean your instructions relating to the copyright claims. Finding pattern jury instructions that might be helpful in this case has proved challenging, so I may as well get your input on this critical issue now. And your proposed instructions should be tailored to the phases of the trial- one phase dealing with actual copying (probative similarity and access), one phase dealing with substantial similarity. One thing I need to emphasize, because there seems to be some disconnect between Second and Ninth Circuit copyright law: I sit in the Second Circuit, not the Ninth. And the plaintiff chose to sue in the Second Circuit, not the Ninth. So to the extent that there are special or unique Ninth Circuit tests or instructions that have not been adopted by the Second Circuit, I will not be charging them, so you should not bother submitting them. Please focus on Second Circuit law in formulating your jury instructions. The principal task confronting me is to figure out what I need to decide in advance of trial in order to make this as easy as possible for the jurors. The topics include the following as further set forth in this Order. (Signed by Judge Colleen McMahon on 12/22/25) BY ECF TO ALL COUNSEL. (yv) (Entered: 12/22/2025) |
| 12/29/2025 | 513 | LETTER addressed to Judge Colleen McMahon from Mark D. Passin, ESQ. dated December 29, 2025 re: Request that the Court Order Defendants to Provide Requested Documents. Document filed by Lynne Freeman..(Passin, Mark) (Entered: 12/29/2025) |
| 01/05/2026 | 514 | LETTER addressed to Judge Colleen McMahon from Amy Nashon on Behalf of All Defendants dated 01/05/2026 re: No Entitlement to Jury Trial for Equitable Remedies. Document filed by Crazy Maple Studio, Inc., Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC..(Nashon, Amy) (Entered: 01/05/2026) |
| 01/06/2026 | 515 | LETTER addressed to Judge Colleen McMahon from Stephen M. Doniger dated January 6, 2026 re: Response to Defendants Letter re Jury Trial. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 01/06/2026) |
| 01/09/2026 | 516 | PROPOSED JURY INSTRUCTIONS. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Prospect Agency, LLC, Universal City Studios, LLC..(Nashon, Amy) (Entered: 01/09/2026) |
| 01/09/2026 | 517 | PROPOSED JURY INSTRUCTIONS. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 01/09/2026) |
| 01/12/2026 | 518 | LETTER addressed to Judge Colleen McMahon from Plaintiff dated January 12, 2026 re: Electronic Device Request. Document filed by Lynne Freeman. (Attachments: # 1 Proposed Order Electronic Device Request Form).(Jenkins, David) (Entered: 01/12/2026) |
| 01/12/2026 | 519 | LETTER addressed to Judge Colleen McMahon from Plaintiff dated January 12, 2026 re: Electronic Device Request. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit Electronic Device Request Form).(Jenkins, David) (Entered: 01/12/2026) |
| 01/12/2026 | 520 | LETTER addressed to Judge Colleen McMahon from Dwayne K. Goetzel dated 01/12/2026 re: Electronic Devices. Document filed by Tracy Deebs-Elkenaney. (Attachments: # 1 Proposed Order Electronic Device Form).(Goetzel, Dwayne) (Entered: 01/12/2026) |
| 01/12/2026 | | Minute Entry for proceedings held before Judge Colleen McMahon: Pretrial Conference held on 1/12/2026. Decision: Conference held. Any party wishing to move for summary judgment on substantial similarity must do so by January 26, 2026. Briefs are not to exceed 60 pages. Opposition briefs are due February 9, 2026, and reply briefs on February 17, 2026. The court is in possession of the following manuscripts: BMR (2011), Masqued (2016), Masqued (2014), Masqued (2013), Masqued (2012), and BMR (2010). The parties may cite these documents as exhibits; please do not refile or send copies of |

| | | |
|---|---|---|
| | | these documents to chambers in support of any motion. If Plaintiff intends to rely on any manuscripts not mentioned above in support of her motion for summary judgment, any such manuscripts should be mailed to chambers as soon as possible. Defendants may move for summary judgment on actual damages and to strike Plaintiffs jury demand no later than January 30, 2026. Plaintiffs opposition brief is due February 13, 2026, and Defendants reply brief on February 20, 2026. Plaintiff is to file her proposed rebuttal expert report as soon as possible. Any motions in limine are to be filed by March 31, 2026 and must follow the rules set out in this courts Individual Practices and Procedures. Submitted by: Jordyn Manly. (Court Reporter Martha Martin). (mde) (Entered: 01/12/2026) |
| 01/20/2026 | 521 | TRANSCRIPT of Proceedings re: CONFERENCE held on 1/12/2026 before Judge Colleen McMahon. Court Reporter/Transcriber: Martha Martin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/10/2026. Redacted Transcript Deadline set for 2/20/2026. Release of Transcript Restriction set for 4/20/2026..(Moya, Goretti) (Entered: 01/20/2026) |
| 01/20/2026 | 522 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 1/12/2026 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 01/20/2026) |
| 01/22/2026 | 523 | LETTER MOTION for Leave to File Excess Pages *re Summary Judgment* addressed to Judge Colleen McMahon from Plaintiff dated January 22, 2026. Document filed by Lynne Freeman..(Jenkins, David) (Entered: 01/22/2026) |
| 01/23/2026 | 524 | ORDER granting 523 Letter Motion for Leave to File Excess Pages. Granted. Defendants are also permitted to file a 100 page brief. SO ORDERED. (Signed by Judge Colleen McMahon on 1/23/2026) (ar) (Entered: 01/23/2026) |
| 01/26/2026 | 525 | MOTION for Summary Judgment *on Substantial Similarity*. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 01/26/2026) |
| 01/26/2026 | 526 | MEMORANDUM OF LAW in Support re: 525 MOTION for Summary Judgment *on Substantial Similarity*. . Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 01/26/2026) |
| 01/26/2026 | 527 | MOTION for Summary Judgment *on Substantial Similarity*. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC. Responses due by 2/9/2026.(Nashon, Amy) (Entered: 01/26/2026) |
| 01/27/2026 | 528 | NOTICE of Errata in Docket 527 re: 527 MOTION for Summary Judgment *on Substantial Similarity*.. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC. (Attachments: # 1 Errata Corrected Motion).(Nashon, Amy) (Entered: 01/27/2026) |

| | | |
|---|---|---|
| 01/30/2026 | 529 | MOTION for Summary Judgment *Re: Damages and to Strike Jury Demand*. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC. Responses due by 2/13/2026 (Attachments: # 1 Exhibit Rule 56.1 Statement, # 2 Affidavit Declaration of Amy Nashon).(Nashon, Amy) (Entered: 01/30/2026) |
| 01/30/2026 | 530 | NOTICE of PROPOSED REBUTTAL EXPERT REPORT OF KATHRYN REISS. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit Proposed Reiss Rebuttal Report).(Doniger, Stephen) (Entered: 01/30/2026) |
| 02/09/2026 | 531 | MEMORANDUM OF LAW in Opposition re: 527 MOTION for Summary Judgment *on Substantial Similarity*. . Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 02/09/2026) |
| 02/09/2026 | 532 | DECLARATION of Stephen M. Doniger in Opposition re: 527 MOTION for Summary Judgment *on Substantial Similarity*.. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1).(Doniger, Stephen) (Entered: 02/09/2026) |
| 02/09/2026 | 533 | RESPONSE in Opposition to Motion re: 525 MOTION for Summary Judgment *on Substantial Similarity*. . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC..(Nashon, Amy) (Entered: 02/09/2026) |
| 02/10/2026 | 534 | NOTICE of Errata in Docket 533 re: 533 Response in Opposition to Motion,. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC. (Attachments: # 1 Errata Corrected Opposition at Docket 533).(Nashon, Amy) (Entered: 02/10/2026) |
| 02/13/2026 | 535 | MEMORANDUM OF LAW in Opposition re: 529 MOTION for Summary Judgment *Re: Damages and to Strike Jury Demand*. . Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 02/13/2026) |
| 02/13/2026 | 536 | DECLARATION of Mark D. Passin in Opposition re: 529 MOTION for Summary Judgment *Re: Damages and to Strike Jury Demand*.. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit 1 to Passin Decl.).(Doniger, Stephen) (Entered: 02/13/2026) |
| 02/17/2026 | 537 | REPLY MEMORANDUM OF LAW in Support re: 525 MOTION for Summary Judgment *on Substantial Similarity*. . Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 02/17/2026) |
| 02/17/2026 | 538 | REPLY MEMORANDUM OF LAW in Support re: 527 MOTION for Summary Judgment *on Substantial Similarity*. . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC..(Nashon, Amy) (Entered: 02/17/2026) |
| 02/20/2026 | 539 | MOTION to Strike Document No. 538 -- *MOTION To Strike Portions of Dfendants Reply Memorandum of Law*. Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 02/20/2026) |
| 02/20/2026 | 540 | MEMORANDUM OF LAW in Support re: 539 MOTION to Strike Document No. 538 -- *MOTION To Strike Portions of Dfendants Reply Memorandum of Law*. . Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 02/20/2026) |
| 02/20/2026 | 541 | REPLY MEMORANDUM OF LAW in Support re: 529 MOTION for Summary Judgment *Re: Damages and to Strike Jury Demand*. . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, |

| | | |
|---|---|---|
| | | Macmillan Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC.. (Nashon, Amy) (Entered: 02/20/2026) |
| 02/24/2026 | 542 | RESPONSE in Opposition to Motion re: 539 MOTION to Strike Document No. 538 -- *MOTION To Strike Portions of Dfendants Reply Memorandum of Law.* . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Macmillan Publishers, LLC, Universal City Studios, LLC..(Goetzel, Dwayne) (Entered: 02/24/2026) |
| 02/24/2026 | 543 | NOTICE of Errata re: 531 Memorandum of Law in Opposition to Motion, 526 Memorandum of Law in Support of Motion. Document filed by Lynne Freeman. (Attachments: # 1 Exhibit A - Corrected MSJ Brief (Redlined)).(Doniger, Stephen) (Entered: 02/25/2026) |
| 02/25/2026 | 544 | MEMORANDUM OF LAW in Support re: 525 MOTION for Summary Judgment *on Substantial Similarity. -- CORRECTED Memorandum of Law in Support.* Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 02/25/2026) |
| 02/25/2026 | 545 | MEMO ENDORSED ORDER denying 539 Motion to Strike docket entry and document from the record.. ENDORSEMENT: Motion Denied. (Signed by Judge Colleen McMahon on 2/25/26) (yv) (Entered: 02/25/2026) |
| 02/26/2026 | 546 | OPPOSITION BRIEF re: 544 Memorandum of Law in Support of Motion . Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC..(Goetzel, Dwayne) (Entered: 02/26/2026) |
| 02/26/2026 | 547 | RESPONSE re: 546 Opposition Brief, . Document filed by Lynne Freeman..(Doniger, Stephen) (Entered: 02/26/2026) |
| 03/16/2026 | 548 | DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND DENYING AS MOOT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR ACTUAL DAMAGES AND MOTION TO STRIKE JURY DEMAND denying 525 Motion for Summary Judgment; granting 527 Motion for Summary Judgment; denying as moot 529 Motion for Summary Judgment. This is a case that is easily disposed of once one reads the allegedly infringed and infringing works against each other and in light of the well-developed law in this Circuit on substantial similarity within literary works. Freeman's novel and Wolff's Crave novels are indeed similar, but only in the ways that all young adult romantasy fiction novels are similar to each other. At the granular level, looking at their unique creative expression, they are substantially different not substantially similar. Therefore, Defendants' motion for summary judgment on Plaintiff's copyright claims is GRANTED. Plaintiff's motion for summary judgment is DENIED. Defendants' motion for summary judgment on Freeman's actual damages claim and motion to strike jury demand are DENIED AS MOOT. The Clerk of Court is respectfully requested to remove the three motions at Dkt. Nos. 525, 527, and 529 from the Court's list of open motions. Sadly, this ruling does not end the Crave/Freeman saga. The decision to dismiss Freeman's case effectively disposes of the cases that Freeman has brought against Barnes & Noble Booksellers, Inc., Apple Inc., Amazon.com Inc., Target Brands Inc., and Walmart Inc., charging them with contributory infringement as a result of sales of the four Crave novels. See Freeman v. Barnes & Noble Booksellers, Inc. et al., Case No. 2:23-cv-4145; Freeman v. Apple, Inc., Case No. 23-cv-7051; Freeman v. Amazon.com Inc. et al., Case No. 23-cv-4796. However, I see no reason to lift the stay in those cases at the present time. If Freeman takes an appeal from this decision, we can abide the decision from the Second Circuit before entering final orders that will dispose of those cases in one way or another depending on whether this decision is affirmed or reversed. If there is no appeal we can |

| | | |
|---|---|---|
| | | lift the stay at that time. The newest case, Freeman v. Deebs-Elkenaney et al., Case No. 25-cv-9345, involves allegations that the fifth and sixth novels in the Crave series infringe Freeman's copyrights, for substantially the same reasons that the first four Crave novels infringed. The defendants in that case have 30 days to file a motion for dismissal/summary judgment, limited to the issue of substantial similarity. The record on the motion will consist of the Freeman works that were discussed in this opinion and the novels Charm and Cherish nothing more. There is no need for any other evidence to be introduced; the motions will be considered in the manner that many such motions are considered in this Circuit. See supra n.10. Plaintiff will have 30 days thereafter to file responsive papers opposing any motion that the defendants in the new case choose to file. The moving defendants will have ten business days to file a reply. I will not extend this schedule. This constitutes the decision and order of the Court. It is a written decision. (Signed by Judge Colleen McMahon on 3/16/26) BY ECF TO ALL COUNSEL (yv) (Entered: 03/16/2026) |
| 03/16/2026 | | Transmission to Orders and Judgments Clerk. Transmitted re: 548 Order on Motion for Summary Judgment, to the Orders and Judgments Clerk.(yv) (Entered: 03/30/2026) |
| 03/31/2026 | 549 | CLERK'S JUDGMENT re: 548 Order on Motion for Summary Judgment in favor of Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC, Emily Sylvan Kim, Tracy Deebs-Elkenaney against Lynne Freeman. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Decision and Order dated March 16, 2026, this is a case that is easily disposed of once one reads the allegedly infringed and infringing works against each other and in light of the well-developed law in this Circuit on substantial similarity within literary works. Freeman's novel and Wolff's Crave novels are indeed similar, but only in the ways that all young adult romantasy fiction novels are similar to each other. At the granular level, looking at their unique creative expression, they are substantially different not substantially similar. Therefore, Defendants' motion for summary judgment on Plaintiff's copyright claims is GRANTED. Plaintiff's motion for summary judgment is DENIED. Defendants' motion for summary judgment on Freeman's actual damages claim and motion to strike jury demand are DENIED AS MOOT. Sadly, this ruling does not end the Crave/Freeman saga. The decision to dismiss Freeman's case effectively disposes of the cases that Freeman has brought against Barnes & Noble Booksellers, Inc., Apple Inc., Amazon.com Inc., Target Brands Inc., and Walmart Inc., charging them with contributory infringement as a result of sales of the four Crave novels. See Freeman v. Barnes & Noble Booksellers, Inc. et al., Case No. 2:23-cv-4145; Freeman v. Apple, Inc., Case No. 23-cv-7051; Freeman v. Amazon.com Inc. et al., Case No. 23-cv-4796. However, the Court sees no reason to lift the stay in those cases at the present time. If Freeman takes an appeal from the decision, we can abide the decision from the Second Circuit before entering final orders that will dispose of those cases in one way or another depending on whether this decision is affirmed or reversed. If there is no appeal we can lift the stay at that time. The newest case, Freeman v. Deebs- Elkenaney et al., Case No. 25-cv-9345, involves allegations that the fifth and sixth novels in the Crave series infringe Freeman's copyrights, for substantially the same reasons that the first four Crave novels infringed. (Signed by Clerk of Court Tammi M Hellwig on 3/31/2026) (Attachments: # 1 Appeal Package) (km) (Entered: 04/01/2026) |
| 04/01/2026 | | Terminate Transcript Deadlines (km) (Entered: 04/01/2026) |
| 04/01/2026 | 550 | AO 121 FORM COPYRIGHT - CASE TERMINATED- SUBMITTED. In compliance with the provisions of 17 U.S.C. 508, the Register of Copyrights is hereby advised that a final decision was rendered on 3/31/2026 in a court action filed on the following copyright(s) in the U.S. District Court Southern District of New York. Form e-mailed to Register of Copyrights.(km) (Entered: 04/01/2026) |

| 04/14/2026 | 551 | MOTION for Attorney Fees *and Costs Pursuant to FRCP 54 and 17 USCA 505*. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC. (Attachments: # 1 Affidavit Declaration of Tracy Wolff, # 2 Affidavit Declaration of Emily Kim, # 3 Affidavit Declaration of Elizabeth Pelletier, # 4 Affidavit Declaration of Wendy Szymanski, # 5 Affidavit Declaration of Amy Nashon). (Nashon, Amy) (Entered: 04/14/2026) |
|---|---|---|
| 04/14/2026 | 552 | NOTICE of Corrected Declaration of Elizabeth Pelletier In Support of Defendants' Motion for Attorneys' Fees and Costs re: 551 MOTION for Attorney Fees *and Costs Pursuant to FRCP 54 and 17 USCA 505*.. Document filed by Tracy Deebs-Elkenaney, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, Emily Sylvan Kim, Macmillan Publishers, LLC, Prospect Agency, LLC, Universal City Studios, LLC..(Nashon, Amy) (Entered: 04/14/2026) |
| 04/15/2026 | 553 | NOTICE OF APPEAL from 548 Order on Motion for Summary Judgment,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, 549 Clerk's Judgment,,,,,,,,,, 362 Memorandum & Opinion,,,,, 398 Order Adopting Report and Recommendations,,,,. Document filed by Lynne Freeman. Filing fee $ 605.00, receipt number ANYSDC-32707448. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Doniger, Stephen) Modified on 4/16/2026 (km). (Entered: 04/15/2026) |
| 04/16/2026 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 553 Notice of Appeal.(km) (Entered: 04/16/2026) |
| 04/16/2026 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 553 Notice of Appeal, filed by Lynne Freeman were transmitted to the U.S. Court of Appeals.(km) (Entered: 04/16/2026) |
| 04/17/2026 | 554 | ORDER holding in abeyance 551 Motion for Attorney Fees. Defendants' Motion for Attorney Fees and Costs will be held in abeyance pending the outcome of the appeal. The Clerk of Court is directed to remove the motion at Docket Number 551 from the Court's list of open motions and to place the case on the suspense docket. The moving parties should notify the Court when further action would be appropriate. (Signed by Judge Colleen McMahon on 4/17/26) BY ECF TO ALL COUNSEL. (yv) (Entered: 04/17/2026) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/29/2026 16:29:23 | | |
| **PACER Login:** | davidmsjenkins | **Client Code:** |
| **Description:** | Docket Report | **Search Criteria:** | 2:22-cv-02435-CM-SN |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

# EXHIBIT 2
# Opinions, Orders, and Transcripts

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
 LYNNE FREEMAN,

                                        Plaintiff,

              -against-                                              22 **CIVIL** 2435 (CM)(SN)

                                                                    **JUDGMENT**

TRACY DEEBS-ELKENANEY ET AL.,

                                        Defendants.
-----------------------------------------------------------------X

         It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Decision and Order dated March 16, 2026, this is a case that is easily

disposed of once one reads the allegedly infringed and infringing works against each other and in

light of the well-developed law in this Circuit on substantial similarity within literary works.

Freeman's novel and Wolff's Crave novels are indeed similar, but only in the ways that all young

adult romantasy fiction novels are similar to each other. At the granular level, looking at their

unique creative expression, they are substantially different not substantially similar. Therefore,

Defendants' motion for summary judgment on Plaintiff's copyright claims is GRANTED.

Plaintiff's motion for summary judgment is DENIED. Defendants' motion for summary judgment

on Freeman's actual damages claim and motion to strike jury demand are DENIED AS MOOT.

Sadly, this ruling does not end the Crave/Freeman saga. The decision to dismiss Freeman's case

effectively disposes of the cases that Freeman has brought against Barnes & Noble Booksellers,

Inc., Apple Inc., Amazon.com Inc., Target Brands Inc., and Walmart Inc., charging them with

contributory infringement as a result of sales of the four Crave novels. See Freeman v. Barnes &

Noble Booksellers, Inc. et al., Case No. 2:23-cv-4145; Freeman v. Apple, Inc., Case No. 23-cv-

7051; Freeman v. Amazon.com Inc. et al., Case No. 23-cv-4796. However, the Court sees no

reason to lift the stay in those cases at the present time. If Freeman takes an appeal from the decision, we can abide the decision from the Second Circuit before entering final orders that will dispose of those cases in one way or another depending on whether this decision is affirmed or reversed. If there is no appeal we can lift the stay at that time. The newest case, Freeman v. Deebs-Elkenaney et al., Case No. 25-cv-9345, involves allegations that the fifth and sixth novels in the Crave series infringe Freeman's copyrights, for substantially the same reasons that the first four Crave novels infringed.

**Dated:** New York, New York

       March 31, 2026

**TAMMI M. HELLWIG**

_____

**Clerk of Court**

BY:         *K. mango*

_____

**Deputy Clerk**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

LYNNE FREEMAN,

                    Plaintiff,

         -against-                                              22-cv-2435 (CM) (SN)

TRACY DEEBS-ELKENANEY ET AL.,

                    Defendants.
_____x

**DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY
JUDGMENT, AND DENYING AS MOOT DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFF'S CLAIM FOR ACTUAL DAMAGES AND MOTION TO
STRIKE JURY DEMAND**

McMahon, J.:

         Plaintiff Lynne Freeman ("Freeman") brings this action against Defendants Tracy Deebs-

Elkenaney, p/k/a Tracy Wolff ("Wolff"), Entangled Publishing LLC ("Entangled"), Emily Sylvan

Kim ("Kim"), Prospect Agency, LLC ("Prospect"), Holtzbrinck Publishers, LLC, d/b/a Macmillan

("Macmillan"), and Universal City Studios LLC ("Universal") pursuant to the Copyright Act, 17

U.S.C. § 101 *et seq*.

         Before the Court are the parties' cross-motions for summary judgment on the issue of

substantial similarity,[1] as well as Defendants' motion for summary judgment on Plaintiff's claim

for recovery of actual damages and their motion to strike Plaintiff's jury demand.

         For the reasons set forth below, Defendants' motion for summary judgment on the issue of

substantial similarity is GRANTED and Plaintiff's motion for summary judgment on the same

---

[1] Plaintiff incorporates by reference all briefing and evidence filed in connection with her prior summary judgment
motion. *See* Dkt. No. 543-1 at 9 n.1.

issue is DENIED. Defendants' motion for summary judgment on Plaintiff's actual damages claim and motion to strike Plaintiff's jury demand are DENIED as moot. The Clerk of Court will enter judgment for Defendants and dismiss the case.

**BACKGROUND**[2]

### I.     The Parties

Plaintiff Lynne Freeman ("Freeman") is the author of multiple drafts of an unpublished novel variously entitled "Blue Moon Rising" and "Masqued" (referred to herein as "BMR/Masqued," except when a specific draft is under discussion). Freeman also wrote down notes that set out ideas and outlines for various versions of her novel. The record includes six drafts of a novel and nine sets of notes. *See* Dkt. No. 289 at ¶ 19.

Freeman's unpublished works were registered with the United States Copyright Office in September 2021 under four group Registration Numbers: TXu002276330; TXu002282260, TXu002276335, and TXu002276337.[3]

Defendant Tracy Deebs-Elkenaney, known professionally as Tracy Wolff ("Wolff"), is credited as the author of the books Crave, Crush, Covet, and Court (hereinafter referred to collectively as the *Crave*[4] series). Wolff is a *New York Times* bestselling author of at least 60 books, including 46 full-length novels in the paranormal romance, urban fantasy, young adult, new adult, erotic, and contemporary romance genres.

---

[2] Unless otherwise indicated, the facts contained in this section are undisputed and are drawn from the parties' Rule 56.1 statements of undisputed facts and counterstatements. *See* Dkt. Nos. 289, 299, 310, 332.

[3] As best as I can tell, BMR 2011 was registered under TXu002276335, and Masqued 2012/2013/2014 under TXu002276337. I cannot figure out what was registered under the other two numbers. The parties do not challenge Freeman's assertion that she has registered copyrights in all six draft versions of the novel and in the notes as well, so I will assume, for purposes of deciding this motion, that all six drafts and the nine sets of notes are registered somewhere.

[4] The Court refers to the first of Defendant's allegedly infringing book as "Crave" and to the series as a whole as "*Crave*."

2

Defendant Entangled Publishing, LLC ("Entangled") is a publishing company that published each of the books in the *Crave* series. Elizabeth Pelletier ("Pelletier") is the majority owner and Chief Executive Officer of Entangled. Stacy Abrams ("Abrams") is Entangled's Editorial Director of Publishing and Vice President of Operations. Abrams also worked for Entangled as a Copy Editor. Pelletier and Abrams are not individually named as defendants in this action.

Defendant Prospect Agency ("Prospect") is a literary agency founded in 2005 by Defendant Emily Sylvan Kim ("Kim"). Kim is the principal of Prospect and has served as Wolff's literary agent since 2007. Between 2010 and 2014, Kim also acted as Freeman's literary agent.

Defendant Holtzbrinck Publishers LLC, d/b/a Macmillan ("Macmillan") has distributed each book in the *Crave* series pursuant to an agreement with Entangled.

Defendant Universal City Studios, LLC ("Universal"), a film studio, hopes to make a movie out of the novel Crave, and perhaps its sequels. It has licensed the right to make a film adaptation of Crave from Entangled – hence its inclusion as a defendant in this lawsuit.

## II.    Factual Background

From 2010 to 2014, Freeman attempted to find a publisher for her young adult paranormal romance novel, BMR/Masqued. In pursuit of that goal, Freeman entered into a written agency agreement with Kim in December 2010, pursuant to which Kim, individually and on behalf of Prospect, agreed to act as Freeman's literary agent. Freeman worked with Kim through revisions and rewrites of BMR/Masqued for approximately three years. During that time, Freeman sent Kim at least 10-15 drafts of BMR/Masqued, as well as copies of her notes. In October of 2013, Kim sent a draft of BMR/Masqued (then-titled Masqued) to Abrams at Entangled. Whether this draft

was the version referred to herein as Masqued 2013 or an earlier version (Masqued 2012) is not clear.

All six versions of the novel at issue are about a young girl – a high school junior at a public school in Anchorage, Alaska – who is, unbeknownst to herself, a tripartite paranormal creature, or the "thrice born daughter" (part witch, part shapeshifter, part demon). The heroine will come into her powers on her seventeenth birthday, and by virtue of her mixed heritage, she is the key to the resolution of an ancient enmity among the powers of Shadow and Light.  For the most part, the various iterations of BMR/Masqued contain the same characters (albeit known by different names in different drafts) and the same basic plot. The sixth and last version of the novel differs substantially from its five predecessors.

Freeman herself describes her manuscripts as "iterations and edits of one overarching story," Dkt. No. 284 at 1, though after reading all of them (multiple times), the Court concludes that Freeman's most recent draft (referred to herein as Masqued 2016) differs so much from the five earlier drafts (including having many fewer characters and not following the same story template) as to require separate analysis. *See infra* Section V. The first five versions in the record – BMR 2010 and 2011, and Masqued 2012, 2013, and 2014 – are definitely variations on the same story; they were written off a common template and all contain many of the same incidents.

Ultimately, Kim and Freeman were unable to secure a publishing deal for Freeman's work. The written agency agreement between Freeman and Kim formally expired in March 2014, and Freeman and Kim parted amicably.

Kim recalls that she sent only one version of Freeman's work to Entangled; which Abrams testified that she did not read. Although Freeman posits that Kim "might have" sent more than one version of her work to Entangled after their commercial relationship ended, her speculation is not

evidence; Kim denies doing anything to promote her former client's work after their commercial relationship ended, and no evidence in the record supports any inference that this in fact occurred. However, as I note below, I will presume access for the purpose of deciding the competing summary judgment motions.

Several years after Kim and Freeman parted ways, Pelletier, Entangled's CEO, decided that Entangled should publish a young adult novel with a "fish out of water trope" or an "ordinary girl in a super rarified world" plot. PSUF ¶ 46. Pelletier instructed several of Entangled's editors, including Abrams, to find an author who could write a book in the paranormal genre for Entangled's teen line. When an unrelated third party was unable to come up with something, Abrams asked Wolff if she could quickly write such a book for Entangled. Wolff presented Abrams with five potential plot ideas, including one for a "Warlock or Vampire boarding school book." DSUF ¶ 86. Pelletier and Abrams felt the boarding school plot was closest to what Entangled was looking for, and in May 2019, Abrams told Wolff that Entangled wanted to move forward with the book that would become Crave.

Crave, the first novel in the series, was published in April 2020. The book was a major commercial success. It morphed into a four-book series;[5] each book was published by Entangled and distributed by Macmillan.

The parties disagree about who participated in the writing of the *Crave* novels. Defendants contend that Wolff alone wrote the books, while Pelletier provided substantive edits, Abrams provided copy edits, and Kim provided moral support. Freeman argues that Pelletier, Abrams, and Kim were "very involved" in writing the *Crave* series. PSUF ¶¶ 49, 82; DSUF ¶¶ 92–99. Freeman

---

[5] By now it is a six-book series; Wolff published two more books after this lawsuit was well underway. Those books are the subject of another lawsuit, *see infra*. p. 6. That action has been stayed pending the resolution of this case.

was not privy to the actual writing process of the *Crave* books, but she infers that Kim, Abrams, and Pelletier assisted Wolff; she reaches this conclusion based on Kim's close personal relationships with Wolff, Abrams, and Pelletier; a series of text messages involving Kim; a shared Google Doc; and Wolff's deposition testimony that the *Crave* series was a "group project" among her, Pelletier, and Kim. *See* Dkt. No. 284 at 9–10, 20.

For purposes of this opinion – which assesses only substantial similarity – I will assume that Wolff was assisted by Abrams, Pelletier, and Kim in writing the *Crave* novels. Since there is no evidence in the record that Wolff herself ever saw any of Freeman's drafts or notes, the basis for inferring access is the fact that Kim, who allegedly saw much of what Freeman wrote, personally participated in drafting the *Crave* novels and sent a version of Masqued to Abrams at Entangled.

### III.     Procedural History

Freeman commenced this lawsuit on March 25, 2022. Dkt. No. 1. Two months later, she filed her First Amended Complaint, asserting claims against Defendants for copyright infringement, contributory copyright infringement, and vicarious copyright infringement, as well as state law claims against Prospect and Kim for fraud, fraudulent concealment, breach of contract, and breach of fiduciary duty. Dkt. No. 24.

Freeman has brought separate lawsuits against Barnes & Noble Booksellers, Inc., Apple, Inc., Amazon.com Inc., Target Brands Inc., and Walmart Inc. for copyright infringement for selling Wolff's novels. *See Freeman v. Barnes & Noble Booksellers, Inc. et al.*, Case No. 2:23-cv-4145; *Freeman v. Apple, Inc.*, Case No. 23-cv-7051; *Freeman v. Amazon.com Inc. et al.*, Case No. 23-cv-4796. Freeman recently brought a new lawsuit, alleging that the fifth and sixth books in the *Crave* series infringe her copyright. *See Freeman v. Deebs-Elkenaney et al.*, Case No. 25-cv-9345.

This case, as well as all the seller cases, were originally assigned to my colleague, the Honorable Louis Stanton, who referred the matters to the assigned Magistrate Judge, the Honorable Sarah Netburn, for general pretrial supervision. Magistrate Judge Netburn superintended years of contentious discovery in the instant case, while the other cases remained stayed.

As soon as fact discovery concluded, Freeman moved for summary judgment on her direct copyright infringement claim. Defendants cross-moved for summary judgment on that claim and also moved for summary judgment dismissing Freeman's state law claims. Judge Stanton referred these cross motions, as well as various *Daubert* motions concerning expert testimony offered by the parties, to Judge Netburn in the first instance.

On August 1, 2024, Judge Netburn issued a Report and Recommendation. She recommended that the court deny the parties' cross-motions for summary judgment on Freeman's direct copyright infringement claim but grant Defendants' motion for summary judgment dismissing Freeman's state law claims. *See* Dkt. No. 361.

With respect to Freeman's copyright claim: the first prong of copyright analysis is "actual copying," the elements of which are probative similarity and access. Judge Netburn concluded that there was no genuine issue of fact as to probative similarity, but there was a genuine issue as to access, which precluded granting summary judgment to either side on the issue of "actual copying." *Id*. at 8, 15.

Having found actual copying to be in dispute, Judge Netburn expressly declined to reach the second prong of the copyright analysis, which asks whether the works in question were "substantially similar." The learned Magistrate Judge declined to reach the question of substantial

7

similarity even though that issue could have been independently dispositive of the case. *See id*. at 17.

Both parties objected to Judge Netburn's findings and her Report and Recommendation was referred to the district judge for review.

Judge Stanton modified Judge Netburn's R&R in a brief decision issued on November 21, 2024. *See* Dkt. No. 398. He agreed with Judge Netburn that the state law claims should be dismissed. He also endorsed her conclusion that there was a genuine issue of fact as to access. But he rejected her conclusion that there was no genuine issue of fact as to probative similarity – an issue on which Judge Netburn found in favor of Plaintiff, not Defendants. Judge Stanton concluded that Judge Netburn's reasoning, while logical and persuasive, was akin to a finding that only a jury could make.

Like Judge Netburn, Judge Stanton declined to address the parties' copious arguments about substantial similarity. Although Defendants asked that the district judge do what the Magistrate Judge did not, Judge Stanton stated, without engaging in any substantive analysis, that all issues in the case should be decided by a jury. The only argument he addressed was Defendants' contention that the court should reach substantial similarity because a jury would be unable to digest such voluminous material. He counseled that Defendants should not worry about that, since "experienced trial counsel will be able to present the meat of it [] efficiently at trial." Dkt. No. 398 at 3.

Judge Stanton adopted the R&R as modified as his opinion.

On September 17, 2025, the case was reassigned to me. Defendants immediately asked this Court to decide the issue of substantial similarity, which had not been previously addressed. *See* Dkt. No. 492. After concluding that nothing prevented me from considering the issue in advance

8

of trial, I raised the possibility of revisiting summary judgment with the parties in a December 5, 2025 order, *see* Dkt. No. 503. At that point, I had not nearly finished reading all of the parties' works. By the time we held a hearing on January 12, 2026, I had read a great deal more.[6] I directed the parties to make their respective motions, limited to the one and only issue not previously addressed on the merits: substantial similarity.[7]

On January 26, 2026, the parties cross-moved for summary judgment. *See* Dkt. Nos. 525, 528-1; 543-1.[8] Those motions were fully briefed on February 17, 2026.

## IV.     The Works

The Court has personally read every word of the four Wolff books and the six Freeman drafts and nine sets of notes at issue in this case. That was a lot of reading. Each of Freeman's first five drafts is approximately 450 double spaced pages long. The sixth (Masqued 2016) is 108 pages long; it appears to be incomplete. There are approximately 55 additional pages of notes, variously single and double spaced. Each of Wolff's four novels is about 650 pages long, but that number is highly misleading because, with each successive volume, the print and the margins on each page get smaller and the line spacing gets closer. When Wolff's works are normed for changes in print and margin sizes, they easily exceed 3000 pages – which means the Court has read upwards of 6000 pages of romantasy fiction.

---

[6] It took me about 8 weeks to read all of the Plaintiff's drafts and the Defendants' novels – though my reading was intermittent.

[7] I did not authorize Defendants to make any motion addressed to damages, and if I had reached a different result on the substantial similarity motions, I would simply have denied that motion without prejudice to renewal at trial. By virtue of my decision on substantial similarity, the damages motion has become moot. The jury trial issue was raised by letter several months ago and I told the Defendants to formalize that motion; however, it too is now moot.

[8] On February 24, 2026, two weeks after filing her initial brief, Plaintiff filed a "notice of errata" regarding her memorandum of law in support of her motion for summary judgment and attached a revised brief. *See* Dkt. Nos. 543; 543-1. I don't intend to get into a dispute about whether there really was a "clerical production error" in the creation of the original brief; for purposes of this decision, I have relied on the revised brief.

9

This opinion contains two sets of summaries of these works – brief summaries in the text of the opinion, and more fulsome summaries appended as addenda to this opinion and intended to be read in connection with the Court's analysis. Obviously, any analysis of whether Freeman's and Wolff's works are substantially similar – which is the only issue that will be addressed in this opinion – requires that comparison be made between the actual works written by Freeman and Wolff, not of summaries of those works. And that is exactly what I have done. But since it is not possible for the reader to understand the parties' arguments or the court's ruling without being at least somewhat familiar with the content of the works, the summaries are offered for clarification.

### a.  *BMR/Masqued (The Template)*

Five of the six drafts of Freeman's novel – all except the 2016 version of Masqued – follow the same basic outline, which I refer to as Freeman's template. Certain details change from draft to draft, but the underlying story remains fundamentally the same in all five drafts.

The story starts when the sixteen-year-old heroine has a vision in which she is told she must meet her destiny and choose between shadows or light.

The story is set against the backdrop of a frightening crime: sixteen-year-old girls are being abducted by animal-like creatures in the dead of night, only to be returned the next morning bearing some sort of mark on their necks.

When the heroine was seven, she, her mother, and her aunt moved from California to Alaska after her father was killed in an accident.

The heroine's childhood best girlfriend(s) reject her when she arrives at school on the day the story begins.

A handsome, sun-kissed New Boy arrives at school on a motorcycle with a gorgeous girl in tow – his sister. He pays attention to our heroine in their shared classes, one of which is taught

10

by his parents, who are archaeologists. The parents, the boy, and his sister are shapeshifting paranormal creatures and members of an ancient order. They are in Anchorage searching for objects that were supposedly cursed by a Celtic Druid and subsequently brought to Alaska from New Zealand by Captain James Cook.

Mean Girl Taylor – beautiful and popular with all the boys – announces that she wants New Boy to be her next boyfriend, but New Boy expresses no interest in her.

New Boy drives the heroine home on his motorcycle, to the consternation of her mother.

Because her mother will not talk to her about such matters, the heroine discusses her family's past and her own future with her aunt, who is a witch and a veterinarian.

The heroine casts a Tarot reading about New Boy; the cards come to life and she tries to interpret the resulting vision, which involves a maiden, two knights, wolves, a cup, a flower, and (in some versions) a dagger.

A month passes, during which our heroine and New Boy have minimal contact.

Our heroine is rescued from having to each lunch alone by her long-time biracial male friend – the Class President, whom the heroine alone knows is gay – and his friends.

The heroine begins to develop mysterious markings on her neck and spine, which her aunt hides with a salve that makes them disappear.

New Boy asks the heroine to meet him at a school dance, which she attends with her gay friend and three of his pals; she is dressed as Little Red Riding Hood.

Mean Girl Taylor makes sure that our heroine overhears her talking about her "date" with New Boy, and our heroine is bereft. She leaves the dance and goes outside. New Boy follows.

After New Boy explains that he was not on a date with Mean Girl Taylor, our heroine and New Boy enjoy their first romantic moment outside the school under the Northern Lights.

When they kiss, New Boy gets a little "wolfy;" our heroine, frightened, ditches New Boy when they arrive at the local diner and asks her gay friend to take her home.

New Boy comes to her home, hoping to explain himself. He cannot force his way in and our heroine will not let him in. But they agree to meet the next day at the local Barnes and Noble.

Later on Halloween night, the heroine awakens from a dream (see below) to find her mother engulfed in a fit of madness.

The heroine has several different dreams. In some she encounters a kindly, grey-eyed wolf who is her spiritual guide. In others, she is pulled through a mirror by someone who looks remarkably like her, only with blue, not grey, eyes.

At Barnes and Noble the next day, New Boy tells the heroine as much as he can about himself and his family and the work they are sworn to do without running afoul of a magical vow he has made (a *geas*). He tells her about their search for a girl, the "thrice born daughter," a girl of mixed parentage who must be killed before she comes into her powers on her seventeenth birthday and tips the precarious balance between the paranormal worlds of Shadow and Light. The girl will be identified by certain markings on her body. New Boy and our heroine kiss in the Barnes and Noble parking lot; they are seen by other students and so publicly become a couple.

The heroine's old friend(s), including Mean Girl Taylor, unexpectedly invite her to go with them to a party. While the heroine does not want to go, her mother insists that she do so, and that she go to the home of one of her friends to get ready.

The girls arrive at an unsupervised party at the home of high school seniors – not the party the heroine thought they were attending.

At the party the heroine is given punch spiked with alcohol. She thinks it is delicious and drinks a lot of it. She gets drunk.

12

New Boy, Gay Friend, and her other new friends arrive to take her home. They recognize that she is drunk, and when she resists their efforts to get her to leave with them, they simply pick her up and take her away. On the way home, she throws up in New Boy's car. She also sees mysterious marking on his fingers.

When she arrives home, she is told that members of her family have an unusually strong reaction to alcohol.

The next day – a Saturday – our heroine goes into the deserted high school, where she fights and vanquishes a demon who is attacking New Boy's mother.

After they fight, the demon bows to our heroine and says unfamiliar words before disappearing. Our heroine does not understand what she has heard, but New Boy's family explains to her that the demon invoked the name of the Druid who placed a curse on the objects they are seeking.

The heroine is seriously wounded in the fight, but New Boy cures her with his bite, which intensifies the connection between them.

New Boy's family, all of whom are shapeshifters, want to know more about who our heroine might be. Since she does not know the truth about herself, she cannot tell them anything. They infer, however, that her father must have been a shifter from the pendant that he gave her – one made by an ancient Egyptian wolf god – which is similar to pendants that they wear.

New Boy's family blood-pledge themselves to protect the heroine, because she saved the life of New Boy's mother.

New Boy takes the heroine home, and then shows up in her bedroom to look out for her. She welcomes his presence.

13

New Boy's sister arrives to take her brother to a meeting about one of the cursed objects they are seeking. Sister explains to our heroine that, because her brother has bitten our heroine, he must remain with her to protect her. As a result, he can only go to the meeting if our heroine goes, too. New Boy does not want to go, but our heroine insists.

The three teens go to a notorious local bar, which has a back "VIP" room that turns out to be a hangout for supernatural creatures – The Sanctuary.

While at this place, the heroine sees a gorgeous demonic man who fascinates her. This handsome demon seems to recognize our heroine, although he calls her by a name not her own. He engages with our heroine, but she is uncomfortable and puts him off.

The heroine's true friends arrive and lure her outside, where they are kidnapped by vampires and are taken to the lair of their master, Julian – the fascinating demon she met in the bar.

Julian explains that he had a relationship with members of the heroine's family. He tells the heroine that her family owes him a blood debt for taking away his true love. He explains that our heroine's beloved father Dante is not dead, but is Julian's prisoner, because Julian blames Dante for the loss of his beloved.

When Julian seeks to imprison some of her friends, and even threatens to feed one of them to his demons, our heroine agrees to fulfill any demand he makes in exchange for their freedom.

Rescuers arrive at Julian's lair. There is a fight, during which Julian's demonic creatures are vanquished. Julian disappears.

Mean Girl Taylor arrives at Julian's lair while Julian's prisoners and their rescuers are making their escape. She had something to do with Julian's capture of our heroine and her new

14

friends. She is wearing one of the cursed objects, a serpent ring; it is wrested from her finger and ends up on the heroine's.

Instead of leaving the lair with her friends, the heroine goes through a mirror that she finds in Julian's house. It leads her into Avalon, where she meets a priestess who is related to her. Told that she can free her father, our heroine has to choose between two wolves that are caught in traps. She chooses the one with amber eyes rimmed in black. Our heroine and the wolf she freed go back through the mirror to Anchorage, whereupon the wolf turns into a man. It turns out that our heroine freed, not her father, but the Druid whose name was invoked by the demon.

The Druid tries to console our heroine, who is distraught that she has chosen wrongly. He gives her an amulet so she can call him if she is in trouble.

New Boy turns up to fight the Druid, who turns into a raven and flies away.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\* \* \* \* \* \* \* \*

Addendum A to this opinion summarizes the first of the five versions of this story, and then goes on to describe the principal differences in each succeeding draft.

Addendum B to this opinion summarizes the last and final draft of Freeman's novel, which does not follow this template and which will be discussed separately.

### b. *Crave*

The *Crave* series tells the story of a teenaged girl named Grace Foster, who is forced to relocate from San Diego following the tragic death of her parents. She finds herself at the elite boarding school Katmere Academy, a gothic castle in the remote mountains of northern Alaska, where she is reunited with her Uncle Finn – Katmere's headmaster – and her cousin Macy. Grace soon discovers that Katmere is anything but an ordinary boarding school; it is home to all kinds of supernatural creatures, including vampires (like the mysterious and attractive Jaxon Vega),

15

witches, dragons, and werewolves. Crave, the first novel in the four-novel series, focuses on the efforts of Grace – a normal, human girl (or so she thinks) – to find her place among various supernatural factions. Grace discovers she is connected to the supernatural world in ways she never imagined – her relatives are witches and she herself is, unbeknownst to her, a very special paranormal creature.

Grace is targeted by a witch named Lia, who wants to kill her. Lia believes that, by doing so, she can resurrect her boyfriend, Hudson Vega (Jaxon's brother), whom Jaxon killed the previous year to prevent Hudson from destroying the world. Grace is also befriended by a biracial boy named Flint, who turns out to be a dragon prince; Flint believes that he needs to kill Grace in order to prevent Lia from resurrecting Hudson. And Grace falls in love with the mysterious vampire prince Jaxon, who loves her in return and who rescues her from multiple potential disasters – wolf attacks, falling chandeliers, etc.

Grace survives Lia's murder plot, but Hudson is "resurrected" (he was never really dead, as it turns out), only to be trapped in Grace's mind. When Grace turns to stone while trying to protect Jaxon from his brother's ire, we and the residents of Katmere learn that Grace is not human at all; she is the first gargoyle born in a thousand years. Gargoyles – creatures invented to maintain the balance between the forces of order (humans) and chaos (supernaturals) – were thought to have been killed off by Cyrus the Vampire King, father of Hudson and Jaxon and the villain of the series. Instead, they have been trapped for a millennium in a magic spell cast by the God of Chaos – an elderly vampire known as The Bloodletter – while their King Alistair (Grace's distant ancestor), known as The Unkillable Beast, remained imprisoned by Cyrus.

The last three volumes in the series follow Grace through a series of increasingly challenging adventures, which she shares with an ever-expanding circle of friends – including

Hudson, Jaxon, Flint, Cousin Macy (a witch) and her friends Gwen (a witch) and Eden (a dragon), Jaxon's posse of vampire companions (known as The Order), a Creole witch named Remy, a red-haired manticore named Calder, a wolf named Xavier, a nonbinary wolf of Syrian ancestry named Dawud, a giant named Vander, and ultimately Cyrus's illegitimate daughter Isadora. With their help, Grace learns how to harness her supernatural powers. Over the course of their senior year in high school and the following summer, Grace and her friends go on repeated quests for magical objects (like the moonstone from a powerful warlock or the bloodstone from a born vampire) and endure many difficult trials – starting with the schoolyard game Ludares and proceeding through the Trials that earn Grace a seat on The Circle (the ruling council of paranormals), the terrors of the Aethereum Prison, and finally the Impossible Trials, which Grace must survive in order to obtain the Tears of Eleos. Grace and her friends undertake these herculean tasks in an effort to release Hudson from Grace's mind, acquire the key that will release Alistair from his chains, reanimate the long-dormant Gargoyle Army, and prevent the evil Cyrus from finding the Crown and becoming a demigod. Along the way, Grace finds herself caught in a love triangle with the two brothers, one of whom (Hudson) is her true-born mate, while the other (Jaxon), for whom she cares deeply, is attached to her by a false mating bond. In the end, good triumphs over evil; the last novel, Court, ends with Grace enrolled at the University of California San Diego – her dream college – where she plans to study international politics and government so she can discharge her role as Gargoyle Queen.

This is a very brief summary of some 3000 pages of text spread over four novels. Addendum C, incorporated into this opinion by reference, contains a more fulsome summary of Wolff's four novels.

17

**LEGAL STANDARD**

### I.    Motion for Summary Judgment

The Court grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material facts exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets that burden, the non-movant may defeat summary judgment by producing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 250. The non-movant must present concrete evidence and rely on more than conclusory allegations or denials. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). A court generally evaluates each cross-motion independently of the other, resolving ambiguities and drawing all reasonable inferences in favor of the non-moving party. *Id.* "But where, as here, the motion and cross-motion seek a determination of the same issues, the Court may consider them together." *ExteNet Sys., Inc. v. Vill. of Pelham*, 377 F. Supp. 3d 217, 223 (S.D.N.Y. 2019).

### II.    Copyright Infringement

To prevail on a claim of copyright infringement, a plaintiff must establish "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

To establish copying, the plaintiff must show that (1) the defendant "actually copied" the plaintiff's work, and (2) the copying is illegal because a "substantial similarity" exists between the defendant's work and the protectable elements of the plaintiff's work. *Streetwise Maps, Inc. v.*

18

*VanDam, Inc*., 159 F.3d 739, 747 (2d Cir. 1998). As noted above, "actual copying" is a function of (1) probative similarity between the allegedly infringed and infringing works, coupled with (2) access by the defendant to the plaintiff's work. As to both of those issues, predecessor judges found genuine issues of material fact, and I have no need to address either issue in order to reach the ultimate question posed by the second round of summary judgment motions – which is whether there is substantial similarity between the plaintiff's and the defendant's work. If there is no substantial similarity, then it does not matter whether there are genuine issues of fact as to actual copying; without substantial similarity, the Defendants win.

A determination of copyright infringement requires a side-by-side comparison of the disputed works – not of summaries of the work, but of the works themselves. *Sheldon Abend Revocable Tr. v. Spielberg*, 748 F. Supp. 2d 200, 204 (S.D.N.Y. 2010). In making that comparison, the trier of fact must consider the total concept and feel of the works, which is a function of the work's theme, characters, plot, sequence, pace, and setting. *Id*. at 205. The proper inquiry is "whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *Id*. (quoting *Yurman Design, Inc. v. PAJ, Inc*., 262 F.3d 101, 111 (2d Cir. 2001)). Random similarities scattered throughout the works do not support a finding of substantial similarity, because "Such a scattershot approach . . . fails to address the underlying issue: whether a lay observer would consider the works *as a whole* substantially similar to one another." *Williams v. Crichton*, 84 F.3d 581, 590 (2d Cir. 1996) (emphasis added).

Summary judgment on the question of substantial similarity is appropriate if "the similarity concerns only noncopyrightable elements of plaintiff['s] work" or if "no reasonable trier of fact could find the works substantially similar." *Id.* at 587 (quoting *Walker v. Time Life*

*Films, Inc.*, 784 F.2d 44, 48 (2d Cir. 1986)). This determination "must be made on a case-by-case basis, as there are no bright-line rules for what constitutes substantial similarity." *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998).

## DISCUSSION

Defendants do not challenge Freeman's claim to valid copyrights in the works at issue and, for purposes of this opinion, the Court assumes that there is probative similarity between Freeman's works and Wolff's and that Defendants had access to all six of Freeman's drafts and nine sets of notes.[9] Thus, the only issue before the Court is whether there is substantial similarity between Freeman's work and the *Crave* series.

However, before reaching the texts themselves, I need to address several preliminary issues.

## I.    The Issue Of Substantial Similarity Has Never Been Decided On The Merits

Freeman asserts that this Court lacks the power to reconsider the propriety of summary judgment because Judge Stanton previously concluded that all issues in the case – including substantial similarity – should go to a jury. She describes this as a finding that there was a genuine issue of material fact as to substantial similarity.

However, as discussed in detail in this Court's December 5, 2025 Request for Submissions, *see* Dkt. No. 503, it is quite clear that neither Judge Netburn nor Judge Stanton ever addressed the parties' substantial similarity arguments on the merits. Neither jurist made the requisite comparison between Plaintiff's and Defendants' works and concluded that genuine issues of fact precluded

---

[9] This assumption becomes quite strained when dealing with Masqued 2016, because Kim, who at one time served as agent for Freeman and at all relevant times served as Wolff's agent, had terminated her relationship with Freeman in March 2014 – two years before Masqued 2016 was written. Even assuming *arguendo* that most of Freeman's notes were written during the four years when Kim was working with Plaintiff, there is really nothing in those notes that corresponds to the unique characteristics of Masqued 2016 – which even a cursory read of Addenda A and B reveals to be both incomplete and substantially different from the first five versions of Freeman's novel. However, I will assume that Defendants had access, either direct or indirect, to all six drafts of Freeman's unpublished novel.

20

summary judgment. And even if one or both of them had done so, this Court could still revisit the issue prior to trial.

In Freeman's view, Judge Netburn must have found a genuine issue of fact on substantial similarity because she found that substantial similarity "presents a particularly close question of fact" given that "the similarities [between the works] fall somewhere between probative and striking." Dkt. No. 361 at 16.

But there is absolutely no doubt about what Judge Netburn did and did not do. She expressly "decline[d] to address substantial similarities" in her Report and Recommendation, *id*. at 9, explaining that, "The factual dispute over access to BMR 2014 particularly *prevents the Court from prematurely discussing substantial similarity*," and that "because access is in dispute, the *Court should not determine whether the at-issue works are substantially similar*." *Id*. at 17 (emphasis added). Judge Netburn never addressed the issues that have to be discussed in order to assess substantial similarity because she believed that, having found an issue of fact on actual copying, she ought not do so.

Furthermore, nothing that Judge Netburn said about probative and striking similarity has any relevance to the issue of substantial similarity. Probative and striking similarity have to do with actual copying; neither has anything to do with substantial similarity, which is an independent inquiry judged by an entirely different standard. Indeed, actual copying is frequently presumed when motions for summary judgment are made, precisely so that courts can reach the ultimate and decisive issue of substantial similarity.[10]

---

[10] *See e.g., Duffy v. Penguin Books USA Inc.*, 4 F. Supp. 2d 268, 272 (S.D.N.Y. 1998); *Williams*, 84 F.3d at 587; *Spielberg*, 748 F. Supp. 2d at 203; *Green v. Lindsey*, 885 F. Supp. 469, 479 (S.D.N.Y. 1992), *aff'd*, 9 F.3d 1537 (2d Cir. 1993); *Psihoyos v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 268, 278 (S.D.N.Y. 2005).

Nor did Judge Stanton, in modifying and adopting Judge Netburn's Report and Recommendation, engage in a merits-based analysis of substantial similarity. And he did not, contrary to Plaintiff's argument, find any genuine issue of material fact as to substantial similarity in this case. Judge Stanton merely found that, because similarities between competing works "*frequently* [present] a fact issue for jury resolution," all questions related to direct copyright infringement were best left for trial. Dkt. No. 398 at 2 (emphasis added). That there is "frequently" a genuine issue of fact concerning substantial similarity is not, as a matter of law or logic, the same thing as finding that there is a genuine issue of fact concerning substantial similarity between these specific works.

No such finding could have been made here. Judge Stanton's brief opinion is bereft of any discussion of the factors the Second Circuit requires the trier of fact to consider when assessing whether substantial similarity exists. My learned colleague's brief discussion of substantial similarity was limited to declaring that the issue was not too complicated to be tried, despite the volume of material that the trier of fact would have to read. He rejected that argument because he believed that "experienced trial counsel will be able to present the meat [of the material at issue] as efficiently at trial." *Id*. at 3.

Furthermore, even if Judge Stanton had issued a merits-based decision on substantial similarity (he did not), it is axiomatic that "rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment, and may be modified to the same extent if the case is reassigned to another judge." *In re U.S.*, 733 F.2d 10, 13 (2d Cir. 1984). As specifically applicable to the instant situation, "It is clear that a second judge has the power to grant summary judgment despite another judge's previous denial of summary judgment." *Wright*

22

*v. Cayan*, 817 F.2d 999, 1002 n.3 (2d Cir. 1987); *see also Dictograph Prods. Co. v. Sonotone Corp.*, 230 F.2d 131, 134–36 (2d Cir. 1956).

To the extent Freeman argues that there are no grounds for my departing from what she characterizes as the "law of the case," the Court disagrees. "The law of the case doctrine, although not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons, including, *inter alia*, the need to correct a clear error or prevent manifest injustice." *In re Peters*, 642 F.3d 381, 386 (2d Cir. 2011) (citations omitted). The doctrine "does not rigidly bind a court to its former decisions, but is only addressed to its good sense." *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009). Thus, "unlike the doctrines of *res judicata* and collateral estoppel, which a court cannot ignore where they apply, the law of the case, as Justice Holmes remarked, 'merely expresses the practice of the courts generally to refuse to reopen what has been decided.'" *Devilla v. Schriver*, 245 F.3d 192, 197 (2d Cir. 2001) (quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)).

I am not proposing to reopen anything that has actually been decided; there is no "law of the case" on the issue of substantial similarity because the law of the case doctrine "presumes a hearing on the merits," and thus applies only to "issues that have actually been decided by the Court." *Ocasio v. City of Canandaigua*, 2024 WL 3218254, at *2 (W.D.N.Y. June 28, 2024) (citations omitted). But even if the prior summary judgment decision did implicate the law of the case, there are cogent and compelling reasons to revisit that decision. *See* Dkt. No. 503 at 7–8; *Harris v. Key Bank Nat'l. Ass'n.*, 193 F. Supp. 2d 707, 712 (W.D.N.Y.), *aff'd sub nom. Harris v. Key Bank Nat. Ass'n*, 51 F. App'x 346 (2d Cir. 2002) (court can depart from the "law of the case" if a party is indeed entitled to summary judgment because denying a well-founded summary

23

judgment motion "could work a manifest injustice, by forcing that party to defend against a meritless claim all the way through trial.").

Accordingly, the Court rejects Freeman's effort to avoid having a court examine, in the first instance and in the necessary detail, whether there is any genuine issue of fact concerning substantial similarity between her work and Wolff's.

## II.       Substantial Similarity

Substantial similarity exists only when it "was protected expression in the earlier work that was copied and . . . the amount that was copied is more than de minimis." *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc*., 338 F.3d 127, 131 (2d Cir. 2003) (internal quotations marks omitted).

"Simply because a work is copyrighted does not mean every element of that work is protected." *Boisson v. Banian, Ltd*, 273 F.3d 262, 268 (2d Cir. 2001). Because originality is the *sine qua non* of copyright, only those components of a work that are original to the author are protectable. *Id*. Copyright protection therefore extends only to an author's particular expression of an idea – not to the idea itself. *Id*.

Accordingly, tropes (recurrent scenes or motifs) or *scènes à faire* (sequences of events that necessarily result from the choice of a setting or situation) are not entitled to copyright protection. *Walker*, 784 F.2d at 50. For example, courts have found that drunks, prostitutes, vermin, and derelict cars are *scènes à faire* in works about policemen in the South Bronx, *Id*. at 50; conspiracies, characters with superhuman qualities, and advanced technology are *scènes à faire* in the action-adventure and science fiction genres, *Hist. Truth Prods., Inc. v. Sony Pictures Ent., Inc*., 1995 WL 693189, at *8 (S.D.N.Y. Nov. 22, 1995); heroes performing feats of miraculous strength, fighting megalomaniac villains, and leading double lives are *scènes à faire* in works about superheroes,

*Warner Bros. Inc. v. Am. Broad. Cos*., 654 F.2d 204, 209–10 (2d Cir. 1981); and lying under a chicken, sitting in a refrigerator, and facing the possibility of being scrambled or fried are *scènes à faire* in works about the personification of an egg, *Gibson v. CBS, Inc*., 491 F. Supp. 583, 585–86 (S.D.N.Y. 1980). As a matter of law, the mere presence of these commonplace elements in the works of two different authors cannot give rise to substantial similarity.

In addition to tropes/*scènes à faire*, "words, short phrases, titles, and slogans are not subject to copyright, even if they can be trademarked." *Lewinson v. Henry Holt & Co., LLC*, 659 F. Supp. 2d 547, 568 (S.D.N.Y. 2009) (quoting *Moody v. Morris*, 608 F. Supp. 2d 575, 579 (S.D.N.Y. 2009)). Accordingly, "the ordinary phrase may be quoted without fear of infringement." *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992) (citation omitted). A defendant's copying of an ordinary word or phrase is actionable only if the phrase amounts to a "sequence of thoughts, choice of words, emphasis, and arrangement to satisfy the minimal threshold of required creativity." *Id*. at 1073 (quoting *Salinger v. Random House, Inc*., 811 F.2d 90, 98 (2d Cir. 1987)).

The standard test for substantial similarity asks whether "an ordinary observer, unless he set out to detect the disparities [between the works], would be disposed to overlook them, and regard [their] aesthetic appeal as the same." *Peter F. Gaito Architecture LLC v. Simone Dev. Corp*., 602 F.3d 57, 66 (2d Cir. 2010) (internal quotation marks and citation omitted). In applying the "ordinary observer test," courts ask whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995) (internal quotation marks omitted).

Where, as here, a work contains both protectable and unprotectable elements, courts apply the "more discerning ordinary observer test," which asks whether, after extracting the unprotected elements, "the *protectible elements, standing alone*, are substantially similar." *Id*.

That said, a court is not required to dissect the works at issue into their separate components and compare only the protectable elements. Instead, a court should be "principally guided by comparing the contested [work's] total concept and overall feel with that of the allegedly infringing work, as instructed by its good eyes and common sense." *Gaito*, 602 F.3d at 66 (internal quotations omitted). This is so because a compilation of unprotectable elements can merit copyright protection as long as the author has selected, coordinated, and arranged the elements of his or her work in an original way. *Knitwaves*, 71 F.3d at 1003–1004.

In cases involving literary works, the "more discerning ordinary observer" test requires the court to consider "the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting." *Boisson*, 273 F.3d at 273 (quoting *Williams*, 84 F.3d at 588). Liability will only result if the protectable elements are substantially similar. *Id*. Random similarities scattered throughout the works will not support a finding of substantial similarity because, "Such a scattershot approach . . . fails to address the underlying issue: whether a lay observer would consider the works *as a whole* substantially similar to one another." *Williams*, 84 F.3d at 590 (emphasis added).

## III.   Materials Considered

In determining substantial similarity, the Court "must only consider the works *in their entirety and final form* as presented to the public." *Walker v. Time Life Films, Inc*., 615 F. Supp. 430, 434 n.2 (S.D.N.Y. 1985), *aff'd*, 784 F.2d 44 (2d Cir. 1986) (emphasis added). The works themselves "supersede and control contrary descriptions of them," including "any contrary allegations, conclusions or descriptions of the works contained in the pleadings." *Gaito*, 602 F.3d at 64 (citations omitted).

26

Obviously, Freeman's work was never finalized or published, so I cannot compare the *Crave* novels to Freeman's works in their "final form" or "as presented to the public." However, I must compare the various drafts themselves to the allegedly infringing works; I cannot rely on the "similarity indexes" that were created for purposes of litigation, listing "the most telling similarities" between the works. Dkt. No. 276 at 4. These indexes are appended to Freeman's declaration in support of her first summary judgment motion. *See* Dkt. Nos. 276; 276-44 through 276-56. Lists of this sort are "inherently subjective and unreliable," particularly where, as here, "the list emphasizes random similarities scattered throughout the works." *Williams*, 84 F.3d at 590 (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)). Such lists are unhelpful because, "Such a scattershot approach cannot support a finding of substantial similarity[.]" *Id*. This does not mean the Court entirely disregards the similarities identified in them; rather, the Court considers any similarities in the context of the works as a whole in evaluating whether the total concept and overall feel of the works are substantially similar.

To the extent Freeman's notes merely reflect ideas, potential options, or undeveloped concepts, they are not entitled to copyright protection and do not factor into the Court's substantial similarity analysis. Notes of the sort found in Dkt. Nos. 397-1 through 397-9 are merely ideas that Freeman considered – and in some instances incorporated into – some or all of her various drafts. But it is the *expression* as found *in her drafts* – not the ideas set out in her notes – in which she is entitled to protection. Once again, I emphasize: copyright protection extends only to a work's particular expression of ideas, not to the underlying ideas themselves. *See Kregos v. Associated Press*, 3 F.3d 656, 663 (2d Cir. 1993).[11]

---

[11] Two pages of Freeman's notes appear to be a draft passage of a scene in which the heroine overhears her mother and her aunt talking about her; but the passage as it appears in the notes does not appear in any of Freeman's completed

#### IV.    Expert Testimony

Because it is the opinion of the ordinary observer (or, more precisely, the more discerning ordinary observer) that matters when assessing substantial similarity, expert testimony about similarity of expression is rarely appropriate. *See Walker*, 784 F.2d at 51. However, both sides have submitted expert testimony that principally addresses what tropes are commonly found in the young adult paranormal romance literary genre. *See* Dkt. Nos. 315-1; 530-1. Expert testimony on this limited topic is admissible and has been considered in connection with reaching a decision on the motions. *See Walker*, 784 F.2d at 51–52.

Of course, there is ample authority that, even on a motion to dismiss, a court may determine, as a matter of law, which elements of a plaintiff's work are entitled to copyright protection. *See Gal v. Viacom Int'l, Inc.,* 403 F. Supp. 2d 294, 305 (S.D.N.Y. 2005); *Adams v. Warner Bros. Pictures Network*, 2007 WL 1959022, at *5 (E.D.N.Y. June 29, 2007), *aff'd sub nom. Adams v. Warner Bros. Pictures*, 289 F. App'x 456 (2d Cir. 2008); *Boyle v. Stephens, Inc.*, 1998 WL 80175, at *3–5 (S.D.N.Y. Feb. 25, 1998), *aff'd*, 1998 WL 690816 (S.D.N.Y. Sept. 29, 1998), *aff'd*, 21 F. App'x 76 (2d Cir. 2001). But in this case, I find it appropriate to consider certain limited aspects of the expert reports that the parties have submitted – specifically, testimony that identifies for the trier of fact tropes/*scènes à faire* that occur with regularity in the genre of work here at issue – young adult fantasy/romantasy fiction. I do not ordinarily read books in this genre, and one cannot assume that jurors would necessarily be familiar with such books either – or would read enough of them to recognize tropes/*scènes à faire* when they are encountered.

---

drafts in Dkt. No. 397-2. For comparison purposes, I rely on the versions of this scene that appear in Freeman's actual drafts.

28

Fortunately, the admissible expert testimony does not give rise to any genuine issue of fact. Both experts in this case agree that all of the following are, at a high level, *scènes à faire* that are commonly encountered in fantasy/romantasy fiction:

1. The main character is in a new and unfamiliar world;

2. The main character learns her true calling, which involves using powers she never knew she had in order to win a battle between good and evil;

3. The heroine is a teenager with high-school aged friends;

4. The heroine believes at the beginning that she is ordinary/human;

5. The heroine is the "Chosen One" who can restore some kind of balance to the world;

6. The story is set in a school;

7. The school is inhabited by supernatural creatures such as vampires, werewolves, and witches;

8. The heroine suffers from anxiety;

9. The heroine is kidnapped;

10. The heroine has lost one or both parents and has surrogate parents;

11. The heroine moving to a new location to live;

12. The heroine is instantly attracted to a really good looking (as in, model-like) boy;

13. The romantic lead is instantly attracted to the heroine;

14. A love triangle.

*See* Dkt. Nos. 315-1, 530-1.

In addition to the above, Defendants' expert, Emily Easton, identifies other tropes/*scènes à faire* that are common to this genre:

29

1. The main character moving to a new location due to trauma, such as the death of a parent;

2. The main character missing her former home;

3. Experiencing anxiety and panic attacks after the loss of a loved one;

4. A remote location;

5. A castle setting;

6. Gothic architecture;

7. The main character being attacked by supernatural creatures, such as vampires or werewolves;

8. The romantic lead being a supernatural creature;

9. The romantic lead having dark secrets;

10. The main character being nervous or excited around the romantic lead;

11. The main character and romantic lead sharing a "momentous" or "epic" kiss;

12. The main character being concerned for the romantic lead or trying to save him;

13. The romantic lead rescuing the main character;

14. A love triangle involving brothers vying for the same love interest;

15. It being dangerous or forbidden for the main character and romantic lead to be together;

16. Rival supernatural factions;

17. Supernatural creatures belonging to secret societies;

18. A location where different supernatural creatures mix and mingle, sometimes under protection;

19. A character being trapped in another dimension;

20. Magical creatures discovering alternate realms as they learn about their powers and visiting those realms either voluntarily or accidentally;

21. The main character attempting to avenge a loved one's death or being the target of an antagonist seeking revenge for the loss of their loved one;

22. Weaving elements of mythology and fairytales as part of the world building;

23. The main character having prophetic dreams or visions;

24. The existence of powerful magical objects or artifacts.

*See* Dkt. Nos. 315-1, 530-1. Plaintiff's expert, Kathryn Reiss, does not disagree that these elements commonly appear in young adult romantasy fiction. In fact, she admits that some of them do; she says, for example, that "It is not uncommon for the protagonists to have lost their parents, have surrogate parents move to a new location to live, suffer anxiety, and/or believe they are ordinary/human." Dkt. No. 530-1 at ¶ 36. But more significantly, she does not testify that any of the items listed in Easton's report are *not* tropes or *scènes à faire* that are regularly seen in this genre. Therefore, there is no disputed issue of fact for a jury to resolve; in addition to the 11 elements that both experts identify as tropes or *scènes à faire* in the romantasy genre, the 24 elements that Easton additionally identifies as tropes or *scènes à faire* also qualify.

Reiss goes on to opine that the manner in which Freeman expresses certain of these tropes/*scènes à faire* is unique. *See id.* at ¶ 38. For example, she argues that it is not common for romantasy works to incorporate all of the elements described above, while Freeman's novel does. *Id*. at ¶ 36.

But there is no need for an expert to testify about uniqueness of expression. Copyright protection extends only to a work's particular expression of ideas, not to the ideas themselves. *See Kregos*, 3 F.3d at 663. It is the manner of expressing the common trope of "boy meets girl from

31

opposing factions/boy and girl fall in love/boy and girl end up dead" that distinguishes *Romeo and Juliet* from *West Side Story*. The issue for decision on this motion is whether Freeman and Wolff express the tropes/*scènes à faire* that appear in their respective works in a substantially similar manner. No expert testimony is needed to reach that conclusion, and none will be considered – from either expert. *See Walker*, 784 F.2d at 51; *Laureyssens v. Idea Grp., Inc.*, 964 F.2d 131, 140 (2d Cir. 1992), *as amended* (June 24, 1992).

Unlike Reiss, Defendants' expert does not opine on the similarity of expression between BMR/Masqued and *Crave*. However, she does identify certain tropes or *scènes à faire* as being found in BMR/Masqued. I do not need expert testimony on this issue, either. A reader armed with information about what elements are commonly found in books of this genre is perfectly capable of ascertaining, from her own reading, whether those elements can be found in Freeman's or Wolff's works.  I will only consider Easton's report for its uncontested explanation of what elements qualify as tropes/*scènes à faire* in works of this genre.

I reiterate: expert opinion is appropriately considered in this case for the limited purpose of acquainting the trier of fact with the tropes/*scènes à faire* that are commonly encountered in fantasy/romantasy fiction directed to young adults. This testimony is helpful in deciding which elements of BMR/Masqued qualify as protectable expression, as opposed to being unprotectable ideas. *See Walker*, 615 F. Supp. at 436 (S.D.N.Y. 1985). However, expert testimony is admissible for no other purpose – certainly not on the ultimate question of whether Freeman's work and Wolff's are substantially similar – and neither party's expert opinion will not be considered for any other purpose.[12]

---

[12] As I told the parties at a conference, both of their experts are amply qualified to testify about this issue. There is no *Daubert* issue of competency to decide.

## V.    Aggregation of Freeman's Works

The parties agree that the four *Crave* novels at issue in this case are a single series that tells one entire story from its beginning – when the heroine arrives at her new and unfamiliar school – to its end – a year later, when the powers of evil have been vanquished and the heroine returns to California to start college. They do not disagree that the *Crave* series should be considered in the aggregate when comparing it with Freeman's work. This is consistent with case law, which treats separate but contiguous works that tell a single story as one aggregated work. *See Montgomery v. Holland*, 408 F. Supp. 3d 353, 375 n.8 (S.D.N.Y. 2019), *aff'd sub nom. Montgomery v. NBC Television*, 833 F. App'x 361 (2d Cir. 2020); *see also Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1372–73 (2d Cir. 1993); *DiTocco v. Riordan*, 815 F. Supp. 2d 655, 667 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 126 (2d Cir. 2012); *Kaye v. Cartoon Network Inc.*, 297 F. Supp. 3d 362, 364–66 (S.D.N.Y. 2017).

What the parties disagree about is whether Freeman's works should be aggregated. Freeman argues that her six manuscripts should be considered as a single work, because the drafts are "iterations and edits of one overarching story" from which "Defendants seemingly picked and chose which parts and options they liked best to create the Crave series." Dkt. No. 284 at 1, 26. Defendants insist that each unpublished manuscript must be compared individually to the *Crave* series. In their view, Freeman's attempt to construct a copyright claim from bits and pieces of her various manuscripts and notes would effectively allow her to "cover all bases;" if one fact pattern is not similar to a challenged element of *Crave*, Freeman can simply claim that another permutation of the story in a different draft works better.

The parties briefed this issue to Judge Netburn. The learned Magistrate Judge concluded that, for the purpose of examining similarities between two literary works in such aspects as total

33

concept and feel, theme, characters, plot, sequence, pace, and setting (*i.e.,* for purposes of conducting a substantial similarity analysis), Plaintiff could not rely on an amalgam of bits and pieces of her various manuscripts, because her various drafts were not a series – they were, according to Freeman herself, a collection of works-in-progress leading to a final manuscript. *See* Dkt. No. 105 at 3. Judge Netburn therefore required Plaintiff to identify two manuscripts to serve as the primary works that establish her copyright claim. *Id*. at 4. Judge Stanton overruled Plaintiff's objections to Judge Netburn's ruling, finding that the identification of two manuscripts was a "practical way" and "fair place to start the comparison process." Dkt. No. 181 at 1, 2. Judge Stanton, however, made clear that Plaintiff's selection of two test examples was not a ruling on the remainder of her evidence; he said that any final decision about Plaintiff's aggregation argument would be "premature" – as indeed it was, since aggregation is relevant to substantial similarity, and Judge Netburn expressly declined to reach that issue. Dkt. Nos. 141 at 3; 181 at 2.

Addressing the aggregation issue is no longer premature. I have read all six of Freeman's drafts. Unlike Judges Netburn and Stanton – who, had they addressed substantial similarity, would have limited their consideration to just two of Freemans' six manuscripts – I intend to conduct my substantial similarity analysis on the basis of all six drafts, not just two of them. The issue is whether we should analyze all six Freeman drafts as though they were a single novel or split them into their component parts.

I conclude that we should do some of each.

I agree with Judge Netburn that Freeman's argument that her various drafts must be aggregated finds no support in either the Copyright Act of 1976 – which refers to the infringed "work" in the singular – or in the case law. The law in this Circuit is clear: "a court must not 'aggregate' a plaintiff's work, but must consider each allegedly infringed work independently."

34

*Dean v. Cameron*, 53 F. Supp. 3d 641, 647 (S.D.N.Y. 2014). The exception to that rule is where multiple works are essentially a single work because they are a series, as discussed above.

Moreover, courts are under no obligation to consider earlier drafts of a work, as they "need only consider the final version of the [work] as presented to the viewing public." *Hudson v. Universal Pictures Corp.*, 2004 WL 1205762, at *3 (E.D.N.Y. Apr. 29, 2004), *aff'd sub nom. Hudson v. Imagine Ent. Corp.*, 128 F. App'x 178 (2d Cir. 2005) (quoting *Walker*, 615 F. Supp. at 436)). Where, as here, no version of the work was presented to the viewing public, it would appear that this rule (if rule it be) limits the Court to comparing the final draft of Freeman's work to the *Crave* series.

Freeman's reliance on *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132 (2d Cir. 1998) to argue that her six drafts constitute a single work is misguided. In *Castle Rock*, producers of the television show *Seinfeld* brought a copyright infringement suit against the author and publisher of a 132-page book that contained 643 trivia questions and answers about the events and characters depicted in *Seinfeld*. *Id.* at 135. The Second Circuit found it appropriate to analyze in the aggregate the amount copied from the eighty-four *Seinfeld* episodes – "a discrete, continuous television series" – rather than analyze separately the amount of expression copied from each individually copyrighted episode. *Id.* at 138. Critically, the Second Circuit declined to apply the standard total concept and feel test in this case, finding it "simply not helpful in analyzing works that, *because of their different genres and media*, must necessarily have a different concept and feel." *Id*. at 140 (emphasis added). It instead applied an alternative approach, which focused on whether the copying was "quantitatively *and* qualitatively sufficient" to support a finding of infringement. *Id*. at 138 (citation omitted). Applying that approach, the *Castle Rock* court considered the *Seinfeld* episodes in the aggregate only for the purpose of

determining whether the defendant's copying was *quantitatively* sufficient to support a finding of infringement. *Id*. The Second Circuit ultimately affirmed the district court's judgment in favor of the plaintiff, finding that the trivia book unlawfully copied from *Seinfeld*. *Id*. at 135.

The *Castle Rock* approach does not apply here, because we are not comparing works from different genres and media – we are comparing novels with novels, albeit unpublished draft novels with completed and published novels. *Castle Rock*'s treatment of "a discrete, continuous television series" as one work for purposes of determining whether the quantity of copying exceeded a *de minimis* level thus offers no support for Freeman's assertion that this Court should compare the "total concept and feel" of different drafts of the same story to the total concept and feel of the *Crave* series. *See Kroencke v. Gen. Motors Corp*., 270 F. Supp. 2d 441, 443–44 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 339 (2d Cir. 2004).

The other cases Freeman cites, in which courts have utilized an aggregate approach where a plaintiff alleges infringement of separate but contiguous works, also have no bearing here, where Plaintiff's works consist of various drafts of a single novel. *See Montgomery*, 408 F. Supp. 3d at 375 n.8 ("Where the allegedly infringed work is made up of separate but contiguous works, it is appropriate to treat them in the aggregate as a single work"); *see also Twin Peaks*, 996 F.2d 1366, 1370–71 *DiTocco*, 815 F. Supp. 2d at 658–64; *Kaye*, 297 F. Supp. 3d at 364–66. Unlike the works at issue in those cases – and unlike the four *Crave* novels, which tell a single, consistent story from beginning to end – Freeman does not allege that her six copyrighted works are a "series" that, taken together, tell a single story. Rather, they are a collection of works-in-progress, which tell the same story in different ways. They were intended to lead up to one final publishable manuscript. That they never arrived at that end point does not make the drafts an "aggregate" work in the same way the *Crave* novels are. Freeman herself explains that her copyrighted works "essentially set[]

36

forth different options of how to best present [a single] story with notes explaining the characters and their backstories." Dkt. No. 284 at 19.

Freeman does not cite, and the Court is not aware of, any case supporting the notion that a court can aggregate multiple unfinished drafts of the same underlying work for purposes of determining substantial similarity. The paucity of case law supporting Freeman's proposed approach is unsurprising, because such an approach would overlook the fundamental question of whether a lay observer would consider the works *as a whole* substantially similar to one another. *Williams*, 84 F.3d at 590. The Court has serious doubts about whether Freeman's aggregation theory is legally sound. The better view is that each copyrighted work must be assessed independently in considering whether the total concept and overall feel of the works are substantially similar.

But the Court need not definitively reject Plaintiff's aggregation argument, because even aggregating the first five of her drafts – the ones that conform to the same story template and contain the same characters – no reasonable juror could find that Freeman's works are substantially similar to Wolff's. Accordingly, for the purposes of the substantial similarity comparison, the Court will consider the first five drafts as a single aggregated work. Frankly, as Freeman's novel evolved over time, the differences from draft to draft are relatively insubstantial.

I do agree with Defendants, however, that the sixth and last version of BMR/Masqued – Masqued 2016 – does not follow the template of the five earlier drafts and is sufficiently different from the earlier versions so that it cannot be aggregated with them for purposes of the substantial similarity analysis. That separate analysis will be found in Section VIII, *infra*.

## VI.     Plaintiff's Alternative Theories of Substantial Similarity

Despite recognizing that the "more discerning ordinary observer" test is the appropriate test for substantial similarity under Second Circuit precedent, Freeman contends that the Court should judge whether Wolff's novels are substantially similar to hers using the "comprehensive nonliteral similarity" and "fragmented literal similarity" tests. Freeman is incorrect on both counts.

The "comprehensive nonliteral similarity" test, initially propounded by Professor Nimmer, remains an academic's suggestion in this Circuit, where courts do not normally apply it. *See Castle Rock*, 150 F.3d at 140–41; *Est. of Smith v. Cash Money Recs., Inc.*, 253 F. Supp. 3d 737, 746 n.4 (S.D.N.Y. 2017), *aff'd sub nom. Est. of Smith v. Graham*, 799 F. App'x 36 (2d Cir. 2020). The few courts that have discussed this test have explained that the doctrine of comprehensive nonliteral similarity can provide copyright protection "where there is no word-for-word or literal similarity but where defendant has nonetheless appropriated *the fundamental essence or structure* of plaintiff's work." *Arica Inst.*, 970 F.2d at 1073 (internal quotations omitted, emphasis added); *Lewinson*, 659 F. Supp. 2d at 570. But as Freeman explains it in her briefs, a trier of fact evaluates comprehensive nonliteral similarity by examining "factors such as similarity in plot, theme, dialogue, mood, setting, pace and sequence." Dkt. Nos. 284 at 24; 543-1 at 15. Those are the very elements that a trier of fact evaluates when applying the ordinary observer test (or the more discerning ordinary observer test) on which courts in the Second Circuit rely when deciding whether two works are substantially similar to each other. *See Spielberg*, 748 F. Supp. 2d at 205. Since this Court will be comparing "factors such as similarity in plot, theme, dialogue, mood, setting, pace and sequence" when addressing substantial similarity, it hardly matters whether we

call it the "more discerning ordinary observer test" or "comprehensive nonliteral similarity."[13] I prefer to use the term that is widely recognized in this Circuit. But, in any event, I will be analyzing all of the factors that Freeman contends are pertinent to comprehensive nonliteral similarity.

Alternatively, Freeman asserts that she can prevail under a theory of fragmented literal similarity, which "focuses upon copying of direct quotations or close paraphrasing." *Castle Rock*, 150 F.3d at 140. Fragmented literal similarity "exists where the defendant copies a portion of the plaintiff's work exactly or near exactly, without appropriating the work's overall essence or structure." *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 597 (S.D.N.Y. 2013) (quoting *Newton v. Diamond*, 388 F.3d 1189, 1194 (9th Cir. 2004)). Under this theory, "the question of substantial similarity is determined by an analysis of whether the copying goes to trivial or substantial elements of the original work." *Id*. at 598 (internal quotations omitted). Because fragmented literal similarity involves literal copying (or close paraphrasing), under this test – more so than under the standard "ordinary observer" test – a "relatively small" quantitative portion of the pre-existing work can be substantial if it is of great qualitative importance to the plaintiff's work as a whole. *Id.*

The fragmented literal similarity test, which is most often applied in music plagiarism cases, is rarely apposite when considering literary works. The facts in the few literary cases that Freeman cites are so different from the facts of this case as to render them unpersuasive.

In *Twin Peaks*, for example, the Second Circuit found that the district court properly applied a "literal similarity" test instead of a "substantial similarity" test where two chapters of the

---

[13] Moreover, as will be seen in the extensive discussion that follows, Wolff did not appropriate the "fundamental essence or structure" of Freeman's work. Both authors use tropes and *scènes à faire* that are common to all romantasy fiction book for young adults. There any substantial similarity ends.

allegedly infringing book consisted of extensive direct quotations (at least 89 verbatim lines of dialogue) from the plaintiff's teleplays. 996 F.2d 1366 at 1372–73.

In *Paramount Pictures Corp. v. Carol Publishing Group*, 11 F. Supp. 2d 329 (S.D.N.Y. 1998), *aff'd sub nom. Paramount Pictures Corp. v. Carol Pub. Grp., Inc.*, 181 F.3d 83 (2d Cir. 1999), the court found a finding of fragmented literal similarity to be appropriate where the defendant's work directly lifted dialogue (such as quotes like "long live and prosper") from the plaintiff's work and copied fictional facts (including fictional alien species and fictional technologies) that comprised the "heart" of plaintiff's work. *Id*. at 333–34.

Finally, in *Warner Bros. Entertainment Inc. v. RDR Books*, 575 F. Supp. 2d 513 (S.D.N.Y. 2008), the court relied on a fragmented literal similarity theory in finding that the allegedly infringing work contained "a considerable number of direct quotations (often without quotations marks) and close paraphrases of vivid passages in the *Harry Potter* works." *Id*. at 537. The defendant's work in *Warner Bros*. was a "Lexicon manuscript" (an online encyclopedia) that was created using the content of plaintiff's work; it "cull[ed] every item and character that appear[ed] in the *Harry Potter* works, no matter if it play[ed] a significant or insignificant role in the story." *Id*. at 525. Specifically, the Lexicon's entries included "every spell (e.g., Expectro Patronum, Expelliarmus, and Incendio), potion (e.g., Love Potion, Felix Felicis, and Draught of Living Death), magical item or device (e.g., Deathly Hallows, Horcrux, Cloak of Invisibility), form of magic (e.g., Legilimency, Occlumency, and the Dark Arts), creature (e.g., Blast-Ended Skrewt, Dementors, and Blood-Sucking Bugbears), character (e.g., Harry Potter, Hagrid, and Lord Voldemort), group or force (e.g., Aurors, Dumbledore's Army, Death Eaters), invented game (e.g., Quidditch), and imaginary place (e.g., Hogwarts School of Witchcraft and Wizardry, Diagon Alley, and the Ministry of Magic)" that appeared in the plaintiff's works. *Id*. In other words, the

40

defendant's work copied, word for word, essential features lifted directly from the *Harry Potter* books in order to create the encyclopedia.

Freeman points to no case in which a court has found this doctrine to be applicable to literary works like the ones at issue here, where the allegedly infringing work includes short fragments of language (much of it paraphrased) that are in no way essential to the work. In this context, focusing upon isolated short language fragments "improperly distract[s] [the Court] from inquiring as to whether substantial similarity exists" between Freeman's works and the *Crave* series. *Castle Rock*, 150 F.3d 132 at 140. This is precisely the type of scattershot approach that "cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another." *Williams*, 84 F.3d at 590.

Moreover, Freeman cannot prevail on a theory of fragmented literal similarity because the "literal" similarities to which she points are simply ordinary words or common phrases that any author is free to use. Examples of fragmented literal similarity identified by Freeman include Wolff's use of the following phrases: "things that go bump in the night," "pang of disappointment," "my stomach is roiling," "he gives me a knowing look," "grab my backpack and head out," "everything is going to be okay," "my blood freezes in my veins," "the whooshing sound," "tears streaming down my cheeks," "I'm so sorry this happened," "I don't have a clue," "I feel exactly the same way," "harder than I thought it would be," "and to hell with the consequences," "and that's when it hits me," "kisses the top of my head," and "like a sack of potatoes." *See* Dkt. Nos. 276-34; 276-53; 276-54; 276-56. Arguing that the use of these common phrases demonstrates substantial similarity trivializes copyright law.

41

Similarly, Freeman's alleged "close paraphrases" are not entitled to copyright protection. The following examples are illustrative:

| *BMR/Masqued* | *Crave* |
|---|---|
| "A long moment of intense silence descends between us, his fingers locked around my wrist . . ." 2013 p. 105 | "An awkward silence descends between us, and I honestly don't know . . ." Covet p. 126 |
| "A shiver skitters down my spine." 2013 p. 57 | ". . . and then our gazes collide, and a shiver of fear skitters down my spine." Covet p. 448 |
| "Meret and I walk for what feels like a mile until we come to a large set of golden double doors . . ." 2016 p. 97 | "Either way, we walk down a really, really, really long corridor until we come to a pair of gold double doors." Covet p. 567 |
| "He reached out and with his thumb and forefinger tilted my chin up, forcing my gaze to meet his." 2010 p. 426; 2013 p. 364 | "Hudson reached out and tilts my chin up with his finger until he's holding my gaze in his fathomless blue depths." Court p. 593 |
| "I took a slow breath as I tried to do the math in my head. 'That means he's—he's like—' 'Over a thousand years old, give or take a few years." 2010 p. 337 | "So then how could she be a thousand years old and still look . . . At least not until I start to do the math in my head . . ." Court p. 369 |
| "I can smell the demon in you." 2014 p. 329 | ". . . I definitely smell the gargoyle in you . . ." Covet p. 229 |
| ". . . something sparkly caught the light . . . Tattoos! And they were moving on his fingers, swirling in a strange dance." 2011 p. 289 | ". . . captured by the tattoo that's so bright now, it's practically blinding as it swirls and dances up and down the biceps and forearm." Covet p. 605 |

Dkt. No. 543 at 115–16. Freeman is correct that fragmented literal similarity does not always require *literal* similarity – close paraphrasing can also be considered. *See Castle Rock*, 150 F.3d at 140. However, the "close paraphrases" to which Freeman points consist of ordinary words and short phrases that are not subject to copyright protection "except to the extent they are given unique—and therefore protectable—expression in an original creation." *Walker*, 784 F.2d at 50. A close examination of the works reveals that the *Crave* books do not appropriate Freeman's "sequence of thoughts, choice of words, emphasis and arrangement in such a way as to make actionable the use of single words and short phrases." *Arica Inst.*, 970 F.2d at 1073 (internal quotations omitted). And, to the extent any of Freeman's examples could be considered *protectable*

elements of her works, any similarities to the *Crave* series are trivial, insubstantial, and qualitatively unimportant. They do not go to the heart of either her work or Wolff's. These alleged similarities thus cannot serve as the basis for a copyright infringement claim.

For these reasons, the Court will focus on the Second Circuit's "total concept and feel" test as viewed from the perspective of the "more discerning ordinary observer, examining similarities between the works in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting of the works to determine whether Freeman's manuscripts are substantially similar to the *Crave* series.

For the avoidance of doubt, the Court has also considered whether the asserted similarities, taken collectively, produce a protectable selection or arrangement which *Crave* appropriates. They do not. The similarities Plaintiff identifies consist of either generic genre beats arranged in a conventional fashion or are embedded in narrative structures, settings, and character arcs that are materially different when considering the total concept and overall feel of the works.

## VII.    Application: BMR/Masqued 2010-2014

Freeman lists hundreds of purported similarities between her drafts and the *Crave* novels. It is not necessary to discuss every alleged similarity between Freeman's works and the *Crave* series; a discussion of her principal points is sufficient to allow the Court to conclude that there is no substantial similarity between the allegedly infringed and infringing works as a matter of law. *See Walker*, 615 F. Supp. at 435; *Zambito v. Paramount Pictures Corp.*, 613 F. Supp. 1107, 1111 (E.D.N.Y.), *aff'd*, 788 F.2d 2 (2d Cir. 1985).

### a.  Themes

Broadly speaking, both BMR/Masqued and *Crave* are based on similar themes – as indeed are most novels in this particular genre. Both involve a smart, pretty high school girl who has been

43

uprooted from her childhood home. The girl discovers that she has supernatural abilities, which are key to resolving an ancient feud among paranormal factions. Over the course of the books, the heroine must come to terms with the loss (by death or otherwise) of one or more parents. She finds love with a hunky boy who turns out to be a paranormal. She discovers who she truly is and learns to fight demonic powers with the help of friends, most or all of whom are, like her and her boyfriend, paranormal creatures. And she ultimately restores the balance between two opposing forces.

As previously noted, such highly generalized tropes, explored in countless young adult paranormal romance novels and other types of fantasy fiction, are not entitled to copyright protection. *See Brown v. Perdue*, 2005 WL 1863673, at *6 (S.D.N.Y. Aug. 4, 2005), *aff'd*, 177 F. App'x 121 (2d Cir. 2006). Indeed, Freeman's own expert opines that, at an abstract level, these are unprotectable tropes. *See* Dkt. No. 530-1 at ¶¶ 20, 21, 28, 36, 37.

So let us turn to how Plaintiff and Defendants express these tropic themes.

### b. Setting

Settings that naturally flow from a shared theme or genre are unprotectable *scènes à faire*. *See Lewinson*, 659 F. Supp. 2d at 574; *Allen v. Scholastic Inc.*, 739 F. Supp. 2d 642, 664–65 (S.D.N.Y. 2011); *Williams*, 84 F.3d at 589; *Nobile v. Watts*, 289 F. Supp. 3d 527, 535 (S.D.N.Y. 2017), *aff'd*, 747 F. App'x 879 (2d Cir. 2018). Similarly, settings based on real places known to the public are not copyrightable. *See Walker*, 784 F.2d at 50.

Freeman contends that the works are substantially similar because both take place in a high school in Alaska. Alaska is a place known to the public, so setting a novel in Alaska is not copyrightable. Neither is setting a novel about teenagers in a high school.

Moreover, while both BMR and *Crave* are set in the same state and include scenes that take place at a high school, the similarities end there.

BMR is set in Anchorage, Alaska's largest city. Anchorage is home to schools, bars, restaurants, and bookstores (many of which are based on real-life establishments, like Barnes and Noble), all of which are within easy driving distance of the protagonist's home. *Crave*, by contrast, is set in the remote Alaskan mountains near Denali, 250 miles north of Anchorage, in an area accessible only by snowmobile. *Crave*'s characters do not (and cannot) drive to bars, restaurants, or bookstores; instead, they eat, sleep, study, and socialize within the isolated walls of their private and most unusual school, known as Katmere Academy.

While some scenes in BMR/Masqued take place at West High, most of the story takes place elsewhere in Anchorage – at a beach, at the protagonist's home, at the home of her boyfriend or her best girlfriend, at a Barnes and Noble, at an unsupervised teen house party, at various local dining establishments (a diner, a Tex-Mex restaurant), and even a notorious local bar. The supernatural world about which Anna/Mia learns over the course of the novel is located behind a nondescript VIP door at said notorious bar that is guarded by a troll; the magical Gloaming is accessible by the Unseen anywhere there is a forest. The heroine's mother and aunt (both of whom are Kindred witches), her boyfriend's family, the MacKays (shapeshifters), and even the villain, Julian (who is variously a vampire or an incubus) live in rather large and fancy houses, but they are still houses – they are not castles. When the heroine goes to the misty world of Avalon, she does so in her dreams and visions, or she steps through a magic mirror, which she sees in a dream and then encounters at the villain's home.

Conversely, the novel Crave, the first volume in the *Crave* series, takes place entirely at Katmere Academy, a magical boarding school for supernatural creatures where overt paranormal

activity is always going on – indeed it is a feature of the curriculum. Katmere is set in a gothic castle, which Wolff describes in extensive detail. It is comprised of dorm rooms, secret passageways, turrets, underground tunnels leading to satellite classrooms, a tower room for one of two vampire prince brothers and an underground lair for the other, a dragon boneyard, an arena where a magical game called Ludares is played, and a Great Hall that functions as an auditorium. Katmere was once a dragon's lair, and portions of the castle are studded with precious jewels that were once part of a dragon's hoard. It is, in short, like no public high school, in Alaska or anywhere else.

Once we get beyond the first volume of the *Crave* series, Wolff introduces many fully developed, elaborate settings that are spread across the globe. These find no counterpart in any version of Freeman's works. There is an ice cave hidden in the Alaskan wilderness, home to an elderly woman who happens to be a vicious vampire known as The Bloodletter (and who is actually the Goddess of Chaos); a volcanic island on which The Unkillable Beast (an ancient gargoyle) is imprisoned; Giant City in the California redwoods, where giants dwell among the giant trees; the Aethereum Prison in New Orleans; the tropical island that is home to The Crone (the Goddess of Order); and the Impossible Trials arena, which is hidden behind a taffy shop in St. Augustine, Florida. There are also the royal courts of the principal types of paranormals in *Crave*. These are located in parallel universes all over the world: the Witch Court is in Turin, Italy; the Vampire Court is in London; the Gargoyle Court is in Cork, Ireland; the Dragon Court is in midtown Manhattan. The heroines and her friends travel to all of these places, where they meet a variety of other supernatural creatures. Anna/Mia, by contrast, never leaves Anchorage, except to pass over into Avalon. *See DiTocco*, 815 F. Supp. 2d at 670.

Alaska also plays a very different role in each work.

For BMR's protagonist (Anna/Mia), Anchorage has long been home – a familiar and comfortable place where she has lived for a decade. She moved to Anchorage when she was seven; California is but a distant childhood memory. And her school, West High School, is a typical public high school, with a typical mix of students (a few of whom turn out to be paranormal, but not nearly all).

For Grace, the protagonist of *Crave*, the remote Alaskan wilderness is itself a character; its unfamiliar, intimidating, and isolating nature has a profound impact on the heroine throughout the series. She was uprooted from her Southern California home at age seventeen, just after the beginning of her senior year in high school. Her new home is a boarding school for the children of four types of supernatural beings – vampires, werewolves, witches, and dragons.

Freeman's assertion that the works are substantially similar because they both feature a similar castle exemplifies the weakness that runs throughout her presentation. While Katmere is identified as a castle, the word "castle" does not appear in any draft of BMR/Masqued.[14] It is of no moment that one line in Freeman's many pages of notes – only some of which ever made it into a draft of her novel – mentions in passing that "Ian and Sasha" (characters who were never written into any draft of her novel) live on a "large compound like a castle." Dkt. No. 397-9 at 5. Likewise, the notion that Katmere is substantially similar to the "Old-World European chateau" in which the MacKays live, simply because "chateau" is the French word for "castle," borders on the frivolous. No building in any of Freeman's drafts looks or feels remotely like the ancient dragon's lair in the Alaskan wilderness that is Katmere Academy. This is a motif we will encounter again and again as we examine the factors that play into the "total look and feel" of these two sets of works.

---

[14] The same is true of "Katmai," a real place in Alaska which is mentioned only in Freeman's notes and is not expressed in any of the six drafts of BMR/Masqued.

47

### c. Characters

To determine whether characters are substantially similar, courts consider "the 'totality of [the characters'] attributes and traits' as well as the extent to which the defendants' characters capture the 'total concept and feel' of figures in [plaintiff's work]." *Walker*, 784 F.2d at 50 (quoting *Warner Bros. Inc. v. Am. Broad. Companies, Inc.*, 720 F.2d 231, 241 (2d Cir. 1983)). This is an exacting standard, one not easily met. The Second Circuit has provided the following guidance:

> What the character thinks, feels, says and does and the descriptions conveyed by the author through the comments of other characters in the work episodically fill out a viewer's understanding of the character. At the same time, the visual perception of the character tends to create a dominant impression against which the similarity of a defendant's character may be readily compared, and significant differences readily noted.

> Ultimately, care must be taken to draw the elusive distinction between a substantially similar character that infringes a copyrighted character despite slight differences in appearance, behavior, or traits, and a somewhat similar though non-infringing character whose appearance, behavior, or traits, and especially their combination, significantly differ from those of a copyrighted character, even though the second character is reminiscent of the first one.

*Warner Bros.*, 720 F.2d at 241–42. It is precisely on the distinction between "somewhat similar" and "substantially similar" characters that Freeman's argument falters.

Copyright law provides "very limited protection" to characters in a creative work. *Jones v. CBS, Inc.*, 733 F. Supp. 748, 753 (S.D.N.Y. 1990). A copyright infringement claim with respect to a character cannot succeed "unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines." *Smith v. Weinstein*, 578 F. Supp. 1297, 1303 (S.D.N.Y. 1984), *aff'd*, 738 F.2d 419 (2d Cir. 1984). A basic or stock character type is not copyrightable, whereas a "uniquely developed character with some degree of novelty" is. *Jones*, 733 F. Supp. at 753. A protagonist who is a young girl with psychic abilities, for instance, is an unprotectable idea, as are "using psychic abilities to save people, seeing and doing supernatural things, and defeating villains" – all of which necessarily

48

flow from the idea of a character using her psychic abilities to triumph over evil. *Acker v. King*, 46 F. Supp. 3d 168, 175 (D. Conn. 2014).

"The bar for substantial similarity in a character is set quite high." *Spielberg*, 748 F. Supp. 2d at 208. Judge Scheindlin's oft-cited decision in *Hogan v. DC Comics*, 48 F. Supp. 2d 298 (S.D.N.Y. 1999) provides a useful example. There, the court declined to find that two half-human, half-vampire characters – both named Nicholas Gaunt – were substantially similar, even though both were white males in their early twenties with thin-to-medium builds, pale skin, dark messy hair, and a slovenly appearance. *Id*. at 311–12. While the two characters were obviously somewhat similar, Judge Scheindlin found that both characters being half-vampire and half-human was a non-protectable idea in the public domain and pointed out that the way in which the two characters became half-vampires was different in the two works. *Id*. She further held that while they shared a similar appearance – characteristics common to many "Generation X" post-adolescents – they had distinct physical features (including face shape, haircut, and presence of tattoos) and interacted with other characters in different ways. *Id*. at 312; *see also Cabell v. Sony Pictures Entm't, Inc*., 714 F. Supp. 2d 452, 459–61 (S.D.N.Y. 2010), *aff'd*, 425 Fed. Appx. 42 (2d Cir. 2011).

With this in mind, we turn to a comparison of the works' characters, based on the Court's "considered impressions." *Nichols v. Universal Pictures Corp*., 45 F.2d 119, 123 (2d Cir. 1930). A detailed description of the characters in BMR/Masqued and *Crave* is set out in Addendum D. It is readily apparent that none of the characters in BMR/Masqued is "substantially similar" to the characters in *Crave* when the proper test is applied.

The heroines of both works are female teenagers with supernatural abilities. But Freeman's copyright "do[es] not entitle [her] to protection of the idea of a character with superhuman powers who battles the forces of evil." *Warner Bros. v. Am. Broad. Companies, Inc*., 523 F. Supp. 611, 615

49

(S.D.N.Y. 1981), *aff'd and remanded*, 654 F.2d 204 (2d Cir. 1981). As should be apparent from reading Addendum D, Freeman and Wolff describe their heroine in vastly different ways. The girls (one tall, slim and dark; one short and busty with curly hair and freckles) look nothing alike. They are in different years in high school. They are different types of supernatural characters – one is part Kindred witch, part shifter and part demon (she has three lineages); the other is half gargoyle and half witch. Because they are different types of supernaturals, they have different powers: Grace can fly, turn herself to stone, stop time, and heal using the power of the earth, while Anna/Mia reads Tarot cards that come to life and has prophetic visions. What powers she will have after her upcoming initiation remain to be revealed; we learn nothing about them in any draft of BMR/Masqued. Anna/Mia passes through a mirror into a mysterious magical land; Grace travels from Alaska to various real places on earth – or to parallel universes behind those places – either by flying while in her gargoyle form, passing through portals created by witches, riding on the back of a dragon, or "fading" in the arms of a vampire.

Anna/Mia's mother is alive – whether that mother be Marcheline, the artist who raised her, or Elise, the High Priestess of Avalon – while her father, believed to be dead for almost a decade, is actually alive in a magical land, trapped in the form of a wolf. Grace's parents are really, truly dead – both of them – and they are very recently deceased.

Grace has a bubbly and quirky cousin one year younger than her who functions as her "wing woman" and helps her adjust to the supernatural world. Anna/Mia does not have a similar friend – her only close girlfriend (Amanda/Samantha) has rejected her, and her relationship with her new friends is not well developed.

Freeman asserts that both heroines experience "anxiety and panic attacks from the trauma of family members' deaths which manifest physically throughout both stories." Dkt. No. 543-1 at

21. According to Freeman, these panic attacks are "not merely backstory but active elements of the heroine's characterization throughout the plot." *Id*. The heroines "even utilize the same techniques of careful breathing and counting their breaths to manage their anxiety and panic." *Id*. This is undoubtedly true for Grace, whose grief is raw and fresh and for whom panic attacks are a defining character trait. There is, however, no indication in *any* draft that Anna/Mia experiences panic attacks, let alone panic attacks over the ostensible "death" of her father nine years earlier. While Anna/Mia may experience moments of anxiety and panic – as people often do when placed in stressful or unfamiliar situations – the words "panic attack" do not appear in any version of BMR/Masqued. It is only in Freeman's notes that she suggests Anna/Mia suffers from panic attacks – an unprotectable idea that was never expressed in her drafts. Freeman points to a scene in BMR 2011 in which Anna/Mia experiences "fear and anxiety" over being locked in a dark van by demons, but her fear and anxiety is unrelated to her father's presumed death a decade earlier. Rather, it is a perfectly normal reaction from someone who has just been kidnapped; it is impossible to imagine a character who would *not* be fearful in this situation. And there is, of course, nothing remotely original about using breathing techniques to cope with anxiety.

Freeman also suggests that the heroines share "parallel, specific lifestyle details." *Id*. at 26. For example, she says that the heroines' favorite food comes from a local Mexican restaurant, and they often drink tea. The heroine also "ducks her head down" when she is uncomfortable, loves homemade chocolate chip cookies, and eats apples and yogurt at school. *Id*.

Putting aside that a shared love of Mexican food or tea is not borne out in the works themselves (Grace's favorite food is Pop Tarts – although she does like tacos, as do many teenaged girls – and while she may drink tea on occasion, she much prefers Dr. Pepper), these alleged similarities are both unprotectable and nothing more than random, minute details that do nothing

51

to address the question of whether the characters themselves are substantially similar. Moreover, there is no "local Mexican restaurant" in *Crave* – there is not a restaurant anywhere close to Katmere. When Grace eats tacos, it is at a stall in a marketplace in a prison in New Orleans or when Jaxon brings her favorite street tacos from her hometown in San Diego – not in a local Mexican restaurant.

Freeman's other arguments about the purported similarities between the two heroines merely reflect unprotectable *scènes à faire*, such as the heroine's relocating to a new state after the death of her parent(s), failing to see herself as beautiful despite her good looks, believing she is an ordinary human, and discovering she is a rare and unique supernatural being of magical lineage meant to restore and maintain the balance. Though there are some specific similarities, like the heroine's relocating from Southern California to Alaska,[15] these details have no bearing on the total concept and feel of the characters.

Ash/Roman and Jaxon, the heroines' boyfriends, are also quite different. Though Freeman characterizes both romantic leads as "wild," "sexy," "beautiful," "smoking hot," "gorgeous" and "dangerous," Dkt. No. 543-1 at 27–28, hot, sexy, dangerous boys – central to virtually all young adult romance novels – cannot be copyrighted. The Viking Ash/Roman has rosy cheeks and sun-kissed skin; Jaxon has black hair, black eyes, and wears black clothes. He is presumably pale (he is, after all, a vampire) and has a jagged scar from the center of his left eyebrow to the left corner of his mouth. Both boys smell delightful to the heroine (a common phenomenon where

---

[15] Another example of the liberties Freeman takes with her own work: she says that both heroines have maternal grandmothers with green eyes. In none of the five drafts that follow the template does Anna/Mia have a maternal grandmother with green eyes. In fact, in three of those five drafts, the heroine does not have a maternal grandmother at all. In all versions of the novel that conform to the template, the mysterious woman in the mirror – who is variously Anna/Mia's biological mother (BMR 2010 and 2011 or Masqued 2012) or her grandmother (Masqued 2013 and 2014) – has blue eyes, not green eyes. Only in *Masqued 2016* – the novel that does not conform to the template and that is being separately analyzed – does the heroine (Ella) have a maternal grandmother who has green eyes. As for the *Crave* novels: the character with green eyes is a vampire and a goddess – not a witch or a priestess – and she is not the heroine's maternal grandmother, but her ancestor going back many generations.

pheromones associated with sexual attraction are involved), but contrary to Freeman's assertions, they do not share the same scent; Ash/Roman smells like citrus and spice "with a note of musk and woods to the sunlit forest and waterfalls," whereas Jaxon smells like orange and freshwater.

Jaxon is a dark vampire prince, and a disturbed and violent one at that; he is the product of a highly dysfunctional family and believes (wrongly) that he murdered his own brother. Ash/Roman is a werewolf/shapeshifter, not a vampire – in fact, he hates all "Sanguines," as he calls creatures that feed off blood, believing them to be demonic. He comes from a close and loving family and has a preternaturally sunny disposition. He is not royalty. And while he "feels responsible" for the death of his older brother Dylan, Ash/Roman did not kill Dylan, or try to.

Like all vampires, Jaxon drinks blood and has no reflection. He also has the power of telekinesis – the ability to move objects with his mind. He runs with a posse of friends (The Order) who are vampires like he is. And he travels by "fading" – moving very fast. Unlike Jaxon, Ash/Roman has no posse; his "friends" are the members of his family, all of whom are werewolves or shapeshifters, as he is. He moves quickly by riding on a motorcycle, until he turns into a wolf – at which point he can carry the heroine on his back. Both heroes can move very quickly, but this is by no means original to Freeman's work; Edward, the hero of *Twilight*, does the same.

Freeman's position that the romantic leads are substantially similar because they both feel a responsibility to protect the heroine from supernatural creatures wanting to harm or kill her exemplifies the weakness of her argument. There is nothing original about a romantic lead who wants to protect the heroine; it is perhaps the ultimate teen romance trope. A romantic lead who does *not* want to protect the heroine from evil supernatural creatures would never be found in a young adult romantic fantasy novel.

*BMR/Masqued* has no counterpart to Hudson, who becomes Grace's primary romantic interest halfway through the *Crave* series. Freeman seems to have intended to develop a second love interest who "encourages [the heroine] to be herself and become powerful" in future works – apparently in the person of Ronan/Aedan, the Druid priest. But that idea never made it into any draft of her novel. Dkt. No. 531 at 53.

Were there reason to compare them, aside from being dark and extremely attractive, Ronan/Aedan and Hudson are very different. Hudson Vega is a recent high school graduate and the heir to the Vampire Kingdom. An upper-class, Armani-wearing Brit who grew up in London, Hudson was ostensibly killed by his brother a year earlier so that he would not help establish the supremacy of "born" vampires.[16] – something he never intended to do. And, of course, Hudson is a vampire, and a very powerful one at that. Ronan/Aedan O'Faolain, by contrast, is an adult Celtic Druid. He dresses like a Druid would – in black leather boots, fitted breeches, and an unlaced tunic, with arms tattooed with runes and Celtic symbols. As far as the reader knows, Ronan/Aedan murdered his entire community and enslaved his priests to sacred objects; there is no indication in Freeman's notes, and certainly none in any text, that these legends about him are untrue. Ronan/Aedan disappeared from the earth centuries before Freeman's story begins; Hudson disappeared one year before Wolff's story begins. We know literally nothing more about Ronan/Aedan, because his character – unlike Hudson's – is not fleshed out. Aside from a single reference in one of Freeman's notes,[17] Anna/Mia's romance with Ronan/Aedan exists solely in Freeman's mind. Anna/Mia does have an immediate attraction to the man she released, but she

---

[16] The Vegas and some other vampires are "born" vampires – they were born with a taste for blood due to a genetic mutation. This distinguishes them from "made" vampires, who got that way in the old-fashioned way – by being bitten and drained. Competition between born and made vampires is a feature of Wolff's work. There is no similar concept in Freeman's novel.

[17] Dkt. No. 397-1 at 3.

also has an indistinguishable immediate attraction to the fascinating demon who turns out to the Julian, the villain of BMR/Masqued. And while in BMR 2010 and 2011 (but not in subsequent drafts), Ronan bites Anna while kissing her so he can taste her blood (which seems to be how supernatural characters ascertain who the girl is – Julian does exactly the same thing), he is most definitely not a vampire.

The villains in Plaintiff's and Defendants' works are also very different. Julian is an incubus or vampire, depending on the draft. In every draft, Julian previously had a romantic relationship with the heroine's biological mother; in some drafts, he is the girl's biological father. The story of Julian's thwarted love changes from version to version, but in each instance he is an angry, spurned lover who blames the heroine's father Dante for the loss of his one true love. Julian gets back at the family that has wronged him by imprisoning the father in a magical world in the form of a wolf; he plans to use Anna/Mia to recover, in one way or another, his lost love. Cyrus, the megalomaniac Vampire King, is the father of Hudson and Jaxon. He has no romantic connection whatsoever to the heroine's family; indeed, he is believed to have eliminated her kind (gargoyles) entirely. He is head of The Circle (the ruling council of supernatural beings) and the leader of an army of misfits. He has lost his powers and is bent on recovering them and becoming a demigod.

Next, Freeman contends that, "A smoky gray-eyed, telepathic, Gaelic-speaking father/grandfather named Athair/Alistair, who appears as a voice in the heroine's head and is imprisoned in his beast form by the vampire prince/vampire king cannot plausibly be dismissed as a stock or indispensable trope of young adult fiction." Dkt. No. 543-1 at 32. That may be so, but Freeman's grey-eyed wolf is dissimilar from Wolff's imprisoned gargoyle.

The character to whom Freeman refers is, in BMR/Masqued, the heroine's father (whether biological or adoptive). His name is Dante, not Athair; but since he is not allowed to reveal himself,

he tells Anna/Mia to call him "Athair Mo Chroid" (Gaelic for Father of My Heart). Dante is believed to have been killed a decade before the story begins; he appears in the story as a grey-eyed wolf who guides Anna/Mia spiritually, as a parent would. He is trapped in another dimension as punishment for his role in the loss of Julian's one true love. Aside from one instance when Anna/Mia hears her father's voice in a dream, the heroine does not hear him except when he is in her presence speaking to her.

Dante's purported counterpart in *Crave* is actually named Alistair. Alistair is not Grace's father, or her grandfather, or her great grandfather – he is her great-great-great-great-great-great-great grandfather many generations back. He is not a grey-eyed wolf. In his gargoyle form, he is an enormous creature made of jagged rock with bloodred eyes; in his human form, he is a tall man who looks to be in his late thirties with smoke-grey eyes, braided blond hair, and a goatee.[18] He has been restrained in a rock cave on a volcanic island in his gargoyle form for one thousand years. He is ultimately revealed to be the Gargoyle King and leader of the Gargoyle Army. Because Grace is a gargoyle, she can hear him speaking to her in her head – telepathy is a talent that gargoyles have, but that Anna/Mia does not.

Nor are any of the other secondary characters in Freeman's works substantially similar to those in *Crave*. For instance, Anna/Mia's aunt is a veterinarian and a healer; Grace's uncle is the headmaster of a school. They are, of course, both witches, but there is nothing in the *Crave* series like the "Kindred," a particularly potent type of witch like Anna/Mia's aunt. In any event, witches are a common type of supernatural being in fantasy fiction.

Each heroine also has a biracial gay male friend, both of whom are charismatic and charming and occasionally provide comic relief. But none of these traits is copyrightable. At an

---

[18] It should come as no surprise that Alistair has grey eyes. He is, after all, a gargoyle – a creature made of stone. Interestingly, in his magical gargoyle form his eyes are red, not grey.

abstract level, Freeman is correct that both characters are "winged," at least in some of her drafts. However, beginning with Masqued 2013, when Brendan is first revealed to be paranormal himself and suddenly has wings, he is a Faery, whose supernatural powers (whatever they may be) are not fully developed. Flint, in *Crave*, is a powerful dragon prince who can fly and shoot fire and ice. Brendan is closeted throughout the novel; Flint has a robust love life that contributes significantly to the story. Their race turns out to be entirely irrelevant to either story.

A more fulsome description of the characters – and there are many of them – is found in Addendum D to this opinion. But we have covered enough ground above to establish that there is no substantial similarity between Freeman's characters and Wolff's – other than at the macro level one would expect of characters in a teen romantasy novel.

### d. Plot and Sequence

The plots of the works are summarized above and are set out in detail in Addenda A-C. The addenda go into considerable detail in order to illustrate that the plot of the five template drafts bears only the most tangential resemblance – certainly not substantial similarity – to the plot of the *Crave* novels.

Both Freeman's and Wolff's works tell the story of a displaced girl who is moved from California to Alaska when one parent (Freeman) or both parents (Wolff) die – although Anna/Mia's father has been "dead" for a decade (and is not really dead at all), while Grace's parents are both newly deceased and really, truly dead. Both girls are in high school (one a junior and one a senior). Neither girl knows much, if anything, about her supernatural origins when the story begins; her knowledge evolves gradually. Both girls turn out to be hybrid paranormals – Anna/Mia is either a Nyx and "Kindred" or a "thrice born daughter" of mixed heritage from light and shadow, while Grace is half witch and half gargoyle, a type of being not seen for 1000 years. Both girls fall in

57

love with a fascinating boy – one sun kissed and Viking-like (Ash/Roman), the other a dark, pale, and brooding prince (Jaxon). The boys turn out to be paranormal as well – Ash/Roman is a werewolf or shapeshifter, as well as a Viking Berserker; Jaxon is a vampire. Because of her unique heritage, each heroine will turn out to have a critical role to play in a looming conflict within the supernatural world – a conflict between beings of Shadow and beings of Light (Freeman) or among vampires, werewolves, witches, dragons, and humans (Wolff). The lives of both girls are endangered for reasons they do not understand, and they are repeatedly rescued by their boyfriends. Each one has a role in causing a mysterious male – believed to be evil – to return to earth.

So yes, there are unquestionably similarities between the plots of *Crave* and BMR/Masqued 2010-2014. But those similarities relate to uncontested tropes/*scènes à faire* that are the staple of this literary genre, and of fantasy fiction writ more broadly. The displaced girl who knows nothing of her true ancestry is a trope. Like Rey in *Star Wars* (and Luke Skywalker before her), Anna/Mia and Grace have never been told the story of who or what they are. That they turn out to have great powers can hardly be a surprise; that is the story of every supernatural heroine. Likewise, that each heroine is the "Chosen One" is a trope/*scène à faire*; the same can be said about Percy Jackson in *Percy Jackson & The Olympians* and *The Mortal Instrument*'s Clarissa Fairchild.

When we delve into the detailed expression of those tropes, the similarities fall away.

The first five drafts of Freeman's novel concern Anna/Mia's discovery of her true nature and parentage. In each successive iteration, the climax of the story occurs when the girl learns who she is and who her parents are (or are not). The secondary plot turns on her efforts to free the person she knew as her father – who is not really dead, despite what she has been told – from an

58

enchanted imprisonment, her failure to do so, and her release of what she presumes to be an evil force instead.

In the first volume of *Crave*, the central story is about Grace's adjustment to her new home immediately following the sudden death of her parents – an adjustment the heroine of BMR/Masqued made a decade before the story began – as well as learning the truth about how her parents were killed (and they really were killed). There is no issue of "true parentage" to sort out – her parents are the people who raised her. Nor is there any "dead" parent (or parental figure) who turns out to be alive. Grace does not learn in the first volume of *Crave* that she is a paranormal being, or what her supposed role is in some wider conflict, as Anna/Mia does in BMR/Masqued. That comes later in the series.

Whatever discrete similarities there might be between the plot of BMR/Masqued and the first volume of *Crave*, any suggestion of substantial similarity evaporates entirely when we move on to the second, third, and fourth volumes of the *Crave* series. In the three subsequent volumes, Grace and her friends are caught up in a long-standing war for control of the supernatural world. Gargoyles were the supernatural race created to balance the forces of chaos and order; and Grace – the first gargoyle to be born in a millennium – holds the key to vanquishing the evil Cyrus, the Vampire King, and ending his dreams of paranormal conquest and world domination. As they learn more and more about Cyrus' evil plan – and endure a series of increasingly difficult trials in order to acquire the means to defeat him, in a final, cataclysmic battle between huge armies – Grace and her friends grow in the virtues they will need when they ultimately triumph over evil: collaborative leadership, self-knowledge, loyalty, self-sacrifice, and resilience.

To equip themselves to fight Cyrus and his evil allies, Grace and her friends embark on picaresque journeys to exotic places all over the globe. Their travels to these places, and then back

to their base of operations at Katmere, are eased by the ability of Grace's cousin Macy, a witch, and her witch friends to create portals through which they can hop from one location to another. Their travels are designed to help them find magical objects they need to complete various missions. For example, they have to find four magical objects in order to eject Hudson from Grace's head; they need to find the key that will unlock The Unkillable Beast's chains so they can free him; they must find something called The Crown in order to stop Cyrus.

There is nothing at all like any of this in BMR/Masqued, which takes place entirely in Alaska and in the mythical realm of Avalon. In fact, one of the clever aspects of the *Crave* books is that the headquarters of the paranormal races are located in recognizable locations on earth that have characteristics that correspond to those of their paranormal residents. For example, the Dragon Court is located in New York City, the glittering financial capital of the world, where the dragons – known for their hoards of treasure – keep their riches hidden in a parallel universe located behind Radio City Music Hall. The Gargoyle Court, home of creatures made of stone, is on the rocky shores of Southeastern Ireland. The Aethereum Prison from which escape is all but impossible – and which houses the Pit, where Hudson competes in vicious wrestling matches while Grace eats tacos – is located in the New Orleans, a city whose well known motto is "*Laissez le bon temps roulez*" (let the good times roll).

Volumes Two, Three, and Four of the *Crave* series – Crush, Covet, and Court – involve our heroine in a series of adventures akin to the various quests that Harry Potter and his friends must go through in the seven volumes of his story. They must play a magical game (Ludares) in a school tournament reminiscent of the Quidditch tournaments of Hogwarts. Their quest for magical items (a dragon bone, a bloodstone, and the eyetooth of an alpha werewolf, for example) differs little from the journey taken by Harry, Ron, and Hermione to find the three Deathly Hallows.

Among the plotlines in the last three volumes of *Crave* that have no counterpart in Freeman's work are: a vampire prince trapped in the heroine's head, where he carries on an endless conversation with her that no one else can hear; a love triangle involving the heroine and the two vampire prince brothers, each of whom is tied to Grace with a mating bond (one genuine and one manufactured); the painful breaking of the mating bond between Grace and Jaxon and the destruction of Jaxon's soul as a result; Jaxon's salvation when the Dragon Queen, Flint's mother, gives him her own heart; the relationship between Grace, Jaxon, and an elderly female vampire, Jaxon's godmother, who lives in a cave in the Alaskan wilderness and who holds the key to many of the mysteries of Grace's life; the death of some of Grace's friends (including Luca, Xavier, and Calder) and the wounding of others (like Flint and Mekhi); the disappearance of their Katmere classmates in a mass kidnapping; a gargoyle army, long frozen on the stony cliffs of Cork County that comes to life and helps Grace and her friends defeat Cyrus; the desperate search, by Grace and by the evil Vampire King, for something called The Crown, which is believed to confer godlike power on its possessor; a war between massive armies captained by the Vampire King and his allies and by Grace; and an escape from the "unescapable" Aethereum Prison.

Of course, both BMR/Masqued and *Crave* include the inevitable love story between the heroine and a hot boy who turns out to be a paranormal – this is "romantasy" fiction, so there has to be a romance, and hot boys are a staple of the genre. Indeed, the romances in both Plaintiff's and Defendants' works are reminiscent of the love story in *Twilight*, the granddaddy of the current generation of romantasy novels. But aside from a first kiss under the night sky (the Aurora Borealis in BMR/Masqued and a meteor shower in Crave) – which is truly a *scène à faire* in any romance novel set in the Far North (as many of them are) – those love stories play out in entirely different ways. Both Ash/Roman and Jaxon rescue their girlfriend from danger, but rescue is a *scène à faire.*

61

They do so in very different ways – Ash/Roman turns into a wolf and fights Julian's goons, while in the first volume of *Crave*, Jaxon saves Grace from a pair of evil wolves who are trying to throw her outside in the snow, as well as from a falling chandelier dropped by Flint in the cafeteria. And in Crush, Hudson, Grace's new love interest, saves Grace's life by burying her with stones after she is bitten by Cyrus.

It is true that Jaxon seals Grace's wound with his vampire's venom, while Ash/Roman cures Anna/Mia's demonic wound with his wolf's bite. But there is nothing original about this; it is a common romantasy trope. In *Twilight*, for example, Edward cures Bella with a bite by sucking the venom of an evil vampire out of her body.

In light of the above, it is not surprising that Freeman does not seriously argue that the plots of her book and Wolff's books are substantially the same. Instead, she argues that both sets of work have many similar elements. But that is not the way substantial similarity is proved.

For one thing, many of the common elements that Freeman identifies fall into this same bucket of unprotectable tropes or *scènes à faire*:

- The romantic lead being hot and dangerous and having an "immediate connection" to the heroine;

- The romantic lead warning the heroine to stay away from him;

- The romantic lead walking the heroine to class and inviting her to sit next to him in class;

- The heroine worrying about mean girls in the cafeteria;

- The heroine being shy when introducing herself to the class;

- The mean girls trying to hurt the heroine;

- The heroine being embarrassed when the romantic lead finds her crying;

- The romantic lead trying to stay away from the heroine;

- The heroine reading books and doing research to learn more about the supernatural world;

- The existence of a supernatural war;

- The romantic lead's having "significant power of the mind;"

- The romantic lead's believing he has a duty to stop the supernatural war;

- The romantic lead telling the heroine he will keep her safe;

- The romantic lead's coming to the heroine's rescue;

- Someone having murdered the heroine's parents;

- The romantic lead and the heroine questioning whether love is enough;

- The romantic lead having supernatural speed;

- The heroine having to confront being lied to by her family about who she really is;

- The heroine panicking when seeing blood on herself.

Freeman insists that Wolff parrots her original manner of expressing these tropes/*scènes à faire*. But her examples are frequently not tethered to the contents of the actual drafts.

For example, Freeman suggests that, while "dead parents" is a trope, Wolff copied her expression, because in both books the death of the heroine's parents is "accidental, vehicular, and violent, leaving the protagonist with physical and psychological scars." Dkt. No. 543-1 at 42. But this argument is not supported by the works themselves. Anna/Mia's father Dante "died" a decade before the story begins, either in an elevator accident or a plane crash, depending on the manuscript; he later turned out to be alive, albeit enchanted, having not perished in any sort of accident, but rather being imprisoned by an evil demon. Grace's parents, on the other hand, died in a car accident a month earlier and are dead. So, while both Anna/Mia's father and Grace's

parents supposedly came to grief in a "vehicle," the similarities end there. A car accident is not the same thing as an elevator or airplane crash. A live but enchanted parent is not the same thing as two dead ones. And children are generally traumatized when a parent dies; suffering physical and psychological scars is hardly uncommon – or copyrightable.

Another example: both heroines' drinks are spiked. At the highest level, that is true – and a spiked drink is surely an unprotectable trope of teen fiction (has there ever been a high school party in literature or film that does not feature spiked punch?), or fairytales more generally (the poisoned apple in *Snow White* being one of the better-known examples). But again, the expression of this trope is vastly different in each work. Anna/Mia's *fruity punch* is spiked with Everclear, a colorless, odorless grain *alcohol*; Grace's *tea*, which she drinks with Jaxon in his tower, is spiked with *poison* that incapacitates the heroine. While Mean Girl Taylor offers Grace her first glass of punch spiked with Everclear, there is no indication in the text that Taylor put the Everclear in the punch, or that only Anna/Mia's drink was spiked. In fact, the punchbowl was equally available to all guests at the unsupervised high school party that Anna/Mia attends; she herself dipped into it repeatedly because she liked the taste. And she reacts to it by doing what drunken kids do – she dances around and has a high old time. The poisoned tea, by contrast, was prepared by Lia expressly to disable Grace; Lia (through an unsuspecting Jaxon) provides Grace with every drop she drinks, and only Grace and Jaxon partake of the poisoned tea, which has vastly different effects on each of them – it enrages Jaxon and incapacitates Grace. And of course, there is a massive difference between getting drunk at a party and having one's inhibitions loosened, and being poisoned so that one can be tied up and used as a human sacrifice.

In connection with her original motion for summary judgment, Plaintiff's counsel listed hundreds of additional points of purported similarity between Freeman's drafts and the *Crave*

novels. *See* Dkt. Nos. 276-34; 276-44 through 276-56.  But virtually all of the similarities Freeman identifies in these lists are either tropes/*scènes à faire*, similarities based on the shared use of ordinary words and common phrases, or trivial details that have no bearing on the total concept and overall feel of the works. Freeman's lists, for example, include such things as both works mentioning Hawaii and both heroines grabbing an apple between classes – as well as the fact that both novels featured the phrase "Well, well, well." Dkt. No. 276-3 at 98.

Many of Freeman's alleged similarities fall into this category: the heroine comparing the Alaskan landscape to the moon; the heroine and her friends "discuss[ing] jeans/party attire"; the heroine being given a "lemon verbena" tea blend; the heroine wearing a revealing red dress; the heroine liking chocolate chip cookies; the heroine eating yogurt (BMR/Masqued) or frozen yogurt (*Crave*) in the school cafeteria; the romantic lead smelling good; and "the heroine's gemstone necklace and gem stones." There is even a reference to *Peter Pan* "when the heroine is about to fly." Dkt. No. 543-1 at 85.[19]

While some of these are indeed discrete points of similarity, some are not.

Freeman's "gemstone" example, for instance, cannot reasonably be construed as similar in the works, even at the most abstract level. She asserts that, at more or less the same point in her drafts and in the opening novel in *Crave* (around page 80), "the heroine's gemstone necklace and the heroine noticing gemstone jewelry worn by girls, occurs" and neither heroine knows that the gemstone jewelry was made by supernatural witches. *Id*. at 49. But that both scenes involve jewelry of some sort does not make them substantially similar, no matter the page number on which they occur. In BMR/Masqued, the necklace being referenced is an amulet or pendant, which came from

---

[19] This characterization is misleading at best. Anna/Mia – unlike Wendy in *Peter Pan* – does not fly. In the example Freeman points to, she is being carried in her werewolf boyfriend's arms as they jump 30 feet from a balcony. Grace – who has wings – does indeed fly; that is a gargoyle power. Anna/Mia has no such power in any of Freeman's drafts.

the heroine's father, and which her aunt reminds the girl to wear every day. The passage Freeman cites to describes the amulet as a pendant "made of an unusual looking metal that is neither silver nor gold but a mixture of both. On the front is a depiction of a jackal's head in profile wearing an Egyptian headdress and collar encrusted in lapis and carnelian." BMR 2011 at 80. It will turn out to have been created, not by a witch, but by Wepwawet, an Egyptian wolf god. BMR 2011 at 440– 41. In Crave, Grace describes Macy's witch friends as spectacular, with "different gemstones gleaming in their hair and against their skin. Earrings, pendants, hair clips, plus eyebrow, lip, and nose rings, all bedecked with colorful stones." Crave p. 80. At no point in the novel do we learn who made the gemstones they wear or what colors they are.

The same is true of Freeman's argument about the heroine's learning that she is "one of the only remaining" supernatural beings of her kind. While this may be true for Anna/Mia,[20] it is definitely not true for Grace. Thousands of gargoyles, an entire army of them,  exist in *Crave*; they are simply frozen in time. Freeman even acknowledges this when she claims Grace learns that "special creatures *of her kind* can communicate telepathically across long distances." Dkt. No. 543-1 at 103 (emphasis added).

These are examples of "similarities" that turn out not to be similar at all when one goes back to the text. But even the actual similarities identified by Freeman are nothing more than specific bits and pieces found here and there in works of extended length – almost 3000 printed pages of *Crave* novels, and five separate drafts of Freeman's novel, which spans 400-500 typewritten pages. Given the genre and the target audience, it should not be surprising to find a little something here and a tiny reference there that are similar – like the heroine's comparing

---

[20] Actually, it is not always true of Anna/Mia. In the 2013 and 2014 drafts of Masqued, the heroine's childhood friend and her Mean Girl nemesis are revealed as Nyxes as well. So, there are at least three Nyxes in existence in multiple versions of Freeman's novel.

Alaska's landscape to the moon or wondering if the romantic lead could be an alien. But that is not the measure of substantial similarity. One measures substantial similarity with reference to the overall look and feel of the works -- not discrete bits and pieces of text.

Freeman urges that these similarities, even if not individually protectable, amount to infringement when viewed collectively. But even if the Court were to accept that Freeman's hundreds of claimed similarities are both protectable and substantially similar to things that occur in *Crave* – something it is impossible to do, since so many of the similarities are tropes/*scènes à faire* – no reasonable trier of fact, having read the works in their entirety, could conclude that the plots of BMR/Masqued and the four *Crave* novels are substantially similar. Or, to put it in the language of the case law, this is not a case where the ordinary observer who is not trying to detect disparities between Freeman's work and Wolff's "would be disposed to overlook them, and regard [their] aesthetic appeal as the same." *Gaito*, 602 F.3d at 66. The texts consist mostly of disparities; one need not look hard to detect them. Indeed, the ordinary observer could not possibly think that the few discrete similarities between the 1600 or so typed pages of the BMR/Masqued novels and the 2700+ pages of the *Crave* novels come close to outweighing the appreciable differences in the plots of the two sets of works.

Freeman identifies feminism and diversity, which are ostensibly woven into the plots of Plaintiff's and Defendants' works, as "themes" of her work. I have chosen to analyze them as plot points, since they appear to this reader to be tangential to the actual themes of the work. But however they are labeled, no reasonable trier of fact could conclude that these ideas are expressed in a substantially similar manner.

Freeman posits that "feminism" in her book is illustrated through her heroine's choosing a second love interest who "encourages her to be herself and become powerful" instead of protecting

67

her "like an ordinary fantasy partner." Dkt. No. 531 at 53. And she claims that this idea is parroted in the *Crave* novels when Grace – Wolff's heroine – "chooses" a second boyfriend (Hudson) who also encourages Grace's independence.

I will not bother to critique Freeman's notion that choosing between potential boyfriends represents a high expression of feminism. But her characterization of what the two heroines do misrepresents what is actually found in Freeman's and Wolff's works.

Anna/Mia – the heroine of Freeman's first five drafts of BMR/Masqued – does not choose a "second love interest" at all. She has one and only one boyfriend in the novel – Ash/Roman MacKay, a werewolf/shapeshifter and a Viking Berserker. As Plaintiff herself observes, Anna/Mia barely interacts with the Ronan/Aedan character – the character Freeman identifies as the alternate love interest. *See* Dkt. Nos. 397-1 at 3 ("Ronan and Anna. Barely meet in book 1."). It is only in her notes where Freeman posits that the Ronan/Aedan character – the one who barely appears in the first five drafts of her novel – will eventually (in a subsequent book that was never written) become romantically involved with Anna/Mia and will want to help the girl use her powers to restore the balance.[21] But that idea never made it into any of Freeman's six drafts; it only appears in idea form in her notes. That Freeman intended to write another novel ("book 2") in which she would develop this kernel of an idea (which is all that it is) into a "love triangle" does not advance her claim to copyright in some sort of "feminist" tale of competing love interests at all. Love triangles, as Freeman herself admits, are tropes, and tropes are simply not protectable.

And contrary to Freeman's assertion, Anna/Mia does not express annoyance at Ash/Roman's desire to protect her. She is grateful when he saves her; she welcomes his presence

---

[21] Literally the only thing Freeman says, in any draft or note, about a romance between Anna/Mia and Ronan/Aedan is, "Love triangle for book 2. Ash wants to protect her. Ronan wants to help her learn to use her powers to restore the balance." Dkt. 397-1 at 3.

in her room when, after he cures her with his bite, he must remain with her. Again, this may be something Freeman had in mind for future development, but she never got that far.

By contrast, there is definitely a feminist theme in *Crave*, but it is expressed entirely differently from any "feminism" of Anna/Mia's in BMR/Masqued.

In *Crave,* feminism is not expressed by Grace's choice of mate. In fact, contrary to Freeman's characterization, Grace does not "choose" her alternate mate at all. He is chosen for her, by virtue of a mating bond with which she and her ultimate mate (Hudson) were born, and which Grace ultimately accepts as her destiny, despite her continuing feelings for Hudson's brother, Jaxon. It is Jaxon who breaks up with Grace, not *vice versa;* he does so after he discovers that his brother and his girlfriend are truly mated, whereas he and Grace are not. And while Grace at times finds Jaxon to be overprotective, his protectiveness is not what leads Grace to accept that Hudson is her true mate. Grace's relationship with Hudson develops slowly over the course of the *Crave* series, in an emotionally complex enemies-to-lovers arc that has no correlate in Freeman's drafts or notes.  And Hudson too is protective and Grace can chafe at it; for example, she snaps at Hudson when he telepathically prevents her from approaching Cyrus prior to the Ludares tournament.

More significantly, Crave's feminism is expressed through Grace's internal decision-making and emotional growth into a strong female leader.  Over the course of the series, Grace slowly comes to terms with her human and supernatural identities as she grows into her paranormal abilities and learns how to balance her power with emotional vulnerability. Grace's leadership style, which prioritizes collaboration over hierarchy and listening rather than commanding, challenges patriarchal norms that often equate strength with emotional detachment and aggression. That is a classic feminist trope, one that appears nowhere in Freeman's work.

69

*Crave*'s focus on emotional vulnerability – which it treats not as a weakness, but as a strength critical to the survival of Grace's loved ones – easily distinguishes it from BMR/Masqued. Anna/Mia is not even supposed to come fully into her powers until her seventeenth birthday – a date that is still weeks in the future when the novel ends. We do not know what her powers are going to be; she is repeatedly told that, until her initiation, she will not learn what her role is in maintaining the balance. She thus has no opportunity to grow into anything. Anna/Mia's frustration with her mother's refusal to explain what her powers are or what will be involved in her "initiation" is a central theme – arguably *the* central theme – of BMR/Masqued. There is nothing similar in *Crave*; no one tries to stop Grace from developing her powers once they realize that she has them. And Anna/Mia does not develop any leadership traits in Freeman's novel. Any such story arc is nothing more than an undeveloped idea, if indeed it is that.

Freeman's contention that the works treat the theme of "feminism" similarly because both protagonists take advanced classes at high school, quote great works of literature,[22] love reading, and discuss French philosophers is hardly worthy of comment. Many leading female characters in fantasy fiction, like *Harry Potter*'s Hermione Granger, famously share these traits. The characters in both BMR/Masqued and *Crave* are bright high school students; of course they are educated, go to class, and are conversant with books and other academic subjects that they are studying. There is nothing copyrightable in any of that; it is all classic *scènes à faire.*

Freeman's assertion that both works emphasize diversity because they share "characters of myriad backgrounds, sexualities, and ethnicities" is similarly specious. Dkt. No. 531 at 53. Diversity is commonly found in young adult fiction generally, if only as a marketing device; it

---

[22] Or misquote, as the case may be. The passage from M*acbeth* that is meant to demonstrate Anna/Mia's knowledge of Shakespeare should read "By the *pricking* of my thumbs, something wicked this way come," not, "By the *prick* of my thumbs, something wicket this way comes," which is what appears in Freeman's manuscript. *See* Dkt. No. 276-34 at 40.

expands the readership base. The only apparently "diverse" character in Freeman's drafts is Brendan, the protagonist's friend, who is both multiracial and gay. The symbolic presence of one multiracial, gay character – especially a character whose race and sexuality do not factor into Anna/Mia's (or even Brendan's) story arc in a major way – does not make "diversity and inclusion" a protectable theme of Freeman's work.  It is significant that Brendan is totally closeted; he does not even have a same-sex attraction to another character in BMR/Masqued and only Anna/Mia knows about his sexuality. As for his race, it is mentioned once, then dropped; it is irrelevant to the story. It is, in short, tokenism.

Crave, by contrast, explores Flint's evolving identity as a gay man, which is integral to his growth as a character – especially the impact of his sexual orientation on his complicated relationship with Jaxon. Furthermore, Crave contains other diverse characters – to cite just a few examples, there is Luca the gay vampire; Dawud the Syrian nonbinary wolf; and Eden, who develops a lesbian relationship with Grace's human friend, Heather. Wolff's characters act on their diverse sexuality; Freeman's Brendan does not.[23]

Apart from real-world diversity, Freeman contends that both works similarly promote diversity because they populate their worlds with different supernatural beings of different races and backgrounds. Well, of course they do. Freeman's draft is far from the first novel to incorporate more than one kind of paranormal creature; there is nothing unique or original about that. Moreover, simply including a faery here, a ban sidhe there and a few vampires, witches, and werewolves does little to explore the "theme" of diversity. Crave, on the other hand, explores the complex relationships between, and even within, the different factions of paranormal beings. In BMR/Masqued, certain types of beings are inherently evil and certain types are inherently good:

---

[23] Flint's race is as irrelevant to the Crave story arc as Brendan's is to BMR/Masqued.

vampires and succubi are Sanguines, and so are shadow creatures (demons); werewolves (shifters) and witches are on the side of light and so are good. In *Crave*, there are both good and bad vampires and werewolves, as well as good and bad dragons and witches. And the characters of all sorts have to learn to relate, not just to each other, but to giants, manticores, and windigos, among others.

In short, to the extent Freeman identifies feminism, diversity, or inclusion as present in both sets of works, those are simply abstract thematic concepts, which are not protectable in and of themselves. The same is true of Freeman's arguments with respect to "humor" and "friendship, compassion, and grace." And the works do not express these concepts in substantially similar ways.

I could go on, but there is no need to tick off each of Freeman's hundreds of suggested points of comparison between her work and Wolff's novels. In fact, that is simply falling into the trap of looking at discrete bits and pieces rather than examining the total look and feel of the allegedly infringed and infringing works. After considering the works as a whole – and I again emphasize that the Court has read every word of the allegedly infringed and infringing works – no reasonable factfinder could conclude that their plots are substantially similar.

### e. Pace

An examination of the pace of the parties' works also reveals a lack of substantial similarity.

BMR/Masqued takes place over the span of approximately two months, beginning in late September (three weeks into the school year) and ending a few weeks before Anna/Mia's birthday on December 21. The first *Crave* book – which is longer by far than any of the BMR/Masqued drafts – takes place during just two weeks; and the series as a whole (nearly 3,000 pages of it) unfolds across roughly a year, starting relatively early in Grace's senior year in high school and ending with her enrollment in college the following fall.

Moreover, each of Freeman's manuscripts (with the exception of *Masqued 2016*, which I discuss separately) ranges from approximately 400 to 550 double spaced typewritten pages – which means if we consider her work as a single novel (accepting her aggregation theory) it would be perhaps 300-350 printed pages in length. But the four *Crave* novels – which everyone agrees must be considered as a single work – comprise 2,750 printed pages – and as I have already noted, the decreasing print and margin size over the course of four volumes means that this is a substantial undercount. Each of the four *Crave* novels is considerably longer than any of Freeman's manuscripts. *See* Dkt. No. 284 at 14. Of course, *Crave*'s much more extensive world-building necessarily requires more time (and more words/pages) to develop.

Freeman does not address the timespan and length of each work. She instead argues that both works share a nearly identical pacing strategy: a "Slow Burn" mystery that transitions into a "High-Octane" supernatural thriller. She says that the beginning of each work is deliberately paced slowly, focusing on the details of the heroine's arrival at school, the weather, and her loss. As part of this "slow burn," the works discuss the school hierarchy, the heroine's meeting her love interest and her confusion about his behavior, which seems to be distancing. More than halfway through each narrative, the pace accelerates following the reveal of the supernatural world, at which point each work alternates between "a specific rhythmic beat of the romance" and "sudden, brief, and intense scenes of violence that serve to remind the reader of the stakes." There is then a romantic interlude lull that serves as a "calm before the storm" moment before the climax.

The structure described by Freeman is by no means original to her; it is common to virtually all young adult romantasy novels (and, frankly, to most novels, which begin with a gradual introductory section and progress to a faster pace as the story develops). Nor is the pace

of the "romantic buildup" between the protagonist and the romantic lead unique to Freeman's work; Stephanie Meyer utilized this exact structure when writing *Twilight*. Additionally, BMR/Masqued's storyline is interspersed with Tarot card readings and the protagonist's dreams and visions of Avalon; there are no similar episodes in *Crave*, where the story drives compulsively forward. The later novels in the *Crave* series even include a subplot about freezing time, which has no counterpart in BMR/Masqued.

In short, to the extent the pacing of the novels is similar, it merely reflects the genre and is not protectable. And to the extent the stories are paced substantially differently, it is yet another argument against finding any genuine issue of fact as to the lack of substantial similarity between Freeman's and Wolff's books.

### f.   Total Concept and Feel

And so, having discussed individually the various elements of substantial similarity, we come to the ultimate test – could the more discerning ordinary reader conclude that, despite their many differences, the aesthetic appeal of Freeman's work and Wolff's is the same? *See Gaito*, 602 F.3d at 66.

The answer is no. No trier of fact could plausibly find that a more discerning ordinary observer "would recognize the alleged copy as having been appropriated from the copyrighted work." *Knitwaves*, 71 F.3d at 1001 (citation omitted). Therefore, the works are not substantially similar as a matter of law.

In resolving this ultimate question, the Court is "principally guided by comparing the contested [work]'s total concept and overall feel with that of the allegedly infringing work . . . as instructed by [its] good eyes and common sense." *Gaito*, 602 F.3d at 66 (internal quotations omitted). Common sense tells the tale here. Both Plaintiff's and Defendants' works share an

74

overarching premise – a teenager who has suffered the loss of a beloved parent or parents discovers her supernatural identity, her purpose in life, and her one true love. But that similarity is not protectable. Neither are the vast majority of the similarities that we have discussed above – similarities that relate to easily identified tropes and *scènes à faire* that are common to much teen fantasy fiction, including the young adult romantasy genre that is at the heart of this case. And what similarities exist – whether they are protectable or not – are vastly outweighed by the massive differences between the works.

In short, after reading the stories in their entirety, it is perfectly apparent that no discerning ordinary observer applying the Second Circuit's test could conclude that BMR/Masqued is substantially similar to the novels in the *Crave* series.

Freeman asserts that BMR/Masqued and *Crave* share a unique "Alaskan Gothic" feel: "a young and thrilling supernatural romance set against a dark and oppressive backdrop and atmosphere." Dkt. No. 531 at 54. What Freeman refers to as "Alaskan Gothic" is an unprotectable *scène à faire.* There is nothing remotely unique or original about a supernatural romance that takes place in a remote, dark setting; indeed, it seems that the Pacific Northwest (*Twilight*) is a common locale for finding vampires and werewolves at a high school. But Plaintiff and Wolff express this theme in dramatically different ways.

BMR/Masqued is dark, mystical, foreboding, and solemn throughout. The plot unfolds slowly, with a heavy emphasis on mysticism, ritualism, and introspection. It is occult-driven and full of prominent symbolism – most notably through the use of Tarot cards, which function as prophetic signals. The protagonist's dreams act as a gateway to the supernatural world. There are good types of beings and bad types of beings.

75

*Crave*, by contrast, is dramatic, romantic, and emotionally intense. It is also action-packed, full of emotional highs and lows, and in many places, very funny. It is written in a more light-hearted and casual tone. It features a far more complex and creative supernatural world, one in which hierarchies are clearly delineated and each type of paranormal has some characters who exhibit heroic or "good" qualities and some who exhibit evil qualities.

Freeman contends that the works are also substantially similar because each heroine's "internal monologue" is characterized by modern sarcasm, self-deprecation, and snark that contrasts with the heaviness of her past loss and future challenges. I will, for purposes of this motion, accept Freeman's characterization of her heroine's introspectivity as essentially correct.[24] But the use of humor to develop character is nothing new; novels of all sorts, including young adult novels, have used humor as a character development device since time immemorial. And the expression of humor in each work is vastly different. BMR/Masqued's use of humor is sparse and subdued; it offers a brief respite from the plot's foreboding, ominous tone, without undercutting the novel's seriousness. It is more incidental/situational, appearing primarily in social exchanges. There may be humor in some of Anna/Mia's internal monologues, but it is certainly not one of her defining characteristics. And there is nothing particularly "snarky" or sarcastic about Anna/Mia's interchanges with Ash/Roman.

Humor is, however, a defining feature of *Crave*'s narration. *Crave*'s use of humor is overt, frequent and, at times, self-aware. Grace's role as the narrator is characterized by a sarcastic internal monologue, which helps readers identify with and relate to her. Humor, particularly witty banter, is also a bonding mechanism and core feature of character chemistry – particularly in Grace's relationship with Hudson, which has no counterpart in Freeman's work. Humor is used

---

[24] I would not have characterized Anna/Mia's introspectivity in this manner if left to my own devices, but I will accept Freeman's characterization in order to explain why it does not create substantial similarity.

structurally for pacing and to fuel romantic intensity. *Crave*'s comedic cadence and the heroine's sarcasm-driven identity are not mirrored in BMR/Masqued.

Freeman also argues that both works use specific literary and pop-culture references to texture both dialogue and internal narration and storytelling. These include references to *Humpty Dumpty*, *Peter Pan*, *Sleeping Beauty*, *Snow White*, *Star Wars*, *Grey's Anatomy*, *The Hulk*, *Superman*, Lois Lane, *Wizard of Oz, Frankenstein*, *Romeo and Juliet*, *Twilight*, Tom Cruise, French philosophers, *The Three Musketeers*, *Mean Girls*, Shakespeare, Stonehenge, and Barbies. But books about teenagers would be expected to refer to the popular culture that infuses their lives; that is simply *scènes à faire* and not protectable.

In examining the works' "total concept and feel," the Court also considers whether *Crave* has appropriated "the original way in which [Freeman] has 'selected, coordinated, and arranged' the elements of [] her work." *Gaito*, 602 F.3d at 66 (quoting *Knitwaves Inc.*, 71 F.3d at 1004)). Freeman contends that, even if the individual elements of her works are not independently protectable, *Crave* misappropriates her "unique selection and arrangement of characters, settings, and plot elements." Dkt. No. 531 at 56.

Even where individual elements are not protectable, copyright protection can extend to an author's original selection, coordination, and arrangement of those elements. But that principle does not assist Freeman here, because the selection and arrangement of individually unprotectable elements in BMR/Masqued is not sufficiently original to warrant copyright protection. In fact, her selection and arrangement of events is dictated by genre conventions and is consistent with what a reader would expect in any young adult paranormal romance story: loss; ignorance; young love; discovery; challenge; and overcoming challenge.

Freeman suggests that there is something unique and original about the fact that, in BMR/Masqued, the heroine meets her boyfriend in Chapter 2; and that, after the heroine's abduction, the romantic lead thinks it is his fault and the two get into an argument before confessing their love and sharing an epic kiss. But there is nothing original or unique about any of that. It is a characteristic of the genre (and of romance novels generally) that the heroine meets her love interest early in the story and their relationship develops over the course of the novel. Frequently they argue about whether they should be together; eventually they fall into each other's arms.

Nor does Freeman make a concerted effort to demonstrate how her selection and arrangement of events in a single manuscript is substantially similar to the selection and arrangement of events across the four *Crave* books as a whole. Instead, Freeman argues that individual scenes in one or more of her drafts are substantially similar to some scene somewhere in the *Crave* series. For example, she takes a scene early in the first *Crave* novel -- two wolves try to throw Grace out in the snow, but Jaxon saves her – and compares it to what she calls the "80's Rocker Scene" in BMR/Masqued – the scene in which two punks (one of whom looks like the 80s Rocker Billy Idol) try to force Anna/Mia into their van, only to be thwarted by the appearance of Ash/Roman. Freeman argues that these scenes are substantially similar because, "The kidnapping, confrontation, rescue, and aftermath unfold in the same narrative order." *Id*. at 52. But Freeman did not invent an attack scene that starts with a confrontation and capture, progresses to the heroine's rescue, and concludes with the aftermath of the attack. An attack sequence structured any other way would make little sense.

Much of Freeman's "selection and arrangement" argument is based on "distinctive, expressive details" that she contends are shared by both works – for example, the attackers not wearing jackets, a reference to the eighties, or the taste of blood in the heroine's mouth. *See, e.g.*,

*id.* at 45–47. But it bears repeating – principally because Freeman simply ignores this – that similarities between specific, scattered details in two works, including but not limited to where the alleged similarities reflect ordinary words and phrases, are not entitled to copyright protection and so have no bearing on whether Freeman's selection and arrangement of unprotectable elements is original. *See supra* Section II.

Finally, "the dramatic difference in length" between BMR/Masqued and the *Crave* series – between 400-600 double spaced typescript pages for Freeman's lone novel (which translates to even fewer printed pages) and 2,750 printed pages over four separate novels that tell one long story – "immediately undermines [Freeman's] suggestion that the authors similarly selected, coordinated and arranged the elements of their work." *Allen*, 739 F. Supp. 2d at 657 (internal quotations omitted).

Even if Plaintiff's selection and arrangement of elements in BMR/Masqued was original – and thus protectable – that selection and arrangement is not appropriated by *Crave* in any substantially similar way when the works are considered in their totality.

In sum, the total concept and feel of BMR/Masqued and *Crave* are vastly different in substance, style, structure, length, tone, and mood. They "engender very different visceral responses from their readers." *Id*.

As a matter of law, they are not substantially similar.

## VIII. Application: Masqued 2016

With *Masqued 2016*, Freeman abandons the template that characterized her first five drafts and sets out in a new direction.

For one thing, many of the critically important characters and incidents from the earlier drafts are simply gone. There is no mass abduction of teenaged girls, no search for cursed objects,

no Druid priest (whether he is intended to develop into a love interest or not), no vampire/incubus villain. There is no friend who is identified in the text as gay, no Halloween dance, no meet up at Barnes and Noble, no visit to magical locations like The Gloaming or The Sanctuary, no high school party with spiked punch, no teen gatherings at local diners or Tex Mex restaurants. Most if not all of the supernatural creatures are witches (good witches and bad witches, or Circle and Coven). There is no attraction or confrontation between the heroine and any demonic villain. The heroine makes no choice to rescue one of two wolves. There are no wolves.

The entire draft (which appears to be incomplete) takes place over the course of 24 hours. This allows no time for character growth, or for relationships that are hinted at (as between the heroine and the New Boy) to develop.

And above all there is no mention of a Nyx – no half Unseen/half demon girl (let alone one with three bloodlines) with mysterious markings down her neck and spine who is the key to the battle between Shadow and Light. That critical element of Freeman's story is left out entirely.

The heroine, now named Gabriella (Ella), knows from the beginning that she is a budding witch. Her mother and aunt are priestesses of the Egyptian goddess Isis. Her mother's amulet (not her father's) imprisons a powerful evil force; Ella accidentally sets it free while practicing magic and reading Tarot cards in her room. When the amulet is exposed to Ella's blood and breaks, it flies off her neck and out the window, and she unwittingly sets off something called The Return.

The evil force she released kills a school of fish, which wash up on a beach that Ella visits during her motorcycle ride with the New Boy. The punk enforcers who accost her there are not Julian's goons, but police from The Order, who seek to enforce rules against magic in public, and who turn into snake gods when threatened by Ella's mother in her full Priestess of Isis glamour. Ella's mother disappears with a man who appears out of mist; we know absolutely nothing about

who or what he might be. Ella's friend Brendan is bitten by one of the snakes and must be taken to a sacred place to be healed. New Boy Roman turns out to be both Kindred (a type of Good Witch) and a representative of The Order. While he and Ella are attracted to one another, they have no time to get to know each other or to develop any serious romantic attachment. Ella wants to save her mother, not her father; New Boy agrees to help her. Everyone steps through a mirror found in Ella's house into the Temple of Isis in ancient Egypt. The only choice Ella is required to make is whether to accept or turn down her calling to be Keeper of the Amulet – a charge her mother turned down, but which Ella accepts.

This brief description of *Masqued 2016* (a fuller one is found in Addendum B) is sufficient to reveal that the *Crave* novels bear no substantial similarity to the final draft of Freeman's unpublished novel. Only at the most macro level – teenaged girl coming into her powers; girl meets boy and is instantly attracted; magic forces are accidentally unleashed; and the heroine must make a choice about whether to accept her calling – can *Masqued 2016* be compared at all to the *Crave* novels. *Masqued 2016* is so utterly incomplete that any discussion of the elements of substantial similarity – theme, setting, plot, characters and pace – is virtually impossible. Freeman's last draft barely has a plot; its characters are few and not fully developed; there is no identified villain or a coherent story arc; it ends almost as soon as it begins. It is entirely lacking in the rich character development and elaborate plot lines that can only develop over time and that characterize the *Crave* novels.

The only similarities to which Freeman can point are things like the fact that the heroine is descended from a goddess who has a twin sister; the heroine has a "green-eyed grandmother" (*see* n. 15 at p. 52, supra., for a discussion of green eyed grandmothers);  a romantic lead with eyes that have gold or silver "flecks" in them; or tea flavored with lemon verbena. These are simply

exemplars of what cannot be relied on to establish substantial similarity – discrete bits of scattered similarities untethered to the overall look and feel of the works.

No reasonable trier of fact could conclude that, if one overlooked such discrete bits and pieces, Masqued 2016 and *Crave* were at all similar, let alone substantially similar, except at the level of tropes and *scènes à faire* – and precious few of those.

## CONCLUSION

This is a case that is easily disposed of once one reads the allegedly infringed and infringing works against each other and in light of the well-developed law in this Circuit on substantial similarity within literary works. Freeman's novel and Wolff's *Crave* novels are indeed similar, but only in the ways that all young adult romantasy fiction novels are similar to each other. At the granular level, looking at their unique creative expression, they are substantially different – not substantially similar.

Therefore, Defendants' motion for summary judgment on Plaintiff's copyright claims is GRANTED. Plaintiff's motion for summary judgment is DENIED.

Defendants' motion for summary judgment on Freeman's actual damages claim and motion to strike jury demand are DENIED AS MOOT.

The Clerk of Court is respectfully requested to remove the three motions at Dkt. Nos. 525, 527, and 529 from the Court's list of open motions.

Sadly, this ruling does not end the *Crave*/Freeman saga.

The decision to dismiss Freeman's case effectively disposes of the cases that Freeman has brought against Barnes & Noble Booksellers, Inc., Apple Inc., Amazon.com Inc., Target Brands Inc., and Walmart Inc., charging them with contributory infringement as a result of sales of the four *Crave* novels. *See Freeman v. Barnes & Noble Booksellers, Inc. et al.*, Case No. 2:23-cv-

82

4145; *Freeman v. Apple, Inc.*, Case No. 23-cv-7051; *Freeman v. Amazon.com Inc. et al.*, Case No. 23-cv-4796. However, I see no reason to lift the stay in those cases at the present time. If Freeman takes an appeal from this decision, we can abide the decision from the Second Circuit before entering final orders that will dispose of those cases in one way or another depending on whether this decision is affirmed or reversed. If there is no appeal we can lift the stay at that time.

The newest case, *Freeman v. Deebs-Elkenaney et al.*, Case No. 25-cv-9345, involves allegations that the fifth and sixth novels in the *Crave* series infringe Freeman's copyrights, for substantially the same reasons that the first four *Crave* novels infringed. The defendants in that case have 30 days to file a motion for dismissal/summary judgment, limited to the issue of substantial similarity. The record on the motion will consist of the Freeman works that were discussed in this opinion and the novels Charm and Cherish – nothing more. There is no need for any other evidence to be introduced; the motions will be considered in the manner that many such motions are considered in this Circuit. *See supra* n.10.  Plaintiff will have 30 days thereafter to file responsive papers opposing any motion that the defendants in the new case choose to file. The moving defendants will have ten business days to file a reply. I will not extend this schedule.

This constitutes the decision and order of the Court. It is a written decision.

84

Dated: March 16, 2026

_____

U.S.D.J.

BY ECF TO ALL COUNSEL

## ADDENDUM A

The first five drafts of Blue Moon Rising/Masqued (2010 through 2014) follow a common template, which is summarized in the main text of the decision. What follows is a complete summary of BMR 2010, followed by a summary of the principal differences in each successive draft.

### I. BMR (2010) (the original plot)

The heroine of Blue Moon Rising is a sixteen-year-old high school junior named Anna (short for Annalise) St. Clair. When she was in the second grade, Anna moved from California to Alaska, together with her beautiful mother (Marcheline, an artist) and her aunt (Brienne, or Brie, a veterinarian). They moved shortly after her father, Dante, died in an elevator accident. Anna and her mother changed their names from DeWinter to St. Clair when they moved.

Anna, her mother, and her aunt live in a large and very un-Alaskan house surrounded by stone walls and a security gate; it is located on Cook Inlet in Anchorage, Alaska.

Anna has long inky black hair, olive skin, and grey eyes. She is a junior at West High School, a public high school in Anchorage. She has had two best girlfriends, Amanda Dunst and Taylor Vaughn, and a guy friend, Brendan, who is biracial, the class president, very good looking, and very popular. Brendan is also secretly gay, a fact known only to Anna.

Anna has always been fascinated by the supernatural – an interest of which her mother disapproves, even though her Aunt Brie practices Wicca and Marcheline herself had "talents" at one time. Anna reads Tarot card spreads, has dreams and visions, and has premonitions of the future. She always wears a pendant that was given to her by her father.

BMR 2010 begins in late September, three weeks into Anna's junior year at West High School.  The book begins as Anna – who is not allowed to drive when the moon is full – has a vision while being driven to school in her mother's car. In the vision, she is looking for someone;

she is chased, gets to the edge of a cliff, is told that she must choose, and turns around to "meet her destiny" – only to be confronted by a wolf with amber eyes rimmed in black. She comes to with a start.

When she arrives at school, Anna sees two new students, a boy and a girl, arrive on a motorcycle. They are dressed in black leather and look like supermodels. The boy's eyes are amber rimmed in black; he smells clean and woodsy. There is an instant connection between Anna and the boy. He enters Anna's first period math class; Taylor, an archetypal Mean Girl who always gets any guy she wants, immediately announces that he will be her new boyfriend. The boy shows no interest in Taylor.

Amanda and Taylor have been Anna's best girlfriends since Anna arrived in Alaska almost a decade earlier. But both girls are now cheerleaders, and they diss Anna; they have moved their lockers to a new location and won't hang out with her anymore.

Anna is consoled by the new boy, Ash, who walks her to their next class, Ancient Global Studies (AGS). The substitute teachers, who look like Vikings, are Drs. Baen and Caitlin MacKay, field archaeologists and parents of Ash and his twin sister, Lily (the girl on the motorcycle).  The MacKays are in Anchorage looking for ancient Celtic artifacts brought to Alaska by Captain James Cook. When Rachel Hudson, editor of the school newspaper and hater of all Mean Girls, expresses skepticism about Celtic artifacts finding their way to Alaska via New Zealand, the teachers tell the class a legend about a Celtic tribe that made its way to New Zealand, only to be wiped out, not by native New Zealanders, but by a Druid named Ronan O'Faolain and his fellow priests. After massacring the Celtic tribe, O'Faolain supposedly enslaved the other priests to 13 sacred Celtic objects. The MacKays tell the class that they moved here in search of these artifacts. As the class

2

ends and students leave the room, Anna sees Caitlin MacKay move faster than any human possibly could to keep her husband Baen's mug from falling to the floor.

At the end of the day, Taylor and Amanda – who were supposed to drive Anna home – ignore her, so she starts walking home alone. Anna feels like she is being watched by a raven perched on the roof of Taylor's car. Suddenly, Ash drives by and offers her a ride home on his motorcycle. Anna knows her mom will disapprove, but she accepts. When they arrive at Anna's house, her mother does indeed disapprove, and loudly. Ash mollifies Anna's mother and aunt by telling them that he was concerned about Anna's walking alone. It seems that teenaged girls in Anchorage are being abducted and go missing for a few hours on full moon nights. The abducted girls return 24 hours later, bearing strange marks on them and having no memory of what happened to them – just vague recollections of creatures wearing animal masks, perhaps even a werewolf.

When Ash leaves, Anna goes to her room, and her aunt brings her a cup of tea. At her aunt's suggestion, Anna casts a six card Tarot spread – the High Priestess, the Moon (a card that contains two wolves), the Knight of Cups, the Ace of Cups, the Lovers and the Knight of Swords – and the cards come to life. Anna has a vision of a young woman and a young man. The man gives the woman a golden cup and a red rose. The rose pricks the woman's finger and three drops of blood fall to the ground; they turn into a large black wolf. The wolf attacks the young man, who turns into a raven and flies away. The wolf then becomes a knight mounted on a white stallion. He reaches for the young woman, who is standing between the knight and yet another black wolf. The second black wolf appears older and wiser than the first but is nonetheless prepared to fight the mounted knight. Anna does not know how to interpret the vision, or whether Ash is the Knight of Cups.

The next day at school, Anna tries to get Taylor and Amanda to explain what has happened to rupture their friendship, but the girls are not forthcoming.  Anna fears that she will have to eat lunch alone, but her old friend Brendan seats Anna with guys in their class – Jake and Carter, who are Taylor and Amanda's boyfriends, and Mason, a particularly smart student.

Anna has little interaction with Ash outside of class over the next four weeks, aside from an incident when she sees him rescue an injured dog. After Anna witnesses the rescue, Ash drives by in an SUV and takes her home. During the ride, they discuss the people in their lives whom they have lost – Anna's father and grandparents, who were killed in an elevator accident when she was seven; Ash's older brother, who fell down a ravine on an archeological dig the previous year. Although neither had anything to do with the deaths of their loved ones, they feel responsible.

Ash asks Anna to meet him at the school's Halloween dance. The dance is scheduled on the same day as her mother's art exhibition, and Anna lies to her mother and aunt about not feeling well so she can skip Marcheline's event and meet Ash at the dance. Anna arrives at the dance with Brendan and his friends – Rachel from AGS class, Rachel's cousin Jenny, and Mason, the smart friend of Brendan's who also happens to be Jenny's boyfriend. Anna is dressed as Little Red Riding Hood.

In the restroom at the dance, Taylor brags about how she and Ash had dinner together and that he drove her to the dance. Anna is crestfallen and starts to leave, but Ash follows her. He explains that he was not on a date with Taylor – they simply attended the same fundraising dinner prior to the dance where they were seated together by chance. Reconciled, Ash and Anna kiss under the Northern Lights, which are, of course, glowing in Alaska. But Anna sees Ash's eyes glow like an animal's, and his very long canine teeth. Ash senses that Anna is frightened and pulls back; they leave school together to join Brendan's friends at a local diner.

4

As soon as they arrive at the diner, Anna tells Ash to get her some food. Once he leaves the table to place the order, she begs Brendan to drive her home, and he does. When she gets home, Anna casts a second Tarot spread, pulling the same six cards in the same order, and has the same vision as before. Anna does some research and begins to fear that Ash might be a werewolf.

Ash calls Anna. He tells her that her house is warded, so he cannot come in without being invited. Anna will not let him in. They agree to meet in a public place the next day to talk about what happened and who Ash might be.

Anna then dozes off and dreams that she is standing in front of a beautiful mirror. She sees what appears to be her reflection, except that the girl in the mirror looks lovelier than Anna and has blue eyes rather than Anna's grey. When Anna reaches toward the reflection, it comes to life and pulls her through the mirror, where she finds herself nose to nose with a raven, who tells her that mirrors are doors. She awakens in terror, only to find that her mother has been overtaken by a fit of madness. Marcheline calls out for Dante, her late husband. Anna fears that her mother is mentally ill and worries that she might be, too. She brings her mother medicine, and Marcheline promises to explain everything to Anna someday. But continually being put off in this way frustrates Anna.

The next day, Anna meets Ash in Barnes and Noble. Ash explains that he cannot tell her what he is because he has taken an oath – a *geas* – which he dares not break. But when Anna says her life is too full of secrets and things that cannot be discussed, Ash tells her what he can. He reveals that he is not human, but is one of the "good guys" in the supernatural world. He admits to being a shapeshifter but says he is young and has just come into his abilities, so he can't totally control them – which explains why Anna saw "a little fang" and animal eyes the previous night.

5

While answering Anna's questions, Ash runs afoul of the *geas*. But by letting her guess the answers, he is able to explain that the "bad guys" are demons who beguile and seduce their way into people's lives. He tells her that demons are responsible for the frightening spate of teen abductions in Anchorage. The demons are searching for the "thrice born daughter" – a girl of mixed heritage (part demon, part "being of light") destined to tip the balance between light and dark magic. According to prophecy, the "thrice born daughter" will soon turn seventeen, come into her abilities, and tip the balance between light and dark forever. She will have "markings" on her body, but Ash does not know what those will look like. He explains that the good guys are trying to find her before the demons do.

When Anna tells Ash that she has "talents" and that her aunt practices Wicca, Ash posits that Anna may have some sort of witch ancestry. He invites her to dine with his family the next evening. The two share a kiss in the parking lot, but Anna pulls away when she has a vision of Ash as a vicious wolf hovering over her body.

That night, Anna dreams that she is in Longfellow's "forest primeval," where she encounters a large, dark wolf with glittering silver eyes. The wolf calls himself Athair Mo Chroid – which Anna thinks is his name, but which is in fact a Gaelic phrase meaning Father of My Heart. The wolf calls Anna "Daughter of the Moon." He asks Anna where she is going, and she says she is looking for her father. The wolf asks if she is ready for her initiation, because she must choose; he tells her to choose with her heart, not with her eyes. The wolf tells our heroine to remember him when the time comes.

The next day, Ash picks Anna up for school. He stops for a breakfast of tea and scones with Anna's mother and aunt. On the way to school, Ash tells her more about the war between light and dark. He confesses that he hunts demons and is trying to help his parents find the cursed objects,

6

including Captain Cook's dagger, before the demons get them. His family believes the cursed objects are trying to make their way to the girl – the "thrice born daughter" – who is the key to a long running war between those who serve the shadows and those who serve the light. The objects will corrupt whoever uses them, which to Anna sounds like Tolkien. Ash says that his people are called "the Brethren" and they are "the Ancients," the governing branch – but he is unable to tell her anything more. He also tells her that someone was taken by demons the night before and was returned compromised.

When the pair arrive at school and are confronted with questions about their relationship. Anna must justify arriving with Ash to a suspicious Brendan. Lily, Ash's twin sister, warns Anna not to distract Ash from what he needs to do. Ash suggests that he and Anna not be seen together, but the gossip columnist at the school paper caught them kissing in the Barnes and Noble parking lot and exposes them in the school paper. So Ash gives Anna a red rose, the symbol of the beginning of a romance. Anna has a vision of Ash as the wolf who turned into the knight in her Tarot reading.

Amanda and Taylor unexpectedly invite Anna to a party at the home of their classmate, Whitney. The three girls plan to get ready together at Amanda's house. Anna does not want to go, but her mother, who wants Anna to engage in normal activities, insists. When they arrive at the party – an unchaperoned event at the home of a senior, not a party at Whitney's – Taylor gives Anna a glass of 7-Up spiked with liquor. Anna detests the taste and spits it out. She is uncomfortable at the party and texts Ash, Jenny, Rachel, Brendan, and Mason to come get her. Taylor then gives Anna a glass of punch, which tastes good to her, but is also spiked, this time with Everclear. Taylor reaches out to grab Anna's arm, and Anna receives an electric shock. Anna hears a strangely sweet voice coming out of Taylor's mouth, saying, "You will need a backbone if you are going to find your father."

Anna keeps helping herself to punch, not knowing that it, too, is spiked. When Ash and the four friends arrive, they find that a drunk Anna has thrown a cup of punch on Taylor. Anna is having fun and doesn't want to leave. When Ash picks her up to carry her to the car, she gets angry, and her anger causes the lights to blow out. In the dark, she sees tattoos on Ash's fingers – rings – in silver, black and gold. After she vomits, Ash tells Anna that she should not be able to see his rings and asks what she knows about her father.  Anna retorts that he was not a wolf. Ash tells Anna that her powers, whatever they are, are a gift. Ash also intuits that Taylor gave Anna spiked punch deliberately; he offers to talk to Taylor, but Anna says she will do it herself.

When Ash gets Anna home, Marcheline tells Anna that no one in their family can tolerate spirits. Anna can see that her mother and aunt are keeping things from her, and she is angry. When Ash calls to check on Anna, she asks about his rings. He tells her the black and silver ones are magic spells to protect him, while the gold one represents the *geas*.

That night, Anna has another dream. She sees she thinks is Athair, the grey wolf, again, though his voice sounds different. She says that she needs to find her father and learn the truth about herself. He asks if she is ready, then walks her into the "Faery." The wolf leaves her by a mirror hanging on a tree. In the mirror, Anna again sees what looks like her reflection, only the reflection is dressed in white and silver with gemstones; again, she has blue eyes, not grey eyes like Anna's. The reflection tells Anna there is not much time and grabs her hand. But Anna, fearful, bites the reflection's arm to break its grip. She then hears her father's voice calling her name and another voice telling her that she must accept the truth of who she is. When Anna awakens, she is bleeding from a bite on her arm; the tooth marks are those of an animal.

The next day, a Saturday, Anna goes to the deserted high school to pick up a book so she can finish her homework. She finds Caitlin MacKay – the AGS teacher and Ash's mom – alone in

a classroom. She is confronted by a naked man covered in swirls that remind Anna of Ash's rings – a demon called a Buidseachd. Caitlin turns into a wolf and attacks the demon, but he injures her gravely. Anna, recognizing the being as evil, grabs a spear and attacks. She wounds the demon, but he overpowers her. The demon shreds her clothes with his claws, rips her skin with his claws, and licks her blood. Suddenly the demon turns back into an ordinary man, bows to her, and says "*Ro nuno faylin!*" before vanishing.

Ash arrives and sees that Anna is bleeding to death. Ash tells Anna that he is going to bite her and does so, despite Caitlin telling him that there will be consequences. As he does, Anna realizes that this was the vision she had in the Barnes and Noble parking lot. The bite heals her.

Ash and Caitlin take Anna to their home, where she receives more medical attention from Mac, the doctor of the MacKay pack. The MacKays ask Anna how she was able to vanquish the buidseachd; she says she does not know. Anna tells the MacKays about the syllables she heard but does not tell them that the demon bowed to her. The MacKays realize that the demon was invoking Ronan O'Faolain, the Druid connected to the cursed objects. They tell Anna more about Ronan, including about how he was a good man who became evil after dealing with demons.

Ash's father, Baen, asks Anna about her people and who she really is. When he realizes that she really does not know about herself, he asks to see her pendant. Baen is shocked to see that it is a powerful pendant made by the Egyptian wolf god Wepawet for one of his children. The MacKays surmise that Anna's father must have been a Sentinel (another word for werewolf), like they are, because they wear similar, albeit less powerful, pendants. The family blood-pledge themselves to protect Anna because she saved Caitlin. After they pledge, Anna sees two swirling rings on her finger, one black and one silver.  Ash tells her that, because he has bitten her, he will always have a sense of when she is in danger.

When she returns home, Anna finds Ash in her bedroom; he jumped up from the ground. Anna expresses pleasure that Ash is with her; when he promises to take care of her, she is touched by his efforts to calm and soothe her. Ash shifts for Anna to show her it is not painful. When Ash realizes that Anna can "hear" what he is thinking and converse with him while he is in wolf form, he concludes that she, too, will be a shifter when she turns seventeen.

Anna tells Ash that her aunt says their family is descended from witches; he surmises that Anna might have some distant relation to the Kindred, the great witches of old, only a few of whom are left. Ash tells Anna that the Kindred were betrayed by a half-Kindred, half-Sentinel being and the Catholic Church wiped them out. Ash kisses Anna and she falls asleep.

Lily arrives at Anna's house to take Ash to "The Sanctuary" to meet a vampire who claims to have one of the cursed objects. Lily tells Anna that, because Ash bit her, he cannot leave Anna's side until she reaches her seventeenth birthday. Ash wants to remain at Anna's house, but Anna decides she and Ash will go so that he does not miss the meeting with the vampire. The three of them jump out of her bedroom window.

The Sanctuary is the back room (for VIPs – Vamps, Imps and Persons of Unknown Supernaturalness) at Chilkoot Charlie's, a notorious bar in Anchorage. Despite being underage, Anna gets past the troll bouncer because she is a guest of Clan MacKay. When they pass into the private space, it is suddenly summertime, and everyone other than Anna is visibly a supernatural. Sensing that she is being watched, Anna looks up and sees a gorgeous man and woman sitting at the bar. The man looks at her and says, with intense longing, "Elise?" Anna cannot tear her eyes away from him. The man bites the woman on the neck, and Anna senses that he is really indicating that he would like to bite her. When Anna tells Ash that she thinks the man and woman are

10

gorgeous, Ash says he is not into vampires (also known as "Sanguines") – demons for whom human blood is addictive.

Unexpectedly, her friends Brendan, Rachel, Jenny, and Mason arrive at Chilkoot Charlie's. Jenny explains that Taylor told them where Anna was and that they were looking for her because all four of them dreamed the previous night that Anna was in danger. Jenny wants Anna to leave with them for a slumber party. Anna says she will not leave Ash, but Jenny says her friends, who are standing outside in the frigid temperatures, will not leave Chilkoot Charlie's without her. Anna decides to leave with her friends, telling Ash that he has to make good on his obligations to his family. She promises to call him when she arrives home. It is the night of the blue moon and Anna has a sense that something terrible is going to happen.

In the parking lot, Anna sees two terrible looking men, whom she recognizes as vampires. She tries to get away but her friends (who are under a spell) block her path. All five of them are kidnapped. The vampires take the teens to their Master, someone named Julian; he is the fascinating man who called her Elise at the bar. Julian puts her friends in a trance and "sorts" them, á la Harry Potter, by taking a bite out of each one and tasting their blood. He sends Jenny and Brendan away to be turned into blood (sex) slaves and keeps Mason to see what talents his brilliance can offer. But he gives Rachel to the demons to eat, and Anna says she will do anything to spare Rachel's life. Julian offers to free all four of her friends if Anna will do whatever he asks. She agrees.

Julian demands that Anna become his bride for eternity. He claims that her family owes him a blood debt because Dante, her father, stole and killed Elise, Julian's wife, who had loved him enough to become a Sanguine like himself. Julian reveals that Anna's father is not dead but

11

is Julian's prisoner. Julian tastes Anna's blood to confirm who she is. He tells her he plans to make her a Sanguine, too.

The MacKays crash in, and Anna and the MacKays fight Julian's guards, the demon Ka Ramun. The wolves decapitate the demons, and Julian disappears. The MacKays try to get Anna and her friends out of Julian's lair. Ash says he must stay and take out Julian because Julian has tasted Anna's blood.

Taylor walks in; she is wearing one of the cursed objects, a snake ring. When they wrangle it off her finger, she awakens, confused.

As they all leave the lair, Anna sees her reflection in a mirror, although again the reflection has blue eyes, not grey eyes. As Lily screams, "No," Anna goes through the mirror. The reflection turns out to be a Morrigan (Priestess) of Avalon who serves someone called the Mother. The Morrigan explains to Anna that she is Elise, who was once married to Julian and who temporarily became a Sanguine like Julian. She left Julian when she heard the call of the goddess, the Great Mother, which drove him mad and turned him evil.

Elise says that everything will become clear to Anna when she is initiated at age seventeen. Elise tells Anna that she can save Dante, but she must do it now. And she tells Anna that any choice she makes will be the right choice. Although Elise will not tell Anna exactly how they are related, she says that Anna is "flesh of her flesh and bone of her bone." She then calls out that her "vow is honored" and disappears.

Anna pitches forward into the mist and finds two wolves caught in steel traps. The grey wolf with grey eyes is hauntingly familiar; the other wolf is black and has the amber eyes she saw in her dreams. Anna decides that the wolf with amber eyes is her father and calls him Dad; this causes the grey wolf to howl mournfully. Anna frees the amber eyed wolf from his trap; she tries

12

to free the grey wolf as well, but she cannot open the second trap before demon pursuers catch up with them. So she and the amber eyed wolf go back through the mirror. The grey-eyed wolf sacrifices himself by betraying his location to the pursuers; this gives Anna and the amber-eyed wolf time to escape.

Once through the mirror, the amber eyed wolf turns into a man. He is not her father, Dante, but a Celtic Druid, and a very attractive one at that. Anna feels that she failed, but the Druid thanks her for his freedom and tries to console her. He gives her an amulet and tells her she can summon him by putting a drop of blood on it. He also kisses her to obtain a drop of her blood and assure himself of who she is.

Just then, Ash arrives and attacks the man while in the form of a wolf. The man turns into a raven and flies away. Before he does so, the man tells Anna that his name is Ronan O'Faolain.

Anna tells Ash that she has done a terrible thing; Ash thinks she is talking about having kissed the strange man, but Anna means that she has freed someone she thinks is the devil.

## II.    BMR (2011)

Blue Moon Rising 2011 is not appreciably different from Blue Moon Rising 2010. It adheres closely to the template. It contains three key additions.

First, Anna acquires swirling black marks on her neck over the course of the story.  Ash tells her that the girl in the Prophecy of the Thrice Born Daughter will have marks on her neck. Her aunt tells her the marks are hives and gives her a salve to hide them.

Second, when Anna goes through the mirror after the fight at Julian's lair, she is given to understand that she is in Avalon. She is told by the Morrigan Elise that only Kindred can walk in Avalon. Elise also tells Anna that Elise fulfilled the family's duty to the goddess when Marcheline, her older sister, could not.

13

Third, Elise reveals that Anna is her (Elise's) biological daughter. This is prefigured when, early in the draft, Marcheline tells Anna that she is more beautiful than "your mother" was at the same age.

### III.    Masqued (2012)

Besides having a new title, Masqued contains a number of changes from the two BMR drafts.

The role of Tarot is enhanced; the book is divided into six sections, corresponding to the six card Tarot spread that Anna draws to induce the vision that opens the story.

In this version, Anna summons her first vision while practicing Wicca in her bedroom, not while being driven to school. Her abilities are increasing and this frightens her. The vision itself is no different from the one in opening chapter vision in BMR 2010 and 2011, except that Anna is bleeding from a head wound and she wears a serpent ring, which she cannot remove. The ring will turn out to be one of the cursed objects. And just before Anna turns to meet her destiny, a voice says, "Shadow or light, you must choose."

Anna learns early in the book that Marcheline and Brie are powerful Kindred witches and that she is Kindred as well. Her mother admits that she practiced in former times and says she does not want Anna to make the same mistakes she did. Anna also learns, from her Aunt Brie, that Avalon is a real place and that she will go there for her initiation on her seventeenth birthday. At her initiation, Anna will learn what she must do to maintain the balance between Shadow and Light. She is told that the visions she is experiencing are normal in the months prior to initiation.

Anna overhears her mother and aunt talking about her. They refer to the girl as being safe because she is a "needle in a haystack." When Anna tells them she overheard them, they tell her that her father's death was no accident, that he belonged to something called the Order of the Sphinx, and that the Order will want Anna when she turns seventeen. Aunt Brie tells Anna that her

14

father discovered that a high-ranking member of the Order had done something illegal; that he was killed while taking that information to Order members in Los Angeles. Her mother and aunt did not know whom to trust after Dante died, and that for her safety they have allowed the Order to think that Anna – who is descended from the Priestess of Avalon – is dead.

In all versions of Masqued, only Amanda was Anna's childhood friend; Anna has never liked Mean Girl Taylor. Amanda turns away from Anna and becomes a "cheerbot" and a friend of Taylor's; Amanda loves cheerleading and feels that she and Anna now have different interests. One day, to Anna's surprise, Taylor arrives at school wearing the very ring that was on Anna's finger in her vision. She says it was a gift.

Anna bonds with her new friends (Brendan's friends) by joining the school newspaper.

In Masqued, the abductions of sixteen-year-old girls are being carried out by the Order, not by demons. The Order is trying to find a girl who is known as the Nyx. The Nyx is a girl of mixed demonic and Unseen parentage. She is predicted to tilt the balance between shadow and light. Members of the Order are sworn to destroy her before she turns seventeen and comes into her great powers. The fear is that she will choose to align herself with her demon side because she is part demon.

There are many signs that Anna is special: she is having many waking visions; she gradually acquires the mixed black (demonic) and gold (Kindred) hieroglyphic markings on her neck;  Taylor's serpent ring – which Anna first saw on her own finger in her vision – turns into a live snake in Anna's presence; ravens hound her frequently, warn her of danger, call her Priestess, and even part to make a path for her when they congregate on her front porch. She is increasingly having visions, which her aunt tells her is normal, as her powers are waxing.

15

Anna thinks that Taylor might be the Nyx and tries to see if there are marks on Taylor's neck. In fact, both Taylor and Amanda are part demon. Taylor knows that Anna is the "Chosen One."

While getting dressed for the Halloween dance, Anna sees the spells on her own neck, but she is reassured when her aunt tells her that they are simply hives and provides her with a salve.

In Masqued, Anna does not do a Tarot reading with her aunt after Ash brings her home on his motorcycle on the day they meet. But after the Halloween dance, she does a Tarot reading and the cards come to life. The reading is more or less the same, except that the mounted knight who was formerly the dark wolf is carrying a dagger behind his back. He brings it up between himself and the maiden when they kiss, and the knight falls down dead.

In her Halloween night dream, the blue-eyed "reflection" tells her, "Find me in Melusine's mirror." The raven, not the reflection, pulls her through the mirror and pushes her back out again. When Anna awakens, her mother is hysterical, calling not just for Dante, but for Elise and Julian; she asks Julian to give her the dagger.

In order to explain himself to Anna during their visit to Barnes and Noble, Ash takes her to the Gloaming – a faery place. There Ash tells Anna, among other things, that the Nyx will have hieroglyphs on her neck. Terrified, Anna runs out of the Gloaming into the "forest primeval," an ancient forest where she encounters the grey-eyed wolf, who identifies himself as a guide for her initiation. The wolf tells her that she has a dark gift from the Moon, but that her ability to balance light and shadow and emerge transformed is her great challenge. He tells her that she must find the cursed objects and use her gifts to maintain the balance. He also warns her that Ash cannot know what she is and still serves those to whom he is bound. He identifies himself as Athair Mo Chroid.

16

When she returns from the Gloaming, Ash and Anna kiss with increasing passion. Anna's demonic side reveals itself when she kisses Ash; she hungers for him and her hunger gets stronger with each kiss, which takes some of Ash's life force (his lips turn blue, she takes his breath away).

When her friends arrive at the party, a drunken Anna sees Ash with a wolf's head and their other friends looking like magic beings (wearing feathery masks, having shining gold and silver skin).

When Anna returns from the MacKay compound, where she learns about the powerful amulet her father left her, she demands to know the secret of the amulet; Marcheline will tell her nothing.

In this and all subsequent versions in which he appears, Julian is an incubus, not a vampire. Rather than sorting her friends by blood, he sucks a bit of life force from each of them, mouth to mouth. He tells Anna that he transformed her father into an outcast incubus for stealing Elise from him, and that when Dante does not walk as a wolf, he walks as a demon. Julian tells Anna that she is Kindred and that Elise, not Marcheline, is her real mother.

When Taylor arrives at Julian's lair at the end of the fight, Amanda is with her. Amanda reveals that she has always been jealous of Anna, especially of her magical abilities. Taylor reveals that both girls are half succubus; Amanda says that is why the girls were drawn together as children. Amanda also tells Anna that Julian captured her and Taylor and threatened to kill their families if they did not help him capture Anna.

Anna is introduced to Melusine's Mirror, which is her passageway into Avalon. Anna is told by Elise – her mother – that Anna is descended from Melusine, and there are skills she needs to learn in order to free her father. She is told by Elise, the High Priestess that she should wait for

17

her initiation and take lessons before trying to do anything. She is told that the ravens are Elise's messengers to her.

But Anna says that she must find her father, which leads to her making the 'wrong" choice; she chooses to save the wolf who is Ronan rather than the one who is her father, Dante. But while Anna understands that she failed a test by freeing the amber eyed wolf, Elise told her that whatever choice she made would be the right choice for her.

The Druid (Ronan) does not have to taste Anna's blood to know who she is. Nor does he kiss her, though he comes close.

During their few minutes together, Ronan tells Anna that they are cousins of a sort and share a similar magic.

## IV.    Masqued (2013)

In this fourth draft, the role of Tarot is enhanced yet again – even the High Priestess of Avalon casts cards.

More of Anna's friends turn out to be supernatural beings: Brendan, Rachel, Jenny, and Mason are various Unseen Beings of Light (a faery, a banshee (ban sidhe), a siren and a leprechaun).[1]

Marchalene (note the changed spelling) is Anna's biological mother in this version. But this time Julian the incubus is her biological father. Elise, the High Priestess of Avalon, is Anna's grandmother – Marchalene's and Brienne's mother.

Details of Anna's visions differ from those in the earlier drafts, especially the vision where she turns to meet her destiny; she sees a man, not a wolf, and she falls from the cliff,

---

[1] This was hinted at in the 2012 version, when Anna saw her friends looking like they were glowing (the boys) or wearing feathery masks (the girls). However, it was not made explicit, as it is in the 2013 version, where Julian, having sucked a bit of soul from each of her friends, identifies what type of paranormal creature each one is.

18

taking him with her. The man says, "You! It's always been you."

With each new draft there are more raven warnings; the ravens are unmistakably tied to the High Priestess of Avalon; they are her messengers.

Anna accidentally works magic in public on the first day of the story, and as a result she is recognized as a paranormal being by Julian's demon servants, who look like Billy Idol and The Incredible Hulk. Anna and Ash take a detour out to Beluga Point on the way to her home. A raven blocks her path and tells her to beware; she waves her hands and blue lightning emerges from her finger. Billy Idol asks what Anna's clan is, and he and his companion, the Hulk, try to force the girl into a van. Anna tries to fight them off; they run away when Ash comes out of the convenience store and runs toward them. But they do manage to take her backpack, which contains Anna's ID – thereby revealing her name and address to Julian.

Someone named "Julian" is identified as the person who gave Taylor the cursed serpent ring.

Anna goes to the high school on Saturday, not to get a missing book so she can finish her homework, but to wait in her car for Ash so they can make a return visit to the Gloaming. A raven leads her into the building. Once inside she hears a voice saying "Annaliese, it is time to choose: Priestess!"

The demon that Anna vanquishes in Caitlin's classroom is not a buidseachd, but a bronach daman – one of Ronan's cursed priests. By "killing" him, Anna frees his soul. When she "vanquished" him, Anna said something to him in a language she did not understand; then she spoke strange words, which she understood as giving him absolution.

The MacKays are certain that the Nyx they are seeking will choose the dark side because every Nyx before her has chosen to follow her demonic rather than her light side. A line of

19

prophecy says the Nyx will come from the frozen land at the tip of the Devil's Triangle (one of which is located in Anchorage) and that she will join forces with Ronan. The MacKays insist that the Nyx is evil and ask Anna to be on the lookout for her.

The incubus Julian is looking for Shalene, not for Anna. Shalene, not Elise (who is identified as Shalene's and Brienne's mother, ergo Anna's grandmother), was his true love; she was pregnant with his child when they parted. Julian thinks Dante caused Shalene to have a miscarriage and lose their unborn son.

When Anna promises to do whatever Julian asks if he will free her friends, her friends tell her that she did not need to make such a promise, because Julian has to free them or he will incur the wrath of other supernatural beings. Julian nonetheless holds Anna to her promise. In this version, he demands that she call her mother and lure Shalene to Julian's lair.

Shalene and Brie, not the MacKays, show up at the lair to fight Julian and his demons and to rescue Anna and her friends. They are revealed as mighty witches. When Julian asks how they found the lair, they tell him that Anna is spelled so they would always know where she is. Shalene reveals that Anna is Julian's child; he is shocked to learn that there was no son and no miscarriage, and that Anna is his biological daughter. Anna is furious with her mother for keeping her parentage a secret, both from her and from Dante.

At the end of the fight, Shalene remains behind with Julian, while Anna, Brie, and Anna's friends flee Julian's lair. After the serpent ring detaches itself from Taylor and winds itself around Anna's finger – from which it cannot be removed, as in her vision – Anna sees the mirror and hears a voice telling her it is time to begin her initiation. As she steps through, Rachel's voice, not Lily's, screams no.

20

Anna's destiny is revealed to her by her grandmother, Elise, using Tarot cards. When Anna complains that she had no choice about being the Nyx, Elise tells her that, while destiny may be written, there is always choice. Elise reveals that Anna is handmaiden to Nyx, Goddess of the Night, the Dark Moon, who has chosen Anna to carry out her will. She is also told that great sacrifice will be demanded of her and that either she will be Ash's undoing or he will be hers. And she is told that, as Priestess, she may not make an alliance with any man; she belongs to the goddess alone. She is identified as a descendant of Melusine.[2]

Elise also tells Anna that the first test of her initiation is about her and her guide. When she says she has met him – Athair Mo Chroid (Father of my Heart) – Elise chides her and tells her what those words mean.

After Ronan and Ash fight and Ronan turns into a raven and flies away, Anna shows Ash her back, revealing her as the Nyx. "You," he says, "it's always been you." But he says he loves her and cannot kill her.

There is a new finale; the story does not end with Anna's and Ash's last conversation. Instead, Ash takes Anna home. Brie and the MacKays are there, but Shalene is not present, and the reader is not told why.  Anna runs away from all these loving people, jumps into Ash's car and drives away too fast, spins out on black ice and has an accident. She is rescued by Ronan. When she calls him Bloodletter, he just laughs and turns into a raven, leaving her to her rapidly approaching family and friends.

---

[2] It is probably time to note that Melusine is not an invention of Freeman's, but is a familiar figure of European folklore, particularly in France, Germany, and the Low Countries. She is the daughter of a water sprite and a human, raised in the mythical island of Avalon. On Saturdays she turns into a two tailed water serpent below the waist – or, in some tellings, a dragon. Melusine marries a human prince, on the condition that he never try to see her on Saturday. Needless to say, he breaks the vow, and it all ends badly. *See* https://en.wikipedia.org/wiki/Melusine.

There is a page of notes at the end of this chapter. Some of the things in the notes will end up in the fifth draft of Masqued.

## V.        Masqued (2014)

Until the climax at its end, Masqued 2014 is very similar to Masqued 2013.

Names are changed, including the names of the heroine (now Mia, or more fully Mariana, St. James), the new boy (now Roman, not Ash), the former best friend (Samantha, not Amanda), the High Priestess (Marise, not Elise) and the Druid (now Aedan, not Ronan). Brie's name is spelled differently (Brynne). The Gloaming is now called the Otherworld. The Sentinels or the Order are called the DarkHunters; they are in service to the Council, which also seems to be called the Order. The bad guys are the Shadowspawn.

Anna/Mia's four true friends are now reduced to two (Brendan and Rachel, who are cousins). Jenny and Mason simply disappear.

There are a few additions to the basic plot. For example, Mia is told by her mother that they came to Alaska because her mixed bloodline put her in danger in the war between shadow and light; Marchalene says she has lost everyone who matters to her and she will not lose Mia too.

When Mia first meets Athair the wolf, she asks him if she is the Nyx. He in turn asks her if she is evil. He tells her that shadow and light are two sides of the same whole. He also tells her that the Order is her enemy and its agents will kill her if they get the chance.

The night of the party, while prepping with Taylor and Samantha, the other girls tell Mia that the three of them are different from other girls.

When Mia goes into the deserted high school, she hears her name and a voice saying, "You called and I answered your plea; you must choose."

These are minor differences. However, once Mia and her friends arrive at Julian's lair, there are significant changes – including a whole new ending.

First, in Julian's lair, Mia learns that both she and Taylor are daughters of Julian; they are half-sisters. All the Cheerbots are at least part succubus, which is why they are so popular with the boys. Taylor, however, is half succubus and half Dark Fae – she is entirely a shadow being, and she calls herself wicked. Nonetheless, she goes with Mia when Mia tells her that being wicked is a choice.

Second, Mia is told that Dante was aware all along that Mia was not his biological daughter. In the 2013 version, Dante did not know that he was not the biological father of Shalene's child.

Third, when Marise tells Mia that if she follows her heart either she or Roman will be the undoing of the other, Mia announces that she will refuse her gifts. Marise tells her to speak to her guide; she says she has already spoken to Athair.

Fourth, Marise tells Mia to remember that Dante can never leave Avalon, a warning she promptly forgets.

Fifth, when confronted with the need to choose between the two wolves, Mia believes that the one with amber eyes is Roman (which happens to be correct). She chooses the one with the grey eyes, because she thinks he is her father. A voice tells her that she has chosen the Shadows.

Wanting to save both wolves, Mia pledges her life to the Dark Moon Goddess in exchange for the life of the amber eyed wolf, whom a voice calls the "Boy of Light."

When she goes back through the mirror, the man she first chose to save – the grey-eyed wolf – is of course not her father. The man reminds Mia that she was told Dante could never leave Avalon. He then reveals himself as Aedan. Although Mia thinks her choice was a mistake, Aedan tells her that she chose him for a reason and that there are no mistakes in such matters.

After Aedan leaves her, Mia rejects Roman, because she does not want him to be at risk from her demon side. Mia tells Roman that it is too much work to love him; all she wants is a normal human life. When Roman kisses her goodbye, she feels nothing.

A week later, Mia's mother Shalene is dying – poisoned by Julian when she would not agree that their daughter, Mia, could live with him for six months out of every year.

Shalene tells Mia that it is impossible to run away from fate, using her own life story as an example. She left Avalon and abandoned her calling, not once, but twice. Having foreseen that Julian would kill her, she tried to save herself by taking Mia to Alaska – only to walk right into her destiny.

Shalene explains Julian's obsession with the Order. The Order had members from both Shadow and Light until World War II, when it split and the Order expelled all its Shadow members and began hunting them down.

The dying Shalene is no longer able to cross into Avalon, but Mia is able to take her using Melusine's Mirror. And while Shalene cannot return to earth from Avalon a third time, she will be in Avalon with Dante forever – and will ultimately fulfill her calling and become High Priestess in place of her mother.

At the very end of the story, Roman comes to Mia. He says he does not believe that she does not love him, because Taylor told Roman that Mia would always try to do what was right. So Mia tells Roman the truth about herself, her family – even the fact that she is the Nyx. In this version, she also tells Roman that she has unwittingly freed Aedan. But Roman (who is, of course, the Boy of Light) tells Mia that he loves her, and because she sacrificed her own life to save him, he cannot fulfill his vow to harm her – even if she is the Nyx. Roman also says that knowing Mia has caused him to question everything he has been taught about the Order and Shadowspawn. He

has decided that it is his destiny to follow his heart. He asks Mia if she will follow hers or live a life of regret. As the book ends, they kiss.

## ADDENDUM B

### I.    Masqued (2016)

The last version of Masqued varies substantially from the template of Blue Moon Rising; it is as though Freeman decided to start over. It is, therefore, necessary to tell the new story in some detail.

Anna/Mia is now Ella (Gabriella). Hecubus, her cat, is now Pharaoh and is Mia's familiar. Her aunt is now Aunt Rose (Roselyn). Her mother, once Shalene, is now Gwendolyn. They moved to Alaska when Ella was five, not seven – just after the death of her father, Dante, and her twin sister, Emmeline.

To induce the vision that opens the story, Ella, who knows that she is Kindred, places her mother's amulet around her neck. The vision she experiences is more or less the same as in the earlier books – including the fact that Ella is wearing the ouroboros (snake) ring – until Ella turns to meet her destiny (the young man who says, "It is you."). At that moment, Ella is stabbed with the dagger, and a sibilant voice says, "The Return Has Begun." Ella awakens to find both blood and a scar on her stomach. She is holding a Tarot card in her hand – the Tower, the card that indicates one is blind to a shocking truth.

When Ella takes off the amulet, it feels hot and flies out of her hand, smashes through the window, and disappears. Ella worries that her mother will be furious, because the amulet is a prized possession.

The next morning, Gwendolyn tells Ella she must stop trying to read Tarot cards. Ella asks her mother how she will learn her calling without reading cards. Her mother says there are rules, which Gwendolyn and Rose followed, and which Ella must follow as well. She cannot use her powers without supervision. Gwendolyn tells Ella that she is undergoing Kindred puberty and

stinks of cinnamon, the smell of her family's magic. She douses Ella with perfume to hide the smell and tears up one of her Tarot cards so that Ella cannot spread the deck. She urges her daughter to try meditation.

Gwendolyn and Rose sense that terrible magic was unleashed the night before. Powers have killed hundreds of fish, which have washed up along Cook Inlet. Ella wonders if she unleashed the magic when she used the amulet. But when her mother (who does not know about the loss of the amulet at this point) tells her that there are two types of Kindred, only one of which gets strength from taking life, Ella feels reassured that she did not kill the fish.

The hot new boy and girl arrive at the school on a motorcycle, and the boy is in Ella's first class (which is now French, not math). The boy's name is Roman.

Strange things are happening to Ella. In French class she speaks perfect French to her teacher, with a Belgian accent (the teacher is from Belgium). Ella claims to be joking and says she cannot really speak French, but the new boy isn't buying it.

In the bathroom, Mean Girl Taylor is making fun of another student and wearing a snake ring – the same one that Ella was wearing in her vision. Taylor says her father gave it to her, and that it came from Egypt.

In their AGS class, the teacher has mysteriously accepted a position in Hawaii and had to leave immediately. The MacKays, Roman's parents, are the new teachers. Everyone in the class seems to know a lot about the Great Pyramid of Giza, and there is a discussion about explaining the inexplicable. Rachel says she hopes that the class will be open minded enough to explore the possibility that alien technology was used to build the pyramid. There is no discussion of Celtic Druids or a search for mystery objects that arrived in Alaska from New Zealand.

2

When Ella gets onto Roman's motorcycle, her friend Brendan suddenly appears and offers to take her home. Brendan – who in this version is not identified as gay – asks where Roman is from; Roman says his family doesn't stay in one place too long. Rachel and Brendan leave to interview someone who thinks he saw an alien in his backyard. Brendan reminds Ella that her mother will go ballistic if she rides home on a motorcycle; she responds that she is giving Roman a tour of the town.

Roman and Ella stop at the convenience store at Point Woronzoff, a location in Anchorage. Ella goes down to the beach, while Roman goes in to buy food. Ella sees the dead fish, covered with red sores, as well as two belugas, side by side, alive but with skin oozing. Ella tries to invoke the Power to save the belugas. Suddenly the belugas are enveloped in a blue light, and two glyphs appear on their foreheads – the golden glyph of Isis and a black and silver lightning bolt with swirling sand. As blue light emanates from her fingers, the dead fish twitch and the broken amulet appears around her neck; both glyphs are on it. Ella realizes that she had something to do with what happened the night before. As if to confirm, the amulet, which has broken in two, suddenly appears around her neck.

Ella is approached by Punk Rock – one of the two demonic creatures from earlier drafts – who asks if she is "Coven or Circle." He tells her that he saw "the light show," says that The Return has begun, and cautions that a girl like her should not be meddling with it. Punk Rock and Hulk grab her despite her efforts to fight them off; but when Roman approaches, they drop Ella and run away. The dead fish come back to life, albeit strangely; they bear the lightning glyph. All the fish and whales are borne out to sea on a dangerous bore tide that nearly drowns Ella and Roman. Ella tells Roman that he saved her twice – once from Punk Rock and Hulk, once from drowning.

3

When she gets home, Ella overhears Rose say to her mother, "Just because you turned your back on the Circle and your true calling doesn't give you the right to make the same choice for Ella." Ella makes the connection with Punk Rock's question about Circle or Coven, which she had not previously understood.

Ella tells her mother and aunt that she healed the sick whales and even raised the dead ones. She also confesses what happened with the amulet the night before. Gwendolyn says that Ella must leave Alaska immediately. The two women explain to Ella that, when she used the amulet, her budding magical powers were accelerated and amplified; what should have taken years of development happened literally overnight. They also tell Ella that she has unwittingly unleashed a terrible force, an ancient evil. If the evil force gets the amulet, the door to the world will unlock and The Return will happen – dark forces will be brought back into the world.

When Ella blames herself for this disaster, her mother says no, it is her fault, because she cast away her responsibilities as Keeper of the Amulet, and refused to honor her vow to the Circle, after Ella's father and her twin sister Emmeline were killed. Gwendolyn reveals to her daughter that she was a Priestess of Isis, one of the Chosen. She explains the difference between The Coven (Kindred who follow the dark path) and The Circle (Kindred who are descendants of the light gods and caretakers of the earth).

The evil spirit that was trapped in the amulet is the Ka (or soul) of an evil pharaoh; he was imprisoned in the amulet by the Egyptian gods Isis and Osiris. The marks on the amulet are of Isis and Set, the darkest god. The balance of dark and light kept the seal intact, but the blood from Ella's cut unlocked the amulet when her power was channeled through it. Once the amulet broke in half, the evil was set free. Now the good guys have to find the other half of the amulet before the bad guys do.

When Ella tries to take her half of the amulet off, it burns, and Rose announces that the magic has chosen Ella and she must make the offering. Rose swings a pendulum of amethyst and crystal above a map of Alaska to try to find the other half of the amulet, but she cannot. However, when Ella tries the same thing, she learns that the other half of the amulet is at West High School – Ella's school. The amulet is seeking the descendant of the dark gods, someone Ella's age – someone she knows. Ella needs to find the other Kindred at her school. Her mother puts Roman at the top of the list of possibilities.

Ella asks if there are Kindred police who can help them. There are – known as The Order of the Sphinx – but Ella's family cannot go to them for protection because they would quiet the magical power of anyone they suspect has anything to do with The Coven. Her relatives explain to Ella that The Order has become too narrow-minded and too political. They want to destroy the dark god's bloodline, so they quiet the powers of anyone who carries that bloodline, whether that person is evil or not.

Ella is angry that she was told none of this, but her mother tells her that her father and sister were murdered, and that she was told nothing in order to keep her safe.

Suddenly Brendan shows up at the door. Punk Rock and Hulk, who are from The Order, have captured him. They announce that Ella used her powers in public, which violated something called the Compact; they have come to quiet her. Ella's mother transforms herself into a Priestess of Isis and says that The Order will not want to start a war with her. Gwendolyn also tells Punk Rock and Hulk that she has unfinished business with the one who was freed the night before; she wants to be found. Punk Rock and Hulk transform into descendants of the Snake God, with forked tongues; Brendan is bitten. Rose tells everyone not to move but it is too late – the snake coils around Ella's leg and mist rises from the floor. Suddenly the mist turns into a man, crouched on

5

all fours and covered in hieroglyphics. He too is a hottie in black leather, and Ella feels his pain. He looks at Ella's mother. Suddenly Gwendolyn, the man from the mist, and the snakes all disappear in a cloud of sulfur. Ella passes out.

Ella wakes up with her head in Roman's lap. Rose and Brendan are on the floor. Roman says this is his fault, and he will make it so that they don't remember this, but first he needs to ask some questions. When he says he is on Order business, Ella tells him not to use his powers on them. She and Roman simultaneously realize that they are both Kindred. Ella demands that Roman prove that he is Order; he holds out his wrist, and Rose says it bears the mark of The Order.

Roman says he returned to Ella's house because he sensed that The Coven might be interested in the "human girl" he was with today. He did not call for reinforcements because he really did not want Ella involved in what was unfolding. Rose tells Roman that The Coven followed him to their home and now Gwendolyn has been taken. Roman promises Ella that they will find her mother.

When Roman's sister and cousin, both members of The Order, arrive and ring the bell, Rose tells Roman that he cannot tell them that Ella is Kindred if he wants to ensure Ella's safety. He tells his relatives to go away and stays with Ella.

Brendan is dying of a magic snake bite. Roman offers the services of his uncle, a Kindred healer, but Rose explains that the only ones who can heal this bite are the Seven Crystal Healers of Isis – of whom she is one. Rose needs to consult the High Priestess to find out where Gwendolyn is, and Brendan needs to be taken to the healing place. So they go the entryway of the house, where sits a floor length mirror framed with gold winged Egyptian goddesses – the only thing the family brought from California when they moved to Alaska. Rose causes Ella to prick her finger on the mirror and smears the glass with her blood – because there is always a price to pay with ancient

6

gods' magic. They all step through the mirror, cats too. Rose says as long as Cleo the cat (Gwendolyn's familiar) is alive, they will know that Gwendolyn is alive.

They find themselves in an ancient Egyptian temple of Isis, which also happens to be Avalon, a sanctuary that connects the earth to Amarna, the home of the gods. Rose and priestess attendants take Brendan to the healing rooms. Ella is taken to the High Priestess.

Ella says she has to find her mother before the evil she unleashed realizes that Gwendolyn does not have the amulet. The priestess spreads a Tarot deck and draws three cards. First is the Lovers. Although Ella feels tied to Roman, the Priestess tells her that following her heart will be either her undoing or his. She explains that, by following her heart, her mother was foresworn to the goddess and her mother's lover is dead.

The second card is the Skeleton King, which represents death. The High Priestess says that death follows in Ella's wake. The Coven and The Order are both Ella's enemies – when The Order discovers that she has freed Set, the God of Chaos, they will destroy her. Set's goal is to bring about the return of the gods from Amarna to earth. He needs the amulet to open the door, while Ella needs the amulet to destroy Set. Its magic is now too weak to keep Set prisoner, so he must be destroyed. That is Anna's calling since she is now Keeper of the Amulet – although the High Priestess says, "There may be another." Maintaining the balance will require great sacrifice, including a death personal to Ella.

Ella needs to find the person who holds the other half of the amulet, so they can work together to seal the door. When Ella asks if that person would not want to help Set remain free, she is told never to underestimate the power of free will.

7

The third and final card in the draw is the High Priestess. It means that Ella is a daughter of Isis. True daughters of Isis have fraternal twins, like Isis and her sister – like Gwendolyn and Roselyn – like Ella and Emmeline.

Ella has to decide whether she wants to accept her calling. She says she must save her mother. The High Priestess says saving her mother is not the same thing as accepting her calling. If she decides to be Keeper of the Amulet, she cannot change her mind. Ella says, "The amulet chose me." Ella thereby passes the test and is now the Keeper of the Amulet and a huntress. And the High Priestess reveals that she is Ella's grandmother.

<u>**ADDENDUM C**</u>

There are four separate novels in the *Crave* series here at issue: *Crave, Crush, Covet*, and *Court*. Collectively they tell a single story, beginning with the introduction of key characters and ending with the vanquishing of the forces of evil. The novels are summarized below.

**I.      Crave**

Crave is told from the first-person perspective of Grace Foster, a seventeen-year-old girl from San Diego. Just weeks after her parents are unexpectedly killed in a car accident, Grace is forced to move to Alaska, to live with her only two remaining family members – her Uncle Finn and his daughter, Macy. Grace travels by bush plane and snowmobile from Fairbanks to Healy, Alaska – a snowy outpost of a "town" at the north end of the Denali National Preserve – and then on to Katmere Academy, an isolated boarding school in a gothic castle near Denali where Grace's uncle is headmaster and her cousin is a pupil.

Although she rooms with her ebullient cousin Macy, from her first day at Katmere, Grace feels like an outsider and has difficulty adjusting to her new and alien surroundings – even as she becomes the object of scrutiny from other students. One of them, Jaxon Vega – an attractive and mysterious "bad boy" dressed in black leather who runs with a posse of similarly-attired companions – warns Grace about the dangers lurking at the school and tries to intimidate her. But Grace finds herself drawn to him. Grace also befriends Flint, a popular, funny, and easygoing student who seems to want to help Grace acclimate to life at Katmere.

Jaxon's warnings are not empty; Grace has a series of near-death experiences during her first week at Katmere. While she is exploring the castle, two boys corner her and try to drag her out into the sub-freezing night; Jaxon appears out of nowhere and saves her. While participating in a snowball fight organized by Flint, Grace is blown out of a tree and injures her ankle in the fall;

Jaxon, who carried Grace back to her room, believes that Flint caused the fall. A few days later, a chandelier in the school's cafeteria nearly falls on Grace's head while she is sitting next to Flint at breakfast; Jaxon pushes her out of the way.

Although Jaxon seems to have Grace's best interest at heart, Macy warns her cousin that Jaxon and his posse of friends (known as The Order) are dangerous; she also tells Grace that she cannot be friends with both Flint and Jaxon, as the boys have a complicated relationship. But Grace tells her cousin that she has "feelings" for Jaxon.

After attending a welcome party in her honor – at which she notices that the students seem to form separate groups or cliques – Grace wanders into the school's library, where she hears a girl chanting in an unfamiliar language while reading a book. The girl, Lia, introduces herself and invites Grace to her room for a cup of tea. Lia tells Grace that her boyfriend died several months earlier, and the two bond over their recent losses. Macy arrives to take Grace back to their room; she tells her cousin that Lia is a popular student but has been reclusive since her boyfriend, Hudson, died.

On her first day of school, Mehki, a friend of Jaxon's, escorts Grace to her first class. Later in the day, Grace encounters Flint, who shows Grace the secret tunnels beneath the school. In the tunnel they find Lia, who is in Grace's art class. Suddenly the ground starts shaking; fortunately, Grace, Flint, and Lia make it out of the tunnels. As she emerges, Grace runs into Jaxon, who asks her about her friendship with Flint.

Grace sees Jaxon and Lia having a tense encounter; Jaxon explains that they were fighting about Hudson, who was his brother. Over the next few days, Jaxon and Grace exchange playful text messages as she recovers from the ankle injury she suffered during the snowball fight; Jaxon even sends Grace a copy of *Twilight*.

Jaxon invites Grace to his room, which is located in Katmere's highest tower and is filled with books and art. Jaxon encourages Grace to step outside onto the parapet, where they watch a meteor shower; once back inside, they kiss. To their surprise, their kiss is interrupted by an earthquake; the window shatters, sending shards of glass flying into Grace's face. Jaxon tells Grace that she needs to leave immediately, and Grace begins to run. She wakes up in her dorm room covered in bandages, with no memory of how she got there.

Macy tells Grace that a piece of flying glass nicked an artery in her neck, but Jaxon got her to the school nurse, Marise, before she bled out. Marise tells Grace not to remove the bandage from her neck. Grace, wanting to make sure Jaxon is all right, sneaks out of her room; she finds Jaxon, who feels guilty for putting her in danger and urges Grace to stay away from him. Back in her dorm room, Grace ignores Marise's instruction and removes the bandage from her neck. She sees two bite marks.

Grace confronts Macy, who tells her that Jaxon is a vampire. Macy explains that Jaxon used his venom to seal the wound before taking her to Marise – also a vampire – who bit Grace to repair the arterial tear. Macy reveals that Katmere is home to all sorts of paranormal creatures, including vampires, wolf-shifters, dragons (like Flint), and witches – two of whom are Macy and her father, Uncle Finn. Macy tells Grace that her own father was also a warlock, though he lost his powers after falling in love with Grace's mother.

Jaxon believes that someone is trying to kill Grace, though he does not know why. Grace's Uncle Finn wants to send her back to San Diego, but Grace objects; she tells her uncle about her blossoming relationship with Jaxon. Uncle Finn tells Grace that Jaxon and the members of the Order are "born" vampires – that is, they are vampires because of a genetic mutation, not because they were bitten.

3

Grace heads to the library, where Flint tells her that he can fly and shoot fire and ice; Grace thinks Flint is hitting on her. They find Jaxon and The Order in a violent fight with Cole, the alpha wolf-shifter, and his wolf-shifter friends. Jaxon sinks his fangs into Cole's neck and drains his blood but does not kill him. Jaxon tells everyone in the room that what he did to Cole was a warning.

After the fight, Jaxon tells Grace that there has always been tension between vampires and shifters. He is surprised when Grace says she is not scared of him and wants to be together – even after Jaxon tells the girl that he set off the earthquake the last time they kissed. They kiss and Jaxon bites Grace and drinks some of her blood. This is a sexual contact; it does not turn Grace into a vampire.

Jaxon also tells Grace about himself. He is the Vampire Prince, heir to the Vampire Kingdom. His older brother, Hudson, should have been the heir. But after learning that Hudson planned to use his mind-control abilities to make born vampires the leaders of the supernatural and mortal worlds, Jaxon killed his brother. Jaxon feels guilty about Hudson's death but believes he acted for the greater good. Jaxon once again expresses concern over Grace's safety at Katmere and promises to keep her safe.

Grace starts to adapt to her new reality as the only human in a school full of paranormal creatures. While walking to class in the tunnels with Mekhi one day, she is approached by Flint, who wants to tell her something. But Grace no longer trusts Flint and refuses to go anywhere alone with him. Flint warns Grace not to go anywhere alone.

That night, Grace goes to Jaxon's tower for their first official "date." Jaxon takes Grace outside to look at the Northern Lights; he uses his telekinetic powers to float them high above the castle. Jaxon then gives Grace a topaz necklace. When they go back inside, Jaxon makes tea from

4

a special blend that Lia gave him. As soon as he drinks the tea, Jaxon is overcome with rage and aggression; he tells Grace to leave immediately. Grace does so, but collides with Lia, who slaps Grace across the face. When Jaxon intervenes, Lia shoots him in the heart with a tranquilizer gun. Grace succumbs to the power of the tea and collapses.

Grace wakes up tied to an altar somewhere in the tunnels beneath Katmere. She frees herself from the restraints and runs toward the sound of screams, thinking Jaxon is in trouble. When the room is illuminated by candlelight, Grace sees that she is covered in blood. Suddenly a giant dragon picks Grace up; Lia catches the dragon, and they fight. To Grace's surprise, the dragon turns into Flint. Grace tries to escape, but Flint catches her. While Lia is temporarily incapacitated, Flint reveals that Lia killed Grace's parents in order to get Grace to Katmere. He says that the only way to stop Lia from following through with her "plan" (which Flint does not have time to explain) is for Grace to die. Flint starts to strangle Grace, but Jaxon bursts into the room and the two boys fight. Grace again tries to escape, but is stopped by a crazed Lia, who drags her back to the blood-soaked room. Lia tells Grace that she, Lia, was "mated" to Hudson; she also reveals that Grace is "mated" to Jaxon in the same way. Lia tries to tie Grace to the altar, but in a last-ditch effort to save herself, Grace grabs Lia's spellbook, rips out the open page and burns it.

Lia, furious, manages to tie Grace to the altar. Lia tells her prisoner that she spent months searching for Grace and planning her parents' "accident" – all as part of her grand plan to bring Hudson back to life. Lia begins chanting, and smoke starts filling the room.

Suddenly, Jaxon breaks into the room. Lia stabs him with her ceremonial knife and uses the black smoke that is filling the room to strangle Jaxon. But Grace grabs Lia's knife and stabs Lia in the chest. To save Jaxon from the black smoke, Grace inhales it. The smoke relinquishes its

5

hold on Jaxon; he manipulates the smoke into a ball and fires it straight towards Lia, who explodes into a cloud of dust.

Jaxon is still bleeding out from the stab wound, so Grace does the only thing she can think of – she forces him to drink her blood. Grace wakes up in Katmere's infirmary and is reunited with Jaxon, who reveals that he almost drank her dry – but she saved his life. While Grace recovers, Jaxon confesses that he does not know where Hudson is or if he came back to life.

Four days later, Grace is walking to class when the cloud of black smoke reappears. The smoke clears to reveal Hudson, who is holding a broadsword aimed at Jaxon's head. When Hudson swings the sword at Jaxon, Grace steps in front of the blade to save Jaxon – and the story ends.

The narrative then shifts to Jaxon's perspective. Readers learn that, while Grace does not know it, she is not an ordinary human, but the first gargoyle to be born in a thousand years. When she blocked Hudson's sword, she turned herself to stone. When the librarian tells Jaxon that Grace should be able to turn back on her own, Jaxon surmises that Grace is stuck with Hudson and is choosing to remain in stone form to prevent Hudson from endangering the school. The book ends with Jaxon vowing to break Grace out of her gargoyle form and separate her from Hudson.

## II.     Crush

It is four months after Crave ended. Grace has finally returned to her human form. She has no knowledge of how much time has passed and no memory of anything that occurred while she was in gargoyle form. The fact that she is a gargoyle shocks her.

To Grace's dismay, no one knows where Hudson is, or whether he is dead or alive. Grace is concerned that she may have unintentionally brought Hudson back to Katmere with her. Grace also feels guilt over months of missed messages from her best friend in San Diego, Heather – who knows nothing of Grace's life at Katmere or her supernatural identity.

Grace returns to classes, eager for a sense of normalcy. But she finds herself the center of attention from her intrigued classmates. To her dismay, she is assigned to do a class project with Flint, who uses the occasion to try to rekindle their friendship. Grace is nervous about spending time with Flint after he tried to kill her; their reconciliation is complicated by Jaxon, who wants to protect Grace from Flint. Gradually Grace thaws toward the dragon prince.

During a passionate moment with Jaxon, Grace becomes overwhelmed with conflicting emotions. A few days later, Grace again freezes when Jaxon leans in to kiss her. She is frustrated that they are unable to pick up where they left off and does not understand why they cannot do so.

Macy assures her cousin that being a rare gargoyle is cool and exciting. Grace asks Macy about the mating bond that Lia had mentioned; Macy explains mating bonds snap into place when two people who are destined for one another first touch. Grace feels conflicted when she learns that Jaxon knew they were mated when they first touched but did not tell her.

Grace finds solace in a painting for art class. During a sleepless night, Grace feels driven to go to the art studio, which is connected to Katmere by the underground tunnels. The next morning, Grace wakes up to find herself covered in blood. She has no recollection of how it got there, but she realizes it is not her blood. As she tries to recall the events of the night before, Grace and Macy learn that Cole, the alpha wolf-shifter, was attacked and drained of blood during the night.

Despite Macy's reassurance, Grace is unable to shake the suspicion that she had something to do with the attack on Cole. Grace tells her Uncle Finn and Jaxon about what happened; they are similarly perplexed and express concern that Cole and his wolf-shifter friends will seek revenge.

Grace, eager to learn more about gargoyles, heads to the library. The next thing she knows, she wakes up on the floor of a tower – again with no clue how she got there. Security footage

shows Grace stealing the Athame of Morrigan, a precious artifact that is housed in the library; she seems to be acting under someone's influence. Jaxon believes it could be Hudson, given his brother's power of persuasion. Suddenly Grace realizes that Hudson is not dead; he is trapped inside her mind.

Grace and her friends are determined to expel Hudson from her mind. Jaxon suggests that they seek help from someone known as The Bloodletter – an ancient vampire with a vicious reputation who lives in a remote ice cave under Denali. She is Jaxon's godmother; she raised him. Jaxon and Grace travel to her remote ice cave by "fading," which is how vampires move with great speed. When they arrive, Grace is surprised to find that The Bloodletter appears to be a sweet old lady, who knits placidly though she is surrounded by buckets of blood.

During their visit, Hudson starts making flirty remarks in Grace's head. The Bloodletter warns Grace that if Hudson remains in her mind for too long, he may completely take over. She encourages Grace to build a temporary wall in her mind, to shield her from Hudson's influence. But to get Hudson out of her head for good, Grace must find four magical items that will complete a spell: the eyetooth of an alpha werewolf, the moonstone from a powerful warlock, the full bone of a dragon, and the bloodstone from a born vampire. If Grace can locate those four items, she can cast a spell that will bring Hudson back to life. But in order to strip Hudson of his powers, Grace must also find a fifth item – the heartstone of the mythical Unkillable Beast, who lives near the North Pole.

Jaxon and Grace realize they already have two of the objects – the tooth of an alpha werewolf (Cole) and the moonstone from the hilt of the Athame of Morrigan – both of which Hudson acquired while controlling Grace's body. The Bloodletter assures them that she can acquire the bloodstone. But they must find the dragon bone and the heartstone. This last seems particularly

8

difficult; Jaxon tells Grace that almost no one makes it back alive from visiting The Unkillable Beast.

Though no longer able to control Grace's body, Hudson's voice continues to be a consistent presence in her mind; he banters with her throughout the day. He is sarcastic and brilliant, deeply wounded from past trauma. He is also frustrated to be trapped in Grace's mind. Grace, for her part, is embarrassed that Hudson knows all of her thoughts – including those about her relationship with Jaxon, his brother. When Jaxon surprises Grace with a romantic dinner, it does not go according to plan thanks to Hudson's jealous comments and apparent rivalry with his brother.

Grace and Jaxon learn that gargoyles are considered to be protectors of magic and the different factions that wield it. Jaxon confesses to Grace that his father, Cyrus the Vampire King, killed all the gargoyles long before Jaxon was born, in order to acquire more power for himself and Jaxon's mother, Delilah. His father killed the Gargoyle King with his "eternal bite" – a deadly bite that no one has ever survived. Because Cyrus annihilated the gargoyles, he and Delilah now sit at the head of The Circle – the ruling body that governs all paranormals. Hudson points out to Grace that Cyrus killed the gargoyles after convincing his allies that the gargoyles were going to side with humans who were planning a war. Hudson insists that he is nothing like his father, but Jaxon warns Grace that Hudson is too powerful and dangerous to be let loose on the world.

When Jaxon tries to kiss Grace goodnight, she feels awkward about Hudson's presence and tells Jaxon that "three's a crowd." Back in her room, Grace grapples with confusion about the relationship she and Hudson seem to be developing.

During lunch, Grace and her friends discuss the upcoming Ludares tournament – a high-stakes magical tournament, which involves passing a heated ball between team members while avoiding magical obstacles. The prize for the Ludares winners is a bloodstone – the very thing

9

Grace needs to get Hudson out of her head. So her team – which includes Jaxon, Macy, Mehki, Flint, Xavier (a cheerful wolf), Eden (a badass dragon) and Gwen (a witch friend of Macy's) – is determined to win. Uncertain about employing her gargoyle powers, Grace is reluctant to compete; but as they train for the tournament, Grace becomes confident in her ability to fly and learns that she can channel magic from others. With Macy's help, Grace practices channeling magic to light a candle.

During the conversation about Ludares, Grace learns there is another war brewing. Hudson mentions that Cyrus and the wolves are teaming up with "made" vampires (ones who become vampires by being bitten, not via genetics) to wipe everyone else out of existence. Grace and her friends also discover that she seems to be immune to magic. This explains why, when Macy offers to use her witch powers to do a "glamour," on her cousin, the spell would not work.

The group is nervous about Hudson's unpredictable nature. Flint is particularly nervous; he believes that Hudson was responsible for the death of his (Flint's) brother. But Grace defends Hudson to her friends; the more time she spends with him, the deeper their connection and the better she likes him. She also understands him better: as they grow closer, Grace learns more about Hudson, including the fact that anything he did that alarmed Jaxon was necessary to prevent even greater evils, including a war among supernatural beings. Unsure of whom to believe, and sensing a growing attraction to Hudson, Grace finds herself caught in a "love triangle" between the brothers, for both of whom she cares deeply.

Grace soon learns that Hudson – who has no access to blood while trapped in her mind – has been pulling energy from her mating bond with Jaxon in order to sustain himself. Jaxon suggests that, rather than find the items needed for the spell, they simply break their mating bond and cut off Hudson's energy supply. He tells Grace that The Bloodletter once gave him a spell that

10

would break their mating bond, but he no longer has it – he threw it out once he met Grace. Grace does not want to break their mating bond, and Jaxon ultimately agrees.

At a pre-Ludares assembly the Katmere community is surprised by the arrival of The Circle, led by Cyrus and Delilah Vega, the Vampire King and Queen. The members of The Circle – which includes the Dragon King and Queen (Flint's parents) and the leaders of the other supernatural factions – want to meet the first gargoyle born in a thousand years. Jaxon and Hudson both warn Grace to stay away from Cyrus; Hudson even exerts control over Grace to prevent her from moving when Cyrus unexpectedly calls her to the stage. She is furious with Hudson for doing this.

Before the Ludares tournament begins, Flint tells Grace that he is gay and has been in love with someone who he cannot be with. She realizes that he loves Jaxon.

Grace and her friends win the Ludares tournament. Immediately thereafter the whole team sets out on a quest to the dangerous dragon boneyard at Katmere, where – despite being surrounded by exploding bones – they obtain the dragon bone needed for the spell.

The next day, the group attends an assembly to receive their prize for winning the Ludares tournament – the bloodstone of a born vampire. To everyone's surprise, Delilah announces that The Circle intends to take Grace back to the Vampire Court. Following Hudson's advice, Grace boldly challenges for a seat on The Circle, as the only existing gargoyle. To win her seat, Grace and Jaxon must compete in a dangerous, high-stakes contest called the Trials. No challenger has prevailed in  the Trials in a thousand years.

Grace and her friends discuss how best to retrieve the heartstone of The Unkillable Beast, so that Grace can get Hudson out of her head and disarm him before the Trials. Though Grace trusts Hudson, her friends insist that they retrieve the fifth item so Hudson will be stripped of his

11

powers. The group heads out on a quest to a volcanic island located near the Arctic Circle, where they find The Unkillable Beast, a monstrous creature made of jagged rock. The Beast is guarded by guards from The Circle; Mekhi is gravely injured when the group confronts the guards, and without his help, the group must reevaluate their plan to kill The Unkillable Beast. They decide to set a trap using Xavier as the bait.

When they enter The Unkillable Beast's cave and see him, the group realizes they cannot kill this creature. While trying to protect Macy (with whom he has fallen in love), Xavier is killed.

Grace decides to try to communicate with the Beast directly, and they are able to communicate telepathically. Grace realizes that the voice who has been warning her of danger since she became a gargoyle – which she initially thought was just her "gargoyle voice" – is actually the Beast. Grace learns that the Beast is not a monster, but a gargoyle like herself – and that he is immune to magic, just as she is. The Beast has been chained and tortured for centuries. He wants to be freed, but Grace cannot break his chains; she vows to return and release him.

The Beast reveals that the heartstone is not a jewel, but rather is his stone heart; he offers it to Grace, but she refuses to take it, understanding that this would result in the Beast's death.

The friends return to Katmere with only minutes to spare before the Trials are to begin. Before they can get to the arena, they are confronted by Cole, the alpha wolf-shifter. Cole has retrieved the spell that Jaxon threw away. He uses it to break the mating bond between Jaxon and Grace. Jaxon and Grace experience immense physical and psychological pain when Cole casts the spell; it incapacitates Jaxon and renders him incapable of enduring the Trials with Grace. But emboldened by Hudson's encouragement, Grace makes her way to the arena alone. She uses the four magical objects to get Hudson out of her mind; the spell works, and Grace sees Hudson

12

standing before her. Hudson tells her that he has hidden his magic deep inside her memories. She enters the arena and the Trials begin.

Grace quickly realizes that the Trials are rigged. But driven by a renewed sense of determination – and after finding the magical powers Hudson has stored deep in her memories – Grace defeats her opponents, wins the Trials and earns the title of Gargoyle Queen.

 Cyrus is furious that Grace has won. He claims that Grace cheated in the Trials by using Hudson's magic and, declaring that she should be punished with death; he administers his "eternal bite." Fatigued from the Trials, Grace is unable to defend herself; she is at the brink of death. But Hudson buries her alive under stones and Grace's gargoyle body begins to absorb the stone. She survives.

## III.    Covet

Grace is overcome with grief and guilt over the death of Xavier. But with graduation looming, she must finish her coursework. At the same time, she must grapple with her lingering feelings for Jaxon in light of learning that she and Hudson share a mating bond. As Hudson starts spending time with Grace and her friends, Jaxon, sensing a shift, ends his relationship with Grace.

Though heartbroken over her breakup with Jaxon, Grace's attraction to Hudson deepens. Hudson admits to Grace that their mating bond snapped into place when they first touched. He also suggests that there was something suspicious about Grace and Jaxon's mating bond, because it could be broken by a spell, whereas true mating bonds break only at death.

Grace tries to maintain a friendship with Jaxon, but he withdraws from her. She visits his tower, only to find that it has been converted from a cozy and personal room she once knew into a cold, stark room filled with gym equipment, Grace becomes concerned about Jaxon's emotional state.

13

Seeking answers about her mating bond with Jaxon, Grace and Hudson visit The Bloodletter, while Jaxon travels to the Vampire Court to learn more about Cyrus's plans. When they arrive at her cave, Grace and Hudson find two human corpses from which blood is draining into a bucket. The Bloodletter confesses to Grace and Hudson that she cannot restore the mating bond between Grace and Jaxon because it was not a true mating bond – she herself created it. The Bloodletter explains that a group of witches (one of them Grace's father) came to her, concerned about their coven and the fate of the world. They asked her to help them bring the gargoyles back to restore balance. The Bloodletter agreed to give them a gargoyle child; but in return, she demanded that the child be mated to Jaxon unless either of them refused the bond.

Seeing that Grace still loves Jaxon, Hudson asks The Bloodletter to break his mating bond with Grace, but The Bloodletter admits that she cannot undo a true mating bond. The only way to break it would be to find The Crown – an object thought to bring balance to the universe and give whoever wears it infinite power. She reveals that Cyrus has long been looking for the Crown, but has been unable to find it.

To get the Crown, Grace and Hudson must return The Unkillable Beast to his human form, by breaking the enchanted chains that restrain him. To break the chains, they must locate the Blacksmith who forged them.  No one knows where the Blacksmith is. Grace tells The Bloodletter that she is able to communicate with the Beast; she can hear his voice in her head, warning of danger.

Grace and Hudson return to Katmere to find Jaxon, who has just returned from the Vampire Court. Jaxon tells his brother that Cyrus has issued a warrant for Hudson's arrest; he plans to send his son to the notorious supernatural prison known as the Aethereum, from which escape is impossible. Shortly thereafter, Grace and Jaxon discover Hudson surrounded by aggressive wolf-

14

shifters. Hudson defeats the wolves in an astonishing display of strength, which surprises everyone. Later, the friends discuss the increasing number of altercations between supernatural factions led by vampires, on the one hand, and werewolves/shifters on the other; the atmosphere at Katmere has become exceedingly tense. Grace and her friends surmise that Cyrus is behind the violence at Katmere. Hudson shares that Cyrus had previously planned to take control of Katmere and hold the students hostage in order to blackmail all the major ruling families (whose children attend the school) to join his attack on humankind. Learning that Cyrus and Delilah plan to attend their graduation ceremony, the group is determined to find the Crown prior to graduation.

Grace and Hudson decide to give in to their mating bond and pursue a relationship.

Hoping to find the Blacksmith, the group travels through a magic portal (created by Macy) to Giant City – a secret city of sequoia redwoods hidden within a lush forest that is home to giants known for their metalwork. Grace and Hudson are led to the Blacksmith's wife, who tells them the Blacksmith has been imprisoned in the Aethereum for centuries.

Unable to complete their quest before graduation, the group returns to Katmere to complete final exams. When the tests are done, Flint invites Grace to the Dragon Court's upcoming Wyvernhoard festival, where Flint plans to introduce his parents to his boyfriend, Luca. Jaxon tells Grace that he cannot attend the festival, because he plans to go to London to try to get the charges against Hudson dropped. Grace grows concerned about Jaxon's increasing emotional distance.

Grace and her friends (minus Jaxon) travel by portal to New York City, home to the luxurious Dragon Court and Flint's parents, the Dragon King and Queen. As soon as they arrive, the Dragon Queen, Nuri, orders her guards to seize Hudson, whom she blames for the death of her son, Flint's brother. Hudson agrees to be taken into custody as long as his friends remain safe and free. Grace confronts Nuri about Hudson's arrest and the two discuss the ongoing battle between

15

dragons and witches, on one hand, and wolves and vampires, on the other. Nuri agrees to release Hudson and help take down Cyrus, believing it will keep Flint safe. Nuri also tells Grace that she should let Hudson go to the Aethereum, where he will be safe until Cyrus is defeated. She tells Grace about The Crone, a mysterious witch who helped build the prison and who holds the secret to escaping it.

After rescuing Hudson and attending an extravagant gala in honor of Wyvernhoard, the group reunites with Jaxon and sets off on dragonback to visit The Crone on her secluded island. The Crone is willing to talk to her visitors – all but Jaxon, who is ordered to remain outside. The Crone says that he has no soul.

The Crone tells the young people about twin sisters named Cassia and Adria, born of two deities. Adria, the Goddess of Order, created humans; Cassia, the Goddess of Chaos, created paranormals. But humans and paranormals were immediately at odds. Unable to find balance between order and chaos, the sisters could do nothing but watch. Their father created gargoyles, not from order or chaos but from the source of magic, in order to balance out the forces caused by humans and paranormals. Grace learns from The Crone's tale that gargoyles are uniquely able to straddle both the human and paranormal worlds and that they have an innate desire to become peacemakers.

The Crone tells Grace that she is not actually immune to magic; she is susceptible only to the most ancient forms of it. She also explains that gargoyles went extinct because they were betrayed by the Gargoyle King, who sided with the paranormals over the humans – even to the point of becoming mated to a paranormal, which broke the balance between order and chaos. One of the Gargoyle King's men, eager to stop what he saw as a threat against his kind, told Cyrus the

16

secret of how to kill gargoyles. He believed that Cyrus would kill only the Gargoyle King, but of course Cyrus killed all of the gargoyles.

The Crone further reveals that Cyrus lost his magic long ago, so he rules with fear and ruthlessness. His eternal bite is not magical, but venomous. The group realizes that Cyrus is seeking the Crown in order to restore his magical powers.

The conversation then shifts to the Aethereum. In exchange for a future favor, The Crone gives Grace three toxic flowers that will allow anyone who ingests them to escape from the Aethereum by mimicking death.

Back at Katmere, the friends learn that Jaxon's soul broke when his mating bond with Grace was broken. Grace's soul did not break only because Hudson, who was still in her mind, held it together. Grace hopes to find the Crown to mend Jaxon's soul and stop him from turning into a monster – which is what happens to a soulless being.

The group attends an anticlimactic graduation ceremony and prepares for a celebration later that night. But Hudson is arrested by the Nuri's guards; he is to be sent to the Aethereum. Grace insists that she has the right, as Hudson's mate, to accompany him. To their surprise, Cyrus announces that The Circle has issued an arrest warrant for Flint, because of his earlier attempt to kill Grace. All three young people are sent to the Aethereum, which is located in New Orleans. As soon as they enter bracelets suppress their magical powers.

Once inside the prison, they meet Remy, a warlock who was born in the Aethereum and who can see the future. They also meet Calder, a flirty yet fierce manticore. The five of them are locked in a cold metal cell, which they can leave only to attend "Hex time." The five friends must survive the Chamber, a magical torture device that forces prisoners to repeatedly relive their worst

memories. Because of Remy's unique powers, he can avoid the Chambers – a privilege he is able to extend to Grace. But Hudson, Flint, and Calder experience multiple nights of torture.

During Hex time, the friends play games against other inmates, under the watchful eyes of Windigo guards, in order to earn money that they will need to escape. They amass a significant amount of gold.

The friends arrives at the Pit, a bustling marketplace filled with colorful stalls where all types of food and goods are sold. At a fortune-telling stall run by a troll, Grace draws a tarot card that reveals trouble to come. After a lunch of tacos, the group locates the Blacksmith – a giant named Vander Bracka – imprisoned in a large furnace room. Vander is initially reluctant to escape; he has lived most of his life in the prison. But Vander agrees to make the key that Grace and her friends need to unchain The Unkillable Beast in the hope of being reunited with his mate.

Hudson heads to the fighting rings in the Pit, hoping to earn more gold. Remy takes Grace to a tattoo parlor; he insists that the tattoo will allow Grace to pull magic that Remy has never been able to access, which will assist in their escape. When the friends reunite, it is clear that Hudson has been severely beaten while fighting. However, he has earned many bags of gold.

Grace gives Vander one of The Crone's magical flowers, but it has no effect on him. Calder takes the second flower and becomes incapacitated. Remy is insistent that he consume the last flower because, in his visions of the future, he escapes from the prison using one of the flowers. But this means there is no plan for Grace, Flint, and Hudson to escape.

Remy leads the group to Charon, a young boy with a god complex who claims to run the prison. They offer him their gold, but not enough to get them out. Charon does, however, agree to let the friends go if they can defeat two giant prison guards in front of a crowd of spectators. Though the crowd is expecting a bloodbath, Grace and Hudson defeat the guards by dropping

18

chandeliers on them. Charon tries to renege on his promise, but he eventually agrees to allow five of the six companions to leave – though he refuses to remove the bracelets that are inhibiting their magical powers. Remy, having seen in a vision that he will escape using one of The Crone's toxic flowers, agrees to stay behind while the other five escape. Grace, relying on her new tattoo, finds and frees Remy's magic, and he removes their restraints. After an emotional farewell, Grace, Hudson, Flint, Vander, and Calder leave Remy behind in the Aethereum and emerge into a cemetery, where they part with Calder and Vander Bracka. Before parting ways, Vander gives Grace the key that will unlock The Unkillable Beast's unbreakable chains.

Grace, Hudson, and Flint reunite with their Katmere friends and set off to free The Unkillable Beast. But Cyrus and his army of vampires and witches are waiting for them on the Beast's island. A violent battle ensues; Flint is almost killed, and Luca is killed. Jaxon tells Grace to channel his magic to heal Flint. The true extent of Hudson's powers – and his potential for destruction – is revealed as he turns a group of vampires into dust with a single look. Cyrus and his army retreat when Hudson threatens to destroy them all.

Flint awakens. Jaxon is on the brink of death from sacrificing his power to save Flint's life and being bitten by his father. Nuri, the Dragon Queen – struggling with guilt over aligning with Cyrus and grateful for what Jaxon has done to save her son – gives Jaxon her dragon heart. This saves Jaxon's soul.

With Cyrus's army gone, Grace uses Vander's key to unlock the chains restraining The Unkillable Beast, who transforms from his gargoyle form into a man. Having been stuck in his stone form for thousands of years, the Beast struggles to communicate with Grace and her friends. He does not seem to know where the Crown is and implies that his mate requires protection. But when Grace promises the Beast that she will protect his mate in exchange for the Crown, a magical

tattoo of a Crown appears on her palm. Grace promises to deliver the Crown to the Beast's mate. The Beast runs out of the cave.

In a final chapter narrated by Hudson, the group returns to Katmere and are horrified to find the campus has been destroyed. Covet ends with Grace and her friends learning that Cyrus has kidnapped Katmere's students.

## IV.    Court

Court begins where Covet ended, with Grace and her friends preparing for war against Cyrus while mourning the loss of Luca and learning that Flint has lost his leg. Marise, the school nurse and lone survivor of Cyrus's attack, tells the group that Cyrus is draining the kidnapped students of their magical powers, thus endangering their lives.

After a night of much needed rest, Grace finds the Beast, in his human form, sitting at a chess table. When their hands touch, Grace and the Beast turn to stone and are transported to the Gargoyle Court, an opulent medieval castle in Cork, on the east coast of Ireland. Here Grace discovers that the Beast is Alistair, the Gargoyle King, ruler of the Gargoyle Court, and rightful owner of the Crown. The Beast tells Grace that she is his descendant, his great great-great-great-great granddaughter (many generations removed), and that she is now the owner of the Crown. Alistair gives Grace an ornate ring, symbolizing the transition of power.

Grace learns that there are actually thousands of gargoyles in existence, waiting to reclaim their place in the world under their rightful Queen. Alistair introduces Grace to the Gargoyle Army and to Chastain, the Army's lieutenant general, who feared Alistair was dead and is relieved to see him alive. But without warning, Grace finds herself back at Katmere; Alistair is nowhere to be found.

A wolf named Dawud arrives with a warning: the wolves have joined Cyrus and are on their way to Katmere to capture Grace and her friends. Dawud wants to help defeat Cyrus, who has kidnapped his brother. A pack of wolves suddenly attacks; Hudson is able to use his great power to vanquish them. Knowing that more wolves will soon appear, the friends decide to trust Dawud. They help Macy to create a portal to the Witch Court in Italy, while Jaxon and Hudson fend off more arriving wolves. With seconds to spare, the entire group escapes through the portal. In order to make it through the portal, however, Hudson is forced to use his powers to destroy Katmere. With each feat, Hudson becomes more and more drained.

No sooner do the friends arrive at the opulent Witch Court than they are told to leave. To Macy's dismay, the Witch King and Queen refuse to help them; they care only about their daughter, who is one of the captured Katmere students. Hoping to gain their assistance, Grace reveals that she has the Crown. When the Witch King informs Grace that the Crown is powerless without the Gargoyle Army, Grace tells him that she intends to lead the Gargoyle Army to defeat Cyrus. The Witch King and Queen tell Grace that if she can use the Army to save their children from Cyrus, they will help her defeat him once and for all.

Outside of the Witch Court, Grace and her friends find themselves on the streets of an Italian town. They encounter a helpful witch, who informs them that the Crown allows the person wielding it to strip a paranormal of his powers. The witch also reveals that Macy's mother, long thought to be dead, is alive and living in the Vampire Court. She even creates a magic prosthesis for Flint.

The group flies on the back of the dragons to the Gargoyle Court in Cork, Ireland, only to find the Court in ruins. Hudson rents a place for them to rest and recover. While they recuperate,

21

Hudson confesses that he wants Grace to use the Crown to strip him of his powers. He feels guilty about the damage he has caused and is afraid of how he might use these powers. Grace refuses.

The next day, Hudson (who while trapped inside Grace got a good look at her innards) tells Grace that he thinks that if Grace touches a green string deep inside of her, she can manipulate time – a power possessed only by The Bloodletter. When Grace tries holding the green string, the room explodes around her.

Hoping for insight into Grace's green string and the whereabouts of Macy's mother, the group travels by portal to The Bloodletter's ice cave in Alaska. Before entering the cave, Grace reveals to Jaxon that their mating bond was manufactured; Jaxon, it turns out, already knew.

The Bloodletter reveals that she is Cassia, the Goddess of Chaos, twin sister of The Crone (Adria) and creator of paranormal creatures. She also tells Grace that she (The Bloodletter) is Alistair's mate and Grace's ancestor. She and her sister are demigods, and Grace, as her descendant, has demigod powers as well.

The Bloodletter warns that Grace needs the Gargoyle Army to protect her from Cyrus, who wants to take her demigod powers and will stop at nothing to get them for himself. The Bloodletter explains that Cyrus tried to destroy the Gargoyle Army by using gargoyles' ability to channel magic to poison all gargoyles simultaneously. Before the gargoyles died, The Bloodletter froze all gargoyles in time. She gave Chastain a God Stone to prevent the poison from killing the Army for as long as they remained frozen. To save the Army, Grace must learn how to use her powers to connect with all gargoyles.

But with Grace's demigod powers not yet fully developed, Grace and her friends must find an antidote to the poison so they can unfreeze the Army. The antidote – the Tears of Eleos – can only be obtained by winning the Impossible Trials, a series of challenging tests. Grace and her

22

friends are transported to St. Augustine, Florida, where they discover a saltwater taffy shop through which they can access the Impossible Trials arena. The shopkeeper, Tess, tells the group that no one has ever survived the Trials.

The group, divided about whether to confront Cyrus immediately or wait until they have a concrete plan to save the students, returns to the house Hudson rented. Without telling their friends, Macy, Flint, and Mekhi go to the Vampire Court. Grace, Hudson, Jaxon, and Eden follow their friends; they find Cyrus holding the Katmere students hostage and draining them of their powers. To access the Court, Hudson takes them through his secret lair, where Cyrus tortured him during his childhood.

At the Vampire Court, they are captured and reunited with their friends (and Uncle Finn) in a dungeon. Also in the dungeon is Macy's mother, Rowena, who was tortured by The Crone and by Cyrus – a fact of which Uncle Finn was aware but powerless to do anything about.

Cyrus appears, along with a young girl named Isadora. Threatening Grace and her friends with torture and certain death, Cyrus demands that Grace bring him the God Stone; if she does so, he agrees to free the children trapped at the Vampire Court. But Cyrus threatens to kill one of Grace's friends each day until the God Stone is in his possession. To prove that he is serious, Cyrus impales Liam, and Isadora, who can siphon souls, drains Liam of his powers.

Cyrus releases Grace and several of her friends to search for the God Stone. But he insists that Isadora – who is revealed to be Jaxon and Hudson's half-sister – accompany them. As they will learn, Isadora, like Hudson, was tortured by their father while growing up in his court.

Arriving at the frozen-in-time Gargoyle Court, Grace reveals her plan: she will give Cyrus the God Stone to buy time while they compete in the Impossible Trials for the Tears of Eleos. Believing that the Gargoyle Army would refuse to help them, the friends pose as trainers, and

23

Grace tells Chastain that training is necessary for the Army's survival. During the training Grace realizes that the God Stone is the ring on Chastain's finger. She challenges Chastain to a battle, freezes him in time and tries to remove the ring. But the Gargoyle Army comes to Chastain's defense. The angry general tells Grace that she is not worthy of the Army's respect. Grace's attempt to meddle with time earns her a visit from the God of Time, who unfreezes time and so puts the gargoyles at risk of dying from Cyrus's poison. Grace tells Chastain that the Army must turn into stone to avoid the effects of the poison; she begs Chastain to trust her and give up the ring for the safety of the Army. Chastain accepts that sacrifice is the true calling of a gargoyle; he gives her the ring and turns into stone.

Grace and her friends reunite with Remy and Calder, and together they return to the Vampire Court. They deliver the God Stone to Cyrus, who of course refuses to hold up his end of the bargain. While confronting Cyrus, Grace accidentally freezes herself and Cyrus together in time and finds herself trapped in Cyrus' memories. Trapped in his mind, Grace secretly watches as Cyrus and another vampire discuss their plan for world domination, which include sacrificing Delilah the Vampire Queen. After Grace and Cyrus unfreeze, Grace uses the information she gathered while frozen in Cyrus' memories to make a deal with Delilah: Grace will help Delilah get vengeance against her husband in exchange for the students' freedom.

Rowena confesses that she cannot leave the Vampire Court until she fulfills her promise to The Crone, which was to bring The Crone her daughter – Isadora. Grace and her friends take Isadora to The Crone's island, but she demands to return to the Vampire Court.

Once Rowena's promise to The Crone is fulfilled, the entire group, including Macy's mother, is able to leave the Vampire Court. They travel by portal to the Witch Court, where they

24

prepare for the Impossible Trials. Rowena, grateful for Grace and Macy's help, gives them runes and potions that will aid them during the Trials.

Grace and her friends head back to St. Augustine. Grace does not want her friends to risk their lives in order to save the Gargoyle Army, but they insist on competing with her.

In the arena, spectators watch as the group faces and surmounts three of the four dangerous trials they must complete. When they make it to the fourth and final round, Remy throws a rune that reveals a terrifying translucent creature who must be killed. Their powers have no effect on the beast, whose size fluctuates as it moves. Working together, the friends execute a daring to lure the beast into portals. Although Grace injures her wing in the process, the plan succeeds. But the beast appears to be in pain, and Grace realizes that she cannot kill the creature without violating her fundamental values. Instead, Grace channels power from her friends to heal the beast, who turns out to be the young son of Tess, the owner of the saltwater taffy shop.

Grace's sacrifice and empathy allow the friends to win the Trials and earn the antidote. But their success comes at a cost: two more members of The Order, Rafael and Byron, are killed, and Mekhi is gravely injured.

Grace drinks the Tears of Eleos, which cures the poisoned Gargoyle Army. Nonetheless, Chastain refuses to let her connect with the rest of the Army as punishment for her lying and stealing to get the God Stone. Chastain tells her that, because of her actions, the Army will not respect Grace as their Queen and leader.

The group returns to Katmere, where Cyrus and his army are waiting for them. In an intense and violent battle, the friends face off against witches, dragons, vampires, and wolves. After Calder is killed and others injured, Grace decides to confront Cyrus directly. Cyrus uses the opportunity to strap Grace and her friends to a machine designed to drain their powers, funneling their powers

25

to himself. Finding power deep within her, Grace is eventually able to release her friends from the restraints. Cyrus orders his troops to attack, but to Grace's surprise, the Gargoyle Army suddenly appears, vowing to defend their Queen. Armed with both the Crown and the Gargoyle Army, Grace strips Cyrus of his powers.

An epilogue told from Hudson's perspective reveals that three months later, Grace and Hudson have moved to San Diego, where Grace, now in college, plans to move the Gargoyle Court. Court ends with Grace and her friends setting off on another adventure.

**ADDENDUM D**

This addendum summarizes the principal characters in Plaintiff's and Defendants' works.

## I.    BMR/Masqued

**Anna/Mia**: BMR/Masqued's heroine is a sixteen-year-old high school senior named Anna – or in Masqued 2014, Mia – St. Clair. Anna/Mia is tall and slender, with long, dark hair and an olive complexion. Over the course of the story, she will develop marques (glyphs) on her neck and back, which will mark her as special.

Anna/Mia has lived in Anchorage, Alaska, for almost a decade, since the death (which may not really be the death) of Dante DeWinter, her father (or the person she believes to be her father). She lives with Marcheline, her mother (or the person she thinks is her mother) and her Aunt Brie (or Rose). In some versions, the heroine's real mother is Elise, the High Priestess of Avalon, who beckons the heroine through a mirror into an alternate dimension. In others (Masqued 2013 and 2014), Marcheline (sometimes spelled Marchalene, or just Shalene) is in fact Anna/Mia's biological mother, while Elise (called Marise in Masqued 2014) is her grandmother.

Anna/Mia is smart, able to quote literature and enjoys discussing philosophy with her friend Brendan. Though unaware of the full extent of her own supernatural identity, Anna/Mia knows that her beloved aunt is a witch, a member of the Kindred Order. She correctly intuits that her mother once had supernatural powers or practiced the "Craft" as well. She resents the womens' secrecy about her family's past and about her father's death, the memory of which has been dulled by magic teas given to her by her aunt, a healer.

Anna/Mia has a love for tarot cards, which connect her to the magical world. She is intuitive, spiritual, and guided by visions and dreams, which escalate as she approaches her seventeenth birthday. She knows that, on that day, she will experience some sort of initiation, and

will have to make some kind of a choice. As that day grows closer, her "talents" or "powers" become increasingly apparent.

Anna/Mia's goals throughout the novel are two. The first is to find and rescue her father, who is not dead at all, but a prisoner of malign supernatural forces. The second is to learn more about who she is, precisely what her initiation will involve, and what it portends for her future. The climax of the story is set up by Anna/Mia's discovery about her true parentage, as well as her learning that she is the Chosen One (called The Nyx, after the ancient Goddess of the Moon, in later drafts) – a girl of mixed light and shadow heritage who is predicted to tilt the balance between light and shadow when she turns seventeen and comes into her powers.

**Marcheline/Marchalene (Shalene):** Shalene is the woman Anna/Mia believes to be her mother, and who has raised her as her mother. She is the widow of Dante DeWinter. Shalene is a Kindred witch who has given up the Craft. She is the oldest daughter of the High Priestess of Avalon; she rejected her calling to inherit the High Priestess' mantle in order to marry Dante. In Freeman's early drafts, Shalene is not Anna's biological mother, but her aunt; in others (Masqued 2013/2014) she is Anna/Mia's biological mother. In some versions (Masqued 2013/2014), Shalene was once the lover of Julian the villain (see below); in earlier drafts, her older sister Elise was Julian's lover. Shalene is very beautiful but looks nothing like Anna/Mia. She is an artist of some renown. Shalene has incurred Anna/Mia's resentment, both for her overprotectiveness and for her refusal to tell her daughter about herself or allow her to read tarot cards and practice the Craft. She has tried to give Anna/Mia a normal life and does not want the girl to hear or to accept her true calling.

**Brienne/Brynne (Brie):** Brie is Anna/Mia's beloved aunt, the person who best understands her. She is a practicing witch and, as her niece learns, she is Kindred – the most powerful type of

2

witch, in tune with nature and charged with protecting the earth. Brie works as a veterinarian. She is also an herbalist, a cook, and a brewer of teas, some of which are designed to suppress Anna/Mia's early memories so she can have a normal life. She favors telling her niece more about herself, but she defers to Shalene. In Masqued 2016, her name is Rose.

**Ash/Roman**: Anna/Mia falls in love with an attractive new boy who arrives at her high school on the opening day of the story. Ash MacKay (Roman in Masqued 2014) is variously a werewolf, a Berserker (a Viking warrior), or a shapeshifting Sentinel. Ash/Roman is the heroine's one and only boyfriend in every draft of the novel. He is tall and supermodel-level handsome; he has amber eyes rimmed in black and he looks like a young Viking. Ash/Roman rides a motorcycle or drives an SUV and wears black leather clothes to match.

Ash/Roman is the son of Baen and Caitlin MacKay, archeologists who are guest-teaching a course called Ancient Global Studies at West High School, where Ash/Roman and his twin sister Lily are newly enrolled students. Ash/Roman and Lily help their parents on digs and so are conversant with their work. Ash/Roman is distraught over the death of his older brother, Dylan, who fell into a crevasse on a recent dig; he is convinced that Dylan was murdered and has sworn to avenge him. He wears tattoos in honor of his brother and has magical rings of black, silver, and gold on his fingers, which Anna/Mia can see when inebriated.

The MacKays are shapeshifters – they can turn themselves into wolves, and in later drafts, into bears and big cats. They are members of the ancient Order of the Sphinx, to which Dante DeWinter may also have belonged. The Order is looking for the Nyx, believing she will choose to align herself with her demonic ancestors rather than her ancestors of light – including an evil Druid known as Ronan or Aedan O'Faolain, who is linked to the Nyx in a prophecy. Like all members of the Order and everyone in his family, Ash/Roman is sworn to kill the Nyx.

3

Ash has the ability to get people to do what he wants – to compel them – but he does not like to use it, especially on Anna/Mia, whose feelings for him he does not wish to force. He has an affinity for animals. He has just turned seventeen and is newly initiated; he does not have full control over his powers. But his bite can heal, although if he bites someone, he will be able to tell when that person is in trouble, and he has a heightened desire to protect that person. Ash/Roman does take care of Anna/Mia, especially after she saves his mother's life. Except in one instance, he offers to run interference with Taylor; Anna/Mia welcomes and does not resent his care.

**Amanda/Samantha**: Amanda (Samantha in Masqued 2014) is Anna/Mia's oldest friend in Anchorage. The two girls have been like sisters since Anna arrived from California. However, Amanda's interests have recently diverged from Anna/Mia's – she has joined the cheerleaders and become close to Taylor Vaughan and the other Mean Girls at school – and at the outset of the novel she rejects Anna/Mia. She subsequently invites Anna/Mia to a high school party, at which Anna/Mia gets drunk on spiked punch. Over the course of the drafts, Amanda/Samantha changes from a normal human girl to a half succubus (one parent is demon soul sucker). She tells Anna/Mia that she believes they were drawn together because they both have demonic ancestry. She is used by Taylor and Julian to entrap Anna/Mia. Her boyfriend is Carter, a jock.

**Taylor Vaughn:** Taylor is the prettiest and most popular girl at school; she is also the ultimate Mean Girl. In BMR (2010/2011), Taylor is also a lifelong friend of Anna's, but in the Masqued drafts Anna/Mia does not like Taylor and resents her for luring Amanda away. Taylor is furious with Anna/Mia because Ash/Roman is immune to Taylor's charms and likes Anna/Mia instead. In Masqued 2013 and 2014, Taylor, like Amanda/Samantha, is revealed to be half succubus; in Masqued 2014, Taylor is revealed to be Mia's half-sister, and fully demonic. In all iterations of the story, even when she is just a human girl, Taylor plays a pivotal role in delivering

4

Anna/Mia to Julian, the villain. Taylor takes Anna/Mia to a party and gets her to drink alcohol, which makes her drunk. She wears a snake ring on her finger; it is a cursed object, one of twelve being sought by the MacKays. Her boyfriend is Jake, a jock.

**Brendan**: Brendan is one of Anna/Mia's oldest friends and, aside from Amanda/Samantha, her dearest friend. He is a very good-looking biracial guy who is extremely popular (he is the class president). He is also secretly gay, a fact known only to Anna/Mia. For years he and Anna/Mia have (in some versions) talked politics, philosophy, and religion. He comforts Anna/Mia when Amanda/Samantha (and Taylor) diss her and introduces her to his friends from the school newspaper, who become her new friend group: Rachel Holland, Jenny Holland and Mason McGarner (or Garner, in other versions). Brendan is the person Anna/Mia asks to take her home when she becomes leery of Ash/Roman; he is, therefore, somewhat suspicious of Ash/Roman. In Masqued 2013, Brendan is revealed to be a supernatural being (a Faery).

**Rachel**: Rachel Holland is whip smart, editor of the school newspaper (and suspected of being its gossip columnist), skeptical of the nostrums fed by their teachers (especially Baen and Caitlin MacKay) and hater of all Mean Girls. She has burgundy-black hair and a "Gothesque" style, dressing in black platform boots, fishnet stockings, and studded accessories. In all versions prior to Masqued 2014, she is the cousin of Jenny, another member of their group. In Masqued 2014, she is Brendan's cousin. In Masqued 2013, she is revealed to be a supernatural creature (a ban sidhe, or banshee in Anglicized spelling). She is so smart and so difficult that Julian the Incubus has no use for her and wants to feed her to his vampires.

**Jenny**: Jenny is petite and graceful, with sable hair and dark brown eyes. She dresses in an edgy, punkish style but has nowhere near as many piercings as Rachel. She is on the school

5

newspaper staff. She is Rachel's cousin and Mason's girlfriend. In Masqued 2013, she is revealed to be a siren. Jenny does not appear in Masqued 2014.

**Mason**: Mason is short, smart, and red-haired. He is quiet but funny. He is also on the school newspaper staff and he is revealed in Masqued 2013 to be a leprechaun. He has a crush on Jenny. Mason does not appear in Masqued 2014.

**Julian**: BMR/Masqued's villain is Julian, who is variously a vampire (BMR) or an incubus (Masqued). Julian is extremely handsome – seductively so – and Anna/Mia is drawn to him when she first sees him. In the past, Julian had a romantic relationship with someone related to Anna/Mia – either Elise (BMR and Masqued 2012) or Shalene (Masqued 2013/2014). The story of Julian's thwarted love changes from version to version, but in each instance he is an angry, spurned lover who blames Dante DeWinter for the loss of his one true love. He takes his revenge by imprisoning Dante in a magical world in the form of a wolf. Julian's search for Anna/Mia is a backdrop to the novel; either Taylor betrays Anna or his goons locate her when they see her perform magic in public. Julian finally sees Anna/Mia in The Sanctuary, where supernatural beings meet in Anchorage. His goons kidnap her and her friends when the friends unwittingly lure Anna/Mia outside. Julian threatens to enslave or kill Anna/Mia's friends, which leads the girl to promise that she will do anything he asks. In the first three versions of the novel, Julian's demand is that Anna marry him to make up for his lost Elise, whom she closely resembles (because Elise is Anna's biological mother). In the fourth and fifth drafts, Julian's lost love was Shalene, not Elise, and he demands that Anna/Mia lure her mother to his lair so they can be reunited. In Masqued 2013 and 2014, Julian is the heroine's biological father. In Masqued 2014, he is also Taylor's father.

**Elise/Marise:** In BMR and Masqued 2012, Elise is the middle sister of three St. Clair sisters. She looks very much like Anna except that she has blue eyes. She loves Julian and becomes

his wife – even to the point of becoming a Sanguine (blood sucker) – but abandons him to become the High Priestess of Avalon when Shalene refuses that role in order to marry Dante. Her rejection drives Julian mad and turns him evil. In the first three drafts, Elise is Anna's mother, although Dante is her father. In Masqued 2013 and 2014, Elise/Marise is Anna/Mia's grandmother, who retains the title of High Priestess because Shalene, her daughter, has refused to take it up. In all versions, Anna/Mia first sees Elise/Marise in a mirror (in some versions, Melusine's Mirror) and visits her by passing through the mirror. Elise/Marise advises Anna/Mia about her destiny and, in all versions except Masqued 2014, allows her to try to rescue her father. In Masqued 2014, Marise warns Mia that her father cannot leave Avalon, but the girl forgets the warning.

**Dante DeWinter**: Dante is the man who raised Anna/Mia as her father and who in the first three drafts actually is her biological father. In Masqued 2013, Dante mistakenly believed that he was her father; in Masqued 2014, he knew that Julian was Mia's father but loved her anyway. Dante was a member of the Order who learned incriminating information about a high-ranking member and who is believed to have been killed as a result. In fact, Dante was captured by a vengeful Julian, who imprisoned him in the form of a grey-eyed wolf. In Masqued 2013, Dante has been turned into an incubus as well. Dante walks in Avalon, and he encounters Anna/Mia as a sort of spirit guide in her dreams, calling himself Athair Mo Chroid (Gaelic for Father of My Heart). Forced for her first test to choose to rescue one of two wolves, Anna always chooses the one she thinks is her father, but she is always wrong. She is able to escape from Avalon with the wolf she chose only because Athair/Dante sacrifices himself. Dante gave Anna/Mia the pendant she always wears.

**Ronan/Aedan O'Faolain**: Ronan/Aedan is barely a character in the novel, but he is a presence. He is a Celtic Druid, hundreds of years old, who is alleged to have dealt with demons,

killed the entire community of Celts who followed him to New Zealand, and enslaved his priests to objects that thereby became cursed – one of which is Taylor's ring. Also found in wolf form in Avalon, Ronan/Aedan has amber eyes rimmed in black – just like Ash/Roman – and in at least two of the drafts Anna/Mia mistakes him for Athair, her spirit guide. He is always the wolf she frees instead of her father. When Anna/Mia takes Ronan/Aedan through the mirror, he is transformed into a handsome Celtic man with dark hair, wearing a leather jerkin and bearing runes on his skin. He tries to comfort the girl, who is horrified that she has freed a being she thinks is the devil, although she finds him attractive. When Ash/Roman arrives on the scene, Ronan/Aedan turns into a raven and disappears.

Contrary to Plaintiff's suggestion, at no point in any draft of BMR/Masqued is Ronan/Aedan Anna/Mia's boyfriend or an alternate love interest. Indeed, as Freeman admits in her notes, "Ronan and Anna barely meet in (BMR)." Dkt. No. 397-1 at 3. In one of her early notes, Freeman posited that Ronan (as he is then called) will eventually be part of a love triangle with the heroine and "help her learn to use her powers to restore the balance"– but no novel incorporating that concept was ever written.

## II.    *Crave* Series

**Grace:** Anna/Mia's ostensible comparator in the *Crave* series is Grace Foster. Grace is introduced as a grieving high school senior, reeling from the very recent death of her parents in a car accident. Grace is short and curvy; she has curly brown hair and freckles. She is sarcastic and emotionally guarded. Her narrative voice relies heavily on humor and pop-culture references. She loves Pop Tarts, Dr. Pepper, and Harry Styles.

Following her parents' death, Grace is forced to relocate from San Diego to remote Alaska, where her Uncle Finn (her only remaining adult relative) is the headmaster of a private boarding

8

school called Katmere Academy. At Katmere, she shares a dorm room with her cousin Macy, a quirky, bubbly girl who remains loyal to Grace throughout the series.

Grace's early identity is shaped by the (apparent) fact that she is an outsider at Katmere Academy – the only human in a world full of teenaged vampires, werewolves, witches, and dragons who are masquerading as normal teenagers. However, at the end of the first novel, Grace turns to stone while trying to protect her boyfriend from an attack, and we learn that she is no ordinary human, but the first gargoyle to be born in a thousand years. Though unsure of herself when she first discovers her supernatural self, Grace grows into her magical powers and self-confidence over the course of the novels, learning how to fly, turn to stone, manipulate elements, and freeze time. Her leadership arc evolves as she comes to terms with her supernatural identity; she ultimately becomes Gargoyle Queen and Leader of the Gargoyle Army. Through a series of picaresque and increasingly bizarre adventures that take place all over the globe, she and her friends figure out how to defeat the evil power that is seeking to dominate the supernatural world.

**Macy:** Macy is Grace's first cousin, the daughter of Uncle Finn. She believes her mother, Rowena, is dead (though Rowena turns out to be a prisoner at the Vampire Court). Macy, like her father, is a witch, a fact of which Grace is unaware until she arrives at Katmere. Macy, like all witches, has the power to create "portals" through which she and her friends can travel quickly to the faraway places where their adventures take place. She helps Grace adjust to being in a school full of supernatural beings and becomes her devoted sidekick.

**Uncle Finn:** Uncle Finn is Grace's uncle. He is a witch. He has a woodsy smell. He is protective of Grace and tries to act as a father figure.

**Jaxon Vega:** Jaxon is a tall, very dark, and brooding teenaged vampire – the most powerful vampire at Katmere when Grace arrives. He has a sharp jawline and a jagged scar from the center

9

of his left eyebrow to the left corner of his mouth. He has black hair, black eyes, and wears black clothes. The younger of two sons of the Vampire King Cyrus and his wife Delilah, Jaxon was raised by a vicious old lady vampire known as The Bloodletter, who lives in an ice cave in the Alaskan wilderness. He runs everywhere with a "posse" (or perhaps protective detail) consisting of several other young teenaged male vampires – Liam, Rafael, Mekhi, and Byron – who also dress in black and who are known to other students as The Order. Jaxon and his posse travel by "fading," which allows them to cover great distances quickly. They subsist primarily on animal blood; they can drink human blood, but if they do they must stay out of the sun for several days afterward. Unlike the vampires in many stories, when Jaxon and his friends bite someone, that person does not automatically turn into a vampire.

Jaxon is heir to the Vampire Kingdom, which is the most powerful among the various supernatural kingdoms. He tells Grace that he had killed his older brother, Hudson, after discovering Hudson's apparent plan to use his mind-control abilities to make vampires the leaders of the supernatural and mortal worlds. When Jaxon cannot control his emotions, his inner rage unintentionally triggers earthquakes. He has the power of telekinesis, or moving objects using his mind.

Jaxon is very protective of Grace, which alternately pleases and displeases her, especially when she is capable of protecting herself. Jaxon is connected to Grace via a "mating bond," a colored "string" that snaps into place deep inside the soul when two people who are destined to be mates touch. Jaxon's and Grace's bond turns out not to be natural; it was manufactured by Jaxon's guardian, The Bloodletter, so that her ward would become the mate of the world's first gargoyle in a millennium. It is potent nonetheless; when the bond is broken, Jaxon starts to lose his soul.

10

**Flint**: Flint Montgomery is the charismatic, biracial, gay Dragon Prince, son of the Dragon King, Aidan, and Dragon Queen, Nuri. As a dragon, he can fly and shoot fire and ice. Though Flint initially wants to kill Grace to prevent Lia from resurrecting Hudson (see below), he later becomes her close friend and confidante. Though he dates Luca, Flint has had an unrequited crush on Jaxon for a long time; he does not act on it because Jaxon is unavailable.

**Lia**: Lia is a teenaged witch, another senior at Katmere, who pretends to be Grace's friend. Lia was the girlfriend of Jaxon's older brother, Hudson, who is presumed to have been killed by Jaxon the previous year. Lia is obsessed with resurrecting her beloved Hudson; she believes she can accomplish this by sacrificing Grace – hence her interest in the girl. Lia was behind the killing of Grace's parents – an event she staged to lure Grace to Katmere – and she poisons and paralyzes Grace with herbal tea so that Lia can use the girl as a sacrificial offering. The scene at which the sacrifice is supposed to take place is the climax of the first novel of the *Crave* series. Lia ceases to be a character in the *Crave* series when her plan goes awry and she is destroyed.

**Cyrus and Delilah**: The Vampire King and Queen are Jaxon's and Hudson's parents and the rulers of the most powerful of the supernatural kingdoms. Cyrus is the villain of the story. He is a megalomaniac, and his efforts to cement his status as a dominant power in the supernatural world by becoming a god are resisted by Grace, his sons, and their friends. Cyrus leads powerful armies comprised of various supernatural beings; among their goals is harming, killing or capturing Grace and her friends. Cyrus is thought to have destroyed the gargoyle race one thousand years earlier. He raised his older son Hudson and tortured him. Delilah speaks with a melodic British accent. She has the same black eyes and sharp, angled jawline as Jaxon and Hudson. Jaxon is her favorite child.

11

**The Dragon Queen and King**: The Dragon Queen and King, Nuri and Aidan Montgomery, are the rulers of the Dragon Kingdom. They come to Katmere to watch the Ludares tournament and so that Nuri can play against Grace in the Trials. They reappear when Flint takes his friends to the Dragon Kingdom to celebrate the Wyvernhoard festival, and Nuri agrees to help Grace take down Cyrus. When Jaxon is losing his soul, the Dragon Queen gives him her heart because Jaxon almost died while saving Flint's life. As a result, she ceases to be a supernatural being.

**Cassia ("The Bloodletter"):** Cassia is a little old lady vampire (or a vicious vampire masquerading as a little old lady) who lives in a remote ice cave in Alaska, where she drinks the blood of unwitting tourists. She is actually a goddess – the God of Chaos, creator of paranormal creatures – and is sister to Adria, the God of Order (also known as The Crone). She raised Jaxon in order to shield him from his father and she loves him; she created the false mating bond that connects him and Grace. Her long-lost mate is the Gargoyle King, Alistair. The Bloodletter played a role in Grace's conception as the first gargoyle to be born in 1,000 years.

**Adria ("The Crone"):** Adria is Cassia's sister who lives in a mansion that looks like a gingerbread house on an island in the middle of the Pacific Ocean. She is known as The Crone. She is the God of Order, creator of humankind. She resembles a Greek goddess, with long, flowing hair, porcelain skin, and blue eyes. She was the architect of the Aethereum, and she gives Grace three toxic flowers that will allow those who ingest it to escape from the prison. She demands a future favor in return.

**Alistair:** The ancient Gargoyle King known as Alistair is Grace's distant ancestor – many, many generations back. He is also known as The Unkillable Beast. Cyrus imprisoned him a millennium earlier; like Prometheus, he is chained to a rock on an island, and when we first meet

12

him, he is a monstrous creature made of jagged rock with red eyes. Grace seeks him out intending to kill him but realizes he is a gargoyle like her and immune to most magic. Unable to break his chains, Grace promises to return to free him. After finding a key that unlocks the chains, Grace frees Alistair and he returns to his human form. He possesses The Crown, which he gives to Grace when she frees him.

**Hudson Vega**: Central to *Crave*'s storyline is Hudson, Jaxon's teenaged brother and a powerful vampire. Like his brother, Hudson is British; unlike Jaxon, he has cobalt blue eyes. Hudson is cocky and sarcastic; he dresses exclusively in Armani. He can destroy anyone or anything with just his mind. He also has the power of persuasion.

Hudson graduated from Katmere a year before Crave begins, and while he is mentioned throughout the first book, it is not until the very end of Crave that Hudson – who is believed to be dead – actually makes an appearance. His former girlfriend, Lia, thinks she is able to raise Hudson from the dead; in fact, Jaxon did not kill his brother at all, and Hudson, who has simply been hiding, reappears at the end of the first book. In the last pages of Crave, Grace turns to stone as she shields Jaxon from Hudson's wrath; Grace is thus revealed to be a gargoyle. When she returns to her human form four months later, at the beginning of the second novel in the series, Hudson is trapped inside Grace's mind. After a series of quests to retrieve magical objects, Grace is able to expel Hudson from her mind and he becomes a standalone character for the rest of the series.

Hudson, like his brother, is connected to Grace via a mating bond, only his is a true inborn mating bond, and he gradually supplants Jaxon as Grace's boyfriend. He is supportive of Grace as she grows into her destined role as Gargoyle Queen; his assistance is critical to her victory in the Trials, and their connection helps the friends succeed in their magical quests.

**Remy**: Remy is a young warlock born in the Aethereum who speaks with a New Orleans drawl. He is able to see the future. He has shaggy dark hair, broad shoulders, forest green eyes, and a strong jaw. He is essential to helping Grace and her friends escape from the Aethereum.

**Calder**: Calder is a giant manticore (part human and part lion, with eagle wings and a scorpion's tail) whom Grace, Hudson, and Flint first meet when they are imprisoned in the Aethereum. She is flirty and gorgeous, with long red hair and brown eyes.

**Chastain**: Chastain is the lieutenant general of the Gargoyle Army. He wears a ring later to be revealed the God Stone, given to him by The Bloodletter, which he in turn gives to Grace. He refuses to accept Grace as the Gargoyle Queen after she lies to him to get the God Stone, but ultimately helps her defeat Cyrus.

**Dawud**: Dawud is a young, skinny, nonbinary wolf from Syria with brown eyes, brown skin, and black hair long enough to touch his shoulders. After his brother is kidnapped by Cyrus, he comes to Katmere to warn Grace and her friends that the wolves have teamed up with Cyrus to capture them. He goes on magical quests with Grace and her friends and helps them defeat Cyrus.

14

 Outlook

## Activity in Case 1:22-cv-02435-CM-SN Freeman v. Deebs-Elkenaney et al Pretrial Conference - Interim

**From** NYSD_ECF_Pool@nysd.uscourts.gov <NYSD_ECF_Pool@nysd.uscourts.gov>
**Date** Mon 1/12/2026 12:58 PM
**To** CourtMail@nysd.uscourts.gov <CourtMail@nysd.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### Southern District of New York

### Notice of Electronic Filing

The following transaction was entered on 1/12/2026 at 3:57 PM EST and filed on 1/12/2026
**Case Name:** Freeman v. Deebs-Elkenaney et al
**Case Number:** 1:22-cv-02435-CM-SN
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**Minute Entry for proceedings held before Judge Colleen McMahon: Pretrial Conference held on 1/12/2026. Decision: Conference held. Any party wishing to move for summary judgment on substantial similarity must do so by January 26, 2026. Briefs are not to exceed 60 pages. Opposition briefs are due February 9, 2026, and reply briefs on February 17, 2026. The court is in possession of the following manuscripts: BMR (2011), Masqued (2016), Masqued (2014), Masqued (2013), Masqued (2012), and BMR (2010). The parties may cite these documents as exhibits; please do not refile or send copies of these documents to chambers in support of any motion. If Plaintiff intends to rely on any manuscripts not mentioned above in support of her motion for summary judgment, any such manuscripts should be mailed to chambers as soon as possible. Defendants may move for summary judgment on actual damages and to strike Plaintiffs jury demand no later than January 30, 2026. Plaintiffs opposition brief is due February 13, 2026, and Defendants reply brief on February 20, 2026. Plaintiff is to file her proposed rebuttal expert report as soon as possible. Any motions in limine are to be filed by March 31, 2026 and must follow the rules set out in this courts Individual Practices and Procedures. Submitted by: Jordyn Manly. (Court Reporter Martha Martin). (mde)**

**1:22-cv-02435-CM-SN Notice has been electronically mailed to:**

Lacy Herman Koonce, III    lance.koonce@klarislaw.com, clara.cassan@klarislaw.com, docketing@klarislaw.com, gili.karev@klarislaw.com, hamzah.jhaveri@klarislaw.com, mariella.salazar@klarislaw.com, rachel.simon@klarislaw.com, vivek.shah@klarislaw.com

Jennifer L. Pariser    jpariser@oandzlaw.com, paralegal@oandzlaw.com

Dwayne K. Goetzel    dgoetzel@intprop.com, ccomer@intprop.com

Scott Burroughs    scott@donigerlawfirm.com, alicitra@donigerlawfirm.com, anavarro@donigerlawfirm.com, asulich@donigerlawfirm.com, djenkins@donigerlawfirm.com, gguzman@donigerlawfirm.com, gray@donigerlawfirm.com, kschultz@donigerlawfirm.com, lzamora@donigerlawfirm.com, stephen@donigerlawfirm.com, tbarrett@donigerlawfirm.com

Stephen M. Doniger    stephen@donigerlawfirm.com, asulich@donigerlawfirm.com, gray@donigerlawfirm.com, lzamora@donigerlawfirm.com

Laura Zaharia Marion    laura.marion@jcrew.com

Mark D. Passin    mark@reedermccreary.com, anthony@reedermccreary.com, eservice@reedermccreary.com, kim@reedermccreary.com

Amy Lee Nashon    anashon@troygould.com, scervantes@troygould.com

**1:22-cv-02435-CM-SN Notice has been delivered by other means to:**

Universal City Studios, LLC

Q1CVFREC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LYNNE FREEMAN, an individual,

                Plaintiff,

        v.                              22 Civ. 2435 (CM)

TRACY DEEBS-ELKENANEY P/K/A/
TRACY WOLFF, an individual,
*et al*,

                Defendants.             Conference

------------------------------x

                                        New York, N.Y.
                                        January 12, 2026
                                        1:40 p.m.

Before:

                    HON. COLLEEN MCMAHON,

                                        District Judge

                          APPEARANCES

REEDER McCREARY
     Attorneys for Plaintiff
BY:  MARK D. PASSIN
     -and-
DONIGER/BURROUGHS
BY:  STEPHEN M. DONIGER
     DAVID M. S. JENKINS

TROY GOULD
     Attorneys for Defendants
BY:  AMY L. NASHON
     JOHN C. ULIN
     -and-
KOWERT HOOD MUNYON RANKIN & GOETZEL PC
BY:  DWAYNE K. GOETZEL
     -and-
KLARIS LAW PLLC
BY:  LACY H. KOONCE III

Q1CVFREC

(Case called)

THE LAW CLERK:  Counsel, your appearances, please.

MR. PASSIN:  Mark Passin of Reeder McCreary, on behalf of plaintiff, Lynne Freeman.  Good morning, your Honor.

THE COURT:  Hello.  It's afternoon, but it's morning in California.  I know it's still morning in California.

MR. DONIGER:  Good afternoon.  Stephen Doniger, on behalf of plaintiff as well.

And our New Yorker.

MR. JENKINS:  Good afternoon, your Honor.

David Jenkins from Doniger/Burroughs, for plaintiff, Lynne Freeman.

THE COURT:  Okay.  Great.

I'm sure you guys are tired.  Have a seat.

Okay.  Who's at the back table?

MS. NASHON:  Good afternoon, your Honor.

Amy Nashon with Troy Gould, on behalf of all defendants.

MR. ULIN:  Good afternoon, your Honor.

John Ulin, *pro hoc* pending.  Also from Troy Gould, for all defendants.

MR. KOONCE:  Good afternoon, your Honor.

Lance Koonce with Klaris Law, for Prospect Agency and Emily Kim.

MR. GOETZEL:  Dwayne Goetzel, your Honor, on behalf of

Q1CVFREC

Tracy Wolff.

THE COURT:  Okay.  Have a seat, everybody.

Partly I wanted to do this so I could meet you.  I've just gone back and forth on a number of things, but I've now got a court reporter here, so I made up my mind on something.

I have spent more time working on this case since I took it over than you can possibly imagine.  I have read all four *Crave* books.  I am still making my way through Ms. Freeman's six or seven different draft versions of her book.  So I spent my Christmas vacation reacquainting myself with hundreds of copyright cases.

So I will say possibly because I'm getting to you at the eleventh-hour, so I haven't had an opportunity to be familiar with things over the course of the several years that you guys have been litigating, but I certainly in the last two and a half months have spent an awful lot of time with this case.  And I've gone back and forth, and back and forth, and back and forth on a couple of things I raised with you earlier.

I have finally decided — especially in light of your most recent round of letters — don't send me letters — that we're going to have another round of summary judgment motions on my terms.  If I had been the judge on this case from the get-go, A, I would never have had a magistrate judge issuing an R&R on a summary judgment motion.  I don't do that.  It's a waste of time.  I have been told by my wonderful amazing

Q1CVFREC

magistrate judges that they are not fond of it because they feel like they are being law clerks. And it's not what I do. It's not what I do.

And if I had been deciding the summary judgment motion, I would have addressed every issue. I think I told you that earlier. Every potentially dispositive issue would have been decided. And they weren't. Even though you briefed them all, they weren't.

So what I have concluded is that either side is free to move for summary judgment on a very expedited schedule. You are not going to like the schedule, folks, but on a very expedited schedule, you have briefed this issue before, on the issue of substantial similarity. And the defendants can make a motion for summary judgment or preclusion. I think summary judgment seems to be the preferred way to handle this on the issue of what remains of a damages case and a motion to strike a jury.

But you've got to make a motion, people. Do not send me these letters full of case cites. I don't accept letter motions. It's in my rules. I don't believe in letter motions. I want fully briefed motions. And that happens to be a critically important issue, and I want it fully briefed. And I want citations to every interrogatory that you ask that asks for the disclosure of damages, and every question that you ask at the deposition that asks for the disclosure of damages. I

Q1CVFREC

want everything, okay, and I want it in great detail.

Now, you know my -- I'm just going to put this on the record because I've got a court reporter here. You know my initial thoughts because I've sent them to you on the substantial similarity matter. Judge Netburn didn't reach it at all. And Judge Stanton, when overturning her recommendation that there was at least probative similarity and then directing that all issues go to trial, did no analysis of why there was no -- why there was a genuine issue of fact on substantial similarity, even though you all briefed it. And the defendants objected to Judge Netburn's R&R on the ground that she failed to reach it, okay.

So if I told you I don't think it's law of the case, but even if it were, we're still prejudgment, and I'm a district judge, and I can change my mind, and I can change Judge Stanton's mind. So I can rule substantively on this.

I want to make one thing clear: I am not interested in reopening summary judgment on actual copying, right. For purposes of the motion, I'm going to assume that probative similarity and access, independent creation need to go to a jury.

I actually think the plaintiff has the better of the argument on probative similarity right now. But Judge Stanton said that he thought it was a jury issue, maybe it's at least a jury issue. I will tell the defendants I would not be granting

them summary judgment on probative similarity, okay. I'm that far along in my analysis. And there's no question that access would have to go to a jury.

I'm going to assume that those issues aren't in the case right now. And we're going to deal with one issue that would be dispositive, and that's substantial similarity. And that, after reading 150 cases over the course of my Christmas holiday, seems to be what the courts in this district and in this circuit tend to do; they jump right to the ultimate issue, which is substantial similarity. They do run motions to dismiss, for crying out loud, which, frankly, I think is a little weird. But they do it, and that's the issue that they address.

So I don't want to deal with the actual copying issues; I just want to focus on the one issue. And I'm going to give you a lot of pages, but I don't want you to waste time telling me what the standard for summary judgment is. I know. Writing the long statement of facts, facts are best discussed in the context of your argument. Outlining the law on substantial similarity. Guess what? I am now -- my head is stuffed with that, okay. Stuffed with it.

All right. So I've kind of made that clear.

I do want to talk about your expert reports. I told you I was thinking about whether or not to revisit Judge Netburn's *Daubert* ruling. Basically, I think she got it right.

I've read all these reports. Now, of course, I read all the reports because I'm a judge and I have to read everything.

Expert testimony is perfectly appropriate in a case like this to explain to the trier of fact, what's a trope? What's a scène à faire? What kinds of tropes and scènes à faire are common in this type of literature? Give me examples of how common they are by identifying works in which these tropes or scènes à faire have appeared before. That's perfectly acceptable expert testimony. That's the first Easton report. That's what's in there.

But is it Reiss or Reiss?

MR. PASSIN: Reiss.

THE COURT: Reiss — thank you — report that's not what that is. Let me read what she said:

I have been retained in this case to evaluate the similarities between six of the *Blue Moon Rising/Masqued* manuscripts offered by Lynne Freeman and the first four books of the *Crave* series.

No. Not proper expert testimony. Sorry.

Deciding whether there are similarities is the job of the trier of fact, okay?

And on a substantial similarity motion, they are not deciding whether there are individual discrete similarities; they are deciding whether there is substantial similarity in the works as a whole. So considering this, this, this, this,

Q1CVFREC

this, this elements.

So I think that Judge Netburn was correct in striking her report and in striking the Easton rebuttal report, which just does the same thing from the other side.

Now, on the damages thing, you all didn't complete your damages discovery until the end of November, as I understand it. So there was no opportunity previously for the defendant to raise the issue that the defendant has raised in his letter; and to do so appropriately, which is to say in a motion for preclusion or a motion for summary judgment. So I'm okay with allowing you to do it now.

I need some clarification. It's my understanding that the plaintiff is not seeking statutory damages in this case, that the plaintiff wants the big bucks. Right? This case is about clawing back the profits that Tracy Wolff and the publisher have made on these books. It's not about ten cents for each copyright infringement, right?

MR. PASSIN: That's correct, your Honor.

But I should point out that in Ms. Freeman's second supplement to her disclosures, she --

THE COURT: That's what you're going to -- that's what you're going to brief. Okay? We're talking about actual damages and lost profits. One way or another, whether this goes to a jury or it doesn't go to a jury, whether I grant summary judgment to you guys, I'm the person who is going to

decide what the amount of the lost profits is, because that's an equitable remedy in this circuit anyway.

So the thing that would go to the jury is actual damages. And so the issue that I see that I have to decide is in response to legitimate discovery requests, did the plaintiff disclose the existence of any actual damages, all right? And that's what we're going to decide. And you're going to brief that. And if she did so disclose, then she's not going to be precluded from proving actual damages. And if she didn't so disclose, then, to the extent that she made a claim for actual damages in her complaint, then the defendants are entitled to summary judgment dismissing it, because you have to disclose your damages in response to discovery requests.

Okay. So I really need to move very quickly because I want to keep the trial date. Because if there is one thing that you folks do not need, it is to have this hanging over your head for another year. You just don't.

So anyone who wants to move for summary judgment on the issue of substantial similarity — and I gather that's both of you — has until the close of business on January 26th to do that. And you can have a 60-page brief. But I've told you, don't bother with long statement of facts, don't be redundant, don't waste time telling me what the standards are, don't waste your pages. Focus on the argument — why I'm entitled -- why my client is entitled to summary judgment on the issue of

Q1CVFREC

substantial similarity. Okay.

Now, if the defendant chooses to move for summary judgment or preclusion on what damages are provable, you have to make that motion by January 30th.

Briefs in opposition to substantial similarity motions are due on February 9. Briefs and reply briefs are due on February 17th.

Opposition to a motion for summary judgment on damages is due on February 13th, and the reply brief is due on February 20th.

You will have a decision one way or another by the middle of March, because I really want to keep that trial date.

Okay. Not that the *Crave* -- I mean, I wanted to see the *Crave* Bible, but not that the *Crave* Bible is really evidence in this case. When you're dealing with substantial similarity, you're dealing with the works themselves, okay.

But I'm just curious. There's a redaction in my copy of the *Crave* Bible on pages 13 and 14. Does any of you know why? I just got black. You don't know why. See if you can find out why.

And we have one page -- can you show the plaintiff's counsel this page. We have one page that looks very much to me like it's something that Ms. Freeman prepared for you guys as a litigation document. You can see I've been in the weeds. It was clearly prepared after 2016. And it looks to me like she's

Q1CVFREC

telling you things.

MR. PASSIN:  Your Honor, we have to check with our client.

THE COURT:  Okay.  I mean, I'm thinking that's not a document we should be considering?  Okay.

MR. PASSIN:  Thank you for bringing it to our attention.

THE COURT:  Look, my pleasure.  Maybe it's the advantage of having brand-new eyes.

Okay.  So I guess I've kind of preempted a lot of things.  But let me find out what else is percolating with you guys.

And by the way, I would like you to meet someone.  In the event that you would be interested in having a serious settlement discussion — and I mean a serious settlement discussion — the gentleman over here is Jim O'Neill.  He's sighing hi.  Jim is my senior law clerk; he's my permanent law clerk.  And he settles my cases.  I don't settle cases.  I'm a lousy settlement negotiator and, besides, on this case, I'm in the weeds.  So he is my guy.  And he has settled some big case.  He has delivered some nine-figure settlements.  So he is a serious settlement negotiator.

And if you guys are interested, he's around any time between now and the beginning of the trial, assuming that we go to trial.  Okay?  He's around.  I wanted to introduce him to

Q1CVFREC

you, you to him.

MR. PASSIN:  Nice to meet you.

THE COURT:  He is just very good at it and he's very experienced.  So I've made that introduction.

Okay.  So from the plaintiffs -- and, by the way, I do apologize, because I really made a final decision on this over the weekend, if I'm wasting your time today.  I've spent a lot of time thinking about this.  A lot.

Okay.  Sir.

MR. PASSIN:  Your Honor, may I briefly address the Professor Reiss issue?

THE COURT:  Sure.

MR. PASSIN:  So Professor Reiss, it's kind of a long story, but if you look at docket 427 and 428, all right, that was plaintiff's objections to Judge Stanton, the magistrate's January 30, '25 order denying plaintiff's request to designate Professor Reiss as a rebuttal to -- rebuttal report to Emily Easton.

THE COURT:  Hang on.

Did she actually submit a rebuttal report?

MR. PASSIN:  No.  I want to explain why.

THE COURT:  Okay. Fine.

MR. PASSIN:  All right.

What happened was on May 10th, 2023, plaintiff designated Professor Reiss as an affirmative expert witness on

Q1CVFREC

three topics, your Honor: One, which we know is out of the question, to valuate the similarities between the works.

THE COURT: Right.

MR. PASSIN: Two, which we also know is out of the question, to address whether those similarities reflect genre-specific conventions and tropes. And we know you've said before that's out of the question.

But the third and important one is to provide a general discussion of tropes and genre conventions. And then what happened is -- by the way, Professor Reiss is extremely qualified. She is --

THE COURT: No, no. I have no quarrel with the qualifications of either of these individuals, all right. This is not a situation that's going off on qualifications.

MR. PASSIN: So I'll skip that.

THE COURT: I just read three reports.

MR. PASSIN: And where I'm going, just so you know and have it telecast, if you bear with me, is we're only asking for five and a half pages of her report, all right. And those five and a half pages deal solely with general tropes and genre conventions.

THE COURT: General tropes and conventions is okay. So did I miss something here?

MR. PASSIN: Yes. If you look at -- if you pull up --

THE COURT: Here is her report.

Q1CVFREC

MR. PASSIN:  Well, I actually have it highlighted.  If you look at 427, 428 --

THE COURT:  Yeah, but I don't have that.

MR. PASSIN:  Well, it's only five and a half pages.

THE COURT:  Can you give me an idea where to look in here?

MR. PASSIN:  Yes.  I do have the report with me, yes, your Honor.  But I really wish you'd let me tell the story.

THE COURT:  You can tell the story.  Please feel free to tell the story.

MR. PASSIN:  If you look at her report, pages 2 through 8, all she talks about is specific -- is genre conventions in general and tropes in general, as opposed to Emily Easton.  Emily Easton goes into the specific genre and tropes in two of Ms. Freeman's manuscripts which you have already said we cannot do.  But that's what Ms. Easton did in her report, all right.

THE COURT:  The way I read her report -- I'll go back and read it again.  But the way I read her report, she said these things are tropes.  You'll find this one in *Harry Potter*, and you'll find this one in *Twilight*, and you'll find this one -- and that's perfectly fine expert testimony.

MR. PASSIN:  But she also went into the two books, two versions of her books, and pointed out the tropes.  But we could leave those out.

15

Q1CVFREC

But, more important, I want to show you why we didn't designate her as a rebuttal.

So on May 10th, defendants designated Emily Easton as an affirmative expert.

THE COURT: On those three topics.

MR. PASSIN: They were a little different topics, but we won't go into that, okay.

Then on February 7th, defendants filed *Daubert* motions to all of our experts, including Professor Reiss. And forget the other ones. We argued in response to Professor Reiss that, All right, if you want to exclude it, it's fine. But, at the very least, you should leave it in to the extent she discussed tropes and genre conventions.

Now, although the magistrate didn't address the grounds on which she excluded Ms. Reiss's report, including that section, she specifically said that she found Reiss had specialized knowledge relating to identifying which similarities stem from tropes and genre conventions.

Then, on December 11, '24, plaintiff filed before the Court a request for a premotion conference on a contemplated motion for leave to allow Professor Reiss to be a rebuttal expert just on that one issue.

THE COURT: Which, I have to say, I would have allowed.

MR. PASSIN: You would have what? Let me explain what

16

Q1CVFREC

happened.

THE COURT:  I have to say I would have allowed.

MR. PASSIN:  You would have allowed?  Oh, thank you.

THE COURT:  I would have allowed that.

I was surprised that there wasn't a Reiss rebuttal report.

MR. PASSIN:  Right.  But I want to give you the background just so you understand.

Again, we were merely seeking -- if you look at docket 428, you'll see Exhibit 1, those pages, including her CV.

THE COURT:  No, no, I've read those pages.  There's nothing wrong until we get to page 8.  Okay.  Fine.

MR. PASSIN:  Where Magistrate Netburn had problems with the original report, she had no problems with that.  But more importantly, and this is important, your Honor, we really were misled.  Plaintiffs didn't designate Reiss as a rebuttal because in a June 2nd --

THE COURT:  I don't believe in -- you don't have to worry about that.

MR. PASSIN:  Okay.

THE COURT:  I couldn't care less.

MR. PASSIN:  Okay.

THE COURT:  If you have an expert, the expert can file a rebuttal report.  That's like standard operating procedure in this district.  You don't designate your expert, redesignate as

Q1CVFREC

a rebuttal expert. I can't even remember the last case when every expert didn't file a rebuttal report after the other guy's expert report came in, which is why I was surprised that I didn't have a Reiss rebuttal expert report.

MR. PASSIN: Do you want to hear the reason why?

THE COURT: The reason why. The reason why is that they told you you couldn't do it.

MR. PASSIN: No. On June 2nd, at a hearing, defendants' counsel at the time said to your Honor, Your Honor, let's have a summary judgment. Let's use Reiss and let's -- Professor Reiss, let's use Emily Easton. And we reserve our right to exclude Reiss solely on the issue of substantial similarity.

THE COURT: But that's the only issue as to which she has anything to say.

MR. PASSIN: No. If you look at the pages I designated, she talks about that tropes are like a house, and that when you have a house, there's a certain foundation. And the initial foundation may be the same when it's the same genre, but as you get down to specifics, it becomes different. I'm not --

THE COURT: *Romeo and Juliet* is in my standard jury instructions on copyright, okay.

MR. PASSIN: She explains *Romeo and Juliet* has been infringed many times, okay.

Q1CVFREC

THE COURT: It hasn't been infringed at all.

MR. PASSIN: So, anyway, we would be grossly prejudiced, your Honor, if they are allowed to have an expert on tropes in general and we're not, all right. And like I said, we were told by the other side that they are not going to exclude her on those general issues, so we didn't add her. And specifically --

THE COURT: It's not a question of adding her, okay. You didn't file even a proposed report on using her to discuss the general issue of tropes, as opposed to what the overwhelming amount of her report is, which is, here's a similarity between Freeman and Wolff. Here's a similarity between Freeman and Wolff. Here's a similarity between Freeman and Wolff. And that's the ultimate issue. Actually, the ultimate issue isn't discrete, but it's total concept and feel.

But, I mean, I don't want to prejudice you. I really don't.

MR. PASSIN: Your Honor --

THE COURT: Wait, wait, wait. I don't. That's part of the problem with taking over a case after somebody else handled the case. Because I would have had you in, I would have said, Is there going to be a rebuttal report from this woman? You would have said, Oh, yeah, sure, what. Because I would have told you early on that what she submitted wasn't appropriate, but there were things she could have talked about.

19

Q1CVFREC

So feel free to send me what your idea is of Reiss report on the issue of tropes and scènes à faire.

The thing about that issue that I would certainly allow testimony to a jury, so would allow it on summary judgment, is you can illustrate that by saying teenagers with super normal powers, *Harry Potter*, *Twilight*, this book. I don't read a lot of these books. I mean, in the last two months I've read more in this genre than I have ever read in my life. I have not read all the *Harry Potter* books, but I will have read all of the *Crave* books by the time I'm done. That's what's helpful, because that explains this is a trope, it gets used a lot, and here are examples of where it's been used. That to me is perfectly legitimate testimony.

Now, I don't know how you say this is not a trope, this has never been used. And again, I want to emphasize that substantial similarity means substantial similarity. It's not discrete lists of this, she's wearing green in this scene and she's wearing green in that scene. His first name begins with an A, and his first name begins with an A. That doesn't get you substantial similarity.

I mean, look, you could have two characters named Hulk who are superheroes in the Second Circuit, and that's not substantial similarity of characters. And that's from the circuit. So I can't quarrel -- I might quarrel with that, if I had the freedom to quarrel with that, but I can't quarrel with

Q1CVFREC

that.

So why don't you send me what your rebuttal report would have looked like.

MR. PASSIN:  When would you like that, your Honor?

THE COURT:  ASAP.

MR. PASSIN:  Yes, your Honor.

MS. NASHON:  Your Honor, if I may ask, I just want to clarify that this is truly intended to be a rebuttal report to Easton's report on this topic, and not --

THE COURT:  Yeah.  That's what he just told me he was more or less denied the opportunity to file.  And I'm saying, Well, you know, in the McMahon world, you wouldn't have been denied an opportunity to file that.  I looked through the file. I was trying to find it.  That's how commonplace it is.

MS. NASHON:  I understand.

I just am trying to make sure that it is --

THE COURT:  We'll see if they are going to be off the bounds.

MS. NASHON:  Sure.

THE COURT:  Okay.  I mean, both of these women are obviously incredibly qualified to talk about these issues, okay.

Okay.  What else?

MR. KOONCE:  Your Honor, on that last point, just to clarify, I know you said they should submit it ASAP, but it

21

Q1CVFREC

will be with enough time for us to incorporate responses into summary judgment.

THE COURT:  Trust me, you're going to have -- I mean, by the time you get to responsive papers, yes.

MR. KOONCE:  Fair enough.

THE COURT:  They are not going to submit it at the beginning of April.  Who knows?  You may have won by then, or they may have won by then, or nobody may have won by then and we'd be going to trial.

Okay.  So what other important issues are there from the front table or have I short-circuited them all?

MR. DONIGER:  So, your Honor, we came here today to discuss -- ready to discuss the four matters that the Court had outlined.

THE COURT:  I, of course, forget what they were.  That was many pages of reading ago.

MR. DONIGER:  Well, again, we're here to answer the Court's questions.  But the Court had -- essentially, I think we've addressed some of them.  The first was plaintiff's theory of why defendants' work infringes.  The second is how Judge Netburn --

THE COURT:  Yeah, the *Daubert* stuff --

MR. DONIGER:  -- which I think we've addressed.

THE COURT:  We've addressed that.

MR. DONIGER:  The third is any evidentiary rulings

Q1CVFREC

that would need to be made in advance of trial. And the fourth is settlements, and I think you've addressed that.

THE COURT: Let's go back to number one.

I'm happy to have you explain it to me. I'm equally happy to wait -- I suspect you're both moving for summary judgment. You already did both move for summary judgment. Maybe you're not. I know they are going to.

MR. DONIGER: Sure. We did initially. And I think the grounds were fairly set forth in those motions.

THE COURT: In that case, I'll dive into those papers, okay. I'll actually read those papers.

And one thing, if you want to just say, Judge, read the old briefs, or, Judge, read the old brief and here's ten extra pages, because we want to address some extra things this time around, great. That's fine.

I truly don't want to cost your clients a lot of money. I don't want you to have to reinvent the wheel. I accept that I'm making your life more difficult than you thought it was going to be, and I apologize for that.

So if there's an easy way for you to brief this, do it. Hand me the old brief, hand me the old brief plus ten extra pages. Do that.

MR. PASSIN: We don't have to do undisputed facts anew, right?

THE COURT: Yeah. We're at substantial similarity.

Book, manuscript --

MR. DONIGER:  So just brief --

THE COURT:  -- book, manuscript.

MR. DONIGER:  So there is one question on that that I'd like to raise, which has to do with the evidence that we'd be submitting.  One of the very first things that your Honor had done was asked us how we would present a large amount of material to a jury.  We talked about Rule 1006 summaries of evidence.

THE COURT:  Can I tell you something?

MR. DONIGER:  Of course.

THE COURT:  That's a jury issue, if we get there. I've read the books.  So there won't be any summaries.  I've read the books.  Don't need any summaries.  I've read the books.

I don't know that I could lock a jury in a room for long enough for them to read the books.  I spent four weeks reading those *Crave* books.  And whoever is representing the publisher, oh, my God, the print gets smaller with each edition and the margins get more nonexistent.  So they are all 650 pages long, except the last one is 1,000 pages long, with tiny print and no margins.  I read them in about four, four and a half weeks.  I didn't do much else.

MR. DONIGER:  Understood.

THE COURT:  So how we do this at a trial, if we get

Q1CVFREC

there, perplexes me. And I have spent a lot of time thinking about that. And the Second Circuit is very clear that you have to look at the works themselves. I mean, I can understand how a jury could look at the works and draw one conclusion. I'm not sure it could look at the works and draw the other conclusion. Okay. But we don't need to do that now because I've read the books.

MR. DONIGER: Understood.

THE COURT: But I have to tell you, this is just early thinking. I came back from Christmas and talked to Jordyn. You all have met Jordyn now, this is Jordyn Manly. She's the lucky law clerk on this case. And this, by the way, is Arnold Zahn, who is my other term law clerk. He's working on different cases, but he's intimately familiar with this.

So I came back and I said, I'm more convinced than ever that trifurcating this trial, if we get to a trial, is the right thing to do. Because I actually think that the plaintiff's list of similarities is admissible on the issue of probative similarity, and it's absolutely inadmissible on the issue of substantial similarity.

And so if I were the defendants and I were trying the case, I'd keep it out by conceding probative similarity. But I'm not the defendants. So that's what I was thinking then. I might be thinking something different next week. Believe me, I have thought different things at different times about issues

in this case over the last two months.  But the one thing we do not need to decide now is what you're going to be allowed to show the jury because, hand to God, I've read the books.

MR. DONIGER:  I understand.  And that's not what I -- I certainly understand the distinction between what goes to the jury and what goes to the Court.

The reason why I raised the issue is, as you may be aware, in our last summary judgment go-around, we had submitted certain indexes from our client.  And the Court had indicated, Well, I find that to be additional argument that exceeds the scope of the page limitation.

THE COURT:  Okay.

MR. DONIGER:  I want to make sure we don't run afoul of that.

THE COURT:  If you find that you're exceeding the page limitation, let me know, okay.  Five days before your brief comes in, let me know.

I will tell you this:  I'm going to look at the works, and I'm going to apply the test, the Second Circuit's test, total concept and feel test.  This is a work that has -- face it, this is a work that has both protectable and nonprotectable stuff in it, okay.  So that means the discerning reader test is what applies.

And, frankly, I can't tell much difference between the discerning reader and the ordinary reader, but let's assume

Q1CVFREC

that I'm a discerning reader, and that's the test that I'm going to apply. And I'm going to apply it to the actual texts themselves. And you can make any argument that you want.

MR. DONIGER: Okay. I appreciate that.

THE COURT: As I said, I love Judge Netburn. She is so smart. She's smarter than I am. I think she's terrific.

She chose, for whatever reason, not to handle this the way I would have handled it. I never have failed to reach a potentially dispositive issue, okay.

MR. DONIGER: It's less clear to us that that happened, but I understand the Court has a different --

THE COURT: It's very clear. She said she wasn't reaching it. She said because you have to go to trial on actual copying, I'm not going to even begin to talk about substantial similarity. And, frankly, Judge Stanton didn't either.

MR. DONIGER: All right. So I just want to make sure that in terms of the evidence that we submit to the Court --

THE COURT: You can submit any evidence you want. It's a great advantage.

I might tell you in the context of deciding, perhaps in your favor, that there are things that I'm not -- that I didn't consider in reaching that conclusion and I will not allow to be introduced to a jury, okay. But submit away.

MR. DONIGER: All right. Thank you.

Q1CVFREC

THE COURT: Back table. Issues. Concerns.

MS. NASHON: I would like to address Item No. 3 that we just didn't talk about, which is evidentiary rulings that need to be made in advance of trial. And if your Honor would like to set a motion *in limine* briefing schedule on that, as well, since we're setting dates.

THE COURT: Well, I'm happy to set the schedule, but it won't start until I've decided whether there's going to be a trial or not. I think you should assume that there's going to be a trial. I don't think you should assume that you're going to win, okay.

MS. NASHON: Never would be so presumptuous, your Honor.

THE COURT: Never would have crossed your mind, I'm sure.

But I will want motions *in limine* certainly by the end of March. I never, by the way, take reply papers on motions *in limine*. I have rules on motions *in limine*. They are five pages long; each individual evidentiary ruling gets a motion; and you get a five-page response within one week, and that's it. There's no reply. And you get a very cursory -- I don't know quite why I have so many colleagues who write these extensive decisions on motions *in limine*. You'll get a very cursory evidentiary ruling. But that will be happening at the end of March/beginning of April.

Q1CVFREC

MS. NASHON:  Your Honor, would that be the appropriate time to address the number of plaintiff's exhibits?  I noted that your Honor --

THE COURT:  Yeah, we'll have a whole separate conference early in April.  I do have a criminal trial on, but Jim, who handles all my criminal docket, is predicting that that will end up with pleas.  It doesn't, it doesn't.

But the plan would be like the second week of April to have a conference, and to address literally every exhibit and its admissibility to make -- because I make those rulings in advance of trial.  I told you, if it's a bench trial, everything can come in.  I don't worry about it.  I don't make any rulings.  And I consider what's relevant and I don't.

But if we're having a jury trial, we will have a conference, and we will go exhibit-by-exhibit.  And if there are objections to the exhibit, we'll resolve those objections right then and there.  And that's to save their time.  I'm a big fan of saving jury time.

And then I can tell them that you're wonderful, cooperative lawyers who have met with me in advance of the trial, and we've resolved all of these issues so they don't have to worry about them.  And that means there's not a lot of sidebars, because I don't like sidebars.

MS. NASHON:  On a more substantive matter, just thinking about the briefing and the expedited schedule and the

Q1CVFREC

summary judgment, I understand that your Honor indicated that plaintiffs could elaborate on their theory as part of their briefing, but it seemed like they were prepared to elaborate on it to some extent today.

THE COURT:  They just told me they elaborated on it in their last brief.

MS. NASHON:  Well, I would argue, your Honor, that we have had a very hard time throughout this case trying to understand exactly what the theory is, whether the selection --

THE COURT:  I understand that because I've had some difficulty myself.

Could I make a suggestion?  Could I suggest that you make your motion, and you make your best argument, and you wait to see what's in their papers, and that you then respond to that.  That would be my suggestion, is that you remake, I guess, that motion.  And then if they have failed to articulate a discernible theory in their motion papers, I guess I would -- you could certainly point that out.  I mean, I just -- I have not read yet your proposed jury instructions.

Another thing I did over Christmas when I was reading all these cases, I was like writing jury instructions, because I told you, I will start there and work backwards.

But I understand there are proposed jury instructions in the file now, and I will look at them.  And it would seem to me that you would be able to discern what the plaintiff's

Q1CVFREC

theory of the case was from reading those jury instructions.

MS. NASHON:  I guess, your Honor --

THE COURT:  If you can't, maybe there's a problem with the instructions.

MS. NASHON:  Perhaps.

I think what we continue to struggle with really is this idea of what is actually copyrightable, what she contends is copyrightable in her books.  And, you know, as your Honor pointed out in your request for submissions back in December --

THE COURT:  There was a weird suggestion that -- and I'm overstating this, okay.  I want the people at the front table not to have a heart attack.  So I'm overstating this.

You could have read something that came in before Christmas as a suggestion that there was nothing in her work that was independently copyrightable, but, rather, it was the way that this stuff was arranged and articulated, you know.

And my response was I thought that was for calendars and phone books.

Now, I have read cases over Christmas — remember, that's when I read the cases, was over Christmas — that suggest that there is a viable theory of copyright infringement even in a literary work that is a collection of tropes, but it's expressed in a particular way.

Now, I understand that the plaintiff's theory is not plagiarism, is not word-for-word.  That's not the theory.

Q1CVFREC

Well, well, well, by the way, it's never plagiarism. It's been somewhat more complicated. I expect it to be fleshed out. I expect it will be fleshed out. Because I see that you all -- people were going like this at the back table.

I see that you all read the letter that came in before Christmas. And you felt the same way I felt on initial reading, which was, Our theory of the case isn't that there are -- our theory of the case is, yeah, maybe this is a collection of trope and scènes à faire, but it is an original expression; it's its own way of arranging it.

I can understand how you could have interpreted the letter that way, because it's certainly the first way I interpreted the letter. And by the way, I think that's one of the problems with writing letters, because you write them very quickly. And maybe you don't -- you're not completely accurate in what you want to say. That's why I like briefs.

Okay. My theory of substantial similarity is the Second Circuit's theory of substantial similarity, which is the -- I'm going to be laser-focused on that one issue. If you start briefing other stuff, it's just going to go right out of my head. I'm not going to consider it. One issue that nobody ever reached: substantial similarity. No discussion anywhere.

Okay. Anything else?

MR. PASSIN: Your Honor, may I ask one thing? My co-counsel may step on my feet, but is there any way we can get

Q1CVFREC

a little longer?

THE COURT: No, because I want to keep your trial date. And my schedule is such that we have to get the trial done in May. So I really want to keep the trial date. To me, it's -- well, first of all, I think it's very important for you all, one way or another, whether it be on summary judgment or after a trial, to have a verdict, to have an answer to this issue. And then to go to the Court of Appeals, if that's what you want to do.

And the second thing — and this is selfish on my part, I'll grant you — is that any post-trial motions have to be decided in the summer because she's leaving in September. And I can't get a new law clerk acquainted with the case to the same degree -- I can't get a new law clerk who will have read the books. This case in particular is not a case I can pass off. And, unfortunately, I can't keep her beyond her sell-by date.

Okay. Anything else? All right. Go to work.

Oh, wait. Jordyn has a question.

Oh, Jordyn has asked that I remind you, do not send us emails with merits arguments in them. Do not write letters with merits arguments in them.

MR. PASSIN: I'm sorry. Excuse me, your Honor.

THE COURT: No merits arguments in emails. No merits arguments in letters. Merits arguments come in briefs,

Q1CVFREC

accompanied by notices of motion.

Okay.  Go to work.  Go to work.

It's lovely to meet you.

MR. PASSIN:  Thank you, your Honor.

THE COURT:  Nice to meet you.

And I have several more of Ms. Freeman's manuscripts to read, and that's what I'm about to start now.

MR. PASSIN:  Happy reading, your Honor.

THE COURT:  Look, we'll be the only people in the whole world who will have read --

MR. PASSIN:  Can I highlight something?

THE COURT:  No.  But we'll be the only people in the world who will have read all of this stuff:  Us and you guys.

Okay.

*    *    *

ORIGINAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

LYNNE FREEMAN,

Plaintiff,

22 Civ. 2435 (LLS)

- against -

ORDER

TRACY DEEBS-ELKENANEY, et al.,

Defendants.

------------------------------------X

This is an action for copyright infringement, breach of contract, breach of fiduciary duty, fraud, and fraudulent concealment. Plaintiff Freeman moved for summary judgment on her direct copyright infringement claim. The defendants cross-moved for summary judgment on that claim and also moved for summary judgment on Freeman's state law claims for breach of contract, breach of fiduciary duty, fraud, and fraudulent concealment. In a Report and Recommendation on August 1, 2024 ("R&R") (Dkt. No. 361), Magistrate Judge Netburn recommended denying both summary judgment motions on the direct copyright infringement claim but granting summary judgment dismissing Freeman's state law claims. The parties filed timely objections. After a review of the R&R and the parties' objections, the Court adopts both

1

of Magistrate Judge Netburn's conclusions, but narrows the scope of her direct copyright infringement rulings.

Both parties also moved to exclude certain expert testimony and to strike and/or seal various summary judgment exhibits. Magistrate Judge Netburn ruled on those motions in an Opinion & Order on August 1, 2024 (Dkt. No. 362), to which the parties also objected. After a review of that opinion and the parties' objections, the Court adopts all of Magistrate Judge Netburn's rulings regarding expert testimony and motions to strike, and it has already addressed sealing in an earlier order from October 24, 2024 (Dkt. No. 389).

<u>DIRECT COPYRIGHT INFRINGEMENT</u>

As shown by Magistrate Judge Netburn's detailed and comprehensive R&R, the factual issues about access, along with substantial or lesser degrees of similarity, compel the denial of summary judgment. Fed.R.Civ.P. 56 requires that to render summary judgment, there must be "no genuine dispute of any material fact," and it must be clear that the prevailing party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).  If there is no dispute about the material facts and the Court can decide the issues in the case as a matter of law, it can render summary judgment; but unless the material facts are undisputed and the law is clear, the proper disposition of the case is by the familiar trial by jury. Magistrate Judge Netburn properly recognized that there are genuine factual issues about claimed similarities between Freeman's work and the defendants' work that require a jury trial. Rule 56 reserves summary judgment for cases without fact issues, and so the Court's function is confined to applying the law and the constitutional right to trial by jury is preserved.

Magistrate Judge Netburn made carefully limited analyses of the degrees of similarity between the two parties' works, recognizing that "questions of non-infringement have

traditionally been reserved for the trier of fact" and that, because of the central importance of similarity between the competing works, it "is frequently a fact issue for jury resolution." R&R at 6. However, she did hold that "the parties' works share probative, but not striking, similarities." R&R at 15. Those analyses should be taken as advisory rather than mandatory. Her perceptions are shrewd, but their validity and consequences cannot be taken as substitutes for a trial verdict rendered on independent evidence by a properly charged jury. Therefore, all questions related to direct copyright infringement – including access, probative similarity, striking similarity, actual copying, independent creation, and unlawful appropriation – are best left for trial.

Defendants object to preserving the question of substantial similarity for trial, arguing that "trial cannot be held without an antecedent judicial analysis on whether the allegedly infringed elements of the plaintiff's work are protected by copyright," and a trial would take "months given the volume of literature currently at issue" and "impose an impossible burden on the members of the public who are empaneled." Defendants' Objections to the R&R at 13-14 (Dkt. No. 382). However, it is unnecessary to fear that a jury trial will have to cope with more than 5,000 pages of novels, manuscript versions, and drafts that require months to read. Magistrate Judge Netburn correctly identified Freeman's mammoth index of claimed similarities as argument, not evidence. Her recommendation that it be excluded in toto will probably be adopted at trial, but until then the decision is reserved. In fact, the entire case on similarity, in more than necessary detail, is presented in pages 7-21 of plaintiff's response to the defendants' objections to the R&R filed on October 29, 2024 (Dkt. No. 393), and experienced trial counsel will be able to present the meat of it as efficiently at trial.

The cross-motions for summary judgment on direct copyright infringement are denied,

3

and all related questions are preserved for trial.

## STATE LAW CLAIMS

Magistrate Judge Netburn properly dismissed Freeman's claims for breach of contract,
breach of fiduciary duty, fraud, and fraudulent concealment. The parties did not object to her
rulings, and they are therefore adopted without de novo review.

## NON-DISPOSITIVE RULINGS

The Court finds nothing clearly erroneous or contrary to law in Magistrate Judge
Netburn's non-dispositive rulings, and they are all affirmed. She properly identified, detailed,
and excluded the experts' suggestions, which were primarily argumentation. Her Daubert
rulings represent meticulously analyzed and reasoned exclusions of Dr. Chaski, Dr. Juola, and
Professor Reiss. The rebuttal reports of Dr. Coulthard and Ms. Easton are therefore unnecessary
and are also excluded, as are all expert reports related to the state law claims that have now been
dismissed. The Court adopts Magistrate Judge Netburn's decision to exclude Mr. Kaplan's
affidavit on metadata but not Ms. Cole's. It also affirms all of Magistrate Judge Netburn's
rulings on the motions to strike. The Court has already addressed sealing in a separate order
(Dkt. No. 389).

So ordered.

Dated:       New York, New York
             November 21, 2024

                                        Louis L. Stanton
                                _____
                                       LOUIS L. STANTON
                                            U.S.D.J.

4

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/1/2024 _____

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

**LYNNE FREEMAN,**

                                 **Plaintiff,**

          -against-

**TRACY DEEBS-ELKENANEY, et al.,**

                             **Defendants.**

-------------------------------------------------------------------X

**22-CV-02435 (LLS) (SN)**

**OPINION & ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

In this copyright infringement action, both parties move to exclude expert testimony

pursuant to Rule 702 of the Federal Rules of Evidence and Daubert v. Merrell Dow

Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny. Additionally, both parties ask the

Court to strike various summary judgment exhibits and to keep various summary judgment

exhibits under seal. The Court addresses these evidentiary issues in this opinion and order and

makes recommendations on the parties' motions for summary judgment by separate report and

recommendation, also filed today. The relevant factual background to the case can be found in

that report and recommendation.

**DISCUSSION**

**I.     Expert Evidence**

The Defendants ask the Court to exclude six affirmative expert reports offered by

Plaintiff Lynne Freeman. Those experts opine on: (1) the substantial, probative, and striking

similarity between Freeman's works and the *Crave* series; (2) the fiduciary and contractual

obligations that Kim and Prospect owed Freeman; and (3) Kim's and Wolff's motives to copy

Freeman's work. Freeman seeks to exclude two rebuttal experts offered by the Defendants.

**A.    Legal Standard**

Trial courts serve as gatekeepers for expert evidence and are responsible for "ensuring

that an expert's testimony both rests on a reliable foundation and is relevant to the task at

hand." Daubert, 509 U.S. at 597. Under Federal Rule of Evidence 702, expert testimony is

admissible where: (a) the expert's scientific, technical, or other specialized knowledge will help

the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is

based on sufficient facts or data; (c) the testimony is the product of reliable principles and

methods; and (d) the expert has reliably applied the principles and methods to the facts of the

case.

"To determine whether a proposed expert's testimony passes muster under Rule 702, this

Court must inquire into: (1) the qualifications of the proposed expert; (2) whether each proposed

opinion is based on reliable data and reliable methodology; and (3) whether the proposed

testimony would be helpful to the trier of fact." S.E.C. v. Tourre, 950 F. Supp. 2d 666, 674

(S.D.N.Y. 2013) (citing Nimely v. City of New York, 414 F.3d 381, 396-97 (2d Cir. 2005)).

"Because the purpose of summary judgment is to weed out cases in which there is no

genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of

law, it is appropriate for district courts to decide questions regarding the admissibility of

evidence on summary judgment," including the admissibility of expert evidence. Raskin v.

Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) (cleaned up). Indeed, as the "gatekeeper for expert

testimony," the court "performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment." Id.

When evaluating the reliability of an expert's testimony, the court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). In conducting its analysis, the district court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Id. at 266. Contentions that the expert's "assumptions are unfounded 'go to the weight, not the admissibility, of the testimony.'" Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) (quoting Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1188 (2d Cir. 1992)). Nevertheless, "conclusions and methodology are not entirely distinct from one another," and "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Accordingly, a district court may exclude expert testimony if it determines that "there is simply too great an analytical gap between the data and the opinion proffered." Id. "An expert's opinions that are without factual basis and are based on speculation or conjecture are similarly inappropriate material for consideration on a motion for summary judgment." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008).

The court must also conclude that the proposed testimony will assist the trier of fact. In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004). "This 'helpfulness'

standard . . . requires as a precondition to admissibility that the expert testimony possess a valid and specialized connection to the pertinent inquiries in the litigation." <u>Krys v. Aaron</u>, No. 14-cv-2098 (JBS), 2015 WL 3660332, at *3 (D.N.J. June 12, 2015) (citing <u>Schneider v. Fried</u>, 320 F.3d 396, 404 (3d Cir. 2003)) (internal quotation marks omitted). "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." <u>United States v. Mejia</u>, 545 F.3d 179, 194 (2d Cir. 2008).

Exclusion of expert testimony is warranted only when the district court finds "serious flaws in reasoning or methodology." <u>In re Fosamax Prods. Liab. Litig.</u>, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009). Otherwise, if an expert's testimony falls within "the range where experts might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 153 (1999). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." <u>Daubert</u>, 509 U.S. at 596. "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements under Rule 702 are satisfied." <u>United States v. Williams</u>, 506 F.3d 151, 160 (2d Cir. 2007).

**B.    Substantial Similarity Experts**

To establish copyright infringement, a plaintiff must show that: (1) they own a valid copyright; (2) the defendant "actually copied" from the plaintiff's copyrighted work; and (3) the defendant's work is "substantially similar" to the plaintiff's copyrighted work, such that the defendant's copying amounts to "unlawful appropriation." <u>Castle Rock Entm't, Inc. v. Carol</u>

4

Publ'g Grp., Inc., 150 F.3d 132, 137 (2d Cir. 1998). Freeman seeks to introduce expert testimony from Dr. Carole E. Chaski, Dr. Patrick Juola, and Professor Kathryn Reiss to support Freeman's assertion that her works and the *Crave* series share substantial similarities. The Defendants argue that, regardless of an expert's qualifications or the reliability of their methodology, the Court should categorically exclude any expert testimony offered to establish substantial similarity.

An "ordinary lay observer" standard governs substantial similarity, and the determination of substantial similarity is therefore "solely for the trier of fact." Computer Assoc. Int'l v. Altai, 982 F.2d 693, 713 (2d Cir. 1992). For that reason, the "well-established general rule in this circuit has been to limit the use of expert opinion in determining whether works at issue are substantially similar." Id. An exception exists only for "highly complicated and technical subject matter," because such matters can be "somewhat impenetrable by lay observers." Id. Lay observers can easily understand the young adult paranormal romance novels at issue in this case. The factfinder – whether the Court or an appropriately selected jury – can grasp books written for middle and high schoolers. Accordingly, permitting expert testimony on substantial similarity would violate the "ordinary lay observer test" and would usurp, rather than assist, the trier of fact.

Freeman asks the Court to make an exception, arguing that the Court should permit expert testimony on substantial similarity to aid the factfinder's hefty task of reading thousands of pages. Freeman does not cite a single instance of a court using volume, rather than complexity, to justify allowing expert testimony on substantial similarity. Instead, Freeman argues more generally that expert testimony "is frequently admitted where it streamlines the evidence and help jurors avoid confusion especially when dealing with voluminous evidence."

5

ECF No. 346, Plaintiff's Motion *in Limine* Opposition ("Pl. Exp. Opp.") at 3. For many types of claims, expert testimony can streamline evidence without usurping the factfinder and veering from the legal standard. For copyright claims, however, permitting expert testimony only to "streamline" otherwise understandable evidence would disturb the ordinary lay observer test. The Court therefore excludes all expert testimony on substantial similarity.

### C.    Probative and Striking Similarity Experts

Freeman also offers the expert reports of Juola, Chaski, and Reiss to establish probative and striking similarity. ECF No. 283, Plaintiff's Copyright Brief, ("Pl. Copy. Br.") at 15-16.[1] Probative and striking similarity relate to the second element of a copyright infringement claim: actual copying. A plaintiff can establish actual copying by demonstrating: (1) that the defendant had access to the plaintiff's work; and (2) that the similarities between the works are probative of copying. Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003). But where a plaintiff cannot establish access, actual copying can still be shown if "the works in question are 'so strikingly similar as to preclude the possibility of independent creation.'" Id.

Unlike with substantial similarity, a factfinder may consider expert testimony when deciding probative and striking similarity. The Second Circuit Court of Appeals has long held that:

> If there is evidence of access and similarities exist, then the trier of the facts must determine whether the similarities are sufficient to prove copying. On this issue,

---

[1] Confusingly, Freeman states that "Dr. Chaski does not . . . seek to establish striking similarity." Pl. Exp. Opp. at 14. But in the section of Freeman's summary judgment brief titled "Striking Probative Similarity Also Establishes Access," Freeman quotes Chaski's conclusion that "it is virtually impossible that the two works could have been independently created in light of my findings." Pl. Copy. Br. at 15. Given that citation, the Court interprets Freeman as seeking to rely on Chaski to establish probative and striking similarity and considers the admissibility of Chaski's testimony accordingly.

analysis ('dissection') is relevant, and the testimony of experts may be received to aid the trier of the facts. If evidence of access is absent, the similarities must be so striking as to preclude the possibility that plaintiff and defendant independently arrived at the same result.

If copying is established, then only does there arise the second issue, that of illicit copying (unlawful appropriation). On that issue (as noted more in detail below) the test is the response of the ordinary lay hearer; accordingly, on that issue, 'dissection' and expert testimony are irrelevant.

Arnstein v. Porter, 154 F.2d 464, 468 (2d Cir. 1946)[2]; see also Repp v. Webber, 132 F.3d 882, 890 (2d Cir. 1997) (holding that the trial court erred by ignoring expert testimony relevant to striking similarity); McDonald v. Multimedia Entm't, Inc., No. 90-cv-6356 (KC), 1991 WL 311921, at *5 (S.D.N.Y. July 19, 1991) ("Evidence admissible on the issue of 'probative similarity' includes expert testimony 'dissecting' the two works and discussing the works' relationships to other earlier works, for the purpose of illuminating whether similarities between the two works are more likely due to copying or independent creation.").

The Defendants argue that the Court should exclude expert testimony on probative and striking similarity because the subject matter is not technical, enabling a factfinder to decide the issue without the aid of expert testimony. But courts in the Southern District have permitted expert testimony on probative and striking similarity in non-technical infringement cases. See, e.g., Bunick v. UPN, No. 06-cv-2833 (RMB)(HBP), 2008 WL 1968305 (S.D.N.Y. Apr. 30, 2008) (considering expert testimony when deciding whether two television scripts shared

_____

[2] The Court of Appeals has since stated that the "days of Arnstein v. Porter are behind us." Maxtone-Graham v. Burtchaell, 803 F.2d 1253, n.5 (2d Cir. 1986) (cleaned up). But that comment referred only to Arnstein's discussion of the summary judgment standard, not expert testimony. Since Maxtone-Graham, the Court of Appeals has reaffirmed Arnstein's relevant holding on expert testimony. See Laureyssens v. Idea Group, Inc., 964 F.2d 131, 140 (2d Cir. 1992).

7

striking similarities); <u>Muller v. Twentieth Century Fox Film Corp.</u>, 794 F. Supp. 2d (S.D.N.Y. 2011) (acknowledging that expert testimony could be relevant to the striking similarity of screenplays, but excluding the expert testimony because of failure to meet the <u>Daubert</u> factors). The Court therefore declines to find a categorical bar to expert testimony on probative and striking similarity in literary infringement cases.

### i.    Dr. Patrick Juola

Dr. Patrick Juola is a forensic linguist who teaches computer science at Duquesne University. ECF No. 278, Ex. 37, Juola Rep., ¶ 2. Juola has "published numerous journal articles and book chapters on the computational inference of document authorship via the statistical analysis of linguistic features." <u>Id</u>. at ¶ 3. In his expert report, Juola concludes that he would "consider the odds in favor of [*BMR 2011* and the *Crave* series] having a common origin as more than 1000:1." <u>Id</u>. at ¶ 41. Juola reaches this conclusion by: (1) Google searching seven-word sequences shared by *BMR 2011* and the *Crave* series to determine the rarity of those seven-word sequences; (2) using the Google Books Ngram Database ("GBN") to search for commonalities shared by *BMR 2011* and *Crave*, as identified by Freeman's husband; (3) searching the cluster "katm" – related to "Katmai," mentioned in one set of Freeman notes, and "Katmere Academy" in *Crave* – in the "million-word Brown corpus"; and (4) noting that four of the commonalities are not shared by ten "baseline" young adult novels in the same genre as *BMR* and *Crave*.

Freeman fails to establish the reliability of Juola's methodology of using GBN to search short phrases shared by *BMR 2011* and *Crave*. Based on an article cited by Juola and authored by GBN's architects, the platform was designed to "enable us to investigate cultural trends quantitatively." Jean-Baptiste Michel, et al., <u>Quantitative Analysis of Culture Using Millions of</u>

Digitized Books., 331 Science 176 (2010). That article makes no mention of using GBN to identify plagiarism, as Juola uses it here. Neither Freeman nor Juola cites a single article, study, test, or case using GBN to identify plagiarism. The only reference to using GBN in this context comes from a law review article published by Juola himself, where he writes only that GBN "can be consulted to confirm not just whether a usage is rare, but exactly how common or rare it is in natural language." Janet Ainsworth & Patrick Juola, Who Wrote This?: Modern Forensic Authorship Analysis as a Model for Valid Forensic Science, 96 Wash. U. L. Rev. 1161, 1183 (2019). To support that statement, Juola cites Quantitative Analysis of Culture Using Millions of Digitized Books. But as explained above, that article only explains that GBN can be used to identify cultural trends.[3]

In his report, Juola argues that this methodology meets Daubert's requirements because "this technique has been extensively tested" and because "there is an extensive history of peer review and publication dating back to the 1960s." Juola Rep., ¶ 40. That claim cannot possibly apply to Juola's GBN methodology because Google only introduced GBN in 2010. Juola seems to mean that the field of stylometry – or the field of authorship attribution – is established and well-studied; Juola adds that "Google Scholar lists more than 8,000 publications including the word 'stylometry' in its catalog." Id. at ¶ 41. The Court does not question the legitimacy of stylometry generally, but the Daubert factors require the reliability of the *specific* methodology

---

[3] Notably, a feature of GBN lends itself more readily to the identification of cultural trends than plagiarism: GBN only produces hits for phrases that appear "at least 40 times in the corpus." Jean-Baptiste Michel, et al., Quantitative Analysis of Culture Using Millions of Digitized Books., 331 Science 176 (2010).

used by the expert, not the reliability of an entire field of study. For example, physics is a well-studied field, but not every methodology that uses some physics principles will automatically qualify as reliable.

Freeman therefore fails to demonstrate any of the factors that would establish the reliability of Juola's GBN methodology. She provides no evidence that Juola's GBN methodology can be, or has been, tested; she does not demonstrate that the methodology has been "subjected to peer review or publication"; Juola does not comment on the "known or potential rate of error" of his GBN methodology; and Freeman does not establish that anyone has ever applied this methodology outside of this case, let alone that the methodology has gained "general acceptance" in the fields of forensic linguistics or stylometry. Daubert, 509 U.S. at 593-94. Freeman therefore fails to establish the reliability of using GBN to identify plagiarism, as is her burden. Because Freeman fails to establish the reliability of Juola's methodology, and his "conclusions were not supported by other studies," the Court excludes the GBN-related portion of Juola's report. Coning v. Bayer Pharma AG, 982 F.3d 113, 124 (2d Cir. 2020); see also Mowry v. Viacom Int'l, Inc., No. 03-cv-3090 (AJP), 2005 WL 1793773, at *46 (S.D.N.Y. July 29, 2005) (excluding expert testimony because the plaintiff cited no cases of any other expert applying the methodology, and the methodology did not otherwise meet the Daubert factors).

Next, Juola searched the cluster "katm" in the Brown corpus to establish its rarity. In Freeman's materials, the "katm" cluster appears in just one set of notes. See ECF No. 276, Freeman Ex. 3. In the *Crave* series, the students attend a magical boarding school named "Katmere Academy." Juola writes that the Free Dictionary "identifies only five words with this cluster," and that the cluster "does not appear anywhere in the million-word Brown corpus."

Juola Rep., ¶ 34. Based on this, Juola concludes that "the probability of this cluster appearing in both *BMR* and *Crave* is .213 (21.3%), which is unlikely-but-not-incredible." Id. at ¶ 35. But Juola ignores a crucial fact: both stories are set in Alaska, a state hosting a real national park named Katmai.[4] Juola therefore should be asking about the probability of two works *set in Alaska* both containing the "katm" cluster, rather than two works generally. Because Juola does not account for this important context when calculating probabilities, his conclusion undoubtedly misrepresents the probability of the parties' works sharing the "katm" cluster.

Finally, Juola "confirmed" the reliability of his first three methodologies by taking four phrases "shared" by the at-issue works – "tree stump seats," "Stonehenge lite," "air as I try to," and "katm" – and observing that none of the four phrases appears in ten "baseline" novels in the same genre as *BMR* and *Crave*.[5] Id. at ¶¶ 15, 36-37. Juola reasons that, because these four phrases appear in both Freeman's work and Wolff's work, but do not appear in the ten "baseline" novels, he can reject the hypothesis that the phrases reflect genre conventions.[6]

Problematically, Freeman's counsel selected the ten "baseline" novels for Juola. ECF No. 322, Ex. A, Juola Tr. 259:5-260:6. This undermines the notion that the novels constitute a representative baseline for the genre. Freeman's counsel has every incentive to select ten novels in the genre that are relatively dissimilar to *BMR* and *Crave*. Further, Freeman's counsel can

---

[4]  The Court takes judicial notice of this fact. "Official government maps have long been held proper subjects of judicial notice." Gov. of Canal Zone v. Burjan, 596 F.2d 690, 693 (5th Cir. 1979). The Defendants link to a National Park Service government webpage that includes an official map of Katmai National Park in Alaska.

[5] The Court notes that "Stonehenge lite" does not actually appear in any of Freeman's works.

[6] As explained above, this method of "confirmation" fails to account for words that appear in both works because of shared setting, rather than genre conventions.

consult with Freeman to ask which works influenced her most when writing *BMR* in order to exclude those novels from the "baseline" selection. Counsel's selection of the novels therefore embeds bias into Juola's "confirmation" method. Accordingly, the Court excludes this portion of Juola's report as unreliable. U.S. Info. Sys. v. IBEW Local Union No. 3, 313 F. Supp. 2d 213, 217, 233 (S.D.N.Y. 2004) (excluding expert testimony because the plaintiffs "failed to demonstrate that the data set upon which [the expert's] analysis was based was unbiased" and noting that "the reliability of any analysis depends upon an unbiased selection of sample data").

The Court, therefore, excludes Juola's report in its entirety.

### ii.     Dr. Carole E. Chaski

Dr. Carole E. Chaski is a forensic linguist with decades of experience. ECF No. 315, Ex. 5, Chaski Rep., ¶¶ 21-23. Like Juola, Chaski used forensic linguistics to quantify the similarities shared by *BMR* and *Crave*. Specifically, Chaski focused on whether the similarities indicate "conceptual plagiarism" (essentially, advanced paraphrasing).[7] Id. at ¶ 5. To do this, Chaski selected 35 "keywords" "based on the similarities of plot, character, and setting outlined in the complaint." Id. at ¶ 23(e). Chaski then "calculated the way that the 35 keywords operate" in the *Crave* series, Freeman's six *BMR* manuscripts, and the same ten baseline novels used by Juola. Id. at ¶ 10. Specifically, Chaski calculated the "lexical overlap rates" for the 35 keywords. A high lexical overlap rate indicates that the authors "put the keyword with similar companion words." Id. at ¶ 11. Chaski concluded that, for 31 of the 35 keywords, Freeman and Wolff had

---

[7] Chaski also opines on "copy-paste plagiarism" (word-for-word copying) and "mosaic plagiarism" (paraphrasing), but Freeman no longer seeks to rely on those portions of Chaski's report. Pl. Exp. Opp. at n.5.

12

the highest lexical overlap rate – or used the keywords more similarly – than for any of the ten baselines authors. Id. at ¶ 120. Based on this, Chaski concluded that "it is virtually impossible that the two works could have been independently created." Id. at ¶ 135. Chaski's report suffers from three major problems: (1) she did not differentiate between different versions of *BMR*; (2) as with Juola's report, Freeman's counsel selected the ten baseline novels; and (3) Chaski selected the 35 keywords based on Freeman's complaint.

To prove "actual copying," Freeman must establish probative or striking similarity *for each distinct BMR* manuscript and set of notes. If Freeman fails to establish probative or striking similarity for a specific Freeman work, then that work cannot be considered at the substantial similarity stage. Chaski's analysis groups together all six *BMR* manuscripts and treats them as one large work. She then concludes that, as a whole, the *BMR* manuscripts are strikingly similar to the *Crave* series.

To illustrate the problem: Chaski reports that the word "Diego," as used in *BMR* in the aggregate, shares a higher "lexical overlap rate" with the *Crave* series than with any of the ten baseline authors. Chaski uses this finding to support her conclusion that *BMR* and *Crave* share meaningful similarities. But the word "Diego" does not appear once in *BMR 2013*, meaning that Chaski's Diego-related finding would not be relevant to whether the Defendants had access to that iteration of *BMR*. Her report misleadingly implies otherwise. Chaski's decision to aggregate Freeman's works therefore eliminates her report's utility for determining access to each specific *BMR* manuscript. For that reason, her report would not assist the trier of fact with the task of

13

evaluating striking or probative similarity and is excluded on that basis alone. Nimely, 414 F.3d at 396-97.

Freeman seeks to cure this issue by submitting a supplemental affidavit from Chaski. ECF No. 336, Chaski Supplemental Declaration ("Chaski Supp. Decl."). In her supplemental affidavit, Chaski explains that excluding from her analysis the two most recent *BMR* versions – *BMR 2014* and *BMR 2016* – would not change her conclusions about the works' similarities. Id. at ¶ 4. This, however, does not actually cure the issue. Freeman has to establish access for each *BMR* material, not *BMR 2014*, *BMR 2016*, and everything else in the aggregate. Accordingly, even if Chaski removes *BMR 2014* and *BMR 2016*, her report still unreasonably groups together the first four *BMR* versions.[8]

Separately, Chaski uses the same ten "baseline" novels used by Juola and selected by Freeman's counsel. ECF No. 322, Ex. B, Chaski Tr., 39:11-16. Chaski's entire conceptual plagiarism relies on comparing the lexical overlap rates between Freeman's manuscripts and Wolff's series to those ten novels. As is explained above, counsel's selection of the baseline

---

[8] Even if Chaski's supplemental affidavit could cure the issues in her expert report, the supplemental affidavit would be inadmissible as untimely. An expert may supplement a report only when "the expert subsequently learns of information that was previously unknown or unavailable, and the new information renders the earlier report incomplete or inaccurate." Anthem, Inc. v. Express Scripts, Inc., 660 F. Supp. 3d 169, 184-85 (S.D.N.Y. 2023). "To construe supplementation to apply whenever a party wants to bolster its expert opinions would wreak havoc on docket control and amount to unlimited expert opinion preparation." Lewis v. FMC Corp., 786 F. Supp. 2d 690, 705 (W.D.N.Y. 2011) (cleaned up). Freeman does not argue that Chaski learned any new information that required her to supplement her report. Instead, Freeman offers Chaski's supplemental affidavit to cure issues and add information that should have been included in her initial report.

novels embeds bias into Chaski's analysis and could easily skew Chaski's findings in favor of Freeman. Accordingly, Chaski's report is also excludable on this basis.

Finally, Chaski erred by selecting her 35 keywords based on Freeman's complaint, a document in which Freeman identified specific instances in which she and Wolff used the 35 keywords similarly. One would expect, then, for Freeman and Wolff to use those 35 words more similarly than other authors. The decision to select 35 keywords based on Freeman's complaint therefore seems designed to find that *Crave* and *BMR* share more similarities than other books. As with the issue of the "baseline" novels, this methodological decision improperly embeds bias into the data set and justifies exclusion.

The Court, therefore, excludes Dr. Chaski's report in its entirety.

### iii.    Kathryn Reiss

Kathryn Reiss is an "award-winning author of twenty novels for children and young adults" who teaches English and creative writing at Mills College. ECF No. 278, Ex. 36, Reiss Rep., ¶ 1. In contrast to Juola and Chaski, Reiss took a qualitative approach to analyzing striking and probative similarity. She simply read the works, "took copious notes whenever [she] came across examples of similarities that went beyond genre convention or trope," and "drew on [her] knowledge and experience as a writer and professor to eliminate similarities which were the result of genre conventions and tropes." Id. at ¶¶ 7-8.

The Defendants argue that Reiss ignored relevant differences between the parties' works. Freeman claims that this is a non-issue, arguing that the purpose of "Reiss's testimony is to identify the similarities *not* attributable to trope or genre convention, so it would make no sense to address either differences or similarities attributable to tropes." Pl. Exp. Opp. at 6. Freeman,

15

however, mischaracterizes Reiss's testimony. Reiss does not simply list similarities; rather, she concludes that "the similarities are so striking as to preclude the possibility of independent creation." Reiss Rep., ¶ 228. One cannot rationally reach this conclusion without comparing a works' differences and similarities. See, e.g., Klauber Bros. v. M.J.C.L.K., LLC, No. 21-cv-4523, 2022 WL 5108902, at *17 (S.D.N.Y. Oct. 4, 2022) (finding no striking similarity because "the works reflect several significant differences with respect to elements, arrangement, and overall layout"). Exclusion of expert testimony "is warranted where the expert fails to address evidence that is highly relevant to his or her conclusion." Acetaminophen, 2023 WL 8711617, at *53. Because Reiss does not identify or discuss the differences between the works, which are highly relevant to her conclusion on striking similarity, the Court excludes her report.

Insofar as Freeman plans to use Reiss's testimony to establish probative – rather than striking – similarity, Reiss offers no particular expertise. Expert testimony is only admissible if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Reiss's "specialized knowledge" relates to identifying which similarities stem from tropes or genre conventions, and which stem from original elements. But when evaluating probative similarity, the factfinder should consider "the entire work, not just the protectible elements." Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 123 (2d Cir. 1994). Unlike with substantial similarity, then, the factfinder may use trope-based similarities in deciding whether two works are probatively similar. Absent the need for an explanation of trope-based similarities, Reiss's report simply compares the works' similarities as a jury would. "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of

16

understanding on his or her own." United States v. Mejia, 545 F.3d 179, 194 (2d Cir. 2008). Because, absent her trope-based expertise, Reiss's report simply makes "observation[s] that jurors could make as easily," she "usurp[s] the jury's role" on probative similarity. Chapman v. Universal Motown Records Grp., No. 08-cv-3255 (LAP), 2010 WL 517480, at *3 (S.D.N.Y. Feb. 4, 2010). Accordingly, Reiss's delineations about whether similarities relate to trope provide no assistance to the trier of fact at the probative similarity stage.

Finally, even if Reiss's testimony were not excludable for the above reasons, it would still be unreliable. To the extent that Reiss employs any methodology, it consists of separating out trope or genre-based similarities from other similarities. But throughout Reiss's report, she enumerates many similarities that are plainly genre conventions and tropes but fails to identify them as such. For example, Reiss identifies as a notable similarity that in both works, the romantic lead and the heroine "heal one another through their love, and he believes they have a special bond, that they are mates, and that she is the only one for him." Reiss Rep., ¶ 35(c). Similarly, Reiss notes that the *BMR* and *Crave* heroines both find the romantic leads to be "mysterious, dangerous, and alluring." Id. at ¶ 42. Any reasonable person would recognize these similarities as paradigmatic young adult romance genre conventions, but Reiss fails to identify them accordingly, significantly reducing the reliability of her report.

Like with Chaski, Freeman seeks to save Reiss's testimony by introducing a supplemental affidavit explaining that excluding *BMR 2014* and *BMR 2016* from her analysis would not alter her conclusions about similarity. Because the Court excludes Reiss's testimony

17

for reasons unrelated to aggregation, her supplemental affidavit does not cure the identified issues.[9]

The Court, therefore, excludes Reiss's report in its entirety.

### iv.     Rebuttal Experts

The Defendants offer expert testimony from Dr. Malcolm Coulthard to rebut the testimony of Juola and Chaski, as well as testimony from Emily Easton to rebut Reiss's testimony. Because the Court excludes the reports of Juola, Chaski, and Reiss, the rebuttal reports of Coulthard and Easton are unnecessary and therefore also excluded.

### D.     State Law Experts

Freeman seeks to introduce expert testimony from Christine Witthohn to establish motive for her breach of contract and breach of fiduciary duty claims.[10] She also seeks to introduce expert testimony from Marlene Stringer and Eric Ruben to establish that literary agents owe their clients fiduciary duties. The Defendants offer testimony from Rose Hilliard to rebut Witthohn's and Stringer's reports. In my separate report and recommendation, I recommend granting the Defendants' motion for summary judgment on Freeman's breach of contract and breach of

---

[9] Like Chaski's report, Reiss's report discusses *BMR* in the aggregate. But the problem does not reach the severity of Chaski's because she cited each specific *BMR* version throughout her report, allowing a factfinder to piece together which *BMR* versions share which similarities with *Crave*. Because the Court excludes Professor Resiss's testimony on several other bases, the Court does not need to decide whether Reiss's level of aggregation requires exclusion.

[10] The Court's understanding is that Freeman does not seek to use Witthohn's report to establish that the Defendants had a motive to commit copyright infringement. But in the event that the Court misunderstands Freeman's position, the Court clarifies that she cannot use evidence of motive to prove copyright infringement liability. Louissier v. Universal Music Group, Inc., No. 02-cv-2447 (KMW), 2005 WL 5644420, at *5, n.1 (S.D.N.Y. Aug. 30, 2005) (excluding evidence relevant to intent because "a defendant's motive, intent or knowledge are not elements of proof of defendant's liability in a copyright action").

18

fiduciary duty claims for reasons unrelated to motive or the scope of a literary agent's fiduciary duties. Accordingly, if Judge Stanton adopts my recommendations as to those claims, the motions *in limine* as to Witthohn, Ruben, Stringer, and Hilliard will be moot. If Judge Stanton declines to adopt my recommendation and denies the Defendants' motion for summary judgment on the breach of contract and breach of fiduciary duty claims, I will revisit the parties' motions *in limine* to decide the admissibility of affirmative and rebuttal experts on state law issues.

### E.    Metadata Experts

The parties dispute whether Freeman ever sent Kim three *BMR* drafts. The Defendants argue that Freeman did not, and they cite a declaration from defense counsel CeCe Cole in support. Based on Cole's review of metadata, the creation dates of those three *BMR* versions post-date the Kim-Freeman professional relationship. ECF No. 300, Cole Decl., ¶¶ 16-20. Cole explains that, superficially, the metadata shows that all three drafts "were created in or after June 2021, likely in connection with document production in this case." Id. at ¶ 16. She then explains that she found the "native" versions of the documents "provided as deposit copies in connection with her copyright registrations." Id. at ¶ 17. Based on the metadata in the "native" versions, all three *BMR* versions were created after Kim and Freeman stopped working together. To rebut Cole's declaration, Freeman offers an affidavit from Ron Kaplan, an information technology consultant. Kaplan explains that Microsoft Word's "save as" function changes the "creation" date reflected in the metadata. ECF No. 333, Kaplan Decl., ¶ 6.

The Defendants ask the Court to exclude Kaplan's affidavit as undisclosed expert testimony. Freeman responds that if the Court excludes Kaplan's affidavit for that reason, it should exclude Cole's report for the same reason. But Kaplan's report constitutes expert

19

testimony, while Cole's does not. Under Federal Rule of Civil Procedure 701, lay witnesses may only testify to matters that are: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." In her affidavit, Cole describes her perception of the metadata in the relevant documents, based on her own review. Although Cole did rely on some specialized knowledge to review the metadata, a "witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony expert as long as it was based on his investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise." United States v. Rigas, 490 F.3d 208, 224 (2d Cir. 2007) (cleaned up). Because Cole's declaration relied only minimally on specialized knowledge, the Court categorizes her testimony as lay testimony.

On the other hand, Kaplan's testimony relies only on the specialized knowledge he has gained as an information technology consultant. He does not testify about any matters based on his own perception; he never claims to have viewed the metadata in the at-issue documents. Accordingly, the Court categorizes his affidavit as expert testimony. In violation of Rule 26(a), Freeman did not disclose Kaplan's affidavit by the deadline set by the Court.[11] Under Rule 37, exclusion can be the proper sanction for a Rule 26(a) violation. To determine whether exclusion is appropriate, the Court must consider: "(1) the party's explanation for the failure to comply

---

[11] Freeman does not argue that the Defendants failed to timely disclose Cole's metadata-related testimony. Accordingly, Freeman has no excuse for failing to disclose Kaplan's affidavit during expert discovery.

20

with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006) (cleaned up). Those factors support excluding Kaplan's affidavit. Freeman fails to provide any explanation for failing to timely disclose Kaplan's testimony. The "save as" testimony does not significantly move the needle on the question of whether Freeman provided Kim the reports, because Freeman could have sent Kim the manuscripts after they stopped working together. Further, in the absence of a continuance, Freeman's late disclosure deprives the Defendants of the ability to depose Kaplan. Accordingly, the Court excludes Kaplan's affidavit but does not exclude Cole's.

Freeman also argues that "Kaplan's declaration relates to a ministerial fact that is not subject to reasonable dispute." The Court does not classify the innerworkings of Microsoft Word metadata as "ministerial" and accordingly rejects this argument.

## II. Motions to Strike

### A. Similarity Indexes

The parties dispute whether Freeman can rely on 14 "similarity indexes." Combined, the indexes comprise hundreds of pages of lists of the purported similarities between Freeman's works and the *Crave* series. The Defendants ask the Court to strike these indexes and all Rule 56.1 paragraphs citing to them.

The Defendants argue that Freeman's lists constitute undisclosed lay or expert testimony, but the Court disagrees. The lists are more appropriately classified as argument, rather than evidence. The lists simply draw from, recategorize, and reorganize portions of *actual* evidence:

21

the at-issue works. Freeman, too, seems to understand the lists as argument rather than evidence, because she did not disclose the lists during fact or expert discovery. Accordingly, in the Court's view, the lists egregiously violate the briefing limits set by the Court. It is within the Court's "inherent discretion to strike excessive pages," but the Court also holds "reciprocal discretion to waive page limits." Nat'l Grid Corp. Servs., LLC v. Brand Energy Servs., LLC, No. 13-cv-1275 (DRH) (ARL), 2017 WL 1194499, at *10 (E.D.N.Y. Mar. 30, 2017); see also Perez v. United States Immigration & Customs Enforcement, No. 19-cv-3154 (PGG) (JLC), 2020 WL 5362356, at *9 (S.D.N.Y. Sept. 8, 2020) (declining to strike summary judgment memorandum of law that exceeded the page limits set by the Court). In Perez, the Court decided to deny the defendants' motion to strike because it found that the plaintiff had not filed the seven excess pages in bad faith. In other words, the plaintiff in that case "did not act with the intention of gaining an unfair advantage through his violations or otherwise benefit from the excess pages in his memoranda." Perez, No. 19-cv-3154 (PGG) (JLC), 2020 WL 4557387, at *4 (S.D.N.Y. Aug. 6, 2020), R. & R. adopted, 2020 WL 5362356, at *12 (S.D.N.Y. Sept. 8, 2020).

   In the Court's view, Freeman filed the similarity indexes to gain an unfair advantage over the Defendants. Permitting them would grant Freeman hundreds of additional pages of argument. The Defendants could have filed hundreds of pages of lists describing the differences between the at-issue works, but they did not because they followed the Court's orders. Additionally, Freeman's indexes contain numerous frivolous similarities, further evincing bad faith. For example, Freeman points out that in both works: the authors use the phrases "the whooshing sound," "will be moot," and "crooked grin"; the heroine breathes and her heart pounds; the romantic lead is "hot" and is the heroine's boyfriend; and the villain disgusts the heroine. ECF

22

No. 276, Ex. 49, *Court* Language Index, at 14, 21; Ex. 46, *Crave* Language Index, at 20; Ex. 38, Heroine Index, at 15, 20; Ex. 40, Romantic Lead Index, at 3, 9; Ex. 43, Villain Index at 11. These similarities, along with many others identified by Freeman, are shared by hundreds of other novels and hold little probative value. Because Freeman filed the similarity indexes in bad faith, the Court strikes them.

Striking the indexes should not meaningfully prejudice Freeman because even when courts do consider plaintiff-compiled lists of similarities, such lists are afforded minimal weight. Courts reason that such lists are "inherently subjective and unreliable,' particularly where 'the list emphasizes random similarities scattered throughout the works.'" Williams v. Crichton, 84 F.3d 581, 590 (2d Cir. 1996) (citing Litchfield v. Spielberg, 736 F.2d 1352, 1356 (9th Cir. 1984)). In Freeman's lists, she editorializes, arbitrarily highlights "similarities" in various colors, and uses ellipses to omit massive amounts of relevant text, distorting "similar" passages. Accordingly, even if the Court had decided to consider Freeman's indexes, it would have afforded them little weight.

In Freeman's statement of undisputed facts, she repeatedly cites her inadmissible similarity indexes. Under Local Rule 56.1, a party must only cite to "evidence which would be admissible." Local Rule 56.1(c). The Court therefore strikes all paragraphs in Freeman's Rule 56.1 statement that rely solely on her inadmissible similarity indexes. This, too, should not significantly prejudice Freeman because the Court has decided probative, striking, and

substantial similarity based on the works themselves, not the parties' contrary descriptions of the works.

### B.       Freeman's Additional Material Facts

When Freeman countered the Defendants' statement of undisputed facts, she also tacked on about 64 pages of "additional material facts." ECF No. 332. Under Local Rule 56.1(b), a party may add to their counterstatement only "additional material facts as to which it is contended that there exists a genuine issue to be tried." Freeman's additional facts relate to the similarity between the parties' works, a topic raised in her affirmative motion for summary judgment and discussed in her initial statement of undisputed facts. In Freeman's opposition to the Defendants' summary judgment motion, Freeman cites her additional facts to argue that the Court should grant her summary judgment; she does not argue that similarity is in dispute and should be decided by a jury. It is clear, then, that Freeman does not contend that the additional facts are in dispute, rendering the additional facts improper under Rule 56.1. Freeman should have, and could have, included the additional facts in her initial statement of undisputed facts. The Court therefore strikes Freeman's additional facts.

### D.       *Tempest Rising* Evidence

Freeman asks the Court to strike paragraphs 26 to 30 of Defendant's statement of undisputed facts. Those paragraphs all relate to *Tempest Rising*, a prior work of Wolff's. In the parties' summary judgment briefing, *Tempest Rising* is relevant only to the Defendants' claims of independent creation. As explained in my report and recommendation, the Court should not, at this juncture, decide whether the Defendants have established the affirmative defense of independent creation. Accordingly, I do not rely on paragraphs 26 to 30 of the Defendants'

24

statement of undisputed facts in the report and recommendation, and I accordingly do not need to decide whether to strike those paragraphs.

## III.    Sealing

The parties previously requested that the Court seal various summary judgment exhibits. The Court granted the parties' requests on an interim basis but noted that it may reconsider their applications when deciding the summary judgment motions. ECF No. 286. The documents currently under seal fall into two categories: (1) documents deemed confidential by the Defendants and filed under seal pursuant to a stipulated protective order; and (2) Freeman's manuscripts and notes. The parties' disputes over sealing primarily relate to the second category.

"The common law right of public access to judicial documents is firmly rooted in our nation's history." Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006). This strong presumption of access "is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." Id. (quoting United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995)). Documents are considered "judicial documents" if they are "relevant to the performance of the judicial function and useful in the judicial process." Brown v. Maxwell, 929 F.3d 41, 49 (2d Cir. 2019) (citation omitted). The presumption of public access is at its highest when the material is relevant to a court's decision on a dispositive motion, such as a motion for summary judgment. Id. at 50.

Freeman's manuscripts and notes are highly relevant to the Court's decision on the parties' cross-motions for summary judgment. In fact, aside from Wolff's *Crave* series, Freeman's *BMR* materials are the documents *most* central to the issues before the Court. The Court relies on the *BMR* materials to make recommendations about both probative and striking

similarity. The Court therefore considers Freeman's materials judicial documents with the highest presumption of public access.

After finding that documents are judicial documents to which the common law presumption of access attaches, courts must "balance competing considerations against" that presumption. Lugosch, 435 F.3d at 120 (citation omitted). The sealing of judicial documents "may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." Id. at 124. The interests in favor of non-disclosure can include "the privacy interests of those resisting disclosure." Walker v. City of New York, No. 15-cv-500, 2017 WL 2799159, at *6 (E.D.N.Y. June 27, 2017); In re United States for Material Witness Warrant, No. 19-cv-447, 2020 WL 3959208, at *3 (S.D.N.Y. July 13, 2020) (citations omitted). The moving party must make a "particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection." Ashmore v. CGI Grp. Inc., 138 F. Supp. 3d 329, 351 (S.D.N.Y. 2015), aff'd, 923 F.3d 260 (2d Cir. 2019).

The Court recognizes that Freeman holds a privacy interest in her manuscripts and notes. Nevertheless, the right of public access far outweighs Freeman's privacy interest. When initially briefing the issue, Freeman identified two specific injuries that could flow from unsealing her manuscripts: an increased risk of other authors infringing her work and "diminished creative control" over the publication of her work. The Copyright Act, however, protects unsealed work with equal force as sealed work. Unsealing would not "undermine the entire goal of copyright law," as Freeman argues, because she can still sue for copyright infringement after the Court unseals her manuscripts. And any "diminished creative control" over future publication of

26

Freeman's work flows naturally from her choice to file a public lawsuit litigating the substance of her work.

The parties now report that the case is garnering attention on social media, and Freeman puts forth new concerns about unsealing. She argues that social media posts siding with the Defendants "have already caused her substantial harm and prejudiced the jury pool against her," and that unsealing her manuscripts would only worsen both problems.[12] ECF No. 360 at 3. But Freeman does not specify the harm the social media posts have caused her, and the Court does not agree that the social media posts would hinder jury selection; courts in this district have successfully selected impartial juries in many higher-profile cases with more controversy.

In the Court's view, the case's newfound social media attention only strengthens the need for public access. To ensure the public's "confidence in the administration of justice," the public should have Freeman's manuscripts, which are materials central to today's decisions. Lugosch, 435 F.3d at 119 (citing United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995)). The public generally, and Wolff's fans particularly, have a right to look at Freeman's books to consider, for themselves, the validity of her publicly filed accusations. This is especially true in light of the reputational harm faced by Kim and Prospect. Accordingly, the Court orders the unsealing of Freeman's manuscripts and notes.

Freeman argues in the alternative that if the Court unseals her manuscripts, it should also unseal Wolff's unpublished early drafts and "the voluminous text messages" produced by the

---

[12] Freeman's letter also alleges that the Defendants started this social media controversy and speculates about the Defendants' specific tactics and related expenses. None of these arguments are relevant to the Court's analysis under Lugosch.

Defendants. ECF No. 360 at 4. This kind of tit-for-tat unsealing is not consistent with Lugosch; instead, what matters is whether materials qualify as judicial documents, and whether any interests overcome the presumption of public access. Freeman does not cite to which specific exhibits she wants unsealed, and she does not explain why these materials qualify as judicial documents under Lugosch. The Court does not rely on any early Wolff drafts in either of the decisions it issues today, and accordingly, such drafts do not qualify as judicial documents.

Several text messages, however, do qualify as judicial documents. Doniger Exhibit 15 contains text messages central to the Court's conclusion that access is in dispute, and the Court cites those text messages in its report and recommendation. Additionally, Doniger Exhibits 5, 6, 11, 18, and 20 contain text messages related to the *Crave* writing process, and particularly, Kim's role. Because the question of Kim's involvement in *Crave*'s authorship is discussed in my report and recommendation, and those texts messages are relevant to that question, those sets of text messages also qualify as judicial documents. Additionally, the Court relies on Doniger Exhibit 4, Wolff's deposition transcript, to conclude that access is in dispute, rendering that transcript a judicial document. In large part, the text messages and Wolff's deposition transcript discuss non-confidential matters relevant Freeman's claims, and accordingly, the Court identifies no interests outweighing the presumption of public access. To the extent that these materials mention personal and irrelevant information, like Wolff's finances, the parties should redact that confidential information consistent with their protective order.

The Court ORDERS the parties to file unredacted versions of Freeman's manuscripts and notes, the relevant text messages, and Wolff's deposition transcript by August 9, 2024.

28

## CONCLUSION

The Court STRIKES the affirmative expert testimony of Dr. Patrick Juola, Dr. Carole E. Chaski, Professor Kathryn Reiss, and the rebuttal testimony of Dr. Malcolm Coulthard, Emily Easton, and Ron Kaplan. The Court reserves decision with respect to the parties' requests to exclude the testimony of Christine Witthohn, Eric Ruben, Marlene Stringer, and Rose Hilliard, pending the Court's decision on whether to adopt my recommendations regarding Freeman's state law claims. Additionally, the Court GRANTS the Defendants' motion to strike Freeman's similarity indexes and additional statement of facts, DENIES Freeman's motion to seal her manuscripts, notes, text messages, and Wolff's deposition transcript, and otherwise GRANTS the parties' motions to seal. By August 9, 2024, the parties shall file unredacted versions of Freeman's manuscripts and notes, Wolff's deposition transcript, and the relevant text messages (currently under seal at: ECF No. 277, Freeman Exhibits 3-11 and 14-19; ECF No. 301, Cole Exhibits E, F, and CC; and ECF No. 279, Doniger Exhibits 4-6, 11, 15, 18, and 20).

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 297, 309, 314, and 321.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:      August 1, 2024
            New York, New York

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)**

**ADDENDUM "B"**

**Issue (1):** (a) Did the district court err in ordering that the Parties may file a second set of cross-summary judgment motions on the issue of substantial similarity and then granting summary judgment against Freeman's claims of copyright infringement on the basis that no reasonable jury could find that Freeman's *BMR* is substantially similar to Wolff's *Crave* books, after the Parties' original cross-motions for summary judgment each sought a finding as to substantial similarity and were denied in their entirety? and (2) If the Court of Appeals finds that it was not an error for the district court to order that the Parties may file a second set of cross- summary judgment motions on the issue of substantial similarity, did the district court err in denying Freeman's second motion for summary judgment.

**Standard of Review (1):** This Circuit "review[s] de novo a district court's decision to grant summary judgment, construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor." *Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021). "Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir.2011) (quoting Fed.R.Civ.P. 56(a)).

The standard of review for a district court judge's decision to revisit the decision of a prior judge is abuse of discretion. See *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532–33 (9th Cir. 2000). When that prior decision creates law of the case, a judge may use its

1

discretion to depart from the law of the case "where one of the following applies: "(1) the first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) the evidence on remand is substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result." *Mendenhall v. Nat'l Transp. Safety Bd.*, 213 F.3d 464, 469 (9th Cir.2000).

**Issue (2):** Did the district court err in denying Freeman's first motion for summary judgment on her copyright infringement claims in its entirety after, *inter alia*, (1) Defendants offered no evidence to controvert her ownership of a valid copyright, (2) the Court found strong evidence of probative similarity and there was clear intermediary access, and (3) there was substantial similarity between the works?

**Standard of Review (2):** This Circuit reviews summary judgment decisions "de novo." See *Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021). Although a denial of a summary judgment motion is not immediately appealable, it becomes subject to appeal upon final judgment as after final judgment "the earlier, nonfinal orders that affect those judgments become subject to appellate review…An order on summary judgment, if not a final order that can be immediately appealed, does "fall[ ] within the large class of orders that are indeed reviewable on appeal after final judgment." *United States v. 228 Acres of Land & Dwelling Located on Whites Hill Rd. in Chester, Vt.*, 916 F.2d 808, 811 (2d Cir. 1990), citing *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 377, 101 S.Ct. 669, 675, 66 L.Ed.2d 571 (1981).

"In reviewing a summary judgment decision, [this Circuit] appl[ies] the same standards applied by the district court. Under this standard, summary judgment may be granted only if

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024), citing *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126 (2d Cir. 2013).

**Issue (3):** Did the district court abuse its discretion in excluding the testimony of Plaintiff's expert witnesses, Professor Kathryn Reiss and Dr. Carole Chaski , and in precluding Freeman from, at a minimum, producing Professor Reiss as a rebuttal expert witness to rebut Easton's testimony

**Standard of Review (3):** The Second Circuit reviews "a district court's determination to admit or exclude expert testimony under Daubert for abuse of discretion." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 264 (2d Cir. 2002), citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In the context of a *Daubert* determination, "the abuse of discretion standard 'applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion.'" Id. At 265, citing *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. A decision to exclude expert testimony is an abuse of discretion where it is "manifestly erroneous." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 60 (2d Cir. 2002), citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir.1995).

In making a determination to exclude or admit expert testimony, the district court must "look to Federal Rule of Evidence 401 to determine whether the testimony is relevant; i.e., whether it 'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

3

evidence.'"  Id., quoting *Campbell ex rel Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d

179, 184 (2d Cir.2001)