# 26-1016

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

**Lynne Freeman**, an individual,
*Plaintiff-Appellant,*

v.

**Tracy Deebs-Elkenaney**, an individual; **Emily Sylvan Kim**, an individual; **Prospect Agency, LLC**, a New Jersey limited liability company; **Entangled Publishing, LLC**, a Delaware limited liability company; **Holtzbrinck Publishers, LLC dba Macmillan**, a New York limited liability company; **Universal City Studios, LLC**, a Delaware limited liability company,
*Defendants-Appellees,*

**Macmillan Publishers, LLC**; **Crazy Maple Studio, Inc**., a California Corporation,
*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, CASE NO. 1:22-CV-02435-CM-SN, HONORABLE COLLEEN MCMAHON

### BRIEF OF APPELLANT

DONIGER / BURROUGHS
Stephen M. Doniger, Esq.
stephen@donigerlawfirm.com
David M.S. Jenkins, Esq.
247 Water Street, First Floor
New York, New York 10038
Telephone: (310) 590-1820

REEDER LLP
Mark D. Passin, Esq.
mark@reederllp.com
11766 Wilshire Blvd, Suite 1470
Los Angeles, CA 90025
310-861-2475

*Counsel for Plaintiff-Appellant*
*Lynne Freeman*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Lynne Freeman respectfully requests oral argument in this matter.

# CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Plaintiff-Appellant states that Plaintiff-Appellant Lynne Freeman is a natural person.

Dated: July 29, 2026               Respectfully submitted,

By:   */s/ Stephen M. Doniger*
      Stephen M. Doniger, Esq.
      DONIGER / BURROUGHS
      *Attorneys for Plaintiff-Appellant*

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT……………………………………...1

II.     ISSUES PRESENTED FOR REVIEW…………………………...…..2

III.    STATEMENT OF THE CASE……………………………………….3

IV.     SUMMARY OF ARGUMENT …………………………………...5

V.      STANDARD OF REVIEW……………………………………......7

VI.     ARGUMENT…………………………………………………………9

  I.    The District Court should have adjudicated ownership and access in favor of Freeman on the First Summary Judgment …………………9

  A.    There is no dispute Freeman owns a valid copyright in BMR………10

  B.    The uncontroverted evidence establishes intermediary access……...11

  C.    Probative similarity was properly found as a matter of law………...14

  II.   The District Court erred in allowing the Second Summary Judgment motions and then issuing judgment against Freeman……………....16

  A.    It was error to allow the Second Summary Judgment motions………17

  B.    The district court erred in granting summary judgment in favor of Defendants ………………………………………………………….22

    1.  The similarities in this case support a finding of actionable copying …………………………………………………….…25

      a.  The works feature substantially similar characters …………..26

iii

b. *Crave* (book 1) is substantially similar to *BMR*……………... 40

c. *Crush* is substantially similar to *BMR* …………………….…..56

d. *BMR* and *Covet* are substantially similar ……………………58

e. *BMR* and *Court* are substantially similar ……………….……63

f. The works share substantially similar scenes and settings …...65

g. The Themes and Pace of the *Crave* Books and *BMR* are substantially similar…………………………………………..66

h. BMR and the Crave Books are substantially similar in overall feel and impression …………………………………...…..70

i. The Court's summary judgment evaluation was materially inaccurate ……………….………………………………70

III. It was error to exclude the expert testimony of Professors Reiss and Chaski.………………….……………………………………... 86

A. It was error to entirely exclude Professor Reiss.…………………… 87

B. It was error to exclude Dr. Chaski.……………………………….89

VII. CONCLUSION.……………………………………………………... 92

## TABLE OF AUTHORITIES

*Page(s)*

*Cases*

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)...............................................................8, 87

*Arica Inst., Inc. v. Palmer*,
970 F.2d 1067 (2d Cir. 1992) ....................................................................25

*Bey v. City of New York*,
999 F.3d 157 (2d Cir. 2021)........................................................................7

*Boisson v. Banian, Ltd.*,
273 F.3d 262 (2d Cir. 2001).......................................................................23

*Campbell ex rel Campbell v. Metro. Prop. & Cas. Ins. Co.*,
239 F.3d 179 (2d Cir.2001)..........................................................................9

*Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*,
150 F.3d 132 (2d Cir. 1998)............................................ 10, 23, 24, 25, 65

*Cates v. Schlemovitz*,
2023 WL 6200196 (N.D.N.Y. Sept. 22, 2023) .........................................11

*Detective Comics v. Bruns Publications*,
111 F.2d 432 (2d Cir. 1940)........................................................................27

*Devilla v. Schriver*,
245 F.3d 192 (2d Cir. 2001).........................................................................8

*Doninger v. Niehoff*,
642 F.3d 334 (2d Cir.2011)..........................................................................8

*Enter. Mgmt. Ltd., Inc. v. Construx Software Builders, Inc.*,
73 F.4th 1048 (9th Cir. 2023) ....................................................................56

*Eyal R.D. Corp. v. Jewelex New York, Ltd.*,
576 F. Supp. 2d 626 (S.D.N.Y. 2008) ........................................................22

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
314 F.3d 48 (2d Cir. 2002) ...........................................................................9

*Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*,
499 U.S. 340 (1991)......................................................................................9

*Feuer-Goldstein, Inc. v. Michael Hill Franchise Pty. Ltd.*,
No. 16-CV-9987 (PKC), 2019 WL 1382341 (S.D.N.Y. Mar. 27, 2019) ..............12

*Gal v. Viacom Int'l, Inc.*,
518 F. Supp. 2d 526 (S.D.N.Y. 2007) .......................................................20

*Gaste v. Kaiserman*,
863 F.2d 1061 (2d Cir. 1988) .....................................................................11

*Hamil Am. Inc. v. GFI*,
   193 F.3d 92 (2d Cir.1999) ..........................................................................10

*Horgan v. Macmillan, Inc.*,
   789 F.2d 157 (2d Cir.1986) .......................................................................24

*Horizon Comics Productions Inc. v. Marvel Entm't, LLC*,
   No. 16-CV-2499 (JPO), 2019 WL 3080847 (S.D.N.Y. July 15, 2019)..................11

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
   982 F.3d 113 (2d Cir. 2020)........................................................................86

*Johnson v. Holder*,
   564 F.3d 95 (2d Cir. 2009) ....................................................................17, 18

*Jorgensen v. Epic/Sony,*
   *Recs.*, 351 F.3d 46 (2d Cir. 2003)...........................................................12, 15

*Kaye v. Cartoon Network Inc.*,
   297 F. Supp. 3d 362 (S.D.N.Y. 2017) ..........................................................26

*Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*,
   71 F.3d 996 (2d Cir. 1995) .........................................................................23

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ...................................8

*Lessem v. Taylor*,
   766 F. Supp. 2d 504 (S.D.N.Y. 2011) ..........................................................11

*Lewinson v. Henry Holt & Co., LLC*,
   659 F. Supp. 2d 547 (S.D.N.Y. 2009) ..........................................................15

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
   97 F. Supp. 3d 485 (S.D.N.Y. 2015)............................................................88

*McCullock v. H.B. Fuller Co.*,
   61 F.3d 1038 (2d Cir.1995).........................................................................9

*New Old Music Group, Inc. v. Gottwald*,
   122 F. Supp. 3d 78 (S.D.N.Y. 2015)............................................................15

*Nichols v. Universal Pictures Corp.*,
   45 F.2d 119 (2d Cir. 1930).........................................................................22

*Otto v. Hearst Commc'ns, Inc.*,
   345 F. Supp. 3d 412 (S.D.N.Y. 2018) ..........................................................10

*Pannonia Farms, Inc. v. USA Cable*,
   No. 03 CIV. 7841 (NRB), 2004 WL 1276842 (S.D.N.Y. June 8, 2004)...............56

*Paramount Pictures Corp. v. Carol Pub. Grp., Inc.*,
   181 F.3d 83 (2d Cir. 1999).........................................................................25

*Penguin Random House LLC v. Colting*,
   270 F. Supp. 3d 736 (S.D.N.Y. 2017) ..........................................................27

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
   602 F.3d 57 (2d Cir. 2010)...............................................................10, 22, 24

*Price v. Fox Entm't Grp., Inc.*,
   No. 05 Civ. 5259, 2007 WL 241389 (S.D.N.Y. Jan. 27, 2007).........................11, 12

*Puricelli v. Argentina*,
   797 F.3d 213 (2d Cir. 2015)......................................................................................8

*Repp v. Webber*,
   892 F. Supp. 552 (S.D.N.Y. 1995)........................................................................19

*Reyher v. Children's Television Workshop*,
   533 F.2d 87 (2d Cir.1976).....................................................................................23

*Ringgold v. Black Ent. Television, Inc.*,
   126 F.3d 70 (2d Cir. 1997)....................................................................................25

*Rogers v. Koons*,
   960 F.2d 301 (2d Cir. 1992)..................................................................................55

*Sandoval v. New Line Cinema Corp.*,
   147 F.3d 215 (2d Cir.1998)...................................................................................23

*Scott v. Chipotle Mexican Grill, Inc.*,
   315 F.R.D. 33 (S.D.N.Y. 2016)............................................................................88

*Sheldon Abend Revocable Tr. v. Spielberg*,
   748 F.Supp.2d 200 (S.D.N.Y. 2010) ....................................................................26

*Sheldon v. Metro-Goldwyn Pictures Corp.*
   81 F.2d 49 (2d Cir. 1936)......................................................................................24

*SHL Imaging, Inc. v. Artisan House, Inc.*,
   117 F.Supp.2d 301 (S.D.N.Y.2000)......................................................................22

*TufAmerica, Inc. v. Diamond*,
   968 F. Supp. 2d 588 (S.D.N.Y. 2013) ..................................................................22

*Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*,
   338 F.3d 127 (2d Cir.2003)....................................................................................24

*Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*,
   996 F.2d 1366 (2d Cir. 1993) ...............................................................................24

*United States v. Aquart*,
   92 F.4th 77 (2d Cir. 2024) ......................................................................................8

*United States v. Quintieri*,
   306 F.3d 1217 (2d Cir.2002)..................................................................................18

*United States v. Tenzer*,
   213 F.3d 34 (2d Cir. 2000) ......................................................................................8

*United States v. Williams*,
   205 F.3d 23 (2d Cir. 2000) ......................................................................................8

*Warner Bros. Entertainment Inc. v. RDR Books*,
   575 F. Supp. 2d 513 (S.D.N.Y. 2008) ..................................................................40

*Warner Bros. v. American Broadcasting Cos.*
   720 F.2d 231 (2d Cir. 1983)...........................................................................26, 27

*Williams v. Crichton*,
  84 F.3d 581 (2d Cir.1996) ............................................................ 8, 23, 40, 87
*Yonay v. Paramount Pictures Corp*
  163 F.4th 685 (9th Cir. 2026) ......................................................................24
*Zalewski v. Cicero Builder Dev., Inc.*,
  754 F.3d 95 (2d Cir. 2014) ...........................................................................15
*Zen Music, Inc. v. CVS Corp.*,
  1999 WL 605462 (S.D.N.Y. Aug. 11, 1999) ...............................................19

*Statutes*

17 U.S.C. § 101, et seq. ..................................................................................ix
17 U.S.C. § 410 ..............................................................................................10
28 U.S.C. § 1291 .............................................................................................ix
28 U.S.C. § 1331 .............................................................................................ix
28 U.S.C. § 1338(a) .........................................................................................ix

*Rules*

Fed. R. Civ. P. 56(a)……………………………………………………..7
Fed. R. Civ. P. 56(a) advisory committee's note to 2010………………………19
Fed. R. Evid. 401………………………………………………..…….…..…9
Fed. R. Evid. 702………………………………………….……….…...…………86

# JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this matter because it arose under the Copyright Act of 1976, Title 17 U.S.C. § 101 et seq, and the court had federal question jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). This Court has jurisdiction under 28 U.S.C. § 1291 as it arises from a final decision rendered by the district court. Final judgment was entered on April 1, 2026. A timely notice of appeal was filed on April 15, 2026. This appeal is from a final disposition that disposes of all parties' claims.

## I.   PRELIMINARY STATEMENT

For over three years Lynne Freeman worked closely with an agent she trusted to improve and secure a publication deal for her young-adult paranormal romance novel. After those efforts proved unsuccessful and they parted ways, Freeman learned that her former agent worked with another author and close personal friend to develop the New York Times bestselling *Crave* book series, from which copying of Freeman's work was so apparent the magistrate judge in this case found:

> The similarities – some more probative than others – add up to raising an inference that *Crave*'s authors copied these Freeman works. In both sets of works: the heroine lives in Alaska after moving from California in the wake of losing close family members, including their fathers, in a tragic accident; the heroine believes she is human but later learns that she is a supernatural half-witch key to maintaining the balance between good and evil; an evil vampire kidnaps the heroine and bites her; an evil vampire has trapped the heroine's paternal family member in a non-human form; a mean girl spikes the heroine's drink; and more. Absent copying, one would not expect two works to share these kinds of similarities.

*See* [**SA-209-210**].

When this case got to summary judgment, the district court initially denied both parties cross-motions on all issues despite the undisputed evidence that Freeman holds a valid copyright, the findings of probative similarity (noted above), and the undisputed evidence that her agent had access to her work, was the

1

agent and good friend of Tracy Wolff, author of the *Crave* series, and assisted in the writing of that *Crave* series. Separately, the Court excluded two well qualified experts advanced by Freeman to establish access, aid the jury in deciding the issue of substantial similarity, and address claims related to tropes and genre conventions.

After Judge Stanton ordered that all issues be tried to a jury, the case was reassigned to Judge McMahon who first proposed a bench trial instead and then, after Freeman confirmed her preference for a jury trial, ordered new summary judgment proceedings to again address substantial similarity. Following additional briefing, the district court found a lack of sufficient similarity in a lengthy Order that improperly dissected the works, ignored many similarities, attributed others to unprotectable ideas, and contained material factual inaccuracies.

Freeman respectfully requests that the judgment be reversed with instructions for a trial on all issues other than ownership and access, which should be adjudicated in Freeman's favor, and that Freeman's experts be allowed to offer their well-grounded testimony.

## II.   ISSUES PRESENTED FOR REVIEW

1. Did the district court err in failing to summarily adjudicate ownership of a valid copyright and access in Freeman's favor on her first motion for

summary judgment after Appellees offered no evidence to controvert that

ownership and there was clear intermediary access and probative similarity?

2. Did the district court err in allowing a second set of cross-summary

judgment motions on the issue of substantial similarity and then adjudicating

substantial similarity against Freeman when the first set of cross-motions

fully addressed that same question, no new facts or change in law were

presented, and a reasonable jury could have readily found in Freeman's

favor?

3. Did the district court abuse its discretion in excluding the testimony of

Appellant's expert witnesses, Professor Kathryn Reiss and Dr. Carole

Chaski when both were well qualified and offered relevant testimony?

## III.   <u>STATEMENT OF THE CASE</u>

Lynne Freeman ("Freeman") worked with Emily Kim ("Kim") and Prospect

Agency, LLC ("Prospect Agency") from December 2010 through middle of 2014

to represent her in finding a publisher for her young-adult paranormal romance

story entitled Blue Moon Rising (later called *Masqued* and referred herein as

"*BMR*"). [**A-4249; A-3717-3719**]. After Freeman learned of the *Crave* books–

another young-adult paranormal romance story bearing remarkable similarities to

*BMR* on which Kim was also the agent, she initiated this action against Kim,

Prospect Agency, author Tracy Deebs-Elkenaney p/k/a Tracy Wolff ("Wolff"),

3

publisher Entangled Publishing LLC ("Entangled") and distributor Holtzbrinck Publishers, LLC d/b/a Macmillan ("Macmillan").

During litigation, Freeman retained expert witnesses Kathryn Reiss, a writing professor with expertise in the tropes and genre conventions of young adult paranormal romance literature, and Dr. Carole Chaski, a forensic linguist who conducted a review for plagiarism.

After discovery, Judge Stanton referred summary judgment and *Daubert* motions to Magistrate Judge Netburn. [Dkt. No. 254] The parties filed cross summary judgment motions (the "First Summary Judgment" motions), with Freeman seeking adjudication that she held a valid copyright in her *BMR* work, that Defendants had access to that work through Kim and Entangled, and that the *Crave* series and *BMR* share substantial similarity of protectable expression. [**A-7178-7361**] Defendants' motion argued that, although Kim had access to many of Freeman's manuscripts, Wolff created the *Crave* series independently and that the works were not substantially similar. [**A-7220-7222**] Appellees also filed a *Daubert* motion seeking to exclude various of Freeman's experts. [Dkt. No. 321]

Judge Netburn issued a Report and Recommendation that both summary judgment motions be denied, finding, *inter alia*, that "[w]here, as here, the similarities fall somewhere between probative and striking, substantial similarity presents a particularly close question of fact and should be decided by a jury."

4

[**SA-213**] The court also entered an Opinion and Order granting Defendants' motions to exclude the testimony of Professor Reiss and Dr. Chaski. [**SA-169-197**]

Judge Stanton adopted the Report and Recommendation over both parties' objections, concluding that all questions related to Freeman's copyright infringement claims should be resolved by a jury. [**SA-165-197**]. He also confirmed Judge Netburn's Order excluding Reiss and Chaski. [***Id.***]

The case was then reassigned to Judge Colleen McMahon, who determined that substantial similarity had not been adequately addressed on summary judgment and allowed the parties to file renewed motions on that question ("Second Summary Judgment"). [**SA-160**] The parties again filed cross motions and Judge McMahon granted Appellees', finding that *BMR* and the *Crave* books were not substantially similar as a matter of law. Dkt. 530-1.

Freeman timely filed this appeal.

## IV.    SUMMARY OF ARGUMENT

The district court erred in denying Freeman's First Summary Judgment motion as to at least her ownership of a valid copyright and Appellees' access to *BMR* 2010, 2011, 2012 and 2013. First, Appellees offered no argument whatsoever to dispute that *BMR* was entitled to copyright protection or that Freeman was the author and copyright owner in that work. And second, the

5

undisputed evidence–including a review of the works themselves–established that Appellees either had direct access to *BMR* (e.g., Kim and Entangled) or access through Kim and Entangled as intermediaries, and that the *Crave* series shares probative similarity that raises an inference of copying.

The district court also erred in allowing a Second Summary Judgment motion on substantial similarity. Both sides had fully briefed and argued for a finding of substantial similarity in their favor on the First Summary Judgment motions, and the district court had undertaken a full review of the works before denying those motions, finding that substantial similarity posed a close question of fact to be reserved for a jury. There were no new facts, change in law, or other cogent or compelling reasons to depart from the court's prior Orders.

The district court then compounded that error by finding a lack of substantial similarity as a matter of law. While there are differences between *BMR* and the *Crave* series–one is the progressive development of a first book of a contemplated series while the other is an actualized series that necessarily had to add substantial additional material–they share a remarkably similar cast of characters, similar scenes, *Crave* (book 1) and *BMR* share a significant overlap of sequential plot points and story beats, and Books 2-4 of the *Crave* series then flesh out secondary and tertiary storylines from *BMR* involving that same cast of characters. There are also individual scenes that by themselves could support a

6

finding of substantial similarity. In finding a lack of substantial similarity the district court impermissibly dissected the works into constituent elements, abstracted them to ideas or scenes a faire, or else omitted similarities between the works from its analysis entirely.

Finally, the district court erred in silencing Freeman's qualified experts on literary tropes and genre conventions for allegedly not addressing differences between the works at issue even though copyright infringement is indeed concerned with similarities, not differences. It also erred in excluding a well-qualified forensic linguist with relevant and proper testimony regarding access.

The judgment should be reversed.

## V. STANDARD OF REVIEW

This Circuit "review[s] de novo a district court's decision to grant summary judgment, construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor." *Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021). "Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir.2011) (quoting Fed.R.Civ.P. 56(a)).

The Second Circuit "review[s] a district court's application of the law of the case doctrine for abuse of discretion[.]" *Devilla v. Schriver*, 245 F.3d 192, 198 (2d Cir. 2001), citing *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000). While the law-of-the-case doctrine does not bind a court from reconsidering its prior orders with the same "rigidity" as the orders of an appellate court, this Circuit has "consistently recognized it to reflect a 'sound policy' that we should depart from "sparingly and only when presented with cogent and compelling reasons[.]" *United States v. Aquart*, 92 F.4th 77, 87 (2d Cir. 2024), cert. denied sub nom. *Aquart v. United States.*, 145 S. Ct. 1071, 220 L. Ed. 2d 391 (2025), quoting *Puricelli v. Argentina*, 797 F.3d 213, 218–19 (2d Cir. 2015) Such reasons include "[1] an intervening change of controlling law, [2] the availability of new evidence, or [3] the need to correct a clear error or prevent manifest injustice[.]" *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000).

The Second Circuit reviews "a district court's determination to admit or exclude expert testimony under *Daubert* for abuse of discretion." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 264 (2d Cir. 2002), citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). This "abuse of discretion standard 'applies as much to the district court's decisions about how to determine reliability as to its ultimate conclusion.'" *Id*. at 265, citing *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. In making a determination to

exclude or admit expert testimony, the district court must "look to Federal Rule of Evidence 401 to determine whether the testimony is relevant; i.e., whether it 'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* (quoting *Campbell ex rel Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir.2001)). A decision to exclude expert testimony is an abuse of discretion where it is "manifestly erroneous." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 60 (2d Cir. 2002) (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir.1995).

## VI.    ARGUMENT

### I. The District Court should have adjudicated ownership and access in favor of Freeman on the First Summary Judgment.

To establish a claim of copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 361 (1991). This second element of "copying" consists of two parts: "actual copying" which is shown either via direct evidence or evidence of access and probative similarity between the two works, and "unlawful copying" such that the material the defendants copied bore substantial similarities to protected elements of the plaintiff's work. See *Peter F.*

9

*Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010), citing *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir.1999).

Actual copying "may be shown with direct or circumstantial evidence that the defendant had access to the copyrighted work and that there are probative similarities between the works." *Otto v. Hearst Commc'ns, Inc.*, 345 F. Supp. 3d 412, 425 (S.D.N.Y. 2018). "[A]fter actual copying is established" a plaintiff "must proceed to demonstrate that the copying was improper or unlawful by showing that the second work is substantially similar to protected elements of the original work." *Id.*, citing *Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998).

### A. There is no dispute Freeman owns a valid copyright in *BMR*.

In her First Summary Judgment motion, Freeman sought adjudication of her ownership of a valid copyright in *BMR* to facilitate the presentation of the case to the jury. *BMR* is an original work of literature created by Freeman and registered with the United States Copyright Office [**A-7152-7160, Dkt 276 ¶ 5**], providing "prima facie evidence of the valid ownership of a copyright." 17 U.S.C. § 410(c); *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 98 (2d Cir. 1999). Because Appellees offered no contrary evidence, ownership should have been summarily adjudicated in Freeman's favor.

### B. The uncontroverted evidence establishes intermediary access.

10

Next, Emily Kim was an undisputed intermediary with access to Freeman's work who then worked with Wolff to create the *Crave* series. And at least one copy of *BMR* was sent to Entangled, who then hired and worked with Wolff to create the *Crave* series. These facts established access as a matter of law, and it was error for the Court to find otherwise.

Access exists where an alleged infringer (or her intermediary) had a reasonable opportunity to view or copy the plaintiff's work. See *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988); *Price v. Fox Entm't Grp., Inc.*, No. 05 Civ. 5259, 2007 WL 241389, at *8 (S.D.N.Y. Jan. 27, 2007). Importantly, "a copyright infringement plaintiff need not prove that the infringer actually saw the work in question; it is enough to prove that the infringer (or his intermediary) had the mere opportunity to see the work and that the subsequent material produced is substantially similar to the work." *Cates v. Schlemovitz*, 2023 WL 6200196, at *5 (N.D.N.Y. Sept. 22, 2023) (internal quotations omitted).

Courts "may infer that a reasonable possibility of access exists if 'the author sent the copyrighted work to a third party intermediary who has a *close relationship* with the infringer.'" *Lessem v. Taylor*, 766 F. Supp. 2d 504, 508–09 (S.D.N.Y. 2011) (citations omitted) (emphasis in original); see also *Horizon Comics Productions Inc. v. Marvel Entm't, LLC*, No. 16-CV-2499 (JPO), 2019 WL 3080847, at *4 (S.D.N.Y. July 15, 2019); *Price v. Fox*, 2007 WL 241389, at 8

11

(inferring a reasonable possibility of access when the intermediary and the defendant are "business friends"). This includes where the intermediary "supervises or works in the same department as the infringer or contributes creative ideas to [the infringer]." *Feuer-Goldstein, Inc. v. Michael Hill Franchise Pty. Ltd.*, No. 16-CV-9987 (PKC), 2019 WL 1382341, at *6 (S.D.N.Y. Mar. 27, 2019), citing *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 53 (2d Cir. 2003).

Here, Freeman worked with Kim and Prospect Agency from December of 2010 through the middle of 2014 on *BMR*. [**A-4249, A-4251, A-3717-3718; A-3746-3747, A-3866-3868**], and Kim admits to receiving at least 10-15 versions and accompanying notes. [**A-3728-3729, A-3753-3767; A-3980-4248**]. In the summer of 2013, Kim emailed Liz Pelletier ("Pelletier") of Entangled about the *BMR* manuscript, then-titled Masqued, and e-mailed a copy of the manuscript to Stacy Abrams ("Abrams") at Entangled. [**A-3742-3743**]. She told Freeman that she knew Abrams "really well" and that Entangled was her "best bet" for a publisher. [**A-7162**].

Entangled then went on to publish the *Crave* series, which Wolff, Kim, Pelletier, and Abrams admit that they created collectively. At all relevant times, Wolff was a friend and literary client of Kim. [**A-3732-A3735, A-2725-2727**]. And Appellees' testimony and contemporaneous text messages acknowledged that the *Crave* series was a "group project" in which Pelletier created the original

*Crave* series outline and several of the *Crave* series synopses, and Kim actively supported Wolff in writing the books. [**A-2734, A-2755-2759, A-3874-A-3875, A-3824-3825, A-3740, A-2771-2782**]

While Kim now disputes the extent of her involvement in that writing, her contemporaneous text messages establish that she stayed up in "a Google Doc with [Wolff] for 19 hours a day" while she was writing. [**A-2733-2733, A-2786**]. After Wolff told Kim she has a whole new chapter to write and is exhausted, Kim replies "Do you want to write together again?" Wolff replied: "Want to get [sic] in a google doc and help me write, I am falling asleep." [**A-2769**]. Kim tells Abrams, "Tracy and I are team speed writing new scenes." [**A-2791**]. In text messages between Kim and Pelletier discussing writing in the *Crave* Google Doc, Pelletier asks Kim "what did you edit in?" Kim texts Pelletier, "Tracy [Wolff] and I are working in Google Docs." [**A-2830**]. Kim then sends Pelletier entire paragraphs followed by "use this instead," seemingly indicating that those paragraphs should be included in the *Crave* book. [**A-2831**].

Defendants' only real answer was their self-serving denials that neither Kim nor Entangled actually shared *BMR* with Wolff. But Freeman need not prove that the intermediary actually shared the work or that each defendant actually viewed it. She need only establish the existence of an intermediary through whom there was a reasonable opportunity to do so–precisely what the undisputed evidence in

13

this case established. Defendants' answer may go to their defense of independent creation, but it cannot dispute access.

Given this undisputed evidence of Kim's (1) access to *BMR,* (2) long-standing and close relationships with Wolff and the other defendants as friends, colleagues and business partners, and (3) involvement with the creation of the *Crave* series, it was error for the district court to deny Freeman a finding in her favor on access as a matter of law.

### C. Probative similarity was properly found as a matter of law.

There was also no genuine issue as to the second facet of actual copying, probative similarity. Beyond the remarkable similarities between *BMR* and the *Crave* series in not only overall storyline, scenes, and plot points (discussed in Section II.B., *infra*) there are uncanny similarities including 18 shared character names[1], pop culture references, word choices and descriptions[2], and other elements that strongly evidence copying. Indeed, as noted above, Judge Netburn found that Freeman "established probative similarity," with respect to *BMR* 2010,

---

[1] These shared names include the Bloodletter, God of Chaos, Marise, Fiona, Lily, Emma, Dylan, Cleo / Clio, Selene / Celine, Queen of Shadows / Shadow Queen, Collin (Colin), Aedan (Aidan), Gwendolyn (Gwen), Macy (Mason), Athair / Alistair, Morrigan who wears a dagger / Morrigan's dagger, the Hulk, Osiris/Cyrus.

[2] See Dkt. No. 1. Freeman's 86-page initial complaint details pages of shared word choices and description.

14

2011, 2012, and 2013, explaining that "[a]bsent copying, one would not expect two works to share these kinds of similarities." *See* [**SA-210**].

"There is an inverse relationship between access and probative similarity such that the stronger the proof of similarity, the less proof of access is required." *Jorgensen*, 351 F.3d at 56. Thus, the probative similarity between the works in this case establishes access even without the clear and direct evidence of direct and intermediary access.

"Probative similarity... requires only that the works are similar enough to support an inference that the defendant copied the plaintiff's work." *Lewinson v. Henry Holt & Co., LLC*, 659 F. Supp. 2d 547, 563 (S.D.N.Y. 2009) "Similarities between works are 'probative of copying' if they 'would not be expected to arise if the works had been created independently.'" *New Old Music Group, Inc. v. Gottwald*, 122 F. Supp. 3d 78, 85 (S.D.N.Y. 2015) (other citations omitted). When determining whether probative similarity exists, the court must consider the entire work, not just the protectable elements. *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 101 (2d Cir. 2014).

"Evidence admissible on the issue of 'probative similarity' includes expert testimony 'dissecting' the two works and discussing the works' relationship to other earlier works, for the purpose of illuminating whether similarities between the two works are more likely due to copying or independent creation." *New Old*

15

*Music Group, Inc. v. Gottwald*, 122 F. Supp. 3d 78, 85 (S.D.N.Y. 2015) (citations omitted). In this case, Freeman buttressed the obvious probative similarities between the works with the expert testimony of highly qualified witnesses including Dr. Carole Chaski and Professor Kathryn Reiss. As set forth in Section III *infra*, it was error to exclude their testimony.

But even without expert testimony, the probative similarity in this case means that independent creation is not plausible and access was properly established as a matter of law. The district court's denial of Freeman's First Summary Judgment motion should therefore be reversed with instructions to enter an adjudication in favor of Freeman on the ownership and access elements of her infringement claims.

## II. The District Court erred in allowing the Second Summary Judgment motions and then issuing judgment against Freeman.

The First Summary Judgment resulted in extensive briefing by both parties on the question of substantial similarity, a fulsome review by the court of the similarities between the works, and a determination that there were factual questions properly resolved by a jury. It was therefore unwarranted for the district court to allow a second summary judgment proceeding and error to then grant judgment in favor of Appellees where there was ample evidence upon which a

16

reasonable juror could find that the *Crave* series copied protectable expression from *BMR*–both in individual scenes and across the entirety of the story.

### A. It was error to allow the Second Summary Judgment motions.

When this case was reassigned to Judge McMahon, all that was left to do was prepare trial documents and proceed to trial. [**SA-164**]. And at the first conference after reassignment the court made it clear it would not revisit any previous rulings or orders rendered in the case. [**A-7060**].

However, the district court then expressed concern over how the volume of materials in this case could reasonably be presented to a jury [**A-7059**] and suggested the parties agree to a bench trial. [**A-7056**; Dkt. No. 482]. After Appellees agreed but Freeman did not [Dkt. Nos. 483 & 484], the court invited written submissions on a proposed plan to revisit summary judgment, suggesting that the First Summary Judgment motions had not addressed substantial similarity. [Dkt. No. 503]. It then ordered that either side could again move for summary judgment as to substantial similarity [**A-7022-7023**] over Freeman's objections [*see* Dkt. No. 511 pgs. 8-14].

The decision to revisit summary judgment was inconsistent with the law of the case doctrine, particularly after two judicial officers read the same works and both concluded a jury question existed.

17

The law of the case doctrine teaches that "'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'" *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009), citing *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir.2002). A court's discretion to depart from the law of the case is generally proper only where there is an "intervening change in law, availability of new evidence, or 'the need to correct a clear error or prevent manifest injustice.'" *Id*. at 99-100, quoting *Quintieri*, 306 F.3d at 1230. None of those exist here.

To be sure, both parties sought a finding in their favor on the question of substantial similarity on the First Summary Judgment motions. [**A-7178, A-7215**]. After reviewing those motions and the works themselves, full copies of which were put before her, Judge Netburn found that "[w]here, as here, the similarities fall somewhere between probative and striking, substantial similarity presents a particularly close question of fact and should be decided by a jury. [**SA-213**]. Judge Stanton then affirmed–over the Parties' respective objections–finding that "there are genuine factual issues about claimed similarities between Freeman's work and the defendants' work that require a jury trial." [**SA-166**]. And in response to Defendants' request that he reconsider, Judge Stanton confirmed that "all questions related to direct copyright infringement – including access,

18

probative similarity, actual copying, independent creation, and unlawful appropriation – are best left for trial." [**SA-167**].

Yet after reassignment the court concluded, seemingly from the absence of a detailed substantial similarity analysis in the prior Orders, that substantial similarity was not addressed. [**A-7024**; Dkt. No. 503, pp, 1-2; **SA-9-10**]. That was error.

First, where a court finds questions of fact and denies summary judgment, there is no requirement that it provide a detailed analysis in support of that finding. Rather, an order "denying summary judgment need not address every available reason" and the "form and detail of the statement of reasons are left to the court's discretion." Fed. R. Civ. P. 56(a) advisory committee's note to 2010 Amendment. Thus, courts frequently deny summary judgment with brief statements that it finds questions of fact. *See, e.g.*, *Zen Music, Inc. v. CVS Corp.*, 1999 WL 605462, at *7 (S.D.N.Y. Aug. 11, 1999) (denying summary judgment without elucidating why it found questions of fact as to striking, probative, and substantial similarity); *Repp v. Webber*, 892 F. Supp. 552, 557-58 (S.D.N.Y. 1995).

Next, the court certainly undertook a detailed review of both Freeman's work and the offending *Crave* books before denying the First Summary Judgment motions. This was evidenced by, *inter alia*, Judge Netburn's discussion of the differences between *BMR 2014* and *BMR 2016,* and her extensive analysis on

19

probative and striking similarity (including that *BMR*s 2010-2014 bore probative similarities to the *Crave* books while *BMR* 2016 did not. [**SA-209, SA-212**]. The court simply could not have arrived at those findings without a fulsome comparison of the works. And the court's "striking similarity" analysis [**SA-212**] is particularly noteworthy because "[t]he striking similarity test is 'stringent'" and requires "more than a showing of 'substantial similarity.'" *Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 537–38 (S.D.N.Y. 2007). Thus, that analysis required a review of the works at the level of substantial similarity.

Finally, Judge Netburn then correctly explained that summary judgment is only properly granted where "the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." [**SA-213**]. Had she found that to be the case here, she undoubtedly would have recommended a finding against Freeman, which she did not.

Judge Stanton agreed, largely adopting "Judge Netburn's detailed and comprehensive R&R" and found that "the factual issues about access, along with substantial or lesser degrees of similarity, compel the denial of summary judgment." [**SA-166**] (emphasis added). Indeed, Judge Stanton acknowledged that "Magistrate Judge Netburn properly recognized that there are genuine factual issues about claimed similarities between Freeman's work and the defendants'

20

work that require a jury trial" *Id*. Judge Stanton rejected Defendants' suggestion that the court was refusing to decide substantial similarity until after access was determined, explaining that "[t]here is a genuine dispute as the similarities between Freeman's and Wolff's work, particularly in a degree indicative of infringement and copying." [**SA-163**].

Further evidencing Judge Stanton's conclusion that there was a clear jury question on substantial similarity was the statement in his rejection of Defendants' motion for reconsideration that "the entire case on similarity, in more than necessary detail, is presented in pages 7-21" of plaintiff's response to the defendants' objections to the R&R filed on October 29, 2024[.]" [**SA-167**, Dkt. No. 393].

Ultimately, there was no change in law, no new evidence, and no "clear error" to correct or "manifest injustice" to prevent which justified reversing the district court's prior Orders. It was therefore an abuse of discretion to reopen summary judgment, and the case should be remanded with direction to proceed to a jury trial.

## B. The district court erred in granting summary judgment in favor of Defendants.

It was also error for the district court to then grant summary judgment in favor of Defendants. A review of the works themselves reveals that they share a

21

similar concept and feel, theme, characters, plot, sequence, pace, and setting—both across the entirety of the storyline and in subparts.

To be sure, the *Crave* series is not a 1:1 copy of *BMR*–Defendants added and changed elements as they turned Freeman's book one drafts into their own fleshed out series–but they tell the same basic story through a parallel cast of characters and, as explained in *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930), it is "essential to any protection of literary property, whether at common-law or under the statute, that the right cannot be limited literally to the text, else a plagiarist would escape by immaterial variations." Indeed, "[a] defendant creates a derivative work if it "incorporate[s] a substantial element of a preexisting work of authorship and recast[s], transform[s], and adapt[s] those elements." See *Eyal R.D. Corp. v. Jewelex New York, Ltd.*, 576 F. Supp. 2d 626, 633 (S.D.N.Y. 2008), quoting *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F.Supp.2d 301, 305 (S.D.N.Y.2000).

"[T]he Second Circuit has recognized different tests that courts can apply in determining the extent of similarity that will 'constitute a substantial, and hence infringing, similarity.'" *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 596 (S.D.N.Y. 2013), quoting *Peter F. Gaito*, 602 F.3d at 63. Such tests include the "quantitative/qualitative" approach, the "ordinary observer" test, the "total concept and feel" test, the "fragmented literal similarity" test and the "comprehensive

22

nonliteral similarity" test. *Castle Rock,* 150 F.3d at 138-140. Regardless of the test used, substantial similarity is a fact intensive determination, there "are no bright-line rules for what constitutes substantial similarity," and the decision must be made "on a case-by-case basis." *Id.*, quoting *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir.1998).

Where literary works are involved, courts look to "similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting." *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir.1996); *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir.1976).

And this review of the overall similarities considers both copyrightable and non-copyrightable elements since the selection and arrangement of unprotectable elements is itself entitled to copyright protection. See e.g. *Boisson v. Banian, Ltd.*, 273 F.3d 262, 272-73 (2d Cir. 2001); *Crichton*, 84 F.3d at 590. Thus, a defendant commits copyright infringement where it has misappropriated the original way in which the author has selected, coordinated, and arranged the elements of his or her work, regardless of whether those elements are individually protectable. *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1004 (2d Cir. 1995).

Put differently, because works of art like literature are composed of underlying elements that may not be individually protectable (e.g., words, ideas, tropes) but are protectable in their original selection and arrangement, "the

23

defendant may infringe on the plaintiff's work… by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art—the excerpting, modifying, and arranging of [unprotectible components] ...—are considered in relation to one another." *Peter F. Gaito.*, 602 F.3d at 66, quoting *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 133 (2d Cir.2003).[3]

And it also makes no difference that an infringer added to and expanded on the original work since, as Judge Learned Hand famously explained in *Sheldon v. Metro-Goldwyn Pictures Corp.*, "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." 81 F.2d 49, 56 (2d Cir. 1936). Regardless of how the original expression is copied, "'the standard for determining copyright infringement is not whether the original could be recreated from the allegedly infringing copy, but whether the latter is "substantially similar" to the former.'" *Castle Rock*, 150 F.3d at 141 (quoting *Horgan v. Macmillan, Inc.*, 789 F.2d 157, 162 (2d Cir.1986)).

Finally, "the concept of similarity embraces not only global similarities in structure and sequence, but localized similarity in language." *Twin Peaks Prods.,*

---

[3] The Ninth Circuit affirmed this in *Yonay v. Paramount Pictures Corp.*, explaining that "[t]he particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element[.]" 163 F.4th 685, 696 (9th Cir. 2026).

24

*Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1372 (2d Cir. 1993) (endorsing the taxonomy of "comprehensive nonliteral similarity" and "fragmented literal similarity" from the Nimmer treatise, 4 Nimmer § 13.03[A][2]); see also *Ringgold v. Black Ent. Television, Inc.,* 126 F.3d 70, 75 n.3 (2d Cir. 1997); *Arica Inst., Inc. v. Palmer,* 970 F.2d 1067, 1073 (2d Cir. 1992). In evaluating fragmented literal similarity, or "localized similarity in language," the Court examines the copying of direct quotations or close paraphrasing of the original work. See *Castle Rock*, 150 F.3d at 140; *Paramount Pictures Corp. v. Carol Pub. Grp*., 11 F. Supp. 2d 329, 333 (S.D.N.Y. 1998), *aff'd sub nom. Paramount Pictures Corp. v. Carol Pub. Grp., Inc*., 181 F.3d 83 (2d Cir. 1999).

**1. The similarities in this case support a finding of actionable copying**.

A reasonable jury could find that the similarities in plot, characters, settings, tone, and as to their overall concept and feel between *BMR* and the *Crave* reflect actionable copying, and it was error for the district court to find otherwise. To be sure, there are differences between them, but underlying those differences are a parallel cast of characters and shared central plot points that tell a substantially similar first-person story of a girl from San Diego who arrives in Anchorage, Alaska, believing she is human and then learning of her role in a supernatural war.

**a. The works feature substantially similar characters.**

25

"In determining whether characters are similar, a court looks at the 'totality of [the characters'] attributes and traits as well as the extent to which the defendants' characters capture the 'total concept and feel' of figures in [the plaintiff's work]." *Kaye v. Cartoon Network Inc.*, 297 F. Supp. 3d 362, 368 (S.D.N.Y. 2017), quoting *Sheldon Abend Revocable Tr. v. Spielberg*, 748 F.Supp.2d 200, 208 (S.D.N.Y. 2010). It is of no moment if the characters bear superficial differences; the question is whether the overall concept and feel between them is substantially similar. As the Second Circuit explained in *Warner Bros. v. American Broadcasting Cos.*,

> [w]hat the character thinks, feels, says and does and the descriptions conveyed by the author through the comments of other characters in the work episodically fill out a viewer's understanding of the character… Ultimately, care must be taken to draw the elusive distinction between a substantially similar character that infringes a copyrighted character despite slight differences in appearance, behavior, or traits, and a somewhat similar though non-infringing character whose appearance, behavior, or traits, and especially their combination, significantly differ from those of a copyrighted character, even though the second character is reminiscent of the first one.

720 F.2d 231, 241–42 (2d Cir. 1983).

In *Warner Bros.*, the Second Circuit rejected "defendants' mode of analysis whereby every skill the two characters share is dismissed as an idea rather than a protected form of expression." Id. at 243. That each may begin as "an idea does not diminish the expressive aspect of the combination… and [the] similarity

26

cannot be rejected by isolating as an idea each characteristic the characters have in common[.]" Id. (emphasis added). Indeed, "[t]hat approach risks elimination of any copyright protection for a character, unless the allegedly infringing character looks and behaves exactly like the original." *Id*. Nor is copying excused as mere "scenes a faire" simply because both characters draw from common archetypes. See *Penguin Random House LLC v. Colting*, 270 F. Supp. 3d 736, 746 (S.D.N.Y. 2017), citing *Detective Comics v. Bruns Publications*, 111 F.2d 432, 433 (2d Cir. 1940).

Set forth below is a description of the substantial similarity in characters that run throughout the parties' respective works.

### (i.) the Heroine

The heroine shares key psychological, biographical, and somatic characteristics in both works which are evident in her origin/backstory, internal monologues, self-directed humor, reactions to the supernatural, and more. She is driven into the story by a sudden, traumatic accident that claimed the lives of her immediate family members (caused by the villain who later kidnaps her.)[4] Her internal monologue contrasts her former life of "sunshine" in Southern California[5] with the "frozen" hostility of Alaska, which she views as a punitive or hellish

---

[4] **(A-1788–A-1789), (A-6477), (A-2131), (A-6915).**
[5] San Diego, **(A-237), (A-6435).**

27

landscape reflecting her internal grief.[6] She also carries guilt because her final words with her family were in an argument.[7] She now lives in Alaska with the only two family members she believes remain, both later revealed to be supernatural witches.[8] Each heroine utilizes the same techniques of careful breathing and counting breaths to manage her anxiety and panic.[9]

She believes she is an ordinary human but later learns she is a supernatural half-witch by birth–a unique magical being and queen not seen in ten generations/1,000 years who can shift forms, has magic in her blood, and whose purpose is to maintain the balance.[10] She is specifically born to balance two opposing forces: Shadows and Light (*BMR*) / Chaos and Order (*Covet*).[11] The supernatural world being out of balance affects the human world, causing erratic weather and storms.[12] She discovers both parents were supernatural creatures, one a witch, the other a werewolf/gargoyle, and that she is the descendent of a twin

---

[6] **(A-124–A-125), (A-6435–A-6437)**.
[7] **(A-1788–A-1789), (A-6477)**.
[8] **(A-126), (A-6439), (A-1439), (A-6748).**
[9] **(A-1551), (A-4994), (A-482), (A-2470, A-2645), (A-5084, A-5160), (A-2300, A-2350), (A-5297–A-5298)**.
[10] **(A-522), (A-6754), (A-1439), (A-6747), (A-1563), (A-5424), (A-2458), (A-6961), (A-5043, A-5104–A-5105); (A-2665), (A-5603); (A-6349), (A-553), (A-6182), (A-1309), (A-4502)**.
[11] **(A-1439), (A-5391)**.
[12] **(A-49-50), (A-2376, A-2396, A-2564), (A-5104–A-5105), (A-4501–A-4502)**.

28

goddess through her maternal grandmother.[13] She discovers her father "Athair" (*BMR*) / grandfather "Alistair" (*Court*) with smoky-gray eyes, who speaks Gaelic and first appears as a mysterious voice in her head. He is trapped in his bestial form in metal on an island at the hands of the vampire prince/ king after a magical bite.[14]

The heroine is kept ignorant of the supernatural world, her family's true natures, and her place in that world through, among other things, magical teas prepared by her mother and aunt that inhibit her powers.[15] And tea is a part of both stories: "Tea is big in our family...None of us are coffee people." (*BMR*)/ "It was always more about tea at my house." (*Crave*) and her aunt /mother was an herbalist.[16]

She is in danger because she could bring back the resurrection of Ronan in *BMR* / Hudson in *Crave,* whose return would cause war and the end of the

---

[13] **(A-49-50)**, **(A-591)**, **(A-1439)**, **(A-6747)**. **(A-5742, A-5869)**, **(A-821, A-822, A-824)**, **(A-5851–A-5852, A-5873, A-5864, A-5886)**.
[14] **(A-695)**, **(A-5642)**; **(A-1896, A-1911)**, **(A-5750)**, **(A-585)**, **(A-6904–A-6905)**. **(A-2061)**, **(A-5740)**, **(A-691)**, **(A-5742)**, **(A-2646)**, **(A-4498–A-4499)**. **(A-5537)**.
[15] The district court's Addendum D states: "magic tea" is made by Anna's aunt to dim her memories of her father's death (omitting the grandparents' deaths) which is incorrect. In both works the heroine was given "magic tea" to keep her identity hidden from herself. Anna's aunt is an herbalist and brewer of teas (**SA-147-148**); in *Crave*, Grace's mother was the herbalist who made tea blends **(A-6646)**, **(A-6153)**. *See also* **(A-110)** (powers bound to keep her safe) **(A-56).**
[16] **(A-1901)**, **(A-6646)**, **(A-204, A-321)**.

world.[17] She copes with the revelations of the supernatural world by attempting to rationalize the impossible, often with humor. For example, when confronted with a character's extraordinary age, she tries to "do the math in my head" to understand how someone could be "a thousand years old" / "over a thousand years old."[18] She also has the same tic with the romantic lead when uncomfortable: ducking her head down.[19]

Each does not see herself as beautiful but is described by others as "beautiful," "strong," and "smart."[20] She takes advanced classes, loves to read, quotes Shakespeare and other literature, and discusses French philosophers.[21] She is sarcastic and uses humor in stressful situations, using essentially the same nicknames, such as Mr. Tall Dark and Bloodthirsty / Mr. Tall Dark and Surly (for a vampire prince); "the Hulk;" Big, Bad and Bald / Big and Bigger, etc.[22] When embarrassed with the romantic lead she jokes about "word vomit" (*BMR*) / "vomiting words"[23] When she is bitten by a werewolf, she jokes about becoming

---

[17] **(A-1681, A-1686)**, **(A-4388)**; **(A-97-98, 103)**, **(A-1686)**, **(A-5593)**; **(A-1549, A-1563)**, **(A-583)**, **(A-6899–A-6900)**.

[18] **(A-2025)**, **(A-6072, A-6074)**.

[19] **(A-1713)**, **(A-6453)** **(A-289, A-290)**; **(A-6631)**, **(A-532)**

[20] **(A-182, A-185–A-186)**. **(A-6505, A-6710)**, **(A-1741, A-1791)**; **(A-5416)**

[21] **(A-142, A-152)**, **(A-6457, A-6658, A-6679)** , **(A-577, A-498, A-343)**;**(A-6523, A-6623, A-6684)**; **(A-1718)**, **(A-6596, A-6456–A-6457)** **(A-377)**, **(A-2183)**, **(A-5194)**; **(A-2437)** **(A-1481)**, **(A-5375)**.

[22] **(A-620)**, **(A-6464)**; **(A-1278)**, **(A-5172)** ; **(A-1527)**, **(A-5584)**

[23] **(A-165)**, **(A-5045)**

one: "Maybe I'll be a half-wolf, hairy chick running around on all fours," and worries about becoming a "werebear"(*BMR*) / "weregoyle" "garwolf" (*Crave*).[24] When she is kidnapped at the climax of the story and the evil vampire is going to use her to bring back their dead mate, she humorously thinks about Frankenstein: "I could be…Frankenstein's bride" (*BMR*) / "…I read Frankenstein…I can only imagine what abomination she'll bring back from the dead…" (*Crave*).[25]

Each feels like an outsider in her own life: "I've felt out of touch, out of place, my whole life." (*BMR*) / I felt odd, out of place, a fish out of water in my own body… and in my own life."[26] But each ultimately finds comfort in the supernatural world and says it "feels like coming home."[27] And after the loss she has suffered, she finds a new family among her supernatural friends and is willing to sacrifice herself to save those she loves.[28]

### (ii.) Romantic lead

Marked by loss and emotional isolation, the romantic lead is supernatural royalty and belongs to a group called "the Order."[29] He has full red lips, chiseled features, dark hair, a lean and muscular physique, eyes like gemstones with gold

---

[24] **(A-568), (A-2509, A-2514), (A-4377)**
[25] **(A-2653), (A-6917)**
[26] **(A-210, A-561), (A-2260), (A-5593)**
[27] **(A-1597), (A-2381), (A-93); (A-4435, A-4501)**.
[28] **(A-1212, A-1183), (A-6939, A-6940); (A-1627), (A-6101–A-6102); (A-6928); (A-671–A-672)**
[29] (lonely) **(A-65);** (The Order) **(A-234, A-556, A-557), (A-6567, A-6579, A-6824)**

31

/silver "flecks" in them,[30] and smells like citrus/orange and water.[31] He is described by the heroine as a "bad-boy," "dark/fallen angel, a "rockstar," "wicked," "wild," "smoking hot," and "dangerous."[32] The girls at school swoon over /ogle him,[33] and he initially frustrates the heroine by blowing hot and cold, acting uninterested to the point she resents her feelings for him.[34] He tries to stay away because he thinks she is human and being with him will put her in danger.[35] He warns her about "things that go bump in the night" but ultimately can't stay away because he's "selfish."[36] A "reluctant monster," he desires the heroine but fears the danger surrounding him will harm her. His warnings only draw her closer: "Something inside of me responded to the dangerous edge in him and liked it." (*BMR*) "…everything inside me is responding to everything inside him. Even the danger. Especially the danger…(*Crave*)."[37] He acknowledges that a relationship with the heroine will be difficult and tells her: "You know this isn't

---

[30] **(A-127–A-129, A-147, A-171, A-214, A-221, A-232, A-276, A-281);(A-6453, A-6454), (A-119); (A-809)** (Silver flecks) **(A-6461, A-6633)**.
[31] **(A-573), (A-6867)**.
[32] (Dark angel/ fallen angel) **(A-335), (A-6462)** (Bad boy) **(A-56-57), (A-155), (A-6462)** (Rockstar) **(A-133), (A-6569)** (Wicked) **(A-129), (A-6454)** (Smoking hot) **(A-416), (A-6569)** (Dangerous) **(A-129, A-166, A-240, A-364); (A-6454, A-6460, A-6559)**
[33] **(A-1243–A-1244), (A-6455, A-6652)**
[34] **(A-229), (A-6522), (A-1779), (A-6522); (A-1254), (A-6459)**
[35] **(A-410, A-434–A-435) (A-925), (A-6830–A-6831)**]
[36] **(A-1921);(A-1873), (A-6630), (A-412), (A-6994)**.
[37] **(A-240), (A-6559)**.

going to be easy for us," (*BMR*) "This is going to be a lot of things, Grace. Easy isn't one of them." (*Crave*).[38]

He ultimately connects with the heroine through shared grief. He grieves the death of an older brother who was / looks about "nineteen" who he believes was murdered and feels responsible. She recognizes this loss in his eyes and connects with him.[39] He is marked by profound loneliness and a sense of responsibility to stop the rising war.[40] Their first kiss is the catalyst for her discovery of the supernatural world and he tells her he loves her for the first time after the climactic kidnapping rescue.[41]

**(iii.)   The imprisoned father/grandfather, first voice in Heroine's head**

The heroine's father/grandfather, "Athair" in *BMR* and "Alistair" in *Crave*, is a supernatural being with "smoky"/ "smoke-gray eyes" who speaks Gaelic, can communicate telepathically, and first appears as a voice in the heroine's head warning her.[42] She initially confuses his voice in her head with the voice of her supernatural half.[43] He is imprisoned by the vampire prince/king on an island in

---

[38] **(A-1888), (A-6599)**.
[39] **(A-2289), (A-6562); (A-240), (A-5441); (A-238), (A-6461, A-6562, A-6606);** **(A-238), (A-6823)**.
[40] **(A-66), (A-6832); (A-352–A-362), (A-6831)**.
[41] **(A-1374–A-1377), (A-6702).**
[42] **(A-695), (A-5642), (A-691), (A-1896), (A-5739), (A-5742), (A-1911), (A-5750),** **(A-2061), (A-5740).**
[43] **(A-569), (A-4420)**.

his bestial form by magical metal restraints.[44] She tries to free him, tells him she's a "friend," and says "But I'll be back for you, I promise." / "But I promise, we'll come back for you."[45] This combination of highly specific shared traits is not a stock or indispensable trope of young adult fiction.

### (iv.) The second romantic lead, second voice in the heroine's head

Both stories feature a substantially similar second love interest[46] Ronan (*BMR*) / Hudson (*Crave*) a royal, part vampire/ vampire[47] with a British-like / British accent,[48] dark hair[49] and "stormy blue" eyes the heroine calls "blue of a storm at sea" / "storm-tossed blue," "oceanic."[50] He has powerful magic and was trapped in an alternate dimension.[51] He can magically take away free will.[52] His name invokes fear; he is thought to be "evil," "depraved," and blamed for mass

---

[44] **(A-696–A-698), (A-5642), (A-4817), (A-660), (A-696), (A-5114), (A-5537).**
[45] **(A-697), (A-5537); (A-2692), (A-4829).**
[46] As discussed in section II.B.1.i.h. below, the love interest story was foreshadowed and set up starting in *BMR* 2010 and per Freeman's notes to her agent was intended to be fleshed out in her second book--as happened with *Crave*.
[47] **(A-2172), (A-1666), (A-705), (A-4540), (A-49-50), (A-4830), (A-5345).**
[48] **(A-705–A-706); (A-4476).**
[49] **(A-2168), (A-4438).**
[50] **(A-705, A-707), (A-4445), (A-5228).**
[51] **(A-4927), (A-545), (A-4927), (A-708), (A-4955).**
[52] **(A-545), (A-4403, A-4653, A-4777).**

murder.[53] His return would bring an apocalypse, though ultimately he acted for the greater good and is not evil.[54]

He first communicates as a second voice in the heroine's mind. He knows her from the other dimension that she does not remember, which disheartens him and frightens her though she finds him attractive.[55] She mistakenly brings him back with her from that dimension, which terrifies her.[56] Ronan/Hudson serves the same role in the intended/love triangle as the one who encourages the heroine's independence and is intended to be / is her true mate: "Ash wants to protect her. Ronan wants to help her learn to use her powers to restore the balance / "Jaxon wanted to protect me, wanted to take care of me, but Hudson wants to help me learn how to take care of myself."[57]

### (v.) The heroine's multi-racial, part Black, winged, gay best friend

Brendan (*BMR*) / Flint (*Crave*) is the heroine's best male friend, is multiracial, half Black, and gay, which he reveals only to the heroine at first.[58] He is brainy, athletic, and plays on a school sports team.[59] He holds a leadership

---

[53] **(A-159, A-545, A-547, A-715–A-716); (A-2494, A-2535–A-2536), (A-1684); (A-6829, A-6952); (A-4448, A-4467, A-4499).**
[54] **(A-1549, A-1440); (A-4538–A-4539, A-4944–A-4539); (A-49-50); (A-4741)**
[55] **(A-2700), (A-705-708), (A-1669), (A-1189); (A-4573–A-4575)**
[56] **(A-1681), (A-4309), (A-715–A-716), (A-4404).**
[57] **(A-49-50), (A-5187, A-5582), (A-705–A-706, A-708); (A-1670), (A-5099).**
[58] **(A-213), (A-4664, A-4670), (A-6467).**
[59] **(A-1319), (A-6475), (A-212, A-213); (A-4526–A-4527, A-4675–A-4676).**

position at the school and is charismatic and attractive to the point the heroine believes that the romantic lead is jealous during their repeated stare-downs.[60] He is a winged supernatural creature the heroine finds "beautiful" in his other form and he is "gorgeous" in his human form.[61] Known for his humor, he calls the heroine nicknames/a nickname, "waggles his brows" at her and has a charismatic smile.[62]

### (vi.) The vampire prince/king villain

Julian the vampire prince in *BMR*, and Cyrus, the vampire king in the *Crave* series are elitists, with British accents and a predatory presence the heroine describes in identical reptilian terms: "like a cobra" (*Crush*) / "like a king cobra" (BMR).[63] He seeks supernatural domination of the world and despises humans.[64] He is tall, has an intense shade of blue eyes, and dark hair kept short in a modern cut.[65] He inflicts his unique bite, the "Kiss of Life/Death" in *BMR* and the "eternal bite" in *Crave* on the heroine that should– but does not–kill her, and also bites the

---

[60] **(A-212), (A-4676), (A-277–A-278), (A-6588–A-6589, A-6663, A-6675)**.

[61] **(A-1502, A-1624), (A-6746); (A-4556–A-4557); (A-2459), A-6475)**.

[62] **(A-254, A-255, A-277, A-278, A-279, A-293, A-628), (A-6574), (A-4322, A-4323, A-4466, A-4530, A-4554, A-4721); (A-1316); (A-2303), (A-1348)**.

[63] **(A-643, A-655, A-665); (A-4658, A-4662, A-4767); (A-2451, A-2651); (A-6334)**.

[64] **(A-61-62); (A-4739–A-4741)**.

[65] (Tall) **(A-620); (A-2451); (A-4661, A-4921); (A-2086), (A-5791), (A-2086), (A-1622)**.

heroine's father/grandfather, a parallel character whom he has imprisoned.[66] He has a daughter conceived with a woman outside his true mate bond, and that daughter is related to the heroine by blood.[67] The heroine bargains with him to save her friends: "Let's make a deal."[68]

### (vii.) The Heroine's Female Nemesis

Taylor (*BMR*) and Lia (*Crave*) is described by the heroine as popular, "one of the most beautiful" and is a life draining supernatural being (succubus/vampire) responsible for abetting/committing the climatic kidnapping.[69] She is mean to the heroine, tries to slap her, falsely suggests involvement with the romantic lead,[70] spikes the heroine's drink (foreshadowing her later betrayal), and at the climax verbally abuses her as "pathetic," planting doubt about the heroine's supernatural identity.[71]

### (viii.) The heroine's supernatural witch aunt/uncle

---

[66] **(A-646, A-660–A-662, A-667–A-668)**; **(A-1731)**; **(A-4498–A-4500, A-4919–A-4920, A-4922)**; (bit the father/grandfather) **(A-2646–A-2647)**, (grandfather is gargoyle king; survived, discovered later in series) **(A-4498–A-4499)**.

[67] **(A-1164–A-1165, A-1173), (A-6140)**.

[68] **(A-2634), (A-6335–A-6336).**

[69] **(A-843), (A-6526), (A-1813), (A-6537), (A-1642), (A-6745); (A-2146–A-2147); (A-6887)**.

[70] **(A-262), (A-6727–A-6728); (A-264), (A-6728); (A-1498), (A-6911)**.

[71] **(A-1495–A-1497), (A-6532–A-6533, A-6538); (A-1512), (A-6883); (A-2146), (A-6887)**.

*BMR*'s Aunt Brie and *Crave*'s Uncle Finn are one of only two relatives the heroine believes remain, and are supernatural witches who advise her about the supernatural world after having kept her ignorant of it which upsets her.[72] Protective of the heroine, at one point they urge her to leave Alaska fearing for her life.[73] They explain her father's amulet / rune stones, instruct her never to remove it/ keep it on at all times,[74] and show affection by kissing her on the head.[75]

### (ix.) Heroine's maternal grandmother; twin goddess descent

The heroine discovers an unknown grandmother who was /is a vampire,[76] has gleaming eyes with "more than a hint of danger" (*BMR*) / "more than a little avarice" (*Crave*).[77] She descends from a deity, lives in a hidden place (dimension / ice cave), reminds the heroine of a fortune-teller, and calls the heroine "child" and "darling."[78] She explains the creation story, the heroine's lineage via a "twin goddess" through her, and the heroine's role to bring balance.[79] She must make

---

[72] **(A-2062), (A-1439), (A-6748, A-6771–A-6772); (A-343), (A-6776); (A-1562–A-1564); (A-6775).**
[73] **(A-1105), (A-6777–A-6778).**
[74] **(A-192–A-194, A-552), (A-5416–A-5417).**
[75] **(A-1347); (A-6548, A-6639, A-6855).**
[76] **(A-689), (A-4412).**
[77] **(A-815), (A-4428–A-4429).**
[78] **(A-821–A-823); (A-1309, A-1649, A-1652–A-1654); (A-5096, A-5105, A-5385); (A-4424, A-4433, A-4847).**
[79] **(A-820–A-822), (A-1309, A-1441); (A-5104–A-5105, A-5385, A-5388, A-5300–A-5391); (A-2395).**

sacrifices, face tests, and magic has a price.[80] She hugs the heroine, tells her it's been too long, and her eyes glisten with unshed tears discussing the vampire prince/ vampire king's destructive acts.[81] *Crave* also names this character "The God of Chaos" and "Bloodletter," names taken from *BMR* 2016 for the heroine's father and the second love interest, Ronan.[82]

### (x) Mirrored supporting cast

The works share numerous additional supporting characters, including: a childhood best friend who is a school cheerleader / on the school dance team (the heroine is not fond of this activity) and is a supernatural creature.[83] The vampire prince / king's "nasty daughter" with a woman not his mate related to the heroine by blood. Initially hostile to the heroine, she ends up helping her but rejecting her offer to leave her father.[84] There is Rachel/Eden, bold and fearless with her multiple piercings who participates in a school activity with Brendan / Flint, has wings, a unique fashion look, wears special boots, is tough with a strong personality and vibrant hair. [85] The love interest of the heroine's closest friend (Mason / Xavier), a jokester who is also in an extracurricular activity with the

---

[80] **(A-1652), (A-4433); (A-1654), (A-5808); (A-1311), (A-4450).**
[81] **(A-1648, A-1655); (A-5096); (A-690), (A-5880).**
[82] **(A-818), (A-6375); (A-1684); (A-4414).**
[83] **(A-1253), (A-2205), (A-6679–A-6680), (A-2667), (A-6746).**
[84] **(A-1164–A-1167, A-1173), (A-6140).**
[85] **(A-158, A-225, A-447), (A-1502); (A-4702, A-4600, A-4601, A-4604, A-4630).**

heroine and her friends, is devoted to the heroine's closest friend, and is a supernatural creature.[86]

Even to the extent the characters in the works are based on tropes, the shared specific expression of those tropes into an original entourage of characters, selected and arranged as it is, supports a finding of substantially similarity.

> **b.** ***Crave* (book 1) is substantially similar to *BMR*.**

*Crave* (book 1) and *BMR* share the parallels between "the 'pattern' of the work ... the sequence of events and the development of the interplay of characters" that copyright protects. *Williams v. Crichton*. 84 F.3d at 590. And *Crichton* confirmed that while such similarities need to be substantial, they need not be perfect since "dissimilarity between some aspects of the works will not automatically relieve the infringer of liability, for 'no copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated.'" *Crichton*, 84 F.3d at 588, (quoting *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992), cert. denied, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992)). That shared pattern and sequencing is evident here,[87] including the following:

---

[86] **(A-1319), (A-278, A-255), (A-4602, A-4631); (A-2282–A-2283), (A-4600, A-4603); (A-1627), (A-425), (A-4606, A-4634).**

[87] Although the different iterations of *BMR* tell the same story and largely share the same chronology of events, some drafts do change the ordering of certain scenes, creating differences between *Crave* (book 1) and some *BMR* drafts in sequencing. But as the court found in *Warner Bros. Entertainment Inc. v. RDR Books*, 575 F. Supp. 2d 513, 537 (S.D.N.Y. 2008), "[r]eproducing original expression in

1: The inciting incident in both works is the displacement of the teen protagonist from sunny San Diego to the remote harshness of Alaska after an "accident" kills one or both of her parents.[88]

2: Her parent and grandparents/parents were killed in an "accident" involving a crash and fall from a significant height (which we later learn was orchestrated by the vampire villain who kidnaps her).[89] She has anxiety and panic attacks from this trauma and feels guilty because her last words with them were in an argument (which mirrors the romantic lead's unresolved guilt over his older brother's death who was nineteen/looks about nineteen).[90]

3: She lives with her two remaining relatives; both supernatural witches, concealing their true nature, the existence of the supernatural world, and the heroine's own place in it as a unique supernatural creature meant to bring balance.[91]

---

fragments or in a different order… does not preclude a finding of substantial similarity." Thus, if any of the scenes or sections described herein are sufficiently original and similar to scenes in *Crave* a reasonable jury could find infringement regardless of those differences.

[88] **(A-1697, A-1788), (A-124, A-237), (A-6435, A-6763).**
[89] **(A-1788–A-1789, A-2131); (A-6477, A-6915).**
[90] **(A-238), (A-6561–A-6562).**
[91] **(A-126–A-127), (A-6439).**

4: The story begins with the heroine on her way to school, though it's not the first day of school, thinking of her lost family and the Alaskan weather (frozen wasteland /frozen hellhole), comparing it negatively with California.[92]

5: The heroine meets the romantic lead (Ash in *BMR*, Jaxon in *Crave*) at the end of chapter two in each work. Shakespeare is quoted between them.[93]

6: He reaches out and touches her hair, and his last words to her that day are a warning that it's not safe.[94]

7: The heroine's new best friend in *BMR* is Jenny and in *Crave*, Macy. Bubbly and quirky, each serves as the heroine's primary social anchor. The district court's reliance on Macy's cousin relationship is misplaced; *BMR* likewise pairs Jenny with her cousin Rachel.[95] Far from being "not well developed," Jenny and Rachel appear roughly one hundred times in each *BMR* draft, and like Macy (a witch) and Eden (a dragon shifter), are supernatural friends who form part of the heroine's "new family." [96]

---

[92] **(A-124),(A-6439)**, The district court's Addendum A treats the Tarot vision prologue as the relevant opening scene of *BMR* 2010, replacing the shared opening beat with idiosyncratic Tarot imagery *Crave* does not share. **(A-1689)**, **(SA-87)**. It ignores the purpose of this scene foreshadowing the heroine meeting Ronan in the other dimension later in the story. **(A-49-50)**. See Sec II.B.1.i.h *infra*.

[93] **(A-1702)**, **(A-6454, A-6457)**.

[94] **(A-1736)**, **(A-6461)**, **(A-175)**, **(A-6463)**.

[95] **(A-256)** ("Though they're cousins, Rachel and Jenny are BFFs.")

[96] The court itself acknowledges as much: its own Addendum D states that in *BMR* 2013 Jenny "is revealed to be a siren," Rachel "a ban sidhe," and Mason "a

8: Each heroine compares Alaska to the moon (in a sentence in which, incredibly, each author uses 2-em-dash punctuation).[97]

9: Brendan / Flint (later described as a "beautiful" winged creature in his supernatural form) is introduced on the first day and is her closest male friend. He provides comic relief amid the unfolding tensions, later complicated by tension between him and the romantic lead, which she interprets as jealousy.[98]

10: There is a notable locale on a hillside far from town and remote. In *BMR* it is where the romantic lead and his kind live and in *Crave* it is the school for supernaturals where they live. The heroines describe it as an architectural masterpiece / architecture I've only heard described in my art classes. It has a long driveway, a security pad and gate and is made of stone surrounded by walls.[99]

11: Around page 50 of both works,[100] the heroine is caught alone and attacked by two supernaturals appearing human who remind her of 80's rockers. This scene unfolds in remarkable similarity:

  i. The heroine sees two guys not dressed for the winter weather.[101]

---

leprechaun," and the draft confirms it ("Rachel and I are cousins by blood. Sirens and ban sidhe are..."). (**SA-150-151**); (**A-1628**).

[97] (**A-387**); (**A-6466**).

[98] (**A-1765**), (**A-213**); (**A-6467**), (**A-277, A-279, A-295**), (**A-6588–A-6590, A-6675–A-6676**).

[99] (**A-1541**), (**A-6445–A-6446**); (**A-524–A-525**).

[100] Beginning with the 2013 draft, this scene occurs around page 50. Earlier drafts place it later.

[101] (**A-632**), (**A-6485**).

ii. They remind her of eighties rockers / concert goers; earring and dog collar / ring through nose.[102]

iii. Two guys: one muscular, one blond, short.[103]

iv. One says: "Well, well, well. Looks like..."[104]

v. The heroine thinks it's like a bad '80s / teen movie.[105]

vi. One "reaches out and grabs me."[106]

vii. She is pinned "my back to his front."[107]

viii. The heroine stomps / thinks about stomping on his toes.[108]

ix. She tastes her own blood: it's coppery / metallic.[109]

x. She struggles, bucks back to break his nose.[110]

xi. She puts her "fists up." [111]

xii. The romantic lead saves her and scares the two guys, but she doesn't realize it at first.[112]

---

[102] **(A-1277); (A-6485).**
[103] **(A-1277); (A-6485)**.
[104] **(A-1277); (A-6485).**
[105] **(A-874); (A-6487)**.
[106] **(A-1278); (A-6488).**
[107] **(A-875); (A-1279); (A-6488).**
[108] **(A-634); (A-1279); (A-875); (A-6488)**.
[109] **(A-876); (A-6488–A-6489).**
[110] **(A-876); (A-1279); (A-6489).**
[111] **(A-876), (A-1279), (A-6489)**.
[112] **(A-876), (A-6489–A-6490)**.

xiii. She thinks about self-defense class / training. [113]

xiv. He "looks me over" to make sure she's okay. He asks and she says "I'm fine."[114]

xv. He tells her they won't bother her again.[115]

xvi. She thanks him for helping her.[116]

xvii. "He shakes his head" and feels like it's his fault.[117]

xviii. She wonders why the attackers weren't affected by the cold.[118]

xix. When he leaves, she is left "wondering."[119]

12. Taylor / Lia is the fake friend and heroine's female nemesis. She feels tension in her body when Taylor / Lia implies she is involved with the romantic lead. The heroine is taken aback but ultimately doesn't believe her. The romantic lead doesn't like Taylor/Lia.[120]

13. Taylor / Lia spikes the heroine's drink during /after a party. She hands her a cup, tells her she will / hopes she will like it. The heroine sips, thinks it's fruity/floral, tells Taylor/Lia she has to go, Taylor/Lia tells her to stay, Taylor/Lia

---

[113] **(A-1281), (A-878); (A-6491)**.
[114] **(A-1280), (A-6492)**.
[115] **(A-1280); (A-6493)**.
[116] **(A-883); (A-6493)**.
[117] **(A-925), (A-6493)**.
[118] **(A-632), (A-6499–A-6500)**.
[119] **(A-884), (A-6496)**.
[120] **(A-262, A-264), (A-6727–A-6528); (A-443), (A-6857)**.

rolls her eyes. The heroine leaves and "rides waves' nausea and vomits. She later learns Taylor/Lia tampered with her drink. This scene foreshadows the climax of each book: the heroine's kidnapping.[121]

14: The heroine learns that the romantic lead lost an older brother who was 19 (*BMR*) / looked 19 (*Crave*), she sees his anguish, they connect through shared loss.[122]

15: The heroine's aunt / mom is an herbalist who makes special tea blends. The heroine's family prefers drinking tea and uses magical tea on the heroine.[123]

16: The heroine hears a voice in her head that gives her warnings and even uses the same words (later revealed to be her father /grandfather called Athair/Alistair who is trapped in bestial form on an island by the vampire royal villain).[124]

17: The heroine cries over the loss of her family at school. The romantic lead catches her, she's embarrassed. She feels attracted to him.[125]

---

[121] **(A-1812-1813)**, **(A-6537)**, **(A-1495–A-1496)**, **(A-6533–A-6537)**; **(A-1507)**, **(A-6541)**; **(A-1508)**, **(A-6540)**; **(A-1512)**, **(A-6883).**

[122]**(A-238, A-5441,A-57**); **(A-238–A-241)**; **(A-6607, A-6614, A-6829–6830, A-6461, A-6481)**.

[123]*Supra* note 15, 31.

[124] **(A-585, A-118, A-290, A-400, A-543, A-565, A-587, A-588, A-593, A-594, A-596, A-597, A-619, A-634, A-664);(A-6665, A-6850, A-6880, A-6881, A-6882, A-6885, A-6904–A-6905, A-6911, A-6914, A-6916, A-6938)**; **(A-1896)**, **(A-5739)**.

[125] **(A-147–A-148)**; **(A-6684–A-6686).**

18: He then walks her to class / walks her to his room at school, and opens the door inviting her to enter.[126]

19: He is moody with her, hot and cold, such that she dislikes her feelings for him.[127] He tries to stay away thinking she is human and he will endanger her.[128] He warns her about "things that go bump in the night" but ultimately can't stay away because he's "selfish."[129]

20: Their first kiss triggers the heroine's discovery of the supernatural world. In both works, they go outside in the cold winter to view a special phenomenon in the sky. During their kiss, the romantic lead loses control of his powers, causing a frightening supernatural manifestation. She does not learn the truth until the following day. She realizes something about him isn't right, questions whether he is a supernatural being, and demands the truth. She has trouble sleeping and wonders about his strangeness, if he is an alien.[130]

21: The next day she confronts the romantic lead and learns the truth: he's a werewolf / vampire. Her friends, family, and teachers are supernatural beings, her "head is spinning."[131]

---

[126] **(A-150); (A-6688)**.
[127] **(A-229), (A-6522), (A-1779)**; (Dislike)**(A-1254), (A-6459)**.
[128] **(A-410, A-434–A-435)** ; **(A-925), (A-6830–A-6831)**.
[129] **(A-1920–A-1921); (A-1873), (A-6630), (A-412); (A-6994)**.
[130] **(A-1373–A-1378); (A-6695); (A-6699); (A-6701); (A-285–A-286), (A-6702); (A-302), (A-6732–A-6734);(A-306); (A-6692).**
[131] **(A-341), (A-6745); (A-343); (A-6740–A-6741).**

22: The romantic lead has special powers with his mind. She thinks she should be scared of him, what he can do but she isn't. He mentions monsters and wants to scare her for her own good. She thinks about mythological beings from books. He tells her he would never hurt her.[132]

23: She learns one of her parents was a supernatural witch, and remembers how loving her parents were with each other.[133]

24: In both works, the heroine suffers catastrophic blood loss. The romantic lead saves her with a healing bite / venom that rapidly seals wounds. She wonders if she will become like him and is assured she won't.[134]

25: She learns there is war among supernaturals with earth as the battlefield / a giant turf war. The romantic lead feels a responsibility to stop it and protect her world, thinking she's human.[135]

26: Her family wants her to leave Alaska fearing she's in danger, but she does not want to leave. They tell her there's been too much loss and can't let anything happen to her. She stays.[136]

---

[132] **(A-384, A-399), (A-6798); (A-1908), (A-6803); (A-350), (A-6975); (A-343–A-144), (A-6786); (A-285), (A-6804).**
[133] **(A-1439), (A-689–A-691); (A-6771); (A-1787–A-1788); (A-6748).**
[134] **(A-2017): (A-538); (A-6751–A-6452).**
[135] **(A-343); (A-6776); (A-352–A-354, A-361, A-362), (A-6831).**
[136] **(A-1105–A-1106); (A-6777–A-6778, A-6783).**

27: The heroine learns the romantic lead's type of supernatural is due to a gene/genetic mutation, she speculates about his mutation, and there is a history of such people being born not knowing what they are and then killing.[137]

28: She thinks about / looks for books on mythology to learn about the creatures of the supernatural world.[138]

29: The second kiss between the heroine and romantic lead is one where he wants assurance:

    i. She moves in to kiss him but he doesn't respond, she is embarrassed.[139]

    ii. He thinks she couldn't want him because of what he is "who I am / what I am"[140]

    iii. Their fingers lace.[141]

    iv. They express concern about the other walking away and missing out on what they have.[142]

    v. They kiss and "he groans low in his throat." She pulls him closer, her hands are on his back, in his hair.[143]

---

[137] **(A-299), (A-2026–A-2027), (A-6781–A-6782).**
[138] **(A-343–A-344); (A-6786).**
[139] **(A-1427), (A-6810).**
[140] **(A-1909), (A-1426–A-1427), (A-6810).**
[141] **(A-1427), (A-6810)**.
[142] **(A-1442), (A-6811).**
[143] **(A-1444), (A-6815)**.

vi. He explains he had trouble controlling his powers because of the way she makes him feel.[144]

vii: She tells him he's not a monster.[145]

30: Ronan /Hudson, parallel characters, are discussed as evil creatures who committed murder and were responsible for the deaths of many people.[146]

31: Around page 400 of each work, the heroine wonders how old the romantic lead really is and how his kind ages. He asks if she really wants to talk about this. She learns his kind don't age the way humans do, and how old he is.[147]

32: Each story features a similar "Northern Lights" scene:

i. The heroine barely feels the cold as she goes outside with the romantic lead.[148]

ii. Green and purple swirl across the sky. [149]

iii. He puts his arms around her like a /with a blanket.[150]

iv. She mentions the scientific explanation of the lights.[151]

v. They kiss.[152]

---

[144] **(A-1421), (A-6815).**
[145] **(A-366, A-374), (A-6832)**.
[146] **(A-2494), (A-6829)**.
[147] **(A-533), (A-6839).**
[148] **(A-280), (A-6870)**.
[149] **(A-281), (A-6870).**
[150] **(A-274–A-275), (A-6870).**
[151] **(A-281), (A-6871)**.
[152] **(A-1377), (A-6871)**.

vi. They dance and laugh just before the Northern Lights scene in *BMR* and dance and laugh in the Northern Lights in *Crave*.[153]

vii. It's a "light show."[154]

33: In both works' climax, the heroine is kidnapped by the vampire prince (*BMR*) / vampire prince's mate (*Crave*) in an act of vengeance for the believed death of the villain's mate (who is actually alive in another dimension), and the vampire wants to use the heroine to bring them back.[155]

34: The heroine's arms are bound, she is in darkness, and terrified. The voice in her head has deserted her, thinks her abductor is crazy, and wonders why she was kidnapped and why she's special.[156]

35. The heroine feels sorry for the "crazy vampire" at first, even though her life is at stake. Then fury at the realization her family was murdered by this person.[157]

36: The climactic kidnapping and rescue unfolds with specific elements:

i. She is choked by another supernatural (Selene / Flint).[158]

---

[153] **(A-276), (A-6873), (A-1373).**
[154] **(A-1373), (A-6873).**
[155] **(A-2107–A-2148), (A-6883–A-6929)**; (Vengeance) **(A-2130–A-2131), (A-6917–A-6918)**; (Alive dimension) **(A-2155), (A-4941)** (Mate), "mate" **(A-2125, A-2155); (A-6917–A-6918), (A-4705)**; (waited to use heroine) **(A-2124): (A-662).**
[156] **(A-2110), (A-6887); (A-2109), (A-6887–A-6888).**
[157] **(A-2125, A-2131), (A-6915, A-6916).**
[158] **(A-2135), (A-6899–A-6901).**

ii. The vampire prince / romantic lead saves her by throwing Selene / Flint across the room.[159]

iii. The voice comes back, telling her to run. [160]

iv. She argues with it.[161]

v. She is dragged and tries to resist.[162]

vi. She worries about Julian/Lia's strength hurting her brain as she feels disconnected from her body and tries to fight the feeling.[163]

vii. The vampire prince hits and kicks a female vampire and he hits the heroine / the vampire prince's mate hits and kicks the heroine.[164]

viii. The heroine has fury / anger, rage deep within / inside her towards the vampire prince / prince's mate and she feels fire, like hot acid / hot flame because this person murdered her family members.[165] Both stories later reveal that the vampire prince / vampire prince's mate is not really dead but alive in another dimension. [166]

---

[159] **(A-2135), (A-6902.**
[160] **(A-585), (A-6904.**
[161] **(A-569), (A-6916)**.
[162] **(A-672), (A-6907)**.
[163] **(A-1633–A-1634), (A-6908)**.
[164] **(A-1633–A-1634); (A-6908).**
[165] **(A-2134), (A-6909).**
[166] **(A-2151, A-2155), (A-4941), (A-2125, A-2155), (A-6917–A-6918), (A-4705).**

ix. She wonders how she can kill the vampire prince / vampire prince's mate.[167]

x. She realizes she can't compete against the vampire prince's / his mate's strength, so she holds still.[168]

xiii. The voice inside tells her to run but she can't. [169]

xiv. Taylor / Lia tells her she is "pathetic" and isn't what she thinks she is.[170]

37. The heroine worries she'll be Frankenstein's bride / Frankenstein if the plan to resurrect the dead mate works. [171]

38: The romantic lead comes to the rescue, but then is saved by the heroine in the same way:

i. He enters the fray, the door / wall "shudders" and breaks down.[172]

ii. There is a loud /giant wrenching sound and the female vampire is thrown across the room and hits the wall.[173]

iii. There is a sickening crunch of a wrist / bone.[174]

---

[167] **(A-664), (A-6909–A-6910).**
[168] **(A-2137), (A-6911).**
[169] **(A-2164), (A-6914).**
[170] **(A-2668), (A-2147), (A-6915).**
[171] **(A-2653), (A-6917).**
[172] **(A-2138, A-2139): (A-6919).**
[173] **(A-2135), (A-6921–A-6922).**
[174] **(A-2117), (A-6923).**

53

iv. There is a primal war cry when the heroine jumps on a demon's back with a dagger / Lia jumps on the romantic lead's back with a knife.[175]

vi. The romantic lead saves the heroine's life and she saves his; he believes her abduction was his fault. Id. She stabs the demon with a dagger/ stabs the vampire prince's mate with a knife. Id.

ix. When she stabs the demon he turns into dust / when romantic lead throws the smoke at Lia she turns into dust.[176]

x. The vampire prince kills the jealous girlfriend who tried to harm the heroine.[177]

xii. The heroine acts to sacrifice herself to save the romantic lead's life after she has been rescued by the romantic lead from the vampire prince / vampire prince's mate.[178]

xiii. He believes her abduction was his fault, she doesn't agree.[179]

39: The romantic lead is physically and abusively punished for his transgressions by his family / mother, but tells the heroine that his kind heals

---

[175] **(A-672), (A-6922-6924).**
[176] **(A-673), (A-6927).**
[177] **(A-2135), (A-6927).**
[178] **(A-1183), (A-6928).**
[179] **(A-2176), (A-6922).**

quickly, laughs, and tells her not to worry when she is upset about this punishment.[180]

40: The romantic lead tells the heroine he loves her and she tells him she loves him for the first time after she is safe.[181]

41: The romantic lead explains that vampires need blood to survive, but not human blood. He explains the negative consequences of drinking human blood.[182]

42: The heroine accidentally releases Ronan / Hudson from the other dimension where he has been trapped.[183]

43: The heroine and/or the romantic lead pass from a room in Alaska's winter into a summer meadow, wildflowers and sun.[184]

44: Each story ends with the character called "the Bloodletter" turning into a raven (*BMR*) / winged creature (*Crave*) and flying away.[185]

While lists are inherently subjective, the above can be verified in the works and show similarities in both the sequencing of the overall stories and individual scenes which could result in a finding for Freeman–as just one example, a reasonable juror comparing the '80s-rocker assault in *BMR* 2013 against the

---

[180] **(A-1867–A-1869), (A-6937).**
[181] **(A-2175–A-2176), (A-6940).**
[182] **(A-613–A-614), A-6949).**
[183] **(A-715–A-716), (A-6952).**
[184] **(A-605), (A-1423), (A-6998).**
[185] **(A-2703), (A-7002).**

55

corresponding *Crave* pages (discussed *infra*) could find substantial similarity of protectable expression. It was therefore error for the district court to find a lack of substantial similarity as a matter of law.

### c.    *Crush* is substantially similar to *BMR*.

Like the other *Crave* novels, *Crush* expands earlier *BMR* subplots into a central plotline.[186] It starts by tracking the opening chapters of *BMR* 2011 with the heroine missing memories and suffering head pain when she tries to remember. In both works, within the first several pages, the heroine–unable to recall what has happened–wonders: "Am I dead?" [**(A-116)**, **(A-4299–A-4300)**]. It then follows a subplot of *BMR* in which a set of powerful, magical objects must be found in order to prevent Ronan / Hudson from rising again, and to ultimately, stop the

---

[186] It is well established that sequels and subsequent installments in a series are derivative works of the first, including as they incorporate elements such as characters, settings, and plots throughout the series. See *Pannonia Farms, Inc. v. USA Cable*, No. 03 CIV. 7841 (NRB), 2004 WL 1276842, at *7 (S.D.N.Y. June 8, 2004), aff'd in part, dismissed in part, 426 F.3d 650 (2d Cir. 2005) ("Subsequent works in a series (or sequels) are in a sense derivative works while the characters which appear throughout the series are a part of the underlying work upon which the later works are based.") Thus, subsequent installments of a series where the first infringes on another original work also infringe that original where they carry over the elements first substantially copied. *Enter. Mgmt. Ltd., Inc. v. Construx Software Builders, Inc.*, 73 F.4th 1048, 1059–60 (9th Cir. 2023). Accordingly, if a jury finds that *Crave* (book 1) infringes *BMR* then it may also find that books 2-4 infringe to the extent they are built on the same characters, settings, and initial plot lines that *Crave* copied from *BMR*.

56

supernatural war. [**(A-404)**; **(A-547)**: **(A-4451)**, **(A-4707–A-4708)**, **(A-2141, A-2142)**, **(A-2535)**, **(A-4451)**]. The heroine is terrified when she realizes that she accidentally brought him back with her from the Otherworld / Other plane. She has no memory of what happened to her and has injuries she can't explain. When she tries to remember she has terrible head pain. [**(A-1681)**, **(A-708, A-715–A-716)**; **(A-4309, A-4444)**].

She has been told that Ronan/Hudson is evil, depraved, and responsible for the deaths of many, and that if he is free, he will bring war and it would be an apocalypse. In truth, he did what was necessary for the greater good. He gives the heroine his magic to help her. There is an attraction between them, and he is intended to be her true mate / is her true mate. The objects are found and the heroine must pass a trial. The evil vampire prince / king gives the heroine his special bite (the Kiss of Life or Death / the eternal bite), which could / should kill her. The heroine escapes his clutches and survives. The vampire prince / king will now be after her. [**(A-2647)**; **(A-617, A-662)**: **(A-667–A-668)**, **(A-4499)**, **(A-4919–A-4920)**]

There are also substantially similar specific scenes between the works, including one where, as the heroine learns about and develops her powers, she tests them to light a series of candles all at once with magic. [**(A-815)**; **(A-4548)**].

She also learns she has the ability to magically shift forms and fly, referencing Peter Pan when she tries it. [**(A-572)**: **(A-4548, A-4578)**, **(A-597)**, **(A-4610)**]

There are also parallel scenes where the heroine inadvertently takes the romantic lead's life force. [**(A-1473–A-1474, A-1581)**, **(A-4622–A-4623)**, **(A-2332)**]. In another, the romantic lead and the heroine step through a doorway and suddenly it's summer in the middle of an Alaskan winter. [**(A-605)**, **(A-4432)**].

The heroine also confronts/ thinks about her family for lying about her true supernatural nature. [**(A-1681)**; **(A-1202)**: **(A-658)**, (**A-4388**)]. And in both works, Brendan/Flint reveals to the heroine that he is gay, and she is the first and only one to know. [**(A-213)**; **(A-4670–A-4671)**]. Both *BMR* and *Crush* also introduce a power held by the romantic lead that allows him to move so quickly he appears to vanish, called "casting" in *BMR* and "fading" in *Crush*. [**(A-804)**, **(A-4417)**]. At a climactic point of both works, Ronan/Hudson is left weakened and vulnerable but helps the heroine by giving her some of his magic. [**(A-1671)**, **(A-4866)**].

These parallel scenes, set around the same central plot taken from a critical subplot in *BMR*, evidence that Appellees created *Crush* by stitching together both major and minor elements of *BMR* and present a genuine issue of substantial similarity.

      d.     ***BMR* and *Covet* are substantially similar.**

As with *Crush*, *Covet* utilizes the same characters to advance another subplot of *BMR*: The vampire prince / king wants to bring supernaturals out of hiding from the human world and seize power. The heroine learns she is a descendant of one of the twin goddesses and that her kind of being are protectors of humans, supernaturals, and other creatures, whose purpose is to maintain / keep the balance. To stop the supernatural war and bring balance she must restore the Compact (*BMR*) / find the Crown (*Covet*). [**(A-2396)**; **(A-5112)**; **(A-2396)**; **(A-5379)**].

Both *BMR* and *Covet* begin with the heroine panicking and feeling guilty over the deaths of her family members. [**(A-115)**; **(A-4994)**; **(A-125)**; **(A-4994–A-4995)**]. Following a scene addressing a teacher at school who enjoys "torturing" students [**(A-136)**; **(A-5003)**], each work contains an unusually specific scene where the heroine eats yogurt in the cafeteria when nothing else looks appetizing. [**(A-215)**; **(A-5006)**].

The heroine feels tied to the romantic lead with an "invisible string" and cannot help but "word vomit" or stop "vomiting words" around him. [**(A-816)**; **(A-5024)**; **(A-165)**; **(A-5045)**]. Both works also feature parallel scenes of the heroine dancing with the romantic lead where she is nervous because she doesn't know how to slow dance and is worried about embarrassing herself but dances

with him anyway and thinks about kissing him. [**(A-2322)**: **(A-5334)**: **(A-2322–A-2323)**: **(A-5335)**: **(A-2323)**: **(A-5338)**: **(A-5535)**].

Both works feature the supernatural father/grandfather who is in a steel trap chained to a tree / chained to a wall of a cave and has been trapped in his supernatural form with magical metal bindings by the vampire king/prince, who is the overarching villain in both works. [**(A-695–A-697)**, **(A-5535)**.] The heroine later learns that this is her father/grandfather (in *Court*) and that he's been watching over her and communicating with her throughout the story. [**(A-696–A-697)**, **(A-5642–A-5643)**, **(A-5742)**]

The heroine learns she is a creature not seen in their world in ten generations (*BMR*) / 1,000 years (*Covet*) and her kind is not meant to take sides in wars of the supernaturals. [**(A-2458)**: **(A-5043)**; **(A-1564)**, **(A-5391)**]. The supernatural world is out of balance, manifesting in storms and terrible weather that affect the human world as well, and the heroine's unique kind of being is needed to stop the storms and chaos. [**(A-49-50)**; **(A-2396)**: **(A-5104–A-5105)**]. She questions how her kind could have been brought to near extinction despite being so uniquely powerful [**(A-577)**: **(A-5392)**], and in both works the answer is a betrayal by a mixed blood supernatural. [**(A-577)**, **(A-5393)**].

The heroine is told about the story of twin goddesses [**(A-821–A-822)**: **(A-1309)**: **(A-5385)**], and that the war between humans and supernaturals has been

60

going on since the beginning of time / since the creation of humans and supernaturals. [(A-2677–A-2678). (A-5386): (A-5387): (A-5388)]. The heroine also hears the story of the deity that created the world and is responsible for the heroine's unique kind of magical being. [(A-821): (A-721); (A-5390–A-5391)].

At a dramatic moment in both works, the heroine draws the Tower Tarot card (a standard Tarot deck has 78 cards), which depicts a tower being struck by a lightning bolt, a bad omen. [(A-1228): (A-5533)].

The heroine learns that the supernatural world uses the binding of magical powers as a kind of punishment. [(A-792), (A-5431) ;(A-2386)]. She also has magical tattoos that burn and itch at the same time, and glow and allow her to absorb and reuse magic. [(A-582–A-583): (A-5547, A-5647)].

Both works feature a supernatural police force called "Watchers" / "the Watch" [(A-796–A-797): (A-2376): (A-5128)] who the heroine encounters in an enchanted forest during the quest. [(A-1426): (A-5254–A-5255)].

Both *BMR* and *Covet* feature a woman who has lost her mate, and has been left fragile and heartbroken by his loss but can feel that he is still alive. [(A-319, A-323, A-326), (A-5236, A-5237-5238, A-5248)]. The vampire king/prince imprisoned her mate. [(A-319-320): (A-660) (A-5245, A-5247)]. The heroine references Sleeping Beauty in relation to the lost mate. [(A-323): (A-5235)].

61

In both works, the heroine's aunt/uncle talks to her about an amulet / set of rune stones that was her father's and is now hers. [**(A-192–A-193)**; **(A-1658)**; **(A-5416)**]. They tell her to keep this magical object with her at all times. [**(A-194)**, **(A-5417)**] Despite this, they are not forthcoming with the heroine. [**(A-194)**; **(A-5417)**].

*BMR* and *Covet* each include a scene where the heroine is on a beach littered with bodies and uses her magic to try to heal for the first time. [**(A-769–A-771, A-784)**;**(A-5615–A-5617)**]. And in both, Brendan / Flint is mortally wounded during a fight scene and the heroine tries to save them. [**(A-797, A-802–A-803)**]

During *BMR* and *Covet*, the vampire king/prince imprisons the heroine while a villain refers to her as "cherie" / "chere". [**(A-2454–A-2596)**; **(A-1156)**; **(A-5440–A-5450)**]. She encounters demonic guards with translucent skin. [**(A-2622)**: **(A-5437)**]**.** In connection with her imprisonment, the heroine also deals with a female supernatural who is seventeen / looks about seventeen and described as an Amazon [**(A-420)**: **(A-125)**; **(A-5445)** ;**(A-128)**: **(A-151)**: **(A-5445)**], and is a magical being that can shift into a lion / is part lion. [**(A-1589)**, **(A-5447)**] This woman talks about dire topics with a disturbingly casual air, which the heroine describes in exactly the same way: she speaks so casually she could be talking about the weather. [**(A-2210)**: **(A-5466)**].

When the heroine finally discovers the imprisoned creature whose voice she's heard in her head since the beginning of the story (the first voice character) she notices his smoky / smoke gray eyes and sad expression. [**(A-695–A-696)**: **(A-5642)**]. The heroine attempts to free / frees him from an iron trap / cuff restraints, he releases a piercing howl/bellow. [**(A-704–A-705)**; **(A-5642)**]. She tells him: I'm a friend. [**(A-697)**, **(A-5643)**].

e.     *BMR* and *Court* **are substantially similar.**

In *Court* the heroine finally learns that the first voice in her head-her long lost father/grandfather who speaks Gaelic and can communicate telepathically as he is a wolf shifter / gargoyle. [**(A-695)**, **(A-5642, 5742)**]. He tells her to call him Athair / Alistair. **(A-690–A-691, A-5739)** The vampire prince / vampire king is responsible for trapping him in magical trap / chains which keep him in his supernatural form. **(A-5537, A-660)**

The vampire prince / king has taken students from the heroine's school and is holding them hostage and draining them of their power and life force, forcing the heroine to make a deal with him to save them. [**(A-2634)**; **(A-6335–A-6336)**]. The heroine chooses to sacrifice herself to protect them but ends up tricking the vampire prince / king leaving him injured. **(A-1626-A-1627)**; **(A-6336)].** The heroine also learns that both her parents were supernatural beings. [**(A-1439)**, **(A-6747)**, **(A-1106, A-5869)**]

63

*Court* further lifts specific characters, settings, and scenes from *BMR*. Both works introduce a character known as the "God of Chaos." [**(A-818)**: **(A-5864)**]. A new antagonist authority figure is introduced (named "Jikan" in *Court*) and confronts the heroine after she freezes the vampire king army's, and similar to the vampire prince "Julian" he pulls an "old fashioned gold pocket watch" out of his pants during a meeting with the heroine. [**(A-655)**. **(A-5897)**] During a fight scene, when no option is left, the heroine burns the vampire prince/ king which neutralizes him. [**(A-1158)**: **(A-6344)**].

The heroine sees the high priestess/Bloodletter's (her maternal grandmother) eyes glisten "with unshed tears" when discussing the bad acts of the vampire prince /king. [**(A-690), (A-5880)**]. In thinking about a very long-lived supernatural being, who is far older than he really looks, "thousand years" she tries to cope with the impossibility of his age by "doing the math" in her head, which causes her to realize the implications of the different aging process between herself and other supernaturals. [**(A-2022–A-2026)**: **(A-6072–A-6074)**].

Both works also reveal that the heroine's relatives kept her magical nature secret and kept her powers bound, through a special tea. [**(A-56)**; **(A-187, A-204, A-297, A-321)**; **(A-6153)**].

The heroine also learns that the vampire prince / king has a daughter with a woman who is not his mate but is related to the heroine by blood. [**(A-1164–A-**

64

**1165)**: **(A-1167)**: **(A-1173)**: **(A-6140)**]. The heroine feels sympathy for the daughter and invites her to join the side of good, but the daughter chooses to remain loyal to her father, even though she does help the heroine. [**(A-1166)**: **(A-6054–A-6055)**].

The heroine refers to a small/lite Stonehenge in Alaska, which must harness "energy" / "lightning" to activate. [**(A-1325)**: **(A-356)**: **(A-6299–A-6300)**]. Once again, there is a quest for magical objects to save the world from the villain. [**(A-404), (A-5982)**]. In both books, the heroine shows mercy toward a cursed human being who attacks her as a powerful monster, which frees the monster from the curse and incurs a debt to the heroine. [**(A-1528–A-1531, A-1547–A-1548)**; **(A-6278–A-6282)**; **(A-2531-2532)**].

### f. The works share substantially similar scenes and settings.

Both works contain substantially similar protectable scenes and settings. Scenes discussed above, including the '80s rocker fight scene, the kidnapping scene, and the heroine's interactions with her previously unknown maternal grandmother, independently demonstrate copying of protectable expression. The shared settings and narrative backdrop likewise support that conclusion. Indeed, any one of these similarities is quantitatively and qualitatively sufficient to support a finding of infringement. See *Castle Rock,* 150 F. 3d at 138.

And while no author can monopolize the idea of setting a story in Alaska, Alaska can be portrayed in countless ways–a Christmas wonderland, a rugged forest wilderness, or a charming remote frontier–yet here both works depict it through the same expressive lens: a frozen wasteland/frozen hellhole, like being on the moon, a place of exile. The works share multiple distinctive settings including an arctic beach littered with bodies, a doorway in winter that places the heroine in a summer field with wildflowers, and a portal to an island where Athair / Alistair is imprisoned.

g.    **The Themes and Pace of the *Crave* Books and *BMR* are substantially similar.**

Both works also explore overlapping themes including feminism, track strong female characters—including but not limited to the heroine—in their choices, agency, and leadership. [**(A-713)**; **(A-1935, A-1974, A-1976, A-2096–A-2097)**; **(A-6574, A-6622)**; **(A-339, A-713)**; **(A-4713)**; **(A-1586)**; **(A-4310)**] The district court avers that "Anna/Mia does not develop any leadership traits" and that any leadership "story arc is nothing more than an undeveloped idea, if indeed it is that." [**SA-72**]. But leadership is the heroine's express, central destiny, which comes to fruition throughout the story, including when she is told she is "the

66

leader" before "ushering everyone" to safety before the villain comes back.[187] 188

She is "the key to restore the natural balance" and her destiny is to unite Shadows

and Light and root out the corruption in the Order.[189] This is not an "undeveloped

idea;" it is the engine of the plot of each draft, stated in the notes, dramatized in

the manuscript, and resolved in the heroine's decision to take up the role.

Diversity, inclusion and the rejection of stereotypes are likewise prominent

themes in *BMR* and *Crave*, as they share unique cultural references. For example,

Native Alaskan stories are referenced and Chinook words are spoken in *BMR*,

while *Crave* references Chinook as a "Native Alaskan" language. Out of twenty-

one languages spoken in Alaska, both works select Chinook–a pidgin trade

language that originated in Washington, not Alaska. [**(A-231)**, **(A-6552)**]. This

shared and idiosyncratic choice reflects the same expressive approach to cultural

world-building.

Meaningful diversity are also on full display through the Brendan/Flint

character (each heroine's similar multiracial and gay male friend). The district

court singled out Brendan as an example of "tokenism" incorrectly stating

"Brendan … does not even have a same-sex attraction to another character." [**SA-**

---

[187] **(A-1644)** "That ring is on your hand for a reason. And as much as I hate to admit it, that makes you the leader." "I usher everyone out the front doors and then tum for a final look back."

[189] **(A-93-94).**

**72-73**]. In *BMR*, Brendan expressly experiences a same-sex attraction: "Brendan's gaze was locked with Julian's, his lips parted for a kiss … he looked for all the world as though his dearest dream was finally coming true."[190] And the order wrongly states that Brendan is "closeted" unlike Flint. In Crave, no one knows Flint is gay. And in *Crush* (book two) only the heroine knows at first, although her mother and aunt "sort of suspect he's gay and that's why they're so comfortable with [them] spending time together."[191]

Finally, and relatedly, themes of friendship, compassion and grace pervade each work. Each heroine repeatedly states she will do anything to protect her friends, even sacrifice herself to ensure their safety. [**(A-2634)**, **(A-6335)**.] Each likewise expresses compassion even for the villains in the story at times (though this doesn't stop the heroine from wanting justice and taking agency). [**(A-2125)**, **(A-6916)**; **(A-2125)**] In both works, mercy is not weakness but a defining moral posture; the heroine's power is paired with empathy, and justice is tempered by grace.

Moreover, *BMR* and *Crave* (book 1) share a nearly identical structural pacing strategy: a "Slow Burn" mystery that transitions into a "High-Octane" supernatural thriller. Each begins with a deliberately slow pace, focusing on the

---

[190] **(A-2629).**
[191] **(A-396).**

details of the heroine's arrival at school, the weather and her loss. Then more than halfway through each narrative the pace accelerates drastically following the reveal of the supernatural world. At that point, each work alternates between a specific rhythmic beat of the romance (Attraction -> Rejection (Warning) -> Forced Proximity -> Intimacy -> Betrayal -> Reunion) and sudden, brief, and intense scenes of violence that serve to remind the reader of the stakes. There is then a romantic interlude lull in the action towards the end that serves as a "calm before the storm" moment before the climax.

> h.   *BMR* **and the** *Crave* **Books are substantially similar in overall feel and impression.**

*BMR* and the *Crave* Books both share a distinctive "Alaskan Gothic" feel mixed with the heroine's modern sarcasm, self-deprecation, and snark to contrasting with the weight of her past loss and future challenges. And commentators have identified the shared specific literary and pop culture references (discussed in Section I.C., *supra*), with such references used to texture both dialogue and internal narration and storytelling as a defining feature of the *Crave* series' original feel. [Dkt. No. 276-46 p. 123-129]. To be sure, Freeman is not claiming that popular culture references are novel or protectable, but the striking overlap in these references across both works contributes to their shared overall feel.

69

### i. The Court's summary judgment evaluation was materially inaccurate.

The district court's summary judgment ruling rested on 83 pages of analysis and addenda containing materially inaccurate factual assertions about the works while overlooking numerous similarities of protectable expression. And that analysis did not compare the works in the light most favorable to Freeman.

The court began by designating *BMR* 2010, the earliest draft Freeman submitted for comparison, as "the template" and purported to write a "*complete*" summary of the story based on that version. [**SA-87**]. Because it was the earliest draft, many of the shared similarities with *Crave* discussed above had not yet fully developed–such as the "80s rocker" attack, San Diego as the heroine's hometown, the first voice and the second voice in heroine's head, Ronan Bloodletter expanded role across later drafts, and the evolution of the grandmother/twin-goddess mythology from *BMR* 2014's blue-eyed High Priestess to *BMR* 2016's green-eyed grandmother. The district court instead relegated these similarities to a list of "principal differences" among Freeman's drafts and largely ignored them in its analysis.

*BMR* 2010 is important because it demonstrates the consistent core narrative spine of Freeman's story as it developed over years of working with Kim, and shows that superficial changes (e.g., to names, types of creatures, etc.) and the

70

rearranging of scenes do not change the underlying story. For example, Freeman changing the "'80's rocker" supernaturals who attacked the heroine from "vampires" (*BMR* 2010) to "demons" and "soul suckers" (*BMR* 2012) does not meaningfully change the story any more than Wolff changing the romantic lead, with the loss of his brother who "appears 19" backstory and family at the center of the supernatural war, from a "werewolf" (in *BMR*) to a "vampire" (in *Crave*).

Indeed, an email sent from Kim to a publisher to whom she was pitching Freeman's BMR work proves this point–after receiving a rejection letter from a publisher, Kim wrote back:

> The author and I were brainstorming about this book. We do realize it's a tough sell in today's market, but we're wondering if you and your team might find it more marketable if the vampires weren't vampires and the werewolves weren't werewolves. Both of these creatures were based on various elements of Celtic and Egyptian mythology, and with some easy changes, could easily be more elemental in form and less typical of what we think of when we think paranormal these days. If you think these types of changes might be exciting, let me know and perhaps we can talk further. But if you think this books is just too paranormal to work now, not to worry, Lynne is working on a really fun contemporary right now.

[**A-3-5**]. Then, Wolff and Kim appear to have made precisely those sorts of superficial changes to mask their copying of *BMR*–or so a reasonable jury could find.

Despite these superficial differences, the district court's Addendum A (*BMR* 2010 template summary) and Addendum C (*Crave* summary) recount significant similarities starting with thee same opening plot points between the works: a

16/17-year-old girl from California is orphaned by a parent's sudden fatal "accident" and exiled to remote Alaska to live with her remaining family; she feels like an outsider; she meets an attractive, mysterious "bad boy" dressed in black leather, who runs with a clan[192] / "Order," warns her of danger and even tries to keep his distance, yet to whom she feels an instant connection; and a Mean-Girl rival immediately claims him. Yet the court's summary judgment Order then ignores these parallels.

Nor were these shared openings the district court's only analytical omission. The court largely ignored the sequential story beats through which each story unfolds and other scenes and interactions that are, either individually or in their shared selection and arrangement, evidence from which a trier of fact could find substantial similarity of protectable expression. To wit:

**(a) The shared back story: On the way to school grieving lost family:**

Addendum A focuses on an idiosyncratic opening scene from *BMR 2010* involving a Tarot vision (discussed below), while overlooking the parallel opening sequence framing both works: the heroine on her way to school, grieving the loss of her family that led to her trajectory from California to Alaska to live with the only two family members she believes remain–both of whom are supernatural witches (unbeknownst to her). She has been kept ignorant of the supernatural

---

[192] His clan is called The Order in *BMR* which the court ignored. **[A-556].**

72

world and her identity in it with "magic teas" (which the court only discusses in Character Addendum D for *BMR*'s heroine entirely omitting it from *Crave*'s heroine when magic teas are used in both works to keep the heroine's identity hidden)[193] Notably, the district court's *Crave* summary (Addendum C) acknowledges that Grace is left to live with her only two remaining family members without mention of any of the other parallel matching beats. And Addendum C begins by acknowledging that the story is told from the first-person perspective of Grace, the heroine, while the Court nowhere mentions that *BMR* is also told from the first-person perspective of Anna, the heroine. [**SA-120**]

> **(b)** **The two attacker "'80s-rocker" assault**:

As discussed above, this attack scene developed through the various *BMR* drafts, with *BMR* 2013 perhaps having the closest similarity to the parallel *Crave* scene, but the district court's Addendum A treats it as a "draft difference" that the district court's analysis effectively ignores and never compares–despite the fact that a comparison of this scene alone in *BMR 2013* and *Crave* could support a jury finding of infringement.

> **(c)** **The first voice in her head/paternal relative:**

---

[193] *Supra* footnote 15.

Addendum A characterizes the heroine's grey-eyed, Gaelic speaking (grand)father imprisoned in magical chains in bestial form by the story's principal vampire villain as a mere genre convention. But the court never fairly compares Athair to *Crave*'s parallel character Alistair as he is developed across the first 4 books. Both characters are paternal relatives who, *inter alia*, (1) have distinctive "smoky grey" / "smoke-grey" eyes (2) are trapped in their supernatural form in another dimension by the vampire prince / vampire king, (3) are visited by the heroine through a portal and she can't free him, telling him "I'll be back, I promise…" and "I'm a friend."

**(d)** **Telepathy:**

The MSJ order states that Grace and her kind can speak telepathically, "a talent that gargoyles have, but that Anna/Mia does not." [**SA-58**]. In fact, Anna, who is part wolf-shifter like her father, can hear his (Athair's) voice in her head. She can also hear Ash who is a wolf-shifter: "I could hear his voice inside my head as if he had always been there, a part of me." Ash then explains, "But the fact that you could hear me should erase any doubts from your mind about what you are. Other races can't hear us **telepathically,** Anna."[194] Thus, in both works, telepathic communication is presented as a race-specific ability shared by members of the heroine's kind.

---

[194] **(A-2061).**

Indeed, the district court notes Anna's telepathy in BMR in Addendum A p. 10,[195] yet then avers that it doesn't exist in the Order. The court thus failed to properly compare these parallel characters and storylines, and erred in abstracting everything about them to "unprotectable ideas."

**(e)     First kiss under the Northern lights:**

The district court acknowledges the first kiss scenes in each work, but ignores that in each scene is the catalyst for the heroine's discovery of the romantic lead being supernatural and of the paranormal world. This scene is one of a series of shared story beats including the heroine's demand for answers the next day and subsequent revelations about the supernatural world, as discussed *supra*. Indeed, the entire conversation about the "war between supernatural beings" is omitted.[196]

**(f)     Healing bite that does not turn her:**

Addendum A acknowledges that Ash bites Anna to heal her after a demon attack [**SA-95**], and seemingly acknowledges the matching *Crave* story beats in Addendum C [**SA-122**], but then never addresses those shared plot points in its analysis.

---

[195] (**SA-96**).

[196] *See* (**A-1866**): "There is a war going on…" …"Beings of myth and legend are fighting each other every day with Earth as the battlefield." / (**A-6776**): "It's not exactly easy to hide the fact that vampires and dragons are real when we're in the middle of a giant turf war." "Turf war?"... we're talking about different supernatural species …"].

**(g)    Kidnapped by the vampire prince to replace his lost mate:**

According to Addendum A, "Julian" kidnaps the heroine and demands she be his bride because she resembles/relates to his lost love Elise, and notes that her father is his prisoner. But that addendum—and the analysis in the summary judgment order—omit that Julian is a vampire prince (which tracks with *Crave*'s vampire king), omits the shared "reincarnation" / "resurrection" plot point using the heroine to bring back the dead mate, and omits the shared similarity that the allegedly dead mate isn't dead but alive in another dimension. It also omits that he murdered her grandparents in *BMR* (or, indeed, any mention of her grandparents) / parents, the explanation for that murder by the villain, the heroine's pity for him for losing his mate, her desire for vengeance, or any narrative beats of this scene that are shared with *Crave* (book 1).

For example, in *BMR* 2010 Julian the vampire prince explains "So I took him and imprisoned him …" and after Anna says "he died in the elevator crash with my grandparents" Julian corrects her, explaining: "Not so. That was no accident, Anna Sweet." **(A-2131)**. *Crave* then tracks that storyline with Lia, the vampire prince's mate, having "spent months … planning her parents' 'accident'." [**(A-6915)**]. In both works, the voice in the heroine's head has deserted her, she thinks about becoming Frankenstein's bride / Frankenstein if the villain's plan to bring back a dead mate succeeds. [**(A-2653), (A-6917)**]. There are similar

76

sequences with Ash and the door "shuddering" (in this parallel scene in Crave, the wall "shudders" as the romantic lead comes to the rescue) [**(A-2138, A-2139) (A-669–A-670)**, **(A-6919)**], and the heroine stabs a villain to save the romantic lead's life (in *BMR* Anna stabs Julian's demon to save Ash's life and in *Crave* Grace stabs Lia to save Jaxon's life) [**(A-672)**; **(A-6927)**]. Substantial and material details of this series of shared story beats are omitted from the district court's analysis. Instead, the district court says of *BMR* 2010 that "the MacKays" "try to get Anna and her friends out of Julian's lair." The entire sequence is once again reduced to idiosyncratic differences untethered to the core shared story.

(h) **Denying the "love triangle" story set up in *BMR*:**

The district court also erroneously states that there is no secondary love interest or love triangle in *BMR*. While the love triangle was to be a focus of Freeman's next book in the series, it was foreshadowed in the Tarot reading scene that the court's Addendum A devotes half a page to discussing–but without mentioning the "dashing second young man" in the heroine's vision, or the explicit Lovers card framework with two knights that set up the love triangle scene at the end of *BMR* involving Ronan, Ash, and Anna. Anna's Tarot reading reveals two knights who she sees as *two young men with a maiden* competing for her allegiance. One is a white knight corresponding to Ash, she notes. The *second "dashing" young man* offers her a red rose and a golden cup from which they both

77

drink. [**(A-1752–A-1757)**]. The heroine sees blood fall to the ground becoming a wolf which attacks the second young man; *the second young man transforms into a raven and flies off.* Then, at the end of *BMR*, long after the Tarot card reading, Anna is with Ronan whom she has mistakenly released from the other dimension where he was trapped in his wolf form. He kisses her, offers her his necklace, and tastes her blood. Ash arrives and in his fury transforms into a wolf. Anna tries to stop him. Before Ash's jaws close on Ronan, Ronan transforms into a raven and flies away. [**(A-2703)**; **(A-1465)**]

**(i)      Freeing the second love interest by mistake:**

Addendum A states that Anna frees "Ronan," thinking he is "the devil," and he turns into a raven and flies away to end the story. In fact, she never thought he was the devil–there is no such line or word in *BMR*–and she brought him back from the other dimension accidentally. More importantly, the court undertook no comparison to *Crave*'s parallel "Hudson" character who, as discussed *supra*, was also the second voice in the heroine's mind and likewise accidentally brought back from another dimension. Like Hudson, Ronan's eyes are "stormy blue" and blue of storm at sea / storm-tossed blue, he has a British or near-British accent, is royalty, remembers her from the Otherworld / other plane while she doesn't remember him; and he bites her (she feels the sting of a tooth puncturing her lip) to taste her blood. The district court fails to even acknowledge these similarities.

(j)      **Other Material inaccuracies and omissions in Addenda**

Addendum A contains many more material inaccuracies, including:

(i) Contrary to the court's assertion, *BMR* **2010** does **not** feature "**sex slaves.**"

(ii) There is no "**West High School,**" no "**substitute teachers**," except in *BMR* 2016, which the district court excluded from its analysis and then incorrectly used as part of the 2010 template to cite differences.

(iii) There is **no "Rachel Hudson**" character–the court appears to conflate Rachel and *Crave* series' Hudson together.

(iv) In *BMR* 2010, the heroine and her family's surname is **not DeWinter** (it's St. Claire) **and it was not changed when they moved to Alaska**.

(v)  Addendum A has the heroine freeing an "amber eyed wolf," but there is no such wolf who is freed in any draft. The court appears to erroneously attribute "amber eyes" to Ronan that are "just like Ash" in Addendum D (**SA-153**). However, the only character with amber eyes is Ash in *BMR* which is redistributed to *Crave*'s Flint who both have distinctive "molten amber eyes," a unique and expressive color description.[197]

---

[197] (Molten amber eyes) (**A-480**), (**A-6794**).

(vi)  Addendum A incorrectly says Anna learns early in the story that she and her mother and aunt are powerful Kindred witches–the court appears to be conflating her aunt's practice of Wicca (a spiritual path) with being supernatural witches who are not human. In fact, Anna believes she is human throughout the majority of the story. After she is bitten by Ash, for example, she asks if she is still human [**(A-522)**] (which is mirrored in *Crave* when Grace is bitten by a wolf-shifter), and wonders if she will be a half-wolf half-human thing [**(A-568)**, **(A-2514)**, **(A-4377)**].

(vii) Addendum A omits any reference to the characters speaking Gaelic, which is *a shared species language of the wolfshifters redistributed to the gargoyles in Crave.* When Anna tells Ash the name of the wolf, he asks if she speaks Gaelic. When she asks him how he knows Gaelic he says, "My parents speak Gaelic and so does the family, so I've picked it up." [**A-1911**]. The wolves (her father, Ash and his clan) speak **Gaelic**. In the *Crave* series, the **gargoyles** (her grandfather and his kind) similarly speak **Gaelic**.

(viii) Addendum A explains: "The reflection turns out to be a Morrigan (Priestess) of Avalon who serves someone called the Mother." But there is no "Avalon" in *BMR* 2010–the other dimension where the heroine is with Ronan and Athair is the Otherworld (in *Crave* it is called the "other plane"). [**(A-708)**; **(A-4955)**]

80

(ix) The district court stated that "Anna acquires swirling black marks on her neck over the course of the story," but in fact Anna acquires swirling black and golden magical *tattoos*: "Imprinted along my spine from the nape of my neck to the tip of my tailbone were tattoos…" **[A-583]**: "And when I did, my back lit up on fire, thousands of tiny pin pricks." [**A-549**]. This corresponds to *Crave*'s Grace also acquiring magical tattoos [**A-5616**]: "My tattoo burns as the magic lights each tiny needle prick…."

(x) In Addendum C the district court gives only a single line to a twenty-three element bathroom scene in **[A-581–A-584]** which is paralleled in **[A-5843–A-5844]** where the heroine discovers a supernatural tattoo running the full length of her spine, "**coiled**" "**like a snak**e" in *BMR*. She physically collapses in panic ("Panic flared in my stomach and rose up my chest to my throat… I sank to my knees, crippled motionless"), rocks back and forth on the bathroom floor, hands shaking, while sobbing without sound, and the stand-alone mirror cracks in two at the moment of crisis, followed by the love interest calling through the closed door in a voice described as "hesitant. Concerned," [**A-6180**]. Then gives her comfort as she curls up in his arms. The scene in *Court* contains the same sequence of events: cobra imagery for supernatural power inside the heroine: "coiling deep inside me like a cobra waiting to strike" physical collapse into the

81

bathtub, hands shaking, rocking back and forth with tears streaming, a panic attack making breath impossible, the mirror shattering, the love interest whispering "I've got you."

(xi) In Addendum C the district court acknowledges a scene from *Court* in which "Alistair gives Grace an ornate ring, symbolizing a transition of power." [**SA-139**] The court omits the similar passing of leadership to Anna in **(A-1644)**: "That ring is on your hand for a reason. And as much as I hate to admit it, that makes you the leader."

(xii) The district court also mischaracterizes *BMR* 2013, stating that Anna promises to do whatever Julian asks if he will free her friends, while its Order lists "the disappearance of their Katmere classmates in a mass kidnapping" as having no counterpart. In fact, the *Crave* series has Cyrus, the vampire king, mass kidnapping the heroine's classmates to siphon their magic, while in *BMR*, Julian has kidnapped the heroine and her friends and siphons their life force ("His lips hover a few inches from Brendan's as he draws a sip of the blue-white light. The girl beside me groans and lurches forward as though she, too, would like a taste of his life force.") Each heroine offers to sacrifice herself to save them, with war between the supernatural races certain if the kids are harmed. **(A-1627)**: "She didn't know you can't kill us without starting a war."

(xiii) The district court's analysis omits the shared storyline, perhaps best seen between *Court* and *BMR* 2014: the ultimate villain Julian (Cyrus the vampire king in *Court*), has a daughter by a woman who is not his mate and this daughter is related to the heroine by blood. In 2014, she is the heroine's half-sister and in *Court*, she is her cousin. This is a shock to the heroine in both works. It is also a point the court seized on as a difference between the works in its order. Yet in Addendum A it is listed simply as "Mia learns that both she and Taylor are daughters of Julian; they are half-sisters." [**SA-109**]

In *BMR* 2014 Taylor is the parallel character to Izzy in *Court*, who is Cyrus's daughter and Grace's cousin. They perform the same narrative function: In both stories, the heroine feels sympathy for her and offers to have her join the side of good; the daughter chooses to remain loyal to her father, though she does help the heroine. [**A-1166**]: "Maybe Taylor isn't all bad…Maybe she would be different if someone gave her a chance. "'Taylor, come with me,' I say on impulse. 'You don't have to stay here.' She smiles her slow cat's smile. 'Oh but I do! You see dear little Mia, I'm wicked." / [**A-6054–A-6055**]: 'You don't have to stay on the other side, you know.' Even as I say the words, I wonder if I'm making a mistake. But there's something in her eyes-something lurking under all the ice and mockery-that

makes me think there's more there… 'All this sweetness might work for you, but if I've learned anything from Cyrus, it's that nothing's free. And frankly, I'd rather stick with the payment plan I've already got set up.'"

(xiv)  The shared royal lineage / grandmother-goddess / Nyx identity between the works is relegated to a "principal difference" and all but ignored by the district court. In this shared storyline, the heroine is the descendent of a twin goddess, and learns this from a grandmother she did not know existed with green eyes. This and other highly specific details that are only in 2016 and used in *Crave*'s later books are all quarantined to a separate Addendum B summary without any mention in the district court's analysis. Rather, the district court erroneously states that the green-eyed Bloodletter/God of Chaos character does not parallel the corresponding character in *BMR* because the Bloodletter is not the *Crave* heroine's grandmother. [**SA-54**]. But a reasonable jury could find this storyline alone substantially similar to *BMR* 2016.

(xv) The district court's Addendum D states: "magic tea" is made by Anna's aunt to dim her memories of her father's death (omitting the grandparents' deaths) [**SA-146**] which is incorrect and does not address that in both works the heroine has been given "magic tea" to keep her identity hidden from herself. Anna's aunt is an herbalist and brewer of teas [**SA-147-**

**148**], while in Crave, Grace's mother was the herbalist who made tea blends. Tea thus serves the same narrative function in both works and these parallels are omitted from the Order and Addendum D. (See *supra*, Footnote 15)

(xvi) Page 64 the Order[198] states: "While Mean Girl Taylor offers Grace her first glass of punch spiked with Everclear, there is no indication in the text that Taylor put the Everclear in the punch, or that only Anna/Mia's drink was spiked. In fact, the punchbowl was equally available to all guests…" [**SA-93-94**] But later admits that in *BMR* 2010 "Taylor gives Anna a glass of 7-Up spiked with liquor…Taylor then gives Anna a glass of punch, which tastes good to her, but is also spiked, this time with Everclear…Ash also intuits that Taylor gave Anna spiked punch deliberately…" [**A-SA-93-94**]. The court's conclusion–that Anna's drink was not targeted–is contradicted twice in its own Addendum A.

There are many more errors and omissions in the district court's analysis, but Freeman hopes the above is sufficient to show that the district court failed to consider significant shared plot points, storyline, scenes, character interactions and development, and other protectable expressions. Instead, it provided an incomplete, and sometimes inaccurate, summary of *what happens* in each work

---

[198] (**SA-66**).

without lining up the similarities in the light most favorable to Freeman–as it was required to do.

Ultimately, the district court failed to review the evidence in the light most favorable to Freeman, failed to line up the actual points of similarity between the works, and instead performed an improper dissimilarity analysis. When properly compared under the correct standard, a reasonable juror could find substantial similarity of protectable expression, and reversal of the judgment entered in this case is warranted.

**III.    It was error to exclude the expert testimony of Professors Reiss and Chaski.**

The district court erred in excluding the testimony of Freeman's indisputably qualified experts, Professor Reiss and Dr. Chaski.

Under Rule 702, the exclusion of expert testimony is improper where it "rests on a reliable foundation and is relevant to the task at hand." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 122–23 (2d Cir. 2020). "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method" should not result in exclusion, rather a court "should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

86

**A. It was error to entirely exclude Professor Reiss.**

Kathryn Reiss is an acclaimed professor of English and Creative Writing at Northeastern University who has taught topics including "the elements of a story that are required by the genre" and is an award winning author. See [**A-4063**]. In this case, she opined on similarities between the works that could not reasonably be attributed to genre conventions and tropes found in young adult literature. The district court did not dispute her qualifications or that expert testimony on tropes and genre conventions could be helpful, yet excluded her testimony for reasons that should have, at most, gone to the weight of her testimony and not its admissibility.

First, the district court found that Reiss focused on the similarities of the works without identifying differences, but proper similarity analysis requires "the lay observer to focus on similarities rather than differences when evaluating a work. Only when the similarities are insubstantial or unprotectible will a claim fail." *Crichton*, 84 F.3d at 590.

Next, the district court also criticized Reiss for "enumerat[ing] many similarities that are plainly genre conventions and tropes but fail[ing] to identify them as such." But a finding of probative similarity may be grounded in shared unprotectable elements such as tropes, and a finding of substantial similarity may be grounded in the selection and arrangement of unprotectable elements such as

87

tropes. It thus provides no basis for exclusion that she does not specifically identify each trope as such.

And while acknowledging that expert testimony may help determine probative similarity, the district court discounted the value of identifying unprotectable tropes because probative similarity considers the "entire work, not just the protectible elements" and thus expert testimony is unnecessary. [**SA-184**]. But similarities in non-trope elements (including original expression of the shared tropes) may carry far more weight as evidence of access, so differentiating tropes from original expression built on top of them could provide great value to the jury.

The court also excluded expert testimony on substantial similarity because this is not a technical case, despite acknowledging that such testimony may be admissible "where it 'synthesizes' or 'summarizes' data in a manner that 'streamlines th[e] presentation of the data to the jury, saving the jury time and avoiding unnecessary confusion.'" *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016), quoting *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 504 (S.D.N.Y. 2015). This is precisely such a case, as the jury would undoubtedly benefit from a qualified expert streamlining comparisons of the over 5,300 pages of material spread across four full-length books and six manuscripts. Moreover, as acknowledged by Judge McMahon, it

was totally impracticable for a jury to read all of both sides' works in order to render a decision. [**A-7059**]. Thus, Reiss's testimony was essential for a jury trial.

This Court should thus reverse the district's exclusion of Professor Reiss's expert testimony, at least as to her ability to address where tropes end and protectable expression of those tropes begins.

**B. It was error to exclude Dr. Chaski.**

Dr. Carole Chaski is a well-qualified forensic linguist offered in this case to assist with the issues of access, probative similarity, and independent creation based on her forensic review of "lexical clusters" surrounding certain key words that appear in both *BMR* and *Crave* as compared against a baseline of 10 other novels–an analysis grounded in well-established methods of detecting plagiarism commonly employed in forensic linguistics.

The district did not find Dr. Chaski's methodology was unreliable, but excluded her testimony in its entirety on the grounds that "(1) she did not differentiate between different versions of *BMR*; (2)...Freeman's counsel selected the ten baseline novels; and (3) Chaski selected the 35 keywords based on Freeman's complaint." [**SA-181-183**]. None of those facts justified the exclusion of her testimony.

The concern that Chaski "did not differentiate between different versions of *BMR*" is unfounded. Chaski's statistical analysis shows Freeman's six comparison

89

manuscripts as a body contain remarkable overlap rates in lexical clusters to the *Crave* books and includes a known error rate for the data in the case: whenever one of the baseline authors was closer to Freeman than Wolff, that result can and should be counted as an error since it is impossible for any of the baseline authors to have copied Freeman. While breaking that analysis down on a manuscript-by-manuscript basis is certainly possible, the failure to do so does not negate the probative similarity revealed in the comparison of the larger bodies of work.

And her expert analysis is still helpful to the jury to determine probative similarity on a manuscript-by-manuscript basis as the jury can review each manuscript to see whether and to what extent the identified lexical clusters appear in those manuscripts. Chaski's evaluations and opinions should not be excluded.

As for Chaski's 10 baselines novels, there was no finding (or even argument by Defendants, whose expert, Emily Easton, used 7 of the same baseline novels in her evaluation) that any of them were improper as baseline novels. And if Chaski used a fair data set, it is irrelevant who provided it. Or, at least, any potential biases in choosing what novels to use as a baseline goes to the weight of Chaski's testimony, not its admissibility.

Finally, the district court appeared to misunderstand Chaski's methodology and conclusions when it critiqued that "[t]he decision to select 35 keywords based on Freeman's Complaint... seems designed to find that *BMR* and *Crave* share more

90

similarities than other books [and] improperly embeds bias into the data set [which] justifies exclusion." [**SA-183**]. Chaski was not concerned with whether there are more keywords shared between *BMR* and the Crave series than with the baseline novels. [**A-3883-3884**]. Rather, her analysis focused only on the extent to which the keywords are used in the same way (as determined by their lexical clusters). *Id*. As she explains, "each keyword is central to a lexical cluster, the words that co-occur with it, or the keyword's collocations. One adage in linguistics is that you know a word by the company it keeps, that is, you know a word by the words that appear with it, or the lexical cluster around a keyword, (in linguistics terminology, collocations).

One way to measure similarity is to determine how much overlap there is between lexical clusters of the same keyword in different texts." Thus, for example, by measuring the lexical clusters of a keyword like Alaska, Chaski (or any linguist) can determine whether the lexical clusters overlaps between two words are unusually high—as they are for *BMR* and *Crave* compared with the other books that use the keyword Alaska. Thus, it is not specific keywords that matter if they are in both works—what matters is the "company each keeps" in the words around them, i.e., the similarity in the lexical cluster overlaps relative to any other baseline novel that also shares those keywords. Those words (the lexical clusters) reflect objective findings on the probability of access and copying.

91

The district court's decision to exclude Professor Reiss and Dr. Chaski was thus an abuse of discretion. That exclusion should be reversed.

## VII.   CONCLUSION

Copyright law is designed to encourage original artistic expression and thus is, by its nature, a balancing act that allows unprotectable ideas to be copied but precludes the unauthorized use of protectable expression—in the case of literature concept and feel, theme, characters, plot, sequence, pace, and setting. Here, a comparison of the *Crave* and *BMR* works reveals sufficient similarity in those elements that a reasonable juror could see substantial similarity of protectable expression, and the district court's contrary finding rested on an analysis that simply did not fairly compare similar scenes, reduced Freeman's work to unprotectable ideas, and failed to view the evidence in the light most favorable to her. There was also no real question that Freeman held a valid copyright in her work and that Appellees had access to that work. The district court's contrary rulings should be reversed with instructions to proceed to trial, including with Freeman being able to offer the testimony of Professors Chaski and Reiss, and with ownership and access adjudicated in her favor.

Respectfully submitted,

Dated: July 29, 2026          By:   */s/ Stephen M. Doniger*
                                     Stephen M. Doniger, Esq.
                                     David M.S. Jenkins, Esq.
                                     DONIGER / BURROUGHS

92

247 Water Street, First Floor
New York, New York 10038
stephen@donigerlawfirm.com
djenkins@donigerlawfirm.com
(310) 590 - 1820

REEDER LLP
Mark D. Passin
11766 Wilshire Blvd.
Suite 1470
Los Angeles, CA 90025
310-861-2475
*Attorneys for Plaintiff-Appellant*

93

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief compliance with Fed. R. App. P. 32(a)(7)(B) and the orders of this court. The brief contains 20,756 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). Pursuant to this Court's Order of July 14, 2026, the brief does not exceed 21,000.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because it has been prepared in a proportionally spaced typeface in Times New Roman, 14-Point font.

94

**SPECIAL APPENDIX**

**TABLE OF CONTENTS**

| Document | File Date | USDC Dkt. No. | Page |
|---|---|---|---|
| Judgment | 03/31/26 | 549 | SA-1 |
| Decision and Order Granting Defendants' Motion for Summary Judgment, Denying Plaintiff's Cross-Motion for Summary Judgment, And Denying as Moot Defendants' Motion for Summary Judgment on Plaintiff's Claim for Actual Damages and Motion to Strike Jury Demand | 03/16/26 | 548 | SA-3 |
| Minute Order Authorizing Filing of Summary Judgment | 01/12/26 | NDN | SA-160 |
| Order on Motions for Reconsideration | 01/14/25 | 418 | SA-162 |
| Order Adopting R&R and O&O | 11/21/24 | 398 | SA-165 |
| Opinion and Order | 08/01/24 | 362 | SA-169 |
| Report and Recommendations | 08/01/24 | 361 | SA-198 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
 LYNNE FREEMAN,

                            Plaintiff,

            -against-                                        22 **CIVIL** 2435 (CM)(SN)

                                                            <u>**JUDGMENT**</u>

TRACY DEEBS-ELKENANEY ET AL.,

                            Defendants.
-----------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Decision and Order dated March 16, 2026, this is a case that is easily disposed of once one reads the allegedly infringed and infringing works against each other and in light of the well-developed law in this Circuit on substantial similarity within literary works. Freeman's novel and Wolff's Crave novels are indeed similar, but only in the ways that all young adult romantasy fiction novels are similar to each other. At the granular level, looking at their unique creative expression, they are substantially different not substantially similar. Therefore, Defendants' motion for summary judgment on Plaintiff's copyright claims is GRANTED. Plaintiff's motion for summary judgment is DENIED. Defendants' motion for summary judgment on Freeman's actual damages claim and motion to strike jury demand are DENIED AS MOOT. Sadly, this ruling does not end the Crave/Freeman saga. The decision to dismiss Freeman's case effectively disposes of the cases that Freeman has brought against Barnes & Noble Booksellers, Inc., Apple Inc., Amazon.com Inc., Target Brands Inc., and Walmart Inc., charging them with contributory infringement as a result of sales of the four Crave novels. See Freeman v. Barnes & Noble Booksellers, Inc. et al., Case No. 2:23-cv-4145; Freeman v. Apple, Inc., Case No. 23-cv-7051; Freeman v. Amazon.com Inc. et al., Case No. 23-cv-4796. However, the Court sees no

**SA-1**

reason to lift the stay in those cases at the present time. If Freeman takes an appeal from the decision, we can abide the decision from the Second Circuit before entering final orders that will dispose of those cases in one way or another depending on whether this decision is affirmed or reversed. If there is no appeal we can lift the stay at that time. The newest case, Freeman v. Deebs-Elkenaney et al., Case No. 25-cv-9345, involves allegations that the fifth and sixth novels in the Crave series infringe Freeman's copyrights, for substantially the same reasons that the first four Crave novels infringed.

**Dated:** New York, New York

March 31, 2026

**TAMMI M. HELLWIG**

_____

**Clerk of Court**

**BY:** *K. mango*

_____

**Deputy Clerk**

**SA-2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

LYNNE FREEMAN,

                Plaintiff,

   -against-                               22-cv-2435 (CM) (SN)

TRACY DEEBS-ELKENANEY ET AL.,

                Defendants.

————————————————————————x

### DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND DENYING AS MOOT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR ACTUAL DAMAGES AND MOTION TO STRIKE JURY DEMAND

McMahon, J.:

Plaintiff Lynne Freeman ("Freeman") brings this action against Defendants Tracy Deebs-Elkenaney, p/k/a Tracy Wolff ("Wolff"), Entangled Publishing LLC ("Entangled"), Emily Sylvan Kim ("Kim"), Prospect Agency, LLC ("Prospect"), Holtzbrinck Publishers, LLC, d/b/a Macmillan ("Macmillan"), and Universal City Studios LLC ("Universal") pursuant to the Copyright Act, 17 U.S.C. § 101 *et seq*.

Before the Court are the parties' cross-motions for summary judgment on the issue of substantial similarity,[1] as well as Defendants' motion for summary judgment on Plaintiff's claim for recovery of actual damages and their motion to strike Plaintiff's jury demand.

For the reasons set forth below, Defendants' motion for summary judgment on the issue of substantial similarity is GRANTED and Plaintiff's motion for summary judgment on the same

---

[1] Plaintiff incorporates by reference all briefing and evidence filed in connection with her prior summary judgment motion. *See* Dkt. No. 543-1 at 9 n.1.

issue is DENIED. Defendants' motion for summary judgment on Plaintiff's actual damages claim and motion to strike Plaintiff's jury demand are DENIED as moot. The Clerk of Court will enter judgment for Defendants and dismiss the case.

**BACKGROUND**[2]

### I.       The Parties

Plaintiff Lynne Freeman ("Freeman") is the author of multiple drafts of an unpublished novel variously entitled "Blue Moon Rising" and "Masqued" (referred to herein as "BMR/Masqued," except when a specific draft is under discussion). Freeman also wrote down notes that set out ideas and outlines for various versions of her novel. The record includes six drafts of a novel and nine sets of notes. *See* Dkt. No. 289 at ¶ 19.

Freeman's unpublished works were registered with the United States Copyright Office in September 2021 under four group Registration Numbers: TXu002276330; TXu002282260, TXu002276335, and TXu002276337.[3]

Defendant Tracy Deebs-Elkenaney, known professionally as Tracy Wolff ("Wolff"), is credited as the author of the books Crave, Crush, Covet, and Court (hereinafter referred to collectively as the *Crave*[4] series). Wolff is a *New York Times* bestselling author of at least 60 books, including 46 full-length novels in the paranormal romance, urban fantasy, young adult, new adult, erotic, and contemporary romance genres.

---

[2] Unless otherwise indicated, the facts contained in this section are undisputed and are drawn from the parties' Rule 56.1 statements of undisputed facts and counterstatements. *See* Dkt. Nos. 289, 299, 310, 332.

[3] As best as I can tell, BMR 2011 was registered under TXu002276335, and Masqued 2012/2013/2014 under TXu002276337. I cannot figure out what was registered under the other two numbers. The parties do not challenge Freeman's assertion that she has registered copyrights in all six draft versions of the novel and in the notes as well, so I will assume, for purposes of deciding this motion, that all six drafts and the nine sets of notes are registered somewhere.

[4] The Court refers to the first of Defendant's allegedly infringing book as "Crave" and to the series as a whole as "*Crave*."

2

Defendant Entangled Publishing, LLC ("Entangled") is a publishing company that published each of the books in the *Crave* series. Elizabeth Pelletier ("Pelletier") is the majority owner and Chief Executive Officer of Entangled. Stacy Abrams ("Abrams") is Entangled's Editorial Director of Publishing and Vice President of Operations. Abrams also worked for Entangled as a Copy Editor. Pelletier and Abrams are not individually named as defendants in this action.

Defendant Prospect Agency ("Prospect") is a literary agency founded in 2005 by Defendant Emily Sylvan Kim ("Kim"). Kim is the principal of Prospect and has served as Wolff's literary agent since 2007. Between 2010 and 2014, Kim also acted as Freeman's literary agent.

Defendant Holtzbrinck Publishers LLC, d/b/a Macmillan ("Macmillan") has distributed each book in the *Crave* series pursuant to an agreement with Entangled.

Defendant Universal City Studios, LLC ("Universal"), a film studio, hopes to make a movie out of the novel Crave, and perhaps its sequels. It has licensed the right to make a film adaptation of Crave from Entangled – hence its inclusion as a defendant in this lawsuit.

## II.     Factual Background

From 2010 to 2014, Freeman attempted to find a publisher for her young adult paranormal romance novel, BMR/Masqued. In pursuit of that goal, Freeman entered into a written agency agreement with Kim in December 2010, pursuant to which Kim, individually and on behalf of Prospect, agreed to act as Freeman's literary agent. Freeman worked with Kim through revisions and rewrites of BMR/Masqued for approximately three years. During that time, Freeman sent Kim at least 10-15 drafts of BMR/Masqued, as well as copies of her notes. In October of 2013, Kim sent a draft of BMR/Masqued (then-titled Masqued) to Abrams at Entangled. Whether this draft

3

SA-5

was the version referred to herein as Masqued 2013 or an earlier version (Masqued 2012) is not clear.

All six versions of the novel at issue are about a young girl – a high school junior at a public school in Anchorage, Alaska – who is, unbeknownst to herself, a tripartite paranormal creature, or the "thrice born daughter" (part witch, part shapeshifter, part demon). The heroine will come into her powers on her seventeenth birthday, and by virtue of her mixed heritage, she is the key to the resolution of an ancient enmity among the powers of Shadow and Light. For the most part, the various iterations of BMR/Masqued contain the same characters (albeit known by different names in different drafts) and the same basic plot. The sixth and last version of the novel differs substantially from its five predecessors.

Freeman herself describes her manuscripts as "iterations and edits of one overarching story," Dkt. No. 284 at 1, though after reading all of them (multiple times), the Court concludes that Freeman's most recent draft (referred to herein as Masqued 2016) differs so much from the five earlier drafts (including having many fewer characters and not following the same story template) as to require separate analysis. *See infra* Section V. The first five versions in the record – BMR 2010 and 2011, and Masqued 2012, 2013, and 2014 – are definitely variations on the same story; they were written off a common template and all contain many of the same incidents.

Ultimately, Kim and Freeman were unable to secure a publishing deal for Freeman's work. The written agency agreement between Freeman and Kim formally expired in March 2014, and Freeman and Kim parted amicably.

Kim recalls that she sent only one version of Freeman's work to Entangled; which Abrams testified that she did not read. Although Freeman posits that Kim "might have" sent more than one version of her work to Entangled after their commercial relationship ended, her speculation is not

4

SA-6

evidence; Kim denies doing anything to promote her former client's work after their commercial relationship ended, and no evidence in the record supports any inference that this in fact occurred. However, as I note below, I will presume access for the purpose of deciding the competing summary judgment motions.

Several years after Kim and Freeman parted ways, Pelletier, Entangled's CEO, decided that Entangled should publish a young adult novel with a "fish out of water trope" or an "ordinary girl in a super rarified world" plot. PSUF ¶ 46. Pelletier instructed several of Entangled's editors, including Abrams, to find an author who could write a book in the paranormal genre for Entangled's teen line. When an unrelated third party was unable to come up with something, Abrams asked Wolff if she could quickly write such a book for Entangled. Wolff presented Abrams with five potential plot ideas, including one for a "Warlock or Vampire boarding school book." DSUF ¶ 86. Pelletier and Abrams felt the boarding school plot was closest to what Entangled was looking for, and in May 2019, Abrams told Wolff that Entangled wanted to move forward with the book that would become Crave.

Crave, the first novel in the series, was published in April 2020. The book was a major commercial success. It morphed into a four-book series;[5] each book was published by Entangled and distributed by Macmillan.

The parties disagree about who participated in the writing of the *Crave* novels. Defendants contend that Wolff alone wrote the books, while Pelletier provided substantive edits, Abrams provided copy edits, and Kim provided moral support. Freeman argues that Pelletier, Abrams, and Kim were "very involved" in writing the *Crave* series. PSUF ¶¶ 49, 82; DSUF ¶¶ 92–99. Freeman

---

[5] By now it is a six-book series; Wolff published two more books after this lawsuit was well underway. Those books are the subject of another lawsuit, *see infra*. p. 6. That action has been stayed pending the resolution of this case.

SA-7

was not privy to the actual writing process of the *Crave* books, but she infers that Kim, Abrams, and Pelletier assisted Wolff; she reaches this conclusion based on Kim's close personal relationships with Wolff, Abrams, and Pelletier; a series of text messages involving Kim; a shared Google Doc; and Wolff's deposition testimony that the *Crave* series was a "group project" among her, Pelletier, and Kim. *See* Dkt. No. 284 at 9–10, 20.

For purposes of this opinion – which assesses only substantial similarity – I will assume that Wolff was assisted by Abrams, Pelletier, and Kim in writing the *Crave* novels. Since there is no evidence in the record that Wolff herself ever saw any of Freeman's drafts or notes, the basis for inferring access is the fact that Kim, who allegedly saw much of what Freeman wrote, personally participated in drafting the *Crave* novels and sent a version of Masqued to Abrams at Entangled.

### III.    Procedural History

Freeman commenced this lawsuit on March 25, 2022. Dkt. No. 1. Two months later, she filed her First Amended Complaint, asserting claims against Defendants for copyright infringement, contributory copyright infringement, and vicarious copyright infringement, as well as state law claims against Prospect and Kim for fraud, fraudulent concealment, breach of contract, and breach of fiduciary duty. Dkt. No. 24.

Freeman has brought separate lawsuits against Barnes & Noble Booksellers, Inc., Apple, Inc., Amazon.com Inc., Target Brands Inc., and Walmart Inc. for copyright infringement for selling Wolff's novels. *See Freeman v. Barnes & Noble Booksellers, Inc. et al.*, Case No. 2:23-cv-4145; *Freeman v. Apple, Inc.*, Case No. 23-cv-7051; *Freeman v. Amazon.com Inc. et al.*, Case No. 23-cv-4796. Freeman recently brought a new lawsuit, alleging that the fifth and sixth books in the *Crave* series infringe her copyright. *See Freeman v. Deebs-Elkenaney et al.*, Case No. 25-cv-9345.

6

SA-8

This case, as well as all the seller cases, were originally assigned to my colleague, the Honorable Louis Stanton, who referred the matters to the assigned Magistrate Judge, the Honorable Sarah Netburn, for general pretrial supervision. Magistrate Judge Netburn superintended years of contentious discovery in the instant case, while the other cases remained stayed.

As soon as fact discovery concluded, Freeman moved for summary judgment on her direct copyright infringement claim. Defendants cross-moved for summary judgment on that claim and also moved for summary judgment dismissing Freeman's state law claims. Judge Stanton referred these cross motions, as well as various *Daubert* motions concerning expert testimony offered by the parties, to Judge Netburn in the first instance.

On August 1, 2024, Judge Netburn issued a Report and Recommendation. She recommended that the court deny the parties' cross-motions for summary judgment on Freeman's direct copyright infringement claim but grant Defendants' motion for summary judgment dismissing Freeman's state law claims. *See* Dkt. No. 361.

With respect to Freeman's copyright claim: the first prong of copyright analysis is "actual copying," the elements of which are probative similarity and access. Judge Netburn concluded that there was no genuine issue of fact as to probative similarity, but there was a genuine issue as to access, which precluded granting summary judgment to either side on the issue of "actual copying." *Id*. at 8, 15.

Having found actual copying to be in dispute, Judge Netburn expressly declined to reach the second prong of the copyright analysis, which asks whether the works in question were "substantially similar." The learned Magistrate Judge declined to reach the question of substantial

7

SA-9

similarity even though that issue could have been independently dispositive of the case. *See id*. at 17.

Both parties objected to Judge Netburn's findings and her Report and Recommendation was referred to the district judge for review.

Judge Stanton modified Judge Netburn's R&R in a brief decision issued on November 21, 2024. *See* Dkt. No. 398. He agreed with Judge Netburn that the state law claims should be dismissed. He also endorsed her conclusion that there was a genuine issue of fact as to access. But he rejected her conclusion that there was no genuine issue of fact as to probative similarity – an issue on which Judge Netburn found in favor of Plaintiff, not Defendants. Judge Stanton concluded that Judge Netburn's reasoning, while logical and persuasive, was akin to a finding that only a jury could make.

Like Judge Netburn, Judge Stanton declined to address the parties' copious arguments about substantial similarity. Although Defendants asked that the district judge do what the Magistrate Judge did not, Judge Stanton stated, without engaging in any substantive analysis, that all issues in the case should be decided by a jury. The only argument he addressed was Defendants' contention that the court should reach substantial similarity because a jury would be unable to digest such voluminous material. He counseled that Defendants should not worry about that, since "experienced trial counsel will be able to present the meat of it [] efficiently at trial." Dkt. No. 398 at 3.

Judge Stanton adopted the R&R as modified as his opinion.

On September 17, 2025, the case was reassigned to me. Defendants immediately asked this Court to decide the issue of substantial similarity, which had not been previously addressed. *See* Dkt. No. 492. After concluding that nothing prevented me from considering the issue in advance

8

SA-10

of trial, I raised the possibility of revisiting summary judgment with the parties in a December 5, 2025 order, *see* Dkt. No. 503. At that point, I had not nearly finished reading all of the parties' works. By the time we held a hearing on January 12, 2026, I had read a great deal more.[6] I directed the parties to make their respective motions, limited to the one and only issue not previously addressed on the merits: substantial similarity.[7]

On January 26, 2026, the parties cross-moved for summary judgment. *See* Dkt. Nos. 525, 528-1; 543-1.[8] Those motions were fully briefed on February 17, 2026.

## IV. The Works

The Court has personally read every word of the four Wolff books and the six Freeman drafts and nine sets of notes at issue in this case. That was a lot of reading. Each of Freeman's first five drafts is approximately 450 double spaced pages long. The sixth (Masqued 2016) is 108 pages long; it appears to be incomplete. There are approximately 55 additional pages of notes, variously single and double spaced. Each of Wolff's four novels is about 650 pages long, but that number is highly misleading because, with each successive volume, the print and the margins on each page get smaller and the line spacing gets closer. When Wolff's works are normed for changes in print and margin sizes, they easily exceed 3000 pages – which means the Court has read upwards of 6000 pages of romantasy fiction.

---

[6] It took me about 8 weeks to read all of the Plaintiff's drafts and the Defendants' novels – though my reading was intermittent.

[7] I did not authorize Defendants to make any motion addressed to damages, and if I had reached a different result on the substantial similarity motions, I would simply have denied that motion without prejudice to renewal at trial. By virtue of my decision on substantial similarity, the damages motion has become moot. The jury trial issue was raised by letter several months ago and I told the Defendants to formalize that motion; however, it too is now moot.

[8] On February 24, 2026, two weeks after filing her initial brief, Plaintiff filed a "notice of errata" regarding her memorandum of law in support of her motion for summary judgment and attached a revised brief. *See* Dkt. Nos. 543; 543-1. I don't intend to get into a dispute about whether there really was a "clerical production error" in the creation of the original brief; for purposes of this decision, I have relied on the revised brief.

This opinion contains two sets of summaries of these works – brief summaries in the text of the opinion, and more fulsome summaries appended as addenda to this opinion and intended to be read in connection with the Court's analysis. Obviously, any analysis of whether Freeman's and Wolff's works are substantially similar – which is the only issue that will be addressed in this opinion – requires that comparison be made between the actual works written by Freeman and Wolff, not of summaries of those works. And that is exactly what I have done. But since it is not possible for the reader to understand the parties' arguments or the court's ruling without being at least somewhat familiar with the content of the works, the summaries are offered for clarification.

### a. *BMR/Masqued (The Template)*

Five of the six drafts of Freeman's novel – all except the 2016 version of Masqued – follow the same basic outline, which I refer to as Freeman's template. Certain details change from draft to draft, but the underlying story remains fundamentally the same in all five drafts.

The story starts when the sixteen-year-old heroine has a vision in which she is told she must meet her destiny and choose between shadows or light.

The story is set against the backdrop of a frightening crime: sixteen-year-old girls are being abducted by animal-like creatures in the dead of night, only to be returned the next morning bearing some sort of mark on their necks.

When the heroine was seven, she, her mother, and her aunt moved from California to Alaska after her father was killed in an accident.

The heroine's childhood best girlfriend(s) reject her when she arrives at school on the day the story begins.

A handsome, sun-kissed New Boy arrives at school on a motorcycle with a gorgeous girl in tow – his sister. He pays attention to our heroine in their shared classes, one of which is taught

SA-12

by his parents, who are archaeologists. The parents, the boy, and his sister are shapeshifting paranormal creatures and members of an ancient order. They are in Anchorage searching for objects that were supposedly cursed by a Celtic Druid and subsequently brought to Alaska from New Zealand by Captain James Cook.

Mean Girl Taylor – beautiful and popular with all the boys – announces that she wants New Boy to be her next boyfriend, but New Boy expresses no interest in her.

New Boy drives the heroine home on his motorcycle, to the consternation of her mother.

Because her mother will not talk to her about such matters, the heroine discusses her family's past and her own future with her aunt, who is a witch and a veterinarian.

The heroine casts a Tarot reading about New Boy; the cards come to life and she tries to interpret the resulting vision, which involves a maiden, two knights, wolves, a cup, a flower, and (in some versions) a dagger.

A month passes, during which our heroine and New Boy have minimal contact.

Our heroine is rescued from having to each lunch alone by her long-time biracial male friend – the Class President, whom the heroine alone knows is gay – and his friends.

The heroine begins to develop mysterious markings on her neck and spine, which her aunt hides with a salve that makes them disappear.

New Boy asks the heroine to meet him at a school dance, which she attends with her gay friend and three of his pals; she is dressed as Little Red Riding Hood.

Mean Girl Taylor makes sure that our heroine overhears her talking about her "date" with New Boy, and our heroine is bereft. She leaves the dance and goes outside. New Boy follows.

After New Boy explains that he was not on a date with Mean Girl Taylor, our heroine and New Boy enjoy their first romantic moment outside the school under the Northern Lights.

11

**SA-13**

When they kiss, New Boy gets a little "wolfy;" our heroine, frightened, ditches New Boy when they arrive at the local diner and asks her gay friend to take her home.

New Boy comes to her home, hoping to explain himself. He cannot force his way in and our heroine will not let him in. But they agree to meet the next day at the local Barnes and Noble.

Later on Halloween night, the heroine awakens from a dream (see below) to find her mother engulfed in a fit of madness.

The heroine has several different dreams. In some she encounters a kindly, grey-eyed wolf who is her spiritual guide. In others, she is pulled through a mirror by someone who looks remarkably like her, only with blue, not grey, eyes.

At Barnes and Noble the next day, New Boy tells the heroine as much as he can about himself and his family and the work they are sworn to do without running afoul of a magical vow he has made (a *geas*). He tells her about their search for a girl, the "thrice born daughter," a girl of mixed parentage who must be killed before she comes into her powers on her seventeenth birthday and tips the precarious balance between the paranormal worlds of Shadow and Light. The girl will be identified by certain markings on her body. New Boy and our heroine kiss in the Barnes and Noble parking lot; they are seen by other students and so publicly become a couple.

The heroine's old friend(s), including Mean Girl Taylor, unexpectedly invite her to go with them to a party. While the heroine does not want to go, her mother insists that she do so, and that she go to the home of one of her friends to get ready.

The girls arrive at an unsupervised party at the home of high school seniors – not the party the heroine thought they were attending.

At the party the heroine is given punch spiked with alcohol. She thinks it is delicious and drinks a lot of it. She gets drunk.

SA-14

New Boy, Gay Friend, and her other new friends arrive to take her home. They recognize that she is drunk, and when she resists their efforts to get her to leave with them, they simply pick her up and take her away. On the way home, she throws up in New Boy's car. She also sees mysterious marking on his fingers.

When she arrives home, she is told that members of her family have an unusually strong reaction to alcohol.

The next day – a Saturday – our heroine goes into the deserted high school, where she fights and vanquishes a demon who is attacking New Boy's mother.

After they fight, the demon bows to our heroine and says unfamiliar words before disappearing. Our heroine does not understand what she has heard, but New Boy's family explains to her that the demon invoked the name of the Druid who placed a curse on the objects they are seeking.

The heroine is seriously wounded in the fight, but New Boy cures her with his bite, which intensifies the connection between them.

New Boy's family, all of whom are shapeshifters, want to know more about who our heroine might be. Since she does not know the truth about herself, she cannot tell them anything. They infer, however, that her father must have been a shifter from the pendant that he gave her – one made by an ancient Egyptian wolf god – which is similar to pendants that they wear.

New Boy's family blood-pledge themselves to protect the heroine, because she saved the life of New Boy's mother.

New Boy takes the heroine home, and then shows up in her bedroom to look out for her. She welcomes his presence.

13

SA-15

New Boy's sister arrives to take her brother to a meeting about one of the cursed objects they are seeking. Sister explains to our heroine that, because her brother has bitten our heroine, he must remain with her to protect her. As a result, he can only go to the meeting if our heroine goes, too. New Boy does not want to go, but our heroine insists.

The three teens go to a notorious local bar, which has a back "VIP" room that turns out to be a hangout for supernatural creatures – The Sanctuary.

While at this place, the heroine sees a gorgeous demonic man who fascinates her. This handsome demon seems to recognize our heroine, although he calls her by a name not her own. He engages with our heroine, but she is uncomfortable and puts him off.

The heroine's true friends arrive and lure her outside, where they are kidnapped by vampires and are taken to the lair of their master, Julian – the fascinating demon she met in the bar.

Julian explains that he had a relationship with members of the heroine's family. He tells the heroine that her family owes him a blood debt for taking away his true love. He explains that our heroine's beloved father Dante is not dead, but is Julian's prisoner, because Julian blames Dante for the loss of his beloved.

When Julian seeks to imprison some of her friends, and even threatens to feed one of them to his demons, our heroine agrees to fulfill any demand he makes in exchange for their freedom.

Rescuers arrive at Julian's lair. There is a fight, during which Julian's demonic creatures are vanquished. Julian disappears.

Mean Girl Taylor arrives at Julian's lair while Julian's prisoners and their rescuers are making their escape. She had something to do with Julian's capture of our heroine and her new

14

SA-16

friends. She is wearing one of the cursed objects, a serpent ring; it is wrested from her finger and ends up on the heroine's.

Instead of leaving the lair with her friends, the heroine goes through a mirror that she finds in Julian's house. It leads her into Avalon, where she meets a priestess who is related to her. Told that she can free her father, our heroine has to choose between two wolves that are caught in traps. She chooses the one with amber eyes rimmed in black. Our heroine and the wolf she freed go back through the mirror to Anchorage, whereupon the wolf turns into a man. It turns out that our heroine freed, not her father, but the Druid whose name was invoked by the demon.

The Druid tries to console our heroine, who is distraught that she has chosen wrongly. He gives her an amulet so she can call him if she is in trouble.

New Boy turns up to fight the Druid, who turns into a raven and flies away.

* * * * * * * * * * * * * ** * * * * * *** ** * * * * * *

Addendum A to this opinion summarizes the first of the five versions of this story, and then goes on to describe the principal differences in each succeeding draft.

Addendum B to this opinion summarizes the last and final draft of Freeman's novel, which does not follow this template and which will be discussed separately.

### b. *Crave*

The *Crave* series tells the story of a teenaged girl named Grace Foster, who is forced to relocate from San Diego following the tragic death of her parents. She finds herself at the elite boarding school Katmere Academy, a gothic castle in the remote mountains of northern Alaska, where she is reunited with her Uncle Finn – Katmere's headmaster – and her cousin Macy. Grace soon discovers that Katmere is anything but an ordinary boarding school; it is home to all kinds of supernatural creatures, including vampires (like the mysterious and attractive Jaxon Vega),

SA-17

witches, dragons, and werewolves. Crave, the first novel in the four-novel series, focuses on the efforts of Grace – a normal, human girl (or so she thinks) – to find her place among various supernatural factions. Grace discovers she is connected to the supernatural world in ways she never imagined – her relatives are witches and she herself is, unbeknownst to her, a very special paranormal creature.

Grace is targeted by a witch named Lia, who wants to kill her. Lia believes that, by doing so, she can resurrect her boyfriend, Hudson Vega (Jaxon's brother), whom Jaxon killed the previous year to prevent Hudson from destroying the world. Grace is also befriended by a biracial boy named Flint, who turns out to be a dragon prince; Flint believes that he needs to kill Grace in order to prevent Lia from resurrecting Hudson. And Grace falls in love with the mysterious vampire prince Jaxon, who loves her in return and who rescues her from multiple potential disasters – wolf attacks, falling chandeliers, etc.

Grace survives Lia's murder plot, but Hudson is "resurrected" (he was never really dead, as it turns out), only to be trapped in Grace's mind. When Grace turns to stone while trying to protect Jaxon from his brother's ire, we and the residents of Katmere learn that Grace is not human at all; she is the first gargoyle born in a thousand years. Gargoyles – creatures invented to maintain the balance between the forces of order (humans) and chaos (supernaturals) – were thought to have been killed off by Cyrus the Vampire King, father of Hudson and Jaxon and the villain of the series. Instead, they have been trapped for a millennium in a magic spell cast by the God of Chaos – an elderly vampire known as The Bloodletter – while their King Alistair (Grace's distant ancestor), known as The Unkillable Beast, remained imprisoned by Cyrus.

The last three volumes in the series follow Grace through a series of increasingly challenging adventures, which she shares with an ever-expanding circle of friends – including

SA-18

Hudson, Jaxon, Flint, Cousin Macy (a witch) and her friends Gwen (a witch) and Eden (a dragon), Jaxon's posse of vampire companions (known as The Order), a Creole witch named Remy, a red-haired manticore named Calder, a wolf named Xavier, a nonbinary wolf of Syrian ancestry named Dawud, a giant named Vander, and ultimately Cyrus's illegitimate daughter Isadora. With their help, Grace learns how to harness her supernatural powers. Over the course of their senior year in high school and the following summer, Grace and her friends go on repeated quests for magical objects (like the moonstone from a powerful warlock or the bloodstone from a born vampire) and endure many difficult trials – starting with the schoolyard game Ludares and proceeding through the Trials that earn Grace a seat on The Circle (the ruling council of paranormals), the terrors of the Aethereum Prison, and finally the Impossible Trials, which Grace must survive in order to obtain the Tears of Eleos. Grace and her friends undertake these herculean tasks in an effort to release Hudson from Grace's mind, acquire the key that will release Alistair from his chains, reanimate the long-dormant Gargoyle Army, and prevent the evil Cyrus from finding the Crown and becoming a demigod. Along the way, Grace finds herself caught in a love triangle with the two brothers, one of whom (Hudson) is her true-born mate, while the other (Jaxon), for whom she cares deeply, is attached to her by a false mating bond. In the end, good triumphs over evil; the last novel, Court, ends with Grace enrolled at the University of California San Diego – her dream college – where she plans to study international politics and government so she can discharge her role as Gargoyle Queen.

This is a very brief summary of some 3000 pages of text spread over four novels. Addendum C, incorporated into this opinion by reference, contains a more fulsome summary of Wolff's four novels.

17

SA-19

## LEGAL STANDARD

### I.     Motion for Summary Judgment

The Court grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material facts exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets that burden, the non-movant may defeat summary judgment by producing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 250. The non-movant must present concrete evidence and rely on more than conclusory allegations or denials. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). A court generally evaluates each cross-motion independently of the other, resolving ambiguities and drawing all reasonable inferences in favor of the non-moving party. *Id*. "But where, as here, the motion and cross-motion seek a determination of the same issues, the Court may consider them together." *ExteNet Sys., Inc. v. Vill. of Pelham*, 377 F. Supp. 3d 217, 223 (S.D.N.Y. 2019).

### II.     Copyright Infringement

To prevail on a claim of copyright infringement, a plaintiff must establish "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

To establish copying, the plaintiff must show that (1) the defendant "actually copied" the plaintiff's work, and (2) the copying is illegal because a "substantial similarity" exists between the defendant's work and the protectable elements of the plaintiff's work. *Streetwise Maps, Inc. v.*

18

SA-20

*VanDam, Inc*., 159 F.3d 739, 747 (2d Cir. 1998). As noted above, "actual copying" is a function of (1) probative similarity between the allegedly infringed and infringing works, coupled with (2) access by the defendant to the plaintiff's work. As to both of those issues, predecessor judges found genuine issues of material fact, and I have no need to address either issue in order to reach the ultimate question posed by the second round of summary judgment motions – which is whether there is substantial similarity between the plaintiff's and the defendant's work. If there is no substantial similarity, then it does not matter whether there are genuine issues of fact as to actual copying; without substantial similarity, the Defendants win.

A determination of copyright infringement requires a side-by-side comparison of the disputed works – not of summaries of the work, but of the works themselves. *Sheldon Abend Revocable Tr. v. Spielberg*, 748 F. Supp. 2d 200, 204 (S.D.N.Y. 2010). In making that comparison, the trier of fact must consider the total concept and feel of the works, which is a function of the work's theme, characters, plot, sequence, pace, and setting. *Id*. at 205. The proper inquiry is "whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *Id*. (quoting *Yurman Design, Inc. v. PAJ, Inc*., 262 F.3d 101, 111 (2d Cir. 2001)). Random similarities scattered throughout the works do not support a finding of substantial similarity, because "Such a scattershot approach . . . fails to address the underlying issue: whether a lay observer would consider the works *as a whole* substantially similar to one another." *Williams v. Crichton*, 84 F.3d 581, 590 (2d Cir. 1996) (emphasis added).

Summary judgment on the question of substantial similarity is appropriate if "the similarity concerns only noncopyrightable elements of plaintiff['s] work" or if "no reasonable trier of fact could find the works substantially similar." *Id.* at 587 (quoting *Walker v. Time Life*

19

*Films, Inc.*, 784 F.2d 44, 48 (2d Cir. 1986)). This determination "must be made on a case-by-case basis, as there are no bright-line rules for what constitutes substantial similarity." *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998).

## DISCUSSION

Defendants do not challenge Freeman's claim to valid copyrights in the works at issue and, for purposes of this opinion, the Court assumes that there is probative similarity between Freeman's works and Wolff's and that Defendants had access to all six of Freeman's drafts and nine sets of notes.[9] Thus, the only issue before the Court is whether there is substantial similarity between Freeman's work and the *Crave* series.

However, before reaching the texts themselves, I need to address several preliminary issues.

### I. The Issue Of Substantial Similarity Has Never Been Decided On The Merits

Freeman asserts that this Court lacks the power to reconsider the propriety of summary judgment because Judge Stanton previously concluded that all issues in the case – including substantial similarity – should go to a jury. She describes this as a finding that there was a genuine issue of material fact as to substantial similarity.

However, as discussed in detail in this Court's December 5, 2025 Request for Submissions, *see* Dkt. No. 503, it is quite clear that neither Judge Netburn nor Judge Stanton ever addressed the parties' substantial similarity arguments on the merits. Neither jurist made the requisite comparison between Plaintiff's and Defendants' works and concluded that genuine issues of fact precluded

---

[9] This assumption becomes quite strained when dealing with Masqued 2016, because Kim, who at one time served as agent for Freeman and at all relevant times served as Wolff's agent, had terminated her relationship with Freeman in March 2014 – two years before Masqued 2016 was written. Even assuming *arguendo* that most of Freeman's notes were written during the four years when Kim was working with Plaintiff, there is really nothing in those notes that corresponds to the unique characteristics of Masqued 2016 – which even a cursory read of Addenda A and B reveals to be both incomplete and substantially different from the first five versions of Freeman's novel. However, I will assume that Defendants had access, either direct or indirect, to all six drafts of Freeman's unpublished novel.

SA-22

summary judgment. And even if one or both of them had done so, this Court could still revisit the issue prior to trial.

In Freeman's view, Judge Netburn must have found a genuine issue of fact on substantial similarity because she found that substantial similarity "presents a particularly close question of fact" given that "the similarities [between the works] fall somewhere between probative and striking." Dkt. No. 361 at 16.

But there is absolutely no doubt about what Judge Netburn did and did not do. She expressly "decline[d] to address substantial similarities" in her Report and Recommendation, *id*. at 9, explaining that, "The factual dispute over access to BMR 2014 particularly *prevents the Court from prematurely discussing substantial similarity*," and that "because access is in dispute, the *Court should not determine whether the at-issue works are substantially similar*." *Id*. at 17 (emphasis added). Judge Netburn never addressed the issues that have to be discussed in order to assess substantial similarity because she believed that, having found an issue of fact on actual copying, she ought not do so.

Furthermore, nothing that Judge Netburn said about probative and striking similarity has any relevance to the issue of substantial similarity. Probative and striking similarity have to do with actual copying; neither has anything to do with substantial similarity, which is an independent inquiry judged by an entirely different standard. Indeed, actual copying is frequently presumed when motions for summary judgment are made, precisely so that courts can reach the ultimate and decisive issue of substantial similarity.[10]

---

[10] *See e.g., Duffy v. Penguin Books USA Inc.*, 4 F. Supp. 2d 268, 272 (S.D.N.Y. 1998); *Williams*, 84 F.3d at 587; *Spielberg*, 748 F. Supp. 2d at 203; *Green v. Lindsey*, 885 F. Supp. 469, 479 (S.D.N.Y. 1992), *aff'd*, 9 F.3d 1537 (2d Cir. 1993); *Psihoyos v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 268, 278 (S.D.N.Y. 2005).

**SA-23**

Nor did Judge Stanton, in modifying and adopting Judge Netburn's Report and Recommendation, engage in a merits-based analysis of substantial similarity. And he did not, contrary to Plaintiff's argument, find any genuine issue of material fact as to substantial similarity in this case. Judge Stanton merely found that, because similarities between competing works "*frequently* [present] a fact issue for jury resolution," all questions related to direct copyright infringement were best left for trial. Dkt. No. 398 at 2 (emphasis added). That there is "frequently" a genuine issue of fact concerning substantial similarity is not, as a matter of law or logic, the same thing as finding that there is a genuine issue of fact concerning substantial similarity between these specific works.

No such finding could have been made here. Judge Stanton's brief opinion is bereft of any discussion of the factors the Second Circuit requires the trier of fact to consider when assessing whether substantial similarity exists. My learned colleague's brief discussion of substantial similarity was limited to declaring that the issue was not too complicated to be tried, despite the volume of material that the trier of fact would have to read. He rejected that argument because he believed that "experienced trial counsel will be able to present the meat [of the material at issue] as efficiently at trial." *Id*. at 3.

Furthermore, even if Judge Stanton had issued a merits-based decision on substantial similarity (he did not), it is axiomatic that "rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment, and may be modified to the same extent if the case is reassigned to another judge." *In re U.S.*, 733 F.2d 10, 13 (2d Cir. 1984). As specifically applicable to the instant situation, "It is clear that a second judge has the power to grant summary judgment despite another judge's previous denial of summary judgment." *Wright*

22

*v. Cayan*, 817 F.2d 999, 1002 n.3 (2d Cir. 1987); *see also Dictograph Prods. Co. v. Sonotone Corp.*, 230 F.2d 131, 134–36 (2d Cir. 1956).

To the extent Freeman argues that there are no grounds for my departing from what she characterizes as the "law of the case," the Court disagrees. "The law of the case doctrine, although not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons, including, *inter alia*, the need to correct a clear error or prevent manifest injustice." *In re Peters*, 642 F.3d 381, 386 (2d Cir. 2011) (citations omitted). The doctrine "does not rigidly bind a court to its former decisions, but is only addressed to its good sense." *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009). Thus, "unlike the doctrines of *res judicata* and collateral estoppel, which a court cannot ignore where they apply, the law of the case, as Justice Holmes remarked, 'merely expresses the practice of the courts generally to refuse to reopen what has been decided.'" *Devilla v. Schriver*, 245 F.3d 192, 197 (2d Cir. 2001) (quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)).

I am not proposing to reopen anything that has actually been decided; there is no "law of the case" on the issue of substantial similarity because the law of the case doctrine "presumes a hearing on the merits," and thus applies only to "issues that have actually been decided by the Court." *Ocasio v. City of Canandaigua*, 2024 WL 3218254, at *2 (W.D.N.Y. June 28, 2024) (citations omitted). But even if the prior summary judgment decision did implicate the law of the case, there are cogent and compelling reasons to revisit that decision. *See* Dkt. No. 503 at 7–8; *Harris v. Key Bank Nat'l. Ass'n.*, 193 F. Supp. 2d 707, 712 (W.D.N.Y.), *aff'd sub nom. Harris v. Key Bank Nat. Ass'n*, 51 F. App'x 346 (2d Cir. 2002) (court can depart from the "law of the case" if a party is indeed entitled to summary judgment because denying a well-founded summary

**SA-25**

judgment motion "could work a manifest injustice, by forcing that party to defend against a meritless claim all the way through trial.").

Accordingly, the Court rejects Freeman's effort to avoid having a court examine, in the first instance and in the necessary detail, whether there is any genuine issue of fact concerning substantial similarity between her work and Wolff's.

## II.     Substantial Similarity

Substantial similarity exists only when it "was protected expression in the earlier work that was copied and . . . the amount that was copied is more than de minimis." *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003) (internal quotations marks omitted).

"Simply because a work is copyrighted does not mean every element of that work is protected." *Boisson v. Banian, Ltd*, 273 F.3d 262, 268 (2d Cir. 2001). Because originality is the *sine qua non* of copyright, only those components of a work that are original to the author are protectable. *Id*. Copyright protection therefore extends only to an author's particular expression of an idea – not to the idea itself. *Id*.

Accordingly, tropes (recurrent scenes or motifs) or *scènes à faire* (sequences of events that necessarily result from the choice of a setting or situation) are not entitled to copyright protection. *Walker*, 784 F.2d at 50. For example, courts have found that drunks, prostitutes, vermin, and derelict cars are *scènes à faire* in works about policemen in the South Bronx, *Id*. at 50; conspiracies, characters with superhuman qualities, and advanced technology are *scènes à faire* in the action-adventure and science fiction genres, *Hist. Truth Prods., Inc. v. Sony Pictures Ent., Inc.*, 1995 WL 693189, at *8 (S.D.N.Y. Nov. 22, 1995); heroes performing feats of miraculous strength, fighting megalomaniac villains, and leading double lives are *scènes à faire* in works about superheroes,

24

*Warner Bros. Inc. v. Am. Broad. Cos*., 654 F.2d 204, 209–10 (2d Cir. 1981); and lying under a chicken, sitting in a refrigerator, and facing the possibility of being scrambled or fried are *scènes à faire* in works about the personification of an egg, *Gibson v. CBS, Inc*., 491 F. Supp. 583, 585–86 (S.D.N.Y. 1980). As a matter of law, the mere presence of these commonplace elements in the works of two different authors cannot give rise to substantial similarity.

In addition to tropes/*scènes à faire*, "words, short phrases, titles, and slogans are not subject to copyright, even if they can be trademarked." *Lewinson v. Henry Holt & Co., LLC*, 659 F. Supp. 2d 547, 568 (S.D.N.Y. 2009) (quoting *Moody v. Morris*, 608 F. Supp. 2d 575, 579 (S.D.N.Y. 2009)). Accordingly, "the ordinary phrase may be quoted without fear of infringement." *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992) (citation omitted). A defendant's copying of an ordinary word or phrase is actionable only if the phrase amounts to a "sequence of thoughts, choice of words, emphasis, and arrangement to satisfy the minimal threshold of required creativity." *Id*. at 1073 (quoting *Salinger v. Random House, Inc*., 811 F.2d 90, 98 (2d Cir. 1987)).

The standard test for substantial similarity asks whether "an ordinary observer, unless he set out to detect the disparities [between the works], would be disposed to overlook them, and regard [their] aesthetic appeal as the same." *Peter F. Gaito Architecture LLC v. Simone Dev. Corp*., 602 F.3d 57, 66 (2d Cir. 2010) (internal quotation marks and citation omitted). In applying the "ordinary observer test," courts ask whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995) (internal quotation marks omitted).

Where, as here, a work contains both protectable and unprotectable elements, courts apply the "more discerning ordinary observer test," which asks whether, after extracting the unprotected elements, "the *protectible elements, standing alone*, are substantially similar." *Id*.

25

SA-27

That said, a court is not required to dissect the works at issue into their separate components and compare only the protectable elements. Instead, a court should be "principally guided by comparing the contested [work's] total concept and overall feel with that of the allegedly infringing work, as instructed by its good eyes and common sense." *Gaito*, 602 F.3d at 66 (internal quotations omitted). This is so because a compilation of unprotectable elements can merit copyright protection as long as the author has selected, coordinated, and arranged the elements of his or her work in an original way. *Knitwaves*, 71 F.3d at 1003–1004.

In cases involving literary works, the "more discerning ordinary observer" test requires the court to consider "the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting." *Boisson*, 273 F.3d at 273 (quoting *Williams*, 84 F.3d at 588). Liability will only result if the protectable elements are substantially similar. *Id*. Random similarities scattered throughout the works will not support a finding of substantial similarity because, "Such a scattershot approach . . . fails to address the underlying issue: whether a lay observer would consider the works *as a whole* substantially similar to one another." *Williams*, 84 F.3d at 590 (emphasis added).

### III. Materials Considered

In determining substantial similarity, the Court "must only consider the works *in their entirety and final form* as presented to the public." *Walker v. Time Life Films, Inc.*, 615 F. Supp. 430, 434 n.2 (S.D.N.Y. 1985), *aff'd*, 784 F.2d 44 (2d Cir. 1986) (emphasis added). The works themselves "supersede and control contrary descriptions of them," including "any contrary allegations, conclusions or descriptions of the works contained in the pleadings." *Gaito*, 602 F.3d at 64 (citations omitted).

26

SA-28

Obviously, Freeman's work was never finalized or published, so I cannot compare the *Crave* novels to Freeman's works in their "final form" or "as presented to the public." However, I must compare the various drafts themselves to the allegedly infringing works; I cannot rely on the "similarity indexes" that were created for purposes of litigation, listing "the most telling similarities" between the works. Dkt. No. 276 at 4. These indexes are appended to Freeman's declaration in support of her first summary judgment motion. *See* Dkt. Nos. 276; 276-44 through 276-56. Lists of this sort are "inherently subjective and unreliable," particularly where, as here, "the list emphasizes random similarities scattered throughout the works." *Williams*, 84 F.3d at 590 (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)). Such lists are unhelpful because, "Such a scattershot approach cannot support a finding of substantial similarity[.]" *Id*. This does not mean the Court entirely disregards the similarities identified in them; rather, the Court considers any similarities in the context of the works as a whole in evaluating whether the total concept and overall feel of the works are substantially similar.

To the extent Freeman's notes merely reflect ideas, potential options, or undeveloped concepts, they are not entitled to copyright protection and do not factor into the Court's substantial similarity analysis. Notes of the sort found in Dkt. Nos. 397-1 through 397-9 are merely ideas that Freeman considered – and in some instances incorporated into – some or all of her various drafts. But it is the *expression* as found *in her drafts* – not the ideas set out in her notes – in which she is entitled to protection. Once again, I emphasize: copyright protection extends only to a work's particular expression of ideas, not to the underlying ideas themselves. *See Kregos v. Associated Press*, 3 F.3d 656, 663 (2d Cir. 1993). [11]

---

[11] Two pages of Freeman's notes appear to be a draft passage of a scene in which the heroine overhears her mother and her aunt talking about her; but the passage as it appears in the notes does not appear in any of Freeman's completed

27

### IV. Expert Testimony

Because it is the opinion of the ordinary observer (or, more precisely, the more discerning ordinary observer) that matters when assessing substantial similarity, expert testimony about similarity of expression is rarely appropriate. *See Walker*, 784 F.2d at 51. However, both sides have submitted expert testimony that principally addresses what tropes are commonly found in the young adult paranormal romance literary genre. *See* Dkt. Nos. 315-1; 530-1. Expert testimony on this limited topic is admissible and has been considered in connection with reaching a decision on the motions. *See Walker*, 784 F.2d at 51–52.

Of course, there is ample authority that, even on a motion to dismiss, a court may determine, as a matter of law, which elements of a plaintiff's work are entitled to copyright protection. *See Gal v. Viacom Int'l, Inc.,* 403 F. Supp. 2d 294, 305 (S.D.N.Y. 2005); *Adams v. Warner Bros. Pictures Network*, 2007 WL 1959022, at *5 (E.D.N.Y. June 29, 2007), *aff'd sub nom. Adams v. Warner Bros. Pictures*, 289 F. App'x 456 (2d Cir. 2008); *Boyle v. Stephens, Inc.*, 1998 WL 80175, at *3–5 (S.D.N.Y. Feb. 25, 1998), *aff'd*, 1998 WL 690816 (S.D.N.Y. Sept. 29, 1998), *aff'd*, 21 F. App'x 76 (2d Cir. 2001). But in this case, I find it appropriate to consider certain limited aspects of the expert reports that the parties have submitted – specifically, testimony that identifies for the trier of fact tropes/*scènes à faire* that occur with regularity in the genre of work here at issue – young adult fantasy/romantasy fiction. I do not ordinarily read books in this genre, and one cannot assume that jurors would necessarily be familiar with such books either – or would read enough of them to recognize tropes/*scènes à faire* when they are encountered.

---

drafts in Dkt. No. 397-2. For comparison purposes, I rely on the versions of this scene that appear in Freeman's actual drafts.

SA-30

Fortunately, the admissible expert testimony does not give rise to any genuine issue of fact. Both experts in this case agree that all of the following are, at a high level, *scènes à faire* that are commonly encountered in fantasy/romantasy fiction:

1. The main character is in a new and unfamiliar world;

2. The main character learns her true calling, which involves using powers she never knew she had in order to win a battle between good and evil;

3. The heroine is a teenager with high-school aged friends;

4. The heroine believes at the beginning that she is ordinary/human;

5. The heroine is the "Chosen One" who can restore some kind of balance to the world;

6. The story is set in a school;

7. The school is inhabited by supernatural creatures such as vampires, werewolves, and witches;

8. The heroine suffers from anxiety;

9. The heroine is kidnapped;

10. The heroine has lost one or both parents and has surrogate parents;

11. The heroine moving to a new location to live;

12. The heroine is instantly attracted to a really good looking (as in, model-like) boy;

13. The romantic lead is instantly attracted to the heroine;

14. A love triangle.

*See* Dkt. Nos. 315-1, 530-1.

In addition to the above, Defendants' expert, Emily Easton, identifies other tropes/*scènes à faire* that are common to this genre:

29

SA-31

1. The main character moving to a new location due to trauma, such as the death of a parent;

2. The main character missing her former home;

3. Experiencing anxiety and panic attacks after the loss of a loved one;

4. A remote location;

5. A castle setting;

6. Gothic architecture;

7. The main character being attacked by supernatural creatures, such as vampires or werewolves;

8. The romantic lead being a supernatural creature;

9. The romantic lead having dark secrets;

10. The main character being nervous or excited around the romantic lead;

11. The main character and romantic lead sharing a "momentous" or "epic" kiss;

12. The main character being concerned for the romantic lead or trying to save him;

13. The romantic lead rescuing the main character;

14. A love triangle involving brothers vying for the same love interest;

15. It being dangerous or forbidden for the main character and romantic lead to be together;

16. Rival supernatural factions;

17. Supernatural creatures belonging to secret societies;

18. A location where different supernatural creatures mix and mingle, sometimes under protection;

19. A character being trapped in another dimension;

30

SA-32

20. Magical creatures discovering alternate realms as they learn about their powers and visiting those realms either voluntarily or accidentally;

21. The main character attempting to avenge a loved one's death or being the target of an antagonist seeking revenge for the loss of their loved one;

22. Weaving elements of mythology and fairytales as part of the world building;

23. The main character having prophetic dreams or visions;

24. The existence of powerful magical objects or artifacts.

*See* Dkt. Nos. 315-1, 530-1. Plaintiff's expert, Kathryn Reiss, does not disagree that these elements commonly appear in young adult romantasy fiction. In fact, she admits that some of them do; she says, for example, that "It is not uncommon for the protagonists to have lost their parents, have surrogate parents move to a new location to live, suffer anxiety, and/or believe they are ordinary/human." Dkt. No. 530-1 at ¶ 36. But more significantly, she does not testify that any of the items listed in Easton's report are *not* tropes or *scènes à faire* that are regularly seen in this genre. Therefore, there is no disputed issue of fact for a jury to resolve; in addition to the 11 elements that both experts identify as tropes or *scènes à faire* in the romantasy genre, the 24 elements that Easton additionally identifies as tropes or *scènes à faire* also qualify.

Reiss goes on to opine that the manner in which Freeman expresses certain of these tropes/*scènes à faire* is unique. *See id.* at ¶ 38. For example, she argues that it is not common for romantasy works to incorporate all of the elements described above, while Freeman's novel does. *Id.* at ¶ 36.

But there is no need for an expert to testify about uniqueness of expression. Copyright protection extends only to a work's particular expression of ideas, not to the ideas themselves. *See Kregos*, 3 F.3d at 663. It is the manner of expressing the common trope of "boy meets girl from

31

opposing factions/boy and girl fall in love/boy and girl end up dead" that distinguishes *Romeo and Juliet* from *West Side Story*. The issue for decision on this motion is whether Freeman and Wolff express the tropes/*scènes à faire* that appear in their respective works in a substantially similar manner. No expert testimony is needed to reach that conclusion, and none will be considered – from either expert. *See Walker*, 784 F.2d at 51; *Laureyssens v. Idea Grp., Inc.*, 964 F.2d 131, 140 (2d Cir. 1992), *as amended* (June 24, 1992).

Unlike Reiss, Defendants' expert does not opine on the similarity of expression between BMR/Masqued and *Crave*. However, she does identify certain tropes or *scènes à faire* as being found in BMR/Masqued. I do not need expert testimony on this issue, either. A reader armed with information about what elements are commonly found in books of this genre is perfectly capable of ascertaining, from her own reading, whether those elements can be found in Freeman's or Wolff's works. I will only consider Easton's report for its uncontested explanation of what elements qualify as tropes/*scènes à faire* in works of this genre.

I reiterate: expert opinion is appropriately considered in this case for the limited purpose of acquainting the trier of fact with the tropes/*scènes à faire* that are commonly encountered in fantasy/romantasy fiction directed to young adults. This testimony is helpful in deciding which elements of BMR/Masqued qualify as protectable expression, as opposed to being unprotectable ideas. *See Walker*, 615 F. Supp. at 436 (S.D.N.Y. 1985). However, expert testimony is admissible for no other purpose – certainly not on the ultimate question of whether Freeman's work and Wolff's are substantially similar – and neither party's expert opinion will not be considered for any other purpose.[12]

---

[12] As I told the parties at a conference, both of their experts are amply qualified to testify about this issue. There is no *Daubert* issue of competency to decide.

SA-34

## V. Aggregation of Freeman's Works

The parties agree that the four *Crave* novels at issue in this case are a single series that tells one entire story from its beginning – when the heroine arrives at her new and unfamiliar school – to its end – a year later, when the powers of evil have been vanquished and the heroine returns to California to start college. They do not disagree that the *Crave* series should be considered in the aggregate when comparing it with Freeman's work. This is consistent with case law, which treats separate but contiguous works that tell a single story as one aggregated work. *See Montgomery v. Holland*, 408 F. Supp. 3d 353, 375 n.8 (S.D.N.Y. 2019), *aff'd sub nom. Montgomery v. NBC Television*, 833 F. App'x 361 (2d Cir. 2020); *see also Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1372–73 (2d Cir. 1993); *DiTocco v. Riordan*, 815 F. Supp. 2d 655, 667 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 126 (2d Cir. 2012); *Kaye v. Cartoon Network Inc.*, 297 F. Supp. 3d 362, 364–66 (S.D.N.Y. 2017).

What the parties disagree about is whether Freeman's works should be aggregated. Freeman argues that her six manuscripts should be considered as a single work, because the drafts are "iterations and edits of one overarching story" from which "Defendants seemingly picked and chose which parts and options they liked best to create the Crave series." Dkt. No. 284 at 1, 26. Defendants insist that each unpublished manuscript must be compared individually to the *Crave* series. In their view, Freeman's attempt to construct a copyright claim from bits and pieces of her various manuscripts and notes would effectively allow her to "cover all bases;" if one fact pattern is not similar to a challenged element of *Crave*, Freeman can simply claim that another permutation of the story in a different draft works better.

The parties briefed this issue to Judge Netburn. The learned Magistrate Judge concluded that, for the purpose of examining similarities between two literary works in such aspects as total

33

concept and feel, theme, characters, plot, sequence, pace, and setting (*i.e.,* for purposes of conducting a substantial similarity analysis), Plaintiff could not rely on an amalgam of bits and pieces of her various manuscripts, because her various drafts were not a series – they were, according to Freeman herself, a collection of works-in-progress leading to a final manuscript. *See* Dkt. No. 105 at 3. Judge Netburn therefore required Plaintiff to identify two manuscripts to serve as the primary works that establish her copyright claim. *Id*. at 4. Judge Stanton overruled Plaintiff's objections to Judge Netburn's ruling, finding that the identification of two manuscripts was a "practical way" and "fair place to start the comparison process." Dkt. No. 181 at 1, 2. Judge Stanton, however, made clear that Plaintiff's selection of two test examples was not a ruling on the remainder of her evidence; he said that any final decision about Plaintiff's aggregation argument would be "premature" – as indeed it was, since aggregation is relevant to substantial similarity, and Judge Netburn expressly declined to reach that issue. Dkt. Nos. 141 at 3; 181 at 2.

Addressing the aggregation issue is no longer premature. I have read all six of Freeman's drafts. Unlike Judges Netburn and Stanton – who, had they addressed substantial similarity, would have limited their consideration to just two of Freemans' six manuscripts – I intend to conduct my substantial similarity analysis on the basis of all six drafts, not just two of them. The issue is whether we should analyze all six Freeman drafts as though they were a single novel or split them into their component parts.

I conclude that we should do some of each.

I agree with Judge Netburn that Freeman's argument that her various drafts must be aggregated finds no support in either the Copyright Act of 1976 – which refers to the infringed "work" in the singular – or in the case law. The law in this Circuit is clear: "a court must not 'aggregate' a plaintiff's work, but must consider each allegedly infringed work independently."

34

SA-36

*Dean v. Cameron*, 53 F. Supp. 3d 641, 647 (S.D.N.Y. 2014). The exception to that rule is where multiple works are essentially a single work because they are a series, as discussed above.

Moreover, courts are under no obligation to consider earlier drafts of a work, as they "need only consider the final version of the [work] as presented to the viewing public." *Hudson v. Universal Pictures Corp.*, 2004 WL 1205762, at *3 (E.D.N.Y. Apr. 29, 2004), *aff'd sub nom. Hudson v. Imagine Ent. Corp.*, 128 F. App'x 178 (2d Cir. 2005) (quoting *Walker*, 615 F. Supp. at 436)). Where, as here, no version of the work was presented to the viewing public, it would appear that this rule (if rule it be) limits the Court to comparing the final draft of Freeman's work to the *Crave* series.

Freeman's reliance on *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132 (2d Cir. 1998) to argue that her six drafts constitute a single work is misguided. In *Castle Rock*, producers of the television show *Seinfeld* brought a copyright infringement suit against the author and publisher of a 132-page book that contained 643 trivia questions and answers about the events and characters depicted in *Seinfeld*. *Id.* at 135. The Second Circuit found it appropriate to analyze in the aggregate the amount copied from the eighty-four *Seinfeld* episodes – "a discrete, continuous television series" – rather than analyze separately the amount of expression copied from each individually copyrighted episode. *Id.* at 138. Critically, the Second Circuit declined to apply the standard total concept and feel test in this case, finding it "simply not helpful in analyzing works that, *because of their different genres and media*, must necessarily have a different concept and feel." *Id*. at 140 (emphasis added). It instead applied an alternative approach, which focused on whether the copying was "quantitatively *and* qualitatively sufficient" to support a finding of infringement. *Id*. at 138 (citation omitted). Applying that approach, the *Castle Rock* court considered the *Seinfeld* episodes in the aggregate only for the purpose of

35

determining whether the defendant's copying was *quantitatively* sufficient to support a finding of infringement. *Id*. The Second Circuit ultimately affirmed the district court's judgment in favor of the plaintiff, finding that the trivia book unlawfully copied from *Seinfeld*. *Id*. at 135.

The *Castle Rock* approach does not apply here, because we are not comparing works from different genres and media – we are comparing novels with novels, albeit unpublished draft novels with completed and published novels. *Castle Rock*'s treatment of "a discrete, continuous television series" as one work for purposes of determining whether the quantity of copying exceeded a *de minimis* level thus offers no support for Freeman's assertion that this Court should compare the "total concept and feel" of different drafts of the same story to the total concept and feel of the *Crave* series. *See Kroencke v. Gen. Motors Corp.*, 270 F. Supp. 2d 441, 443–44 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 339 (2d Cir. 2004).

The other cases Freeman cites, in which courts have utilized an aggregate approach where a plaintiff alleges infringement of separate but contiguous works, also have no bearing here, where Plaintiff's works consist of various drafts of a single novel. *See Montgomery*, 408 F. Supp. 3d at 375 n.8 ("Where the allegedly infringed work is made up of separate but contiguous works, it is appropriate to treat them in the aggregate as a single work"); *see also Twin Peaks*, 996 F.2d 1366, 1370–71 *DiTocco*, 815 F. Supp. 2d at 658–64; *Kaye*, 297 F. Supp. 3d at 364–66. Unlike the works at issue in those cases – and unlike the four *Crave* novels, which tell a single, consistent story from beginning to end – Freeman does not allege that her six copyrighted works are a "series" that, taken together, tell a single story. Rather, they are a collection of works-in-progress, which tell the same story in different ways. They were intended to lead up to one final publishable manuscript. That they never arrived at that end point does not make the drafts an "aggregate" work in the same way the *Crave* novels are. Freeman herself explains that her copyrighted works "essentially set[]

36

SA-38

forth different options of how to best present [a single] story with notes explaining the characters and their backstories." Dkt. No. 284 at 19.

Freeman does not cite, and the Court is not aware of, any case supporting the notion that a court can aggregate multiple unfinished drafts of the same underlying work for purposes of determining substantial similarity. The paucity of case law supporting Freeman's proposed approach is unsurprising, because such an approach would overlook the fundamental question of whether a lay observer would consider the works *as a whole* substantially similar to one another. *Williams*, 84 F.3d at 590. The Court has serious doubts about whether Freeman's aggregation theory is legally sound. The better view is that each copyrighted work must be assessed independently in considering whether the total concept and overall feel of the works are substantially similar.

But the Court need not definitively reject Plaintiff's aggregation argument, because even aggregating the first five of her drafts – the ones that conform to the same story template and contain the same characters – no reasonable juror could find that Freeman's works are substantially similar to Wolff's. Accordingly, for the purposes of the substantial similarity comparison, the Court will consider the first five drafts as a single aggregated work. Frankly, as Freeman's novel evolved over time, the differences from draft to draft are relatively insubstantial.

I do agree with Defendants, however, that the sixth and last version of BMR/Masqued – Masqued 2016 – does not follow the template of the five earlier drafts and is sufficiently different from the earlier versions so that it cannot be aggregated with them for purposes of the substantial similarity analysis. That separate analysis will be found in Section VIII, *infra*.

SA-39

## VI.    Plaintiff's Alternative Theories of Substantial Similarity

Despite recognizing that the "more discerning ordinary observer" test is the appropriate test for substantial similarity under Second Circuit precedent, Freeman contends that the Court should judge whether Wolff's novels are substantially similar to hers using the "comprehensive nonliteral similarity" and "fragmented literal similarity" tests. Freeman is incorrect on both counts.

The "comprehensive nonliteral similarity" test, initially propounded by Professor Nimmer, remains an academic's suggestion in this Circuit, where courts do not normally apply it. *See Castle Rock*, 150 F.3d at 140–41; *Est. of Smith v. Cash Money Recs., Inc.*, 253 F. Supp. 3d 737, 746 n.4 (S.D.N.Y. 2017), *aff'd sub nom. Est. of Smith v. Graham*, 799 F. App'x 36 (2d Cir. 2020). The few courts that have discussed this test have explained that the doctrine of comprehensive nonliteral similarity can provide copyright protection "where there is no word-for-word or literal similarity but where defendant has nonetheless appropriated *the fundamental essence or structure* of plaintiff's work." *Arica Inst.*, 970 F.2d at 1073 (internal quotations omitted, emphasis added); *Lewinson*, 659 F. Supp. 2d at 570. But as Freeman explains it in her briefs, a trier of fact evaluates comprehensive nonliteral similarity by examining "factors such as similarity in plot, theme, dialogue, mood, setting, pace and sequence." Dkt. Nos. 284 at 24; 543-1 at 15. Those are the very elements that a trier of fact evaluates when applying the ordinary observer test (or the more discerning ordinary observer test) on which courts in the Second Circuit rely when deciding whether two works are substantially similar to each other. *See Spielberg*, 748 F. Supp. 2d at 205. Since this Court will be comparing "factors such as similarity in plot, theme, dialogue, mood, setting, pace and sequence" when addressing substantial similarity, it hardly matters whether we

38

call it the "more discerning ordinary observer test" or "comprehensive nonliteral similarity."[13] I prefer to use the term that is widely recognized in this Circuit. But, in any event, I will be analyzing all of the factors that Freeman contends are pertinent to comprehensive nonliteral similarity.

Alternatively, Freeman asserts that she can prevail under a theory of fragmented literal similarity, which "focuses upon copying of direct quotations or close paraphrasing." *Castle Rock*, 150 F.3d at 140. Fragmented literal similarity "exists where the defendant copies a portion of the plaintiff's work exactly or near exactly, without appropriating the work's overall essence or structure." *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 597 (S.D.N.Y. 2013) (quoting *Newton v. Diamond*, 388 F.3d 1189, 1194 (9th Cir. 2004)). Under this theory, "the question of substantial similarity is determined by an analysis of whether the copying goes to trivial or substantial elements of the original work." *Id*. at 598 (internal quotations omitted). Because fragmented literal similarity involves literal copying (or close paraphrasing), under this test – more so than under the standard "ordinary observer" test – a "relatively small" quantitative portion of the pre-existing work can be substantial if it is of great qualitative importance to the plaintiff's work as a whole. *Id.*

The fragmented literal similarity test, which is most often applied in music plagiarism cases, is rarely apposite when considering literary works. The facts in the few literary cases that Freeman cites are so different from the facts of this case as to render them unpersuasive.

In *Twin Peaks*, for example, the Second Circuit found that the district court properly applied a "literal similarity" test instead of a "substantial similarity" test where two chapters of the

---

[13] Moreover, as will be seen in the extensive discussion that follows, Wolff did not appropriate the "fundamental essence or structure" of Freeman's work. Both authors use tropes and *scènes à faire* that are common to all romantasy fiction book for young adults. There any substantial similarity ends.

allegedly infringing book consisted of extensive direct quotations (at least 89 verbatim lines of dialogue) from the plaintiff's teleplays. 996 F.2d 1366 at 1372–73.

In *Paramount Pictures Corp. v. Carol Publishing Group*, 11 F. Supp. 2d 329 (S.D.N.Y. 1998), *aff'd sub nom. Paramount Pictures Corp. v. Carol Pub. Grp., Inc.*, 181 F.3d 83 (2d Cir. 1999), the court found a finding of fragmented literal similarity to be appropriate where the defendant's work directly lifted dialogue (such as quotes like "long live and prosper") from the plaintiff's work and copied fictional facts (including fictional alien species and fictional technologies) that comprised the "heart" of plaintiff's work. *Id*. at 333–34.

Finally, in *Warner Bros. Entertainment Inc. v. RDR Books*, 575 F. Supp. 2d 513 (S.D.N.Y. 2008), the court relied on a fragmented literal similarity theory in finding that the allegedly infringing work contained "a considerable number of direct quotations (often without quotations marks) and close paraphrases of vivid passages in the *Harry Potter* works." *Id*. at 537. The defendant's work in *Warner Bros*. was a "Lexicon manuscript" (an online encyclopedia) that was created using the content of plaintiff's work; it "cull[ed] every item and character that appear[ed] in the *Harry Potter* works, no matter if it play[ed] a significant or insignificant role in the story." *Id*. at 525. Specifically, the Lexicon's entries included "every spell (e.g., Expectro Patronum, Expelliarmus, and Incendio), potion (e.g., Love Potion, Felix Felicis, and Draught of Living Death), magical item or device (e.g., Deathly Hallows, Horcrux, Cloak of Invisibility), form of magic (e.g., Legilimency, Occlumency, and the Dark Arts), creature (e.g., Blast-Ended Skrewt, Dementors, and Blood-Sucking Bugbears), character (e.g., Harry Potter, Hagrid, and Lord Voldemort), group or force (e.g., Aurors, Dumbledore's Army, Death Eaters), invented game (e.g., Quidditch), and imaginary place (e.g., Hogwarts School of Witchcraft and Wizardry, Diagon Alley, and the Ministry of Magic)" that appeared in the plaintiff's works. *Id*. In other words, the

defendant's work copied, word for word, essential features lifted directly from the *Harry Potter* books in order to create the encyclopedia.

Freeman points to no case in which a court has found this doctrine to be applicable to literary works like the ones at issue here, where the allegedly infringing work includes short fragments of language (much of it paraphrased) that are in no way essential to the work. In this context, focusing upon isolated short language fragments "improperly distract[s] [the Court] from inquiring as to whether substantial similarity exists" between Freeman's works and the *Crave* series. *Castle Rock*, 150 F.3d 132 at 140. This is precisely the type of scattershot approach that "cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another." *Williams*, 84 F.3d at 590.

Moreover, Freeman cannot prevail on a theory of fragmented literal similarity because the "literal" similarities to which she points are simply ordinary words or common phrases that any author is free to use. Examples of fragmented literal similarity identified by Freeman include Wolff's use of the following phrases: "things that go bump in the night," "pang of disappointment," "my stomach is roiling," "he gives me a knowing look," "grab my backpack and head out," "everything is going to be okay," "my blood freezes in my veins," "the whooshing sound," "tears streaming down my cheeks," "I'm so sorry this happened," "I don't have a clue," "I feel exactly the same way," "harder than I thought it would be," "and to hell with the consequences," "and that's when it hits me," "kisses the top of my head," and "like a sack of potatoes." *See* Dkt. Nos. 276-34; 276-53; 276-54; 276-56. Arguing that the use of these common phrases demonstrates substantial similarity trivializes copyright law.

SA-43

Similarly, Freeman's alleged "close paraphrases" are not entitled to copyright protection. The following examples are illustrative:

| BMR/Masqued | Crave |
|---|---|
| "A long moment of intense silence descends between us, his fingers locked around my wrist . . ." 2013 p. 105 | "An awkward silence descends between us, and I honestly don't know . . ." Covet p. 126 |
| "A shiver skitters down my spine." 2013 p. 57 | ". . . and then our gazes collide, and a shiver of fear skitters down my spine." Covet p. 448 |
| "Meret and I walk for what feels like a mile until we come to a large set of golden double doors . . ." 2016 p. 97 | "Either way, we walk down a really, really, really long corridor until we come to a pair of gold double doors." Covet p. 567 |
| "He reached out and with his thumb and forefinger tilted my chin up, forcing my gaze to meet his." 2010 p. 426; 2013 p. 364 | "Hudson reached out and tilts my chin up with his finger until he's holding my gaze in his fathomless blue depths." Court p. 593 |
| "I took a slow breath as I tried to do the math in my head. 'That means he's—he's like—' 'Over a thousand years old, give or take a few years." 2010 p. 337 | "So then how could she be a thousand years old and still look . . . At least not until I start to do the math in my head . . ." Court p. 369 |
| "I can smell the demon in you." 2014 p. 329 | ". . . I definitely smell the gargoyle in you . . ." Covet p. 229 |
| ". . . something sparkly caught the light . . . Tattoos! And they were moving on his fingers, swirling in a strange dance." 2011 p. 289 | ". . . captured by the tattoo that's so bright now, it's practically blinding as it swirls and dances up and down the biceps and forearm." Covet p. 605 |

Dkt. No. 543 at 115–16. Freeman is correct that fragmented literal similarity does not always require *literal* similarity – close paraphrasing can also be considered. *See Castle Rock*, 150 F.3d at 140. However, the "close paraphrases" to which Freeman points consist of ordinary words and short phrases that are not subject to copyright protection "except to the extent they are given unique—and therefore protectable—expression in an original creation." *Walker*, 784 F.2d at 50. A close examination of the works reveals that the *Crave* books do not appropriate Freeman's "sequence of thoughts, choice of words, emphasis and arrangement in such a way as to make actionable the use of single words and short phrases." *Arica Inst.*, 970 F.2d at 1073 (internal quotations omitted). And, to the extent any of Freeman's examples could be considered *protectable*

SA-44

elements of her works, any similarities to the *Crave* series are trivial, insubstantial, and qualitatively unimportant. They do not go to the heart of either her work or Wolff's. These alleged similarities thus cannot serve as the basis for a copyright infringement claim.

For these reasons, the Court will focus on the Second Circuit's "total concept and feel" test as viewed from the perspective of the "more discerning ordinary observer, examining similarities between the works in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting of the works to determine whether Freeman's manuscripts are substantially similar to the *Crave* series.

For the avoidance of doubt, the Court has also considered whether the asserted similarities, taken collectively, produce a protectable selection or arrangement which *Crave* appropriates. They do not. The similarities Plaintiff identifies consist of either generic genre beats arranged in a conventional fashion or are embedded in narrative structures, settings, and character arcs that are materially different when considering the total concept and overall feel of the works.

## VII.   Application: BMR/Masqued 2010-2014

Freeman lists hundreds of purported similarities between her drafts and the *Crave* novels. It is not necessary to discuss every alleged similarity between Freeman's works and the *Crave* series; a discussion of her principal points is sufficient to allow the Court to conclude that there is no substantial similarity between the allegedly infringed and infringing works as a matter of law. *See Walker*, 615 F. Supp. at 435; *Zambito v. Paramount Pictures Corp.*, 613 F. Supp. 1107, 1111 (E.D.N.Y.), *aff'd*, 788 F.2d 2 (2d Cir. 1985).

### a.   Themes

Broadly speaking, both BMR/Masqued and *Crave* are based on similar themes – as indeed are most novels in this particular genre. Both involve a smart, pretty high school girl who has been

43

uprooted from her childhood home. The girl discovers that she has supernatural abilities, which are key to resolving an ancient feud among paranormal factions. Over the course of the books, the heroine must come to terms with the loss (by death or otherwise) of one or more parents. She finds love with a hunky boy who turns out to be a paranormal. She discovers who she truly is and learns to fight demonic powers with the help of friends, most or all of whom are, like her and her boyfriend, paranormal creatures. And she ultimately restores the balance between two opposing forces.

As previously noted, such highly generalized tropes, explored in countless young adult paranormal romance novels and other types of fantasy fiction, are not entitled to copyright protection. *See Brown v. Perdue*, 2005 WL 1863673, at *6 (S.D.N.Y. Aug. 4, 2005), *aff'd*, 177 F. App'x 121 (2d Cir. 2006). Indeed, Freeman's own expert opines that, at an abstract level, these are unprotectable tropes. *See* Dkt. No. 530-1 at ¶¶ 20, 21, 28, 36, 37.

So let us turn to how Plaintiff and Defendants express these tropic themes.

### b. Setting

Settings that naturally flow from a shared theme or genre are unprotectable *scènes à faire*. *See Lewinson*, 659 F. Supp. 2d at 574; *Allen v. Scholastic Inc.*, 739 F. Supp. 2d 642, 664–65 (S.D.N.Y. 2011); *Williams*, 84 F.3d at 589; *Nobile v. Watts*, 289 F. Supp. 3d 527, 535 (S.D.N.Y. 2017), *aff'd*, 747 F. App'x 879 (2d Cir. 2018). Similarly, settings based on real places known to the public are not copyrightable. *See Walker*, 784 F.2d at 50.

Freeman contends that the works are substantially similar because both take place in a high school in Alaska. Alaska is a place known to the public, so setting a novel in Alaska is not copyrightable. Neither is setting a novel about teenagers in a high school.

SA-46

Moreover, while both BMR and *Crave* are set in the same state and include scenes that take place at a high school, the similarities end there.

BMR is set in Anchorage, Alaska's largest city. Anchorage is home to schools, bars, restaurants, and bookstores (many of which are based on real-life establishments, like Barnes and Noble), all of which are within easy driving distance of the protagonist's home. *Crave*, by contrast, is set in the remote Alaskan mountains near Denali, 250 miles north of Anchorage, in an area accessible only by snowmobile. *Crave*'s characters do not (and cannot) drive to bars, restaurants, or bookstores; instead, they eat, sleep, study, and socialize within the isolated walls of their private and most unusual school, known as Katmere Academy.

While some scenes in BMR/Masqued take place at West High, most of the story takes place elsewhere in Anchorage – at a beach, at the protagonist's home, at the home of her boyfriend or her best girlfriend, at a Barnes and Noble, at an unsupervised teen house party, at various local dining establishments (a diner, a Tex-Mex restaurant), and even a notorious local bar. The supernatural world about which Anna/Mia learns over the course of the novel is located behind a nondescript VIP door at said notorious bar that is guarded by a troll; the magical Gloaming is accessible by the Unseen anywhere there is a forest. The heroine's mother and aunt (both of whom are Kindred witches), her boyfriend's family, the MacKays (shapeshifters), and even the villain, Julian (who is variously a vampire or an incubus) live in rather large and fancy houses, but they are still houses – they are not castles. When the heroine goes to the misty world of Avalon, she does so in her dreams and visions, or she steps through a magic mirror, which she sees in a dream and then encounters at the villain's home.

Conversely, the novel Crave, the first volume in the *Crave* series, takes place entirely at Katmere Academy, a magical boarding school for supernatural creatures where overt paranormal

SA-47

activity is always going on – indeed it is a feature of the curriculum. Katmere is set in a gothic castle, which Wolff describes in extensive detail. It is comprised of dorm rooms, secret passageways, turrets, underground tunnels leading to satellite classrooms, a tower room for one of two vampire prince brothers and an underground lair for the other, a dragon boneyard, an arena where a magical game called Ludares is played, and a Great Hall that functions as an auditorium. Katmere was once a dragon's lair, and portions of the castle are studded with precious jewels that were once part of a dragon's hoard. It is, in short, like no public high school, in Alaska or anywhere else.

Once we get beyond the first volume of the *Crave* series, Wolff introduces many fully developed, elaborate settings that are spread across the globe. These find no counterpart in any version of Freeman's works. There is an ice cave hidden in the Alaskan wilderness, home to an elderly woman who happens to be a vicious vampire known as The Bloodletter (and who is actually the Goddess of Chaos); a volcanic island on which The Unkillable Beast (an ancient gargoyle) is imprisoned; Giant City in the California redwoods, where giants dwell among the giant trees; the Aethereum Prison in New Orleans; the tropical island that is home to The Crone (the Goddess of Order); and the Impossible Trials arena, which is hidden behind a taffy shop in St. Augustine, Florida. There are also the royal courts of the principal types of paranormals in *Crave*. These are located in parallel universes all over the world: the Witch Court is in Turin, Italy; the Vampire Court is in London; the Gargoyle Court is in Cork, Ireland; the Dragon Court is in midtown Manhattan. The heroines and her friends travel to all of these places, where they meet a variety of other supernatural creatures. Anna/Mia, by contrast, never leaves Anchorage, except to pass over into Avalon. *See DiTocco*, 815 F. Supp. 2d at 670.

Alaska also plays a very different role in each work.

SA-48

For BMR's protagonist (Anna/Mia), Anchorage has long been home – a familiar and comfortable place where she has lived for a decade. She moved to Anchorage when she was seven; California is but a distant childhood memory. And her school, West High School, is a typical public high school, with a typical mix of students (a few of whom turn out to be paranormal, but not nearly all).

For Grace, the protagonist of *Crave*, the remote Alaskan wilderness is itself a character; its unfamiliar, intimidating, and isolating nature has a profound impact on the heroine throughout the series. She was uprooted from her Southern California home at age seventeen, just after the beginning of her senior year in high school. Her new home is a boarding school for the children of four types of supernatural beings – vampires, werewolves, witches, and dragons.

Freeman's assertion that the works are substantially similar because they both feature a similar castle exemplifies the weakness that runs throughout her presentation. While Katmere is identified as a castle, the word "castle" does not appear in any draft of BMR/Masqued.[14] It is of no moment that one line in Freeman's many pages of notes – only some of which ever made it into a draft of her novel – mentions in passing that "Ian and Sasha" (characters who were never written into any draft of her novel) live on a "large compound like a castle." Dkt. No. 397-9 at 5. Likewise, the notion that Katmere is substantially similar to the "Old-World European chateau" in which the MacKays live, simply because "chateau" is the French word for "castle," borders on the frivolous. No building in any of Freeman's drafts looks or feels remotely like the ancient dragon's lair in the Alaskan wilderness that is Katmere Academy. This is a motif we will encounter again and again as we examine the factors that play into the "total look and feel" of these two sets of works.

---

[14] The same is true of "Katmai," a real place in Alaska which is mentioned only in Freeman's notes and is not expressed in any of the six drafts of BMR/Masqued.

SA-49

### c. Characters

To determine whether characters are substantially similar, courts consider "the 'totality of [the characters'] attributes and traits' as well as the extent to which the defendants' characters capture the 'total concept and feel' of figures in [plaintiff's work]." *Walker*, 784 F.2d at 50 (quoting *Warner Bros. Inc. v. Am. Broad. Companies, Inc.*, 720 F.2d 231, 241 (2d Cir. 1983)). This is an exacting standard, one not easily met. The Second Circuit has provided the following guidance:

> What the character thinks, feels, says and does and the descriptions conveyed by the author through the comments of other characters in the work episodically fill out a viewer's understanding of the character. At the same time, the visual perception of the character tends to create a dominant impression against which the similarity of a defendant's character may be readily compared, and significant differences readily noted.
>
> Ultimately, care must be taken to draw the elusive distinction between a substantially similar character that infringes a copyrighted character despite slight differences in appearance, behavior, or traits, and a somewhat similar though non-infringing character whose appearance, behavior, or traits, and especially their combination, significantly differ from those of a copyrighted character, even though the second character is reminiscent of the first one.

*Warner Bros.*, 720 F.2d at 241–42. It is precisely on the distinction between "somewhat similar" and "substantially similar" characters that Freeman's argument falters.

Copyright law provides "very limited protection" to characters in a creative work. *Jones v. CBS, Inc.*, 733 F. Supp. 748, 753 (S.D.N.Y. 1990). A copyright infringement claim with respect to a character cannot succeed "unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines." *Smith v. Weinstein*, 578 F. Supp. 1297, 1303 (S.D.N.Y. 1984), *aff'd*, 738 F.2d 419 (2d Cir. 1984). A basic or stock character type is not copyrightable, whereas a "uniquely developed character with some degree of novelty" is. *Jones*, 733 F. Supp. at 753. A protagonist who is a young girl with psychic abilities, for instance, is an unprotectable idea, as are "using psychic abilities to save people, seeing and doing supernatural things, and defeating villains" – all of which necessarily

48

SA-50

flow from the idea of a character using her psychic abilities to triumph over evil. *Acker v. King*, 46 F. Supp. 3d 168, 175 (D. Conn. 2014).

"The bar for substantial similarity in a character is set quite high." *Spielberg*, 748 F. Supp. 2d at 208. Judge Scheindlin's oft-cited decision in *Hogan v. DC Comics*, 48 F. Supp. 2d 298 (S.D.N.Y. 1999) provides a useful example. There, the court declined to find that two half-human, half-vampire characters – both named Nicholas Gaunt – were substantially similar, even though both were white males in their early twenties with thin-to-medium builds, pale skin, dark messy hair, and a slovenly appearance. *Id*. at 311–12. While the two characters were obviously somewhat similar, Judge Scheindlin found that both characters being half-vampire and half-human was a non-protectable idea in the public domain and pointed out that the way in which the two characters became half-vampires was different in the two works. *Id*. She further held that while they shared a similar appearance – characteristics common to many "Generation X" post-adolescents – they had distinct physical features (including face shape, haircut, and presence of tattoos) and interacted with other characters in different ways. *Id*. at 312; *see also Cabell v. Sony Pictures Entm't, Inc*., 714 F. Supp. 2d 452, 459–61 (S.D.N.Y. 2010), *aff'd*, 425 Fed. Appx. 42 (2d Cir. 2011).

With this in mind, we turn to a comparison of the works' characters, based on the Court's "considered impressions." *Nichols v. Universal Pictures Corp*., 45 F.2d 119, 123 (2d Cir. 1930). A detailed description of the characters in BMR/Masqued and *Crave* is set out in Addendum D. It is readily apparent that none of the characters in BMR/Masqued is "substantially similar" to the characters in *Crave* when the proper test is applied.

The heroines of both works are female teenagers with supernatural abilities. But Freeman's copyright "do[es] not entitle [her] to protection of the idea of a character with superhuman powers who battles the forces of evil." *Warner Bros. v. Am. Broad. Companies, Inc*., 523 F. Supp. 611, 615

SA-51

(S.D.N.Y. 1981), *aff'd and remanded*, 654 F.2d 204 (2d Cir. 1981). As should be apparent from reading Addendum D, Freeman and Wolff describe their heroine in vastly different ways. The girls (one tall, slim and dark; one short and busty with curly hair and freckles) look nothing alike. They are in different years in high school. They are different types of supernatural characters – one is part Kindred witch, part shifter and part demon (she has three lineages); the other is half gargoyle and half witch. Because they are different types of supernaturals, they have different powers: Grace can fly, turn herself to stone, stop time, and heal using the power of the earth, while Anna/Mia reads Tarot cards that come to life and has prophetic visions. What powers she will have after her upcoming initiation remain to be revealed; we learn nothing about them in any draft of BMR/Masqued. Anna/Mia passes through a mirror into a mysterious magical land; Grace travels from Alaska to various real places on earth – or to parallel universes behind those places – either by flying while in her gargoyle form, passing through portals created by witches, riding on the back of a dragon, or "fading" in the arms of a vampire.

Anna/Mia's mother is alive – whether that mother be Marcheline, the artist who raised her, or Elise, the High Priestess of Avalon – while her father, believed to be dead for almost a decade, is actually alive in a magical land, trapped in the form of a wolf. Grace's parents are really, truly dead – both of them – and they are very recently deceased.

Grace has a bubbly and quirky cousin one year younger than her who functions as her "wing woman" and helps her adjust to the supernatural world. Anna/Mia does not have a similar friend – her only close girlfriend (Amanda/Samantha) has rejected her, and her relationship with her new friends is not well developed.

Freeman asserts that both heroines experience "anxiety and panic attacks from the trauma of family members' deaths which manifest physically throughout both stories." Dkt. No. 543-1 at

50

SA-52

21. According to Freeman, these panic attacks are "not merely backstory but active elements of the heroine's characterization throughout the plot." *Id*. The heroines "even utilize the same techniques of careful breathing and counting their breaths to manage their anxiety and panic." *Id*. This is undoubtedly true for Grace, whose grief is raw and fresh and for whom panic attacks are a defining character trait. There is, however, no indication in *any* draft that Anna/Mia experiences panic attacks, let alone panic attacks over the ostensible "death" of her father nine years earlier. While Anna/Mia may experience moments of anxiety and panic – as people often do when placed in stressful or unfamiliar situations – the words "panic attack" do not appear in any version of BMR/Masqued. It is only in Freeman's notes that she suggests Anna/Mia suffers from panic attacks – an unprotectable idea that was never expressed in her drafts. Freeman points to a scene in BMR 2011 in which Anna/Mia experiences "fear and anxiety" over being locked in a dark van by demons, but her fear and anxiety is unrelated to her father's presumed death a decade earlier. Rather, it is a perfectly normal reaction from someone who has just been kidnapped; it is impossible to imagine a character who would *not* be fearful in this situation. And there is, of course, nothing remotely original about using breathing techniques to cope with anxiety.

Freeman also suggests that the heroines share "parallel, specific lifestyle details." *Id*. at 26. For example, she says that the heroines' favorite food comes from a local Mexican restaurant, and they often drink tea. The heroine also "ducks her head down" when she is uncomfortable, loves homemade chocolate chip cookies, and eats apples and yogurt at school. *Id*.

Putting aside that a shared love of Mexican food or tea is not borne out in the works themselves (Grace's favorite food is Pop Tarts – although she does like tacos, as do many teenaged girls – and while she may drink tea on occasion, she much prefers Dr. Pepper), these alleged similarities are both unprotectable and nothing more than random, minute details that do nothing

51

SA-53

to address the question of whether the characters themselves are substantially similar. Moreover, there is no "local Mexican restaurant" in *Crave* – there is not a restaurant anywhere close to Katmere. When Grace eats tacos, it is at a stall in a marketplace in a prison in New Orleans or when Jaxon brings her favorite street tacos from her hometown in San Diego – not in a local Mexican restaurant.

Freeman's other arguments about the purported similarities between the two heroines merely reflect unprotectable *scènes à faire*, such as the heroine's relocating to a new state after the death of her parent(s), failing to see herself as beautiful despite her good looks, believing she is an ordinary human, and discovering she is a rare and unique supernatural being of magical lineage meant to restore and maintain the balance. Though there are some specific similarities, like the heroine's relocating from Southern California to Alaska,[15] these details have no bearing on the total concept and feel of the characters.

Ash/Roman and Jaxon, the heroines' boyfriends, are also quite different. Though Freeman characterizes both romantic leads as "wild," "sexy," "beautiful," "smoking hot," "gorgeous" and "dangerous," Dkt. No. 543-1 at 27–28, hot, sexy, dangerous boys – central to virtually all young adult romance novels – cannot be copyrighted. The Viking Ash/Roman has rosy cheeks and sun-kissed skin; Jaxon has black hair, black eyes, and wears black clothes. He is presumably pale (he is, after all, a vampire) and has a jagged scar from the center of his left eyebrow to the left corner of his mouth. Both boys smell delightful to the heroine (a common phenomenon where

---

[15] Another example of the liberties Freeman takes with her own work: she says that both heroines have maternal grandmothers with green eyes. In none of the five drafts that follow the template does Anna/Mia have a maternal grandmother with green eyes. In fact, in three of those five drafts, the heroine does not have a maternal grandmother at all. In all versions of the novel that conform to the template, the mysterious woman in the mirror – who is variously Anna/Mia's biological mother (BMR 2010 and 2011 or Masqued 2012) or her grandmother (Masqued 2013 and 2014) – has blue eyes, not green eyes. Only in *Masqued 2016* – the novel that does not conform to the template and that is being separately analyzed – does the heroine (Ella) have a maternal grandmother who has green eyes. As for the *Crave* novels: the character with green eyes is a vampire and a goddess – not a witch or a priestess – and she is not the heroine's maternal grandmother, but her ancestor going back many generations.

SA-54

pheromones associated with sexual attraction are involved), but contrary to Freeman's assertions, they do not share the same scent; Ash/Roman smells like citrus and spice "with a note of musk and woods to the sunlit forest and waterfalls," whereas Jaxon smells like orange and freshwater.

Jaxon is a dark vampire prince, and a disturbed and violent one at that; he is the product of a highly dysfunctional family and believes (wrongly) that he murdered his own brother. Ash/Roman is a werewolf/shapeshifter, not a vampire – in fact, he hates all "Sanguines," as he calls creatures that feed off blood, believing them to be demonic. He comes from a close and loving family and has a preternaturally sunny disposition. He is not royalty. And while he "feels responsible" for the death of his older brother Dylan, Ash/Roman did not kill Dylan, or try to.

Like all vampires, Jaxon drinks blood and has no reflection. He also has the power of telekinesis – the ability to move objects with his mind. He runs with a posse of friends (The Order) who are vampires like he is. And he travels by "fading" – moving very fast. Unlike Jaxon, Ash/Roman has no posse; his "friends" are the members of his family, all of whom are werewolves or shapeshifters, as he is. He moves quickly by riding on a motorcycle, until he turns into a wolf – at which point he can carry the heroine on his back. Both heroes can move very quickly, but this is by no means original to Freeman's work; Edward, the hero of *Twilight*, does the same.

Freeman's position that the romantic leads are substantially similar because they both feel a responsibility to protect the heroine from supernatural creatures wanting to harm or kill her exemplifies the weakness of her argument. There is nothing original about a romantic lead who wants to protect the heroine; it is perhaps the ultimate teen romance trope. A romantic lead who does *not* want to protect the heroine from evil supernatural creatures would never be found in a young adult romantic fantasy novel.

SA-55

*BMR/Masqued* has no counterpart to Hudson, who becomes Grace's primary romantic interest halfway through the *Crave* series. Freeman seems to have intended to develop a second love interest who "encourages [the heroine] to be herself and become powerful" in future works – apparently in the person of Ronan/Aedan, the Druid priest. But that idea never made it into any draft of her novel. Dkt. No. 531 at 53.

Were there reason to compare them, aside from being dark and extremely attractive, Ronan/Aedan and Hudson are very different. Hudson Vega is a recent high school graduate and the heir to the Vampire Kingdom. An upper-class, Armani-wearing Brit who grew up in London, Hudson was ostensibly killed by his brother a year earlier so that he would not help establish the supremacy of "born" vampires.[16] – something he never intended to do. And, of course, Hudson is a vampire, and a very powerful one at that. Ronan/Aedan O'Faolain, by contrast, is an adult Celtic Druid. He dresses like a Druid would – in black leather boots, fitted breeches, and an unlaced tunic, with arms tattooed with runes and Celtic symbols. As far as the reader knows, Ronan/Aedan murdered his entire community and enslaved his priests to sacred objects; there is no indication in Freeman's notes, and certainly none in any text, that these legends about him are untrue. Ronan/Aedan disappeared from the earth centuries before Freeman's story begins; Hudson disappeared one year before Wolff's story begins. We know literally nothing more about Ronan/Aedan, because his character – unlike Hudson's – is not fleshed out. Aside from a single reference in one of Freeman's notes,[17] Anna/Mia's romance with Ronan/Aedan exists solely in Freeman's mind. Anna/Mia does have an immediate attraction to the man she released, but she

---

[16] The Vegas and some other vampires are "born" vampires – they were born with a taste for blood due to a genetic mutation. This distinguishes them from "made" vampires, who got that way in the old-fashioned way – by being bitten and drained. Competition between born and made vampires is a feature of Wolff's work. There is no similar concept in Freeman's novel.

[17] Dkt. No. 397-1 at 3.

54

SA-56

also has an indistinguishable immediate attraction to the fascinating demon who turns out to the Julian, the villain of BMR/Masqued. And while in BMR 2010 and 2011 (but not in subsequent drafts), Ronan bites Anna while kissing her so he can taste her blood (which seems to be how supernatural characters ascertain who the girl is – Julian does exactly the same thing), he is most definitely not a vampire.

The villains in Plaintiff's and Defendants' works are also very different. Julian is an incubus or vampire, depending on the draft. In every draft, Julian previously had a romantic relationship with the heroine's biological mother; in some drafts, he is the girl's biological father. The story of Julian's thwarted love changes from version to version, but in each instance he is an angry, spurned lover who blames the heroine's father Dante for the loss of his one true love. Julian gets back at the family that has wronged him by imprisoning the father in a magical world in the form of a wolf; he plans to use Anna/Mia to recover, in one way or another, his lost love. Cyrus, the megalomaniac Vampire King, is the father of Hudson and Jaxon. He has no romantic connection whatsoever to the heroine's family; indeed, he is believed to have eliminated her kind (gargoyles) entirely. He is head of The Circle (the ruling council of supernatural beings) and the leader of an army of misfits. He has lost his powers and is bent on recovering them and becoming a demigod.

Next, Freeman contends that, "A smoky gray-eyed, telepathic, Gaelic-speaking father/grandfather named Athair/Alistair, who appears as a voice in the heroine's head and is imprisoned in his beast form by the vampire prince/vampire king cannot plausibly be dismissed as a stock or indispensable trope of young adult fiction." Dkt. No. 543-1 at 32. That may be so, but Freeman's grey-eyed wolf is dissimilar from Wolff's imprisoned gargoyle.

The character to whom Freeman refers is, in BMR/Masqued, the heroine's father (whether biological or adoptive). His name is Dante, not Athair; but since he is not allowed to reveal himself,

SA-57

he tells Anna/Mia to call him "Athair Mo Chroid" (Gaelic for Father of My Heart). Dante is believed to have been killed a decade before the story begins; he appears in the story as a grey-eyed wolf who guides Anna/Mia spiritually, as a parent would. He is trapped in another dimension as punishment for his role in the loss of Julian's one true love. Aside from one instance when Anna/Mia hears her father's voice in a dream, the heroine does not hear him except when he is in her presence speaking to her.

Dante's purported counterpart in *Crave* is actually named Alistair. Alistair is not Grace's father, or her grandfather, or her great grandfather – he is her great-great-great-great-great-great-great grandfather many generations back. He is not a grey-eyed wolf. In his gargoyle form, he is an enormous creature made of jagged rock with bloodred eyes; in his human form, he is a tall man who looks to be in his late thirties with smoke-grey eyes, braided blond hair, and a goatee.[18] He has been restrained in a rock cave on a volcanic island in his gargoyle form for one thousand years. He is ultimately revealed to be the Gargoyle King and leader of the Gargoyle Army. Because Grace is a gargoyle, she can hear him speaking to her in her head – telepathy is a talent that gargoyles have, but that Anna/Mia does not.

Nor are any of the other secondary characters in Freeman's works substantially similar to those in *Crave*. For instance, Anna/Mia's aunt is a veterinarian and a healer; Grace's uncle is the headmaster of a school. They are, of course, both witches, but there is nothing in the *Crave* series like the "Kindred," a particularly potent type of witch like Anna/Mia's aunt. In any event, witches are a common type of supernatural being in fantasy fiction.

Each heroine also has a biracial gay male friend, both of whom are charismatic and charming and occasionally provide comic relief. But none of these traits is copyrightable. At an

---

[18] It should come as no surprise that Alistair has grey eyes. He is, after all, a gargoyle – a creature made of stone. Interestingly, in his magical gargoyle form his eyes are red, not grey.

SA-58

abstract level, Freeman is correct that both characters are "winged," at least in some of her drafts. However, beginning with Masqued 2013, when Brendan is first revealed to be paranormal himself and suddenly has wings, he is a Faery, whose supernatural powers (whatever they may be) are not fully developed. Flint, in *Crave*, is a powerful dragon prince who can fly and shoot fire and ice. Brendan is closeted throughout the novel; Flint has a robust love life that contributes significantly to the story. Their race turns out to be entirely irrelevant to either story.

A more fulsome description of the characters – and there are many of them – is found in Addendum D to this opinion. But we have covered enough ground above to establish that there is no substantial similarity between Freeman's characters and Wolff's – other than at the macro level one would expect of characters in a teen romantasy novel.

### d. Plot and Sequence

The plots of the works are summarized above and are set out in detail in Addenda A-C. The addenda go into considerable detail in order to illustrate that the plot of the five template drafts bears only the most tangential resemblance – certainly not substantial similarity – to the plot of the *Crave* novels.

Both Freeman's and Wolff's works tell the story of a displaced girl who is moved from California to Alaska when one parent (Freeman) or both parents (Wolff) die – although Anna/Mia's father has been "dead" for a decade (and is not really dead at all), while Grace's parents are both newly deceased and really, truly dead. Both girls are in high school (one a junior and one a senior). Neither girl knows much, if anything, about her supernatural origins when the story begins; her knowledge evolves gradually. Both girls turn out to be hybrid paranormals – Anna/Mia is either a Nyx and "Kindred" or a "thrice born daughter" of mixed heritage from light and shadow, while Grace is half witch and half gargoyle, a type of being not seen for 1000 years. Both girls fall in

57

SA-59

love with a fascinating boy – one sun kissed and Viking-like (Ash/Roman), the other a dark, pale, and brooding prince (Jaxon). The boys turn out to be paranormal as well – Ash/Roman is a werewolf or shapeshifter, as well as a Viking Berserker; Jaxon is a vampire. Because of her unique heritage, each heroine will turn out to have a critical role to play in a looming conflict within the supernatural world – a conflict between beings of Shadow and beings of Light (Freeman) or among vampires, werewolves, witches, dragons, and humans (Wolff). The lives of both girls are endangered for reasons they do not understand, and they are repeatedly rescued by their boyfriends. Each one has a role in causing a mysterious male – believed to be evil – to return to earth.

So yes, there are unquestionably similarities between the plots of *Crave* and BMR/Masqued 2010-2014. But those similarities relate to uncontested tropes/*scènes à faire* that are the staple of this literary genre, and of fantasy fiction writ more broadly. The displaced girl who knows nothing of her true ancestry is a trope. Like Rey in *Star Wars* (and Luke Skywalker before her), Anna/Mia and Grace have never been told the story of who or what they are. That they turn out to have great powers can hardly be a surprise; that is the story of every supernatural heroine. Likewise, that each heroine is the "Chosen One" is a trope/*scène à faire*; the same can be said about Percy Jackson in *Percy Jackson & The Olympians* and *The Mortal Instrument*'s Clarissa Fairchild.

When we delve into the detailed expression of those tropes, the similarities fall away.

The first five drafts of Freeman's novel concern Anna/Mia's discovery of her true nature and parentage. In each successive iteration, the climax of the story occurs when the girl learns who she is and who her parents are (or are not). The secondary plot turns on her efforts to free the person she knew as her father – who is not really dead, despite what she has been told – from an

SA-60

enchanted imprisonment, her failure to do so, and her release of what she presumes to be an evil force instead.

In the first volume of *Crave*, the central story is about Grace's adjustment to her new home immediately following the sudden death of her parents – an adjustment the heroine of BMR/Masqued made a decade before the story began – as well as learning the truth about how her parents were killed (and they really were killed). There is no issue of "true parentage" to sort out – her parents are the people who raised her. Nor is there any "dead" parent (or parental figure) who turns out to be alive. Grace does not learn in the first volume of *Crave* that she is a paranormal being, or what her supposed role is in some wider conflict, as Anna/Mia does in BMR/Masqued. That comes later in the series.

Whatever discrete similarities there might be between the plot of BMR/Masqued and the first volume of *Crave*, any suggestion of substantial similarity evaporates entirely when we move on to the second, third, and fourth volumes of the *Crave* series. In the three subsequent volumes, Grace and her friends are caught up in a long-standing war for control of the supernatural world. Gargoyles were the supernatural race created to balance the forces of chaos and order; and Grace – the first gargoyle to be born in a millennium – holds the key to vanquishing the evil Cyrus, the Vampire King, and ending his dreams of paranormal conquest and world domination. As they learn more and more about Cyrus' evil plan – and endure a series of increasingly difficult trials in order to acquire the means to defeat him, in a final, cataclysmic battle between huge armies – Grace and her friends grow in the virtues they will need when they ultimately triumph over evil: collaborative leadership, self-knowledge, loyalty, self-sacrifice, and resilience.

To equip themselves to fight Cyrus and his evil allies, Grace and her friends embark on picaresque journeys to exotic places all over the globe. Their travels to these places, and then back

SA-61

to their base of operations at Katmere, are eased by the ability of Grace's cousin Macy, a witch, and her witch friends to create portals through which they can hop from one location to another. Their travels are designed to help them find magical objects they need to complete various missions. For example, they have to find four magical objects in order to eject Hudson from Grace's head; they need to find the key that will unlock The Unkillable Beast's chains so they can free him; they must find something called The Crown in order to stop Cyrus.

There is nothing at all like any of this in BMR/Masqued, which takes place entirely in Alaska and in the mythical realm of Avalon. In fact, one of the clever aspects of the *Crave* books is that the headquarters of the paranormal races are located in recognizable locations on earth that have characteristics that correspond to those of their paranormal residents. For example, the Dragon Court is located in New York City, the glittering financial capital of the world, where the dragons – known for their hoards of treasure – keep their riches hidden in a parallel universe located behind Radio City Music Hall. The Gargoyle Court, home of creatures made of stone, is on the rocky shores of Southeastern Ireland. The Aethereum Prison from which escape is all but impossible – and which houses the Pit, where Hudson competes in vicious wrestling matches while Grace eats tacos – is located in the New Orleans, a city whose well known motto is "*Laissez le bon temps roulez*" (let the good times roll).

Volumes Two, Three, and Four of the *Crave* series – Crush, Covet, and Court – involve our heroine in a series of adventures akin to the various quests that Harry Potter and his friends must go through in the seven volumes of his story. They must play a magical game (Ludares) in a school tournament reminiscent of the Quidditch tournaments of Hogwarts. Their quest for magical items (a dragon bone, a bloodstone, and the eyetooth of an alpha werewolf, for example) differs little from the journey taken by Harry, Ron, and Hermione to find the three Deathly Hallows.

SA-62

Among the plotlines in the last three volumes of *Crave* that have no counterpart in Freeman's work are: a vampire prince trapped in the heroine's head, where he carries on an endless conversation with her that no one else can hear; a love triangle involving the heroine and the two vampire prince brothers, each of whom is tied to Grace with a mating bond (one genuine and one manufactured); the painful breaking of the mating bond between Grace and Jaxon and the destruction of Jaxon's soul as a result; Jaxon's salvation when the Dragon Queen, Flint's mother, gives him her own heart; the relationship between Grace, Jaxon, and an elderly female vampire, Jaxon's godmother, who lives in a cave in the Alaskan wilderness and who holds the key to many of the mysteries of Grace's life; the death of some of Grace's friends (including Luca, Xavier, and Calder) and the wounding of others (like Flint and Mekhi); the disappearance of their Katmere classmates in a mass kidnapping; a gargoyle army, long frozen on the stony cliffs of Cork County that comes to life and helps Grace and her friends defeat Cyrus; the desperate search, by Grace and by the evil Vampire King, for something called The Crown, which is believed to confer godlike power on its possessor; a war between massive armies captained by the Vampire King and his allies and by Grace; and an escape from the "unescapable" Aethereum Prison.

Of course, both BMR/Masqued and *Crave* include the inevitable love story between the heroine and a hot boy who turns out to be a paranormal – this is "romantasy" fiction, so there has to be a romance, and hot boys are a staple of the genre. Indeed, the romances in both Plaintiff's and Defendants' works are reminiscent of the love story in *Twilight*, the granddaddy of the current generation of romantasy novels. But aside from a first kiss under the night sky (the Aurora Borealis in BMR/Masqued and a meteor shower in Crave) – which is truly a *scène à faire* in any romance novel set in the Far North (as many of them are) – those love stories play out in entirely different ways. Both Ash/Roman and Jaxon rescue their girlfriend from danger, but rescue is a *scène à faire.*

61

SA-63

They do so in very different ways – Ash/Roman turns into a wolf and fights Julian's goons, while in the first volume of *Crave*, Jaxon saves Grace from a pair of evil wolves who are trying to throw her outside in the snow, as well as from a falling chandelier dropped by Flint in the cafeteria. And in Crush, Hudson, Grace's new love interest, saves Grace's life by burying her with stones after she is bitten by Cyrus.

It is true that Jaxon seals Grace's wound with his vampire's venom, while Ash/Roman cures Anna/Mia's demonic wound with his wolf's bite. But there is nothing original about this; it is a common romantasy trope. In *Twilight*, for example, Edward cures Bella with a bite by sucking the venom of an evil vampire out of her body.

In light of the above, it is not surprising that Freeman does not seriously argue that the plots of her book and Wolff's books are substantially the same. Instead, she argues that both sets of work have many similar elements. But that is not the way substantial similarity is proved.

For one thing, many of the common elements that Freeman identifies fall into this same bucket of unprotectable tropes or *scènes à faire*:

- The romantic lead being hot and dangerous and having an "immediate connection" to the heroine;

- The romantic lead warning the heroine to stay away from him;

- The romantic lead walking the heroine to class and inviting her to sit next to him in class;

- The heroine worrying about mean girls in the cafeteria;

- The heroine being shy when introducing herself to the class;

- The mean girls trying to hurt the heroine;

- The heroine being embarrassed when the romantic lead finds her crying;

SA-64

- The romantic lead trying to stay away from the heroine;

- The heroine reading books and doing research to learn more about the supernatural world;

- The existence of a supernatural war;

- The romantic lead's having "significant power of the mind;"

- The romantic lead's believing he has a duty to stop the supernatural war;

- The romantic lead telling the heroine he will keep her safe;

- The romantic lead's coming to the heroine's rescue;

- Someone having murdered the heroine's parents;

- The romantic lead and the heroine questioning whether love is enough;

- The romantic lead having supernatural speed;

- The heroine having to confront being lied to by her family about who she really is;

- The heroine panicking when seeing blood on herself.

Freeman insists that Wolff parrots her original manner of expressing these tropes/*scènes à faire*. But her examples are frequently not tethered to the contents of the actual drafts.

For example, Freeman suggests that, while "dead parents" is a trope, Wolff copied her expression, because in both books the death of the heroine's parents is "accidental, vehicular, and violent, leaving the protagonist with physical and psychological scars." Dkt. No. 543-1 at 42. But this argument is not supported by the works themselves. Anna/Mia's father Dante "died" a decade before the story begins, either in an elevator accident or a plane crash, depending on the manuscript; he later turned out to be alive, albeit enchanted, having not perished in any sort of accident, but rather being imprisoned by an evil demon. Grace's parents, on the other hand, died in a car accident a month earlier and are dead. So, while both Anna/Mia's father and Grace's

63

SA-65

parents supposedly came to grief in a "vehicle," the similarities end there. A car accident is not the same thing as an elevator or airplane crash. A live but enchanted parent is not the same thing as two dead ones. And children are generally traumatized when a parent dies; suffering physical and psychological scars is hardly uncommon – or copyrightable.

Another example: both heroines' drinks are spiked. At the highest level, that is true – and a spiked drink is surely an unprotectable trope of teen fiction (has there ever been a high school party in literature or film that does not feature spiked punch?), or fairytales more generally (the poisoned apple in *Snow White* being one of the better-known examples). But again, the expression of this trope is vastly different in each work. Anna/Mia's *fruity punch* is spiked with Everclear, a colorless, odorless grain *alcohol*; Grace's *tea*, which she drinks with Jaxon in his tower, is spiked with *poison* that incapacitates the heroine. While Mean Girl Taylor offers Grace her first glass of punch spiked with Everclear, there is no indication in the text that Taylor put the Everclear in the punch, or that only Anna/Mia's drink was spiked. In fact, the punchbowl was equally available to all guests at the unsupervised high school party that Anna/Mia attends; she herself dipped into it repeatedly because she liked the taste. And she reacts to it by doing what drunken kids do – she dances around and has a high old time. The poisoned tea, by contrast, was prepared by Lia expressly to disable Grace; Lia (through an unsuspecting Jaxon) provides Grace with every drop she drinks, and only Grace and Jaxon partake of the poisoned tea, which has vastly different effects on each of them – it enrages Jaxon and incapacitates Grace. And of course, there is a massive difference between getting drunk at a party and having one's inhibitions loosened, and being poisoned so that one can be tied up and used as a human sacrifice.

In connection with her original motion for summary judgment, Plaintiff's counsel listed hundreds of additional points of purported similarity between Freeman's drafts and the *Crave*

64

SA-66

novels. *See* Dkt. Nos. 276-34; 276-44 through 276-56. But virtually all of the similarities Freeman identifies in these lists are either tropes/*scènes à faire*, similarities based on the shared use of ordinary words and common phrases, or trivial details that have no bearing on the total concept and overall feel of the works. Freeman's lists, for example, include such things as both works mentioning Hawaii and both heroines grabbing an apple between classes – as well as the fact that both novels featured the phrase "Well, well, well." Dkt. No. 276-3 at 98.

Many of Freeman's alleged similarities fall into this category: the heroine comparing the Alaskan landscape to the moon; the heroine and her friends "discuss[ing] jeans/party attire"; the heroine being given a "lemon verbena" tea blend; the heroine wearing a revealing red dress; the heroine liking chocolate chip cookies; the heroine eating yogurt (BMR/Masqued) or frozen yogurt (*Crave*) in the school cafeteria; the romantic lead smelling good; and "the heroine's gemstone necklace and gem stones." There is even a reference to *Peter Pan* "when the heroine is about to fly." Dkt. No. 543-1 at 85.[19]

While some of these are indeed discrete points of similarity, some are not.

Freeman's "gemstone" example, for instance, cannot reasonably be construed as similar in the works, even at the most abstract level. She asserts that, at more or less the same point in her drafts and in the opening novel in *Crave* (around page 80), "the heroine's gemstone necklace and the heroine noticing gemstone jewelry worn by girls, occurs" and neither heroine knows that the gemstone jewelry was made by supernatural witches. *Id*. at 49. But that both scenes involve jewelry of some sort does not make them substantially similar, no matter the page number on which they occur. In BMR/Masqued, the necklace being referenced is an amulet or pendant, which came from

---

[19] This characterization is misleading at best. Anna/Mia – unlike Wendy in *Peter Pan* – does not fly. In the example Freeman points to, she is being carried in her werewolf boyfriend's arms as they jump 30 feet from a balcony. Grace – who has wings – does indeed fly; that is a gargoyle power. Anna/Mia has no such power in any of Freeman's drafts.

SA-67

the heroine's father, and which her aunt reminds the girl to wear every day. The passage Freeman cites to describes the amulet as a pendant "made of an unusual looking metal that is neither silver nor gold but a mixture of both. On the front is a depiction of a jackal's head in profile wearing an Egyptian headdress and collar encrusted in lapis and carnelian." BMR 2011 at 80. It will turn out to have been created, not by a witch, but by Wepwawet, an Egyptian wolf god. BMR 2011 at 440–41. In Crave, Grace describes Macy's witch friends as spectacular, with "different gemstones gleaming in their hair and against their skin. Earrings, pendants, hair clips, plus eyebrow, lip, and nose rings, all bedecked with colorful stones." Crave p. 80. At no point in the novel do we learn who made the gemstones they wear or what colors they are.

The same is true of Freeman's argument about the heroine's learning that she is "one of the only remaining" supernatural beings of her kind. While this may be true for Anna/Mia,[20] it is definitely not true for Grace. Thousands of gargoyles, an entire army of them, exist in *Crave*; they are simply frozen in time. Freeman even acknowledges this when she claims Grace learns that "special creatures *of her kind* can communicate telepathically across long distances." Dkt. No. 543-1 at 103 (emphasis added).

These are examples of "similarities" that turn out not to be similar at all when one goes back to the text. But even the actual similarities identified by Freeman are nothing more than specific bits and pieces found here and there in works of extended length – almost 3000 printed pages of *Crave* novels, and five separate drafts of Freeman's novel, which spans 400-500 typewritten pages. Given the genre and the target audience, it should not be surprising to find a little something here and a tiny reference there that are similar – like the heroine's comparing

---

[20] Actually, it is not always true of Anna/Mia. In the 2013 and 2014 drafts of Masqued, the heroine's childhood friend and her Mean Girl nemesis are revealed as Nyxes as well. So, there are at least three Nyxes in existence in multiple versions of Freeman's novel.

SA-68

Alaska's landscape to the moon or wondering if the romantic lead could be an alien. But that is not the measure of substantial similarity. One measures substantial similarity with reference to the overall look and feel of the works -- not discrete bits and pieces of text.

Freeman urges that these similarities, even if not individually protectable, amount to infringement when viewed collectively. But even if the Court were to accept that Freeman's hundreds of claimed similarities are both protectable and substantially similar to things that occur in *Crave* – something it is impossible to do, since so many of the similarities are tropes/*scènes à faire* – no reasonable trier of fact, having read the works in their entirety, could conclude that the plots of BMR/Masqued and the four *Crave* novels are substantially similar. Or, to put it in the language of the case law, this is not a case where the ordinary observer who is not trying to detect disparities between Freeman's work and Wolff's "would be disposed to overlook them, and regard [their] aesthetic appeal as the same." *Gaito*, 602 F.3d at 66. The texts consist mostly of disparities; one need not look hard to detect them. Indeed, the ordinary observer could not possibly think that the few discrete similarities between the 1600 or so typed pages of the BMR/Masqued novels and the 2700+ pages of the *Crave* novels come close to outweighing the appreciable differences in the plots of the two sets of works.

Freeman identifies feminism and diversity, which are ostensibly woven into the plots of Plaintiff's and Defendants' works, as "themes" of her work. I have chosen to analyze them as plot points, since they appear to this reader to be tangential to the actual themes of the work. But however they are labeled, no reasonable trier of fact could conclude that these ideas are expressed in a substantially similar manner.

Freeman posits that "feminism" in her book is illustrated through her heroine's choosing a second love interest who "encourages her to be herself and become powerful" instead of protecting

67

her "like an ordinary fantasy partner." Dkt. No. 531 at 53. And she claims that this idea is parroted in the *Crave* novels when Grace – Wolff's heroine – "chooses" a second boyfriend (Hudson) who also encourages Grace's independence.

I will not bother to critique Freeman's notion that choosing between potential boyfriends represents a high expression of feminism. But her characterization of what the two heroines do misrepresents what is actually found in Freeman's and Wolff's works.

Anna/Mia – the heroine of Freeman's first five drafts of BMR/Masqued – does not choose a "second love interest" at all. She has one and only one boyfriend in the novel – Ash/Roman MacKay, a werewolf/shapeshifter and a Viking Berserker. As Plaintiff herself observes, Anna/Mia barely interacts with the Ronan/Aedan character – the character Freeman identifies as the alternate love interest. *See* Dkt. Nos. 397-1 at 3 ("Ronan and Anna. Barely meet in book 1."). It is only in her notes where Freeman posits that the Ronan/Aedan character – the one who barely appears in the first five drafts of her novel – will eventually (in a subsequent book that was never written) become romantically involved with Anna/Mia and will want to help the girl use her powers to restore the balance.[21] But that idea never made it into any of Freeman's six drafts; it only appears in idea form in her notes. That Freeman intended to write another novel ("book 2") in which she would develop this kernel of an idea (which is all that it is) into a "love triangle" does not advance her claim to copyright in some sort of "feminist" tale of competing love interests at all. Love triangles, as Freeman herself admits, are tropes, and tropes are simply not protectable.

And contrary to Freeman's assertion, Anna/Mia does not express annoyance at Ash/Roman's desire to protect her. She is grateful when he saves her; she welcomes his presence

---

[21] Literally the only thing Freeman says, in any draft or note, about a romance between Anna/Mia and Ronan/Aedan is, "Love triangle for book 2. Ash wants to protect her. Ronan wants to help her learn to use her powers to restore the balance." Dkt. 397-1 at 3.

SA-70

in her room when, after he cures her with his bite, he must remain with her. Again, this may be something Freeman had in mind for future development, but she never got that far.

By contrast, there is definitely a feminist theme in *Crave*, but it is expressed entirely differently from any "feminism" of Anna/Mia's in BMR/Masqued.

In *Crave,* feminism is not expressed by Grace's choice of mate. In fact, contrary to Freeman's characterization, Grace does not "choose" her alternate mate at all. He is chosen for her, by virtue of a mating bond with which she and her ultimate mate (Hudson) were born, and which Grace ultimately accepts as her destiny, despite her continuing feelings for Hudson's brother, Jaxon. It is Jaxon who breaks up with Grace, not *vice versa;* he does so after he discovers that his brother and his girlfriend are truly mated, whereas he and Grace are not. And while Grace at times finds Jaxon to be overprotective, his protectiveness is not what leads Grace to accept that Hudson is her true mate. Grace's relationship with Hudson develops slowly over the course of the *Crave* series, in an emotionally complex enemies-to-lovers arc that has no correlate in Freeman's drafts or notes. And Hudson too is protective and Grace can chafe at it; for example, she snaps at Hudson when he telepathically prevents her from approaching Cyrus prior to the Ludares tournament.

More significantly, Crave's feminism is expressed through Grace's internal decision-making and emotional growth into a strong female leader. Over the course of the series, Grace slowly comes to terms with her human and supernatural identities as she grows into her paranormal abilities and learns how to balance her power with emotional vulnerability. Grace's leadership style, which prioritizes collaboration over hierarchy and listening rather than commanding, challenges patriarchal norms that often equate strength with emotional detachment and aggression. That is a classic feminist trope, one that appears nowhere in Freeman's work.

SA-71

*Crave*'s focus on emotional vulnerability – which it treats not as a weakness, but as a strength critical to the survival of Grace's loved ones – easily distinguishes it from BMR/Masqued. Anna/Mia is not even supposed to come fully into her powers until her seventeenth birthday – a date that is still weeks in the future when the novel ends. We do not know what her powers are going to be; she is repeatedly told that, until her initiation, she will not learn what her role is in maintaining the balance. She thus has no opportunity to grow into anything. Anna/Mia's frustration with her mother's refusal to explain what her powers are or what will be involved in her "initiation" is a central theme – arguably *the* central theme – of BMR/Masqued. There is nothing similar in *Crave*; no one tries to stop Grace from developing her powers once they realize that she has them. And Anna/Mia does not develop any leadership traits in Freeman's novel. Any such story arc is nothing more than an undeveloped idea, if indeed it is that.

Freeman's contention that the works treat the theme of "feminism" similarly because both protagonists take advanced classes at high school, quote great works of literature,[22] love reading, and discuss French philosophers is hardly worthy of comment. Many leading female characters in fantasy fiction, like *Harry Potter*'s Hermione Granger, famously share these traits. The characters in both BMR/Masqued and *Crave* are bright high school students; of course they are educated, go to class, and are conversant with books and other academic subjects that they are studying. There is nothing copyrightable in any of that; it is all classic *scènes à faire.*

Freeman's assertion that both works emphasize diversity because they share "characters of myriad backgrounds, sexualities, and ethnicities" is similarly specious. Dkt. No. 531 at 53. Diversity is commonly found in young adult fiction generally, if only as a marketing device; it

---

[22] Or misquote, as the case may be. The passage from M*acbeth* that is meant to demonstrate Anna/Mia's knowledge of Shakespeare should read "By the *pricking* of my thumbs, something wicked this way come," not, "By the *prick* of my thumbs, something wicket this way comes," which is what appears in Freeman's manuscript. *See* Dkt. No. 276-34 at 40.

SA-72

expands the readership base. The only apparently "diverse" character in Freeman's drafts is Brendan, the protagonist's friend, who is both multiracial and gay. The symbolic presence of one multiracial, gay character – especially a character whose race and sexuality do not factor into Anna/Mia's (or even Brendan's) story arc in a major way – does not make "diversity and inclusion" a protectable theme of Freeman's work. It is significant that Brendan is totally closeted; he does not even have a same-sex attraction to another character in BMR/Masqued and only Anna/Mia knows about his sexuality. As for his race, it is mentioned once, then dropped; it is irrelevant to the story. It is, in short, tokenism.

*Crave*, by contrast, explores Flint's evolving identity as a gay man, which is integral to his growth as a character – especially the impact of his sexual orientation on his complicated relationship with Jaxon. Furthermore, *Crave* contains other diverse characters – to cite just a few examples, there is Luca the gay vampire; Dawud the Syrian nonbinary wolf; and Eden, who develops a lesbian relationship with Grace's human friend, Heather. Wolff's characters act on their diverse sexuality; Freeman's Brendan does not.[23]

Apart from real-world diversity, Freeman contends that both works similarly promote diversity because they populate their worlds with different supernatural beings of different races and backgrounds. Well, of course they do. Freeman's draft is far from the first novel to incorporate more than one kind of paranormal creature; there is nothing unique or original about that. Moreover, simply including a faery here, a ban sidhe there and a few vampires, witches, and werewolves does little to explore the "theme" of diversity. *Crave*, on the other hand, explores the complex relationships between, and even within, the different factions of paranormal beings. In BMR/Masqued, certain types of beings are inherently evil and certain types are inherently good:

---

[23] Flint's race is as irrelevant to the *Crave* story arc as Brendan's is to BMR/Masqued.

SA-73

vampires and succubi are Sanguines, and so are shadow creatures (demons); werewolves (shifters) and witches are on the side of light and so are good. In *Crave*, there are both good and bad vampires and werewolves, as well as good and bad dragons and witches. And the characters of all sorts have to learn to relate, not just to each other, but to giants, manticores, and windigos, among others.

In short, to the extent Freeman identifies feminism, diversity, or inclusion as present in both sets of works, those are simply abstract thematic concepts, which are not protectable in and of themselves. The same is true of Freeman's arguments with respect to "humor" and "friendship, compassion, and grace." And the works do not express these concepts in substantially similar ways.

I could go on, but there is no need to tick off each of Freeman's hundreds of suggested points of comparison between her work and Wolff's novels. In fact, that is simply falling into the trap of looking at discrete bits and pieces rather than examining the total look and feel of the allegedly infringed and infringing works. After considering the works as a whole – and I again emphasize that the Court has read every word of the allegedly infringed and infringing works – no reasonable factfinder could conclude that their plots are substantially similar.

### e. Pace

An examination of the pace of the parties' works also reveals a lack of substantial similarity.

BMR/Masqued takes place over the span of approximately two months, beginning in late September (three weeks into the school year) and ending a few weeks before Anna/Mia's birthday on December 21. The first *Crave* book – which is longer by far than any of the BMR/Masqued drafts – takes place during just two weeks; and the series as a whole (nearly 3,000 pages of it) unfolds across roughly a year, starting relatively early in Grace's senior year in high school and ending with her enrollment in college the following fall.

**SA-74**

Moreover, each of Freeman's manuscripts (with the exception of *Masqued 2016*, which I discuss separately) ranges from approximately 400 to 550 double spaced typewritten pages – which means if we consider her work as a single novel (accepting her aggregation theory) it would be perhaps 300-350 printed pages in length. But the four *Crave* novels – which everyone agrees must be considered as a single work – comprise 2,750 printed pages – and as I have already noted, the decreasing print and margin size over the course of four volumes means that this is a substantial undercount. Each of the four *Crave* novels is considerably longer than any of Freeman's manuscripts. *See* Dkt. No. 284 at 14. Of course, *Crave*'s much more extensive world-building necessarily requires more time (and more words/pages) to develop.

Freeman does not address the timespan and length of each work. She instead argues that both works share a nearly identical pacing strategy: a "Slow Burn" mystery that transitions into a "High-Octane" supernatural thriller. She says that the beginning of each work is deliberately paced slowly, focusing on the details of the heroine's arrival at school, the weather, and her loss. As part of this "slow burn," the works discuss the school hierarchy, the heroine's meeting her love interest and her confusion about his behavior, which seems to be distancing. More than halfway through each narrative, the pace accelerates following the reveal of the supernatural world, at which point each work alternates between "a specific rhythmic beat of the romance" and "sudden, brief, and intense scenes of violence that serve to remind the reader of the stakes." There is then a romantic interlude lull that serves as a "calm before the storm" moment before the climax.

The structure described by Freeman is by no means original to her; it is common to virtually all young adult romantasy novels (and, frankly, to most novels, which begin with a gradual introductory section and progress to a faster pace as the story develops). Nor is the pace

73

**SA-75**

of the "romantic buildup" between the protagonist and the romantic lead unique to Freeman's work; Stephanie Meyer utilized this exact structure when writing *Twilight*. Additionally, BMR/Masqued's storyline is interspersed with Tarot card readings and the protagonist's dreams and visions of Avalon; there are no similar episodes in *Crave*, where the story drives compulsively forward. The later novels in the *Crave* series even include a subplot about freezing time, which has no counterpart in BMR/Masqued.

In short, to the extent the pacing of the novels is similar, it merely reflects the genre and is not protectable. And to the extent the stories are paced substantially differently, it is yet another argument against finding any genuine issue of fact as to the lack of substantial similarity between Freeman's and Wolff's books.

### f. Total Concept and Feel

And so, having discussed individually the various elements of substantial similarity, we come to the ultimate test – could the more discerning ordinary reader conclude that, despite their many differences, the aesthetic appeal of Freeman's work and Wolff's is the same? *See Gaito*, 602 F.3d at 66.

The answer is no. No trier of fact could plausibly find that a more discerning ordinary observer "would recognize the alleged copy as having been appropriated from the copyrighted work." *Knitwaves*, 71 F.3d at 1001 (citation omitted). Therefore, the works are not substantially similar as a matter of law.

In resolving this ultimate question, the Court is "principally guided by comparing the contested [work]'s total concept and overall feel with that of the allegedly infringing work . . . as instructed by [its] good eyes and common sense." *Gaito*, 602 F.3d at 66 (internal quotations omitted). Common sense tells the tale here. Both Plaintiff's and Defendants' works share an

74

SA-76

overarching premise – a teenager who has suffered the loss of a beloved parent or parents discovers her supernatural identity, her purpose in life, and her one true love. But that similarity is not protectable. Neither are the vast majority of the similarities that we have discussed above – similarities that relate to easily identified tropes and *scènes à faire* that are common to much teen fantasy fiction, including the young adult romantasy genre that is at the heart of this case. And what similarities exist – whether they are protectable or not – are vastly outweighed by the massive differences between the works.

In short, after reading the stories in their entirety, it is perfectly apparent that no discerning ordinary observer applying the Second Circuit's test could conclude that BMR/Masqued is substantially similar to the novels in the *Crave* series.

Freeman asserts that BMR/Masqued and *Crave* share a unique "Alaskan Gothic" feel: "a young and thrilling supernatural romance set against a dark and oppressive backdrop and atmosphere." Dkt. No. 531 at 54. What Freeman refers to as "Alaskan Gothic" is an unprotectable *scène à faire.* There is nothing remotely unique or original about a supernatural romance that takes place in a remote, dark setting; indeed, it seems that the Pacific Northwest (*Twilight*) is a common locale for finding vampires and werewolves at a high school. But Plaintiff and Wolff express this theme in dramatically different ways.

BMR/Masqued is dark, mystical, foreboding, and solemn throughout. The plot unfolds slowly, with a heavy emphasis on mysticism, ritualism, and introspection. It is occult-driven and full of prominent symbolism – most notably through the use of Tarot cards, which function as prophetic signals. The protagonist's dreams act as a gateway to the supernatural world. There are good types of beings and bad types of beings.

SA-77

*Crave*, by contrast, is dramatic, romantic, and emotionally intense. It is also action-packed, full of emotional highs and lows, and in many places, very funny. It is written in a more light-hearted and casual tone. It features a far more complex and creative supernatural world, one in which hierarchies are clearly delineated and each type of paranormal has some characters who exhibit heroic or "good" qualities and some who exhibit evil qualities.

Freeman contends that the works are also substantially similar because each heroine's "internal monologue" is characterized by modern sarcasm, self-deprecation, and snark that contrasts with the heaviness of her past loss and future challenges. I will, for purposes of this motion, accept Freeman's characterization of her heroine's introspectivity as essentially correct.[24] But the use of humor to develop character is nothing new; novels of all sorts, including young adult novels, have used humor as a character development device since time immemorial. And the expression of humor in each work is vastly different. BMR/Masqued's use of humor is sparse and subdued; it offers a brief respite from the plot's foreboding, ominous tone, without undercutting the novel's seriousness. It is more incidental/situational, appearing primarily in social exchanges. There may be humor in some of Anna/Mia's internal monologues, but it is certainly not one of her defining characteristics. And there is nothing particularly "snarky" or sarcastic about Anna/Mia's interchanges with Ash/Roman.

Humor is, however, a defining feature of *Crave*'s narration. *Crave*'s use of humor is overt, frequent and, at times, self-aware. Grace's role as the narrator is characterized by a sarcastic internal monologue, which helps readers identify with and relate to her. Humor, particularly witty banter, is also a bonding mechanism and core feature of character chemistry – particularly in Grace's relationship with Hudson, which has no counterpart in Freeman's work. Humor is used

---

[24] I would not have characterized Anna/Mia's introspectivity in this manner if left to my own devices, but I will accept Freeman's characterization in order to explain why it does not create substantial similarity.

76

SA-78

structurally for pacing and to fuel romantic intensity. *Crave*'s comedic cadence and the heroine's sarcasm-driven identity are not mirrored in BMR/Masqued.

Freeman also argues that both works use specific literary and pop-culture references to texture both dialogue and internal narration and storytelling. These include references to *Humpty Dumpty*, *Peter Pan*, *Sleeping Beauty*, *Snow White*, *Star Wars*, *Grey's Anatomy*, *The Hulk*, *Superman*, Lois Lane, *Wizard of Oz, Frankenstein*, *Romeo and Juliet*, *Twilight*, Tom Cruise, French philosophers, *The Three Musketeers*, *Mean Girls*, Shakespeare, Stonehenge, and Barbies. But books about teenagers would be expected to refer to the popular culture that infuses their lives; that is simply *scènes à faire* and not protectable.

In examining the works' "total concept and feel," the Court also considers whether *Crave* has appropriated "the original way in which [Freeman] has 'selected, coordinated, and arranged' the elements of [] her work." *Gaito*, 602 F.3d at 66 (quoting *Knitwaves Inc.*, 71 F.3d at 1004)). Freeman contends that, even if the individual elements of her works are not independently protectable, *Crave* misappropriates her "unique selection and arrangement of characters, settings, and plot elements." Dkt. No. 531 at 56.

Even where individual elements are not protectable, copyright protection can extend to an author's original selection, coordination, and arrangement of those elements. But that principle does not assist Freeman here, because the selection and arrangement of individually unprotectable elements in BMR/Masqued is not sufficiently original to warrant copyright protection. In fact, her selection and arrangement of events is dictated by genre conventions and is consistent with what a reader would expect in any young adult paranormal romance story: loss; ignorance; young love; discovery; challenge; and overcoming challenge.

77

**SA-79**

Freeman suggests that there is something unique and original about the fact that, in BMR/Masqued, the heroine meets her boyfriend in Chapter 2; and that, after the heroine's abduction, the romantic lead thinks it is his fault and the two get into an argument before confessing their love and sharing an epic kiss. But there is nothing original or unique about any of that. It is a characteristic of the genre (and of romance novels generally) that the heroine meets her love interest early in the story and their relationship develops over the course of the novel. Frequently they argue about whether they should be together; eventually they fall into each other's arms.

Nor does Freeman make a concerted effort to demonstrate how her selection and arrangement of events in a single manuscript is substantially similar to the selection and arrangement of events across the four *Crave* books as a whole. Instead, Freeman argues that individual scenes in one or more of her drafts are substantially similar to some scene somewhere in the *Crave* series. For example, she takes a scene early in the first *Crave* novel -- two wolves try to throw Grace out in the snow, but Jaxon saves her – and compares it to what she calls the "80's Rocker Scene" in BMR/Masqued – the scene in which two punks (one of whom looks like the 80s Rocker Billy Idol) try to force Anna/Mia into their van, only to be thwarted by the appearance of Ash/Roman. Freeman argues that these scenes are substantially similar because, "The kidnapping, confrontation, rescue, and aftermath unfold in the same narrative order." *Id*. at 52. But Freeman did not invent an attack scene that starts with a confrontation and capture, progresses to the heroine's rescue, and concludes with the aftermath of the attack. An attack sequence structured any other way would make little sense.

Much of Freeman's "selection and arrangement" argument is based on "distinctive, expressive details" that she contends are shared by both works – for example, the attackers not wearing jackets, a reference to the eighties, or the taste of blood in the heroine's mouth. *See, e.g.*,

78

SA-80

*id.* at 45–47. But it bears repeating – principally because Freeman simply ignores this – that similarities between specific, scattered details in two works, including but not limited to where the alleged similarities reflect ordinary words and phrases, are not entitled to copyright protection and so have no bearing on whether Freeman's selection and arrangement of unprotectable elements is original. *See supra* Section II.

Finally, "the dramatic difference in length" between BMR/Masqued and the *Crave* series – between 400-600 double spaced typescript pages for Freeman's lone novel (which translates to even fewer printed pages) and 2,750 printed pages over four separate novels that tell one long story – "immediately undermines [Freeman's] suggestion that the authors similarly selected, coordinated and arranged the elements of their work." *Allen*, 739 F. Supp. 2d at 657 (internal quotations omitted).

Even if Plaintiff's selection and arrangement of elements in BMR/Masqued was original – and thus protectable – that selection and arrangement is not appropriated by *Crave* in any substantially similar way when the works are considered in their totality.

In sum, the total concept and feel of BMR/Masqued and *Crave* are vastly different in substance, style, structure, length, tone, and mood. They "engender very different visceral responses from their readers." *Id*.

As a matter of law, they are not substantially similar.

## VIII. Application: Masqued 2016

With *Masqued 2016*, Freeman abandons the template that characterized her first five drafts and sets out in a new direction.

For one thing, many of the critically important characters and incidents from the earlier drafts are simply gone. There is no mass abduction of teenaged girls, no search for cursed objects,

SA-81

no Druid priest (whether he is intended to develop into a love interest or not), no vampire/incubus villain. There is no friend who is identified in the text as gay, no Halloween dance, no meet up at Barnes and Noble, no visit to magical locations like The Gloaming or The Sanctuary, no high school party with spiked punch, no teen gatherings at local diners or Tex Mex restaurants. Most if not all of the supernatural creatures are witches (good witches and bad witches, or Circle and Coven). There is no attraction or confrontation between the heroine and any demonic villain. The heroine makes no choice to rescue one of two wolves. There are no wolves.

The entire draft (which appears to be incomplete) takes place over the course of 24 hours. This allows no time for character growth, or for relationships that are hinted at (as between the heroine and the New Boy) to develop.

And above all there is no mention of a Nyx – no half Unseen/half demon girl (let alone one with three bloodlines) with mysterious markings down her neck and spine who is the key to the battle between Shadow and Light. That critical element of Freeman's story is left out entirely.

The heroine, now named Gabriella (Ella), knows from the beginning that she is a budding witch. Her mother and aunt are priestesses of the Egyptian goddess Isis. Her mother's amulet (not her father's) imprisons a powerful evil force; Ella accidentally sets it free while practicing magic and reading Tarot cards in her room. When the amulet is exposed to Ella's blood and breaks, it flies off her neck and out the window, and she unwittingly sets off something called The Return.

The evil force she released kills a school of fish, which wash up on a beach that Ella visits during her motorcycle ride with the New Boy. The punk enforcers who accost her there are not Julian's goons, but police from The Order, who seek to enforce rules against magic in public, and who turn into snake gods when threatened by Ella's mother in her full Priestess of Isis glamour. Ella's mother disappears with a man who appears out of mist; we know absolutely nothing about

SA-82

who or what he might be. Ella's friend Brendan is bitten by one of the snakes and must be taken to a sacred place to be healed. New Boy Roman turns out to be both Kindred (a type of Good Witch) and a representative of The Order. While he and Ella are attracted to one another, they have no time to get to know each other or to develop any serious romantic attachment. Ella wants to save her mother, not her father; New Boy agrees to help her. Everyone steps through a mirror found in Ella's house into the Temple of Isis in ancient Egypt. The only choice Ella is required to make is whether to accept or turn down her calling to be Keeper of the Amulet – a charge her mother turned down, but which Ella accepts.

This brief description of *Masqued 2016* (a fuller one is found in Addendum B) is sufficient to reveal that the *Crave* novels bear no substantial similarity to the final draft of Freeman's unpublished novel. Only at the most macro level – teenaged girl coming into her powers; girl meets boy and is instantly attracted; magic forces are accidentally unleashed; and the heroine must make a choice about whether to accept her calling – can *Masqued 2016* be compared at all to the *Crave* novels. *Masqued 2016* is so utterly incomplete that any discussion of the elements of substantial similarity – theme, setting, plot, characters and pace – is virtually impossible. Freeman's last draft barely has a plot; its characters are few and not fully developed; there is no identified villain or a coherent story arc; it ends almost as soon as it begins. It is entirely lacking in the rich character development and elaborate plot lines that can only develop over time and that characterize the *Crave* novels.

The only similarities to which Freeman can point are things like the fact that the heroine is descended from a goddess who has a twin sister; the heroine has a "green-eyed grandmother" (*see* n. 15 at p. 52, supra., for a discussion of green eyed grandmothers); a romantic lead with eyes that have gold or silver "flecks" in them; or tea flavored with lemon verbena. These are simply

81

SA-83

exemplars of what cannot be relied on to establish substantial similarity – discrete bits of scattered similarities untethered to the overall look and feel of the works.

No reasonable trier of fact could conclude that, if one overlooked such discrete bits and pieces, Masqued 2016 and *Crave* were at all similar, let alone substantially similar, except at the level of tropes and *scènes à faire* – and precious few of those.

**CONCLUSION**

This is a case that is easily disposed of once one reads the allegedly infringed and infringing works against each other and in light of the well-developed law in this Circuit on substantial similarity within literary works. Freeman's novel and Wolff's *Crave* novels are indeed similar, but only in the ways that all young adult romantasy fiction novels are similar to each other. At the granular level, looking at their unique creative expression, they are substantially different – not substantially similar.

Therefore, Defendants' motion for summary judgment on Plaintiff's copyright claims is GRANTED. Plaintiff's motion for summary judgment is DENIED.

Defendants' motion for summary judgment on Freeman's actual damages claim and motion to strike jury demand are DENIED AS MOOT.

The Clerk of Court is respectfully requested to remove the three motions at Dkt. Nos. 525, 527, and 529 from the Court's list of open motions.

Sadly, this ruling does not end the *Crave*/Freeman saga.

The decision to dismiss Freeman's case effectively disposes of the cases that Freeman has brought against Barnes & Noble Booksellers, Inc., Apple Inc., Amazon.com Inc., Target Brands Inc., and Walmart Inc., charging them with contributory infringement as a result of sales of the four *Crave* novels. *See Freeman v. Barnes & Noble Booksellers, Inc. et al.*, Case No. 2:23-cv-

**SA-84**

4145; *Freeman v. Apple, Inc.*, Case No. 23-cv-7051; *Freeman v. Amazon.com Inc. et al.*, Case No. 23-cv-4796. However, I see no reason to lift the stay in those cases at the present time. If Freeman takes an appeal from this decision, we can abide the decision from the Second Circuit before entering final orders that will dispose of those cases in one way or another depending on whether this decision is affirmed or reversed. If there is no appeal we can lift the stay at that time.

The newest case, *Freeman v. Deebs-Elkenaney et al.*, Case No. 25-cv-9345, involves allegations that the fifth and sixth novels in the *Crave* series infringe Freeman's copyrights, for substantially the same reasons that the first four *Crave* novels infringed. The defendants in that case have 30 days to file a motion for dismissal/summary judgment, limited to the issue of substantial similarity. The record on the motion will consist of the Freeman works that were discussed in this opinion and the novels Charm and Cherish – nothing more. There is no need for any other evidence to be introduced; the motions will be considered in the manner that many such motions are considered in this Circuit. *See supra* n.10.  Plaintiff will have 30 days thereafter to file responsive papers opposing any motion that the defendants in the new case choose to file. The moving defendants will have ten business days to file a reply. I will not extend this schedule.

This constitutes the decision and order of the Court. It is a written decision.

83

**SA-85**

SA-86

Dated: March 16, 2026

_____

U.S.D.J.

BY ECF TO ALL COUNSEL

84

## ADDENDUM A

The first five drafts of Blue Moon Rising/Masqued (2010 through 2014) follow a common template, which is summarized in the main text of the decision. What follows is a complete summary of BMR 2010, followed by a summary of the principal differences in each successive draft.

**I.      BMR (2010) (the original plot)**

The heroine of Blue Moon Rising is a sixteen-year-old high school junior named Anna (short for Annalise) St. Clair. When she was in the second grade, Anna moved from California to Alaska, together with her beautiful mother (Marcheline, an artist) and her aunt (Brienne, or Brie, a veterinarian). They moved shortly after her father, Dante, died in an elevator accident. Anna and her mother changed their names from DeWinter to St. Clair when they moved.

Anna, her mother, and her aunt live in a large and very un-Alaskan house surrounded by stone walls and a security gate; it is located on Cook Inlet in Anchorage, Alaska.

Anna has long inky black hair, olive skin, and grey eyes. She is a junior at West High School, a public high school in Anchorage. She has had two best girlfriends, Amanda Dunst and Taylor Vaughn, and a guy friend, Brendan, who is biracial, the class president, very good looking, and very popular. Brendan is also secretly gay, a fact known only to Anna.

Anna has always been fascinated by the supernatural – an interest of which her mother disapproves, even though her Aunt Brie practices Wicca and Marcheline herself had "talents" at one time. Anna reads Tarot card spreads, has dreams and visions, and has premonitions of the future. She always wears a pendant that was given to her by her father.

BMR 2010 begins in late September, three weeks into Anna's junior year at West High School.  The book begins as Anna – who is not allowed to drive when the moon is full – has a vision while being driven to school in her mother's car. In the vision, she is looking for someone;

SA-87

she is chased, gets to the edge of a cliff, is told that she must choose, and turns around to "meet her destiny" – only to be confronted by a wolf with amber eyes rimmed in black. She comes to with a start.

When she arrives at school, Anna sees two new students, a boy and a girl, arrive on a motorcycle. They are dressed in black leather and look like supermodels. The boy's eyes are amber rimmed in black; he smells clean and woodsy. There is an instant connection between Anna and the boy. He enters Anna's first period math class; Taylor, an archetypal Mean Girl who always gets any guy she wants, immediately announces that he will be her new boyfriend. The boy shows no interest in Taylor.

Amanda and Taylor have been Anna's best girlfriends since Anna arrived in Alaska almost a decade earlier. But both girls are now cheerleaders, and they diss Anna; they have moved their lockers to a new location and won't hang out with her anymore.

Anna is consoled by the new boy, Ash, who walks her to their next class, Ancient Global Studies (AGS). The substitute teachers, who look like Vikings, are Drs. Baen and Caitlin MacKay, field archaeologists and parents of Ash and his twin sister, Lily (the girl on the motorcycle). The MacKays are in Anchorage looking for ancient Celtic artifacts brought to Alaska by Captain James Cook. When Rachel Hudson, editor of the school newspaper and hater of all Mean Girls, expresses skepticism about Celtic artifacts finding their way to Alaska via New Zealand, the teachers tell the class a legend about a Celtic tribe that made its way to New Zealand, only to be wiped out, not by native New Zealanders, but by a Druid named Ronan O'Faolain and his fellow priests. After massacring the Celtic tribe, O'Faolain supposedly enslaved the other priests to 13 sacred Celtic objects. The MacKays tell the class that they moved here in search of these artifacts. As the class

2

SA-88

ends and students leave the room, Anna sees Caitlin MacKay move faster than any human possibly could to keep her husband Baen's mug from falling to the floor.

At the end of the day, Taylor and Amanda – who were supposed to drive Anna home – ignore her, so she starts walking home alone. Anna feels like she is being watched by a raven perched on the roof of Taylor's car. Suddenly, Ash drives by and offers her a ride home on his motorcycle. Anna knows her mom will disapprove, but she accepts. When they arrive at Anna's house, her mother does indeed disapprove, and loudly. Ash mollifies Anna's mother and aunt by telling them that he was concerned about Anna's walking alone. It seems that teenaged girls in Anchorage are being abducted and go missing for a few hours on full moon nights. The abducted girls return 24 hours later, bearing strange marks on them and having no memory of what happened to them – just vague recollections of creatures wearing animal masks, perhaps even a werewolf.

When Ash leaves, Anna goes to her room, and her aunt brings her a cup of tea. At her aunt's suggestion, Anna casts a six card Tarot spread – the High Priestess, the Moon (a card that contains two wolves), the Knight of Cups, the Ace of Cups, the Lovers and the Knight of Swords – and the cards come to life. Anna has a vision of a young woman and a young man. The man gives the woman a golden cup and a red rose. The rose pricks the woman's finger and three drops of blood fall to the ground; they turn into a large black wolf. The wolf attacks the young man, who turns into a raven and flies away. The wolf then becomes a knight mounted on a white stallion. He reaches for the young woman, who is standing between the knight and yet another black wolf. The second black wolf appears older and wiser than the first but is nonetheless prepared to fight the mounted knight. Anna does not know how to interpret the vision, or whether Ash is the Knight of Cups.

3

SA-89

The next day at school, Anna tries to get Taylor and Amanda to explain what has happened to rupture their friendship, but the girls are not forthcoming. Anna fears that she will have to eat lunch alone, but her old friend Brendan seats Anna with guys in their class – Jake and Carter, who are Taylor and Amanda's boyfriends, and Mason, a particularly smart student.

Anna has little interaction with Ash outside of class over the next four weeks, aside from an incident when she sees him rescue an injured dog. After Anna witnesses the rescue, Ash drives by in an SUV and takes her home. During the ride, they discuss the people in their lives whom they have lost – Anna's father and grandparents, who were killed in an elevator accident when she was seven; Ash's older brother, who fell down a ravine on an archeological dig the previous year. Although neither had anything to do with the deaths of their loved ones, they feel responsible.

Ash asks Anna to meet him at the school's Halloween dance. The dance is scheduled on the same day as her mother's art exhibition, and Anna lies to her mother and aunt about not feeling well so she can skip Marcheline's event and meet Ash at the dance. Anna arrives at the dance with Brendan and his friends – Rachel from AGS class, Rachel's cousin Jenny, and Mason, the smart friend of Brendan's who also happens to be Jenny's boyfriend. Anna is dressed as Little Red Riding Hood.

In the restroom at the dance, Taylor brags about how she and Ash had dinner together and that he drove her to the dance. Anna is crestfallen and starts to leave, but Ash follows her. He explains that he was not on a date with Taylor – they simply attended the same fundraising dinner prior to the dance where they were seated together by chance. Reconciled, Ash and Anna kiss under the Northern Lights, which are, of course, glowing in Alaska. But Anna sees Ash's eyes glow like an animal's, and his very long canine teeth. Ash senses that Anna is frightened and pulls back; they leave school together to join Brendan's friends at a local diner.

4

SA-90

As soon as they arrive at the diner, Anna tells Ash to get her some food. Once he leaves the table to place the order, she begs Brendan to drive her home, and he does. When she gets home, Anna casts a second Tarot spread, pulling the same six cards in the same order, and has the same vision as before. Anna does some research and begins to fear that Ash might be a werewolf.

Ash calls Anna. He tells her that her house is warded, so he cannot come in without being invited. Anna will not let him in. They agree to meet in a public place the next day to talk about what happened and who Ash might be.

Anna then dozes off and dreams that she is standing in front of a beautiful mirror. She sees what appears to be her reflection, except that the girl in the mirror looks lovelier than Anna and has blue eyes rather than Anna's grey. When Anna reaches toward the reflection, it comes to life and pulls her through the mirror, where she finds herself nose to nose with a raven, who tells her that mirrors are doors. She awakens in terror, only to find that her mother has been overtaken by a fit of madness. Marcheline calls out for Dante, her late husband. Anna fears that her mother is mentally ill and worries that she might be, too. She brings her mother medicine, and Marcheline promises to explain everything to Anna someday. But continually being put off in this way frustrates Anna.

The next day, Anna meets Ash in Barnes and Noble. Ash explains that he cannot tell her what he is because he has taken an oath – a *geas* – which he dares not break. But when Anna says her life is too full of secrets and things that cannot be discussed, Ash tells her what he can. He reveals that he is not human, but is one of the "good guys" in the supernatural world. He admits to being a shapeshifter but says he is young and has just come into his abilities, so he can't totally control them – which explains why Anna saw "a little fang" and animal eyes the previous night.

SA-91

While answering Anna's questions, Ash runs afoul of the *geas*. But by letting her guess the answers, he is able to explain that the "bad guys" are demons who beguile and seduce their way into people's lives. He tells her that demons are responsible for the frightening spate of teen abductions in Anchorage. The demons are searching for the "thrice born daughter" – a girl of mixed heritage (part demon, part "being of light") destined to tip the balance between light and dark magic. According to prophecy, the "thrice born daughter" will soon turn seventeen, come into her abilities, and tip the balance between light and dark forever. She will have "markings" on her body, but Ash does not know what those will look like. He explains that the good guys are trying to find her before the demons do.

When Anna tells Ash that she has "talents" and that her aunt practices Wicca, Ash posits that Anna may have some sort of witch ancestry. He invites her to dine with his family the next evening. The two share a kiss in the parking lot, but Anna pulls away when she has a vision of Ash as a vicious wolf hovering over her body.

That night, Anna dreams that she is in Longfellow's "forest primeval," where she encounters a large, dark wolf with glittering silver eyes. The wolf calls himself Athair Mo Chroid – which Anna thinks is his name, but which is in fact a Gaelic phrase meaning Father of My Heart. The wolf calls Anna "Daughter of the Moon." He asks Anna where she is going, and she says she is looking for her father. The wolf asks if she is ready for her initiation, because she must choose; he tells her to choose with her heart, not with her eyes. The wolf tells our heroine to remember him when the time comes.

The next day, Ash picks Anna up for school. He stops for a breakfast of tea and scones with Anna's mother and aunt. On the way to school, Ash tells her more about the war between light and dark. He confesses that he hunts demons and is trying to help his parents find the cursed objects,

6

SA-92

including Captain Cook's dagger, before the demons get them. His family believes the cursed objects are trying to make their way to the girl – the "thrice born daughter" – who is the key to a long running war between those who serve the shadows and those who serve the light. The objects will corrupt whoever uses them, which to Anna sounds like Tolkien. Ash says that his people are called "the Brethren" and they are "the Ancients," the governing branch – but he is unable to tell her anything more. He also tells her that someone was taken by demons the night before and was returned compromised.

When the pair arrive at school and are confronted with questions about their relationship. Anna must justify arriving with Ash to a suspicious Brendan. Lily, Ash's twin sister, warns Anna not to distract Ash from what he needs to do. Ash suggests that he and Anna not be seen together, but the gossip columnist at the school paper caught them kissing in the Barnes and Noble parking lot and exposes them in the school paper. So Ash gives Anna a red rose, the symbol of the beginning of a romance. Anna has a vision of Ash as the wolf who turned into the knight in her Tarot reading.

Amanda and Taylor unexpectedly invite Anna to a party at the home of their classmate, Whitney. The three girls plan to get ready together at Amanda's house. Anna does not want to go, but her mother, who wants Anna to engage in normal activities, insists. When they arrive at the party – an unchaperoned event at the home of a senior, not a party at Whitney's – Taylor gives Anna a glass of 7-Up spiked with liquor. Anna detests the taste and spits it out. She is uncomfortable at the party and texts Ash, Jenny, Rachel, Brendan, and Mason to come get her. Taylor then gives Anna a glass of punch, which tastes good to her, but is also spiked, this time with Everclear. Taylor reaches out to grab Anna's arm, and Anna receives an electric shock. Anna hears a strangely sweet voice coming out of Taylor's mouth, saying, "You will need a backbone if you are going to find your father."

7

SA-93

Anna keeps helping herself to punch, not knowing that it, too, is spiked. When Ash and the four friends arrive, they find that a drunk Anna has thrown a cup of punch on Taylor. Anna is having fun and doesn't want to leave. When Ash picks her up to carry her to the car, she gets angry, and her anger causes the lights to blow out. In the dark, she sees tattoos on Ash's fingers – rings – in silver, black and gold. After she vomits, Ash tells Anna that she should not be able to see his rings and asks what she knows about her father. Anna retorts that he was not a wolf. Ash tells Anna that her powers, whatever they are, are a gift. Ash also intuits that Taylor gave Anna spiked punch deliberately; he offers to talk to Taylor, but Anna says she will do it herself.

When Ash gets Anna home, Marcheline tells Anna that no one in their family can tolerate spirits. Anna can see that her mother and aunt are keeping things from her, and she is angry. When Ash calls to check on Anna, she asks about his rings. He tells her the black and silver ones are magic spells to protect him, while the gold one represents the *geas*.

That night, Anna has another dream. She sees she thinks is Athair, the grey wolf, again, though his voice sounds different. She says that she needs to find her father and learn the truth about herself. He asks if she is ready, then walks her into the "Faery." The wolf leaves her by a mirror hanging on a tree. In the mirror, Anna again sees what looks like her reflection, only the reflection is dressed in white and silver with gemstones; again, she has blue eyes, not grey eyes like Anna's. The reflection tells Anna there is not much time and grabs her hand. But Anna, fearful, bites the reflection's arm to break its grip. She then hears her father's voice calling her name and another voice telling her that she must accept the truth of who she is. When Anna awakens, she is bleeding from a bite on her arm; the tooth marks are those of an animal.

The next day, a Saturday, Anna goes to the deserted high school to pick up a book so she can finish her homework. She finds Caitlin MacKay – the AGS teacher and Ash's mom – alone in

8

SA-94

a classroom. She is confronted by a naked man covered in swirls that remind Anna of Ash's rings – a demon called a Buidseachd. Caitlin turns into a wolf and attacks the demon, but he injures her gravely. Anna, recognizing the being as evil, grabs a spear and attacks. She wounds the demon, but he overpowers her. The demon shreds her clothes with his claws, rips her skin with his claws, and licks her blood. Suddenly the demon turns back into an ordinary man, bows to her, and says "*Ro nuno faylin!*" before vanishing.

Ash arrives and sees that Anna is bleeding to death. Ash tells Anna that he is going to bite her and does so, despite Caitlin telling him that there will be consequences. As he does, Anna realizes that this was the vision she had in the Barnes and Noble parking lot. The bite heals her.

Ash and Caitlin take Anna to their home, where she receives more medical attention from Mac, the doctor of the MacKay pack. The MacKays ask Anna how she was able to vanquish the buidseachd; she says she does not know. Anna tells the MacKays about the syllables she heard but does not tell them that the demon bowed to her. The MacKays realize that the demon was invoking Ronan O'Faolain, the Druid connected to the cursed objects. They tell Anna more about Ronan, including about how he was a good man who became evil after dealing with demons.

Ash's father, Baen, asks Anna about her people and who she really is. When he realizes that she really does not know about herself, he asks to see her pendant. Baen is shocked to see that it is a powerful pendant made by the Egyptian wolf god Wepawet for one of his children. The MacKays surmise that Anna's father must have been a Sentinel (another word for werewolf), like they are, because they wear similar, albeit less powerful, pendants. The family blood-pledge themselves to protect Anna because she saved Caitlin. After they pledge, Anna sees two swirling rings on her finger, one black and one silver. Ash tells her that, because he has bitten her, he will always have a sense of when she is in danger.

9

SA-95

When she returns home, Anna finds Ash in her bedroom; he jumped up from the ground. Anna expresses pleasure that Ash is with her; when he promises to take care of her, she is touched by his efforts to calm and soothe her. Ash shifts for Anna to show her it is not painful. When Ash realizes that Anna can "hear" what he is thinking and converse with him while he is in wolf form, he concludes that she, too, will be a shifter when she turns seventeen.

Anna tells Ash that her aunt says their family is descended from witches; he surmises that Anna might have some distant relation to the Kindred, the great witches of old, only a few of whom are left. Ash tells Anna that the Kindred were betrayed by a half-Kindred, half-Sentinel being and the Catholic Church wiped them out. Ash kisses Anna and she falls asleep.

Lily arrives at Anna's house to take Ash to "The Sanctuary" to meet a vampire who claims to have one of the cursed objects. Lily tells Anna that, because Ash bit her, he cannot leave Anna's side until she reaches her seventeenth birthday. Ash wants to remain at Anna's house, but Anna decides she and Ash will go so that he does not miss the meeting with the vampire. The three of them jump out of her bedroom window.

The Sanctuary is the back room (for VIPs – Vamps, Imps and Persons of Unknown Supernaturalness) at Chilkoot Charlie's, a notorious bar in Anchorage. Despite being underage, Anna gets past the troll bouncer because she is a guest of Clan MacKay. When they pass into the private space, it is suddenly summertime, and everyone other than Anna is visibly a supernatural. Sensing that she is being watched, Anna looks up and sees a gorgeous man and woman sitting at the bar. The man looks at her and says, with intense longing, "Elise?" Anna cannot tear her eyes away from him. The man bites the woman on the neck, and Anna senses that he is really indicating that he would like to bite her. When Anna tells Ash that she thinks the man and woman are

10

SA-96

gorgeous, Ash says he is not into vampires (also known as "Sanguines") – demons for whom human blood is addictive.

Unexpectedly, her friends Brendan, Rachel, Jenny, and Mason arrive at Chilkoot Charlie's. Jenny explains that Taylor told them where Anna was and that they were looking for her because all four of them dreamed the previous night that Anna was in danger. Jenny wants Anna to leave with them for a slumber party. Anna says she will not leave Ash, but Jenny says her friends, who are standing outside in the frigid temperatures, will not leave Chilkoot Charlie's without her. Anna decides to leave with her friends, telling Ash that he has to make good on his obligations to his family. She promises to call him when she arrives home. It is the night of the blue moon and Anna has a sense that something terrible is going to happen.

In the parking lot, Anna sees two terrible looking men, whom she recognizes as vampires. She tries to get away but her friends (who are under a spell) block her path. All five of them are kidnapped. The vampires take the teens to their Master, someone named Julian; he is the fascinating man who called her Elise at the bar. Julian puts her friends in a trance and "sorts" them, á la Harry Potter, by taking a bite out of each one and tasting their blood. He sends Jenny and Brendan away to be turned into blood (sex) slaves and keeps Mason to see what talents his brilliance can offer. But he gives Rachel to the demons to eat, and Anna says she will do anything to spare Rachel's life. Julian offers to free all four of her friends if Anna will do whatever he asks. She agrees.

Julian demands that Anna become his bride for eternity. He claims that her family owes him a blood debt because Dante, her father, stole and killed Elise, Julian's wife, who had loved him enough to become a Sanguine like himself. Julian reveals that Anna's father is not dead but

11

SA-97

is Julian's prisoner. Julian tastes Anna's blood to confirm who she is. He tells her he plans to make her a Sanguine, too.

The MacKays crash in, and Anna and the MacKays fight Julian's guards, the demon Ka Ramun. The wolves decapitate the demons, and Julian disappears. The MacKays try to get Anna and her friends out of Julian's lair. Ash says he must stay and take out Julian because Julian has tasted Anna's blood.

Taylor walks in; she is wearing one of the cursed objects, a snake ring. When they wrangle it off her finger, she awakens, confused.

As they all leave the lair, Anna sees her reflection in a mirror, although again the reflection has blue eyes, not grey eyes. As Lily screams, "No," Anna goes through the mirror. The reflection turns out to be a Morrigan (Priestess) of Avalon who serves someone called the Mother. The Morrigan explains to Anna that she is Elise, who was once married to Julian and who temporarily became a Sanguine like Julian. She left Julian when she heard the call of the goddess, the Great Mother, which drove him mad and turned him evil.

Elise says that everything will become clear to Anna when she is initiated at age seventeen. Elise tells Anna that she can save Dante, but she must do it now. And she tells Anna that any choice she makes will be the right choice. Although Elise will not tell Anna exactly how they are related, she says that Anna is "flesh of her flesh and bone of her bone." She then calls out that her "vow is honored" and disappears.

Anna pitches forward into the mist and finds two wolves caught in steel traps. The grey wolf with grey eyes is hauntingly familiar; the other wolf is black and has the amber eyes she saw in her dreams. Anna decides that the wolf with amber eyes is her father and calls him Dad; this causes the grey wolf to howl mournfully. Anna frees the amber eyed wolf from his trap; she tries

12

SA-98

to free the grey wolf as well, but she cannot open the second trap before demon pursuers catch up with them. So she and the amber eyed wolf go back through the mirror. The grey-eyed wolf sacrifices himself by betraying his location to the pursuers; this gives Anna and the amber-eyed wolf time to escape.

Once through the mirror, the amber eyed wolf turns into a man. He is not her father, Dante, but a Celtic Druid, and a very attractive one at that. Anna feels that she failed, but the Druid thanks her for his freedom and tries to console her. He gives her an amulet and tells her she can summon him by putting a drop of blood on it. He also kisses her to obtain a drop of her blood and assure himself of who she is.

Just then, Ash arrives and attacks the man while in the form of a wolf. The man turns into a raven and flies away. Before he does so, the man tells Anna that his name is Ronan O'Faolain.

Anna tells Ash that she has done a terrible thing; Ash thinks she is talking about having kissed the strange man, but Anna means that she has freed someone she thinks is the devil.

## II.     BMR (2011)

Blue Moon Rising 2011 is not appreciably different from Blue Moon Rising 2010. It adheres closely to the template. It contains three key additions.

First, Anna acquires swirling black marks on her neck over the course of the story. Ash tells her that the girl in the Prophecy of the Thrice Born Daughter will have marks on her neck. Her aunt tells her the marks are hives and gives her a salve to hide them.

Second, when Anna goes through the mirror after the fight at Julian's lair, she is given to understand that she is in Avalon. She is told by the Morrigan Elise that only Kindred can walk in Avalon. Elise also tells Anna that Elise fulfilled the family's duty to the goddess when Marcheline, her older sister, could not.

13

SA-99

Third, Elise reveals that Anna is her (Elise's) biological daughter. This is prefigured when, early in the draft, Marcheline tells Anna that she is more beautiful than "your mother" was at the same age.

### III. Masqued (2012)

Besides having a new title, Masqued contains a number of changes from the two BMR drafts.

The role of Tarot is enhanced; the book is divided into six sections, corresponding to the six card Tarot spread that Anna draws to induce the vision that opens the story.

In this version, Anna summons her first vision while practicing Wicca in her bedroom, not while being driven to school. Her abilities are increasing and this frightens her. The vision itself is no different from the one in opening chapter vision in BMR 2010 and 2011, except that Anna is bleeding from a head wound and she wears a serpent ring, which she cannot remove. The ring will turn out to be one of the cursed objects. And just before Anna turns to meet her destiny, a voice says, "Shadow or light, you must choose."

Anna learns early in the book that Marcheline and Brie are powerful Kindred witches and that she is Kindred as well. Her mother admits that she practiced in former times and says she does not want Anna to make the same mistakes she did. Anna also learns, from her Aunt Brie, that Avalon is a real place and that she will go there for her initiation on her seventeenth birthday. At her initiation, Anna will learn what she must do to maintain the balance between Shadow and Light. She is told that the visions she is experiencing are normal in the months prior to initiation.

Anna overhears her mother and aunt talking about her. They refer to the girl as being safe because she is a "needle in a haystack." When Anna tells them she overheard them, they tell her that her father's death was no accident, that he belonged to something called the Order of the Sphinx, and that the Order will want Anna when she turns seventeen. Aunt Brie tells Anna that her

14

SA-100

father discovered that a high-ranking member of the Order had done something illegal; that he was killed while taking that information to Order members in Los Angeles. Her mother and aunt did not know whom to trust after Dante died, and that for her safety they have allowed the Order to think that Anna – who is descended from the Priestess of Avalon – is dead.

In all versions of Masqued, only Amanda was Anna's childhood friend; Anna has never liked Mean Girl Taylor. Amanda turns away from Anna and becomes a "cheerbot" and a friend of Taylor's; Amanda loves cheerleading and feels that she and Anna now have different interests. One day, to Anna's surprise, Taylor arrives at school wearing the very ring that was on Anna's finger in her vision. She says it was a gift.

Anna bonds with her new friends (Brendan's friends) by joining the school newspaper.

In Masqued, the abductions of sixteen-year-old girls are being carried out by the Order, not by demons. The Order is trying to find a girl who is known as the Nyx. The Nyx is a girl of mixed demonic and Unseen parentage. She is predicted to tilt the balance between shadow and light. Members of the Order are sworn to destroy her before she turns seventeen and comes into her great powers. The fear is that she will choose to align herself with her demon side because she is part demon.

There are many signs that Anna is special: she is having many waking visions; she gradually acquires the mixed black (demonic) and gold (Kindred) hieroglyphic markings on her neck;  Taylor's serpent ring – which Anna first saw on her own finger in her vision – turns into a live snake in Anna's presence; ravens hound her frequently, warn her of danger, call her Priestess, and even part to make a path for her when they congregate on her front porch. She is increasingly having visions, which her aunt tells her is normal, as her powers are waxing.

15

SA-101

Anna thinks that Taylor might be the Nyx and tries to see if there are marks on Taylor's neck. In fact, both Taylor and Amanda are part demon. Taylor knows that Anna is the "Chosen One."

While getting dressed for the Halloween dance, Anna sees the spells on her own neck, but she is reassured when her aunt tells her that they are simply hives and provides her with a salve.

In Masqued, Anna does not do a Tarot reading with her aunt after Ash brings her home on his motorcycle on the day they meet. But after the Halloween dance, she does a Tarot reading and the cards come to life. The reading is more or less the same, except that the mounted knight who was formerly the dark wolf is carrying a dagger behind his back. He brings it up between himself and the maiden when they kiss, and the knight falls down dead.

In her Halloween night dream, the blue-eyed "reflection" tells her, "Find me in Melusine's mirror." The raven, not the reflection, pulls her through the mirror and pushes her back out again. When Anna awakens, her mother is hysterical, calling not just for Dante, but for Elise and Julian; she asks Julian to give her the dagger.

In order to explain himself to Anna during their visit to Barnes and Noble, Ash takes her to the Gloaming – a faery place. There Ash tells Anna, among other things, that the Nyx will have hieroglyphs on her neck. Terrified, Anna runs out of the Gloaming into the "forest primeval," an ancient forest where she encounters the grey-eyed wolf, who identifies himself as a guide for her initiation. The wolf tells her that she has a dark gift from the Moon, but that her ability to balance light and shadow and emerge transformed is her great challenge. He tells her that she must find the cursed objects and use her gifts to maintain the balance. He also warns her that Ash cannot know what she is and still serves those to whom he is bound. He identifies himself as Athair Mo Chroid.

16

SA-102

When she returns from the Gloaming, Ash and Anna kiss with increasing passion. Anna's demonic side reveals itself when she kisses Ash; she hungers for him and her hunger gets stronger with each kiss, which takes some of Ash's life force (his lips turn blue, she takes his breath away).

When her friends arrive at the party, a drunken Anna sees Ash with a wolf's head and their other friends looking like magic beings (wearing feathery masks, having shining gold and silver skin).

When Anna returns from the MacKay compound, where she learns about the powerful amulet her father left her, she demands to know the secret of the amulet; Marcheline will tell her nothing.

In this and all subsequent versions in which he appears, Julian is an incubus, not a vampire. Rather than sorting her friends by blood, he sucks a bit of life force from each of them, mouth to mouth. He tells Anna that he transformed her father into an outcast incubus for stealing Elise from him, and that when Dante does not walk as a wolf, he walks as a demon. Julian tells Anna that she is Kindred and that Elise, not Marcheline, is her real mother.

When Taylor arrives at Julian's lair at the end of the fight, Amanda is with her. Amanda reveals that she has always been jealous of Anna, especially of her magical abilities. Taylor reveals that both girls are half succubus; Amanda says that is why the girls were drawn together as children. Amanda also tells Anna that Julian captured her and Taylor and threatened to kill their families if they did not help him capture Anna.

Anna is introduced to Melusine's Mirror, which is her passageway into Avalon. Anna is told by Elise – her mother – that Anna is descended from Melusine, and there are skills she needs to learn in order to free her father. She is told by Elise, the High Priestess that she should wait for

17

SA-103

her initiation and take lessons before trying to do anything. She is told that the ravens are Elise's messengers to her.

But Anna says that she must find her father, which leads to her making the 'wrong" choice; she chooses to save the wolf who is Ronan rather than the one who is her father, Dante. But while Anna understands that she failed a test by freeing the amber eyed wolf, Elise told her that whatever choice she made would be the right choice for her.

The Druid (Ronan) does not have to taste Anna's blood to know who she is. Nor does he kiss her, though he comes close.

During their few minutes together, Ronan tells Anna that they are cousins of a sort and share a similar magic.

## IV.    Masqued (2013)

In this fourth draft, the role of Tarot is enhanced yet again – even the High Priestess of Avalon casts cards.

More of Anna's friends turn out to be supernatural beings: Brendan, Rachel, Jenny, and Mason are various Unseen Beings of Light (a faery, a banshee (ban sidhe), a siren and a leprechaun).[1]

Marchalene (note the changed spelling) is Anna's biological mother in this version. But this time Julian the incubus is her biological father. Elise, the High Priestess of Avalon, is Anna's grandmother – Marchalene's and Brienne's mother.

Details of Anna's visions differ from those in the earlier drafts, especially the vision where she turns to meet her destiny; she sees a man, not a wolf, and she falls from the cliff,

---

[1] This was hinted at in the 2012 version, when Anna saw her friends looking like they were glowing (the boys) or wearing feathery masks (the girls). However, it was not made explicit, as it is in the 2013 version, where Julian, having sucked a bit of soul from each of her friends, identifies what type of paranormal creature each one is.

18

SA-104

taking him with her. The man says, "You! It's always been you."

With each new draft there are more raven warnings; the ravens are unmistakably tied to the High Priestess of Avalon; they are her messengers.

Anna accidentally works magic in public on the first day of the story, and as a result she is recognized as a paranormal being by Julian's demon servants, who look like Billy Idol and The Incredible Hulk. Anna and Ash take a detour out to Beluga Point on the way to her home. A raven blocks her path and tells her to beware; she waves her hands and blue lightning emerges from her finger. Billy Idol asks what Anna's clan is, and he and his companion, the Hulk, try to force the girl into a van. Anna tries to fight them off; they run away when Ash comes out of the convenience store and runs toward them. But they do manage to take her backpack, which contains Anna's ID – thereby revealing her name and address to Julian.

Someone named "Julian" is identified as the person who gave Taylor the cursed serpent ring.

Anna goes to the high school on Saturday, not to get a missing book so she can finish her homework, but to wait in her car for Ash so they can make a return visit to the Gloaming. A raven leads her into the building. Once inside she hears a voice saying "Annaliese, it is time to choose: Priestess!"

The demon that Anna vanquishes in Caitlin's classroom is not a buidseachd, but a bronach daman – one of Ronan's cursed priests. By "killing" him, Anna frees his soul. When she "vanquished" him, Anna said something to him in a language she did not understand; then she spoke strange words, which she understood as giving him absolution.

The MacKays are certain that the Nyx they are seeking will choose the dark side because every Nyx before her has chosen to follow her demonic rather than her light side. A line of

19

SA-105

prophecy says the Nyx will come from the frozen land at the tip of the Devil's Triangle (one of which is located in Anchorage) and that she will join forces with Ronan. The MacKays insist that the Nyx is evil and ask Anna to be on the lookout for her.

The incubus Julian is looking for Shalene, not for Anna. Shalene, not Elise (who is identified as Shalene's and Brienne's mother, ergo Anna's grandmother), was his true love; she was pregnant with his child when they parted. Julian thinks Dante caused Shalene to have a miscarriage and lose their unborn son.

When Anna promises to do whatever Julian asks if he will free her friends, her friends tell her that she did not need to make such a promise, because Julian has to free them or he will incur the wrath of other supernatural beings. Julian nonetheless holds Anna to her promise. In this version, he demands that she call her mother and lure Shalene to Julian's lair.

Shalene and Brie, not the MacKays, show up at the lair to fight Julian and his demons and to rescue Anna and her friends. They are revealed as mighty witches. When Julian asks how they found the lair, they tell him that Anna is spelled so they would always know where she is. Shalene reveals that Anna is Julian's child; he is shocked to learn that there was no son and no miscarriage, and that Anna is his biological daughter. Anna is furious with her mother for keeping her parentage a secret, both from her and from Dante.

At the end of the fight, Shalene remains behind with Julian, while Anna, Brie, and Anna's friends flee Julian's lair. After the serpent ring detaches itself from Taylor and winds itself around Anna's finger – from which it cannot be removed, as in her vision – Anna sees the mirror and hears a voice telling her it is time to begin her initiation. As she steps through, Rachel's voice, not Lily's, screams no.

20

SA-106

Anna's destiny is revealed to her by her grandmother, Elise, using Tarot cards. When Anna complains that she had no choice about being the Nyx, Elise tells her that, while destiny may be written, there is always choice. Elise reveals that Anna is handmaiden to Nyx, Goddess of the Night, the Dark Moon, who has chosen Anna to carry out her will. She is also told that great sacrifice will be demanded of her and that either she will be Ash's undoing or he will be hers. And she is told that, as Priestess, she may not make an alliance with any man; she belongs to the goddess alone. She is identified as a descendant of Melusine.[2]

Elise also tells Anna that the first test of her initiation is about her and her guide. When she says she has met him – Athair Mo Chroid (Father of my Heart) – Elise chides her and tells her what those words mean.

After Ronan and Ash fight and Ronan turns into a raven and flies away, Anna shows Ash her back, revealing her as the Nyx. "You," he says, "it's always been you." But he says he loves her and cannot kill her.

There is a new finale; the story does not end with Anna's and Ash's last conversation. Instead, Ash takes Anna home. Brie and the MacKays are there, but Shalene is not present, and the reader is not told why. Anna runs away from all these loving people, jumps into Ash's car and drives away too fast, spins out on black ice and has an accident. She is rescued by Ronan. When she calls him Bloodletter, he just laughs and turns into a raven, leaving her to her rapidly approaching family and friends.

---

[2] It is probably time to note that Melusine is not an invention of Freeman's, but is a familiar figure of European folklore, particularly in France, Germany, and the Low Countries. She is the daughter of a water sprite and a human, raised in the mythical island of Avalon. On Saturdays she turns into a two tailed water serpent below the waist – or, in some tellings, a dragon. Melusine marries a human prince, on the condition that he never try to see her on Saturday. Needless to say, he breaks the vow, and it all ends badly. *See* https://en.wikipedia.org/wiki/Melusine.

21

SA-107

There is a page of notes at the end of this chapter. Some of the things in the notes will end up in the fifth draft of Masqued.

### V.     Masqued (2014)

Until the climax at its end, Masqued 2014 is very similar to Masqued 2013.

Names are changed, including the names of the heroine (now Mia, or more fully Mariana, St. James), the new boy (now Roman, not Ash), the former best friend (Samantha, not Amanda), the High Priestess (Marise, not Elise) and the Druid (now Aedan, not Ronan). Brie's name is spelled differently (Brynne). The Gloaming is now called the Otherworld. The Sentinels or the Order are called the DarkHunters; they are in service to the Council, which also seems to be called the Order. The bad guys are the Shadowspawn.

Anna/Mia's four true friends are now reduced to two (Brendan and Rachel, who are cousins). Jenny and Mason simply disappear.

There are a few additions to the basic plot. For example, Mia is told by her mother that they came to Alaska because her mixed bloodline put her in danger in the war between shadow and light; Marchalene says she has lost everyone who matters to her and she will not lose Mia too.

When Mia first meets Athair the wolf, she asks him if she is the Nyx. He in turn asks her if she is evil. He tells her that shadow and light are two sides of the same whole. He also tells her that the Order is her enemy and its agents will kill her if they get the chance.

The night of the party, while prepping with Taylor and Samantha, the other girls tell Mia that the three of them are different from other girls.

When Mia goes into the deserted high school, she hears her name and a voice saying, "You called and I answered your plea; you must choose."

These are minor differences. However, once Mia and her friends arrive at Julian's lair, there are significant changes – including a whole new ending.

22

SA-108

First, in Julian's lair, Mia learns that both she and Taylor are daughters of Julian; they are half-sisters. All the Cheerbots are at least part succubus, which is why they are so popular with the boys. Taylor, however, is half succubus and half Dark Fae – she is entirely a shadow being, and she calls herself wicked. Nonetheless, she goes with Mia when Mia tells her that being wicked is a choice.

Second, Mia is told that Dante was aware all along that Mia was not his biological daughter. In the 2013 version, Dante did not know that he was not the biological father of Shalene's child.

Third, when Marise tells Mia that if she follows her heart either she or Roman will be the undoing of the other, Mia announces that she will refuse her gifts. Marise tells her to speak to her guide; she says she has already spoken to Athair.

Fourth, Marise tells Mia to remember that Dante can never leave Avalon, a warning she promptly forgets.

Fifth, when confronted with the need to choose between the two wolves, Mia believes that the one with amber eyes is Roman (which happens to be correct). She chooses the one with the grey eyes, because she thinks he is her father. A voice tells her that she has chosen the Shadows.

Wanting to save both wolves, Mia pledges her life to the Dark Moon Goddess in exchange for the life of the amber eyed wolf, whom a voice calls the "Boy of Light."

When she goes back through the mirror, the man she first chose to save – the grey-eyed wolf – is of course not her father. The man reminds Mia that she was told Dante could never leave Avalon. He then reveals himself as Aedan. Although Mia thinks her choice was a mistake, Aedan tells her that she chose him for a reason and that there are no mistakes in such matters.

23

SA-109

After Aedan leaves her, Mia rejects Roman, because she does not want him to be at risk from her demon side. Mia tells Roman that it is too much work to love him; all she wants is a normal human life. When Roman kisses her goodbye, she feels nothing.

A week later, Mia's mother Shalene is dying – poisoned by Julian when she would not agree that their daughter, Mia, could live with him for six months out of every year.

Shalene tells Mia that it is impossible to run away from fate, using her own life story as an example. She left Avalon and abandoned her calling, not once, but twice. Having foreseen that Julian would kill her, she tried to save herself by taking Mia to Alaska – only to walk right into her destiny.

Shalene explains Julian's obsession with the Order. The Order had members from both Shadow and Light until World War II, when it split and the Order expelled all its Shadow members and began hunting them down.

The dying Shalene is no longer able to cross into Avalon, but Mia is able to take her using Melusine's Mirror. And while Shalene cannot return to earth from Avalon a third time, she will be in Avalon with Dante forever – and will ultimately fulfill her calling and become High Priestess in place of her mother.

At the very end of the story, Roman comes to Mia. He says he does not believe that she does not love him, because Taylor told Roman that Mia would always try to do what was right. So Mia tells Roman the truth about herself, her family – even the fact that she is the Nyx. In this version, she also tells Roman that she has unwittingly freed Aedan. But Roman (who is, of course, the Boy of Light) tells Mia that he loves her, and because she sacrificed her own life to save him, he cannot fulfill his vow to harm her – even if she is the Nyx. Roman also says that knowing Mia has caused him to question everything he has been taught about the Order and Shadowspawn. He

24

SA-110

25

has decided that it is his destiny to follow his heart. He asks Mia if she will follow hers or live a life of regret. As the book ends, they kiss.

SA-111

## <u>ADDENDUM B</u>

### I.     Masqued (2016)

The last version of Masqued varies substantially from the template of Blue Moon Rising; it is as though Freeman decided to start over. It is, therefore, necessary to tell the new story in some detail.

Anna/Mia is now Ella (Gabriella). Hecubus, her cat, is now Pharaoh and is Mia's familiar. Her aunt is now Aunt Rose (Roselyn). Her mother, once Shalene, is now Gwendolyn. They moved to Alaska when Ella was five, not seven – just after the death of her father, Dante, and her twin sister, Emmeline.

To induce the vision that opens the story, Ella, who knows that she is Kindred, places her mother's amulet around her neck. The vision she experiences is more or less the same as in the earlier books – including the fact that Ella is wearing the ouroboros (snake) ring – until Ella turns to meet her destiny (the young man who says, "It is you."). At that moment, Ella is stabbed with the dagger, and a sibilant voice says, "The Return Has Begun." Ella awakens to find both blood and a scar on her stomach. She is holding a Tarot card in her hand – the Tower, the card that indicates one is blind to a shocking truth.

When Ella takes off the amulet, it feels hot and flies out of her hand, smashes through the window, and disappears. Ella worries that her mother will be furious, because the amulet is a prized possession.

The next morning, Gwendolyn tells Ella she must stop trying to read Tarot cards. Ella asks her mother how she will learn her calling without reading cards. Her mother says there are rules, which Gwendolyn and Rose followed, and which Ella must follow as well. She cannot use her powers without supervision. Gwendolyn tells Ella that she is undergoing Kindred puberty and

stinks of cinnamon, the smell of her family's magic. She douses Ella with perfume to hide the smell and tears up one of her Tarot cards so that Ella cannot spread the deck. She urges her daughter to try meditation.

Gwendolyn and Rose sense that terrible magic was unleashed the night before. Powers have killed hundreds of fish, which have washed up along Cook Inlet. Ella wonders if she unleashed the magic when she used the amulet. But when her mother (who does not know about the loss of the amulet at this point) tells her that there are two types of Kindred, only one of which gets strength from taking life, Ella feels reassured that she did not kill the fish.

The hot new boy and girl arrive at the school on a motorcycle, and the boy is in Ella's first class (which is now French, not math). The boy's name is Roman.

Strange things are happening to Ella. In French class she speaks perfect French to her teacher, with a Belgian accent (the teacher is from Belgium). Ella claims to be joking and says she cannot really speak French, but the new boy isn't buying it.

In the bathroom, Mean Girl Taylor is making fun of another student and wearing a snake ring – the same one that Ella was wearing in her vision. Taylor says her father gave it to her, and that it came from Egypt.

In their AGS class, the teacher has mysteriously accepted a position in Hawaii and had to leave immediately. The MacKays, Roman's parents, are the new teachers. Everyone in the class seems to know a lot about the Great Pyramid of Giza, and there is a discussion about explaining the inexplicable. Rachel says she hopes that the class will be open minded enough to explore the possibility that alien technology was used to build the pyramid. There is no discussion of Celtic Druids or a search for mystery objects that arrived in Alaska from New Zealand.

2

SA-113

When Ella gets onto Roman's motorcycle, her friend Brendan suddenly appears and offers to take her home. Brendan – who in this version is not identified as gay – asks where Roman is from; Roman says his family doesn't stay in one place too long. Rachel and Brendan leave to interview someone who thinks he saw an alien in his backyard. Brendan reminds Ella that her mother will go ballistic if she rides home on a motorcycle; she responds that she is giving Roman a tour of the town.

Roman and Ella stop at the convenience store at Point Woronzoff, a location in Anchorage. Ella goes down to the beach, while Roman goes in to buy food. Ella sees the dead fish, covered with red sores, as well as two belugas, side by side, alive but with skin oozing. Ella tries to invoke the Power to save the belugas. Suddenly the belugas are enveloped in a blue light, and two glyphs appear on their foreheads – the golden glyph of Isis and a black and silver lightning bolt with swirling sand. As blue light emanates from her fingers, the dead fish twitch and the broken amulet appears around her neck; both glyphs are on it. Ella realizes that she had something to do with what happened the night before. As if to confirm, the amulet, which has broken in two, suddenly appears around her neck.

Ella is approached by Punk Rock – one of the two demonic creatures from earlier drafts – who asks if she is "Coven or Circle." He tells her that he saw "the light show," says that The Return has begun, and cautions that a girl like her should not be meddling with it. Punk Rock and Hulk grab her despite her efforts to fight them off; but when Roman approaches, they drop Ella and run away. The dead fish come back to life, albeit strangely; they bear the lightning glyph. All the fish and whales are borne out to sea on a dangerous bore tide that nearly drowns Ella and Roman. Ella tells Roman that he saved her twice – once from Punk Rock and Hulk, once from drowning.

SA-114

When she gets home, Ella overhears Rose say to her mother, "Just because you turned your back on the Circle and your true calling doesn't give you the right to make the same choice for Ella." Ella makes the connection with Punk Rock's question about Circle or Coven, which she had not previously understood.

Ella tells her mother and aunt that she healed the sick whales and even raised the dead ones. She also confesses what happened with the amulet the night before. Gwendolyn says that Ella must leave Alaska immediately. The two women explain to Ella that, when she used the amulet, her budding magical powers were accelerated and amplified; what should have taken years of development happened literally overnight. They also tell Ella that she has unwittingly unleashed a terrible force, an ancient evil. If the evil force gets the amulet, the door to the world will unlock and The Return will happen – dark forces will be brought back into the world.

When Ella blames herself for this disaster, her mother says no, it is her fault, because she cast away her responsibilities as Keeper of the Amulet, and refused to honor her vow to the Circle, after Ella's father and her twin sister Emmeline were killed. Gwendolyn reveals to her daughter that she was a Priestess of Isis, one of the Chosen. She explains the difference between The Coven (Kindred who follow the dark path) and The Circle (Kindred who are descendants of the light gods and caretakers of the earth).

The evil spirit that was trapped in the amulet is the Ka (or soul) of an evil pharaoh; he was imprisoned in the amulet by the Egyptian gods Isis and Osiris. The marks on the amulet are of Isis and Set, the darkest god. The balance of dark and light kept the seal intact, but the blood from Ella's cut unlocked the amulet when her power was channeled through it. Once the amulet broke in half, the evil was set free. Now the good guys have to find the other half of the amulet before the bad guys do.

4

SA-115

When Ella tries to take her half of the amulet off, it burns, and Rose announces that the magic has chosen Ella and she must make the offering. Rose swings a pendulum of amethyst and crystal above a map of Alaska to try to find the other half of the amulet, but she cannot. However, when Ella tries the same thing, she learns that the other half of the amulet is at West High School – Ella's school. The amulet is seeking the descendant of the dark gods, someone Ella's age – someone she knows. Ella needs to find the other Kindred at her school. Her mother puts Roman at the top of the list of possibilities.

Ella asks if there are Kindred police who can help them. There are – known as The Order of the Sphinx – but Ella's family cannot go to them for protection because they would quiet the magical power of anyone they suspect has anything to do with The Coven. Her relatives explain to Ella that The Order has become too narrow-minded and too political. They want to destroy the dark god's bloodline, so they quiet the powers of anyone who carries that bloodline, whether that person is evil or not.

Ella is angry that she was told none of this, but her mother tells her that her father and sister were murdered, and that she was told nothing in order to keep her safe.

Suddenly Brendan shows up at the door. Punk Rock and Hulk, who are from The Order, have captured him. They announce that Ella used her powers in public, which violated something called the Compact; they have come to quiet her. Ella's mother transforms herself into a Priestess of Isis and says that The Order will not want to start a war with her. Gwendolyn also tells Punk Rock and Hulk that she has unfinished business with the one who was freed the night before; she wants to be found. Punk Rock and Hulk transform into descendants of the Snake God, with forked tongues; Brendan is bitten. Rose tells everyone not to move but it is too late – the snake coils around Ella's leg and mist rises from the floor. Suddenly the mist turns into a man, crouched on

5

SA-116

all fours and covered in hieroglyphics. He too is a hottie in black leather, and Ella feels his pain. He looks at Ella's mother. Suddenly Gwendolyn, the man from the mist, and the snakes all disappear in a cloud of sulfur. Ella passes out.

Ella wakes up with her head in Roman's lap. Rose and Brendan are on the floor. Roman says this is his fault, and he will make it so that they don't remember this, but first he needs to ask some questions. When he says he is on Order business, Ella tells him not to use his powers on them. She and Roman simultaneously realize that they are both Kindred. Ella demands that Roman prove that he is Order; he holds out his wrist, and Rose says it bears the mark of The Order.

Roman says he returned to Ella's house because he sensed that The Coven might be interested in the "human girl" he was with today. He did not call for reinforcements because he really did not want Ella involved in what was unfolding. Rose tells Roman that The Coven followed him to their home and now Gwendolyn has been taken. Roman promises Ella that they will find her mother.

When Roman's sister and cousin, both members of The Order, arrive and ring the bell, Rose tells Roman that he cannot tell them that Ella is Kindred if he wants to ensure Ella's safety. He tells his relatives to go away and stays with Ella.

Brendan is dying of a magic snake bite. Roman offers the services of his uncle, a Kindred healer, but Rose explains that the only ones who can heal this bite are the Seven Crystal Healers of Isis – of whom she is one. Rose needs to consult the High Priestess to find out where Gwendolyn is, and Brendan needs to be taken to the healing place. So they go the entryway of the house, where sits a floor length mirror framed with gold winged Egyptian goddesses – the only thing the family brought from California when they moved to Alaska. Rose causes Ella to prick her finger on the mirror and smears the glass with her blood – because there is always a price to pay with ancient

6

SA-117

gods' magic. They all step through the mirror, cats too. Rose says as long as Cleo the cat (Gwendolyn's familiar) is alive, they will know that Gwendolyn is alive.

They find themselves in an ancient Egyptian temple of Isis, which also happens to be Avalon, a sanctuary that connects the earth to Amarna, the home of the gods. Rose and priestess attendants take Brendan to the healing rooms. Ella is taken to the High Priestess.

Ella says she has to find her mother before the evil she unleashed realizes that Gwendolyn does not have the amulet. The priestess spreads a Tarot deck and draws three cards. First is the Lovers. Although Ella feels tied to Roman, the Priestess tells her that following her heart will be either her undoing or his. She explains that, by following her heart, her mother was foresworn to the goddess and her mother's lover is dead.

The second card is the Skeleton King, which represents death. The High Priestess says that death follows in Ella's wake. The Coven and The Order are both Ella's enemies – when The Order discovers that she has freed Set, the God of Chaos, they will destroy her. Set's goal is to bring about the return of the gods from Amarna to earth. He needs the amulet to open the door, while Ella needs the amulet to destroy Set. Its magic is now too weak to keep Set prisoner, so he must be destroyed. That is Anna's calling since she is now Keeper of the Amulet – although the High Priestess says, "There may be another." Maintaining the balance will require great sacrifice, including a death personal to Ella.

Ella needs to find the person who holds the other half of the amulet, so they can work together to seal the door. When Ella asks if that person would not want to help Set remain free, she is told never to underestimate the power of free will.

7

SA-118

The third and final card in the draw is the High Priestess. It means that Ella is a daughter of Isis. True daughters of Isis have fraternal twins, like Isis and her sister – like Gwendolyn and Roselyn – like Ella and Emmeline.

Ella has to decide whether she wants to accept her calling. She says she must save her mother. The High Priestess says saving her mother is not the same thing as accepting her calling. If she decides to be Keeper of the Amulet, she cannot change her mind. Ella says, "The amulet chose me." Ella thereby passes the test and is now the Keeper of the Amulet and a huntress. And the High Priestess reveals that she is Ella's grandmother.

SA-119

## <u>ADDENDUM C</u>

There are four separate novels in the *Crave* series here at issue: *Crave, Crush, Covet*, and *Court*. Collectively they tell a single story, beginning with the introduction of key characters and ending with the vanquishing of the forces of evil. The novels are summarized below.

### I. Crave

Crave is told from the first-person perspective of Grace Foster, a seventeen-year-old girl from San Diego. Just weeks after her parents are unexpectedly killed in a car accident, Grace is forced to move to Alaska, to live with her only two remaining family members – her Uncle Finn and his daughter, Macy. Grace travels by bush plane and snowmobile from Fairbanks to Healy, Alaska – a snowy outpost of a "town" at the north end of the Denali National Preserve – and then on to Katmere Academy, an isolated boarding school in a gothic castle near Denali where Grace's uncle is headmaster and her cousin is a pupil.

Although she rooms with her ebullient cousin Macy, from her first day at Katmere, Grace feels like an outsider and has difficulty adjusting to her new and alien surroundings – even as she becomes the object of scrutiny from other students. One of them, Jaxon Vega – an attractive and mysterious "bad boy" dressed in black leather who runs with a posse of similarly-attired companions – warns Grace about the dangers lurking at the school and tries to intimidate her. But Grace finds herself drawn to him. Grace also befriends Flint, a popular, funny, and easygoing student who seems to want to help Grace acclimate to life at Katmere.

Jaxon's warnings are not empty; Grace has a series of near-death experiences during her first week at Katmere. While she is exploring the castle, two boys corner her and try to drag her out into the sub-freezing night; Jaxon appears out of nowhere and saves her. While participating in a snowball fight organized by Flint, Grace is blown out of a tree and injures her ankle in the fall;

Jaxon, who carried Grace back to her room, believes that Flint caused the fall. A few days later, a chandelier in the school's cafeteria nearly falls on Grace's head while she is sitting next to Flint at breakfast; Jaxon pushes her out of the way.

Although Jaxon seems to have Grace's best interest at heart, Macy warns her cousin that Jaxon and his posse of friends (known as The Order) are dangerous; she also tells Grace that she cannot be friends with both Flint and Jaxon, as the boys have a complicated relationship. But Grace tells her cousin that she has "feelings" for Jaxon.

After attending a welcome party in her honor – at which she notices that the students seem to form separate groups or cliques – Grace wanders into the school's library, where she hears a girl chanting in an unfamiliar language while reading a book. The girl, Lia, introduces herself and invites Grace to her room for a cup of tea. Lia tells Grace that her boyfriend died several months earlier, and the two bond over their recent losses. Macy arrives to take Grace back to their room; she tells her cousin that Lia is a popular student but has been reclusive since her boyfriend, Hudson, died.

On her first day of school, Mehki, a friend of Jaxon's, escorts Grace to her first class. Later in the day, Grace encounters Flint, who shows Grace the secret tunnels beneath the school. In the tunnel they find Lia, who is in Grace's art class. Suddenly the ground starts shaking; fortunately, Grace, Flint, and Lia make it out of the tunnels. As she emerges, Grace runs into Jaxon, who asks her about her friendship with Flint.

Grace sees Jaxon and Lia having a tense encounter; Jaxon explains that they were fighting about Hudson, who was his brother. Over the next few days, Jaxon and Grace exchange playful text messages as she recovers from the ankle injury she suffered during the snowball fight; Jaxon even sends Grace a copy of *Twilight*.

2

SA-121

Jaxon invites Grace to his room, which is located in Katmere's highest tower and is filled with books and art. Jaxon encourages Grace to step outside onto the parapet, where they watch a meteor shower; once back inside, they kiss. To their surprise, their kiss is interrupted by an earthquake; the window shatters, sending shards of glass flying into Grace's face. Jaxon tells Grace that she needs to leave immediately, and Grace begins to run. She wakes up in her dorm room covered in bandages, with no memory of how she got there.

Macy tells Grace that a piece of flying glass nicked an artery in her neck, but Jaxon got her to the school nurse, Marise, before she bled out. Marise tells Grace not to remove the bandage from her neck. Grace, wanting to make sure Jaxon is all right, sneaks out of her room; she finds Jaxon, who feels guilty for putting her in danger and urges Grace to stay away from him. Back in her dorm room, Grace ignores Marise's instruction and removes the bandage from her neck. She sees two bite marks.

Grace confronts Macy, who tells her that Jaxon is a vampire. Macy explains that Jaxon used his venom to seal the wound before taking her to Marise – also a vampire – who bit Grace to repair the arterial tear. Macy reveals that Katmere is home to all sorts of paranormal creatures, including vampires, wolf-shifters, dragons (like Flint), and witches – two of whom are Macy and her father, Uncle Finn. Macy tells Grace that her own father was also a warlock, though he lost his powers after falling in love with Grace's mother.

Jaxon believes that someone is trying to kill Grace, though he does not know why. Grace's Uncle Finn wants to send her back to San Diego, but Grace objects; she tells her uncle about her blossoming relationship with Jaxon. Uncle Finn tells Grace that Jaxon and the members of the Order are "born" vampires – that is, they are vampires because of a genetic mutation, not because they were bitten.

3

SA-122

Grace heads to the library, where Flint tells her that he can fly and shoot fire and ice; Grace thinks Flint is hitting on her. They find Jaxon and The Order in a violent fight with Cole, the alpha wolf-shifter, and his wolf-shifter friends. Jaxon sinks his fangs into Cole's neck and drains his blood but does not kill him. Jaxon tells everyone in the room that what he did to Cole was a warning.

After the fight, Jaxon tells Grace that there has always been tension between vampires and shifters. He is surprised when Grace says she is not scared of him and wants to be together – even after Jaxon tells the girl that he set off the earthquake the last time they kissed. They kiss and Jaxon bites Grace and drinks some of her blood. This is a sexual contact; it does not turn Grace into a vampire.

Jaxon also tells Grace about himself. He is the Vampire Prince, heir to the Vampire Kingdom. His older brother, Hudson, should have been the heir. But after learning that Hudson planned to use his mind-control abilities to make born vampires the leaders of the supernatural and mortal worlds, Jaxon killed his brother. Jaxon feels guilty about Hudson's death but believes he acted for the greater good. Jaxon once again expresses concern over Grace's safety at Katmere and promises to keep her safe.

Grace starts to adapt to her new reality as the only human in a school full of paranormal creatures. While walking to class in the tunnels with Mekhi one day, she is approached by Flint, who wants to tell her something. But Grace no longer trusts Flint and refuses to go anywhere alone with him. Flint warns Grace not to go anywhere alone.

That night, Grace goes to Jaxon's tower for their first official "date." Jaxon takes Grace outside to look at the Northern Lights; he uses his telekinetic powers to float them high above the castle. Jaxon then gives Grace a topaz necklace. When they go back inside, Jaxon makes tea from

4

SA-123

a special blend that Lia gave him. As soon as he drinks the tea, Jaxon is overcome with rage and aggression; he tells Grace to leave immediately. Grace does so, but collides with Lia, who slaps Grace across the face. When Jaxon intervenes, Lia shoots him in the heart with a tranquilizer gun. Grace succumbs to the power of the tea and collapses.

Grace wakes up tied to an altar somewhere in the tunnels beneath Katmere. She frees herself from the restraints and runs toward the sound of screams, thinking Jaxon is in trouble. When the room is illuminated by candlelight, Grace sees that she is covered in blood. Suddenly a giant dragon picks Grace up; Lia catches the dragon, and they fight. To Grace's surprise, the dragon turns into Flint. Grace tries to escape, but Flint catches her. While Lia is temporarily incapacitated, Flint reveals that Lia killed Grace's parents in order to get Grace to Katmere. He says that the only way to stop Lia from following through with her "plan" (which Flint does not have time to explain) is for Grace to die. Flint starts to strangle Grace, but Jaxon bursts into the room and the two boys fight. Grace again tries to escape, but is stopped by a crazed Lia, who drags her back to the blood-soaked room. Lia tells Grace that she, Lia, was "mated" to Hudson; she also reveals that Grace is "mated" to Jaxon in the same way. Lia tries to tie Grace to the altar, but in a last-ditch effort to save herself, Grace grabs Lia's spellbook, rips out the open page and burns it.

Lia, furious, manages to tie Grace to the altar. Lia tells her prisoner that she spent months searching for Grace and planning her parents' "accident" – all as part of her grand plan to bring Hudson back to life. Lia begins chanting, and smoke starts filling the room.

Suddenly, Jaxon breaks into the room. Lia stabs him with her ceremonial knife and uses the black smoke that is filling the room to strangle Jaxon. But Grace grabs Lia's knife and stabs Lia in the chest. To save Jaxon from the black smoke, Grace inhales it. The smoke relinquishes its

SA-124

hold on Jaxon; he manipulates the smoke into a ball and fires it straight towards Lia, who explodes into a cloud of dust.

Jaxon is still bleeding out from the stab wound, so Grace does the only thing she can think of – she forces him to drink her blood. Grace wakes up in Katmere's infirmary and is reunited with Jaxon, who reveals that he almost drank her dry – but she saved his life. While Grace recovers, Jaxon confesses that he does not know where Hudson is or if he came back to life.

Four days later, Grace is walking to class when the cloud of black smoke reappears. The smoke clears to reveal Hudson, who is holding a broadsword aimed at Jaxon's head. When Hudson swings the sword at Jaxon, Grace steps in front of the blade to save Jaxon – and the story ends.

The narrative then shifts to Jaxon's perspective. Readers learn that, while Grace does not know it, she is not an ordinary human, but the first gargoyle to be born in a thousand years. When she blocked Hudson's sword, she turned herself to stone. When the librarian tells Jaxon that Grace should be able to turn back on her own, Jaxon surmises that Grace is stuck with Hudson and is choosing to remain in stone form to prevent Hudson from endangering the school. The book ends with Jaxon vowing to break Grace out of her gargoyle form and separate her from Hudson.

## II. Crush

It is four months after Crave ended. Grace has finally returned to her human form. She has no knowledge of how much time has passed and no memory of anything that occurred while she was in gargoyle form. The fact that she is a gargoyle shocks her.

To Grace's dismay, no one knows where Hudson is, or whether he is dead or alive. Grace is concerned that she may have unintentionally brought Hudson back to Katmere with her. Grace also feels guilt over months of missed messages from her best friend in San Diego, Heather – who knows nothing of Grace's life at Katmere or her supernatural identity.

6

SA-125

Grace returns to classes, eager for a sense of normalcy. But she finds herself the center of attention from her intrigued classmates. To her dismay, she is assigned to do a class project with Flint, who uses the occasion to try to rekindle their friendship. Grace is nervous about spending time with Flint after he tried to kill her; their reconciliation is complicated by Jaxon, who wants to protect Grace from Flint. Gradually Grace thaws toward the dragon prince.

During a passionate moment with Jaxon, Grace becomes overwhelmed with conflicting emotions. A few days later, Grace again freezes when Jaxon leans in to kiss her. She is frustrated that they are unable to pick up where they left off and does not understand why they cannot do so.

Macy assures her cousin that being a rare gargoyle is cool and exciting. Grace asks Macy about the mating bond that Lia had mentioned; Macy explains mating bonds snap into place when two people who are destined for one another first touch. Grace feels conflicted when she learns that Jaxon knew they were mated when they first touched but did not tell her.

Grace finds solace in a painting for art class. During a sleepless night, Grace feels driven to go to the art studio, which is connected to Katmere by the underground tunnels. The next morning, Grace wakes up to find herself covered in blood. She has no recollection of how it got there, but she realizes it is not her blood. As she tries to recall the events of the night before, Grace and Macy learn that Cole, the alpha wolf-shifter, was attacked and drained of blood during the night.

Despite Macy's reassurance, Grace is unable to shake the suspicion that she had something to do with the attack on Cole. Grace tells her Uncle Finn and Jaxon about what happened; they are similarly perplexed and express concern that Cole and his wolf-shifter friends will seek revenge.

Grace, eager to learn more about gargoyles, heads to the library. The next thing she knows, she wakes up on the floor of a tower – again with no clue how she got there. Security footage

7

SA-126

shows Grace stealing the Athame of Morrigan, a precious artifact that is housed in the library; she seems to be acting under someone's influence. Jaxon believes it could be Hudson, given his brother's power of persuasion. Suddenly Grace realizes that Hudson is not dead; he is trapped inside her mind.

Grace and her friends are determined to expel Hudson from her mind. Jaxon suggests that they seek help from someone known as The Bloodletter – an ancient vampire with a vicious reputation who lives in a remote ice cave under Denali. She is Jaxon's godmother; she raised him. Jaxon and Grace travel to her remote ice cave by "fading," which is how vampires move with great speed. When they arrive, Grace is surprised to find that The Bloodletter appears to be a sweet old lady, who knits placidly though she is surrounded by buckets of blood.

During their visit, Hudson starts making flirty remarks in Grace's head. The Bloodletter warns Grace that if Hudson remains in her mind for too long, he may completely take over. She encourages Grace to build a temporary wall in her mind, to shield her from Hudson's influence. But to get Hudson out of her head for good, Grace must find four magical items that will complete a spell: the eyetooth of an alpha werewolf, the moonstone from a powerful warlock, the full bone of a dragon, and the bloodstone from a born vampire. If Grace can locate those four items, she can cast a spell that will bring Hudson back to life. But in order to strip Hudson of his powers, Grace must also find a fifth item – the heartstone of the mythical Unkillable Beast, who lives near the North Pole.

Jaxon and Grace realize they already have two of the objects – the tooth of an alpha werewolf (Cole) and the moonstone from the hilt of the Athame of Morrigan – both of which Hudson acquired while controlling Grace's body. The Bloodletter assures them that she can acquire the bloodstone. But they must find the dragon bone and the heartstone. This last seems particularly

8

difficult; Jaxon tells Grace that almost no one makes it back alive from visiting The Unkillable Beast.

Though no longer able to control Grace's body, Hudson's voice continues to be a consistent presence in her mind; he banters with her throughout the day. He is sarcastic and brilliant, deeply wounded from past trauma. He is also frustrated to be trapped in Grace's mind. Grace, for her part, is embarrassed that Hudson knows all of her thoughts – including those about her relationship with Jaxon, his brother. When Jaxon surprises Grace with a romantic dinner, it does not go according to plan thanks to Hudson's jealous comments and apparent rivalry with his brother.

Grace and Jaxon learn that gargoyles are considered to be protectors of magic and the different factions that wield it. Jaxon confesses to Grace that his father, Cyrus the Vampire King, killed all the gargoyles long before Jaxon was born, in order to acquire more power for himself and Jaxon's mother, Delilah. His father killed the Gargoyle King with his "eternal bite" – a deadly bite that no one has ever survived. Because Cyrus annihilated the gargoyles, he and Delilah now sit at the head of The Circle – the ruling body that governs all paranormals. Hudson points out to Grace that Cyrus killed the gargoyles after convincing his allies that the gargoyles were going to side with humans who were planning a war. Hudson insists that he is nothing like his father, but Jaxon warns Grace that Hudson is too powerful and dangerous to be let loose on the world.

When Jaxon tries to kiss Grace goodnight, she feels awkward about Hudson's presence and tells Jaxon that "three's a crowd." Back in her room, Grace grapples with confusion about the relationship she and Hudson seem to be developing.

During lunch, Grace and her friends discuss the upcoming Ludares tournament – a high-stakes magical tournament, which involves passing a heated ball between team members while avoiding magical obstacles. The prize for the Ludares winners is a bloodstone – the very thing

9

SA-128

Grace needs to get Hudson out of her head. So her team – which includes Jaxon, Macy, Mehki, Flint, Xavier (a cheerful wolf), Eden (a badass dragon) and Gwen (a witch friend of Macy's) – is determined to win. Uncertain about employing her gargoyle powers, Grace is reluctant to compete; but as they train for the tournament, Grace becomes confident in her ability to fly and learns that she can channel magic from others. With Macy's help, Grace practices channeling magic to light a candle.

During the conversation about Ludares, Grace learns there is another war brewing. Hudson mentions that Cyrus and the wolves are teaming up with "made" vampires (ones who become vampires by being bitten, not via genetics) to wipe everyone else out of existence. Grace and her friends also discover that she seems to be immune to magic. This explains why, when Macy offers to use her witch powers to do a "glamour," on her cousin, the spell would not work.

The group is nervous about Hudson's unpredictable nature. Flint is particularly nervous; he believes that Hudson was responsible for the death of his (Flint's) brother. But Grace defends Hudson to her friends; the more time she spends with him, the deeper their connection and the better she likes him. She also understands him better: as they grow closer, Grace learns more about Hudson, including the fact that anything he did that alarmed Jaxon was necessary to prevent even greater evils, including a war among supernatural beings. Unsure of whom to believe, and sensing a growing attraction to Hudson, Grace finds herself caught in a "love triangle" between the brothers, for both of whom she cares deeply.

Grace soon learns that Hudson – who has no access to blood while trapped in her mind – has been pulling energy from her mating bond with Jaxon in order to sustain himself. Jaxon suggests that, rather than find the items needed for the spell, they simply break their mating bond and cut off Hudson's energy supply. He tells Grace that The Bloodletter once gave him a spell that

10

SA-129

would break their mating bond, but he no longer has it – he threw it out once he met Grace. Grace does not want to break their mating bond, and Jaxon ultimately agrees.

At a pre-Ludares assembly the Katmere community is surprised by the arrival of The Circle, led by Cyrus and Delilah Vega, the Vampire King and Queen. The members of The Circle – which includes the Dragon King and Queen (Flint's parents) and the leaders of the other supernatural factions – want to meet the first gargoyle born in a thousand years. Jaxon and Hudson both warn Grace to stay away from Cyrus; Hudson even exerts control over Grace to prevent her from moving when Cyrus unexpectedly calls her to the stage. She is furious with Hudson for doing this.

Before the Ludares tournament begins, Flint tells Grace that he is gay and has been in love with someone who he cannot be with. She realizes that he loves Jaxon.

Grace and her friends win the Ludares tournament. Immediately thereafter the whole team sets out on a quest to the dangerous dragon boneyard at Katmere, where – despite being surrounded by exploding bones – they obtain the dragon bone needed for the spell.

The next day, the group attends an assembly to receive their prize for winning the Ludares tournament – the bloodstone of a born vampire. To everyone's surprise, Delilah announces that The Circle intends to take Grace back to the Vampire Court. Following Hudson's advice, Grace boldly challenges for a seat on The Circle, as the only existing gargoyle. To win her seat, Grace and Jaxon must compete in a dangerous, high-stakes contest called the Trials. No challenger has prevailed in  the Trials in a thousand years.

Grace and her friends discuss how best to retrieve the heartstone of The Unkillable Beast, so that Grace can get Hudson out of her head and disarm him before the Trials. Though Grace trusts Hudson, her friends insist that they retrieve the fifth item so Hudson will be stripped of his

11

SA-130

powers. The group heads out on a quest to a volcanic island located near the Arctic Circle, where they find The Unkillable Beast, a monstrous creature made of jagged rock. The Beast is guarded by guards from The Circle; Mekhi is gravely injured when the group confronts the guards, and without his help, the group must reevaluate their plan to kill The Unkillable Beast. They decide to set a trap using Xavier as the bait.

When they enter The Unkillable Beast's cave and see him, the group realizes they cannot kill this creature. While trying to protect Macy (with whom he has fallen in love), Xavier is killed.

Grace decides to try to communicate with the Beast directly, and they are able to communicate telepathically. Grace realizes that the voice who has been warning her of danger since she became a gargoyle – which she initially thought was just her "gargoyle voice" – is actually the Beast. Grace learns that the Beast is not a monster, but a gargoyle like herself – and that he is immune to magic, just as she is. The Beast has been chained and tortured for centuries. He wants to be freed, but Grace cannot break his chains; she vows to return and release him.

The Beast reveals that the heartstone is not a jewel, but rather is his stone heart; he offers it to Grace, but she refuses to take it, understanding that this would result in the Beast's death.

The friends return to Katmere with only minutes to spare before the Trials are to begin. Before they can get to the arena, they are confronted by Cole, the alpha wolf-shifter. Cole has retrieved the spell that Jaxon threw away. He uses it to break the mating bond between Jaxon and Grace. Jaxon and Grace experience immense physical and psychological pain when Cole casts the spell; it incapacitates Jaxon and renders him incapable of enduring the Trials with Grace. But emboldened by Hudson's encouragement, Grace makes her way to the arena alone. She uses the four magical objects to get Hudson out of her mind; the spell works, and Grace sees Hudson

12

**SA-131**

standing before her. Hudson tells her that he has hidden his magic deep inside her memories. She enters the arena and the Trials begin.

Grace quickly realizes that the Trials are rigged. But driven by a renewed sense of determination – and after finding the magical powers Hudson has stored deep in her memories – Grace defeats her opponents, wins the Trials and earns the title of Gargoyle Queen.

Cyrus is furious that Grace has won. He claims that Grace cheated in the Trials by using Hudson's magic and, declaring that she should be punished with death; he administers his "eternal bite." Fatigued from the Trials, Grace is unable to defend herself; she is at the brink of death. But Hudson buries her alive under stones and Grace's gargoyle body begins to absorb the stone. She survives.

## III. Covet

Grace is overcome with grief and guilt over the death of Xavier. But with graduation looming, she must finish her coursework. At the same time, she must grapple with her lingering feelings for Jaxon in light of learning that she and Hudson share a mating bond. As Hudson starts spending time with Grace and her friends, Jaxon, sensing a shift, ends his relationship with Grace.

Though heartbroken over her breakup with Jaxon, Grace's attraction to Hudson deepens. Hudson admits to Grace that their mating bond snapped into place when they first touched. He also suggests that there was something suspicious about Grace and Jaxon's mating bond, because it could be broken by a spell, whereas true mating bonds break only at death.

Grace tries to maintain a friendship with Jaxon, but he withdraws from her. She visits his tower, only to find that it has been converted from a cozy and personal room she once knew into a cold, stark room filled with gym equipment, Grace becomes concerned about Jaxon's emotional state.

SA-132

Seeking answers about her mating bond with Jaxon, Grace and Hudson visit The Bloodletter, while Jaxon travels to the Vampire Court to learn more about Cyrus's plans. When they arrive at her cave, Grace and Hudson find two human corpses from which blood is draining into a bucket. The Bloodletter confesses to Grace and Hudson that she cannot restore the mating bond between Grace and Jaxon because it was not a true mating bond – she herself created it. The Bloodletter explains that a group of witches (one of them Grace's father) came to her, concerned about their coven and the fate of the world. They asked her to help them bring the gargoyles back to restore balance. The Bloodletter agreed to give them a gargoyle child; but in return, she demanded that the child be mated to Jaxon unless either of them refused the bond.

Seeing that Grace still loves Jaxon, Hudson asks The Bloodletter to break his mating bond with Grace, but The Bloodletter admits that she cannot undo a true mating bond. The only way to break it would be to find The Crown – an object thought to bring balance to the universe and give whoever wears it infinite power. She reveals that Cyrus has long been looking for the Crown, but has been unable to find it.

To get the Crown, Grace and Hudson must return The Unkillable Beast to his human form, by breaking the enchanted chains that restrain him. To break the chains, they must locate the Blacksmith who forged them.  No one knows where the Blacksmith is. Grace tells The Bloodletter that she is able to communicate with the Beast; she can hear his voice in her head, warning of danger.

Grace and Hudson return to Katmere to find Jaxon, who has just returned from the Vampire Court. Jaxon tells his brother that Cyrus has issued a warrant for Hudson's arrest; he plans to send his son to the notorious supernatural prison known as the Aethereum, from which escape is impossible. Shortly thereafter, Grace and Jaxon discover Hudson surrounded by aggressive wolf-

14

SA-133

shifters. Hudson defeats the wolves in an astonishing display of strength, which surprises everyone. Later, the friends discuss the increasing number of altercations between supernatural factions led by vampires, on the one hand, and werewolves/shifters on the other; the atmosphere at Katmere has become exceedingly tense. Grace and her friends surmise that Cyrus is behind the violence at Katmere. Hudson shares that Cyrus had previously planned to take control of Katmere and hold the students hostage in order to blackmail all the major ruling families (whose children attend the school) to join his attack on humankind. Learning that Cyrus and Delilah plan to attend their graduation ceremony, the group is determined to find the Crown prior to graduation.

Grace and Hudson decide to give in to their mating bond and pursue a relationship.

Hoping to find the Blacksmith, the group travels through a magic portal (created by Macy) to Giant City – a secret city of sequoia redwoods hidden within a lush forest that is home to giants known for their metalwork. Grace and Hudson are led to the Blacksmith's wife, who tells them the Blacksmith has been imprisoned in the Aethereum for centuries.

Unable to complete their quest before graduation, the group returns to Katmere to complete final exams. When the tests are done, Flint invites Grace to the Dragon Court's upcoming Wyvernhoard festival, where Flint plans to introduce his parents to his boyfriend, Luca. Jaxon tells Grace that he cannot attend the festival, because he plans to go to London to try to get the charges against Hudson dropped. Grace grows concerned about Jaxon's increasing emotional distance.

Grace and her friends (minus Jaxon) travel by portal to New York City, home to the luxurious Dragon Court and Flint's parents, the Dragon King and Queen. As soon as they arrive, the Dragon Queen, Nuri, orders her guards to seize Hudson, whom she blames for the death of her son, Flint's brother. Hudson agrees to be taken into custody as long as his friends remain safe and free. Grace confronts Nuri about Hudson's arrest and the two discuss the ongoing battle between

15

SA-134

dragons and witches, on one hand, and wolves and vampires, on the other. Nuri agrees to release Hudson and help take down Cyrus, believing it will keep Flint safe. Nuri also tells Grace that she should let Hudson go to the Aethereum, where he will be safe until Cyrus is defeated. She tells Grace about The Crone, a mysterious witch who helped build the prison and who holds the secret to escaping it.

After rescuing Hudson and attending an extravagant gala in honor of Wyvernhoard, the group reunites with Jaxon and sets off on dragonback to visit The Crone on her secluded island. The Crone is willing to talk to her visitors – all but Jaxon, who is ordered to remain outside. The Crone says that he has no soul.

The Crone tells the young people about twin sisters named Cassia and Adria, born of two deities. Adria, the Goddess of Order, created humans; Cassia, the Goddess of Chaos, created paranormals. But humans and paranormals were immediately at odds. Unable to find balance between order and chaos, the sisters could do nothing but watch. Their father created gargoyles, not from order or chaos but from the source of magic, in order to balance out the forces caused by humans and paranormals. Grace learns from The Crone's tale that gargoyles are uniquely able to straddle both the human and paranormal worlds and that they have an innate desire to become peacemakers.

The Crone tells Grace that she is not actually immune to magic; she is susceptible only to the most ancient forms of it. She also explains that gargoyles went extinct because they were betrayed by the Gargoyle King, who sided with the paranormals over the humans – even to the point of becoming mated to a paranormal, which broke the balance between order and chaos. One of the Gargoyle King's men, eager to stop what he saw as a threat against his kind, told Cyrus the

16

**SA-135**

secret of how to kill gargoyles. He believed that Cyrus would kill only the Gargoyle King, but of course Cyrus killed all of the gargoyles.

The Crone further reveals that Cyrus lost his magic long ago, so he rules with fear and ruthlessness. His eternal bite is not magical, but venomous. The group realizes that Cyrus is seeking the Crown in order to restore his magical powers.

The conversation then shifts to the Aethereum. In exchange for a future favor, The Crone gives Grace three toxic flowers that will allow anyone who ingests them to escape from the Aethereum by mimicking death.

Back at Katmere, the friends learn that Jaxon's soul broke when his mating bond with Grace was broken. Grace's soul did not break only because Hudson, who was still in her mind, held it together. Grace hopes to find the Crown to mend Jaxon's soul and stop him from turning into a monster – which is what happens to a soulless being.

The group attends an anticlimactic graduation ceremony and prepares for a celebration later that night. But Hudson is arrested by the Nuri's guards; he is to be sent to the Aethereum. Grace insists that she has the right, as Hudson's mate, to accompany him. To their surprise, Cyrus announces that The Circle has issued an arrest warrant for Flint, because of his earlier attempt to kill Grace. All three young people are sent to the Aethereum, which is located in New Orleans. As soon as they enter bracelets suppress their magical powers.

Once inside the prison, they meet Remy, a warlock who was born in the Aethereum and who can see the future. They also meet Calder, a flirty yet fierce manticore. The five of them are locked in a cold metal cell, which they can leave only to attend "Hex time." The five friends must survive the Chamber, a magical torture device that forces prisoners to repeatedly relive their worst

17

SA-136

memories. Because of Remy's unique powers, he can avoid the Chambers – a privilege he is able to extend to Grace. But Hudson, Flint, and Calder experience multiple nights of torture. During Hex time, the friends play games against other inmates, under the watchful eyes of Windigo guards, in order to earn money that they will need to escape. They amass a significant amount of gold.

The friends arrives at the Pit, a bustling marketplace filled with colorful stalls where all types of food and goods are sold. At a fortune-telling stall run by a troll, Grace draws a tarot card that reveals trouble to come. After a lunch of tacos, the group locates the Blacksmith – a giant named Vander Bracka – imprisoned in a large furnace room. Vander is initially reluctant to escape; he has lived most of his life in the prison. But Vander agrees to make the key that Grace and her friends need to unchain The Unkillable Beast in the hope of being reunited with his mate.

Hudson heads to the fighting rings in the Pit, hoping to earn more gold. Remy takes Grace to a tattoo parlor; he insists that the tattoo will allow Grace to pull magic that Remy has never been able to access, which will assist in their escape. When the friends reunite, it is clear that Hudson has been severely beaten while fighting. However, he has earned many bags of gold.

Grace gives Vander one of The Crone's magical flowers, but it has no effect on him. Calder takes the second flower and becomes incapacitated. Remy is insistent that he consume the last flower because, in his visions of the future, he escapes from the prison using one of the flowers. But this means there is no plan for Grace, Flint, and Hudson to escape.

Remy leads the group to Charon, a young boy with a god complex who claims to run the prison. They offer him their gold, but not enough to get them out. Charon does, however, agree to let the friends go if they can defeat two giant prison guards in front of a crowd of spectators. Though the crowd is expecting a bloodbath, Grace and Hudson defeat the guards by dropping

18

SA-137

chandeliers on them. Charon tries to renege on his promise, but he eventually agrees to allow five of the six companions to leave – though he refuses to remove the bracelets that are inhibiting their magical powers. Remy, having seen in a vision that he will escape using one of The Crone's toxic flowers, agrees to stay behind while the other five escape. Grace, relying on her new tattoo, finds and frees Remy's magic, and he removes their restraints. After an emotional farewell, Grace, Hudson, Flint, Vander, and Calder leave Remy behind in the Aethereum and emerge into a cemetery, where they part with Calder and Vander Bracka. Before parting ways, Vander gives Grace the key that will unlock The Unkillable Beast's unbreakable chains.

Grace, Hudson, and Flint reunite with their Katmere friends and set off to free The Unkillable Beast. But Cyrus and his army of vampires and witches are waiting for them on the Beast's island. A violent battle ensues; Flint is almost killed, and Luca is killed. Jaxon tells Grace to channel his magic to heal Flint. The true extent of Hudson's powers – and his potential for destruction – is revealed as he turns a group of vampires into dust with a single look. Cyrus and his army retreat when Hudson threatens to destroy them all.

Flint awakens. Jaxon is on the brink of death from sacrificing his power to save Flint's life and being bitten by his father. Nuri, the Dragon Queen – struggling with guilt over aligning with Cyrus and grateful for what Jaxon has done to save her son – gives Jaxon her dragon heart. This saves Jaxon's soul.

With Cyrus's army gone, Grace uses Vander's key to unlock the chains restraining The Unkillable Beast, who transforms from his gargoyle form into a man. Having been stuck in his stone form for thousands of years, the Beast struggles to communicate with Grace and her friends. He does not seem to know where the Crown is and implies that his mate requires protection. But when Grace promises the Beast that she will protect his mate in exchange for the Crown, a magical

19

SA-138

tattoo of a Crown appears on her palm. Grace promises to deliver the Crown to the Beast's mate. The Beast runs out of the cave.

In a final chapter narrated by Hudson, the group returns to Katmere and are horrified to find the campus has been destroyed. Covet ends with Grace and her friends learning that Cyrus has kidnapped Katmere's students.

## IV.    Court

Court begins where Covet ended, with Grace and her friends preparing for war against Cyrus while mourning the loss of Luca and learning that Flint has lost his leg. Marise, the school nurse and lone survivor of Cyrus's attack, tells the group that Cyrus is draining the kidnapped students of their magical powers, thus endangering their lives.

After a night of much needed rest, Grace finds the Beast, in his human form, sitting at a chess table. When their hands touch, Grace and the Beast turn to stone and are transported to the Gargoyle Court, an opulent medieval castle in Cork, on the east coast of Ireland. Here Grace discovers that the Beast is Alistair, the Gargoyle King, ruler of the Gargoyle Court, and rightful owner of the Crown. The Beast tells Grace that she is his descendant, his great great-great-great-great granddaughter (many generations removed), and that she is now the owner of the Crown. Alistair gives Grace an ornate ring, symbolizing the transition of power.

Grace learns that there are actually thousands of gargoyles in existence, waiting to reclaim their place in the world under their rightful Queen. Alistair introduces Grace to the Gargoyle Army and to Chastain, the Army's lieutenant general, who feared Alistair was dead and is relieved to see him alive. But without warning, Grace finds herself back at Katmere; Alistair is nowhere to be found.

20

**SA-139**

A wolf named Dawud arrives with a warning: the wolves have joined Cyrus and are on their way to Katmere to capture Grace and her friends. Dawud wants to help defeat Cyrus, who has kidnapped his brother. A pack of wolves suddenly attacks; Hudson is able to use his great power to vanquish them. Knowing that more wolves will soon appear, the friends decide to trust Dawud. They help Macy to create a portal to the Witch Court in Italy, while Jaxon and Hudson fend off more arriving wolves. With seconds to spare, the entire group escapes through the portal. In order to make it through the portal, however, Hudson is forced to use his powers to destroy Katmere. With each feat, Hudson becomes more and more drained.

No sooner do the friends arrive at the opulent Witch Court than they are told to leave. To Macy's dismay, the Witch King and Queen refuse to help them; they care only about their daughter, who is one of the captured Katmere students. Hoping to gain their assistance, Grace reveals that she has the Crown. When the Witch King informs Grace that the Crown is powerless without the Gargoyle Army, Grace tells him that she intends to lead the Gargoyle Army to defeat Cyrus. The Witch King and Queen tell Grace that if she can use the Army to save their children from Cyrus, they will help her defeat him once and for all.

Outside of the Witch Court, Grace and her friends find themselves on the streets of an Italian town. They encounter a helpful witch, who informs them that the Crown allows the person wielding it to strip a paranormal of his powers. The witch also reveals that Macy's mother, long thought to be dead, is alive and living in the Vampire Court. She even creates a magic prosthesis for Flint.

The group flies on the back of the dragons to the Gargoyle Court in Cork, Ireland, only to find the Court in ruins. Hudson rents a place for them to rest and recover. While they recuperate,

21

SA-140

Hudson confesses that he wants Grace to use the Crown to strip him of his powers. He feels guilty about the damage he has caused and is afraid of how he might use these powers. Grace refuses.

The next day, Hudson (who while trapped inside Grace got a good look at her innards) tells Grace that he thinks that if Grace touches a green string deep inside of her, she can manipulate time – a power possessed only by The Bloodletter. When Grace tries holding the green string, the room explodes around her.

Hoping for insight into Grace's green string and the whereabouts of Macy's mother, the group travels by portal to The Bloodletter's ice cave in Alaska. Before entering the cave, Grace reveals to Jaxon that their mating bond was manufactured; Jaxon, it turns out, already knew.

The Bloodletter reveals that she is Cassia, the Goddess of Chaos, twin sister of The Crone (Adria) and creator of paranormal creatures. She also tells Grace that she (The Bloodletter) is Alistair's mate and Grace's ancestor. She and her sister are demigods, and Grace, as her descendant, has demigod powers as well.

The Bloodletter warns that Grace needs the Gargoyle Army to protect her from Cyrus, who wants to take her demigod powers and will stop at nothing to get them for himself. The Bloodletter explains that Cyrus tried to destroy the Gargoyle Army by using gargoyles' ability to channel magic to poison all gargoyles simultaneously. Before the gargoyles died, The Bloodletter froze all gargoyles in time. She gave Chastain a God Stone to prevent the poison from killing the Army for as long as they remained frozen. To save the Army, Grace must learn how to use her powers to connect with all gargoyles.

But with Grace's demigod powers not yet fully developed, Grace and her friends must find an antidote to the poison so they can unfreeze the Army. The antidote – the Tears of Eleos – can only be obtained by winning the Impossible Trials, a series of challenging tests. Grace and her

22

SA-141

friends are transported to St. Augustine, Florida, where they discover a saltwater taffy shop through which they can access the Impossible Trials arena. The shopkeeper, Tess, tells the group that no one has ever survived the Trials.

The group, divided about whether to confront Cyrus immediately or wait until they have a concrete plan to save the students, returns to the house Hudson rented. Without telling their friends, Macy, Flint, and Mekhi go to the Vampire Court. Grace, Hudson, Jaxon, and Eden follow their friends; they find Cyrus holding the Katmere students hostage and draining them of their powers. To access the Court, Hudson takes them through his secret lair, where Cyrus tortured him during his childhood.

At the Vampire Court, they are captured and reunited with their friends (and Uncle Finn) in a dungeon. Also in the dungeon is Macy's mother, Rowena, who was tortured by The Crone and by Cyrus – a fact of which Uncle Finn was aware but powerless to do anything about.

Cyrus appears, along with a young girl named Isadora. Threatening Grace and her friends with torture and certain death, Cyrus demands that Grace bring him the God Stone; if she does so, he agrees to free the children trapped at the Vampire Court. But Cyrus threatens to kill one of Grace's friends each day until the God Stone is in his possession. To prove that he is serious, Cyrus impales Liam, and Isadora, who can siphon souls, drains Liam of his powers.

Cyrus releases Grace and several of her friends to search for the God Stone. But he insists that Isadora – who is revealed to be Jaxon and Hudson's half-sister – accompany them. As they will learn, Isadora, like Hudson, was tortured by their father while growing up in his court.

Arriving at the frozen-in-time Gargoyle Court, Grace reveals her plan: she will give Cyrus the God Stone to buy time while they compete in the Impossible Trials for the Tears of Eleos. Believing that the Gargoyle Army would refuse to help them, the friends pose as trainers, and

23

SA-142

Grace tells Chastain that training is necessary for the Army's survival. During the training Grace realizes that the God Stone is the ring on Chastain's finger. She challenges Chastain to a battle, freezes him in time and tries to remove the ring. But the Gargoyle Army comes to Chastain's defense. The angry general tells Grace that she is not worthy of the Army's respect. Grace's attempt to meddle with time earns her a visit from the God of Time, who unfreezes time and so puts the gargoyles at risk of dying from Cyrus's poison. Grace tells Chastain that the Army must turn into stone to avoid the effects of the poison; she begs Chastain to trust her and give up the ring for the safety of the Army. Chastain accepts that sacrifice is the true calling of a gargoyle; he gives her the ring and turns into stone.

Grace and her friends reunite with Remy and Calder, and together they return to the Vampire Court. They deliver the God Stone to Cyrus, who of course refuses to hold up his end of the bargain. While confronting Cyrus, Grace accidentally freezes herself and Cyrus together in time and finds herself trapped in Cyrus' memories. Trapped in his mind, Grace secretly watches as Cyrus and another vampire discuss their plan for world domination, which include sacrificing Delilah the Vampire Queen. After Grace and Cyrus unfreeze, Grace uses the information she gathered while frozen in Cyrus' memories to make a deal with Delilah: Grace will help Delilah get vengeance against her husband in exchange for the students' freedom.

Rowena confesses that she cannot leave the Vampire Court until she fulfills her promise to The Crone, which was to bring The Crone her daughter – Isadora. Grace and her friends take Isadora to The Crone's island, but she demands to return to the Vampire Court.

Once Rowena's promise to The Crone is fulfilled, the entire group, including Macy's mother, is able to leave the Vampire Court. They travel by portal to the Witch Court, where they

24

SA-143

prepare for the Impossible Trials. Rowena, grateful for Grace and Macy's help, gives them runes and potions that will aid them during the Trials.

Grace and her friends head back to St. Augustine. Grace does not want her friends to risk their lives in order to save the Gargoyle Army, but they insist on competing with her.

In the arena, spectators watch as the group faces and surmounts three of the four dangerous trials they must complete. When they make it to the fourth and final round, Remy throws a rune that reveals a terrifying translucent creature who must be killed. Their powers have no effect on the beast, whose size fluctuates as it moves. Working together, the friends execute a daring to lure the beast into portals. Although Grace injures her wing in the process, the plan succeeds. But the beast appears to be in pain, and Grace realizes that she cannot kill the creature without violating her fundamental values. Instead, Grace channels power from her friends to heal the beast, who turns out to be the young son of Tess, the owner of the saltwater taffy shop.

Grace's sacrifice and empathy allow the friends to win the Trials and earn the antidote. But their success comes at a cost: two more members of The Order, Rafael and Byron, are killed, and Mekhi is gravely injured.

Grace drinks the Tears of Eleos, which cures the poisoned Gargoyle Army. Nonetheless, Chastain refuses to let her connect with the rest of the Army as punishment for her lying and stealing to get the God Stone. Chastain tells her that, because of her actions, the Army will not respect Grace as their Queen and leader.

The group returns to Katmere, where Cyrus and his army are waiting for them. In an intense and violent battle, the friends face off against witches, dragons, vampires, and wolves. After Calder is killed and others injured, Grace decides to confront Cyrus directly. Cyrus uses the opportunity to strap Grace and her friends to a machine designed to drain their powers, funneling their powers

25

SA-144

to himself. Finding power deep within her, Grace is eventually able to release her friends from the restraints. Cyrus orders his troops to attack, but to Grace's surprise, the Gargoyle Army suddenly appears, vowing to defend their Queen. Armed with both the Crown and the Gargoyle Army, Grace strips Cyrus of his powers.

An epilogue told from Hudson's perspective reveals that three months later, Grace and Hudson have moved to San Diego, where Grace, now in college, plans to move the Gargoyle Court. Court ends with Grace and her friends setting off on another adventure.

26

**SA-145**

## ADDENDUM D

This addendum summarizes the principal characters in Plaintiff's and Defendants' works.

### I.  BMR/Masqued

**Anna/Mia**: BMR/Masqued's heroine is a sixteen-year-old high school senior named Anna – or in Masqued 2014, Mia – St. Clair. Anna/Mia is tall and slender, with long, dark hair and an olive complexion. Over the course of the story, she will develop marques (glyphs) on her neck and back, which will mark her as special.

Anna/Mia has lived in Anchorage, Alaska, for almost a decade, since the death (which may not really be the death) of Dante DeWinter, her father (or the person she believes to be her father). She lives with Marcheline, her mother (or the person she thinks is her mother) and her Aunt Brie (or Rose). In some versions, the heroine's real mother is Elise, the High Priestess of Avalon, who beckons the heroine through a mirror into an alternate dimension. In others (Masqued 2013 and 2014), Marcheline (sometimes spelled Marchalene, or just Shalene) is in fact Anna/Mia's biological mother, while Elise (called Marise in Masqued 2014) is her grandmother.

Anna/Mia is smart, able to quote literature and enjoys discussing philosophy with her friend Brendan. Though unaware of the full extent of her own supernatural identity, Anna/Mia knows that her beloved aunt is a witch, a member of the Kindred Order. She correctly intuits that her mother once had supernatural powers or practiced the "Craft" as well. She resents the womens' secrecy about her family's past and about her father's death, the memory of which has been dulled by magic teas given to her by her aunt, a healer.

Anna/Mia has a love for tarot cards, which connect her to the magical world. She is intuitive, spiritual, and guided by visions and dreams, which escalate as she approaches her seventeenth birthday. She knows that, on that day, she will experience some sort of initiation, and

SA-146

will have to make some kind of a choice. As that day grows closer, her "talents" or "powers" become increasingly apparent.

Anna/Mia's goals throughout the novel are two. The first is to find and rescue her father, who is not dead at all, but a prisoner of malign supernatural forces. The second is to learn more about who she is, precisely what her initiation will involve, and what it portends for her future. The climax of the story is set up by Anna/Mia's discovery about her true parentage, as well as her learning that she is the Chosen One (called The Nyx, after the ancient Goddess of the Moon, in later drafts) – a girl of mixed light and shadow heritage who is predicted to tilt the balance between light and shadow when she turns seventeen and comes into her powers.

**Marcheline/Marchalene (Shalene):** Shalene is the woman Anna/Mia believes to be her mother, and who has raised her as her mother. She is the widow of Dante DeWinter. Shalene is a Kindred witch who has given up the Craft. She is the oldest daughter of the High Priestess of Avalon; she rejected her calling to inherit the High Priestess' mantle in order to marry Dante. In Freeman's early drafts, Shalene is not Anna's biological mother, but her aunt; in others (Masqued 2013/2014) she is Anna/Mia's biological mother. In some versions (Masqued 2013/2014), Shalene was once the lover of Julian the villain (see below); in earlier drafts, her older sister Elise was Julian's lover. Shalene is very beautiful but looks nothing like Anna/Mia. She is an artist of some renown. Shalene has incurred Anna/Mia's resentment, both for her overprotectiveness and for her refusal to tell her daughter about herself or allow her to read tarot cards and practice the Craft. She has tried to give Anna/Mia a normal life and does not want the girl to hear or to accept her true calling.

**Brienne/Brynne (Brie):** Brie is Anna/Mia's beloved aunt, the person who best understands her. She is a practicing witch and, as her niece learns, she is Kindred – the most powerful type of

SA-147

witch, in tune with nature and charged with protecting the earth. Brie works as a veterinarian. She is also an herbalist, a cook, and a brewer of teas, some of which are designed to suppress Anna/Mia's early memories so she can have a normal life. She favors telling her niece more about herself, but she defers to Shalene. In Masqued 2016, her name is Rose.

**Ash/Roman**: Anna/Mia falls in love with an attractive new boy who arrives at her high school on the opening day of the story. Ash MacKay (Roman in Masqued 2014) is variously a werewolf, a Berserker (a Viking warrior), or a shapeshifting Sentinel. Ash/Roman is the heroine's one and only boyfriend in every draft of the novel. He is tall and supermodel-level handsome; he has amber eyes rimmed in black and he looks like a young Viking. Ash/Roman rides a motorcycle or drives an SUV and wears black leather clothes to match.

Ash/Roman is the son of Baen and Caitlin MacKay, archeologists who are guest-teaching a course called Ancient Global Studies at West High School, where Ash/Roman and his twin sister Lily are newly enrolled students. Ash/Roman and Lily help their parents on digs and so are conversant with their work. Ash/Roman is distraught over the death of his older brother, Dylan, who fell into a crevasse on a recent dig; he is convinced that Dylan was murdered and has sworn to avenge him. He wears tattoos in honor of his brother and has magical rings of black, silver, and gold on his fingers, which Anna/Mia can see when inebriated.

The MacKays are shapeshifters – they can turn themselves into wolves, and in later drafts, into bears and big cats. They are members of the ancient Order of the Sphinx, to which Dante DeWinter may also have belonged. The Order is looking for the Nyx, believing she will choose to align herself with her demonic ancestors rather than her ancestors of light – including an evil Druid known as Ronan or Aedan O'Faolain, who is linked to the Nyx in a prophecy. Like all members of the Order and everyone in his family, Ash/Roman is sworn to kill the Nyx.

3

SA-148

Ash has the ability to get people to do what he wants – to compel them – but he does not like to use it, especially on Anna/Mia, whose feelings for him he does not wish to force. He has an affinity for animals. He has just turned seventeen and is newly initiated; he does not have full control over his powers. But his bite can heal, although if he bites someone, he will be able to tell when that person is in trouble, and he has a heightened desire to protect that person. Ash/Roman does take care of Anna/Mia, especially after she saves his mother's life. Except in one instance, he offers to run interference with Taylor; Anna/Mia welcomes and does not resent his care.

**Amanda/Samantha**: Amanda (Samantha in Masqued 2014) is Anna/Mia's oldest friend in Anchorage. The two girls have been like sisters since Anna arrived from California. However, Amanda's interests have recently diverged from Anna/Mia's – she has joined the cheerleaders and become close to Taylor Vaughan and the other Mean Girls at school – and at the outset of the novel she rejects Anna/Mia. She subsequently invites Anna/Mia to a high school party, at which Anna/Mia gets drunk on spiked punch. Over the course of the drafts, Amanda/Samantha changes from a normal human girl to a half succubus (one parent is demon soul sucker). She tells Anna/Mia that she believes they were drawn together because they both have demonic ancestry. She is used by Taylor and Julian to entrap Anna/Mia. Her boyfriend is Carter, a jock.

**Taylor Vaughn:** Taylor is the prettiest and most popular girl at school; she is also the ultimate Mean Girl. In BMR (2010/2011), Taylor is also a lifelong friend of Anna's, but in the Masqued drafts Anna/Mia does not like Taylor and resents her for luring Amanda away. Taylor is furious with Anna/Mia because Ash/Roman is immune to Taylor's charms and likes Anna/Mia instead. In Masqued 2013 and 2014, Taylor, like Amanda/Samantha, is revealed to be half succubus; in Masqued 2014, Taylor is revealed to be Mia's half-sister, and fully demonic. In all iterations of the story, even when she is just a human girl, Taylor plays a pivotal role in delivering

4

SA-149

Anna/Mia to Julian, the villain. Taylor takes Anna/Mia to a party and gets her to drink alcohol, which makes her drunk. She wears a snake ring on her finger; it is a cursed object, one of twelve being sought by the MacKays. Her boyfriend is Jake, a jock.

**Brendan**: Brendan is one of Anna/Mia's oldest friends and, aside from Amanda/Samantha, her dearest friend. He is a very good-looking biracial guy who is extremely popular (he is the class president). He is also secretly gay, a fact known only to Anna/Mia. For years he and Anna/Mia have (in some versions) talked politics, philosophy, and religion. He comforts Anna/Mia when Amanda/Samantha (and Taylor) diss her and introduces her to his friends from the school newspaper, who become her new friend group: Rachel Holland, Jenny Holland and Mason McGarner (or Garner, in other versions). Brendan is the person Anna/Mia asks to take her home when she becomes leery of Ash/Roman; he is, therefore, somewhat suspicious of Ash/Roman. In Masqued 2013, Brendan is revealed to be a supernatural being (a Faery).

**Rachel**: Rachel Holland is whip smart, editor of the school newspaper (and suspected of being its gossip columnist), skeptical of the nostrums fed by their teachers (especially Baen and Caitlin MacKay) and hater of all Mean Girls. She has burgundy-black hair and a "Gothesque" style, dressing in black platform boots, fishnet stockings, and studded accessories. In all versions prior to Masqued 2014, she is the cousin of Jenny, another member of their group. In Masqued 2014, she is Brendan's cousin. In Masqued 2013, she is revealed to be a supernatural creature (a ban sidhe, or banshee in Anglicized spelling). She is so smart and so difficult that Julian the Incubus has no use for her and wants to feed her to his vampires.

**Jenny**: Jenny is petite and graceful, with sable hair and dark brown eyes. She dresses in an edgy, punkish style but has nowhere near as many piercings as Rachel. She is on the school

SA-150

newspaper staff. She is Rachel's cousin and Mason's girlfriend. In Masqued 2013, she is revealed to be a siren. Jenny does not appear in Masqued 2014.

**Mason**: Mason is short, smart, and red-haired. He is quiet but funny. He is also on the school newspaper staff and he is revealed in Masqued 2013 to be a leprechaun. He has a crush on Jenny. Mason does not appear in Masqued 2014.

**Julian**: BMR/Masqued's villain is Julian, who is variously a vampire (BMR) or an incubus (Masqued). Julian is extremely handsome – seductively so – and Anna/Mia is drawn to him when she first sees him. In the past, Julian had a romantic relationship with someone related to Anna/Mia – either Elise (BMR and Masqued 2012) or Shalene (Masqued 2013/2014). The story of Julian's thwarted love changes from version to version, but in each instance he is an angry, spurned lover who blames Dante DeWinter for the loss of his one true love. He takes his revenge by imprisoning Dante in a magical world in the form of a wolf. Julian's search for Anna/Mia is a backdrop to the novel; either Taylor betrays Anna or his goons locate her when they see her perform magic in public. Julian finally sees Anna/Mia in The Sanctuary, where supernatural beings meet in Anchorage. His goons kidnap her and her friends when the friends unwittingly lure Anna/Mia outside. Julian threatens to enslave or kill Anna/Mia's friends, which leads the girl to promise that she will do anything he asks. In the first three versions of the novel, Julian's demand is that Anna marry him to make up for his lost Elise, whom she closely resembles (because Elise is Anna's biological mother). In the fourth and fifth drafts, Julian's lost love was Shalene, not Elise, and he demands that Anna/Mia lure her mother to his lair so they can be reunited. In Masqued 2013 and 2014, Julian is the heroine's biological father. In Masqued 2014, he is also Taylor's father.

**Elise/Marise:** In BMR and Masqued 2012, Elise is the middle sister of three St. Clair sisters. She looks very much like Anna except that she has blue eyes. She loves Julian and becomes

6

SA-151

his wife – even to the point of becoming a Sanguine (blood sucker) – but abandons him to become the High Priestess of Avalon when Shalene refuses that role in order to marry Dante. Her rejection drives Julian mad and turns him evil. In the first three drafts, Elise is Anna's mother, although Dante is her father. In Masqued 2013 and 2014, Elise/Marise is Anna/Mia's grandmother, who retains the title of High Priestess because Shalene, her daughter, has refused to take it up. In all versions, Anna/Mia first sees Elise/Marise in a mirror (in some versions, Melusine's Mirror) and visits her by passing through the mirror. Elise/Marise advises Anna/Mia about her destiny and, in all versions except Masqued 2014, allows her to try to rescue her father. In Masqued 2014, Marise warns Mia that her father cannot leave Avalon, but the girl forgets the warning.

**Dante DeWinter**: Dante is the man who raised Anna/Mia as her father and who in the first three drafts actually is her biological father. In Masqued 2013, Dante mistakenly believed that he was her father; in Masqued 2014, he knew that Julian was Mia's father but loved her anyway. Dante was a member of the Order who learned incriminating information about a high-ranking member and who is believed to have been killed as a result. In fact, Dante was captured by a vengeful Julian, who imprisoned him in the form of a grey-eyed wolf. In Masqued 2013, Dante has been turned into an incubus as well. Dante walks in Avalon, and he encounters Anna/Mia as a sort of spirit guide in her dreams, calling himself Athair Mo Chroid (Gaelic for Father of My Heart). Forced for her first test to choose to rescue one of two wolves, Anna always chooses the one she thinks is her father, but she is always wrong. She is able to escape from Avalon with the wolf she chose only because Athair/Dante sacrifices himself. Dante gave Anna/Mia the pendant she always wears.

**Ronan/Aedan O'Faolain**: Ronan/Aedan is barely a character in the novel, but he is a presence. He is a Celtic Druid, hundreds of years old, who is alleged to have dealt with demons,

7

SA-152

killed the entire community of Celts who followed him to New Zealand, and enslaved his priests to objects that thereby became cursed – one of which is Taylor's ring. Also found in wolf form in Avalon, Ronan/Aedan has amber eyes rimmed in black – just like Ash/Roman – and in at least two of the drafts Anna/Mia mistakes him for Athair, her spirit guide. He is always the wolf she frees instead of her father. When Anna/Mia takes Ronan/Aedan through the mirror, he is transformed into a handsome Celtic man with dark hair, wearing a leather jerkin and bearing runes on his skin. He tries to comfort the girl, who is horrified that she has freed a being she thinks is the devil, although she finds him attractive. When Ash/Roman arrives on the scene, Ronan/Aedan turns into a raven and disappears.

Contrary to Plaintiff's suggestion, at no point in any draft of BMR/Masqued is Ronan/Aedan Anna/Mia's boyfriend or an alternate love interest. Indeed, as Freeman admits in her notes, "Ronan and Anna barely meet in (BMR)." Dkt. No. 397-1 at 3. In one of her early notes, Freeman posited that Ronan (as he is then called) will eventually be part of a love triangle with the heroine and "help her learn to use her powers to restore the balance"– but no novel incorporating that concept was ever written.

## II. *Crave* Series

**Grace:** Anna/Mia's ostensible comparator in the *Crave* series is Grace Foster. Grace is introduced as a grieving high school senior, reeling from the very recent death of her parents in a car accident. Grace is short and curvy; she has curly brown hair and freckles. She is sarcastic and emotionally guarded. Her narrative voice relies heavily on humor and pop-culture references. She loves Pop Tarts, Dr. Pepper, and Harry Styles.

Following her parents' death, Grace is forced to relocate from San Diego to remote Alaska, where her Uncle Finn (her only remaining adult relative) is the headmaster of a private boarding

8

SA-153

school called Katmere Academy. At Katmere, she shares a dorm room with her cousin Macy, a quirky, bubbly girl who remains loyal to Grace throughout the series.

Grace's early identity is shaped by the (apparent) fact that she is an outsider at Katmere Academy – the only human in a world full of teenaged vampires, werewolves, witches, and dragons who are masquerading as normal teenagers. However, at the end of the first novel, Grace turns to stone while trying to protect her boyfriend from an attack, and we learn that she is no ordinary human, but the first gargoyle to be born in a thousand years. Though unsure of herself when she first discovers her supernatural self, Grace grows into her magical powers and self-confidence over the course of the novels, learning how to fly, turn to stone, manipulate elements, and freeze time. Her leadership arc evolves as she comes to terms with her supernatural identity; she ultimately becomes Gargoyle Queen and Leader of the Gargoyle Army. Through a series of picaresque and increasingly bizarre adventures that take place all over the globe, she and her friends figure out how to defeat the evil power that is seeking to dominate the supernatural world.

**Macy:** Macy is Grace's first cousin, the daughter of Uncle Finn. She believes her mother, Rowena, is dead (though Rowena turns out to be a prisoner at the Vampire Court). Macy, like her father, is a witch, a fact of which Grace is unaware until she arrives at Katmere. Macy, like all witches, has the power to create "portals" through which she and her friends can travel quickly to the faraway places where their adventures take place. She helps Grace adjust to being in a school full of supernatural beings and becomes her devoted sidekick.

**Uncle Finn:** Uncle Finn is Grace's uncle. He is a witch. He has a woodsy smell. He is protective of Grace and tries to act as a father figure.

**Jaxon Vega:** Jaxon is a tall, very dark, and brooding teenaged vampire – the most powerful vampire at Katmere when Grace arrives. He has a sharp jawline and a jagged scar from the center

9

SA-154

of his left eyebrow to the left corner of his mouth. He has black hair, black eyes, and wears black clothes. The younger of two sons of the Vampire King Cyrus and his wife Delilah, Jaxon was raised by a vicious old lady vampire known as The Bloodletter, who lives in an ice cave in the Alaskan wilderness. He runs everywhere with a "posse" (or perhaps protective detail) consisting of several other young teenaged male vampires – Liam, Rafael, Mekhi, and Byron – who also dress in black and who are known to other students as The Order. Jaxon and his posse travel by "fading," which allows them to cover great distances quickly. They subsist primarily on animal blood; they can drink human blood, but if they do they must stay out of the sun for several days afterward. Unlike the vampires in many stories, when Jaxon and his friends bite someone, that person does not automatically turn into a vampire.

Jaxon is heir to the Vampire Kingdom, which is the most powerful among the various supernatural kingdoms. He tells Grace that he had killed his older brother, Hudson, after discovering Hudson's apparent plan to use his mind-control abilities to make vampires the leaders of the supernatural and mortal worlds. When Jaxon cannot control his emotions, his inner rage unintentionally triggers earthquakes. He has the power of telekinesis, or moving objects using his mind.

Jaxon is very protective of Grace, which alternately pleases and displeases her, especially when she is capable of protecting herself. Jaxon is connected to Grace via a "mating bond," a colored "string" that snaps into place deep inside the soul when two people who are destined to be mates touch. Jaxon's and Grace's bond turns out not to be natural; it was manufactured by Jaxon's guardian, The Bloodletter, so that her ward would become the mate of the world's first gargoyle in a millennium. It is potent nonetheless; when the bond is broken, Jaxon starts to lose his soul.

SA-155

**Flint**: Flint Montgomery is the charismatic, biracial, gay Dragon Prince, son of the Dragon King, Aidan, and Dragon Queen, Nuri. As a dragon, he can fly and shoot fire and ice. Though Flint initially wants to kill Grace to prevent Lia from resurrecting Hudson (see below), he later becomes her close friend and confidante. Though he dates Luca, Flint has had an unrequited crush on Jaxon for a long time; he does not act on it because Jaxon is unavailable.

**Lia**: Lia is a teenaged witch, another senior at Katmere, who pretends to be Grace's friend. Lia was the girlfriend of Jaxon's older brother, Hudson, who is presumed to have been killed by Jaxon the previous year. Lia is obsessed with resurrecting her beloved Hudson; she believes she can accomplish this by sacrificing Grace – hence her interest in the girl. Lia was behind the killing of Grace's parents – an event she staged to lure Grace to Katmere – and she poisons and paralyzes Grace with herbal tea so that Lia can use the girl as a sacrificial offering. The scene at which the sacrifice is supposed to take place is the climax of the first novel of the *Crave* series. Lia ceases to be a character in the *Crave* series when her plan goes awry and she is destroyed.

**Cyrus and Delilah**: The Vampire King and Queen are Jaxon's and Hudson's parents and the rulers of the most powerful of the supernatural kingdoms. Cyrus is the villain of the story. He is a megalomaniac, and his efforts to cement his status as a dominant power in the supernatural world by becoming a god are resisted by Grace, his sons, and their friends. Cyrus leads powerful armies comprised of various supernatural beings; among their goals is harming, killing or capturing Grace and her friends. Cyrus is thought to have destroyed the gargoyle race one thousand years earlier. He raised his older son Hudson and tortured him. Delilah speaks with a melodic British accent. She has the same black eyes and sharp, angled jawline as Jaxon and Hudson. Jaxon is her favorite child.

11

SA-156

**The Dragon Queen and King**: The Dragon Queen and King, Nuri and Aidan Montgomery, are the rulers of the Dragon Kingdom. They come to Katmere to watch the Ludares tournament and so that Nuri can play against Grace in the Trials. They reappear when Flint takes his friends to the Dragon Kingdom to celebrate the Wyvernhoard festival, and Nuri agrees to help Grace take down Cyrus. When Jaxon is losing his soul, the Dragon Queen gives him her heart because Jaxon almost died while saving Flint's life. As a result, she ceases to be a supernatural being.

**Cassia ("The Bloodletter")**: Cassia is a little old lady vampire (or a vicious vampire masquerading as a little old lady) who lives in a remote ice cave in Alaska, where she drinks the blood of unwitting tourists. She is actually a goddess – the God of Chaos, creator of paranormal creatures – and is sister to Adria, the God of Order (also known as The Crone). She raised Jaxon in order to shield him from his father and she loves him; she created the false mating bond that connects him and Grace. Her long-lost mate is the Gargoyle King, Alistair. The Bloodletter played a role in Grace's conception as the first gargoyle to be born in 1,000 years.

**Adria ("The Crone"):** Adria is Cassia's sister who lives in a mansion that looks like a gingerbread house on an island in the middle of the Pacific Ocean. She is known as The Crone. She is the God of Order, creator of humankind. She resembles a Greek goddess, with long, flowing hair, porcelain skin, and blue eyes. She was the architect of the Aethereum, and she gives Grace three toxic flowers that will allow those who ingest it to escape from the prison. She demands a future favor in return.

**Alistair:** The ancient Gargoyle King known as Alistair is Grace's distant ancestor – many, many generations back. He is also known as The Unkillable Beast. Cyrus imprisoned him a millennium earlier; like Prometheus, he is chained to a rock on an island, and when we first meet

12

SA-157

him, he is a monstrous creature made of jagged rock with red eyes. Grace seeks him out intending to kill him but realizes he is a gargoyle like her and immune to most magic. Unable to break his chains, Grace promises to return to free him. After finding a key that unlocks the chains, Grace frees Alistair and he returns to his human form. He possesses The Crown, which he gives to Grace when she frees him.

**Hudson Vega**: Central to *Crave*'s storyline is Hudson, Jaxon's teenaged brother and a powerful vampire. Like his brother, Hudson is British; unlike Jaxon, he has cobalt blue eyes. Hudson is cocky and sarcastic; he dresses exclusively in Armani. He can destroy anyone or anything with just his mind. He also has the power of persuasion.

Hudson graduated from Katmere a year before Crave begins, and while he is mentioned throughout the first book, it is not until the very end of Crave that Hudson – who is believed to be dead – actually makes an appearance. His former girlfriend, Lia, thinks she is able to raise Hudson from the dead; in fact, Jaxon did not kill his brother at all, and Hudson, who has simply been hiding, reappears at the end of the first book. In the last pages of Crave, Grace turns to stone as she shields Jaxon from Hudson's wrath; Grace is thus revealed to be a gargoyle. When she returns to her human form four months later, at the beginning of the second novel in the series, Hudson is trapped inside Grace's mind. After a series of quests to retrieve magical objects, Grace is able to expel Hudson from her mind and he becomes a standalone character for the rest of the series.

Hudson, like his brother, is connected to Grace via a mating bond, only his is a true inborn mating bond, and he gradually supplants Jaxon as Grace's boyfriend. He is supportive of Grace as she grows into her destined role as Gargoyle Queen; his assistance is critical to her victory in the Trials, and their connection helps the friends succeed in their magical quests.

13

SA-158

**Remy**: Remy is a young warlock born in the Aethereum who speaks with a New Orleans drawl. He is able to see the future. He has shaggy dark hair, broad shoulders, forest green eyes, and a strong jaw. He is essential to helping Grace and her friends escape from the Aethereum.

**Calder**: Calder is a giant manticore (part human and part lion, with eagle wings and a scorpion's tail) whom Grace, Hudson, and Flint first meet when they are imprisoned in the Aethereum. She is flirty and gorgeous, with long red hair and brown eyes.

**Chastain**: Chastain is the lieutenant general of the Gargoyle Army. He wears a ring later to be revealed the God Stone, given to him by The Bloodletter, which he in turn gives to Grace. He refuses to accept Grace as the Gargoyle Queen after she lies to him to get the God Stone, but ultimately helps her defeat Cyrus.

**Dawud**: Dawud is a young, skinny, nonbinary wolf from Syria with brown eyes, brown skin, and black hair long enough to touch his shoulders. After his brother is kidnapped by Cyrus, he comes to Katmere to warn Grace and her friends that the wolves have teamed up with Cyrus to capture them. He goes on magical quests with Grace and her friends and helps them defeat Cyrus.

14

SA-159

 Outlook

---

### Activity in Case 1:22-cv-02435-CM-SN Freeman v. Deebs-Elkenaney et al Pretrial Conference - Interim

---

**From** NYSD_ECF_Pool@nysd.uscourts.gov <NYSD_ECF_Pool@nysd.uscourts.gov>

**Date** Mon 1/12/2026 12:58 PM

**To** CourtMail@nysd.uscourts.gov <CourtMail@nysd.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

#### U.S. District Court

#### Southern District of New York

**Notice of Electronic Filing**

The following transaction was entered on 1/12/2026 at 3:57 PM EST and filed on 1/12/2026
**Case Name:**　　　　　Freeman v. Deebs-Elkenaney et al
**Case Number:**　　　　1:22-cv-02435-CM-SN
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**Minute Entry for proceedings held before Judge Colleen McMahon: Pretrial Conference held on 1/12/2026. Decision: Conference held. Any party wishing to move for summary judgment on substantial similarity must do so by January 26, 2026. Briefs are not to exceed 60 pages. Opposition briefs are due February 9, 2026, and reply briefs on February 17, 2026. The court is in possession of the following manuscripts: BMR (2011), Masqued (2016), Masqued (2014), Masqued (2013), Masqued (2012), and BMR (2010). The parties may cite these documents as exhibits; please do not refile or send copies of these documents to chambers in support of any motion. If Plaintiff intends to rely on any manuscripts not mentioned above in support of her motion for summary judgment, any such manuscripts should be mailed to chambers as soon as possible. Defendants may move for summary judgment on actual damages and to strike Plaintiffs jury demand no later than January 30, 2026. Plaintiffs opposition brief is due February 13, 2026, and Defendants reply brief on February 20, 2026. Plaintiff is to file her proposed rebuttal expert report as soon as possible. Any motions in limine are to be filed by March 31, 2026 and must follow the rules set out in this courts Individual Practices and Procedures. Submitted by: Jordyn Manly. (Court Reporter Martha Martin). (mde)**

**1:22-cv-02435-CM-SN Notice has been electronically mailed to:**

Lacy Herman Koonce, III     lance.koonce@klarislaw.com, clara.cassan@klarislaw.com, docketing@klarislaw.com, gili.karev@klarislaw.com, hamzah.jhaveri@klarislaw.com, mariella.salazar@klarislaw.com, rachel.simon@klarislaw.com, vivek.shah@klarislaw.com

Jennifer L. Pariser     jpariser@oandzlaw.com, paralegal@oandzlaw.com

Dwayne K. Goetzel     dgoetzel@intprop.com, ccomer@intprop.com

Scott Burroughs     scott@donigerlawfirm.com, alicitra@donigerlawfirm.com, anavarro@donigerlawfirm.com, asulich@donigerlawfirm.com, djenkins@donigerlawfirm.com, gguzman@donigerlawfirm.com, gray@donigerlawfirm.com, kschultz@donigerlawfirm.com, lzamora@donigerlawfirm.com, stephen@donigerlawfirm.com, tbarrett@donigerlawfirm.com

Stephen M. Doniger     stephen@donigerlawfirm.com, asulich@donigerlawfirm.com, gray@donigerlawfirm.com, lzamora@donigerlawfirm.com

Laura Zaharia Marion     laura.marion@jcrew.com

Mark D. Passin     mark@reedermccreary.com, anthony@reedermccreary.com, eservice@reedermccreary.com, kim@reedermccreary.com

Amy Lee Nashon     anashon@troygould.com, scervantes@troygould.com

**1:22-cv-02435-CM-SN Notice has been delivered by other means to:**

Universal City Studios, LLC

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

LYNNE FREEMAN,

                Plaintiff,

  - against -

TRACY DEEBS-ELKENANEY, et al.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

22 Civ. 2435 (LLS)

ORDER

Contrary to the apparent conceptions of the parties, questions of non-infringement have traditionally been reserved for the trier of fact. See Warner Bros. Inc. v. Am. Broad. Companies, Inc., 720 F.2d 231, 239 (2d Cir. 1983) (the issue of substantial similarity "is frequently a fact issue for jury resolution"); Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980) ("[S]ummary judgment has traditionally been frowned upon in copyright litigation."). Not withstanding the fevered expectations and arguments of counsel, I find no error or omission in Magistrate Judge Netburn's August 1, 2024 Report and Recommendation, which is careful, competent and thorough.

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

1

SA-162

entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Magistrate Judge Netburn explains

in detail (pages 7-17 of the Report & Recommendation) the genuine factual disputes in the

evidence regarding access by the defendants to Freeman's work, either directly or through

intermediaries, which could be combined with evidence of similarities between the two authors'

works which support the conclusion of copying. In the nature of things, direct evidence of

copying is rare. Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003).

This case does not meet Rule 56's basic requirement for a summary judgment, "that there

is no genuine dispute as to any material fact." In this case there is a genuine dispute as to

whether a defendant had access to plaintiff Freeman's writings, notes, manuscripts or drafts.

There is a genuine dispute as to whether a defendant copied parts, large or small, of Freeman's

work. There is a genuine dispute as to similarities between Freeman's and Wolff's work,

particularly in a degree indicative of infringement and copying. There is a genuine dispute as to

whether defendant Kim aided Wolff write the *BMR* series.

2

SA-163

These are some of the genuine disputes as to facts which are material to the direct copyright infringement claim, which must be resolved by a jury before the Court can determine whether Freeman is entitled to judgment as a matter of law.

Rule 56 expressly stipulates that summary judgment is granted when it shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Each of those two conditions is simple; neither can be dispensed with.

In this case, one of the counsel for defendants recently colorfully proclaimed that her client would not join any settlement. Presumably it will only accept unconditional surrender. Trial by jury, following the steps set forth in section four of my individual rules of practice, is a time-tested, neutral, fact-based process for resolving disputes.

At bottom, that is the choice of the parties. The Court approves it, as the proper choice for this case.

So Ordered.

Dated: New York, New York
January 14, 2025

_____
LOUIS L. STANTON
U.S.D.J.

3

SA-164

ORIGINAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

LYNNE FREEMAN,

                    Plaintiff,

        - against -

TRACY DEEBS-ELKENANEY, et al.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

22 Civ. 2435 (LLS)

ORDER

This is an action for copyright infringement, breach of contract, breach of fiduciary duty, fraud, and fraudulent concealment. Plaintiff Freeman moved for summary judgment on her direct copyright infringement claim. The defendants cross-moved for summary judgment on that claim and also moved for summary judgment on Freeman's state law claims for breach of contract, breach of fiduciary duty, fraud, and fraudulent concealment. In a Report and Recommendation on August 1, 2024 ("R&R") (Dkt. No. 361), Magistrate Judge Netburn recommended denying both summary judgment motions on the direct copyright infringement claim but granting summary judgment dismissing Freeman's state law claims. The parties filed timely objections. After a review of the R&R and the parties' objections, the Court adopts both

1

SA-165

of Magistrate Judge Netburn's conclusions, but narrows the scope of her direct copyright infringement rulings.

Both parties also moved to exclude certain expert testimony and to strike and/or seal various summary judgment exhibits. Magistrate Judge Netburn ruled on those motions in an Opinion & Order on August 1, 2024 (Dkt. No. 362), to which the parties also objected. After a review of that opinion and the parties' objections, the Court adopts all of Magistrate Judge Netburn's rulings regarding expert testimony and motions to strike, and it has already addressed sealing in an earlier order from October 24, 2024 (Dkt. No. 389).

## DIRECT COPYRIGHT INFRINGEMENT

As shown by Magistrate Judge Netburn's detailed and comprehensive R&R, the factual issues about access, along with substantial or lesser degrees of similarity, compel the denial of summary judgment. Fed.R.Civ.P. 56 requires that to render summary judgment, there must be "no genuine dispute of any material fact," and it must be clear that the prevailing party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). If there is no dispute about the material facts and the Court can decide the issues in the case as a matter of law, it can render summary judgment; but unless the material facts are undisputed and the law is clear, the proper disposition of the case is by the familiar trial by jury. Magistrate Judge Netburn properly recognized that there are genuine factual issues about claimed similarities between Freeman's work and the defendants' work that require a jury trial. Rule 56 reserves summary judgment for cases without fact issues, and so the Court's function is confined to applying the law and the constitutional right to trial by jury is preserved.

Magistrate Judge Netburn made carefully limited analyses of the degrees of similarity between the two parties' works, recognizing that "questions of non-infringement have

2

SA-166

traditionally been reserved for the trier of fact" and that, because of the central importance of similarity between the competing works, it "is frequently a fact issue for jury resolution." R&R at 6. However, she did hold that "the parties' works share probative, but not striking, similarities." R&R at 15. Those analyses should be taken as advisory rather than mandatory. Her perceptions are shrewd, but their validity and consequences cannot be taken as substitutes for a trial verdict rendered on independent evidence by a properly charged jury. Therefore, all questions related to direct copyright infringement – including access, probative similarity, striking similarity, actual copying, independent creation, and unlawful appropriation – are best left for trial.

Defendants object to preserving the question of substantial similarity for trial, arguing that "trial cannot be held without an antecedent judicial analysis on whether the allegedly infringed elements of the plaintiff's work are protected by copyright," and a trial would take "months given the volume of literature currently at issue" and "impose an impossible burden on the members of the public who are empaneled." Defendants' Objections to the R&R at 13-14 (Dkt. No. 382). However, it is unnecessary to fear that a jury trial will have to cope with more than 5,000 pages of novels, manuscript versions, and drafts that require months to read. Magistrate Judge Netburn correctly identified Freeman's mammoth index of claimed similarities as argument, not evidence. Her recommendation that it be excluded in toto will probably be adopted at trial, but until then the decision is reserved. In fact, the entire case on similarity, in more than necessary detail, is presented in pages 7-21 of plaintiff's response to the defendants' objections to the R&R filed on October 29, 2024 (Dkt. No. 393), and experienced trial counsel will be able to present the meat of it as efficiently at trial.

The cross-motions for summary judgment on direct copyright infringement are denied,

3

SA-167

and all related questions are preserved for trial.

## STATE LAW CLAIMS

Magistrate Judge Netburn properly dismissed Freeman's claims for breach of contract, breach of fiduciary duty, fraud, and fraudulent concealment. The parties did not object to her rulings, and they are therefore adopted without de novo review.

## NON-DISPOSITIVE RULINGS

The Court finds nothing clearly erroneous or contrary to law in Magistrate Judge Netburn's non-dispositive rulings, and they are all affirmed. She properly identified, detailed, and excluded the experts' suggestions, which were primarily argumentation. Her Daubert rulings represent meticulously analyzed and reasoned exclusions of Dr. Chaski, Dr. Juola, and Professor Reiss. The rebuttal reports of Dr. Coulthard and Ms. Easton are therefore unnecessary and are also excluded, as are all expert reports related to the state law claims that have now been dismissed. The Court adopts Magistrate Judge Netburn's decision to exclude Mr. Kaplan's affidavit on metadata but not Ms. Cole's. It also affirms all of Magistrate Judge Netburn's rulings on the motions to strike. The Court has already addressed sealing in a separate order (Dkt. No. 389).

So ordered.

Dated:      New York, New York
           November 21, 2024

_____
LOUIS L. STANTON
U.S.D.J.

4

SA-168

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/1/2024____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

LYNNE FREEMAN,

                                    **Plaintiff,**

              -against-

TRACY DEEBS-ELKENANEY, et al.,

                                    **Defendants.**

-----------------------------------------------------------------X

22-CV-02435 (LLS) (SN)

**OPINION & ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

In this copyright infringement action, both parties move to exclude expert testimony

pursuant to Rule 702 of the Federal Rules of Evidence and <u>Daubert v. Merrell Dow</u>

<u>Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and its progeny. Additionally, both parties ask the

Court to strike various summary judgment exhibits and to keep various summary judgment

exhibits under seal. The Court addresses these evidentiary issues in this opinion and order and

makes recommendations on the parties' motions for summary judgment by separate report and

recommendation, also filed today. The relevant factual background to the case can be found in

that report and recommendation.

                              **DISCUSSION**

**I.      Expert Evidence**

The Defendants ask the Court to exclude six affirmative expert reports offered by

Plaintiff Lynne Freeman. Those experts opine on: (1) the substantial, probative, and striking

similarity between Freeman's works and the *Crave* series; (2) the fiduciary and contractual

SA-169

obligations that Kim and Prospect owed Freeman; and (3) Kim's and Wolff's motives to copy Freeman's work. Freeman seeks to exclude two rebuttal experts offered by the Defendants.

### A.    Legal Standard

Trial courts serve as gatekeepers for expert evidence and are responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." <u>Daubert,</u> 509 U.S. at 597. Under Federal Rule of Evidence 702, expert testimony is admissible where: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"To determine whether a proposed expert's testimony passes muster under Rule 702, this Court must inquire into: (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based on reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact." <u>S.E.C. v. Tourre,</u> 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (citing <u>Nimely v. City of New York,</u> 414 F.3d 381, 396-97 (2d Cir. 2005)).

"Because the purpose of summary judgment is to weed out cases in which there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law, it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment," including the admissibility of expert evidence. <u>Raskin v. Wyatt Co.,</u> 125 F.3d 55, 66 (2d Cir. 1997) (cleaned up). Indeed, as the "gatekeeper for expert

SA-170

testimony," the court "performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment." Id.

When evaluating the reliability of an expert's testimony, the court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). In conducting its analysis, the district court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Id. at 266. Contentions that the expert's "assumptions are unfounded 'go to the weight, not the admissibility, of the testimony.'" Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) (quoting Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1188 (2d Cir. 1992)). Nevertheless, "conclusions and methodology are not entirely distinct from one another," and "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Accordingly, a district court may exclude expert testimony if it determines that "there is simply too great an analytical gap between the data and the opinion proffered." Id. "An expert's opinions that are without factual basis and are based on speculation or conjecture are similarly inappropriate material for consideration on a motion for summary judgment." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008).

The court must also conclude that the proposed testimony will assist the trier of fact. In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004). "This 'helpfulness'

3

SA-171

standard . . . requires as a precondition to admissibility that the expert testimony possess a valid and specialized connection to the pertinent inquiries in the litigation." Krys v. Aaron, No. 14-cv-2098 (JBS), 2015 WL 3660332, at *3 (D.N.J. June 12, 2015) (citing Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003)) (internal quotation marks omitted). "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." United States v. Mejia, 545 F.3d 179, 194 (2d Cir. 2008).

Exclusion of expert testimony is warranted only when the district court finds "serious flaws in reasoning or methodology." In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009). Otherwise, if an expert's testimony falls within "the range where experts might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements under Rule 702 are satisfied." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007).

### B.    Substantial Similarity Experts

To establish copyright infringement, a plaintiff must show that: (1) they own a valid copyright; (2) the defendant "actually copied" from the plaintiff's copyrighted work; and (3) the defendant's work is "substantially similar" to the plaintiff's copyrighted work, such that the defendant's copying amounts to "unlawful appropriation." Castle Rock Entm't, Inc. v. Carol

4

SA-172

Publ'g Grp., Inc., 150 F.3d 132, 137 (2d Cir. 1998). Freeman seeks to introduce expert testimony from Dr. Carole E. Chaski, Dr. Patrick Juola, and Professor Kathryn Reiss to support Freeman's assertion that her works and the *Crave* series share substantial similarities. The Defendants argue that, regardless of an expert's qualifications or the reliability of their methodology, the Court should categorically exclude any expert testimony offered to establish substantial similarity.

An "ordinary lay observer" standard governs substantial similarity, and the determination of substantial similarity is therefore "solely for the trier of fact." Computer Assoc. Int'l v. Altai, 982 F.2d 693, 713 (2d Cir. 1992). For that reason, the "well-established general rule in this circuit has been to limit the use of expert opinion in determining whether works at issue are substantially similar." Id. An exception exists only for "highly complicated and technical subject matter," because such matters can be "somewhat impenetrable by lay observers." Id. Lay observers can easily understand the young adult paranormal romance novels at issue in this case. The factfinder – whether the Court or an appropriately selected jury – can grasp books written for middle and high schoolers. Accordingly, permitting expert testimony on substantial similarity would violate the "ordinary lay observer test" and would usurp, rather than assist, the trier of fact.

Freeman asks the Court to make an exception, arguing that the Court should permit expert testimony on substantial similarity to aid the factfinder's hefty task of reading thousands of pages. Freeman does not cite a single instance of a court using volume, rather than complexity, to justify allowing expert testimony on substantial similarity. Instead, Freeman argues more generally that expert testimony "is frequently admitted where it streamlines the evidence and help jurors avoid confusion especially when dealing with voluminous evidence."

5

SA-173

ECF No. 346, Plaintiff's Motion *in Limine* Opposition ("Pl. Exp. Opp.") at 3. For many types of claims, expert testimony can streamline evidence without usurping the factfinder and veering from the legal standard. For copyright claims, however, permitting expert testimony only to "streamline" otherwise understandable evidence would disturb the ordinary lay observer test. The Court therefore excludes all expert testimony on substantial similarity.

### C.      Probative and Striking Similarity Experts

Freeman also offers the expert reports of Juola, Chaski, and Reiss to establish probative and striking similarity. ECF No. 283, Plaintiff's Copyright Brief, ("Pl. Copy. Br.") at 15-16.[1] Probative and striking similarity relate to the second element of a copyright infringement claim: actual copying. A plaintiff can establish actual copying by demonstrating: (1) that the defendant had access to the plaintiff's work; and (2) that the similarities between the works are probative of copying. Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003). But where a plaintiff cannot establish access, actual copying can still be shown if "the works in question are 'so strikingly similar as to preclude the possibility of independent creation.'" Id.

Unlike with substantial similarity, a factfinder may consider expert testimony when deciding probative and striking similarity. The Second Circuit Court of Appeals has long held that:

> If there is evidence of access and similarities exist, then the trier of the facts must determine whether the similarities are sufficient to prove copying. On this issue,

---

[1] Confusingly, Freeman states that "Dr. Chaski does not . . . seek to establish striking similarity." Pl. Exp. Opp. at 14. But in the section of Freeman's summary judgment brief titled "Striking Probative Similarity Also Establishes Access," Freeman quotes Chaski's conclusion that "it is virtually impossible that the two works could have been independently created in light of my findings." Pl. Copy. Br. at 15. Given that citation, the Court interprets Freeman as seeking to rely on Chaski to establish probative and striking similarity and considers the admissibility of Chaski's testimony accordingly.

analysis ('dissection') is relevant, and the testimony of experts may be received to aid the trier of the facts. If evidence of access is absent, the similarities must be so striking as to preclude the possibility that plaintiff and defendant independently arrived at the same result.

If copying is established, then only does there arise the second issue, that of illicit copying (unlawful appropriation). On that issue (as noted more in detail below) the test is the response of the ordinary lay hearer; accordingly, on that issue, 'dissection' and expert testimony are irrelevant.

Arnstein v. Porter, 154 F.2d 464, 468 (2d Cir. 1946)[2]; see also Repp v. Webber, 132 F.3d 882, 890 (2d Cir. 1997) (holding that the trial court erred by ignoring expert testimony relevant to striking similarity); McDonald v. Multimedia Entm't, Inc., No. 90-cv-6356 (KC), 1991 WL 311921, at *5 (S.D.N.Y. July 19, 1991) ("Evidence admissible on the issue of 'probative similarity' includes expert testimony 'dissecting' the two works and discussing the works' relationships to other earlier works, for the purpose of illuminating whether similarities between the two works are more likely due to copying or independent creation.").

The Defendants argue that the Court should exclude expert testimony on probative and striking similarity because the subject matter is not technical, enabling a factfinder to decide the issue without the aid of expert testimony. But courts in the Southern District have permitted expert testimony on probative and striking similarity in non-technical infringement cases. See, e.g., Bunick v. UPN, No. 06-cv-2833 (RMB)(HBP), 2008 WL 1968305 (S.D.N.Y. Apr. 30, 2008) (considering expert testimony when deciding whether two television scripts shared

---

[2] The Court of Appeals has since stated that the "days of Arnstein v. Porter are behind us." Maxtone-Graham v. Burtchaell, 803 F.2d 1253, n.5 (2d Cir. 1986) (cleaned up). But that comment referred only to Arnstein's discussion of the summary judgment standard, not expert testimony. Since Maxtone-Graham, the Court of Appeals has reaffirmed Arnstein's relevant holding on expert testimony. See Laureyssens v. Idea Group, Inc., 964 F.2d 131, 140 (2d Cir. 1992).

7

SA-175

striking similarities); <u>Muller v. Twentieth Century Fox Film Corp.</u>, 794 F. Supp. 2d (S.D.N.Y. 2011) (acknowledging that expert testimony could be relevant to the striking similarity of screenplays, but excluding the expert testimony because of failure to meet the <u>Daubert</u> factors). The Court therefore declines to find a categorical bar to expert testimony on probative and striking similarity in literary infringement cases.

### i.     Dr. Patrick Juola

Dr. Patrick Juola is a forensic linguist who teaches computer science at Duquesne University. ECF No. 278, Ex. 37, Juola Rep., ¶ 2. Juola has "published numerous journal articles and book chapters on the computational inference of document authorship via the statistical analysis of linguistic features." <u>Id</u>. at ¶ 3. In his expert report, Juola concludes that he would "consider the odds in favor of [*BMR 2011* and the *Crave* series] having a common origin as more than 1000:1." <u>Id</u>. at ¶ 41. Juola reaches this conclusion by: (1) Google searching seven-word sequences shared by *BMR 2011* and the *Crave* series to determine the rarity of those seven-word sequences; (2) using the Google Books Ngram Database ("GBN") to search for commonalities shared by *BMR 2011* and *Crave*, as identified by Freeman's husband; (3) searching the cluster "katm" – related to "Katmai," mentioned in one set of Freeman notes, and "Katmere Academy" in *Crave* – in the "million-word Brown corpus"; and (4) noting that four of the commonalities are not shared by ten "baseline" young adult novels in the same genre as *BMR* and *Crave*.

Freeman fails to establish the reliability of Juola's methodology of using GBN to search short phrases shared by *BMR 2011* and *Crave*. Based on an article cited by Juola and authored by GBN's architects, the platform was designed to "enable us to investigate cultural trends quantitatively." Jean-Baptiste Michel, et al., <u>Quantitative Analysis of Culture Using Millions of</u>

8

SA-176

Digitized Books., 331 Science 176 (2010). That article makes no mention of using GBN to identify plagiarism, as Juola uses it here. Neither Freeman nor Juola cites a single article, study, test, or case using GBN to identify plagiarism. The only reference to using GBN in this context comes from a law review article published by Juola himself, where he writes only that GBN "can be consulted to confirm not just whether a usage is rare, but exactly how common or rare it is in natural language." Janet Ainsworth & Patrick Juola, Who Wrote This?: Modern Forensic Authorship Analysis as a Model for Valid Forensic Science, 96 Wash. U. L. Rev. 1161, 1183 (2019). To support that statement, Juola cites Quantitative Analysis of Culture Using Millions of Digitized Books. But as explained above, that article only explains that GBN can be used to identify cultural trends.[3]

In his report, Juola argues that this methodology meets Daubert's requirements because "this technique has been extensively tested" and because "there is an extensive history of peer review and publication dating back to the 1960s." Juola Rep., ¶ 40. That claim cannot possibly apply to Juola's GBN methodology because Google only introduced GBN in 2010. Juola seems to mean that the field of stylometry – or the field of authorship attribution – is established and well-studied; Juola adds that "Google Scholar lists more than 8,000 publications including the word 'stylometry' in its catalog." Id. at ¶ 41. The Court does not question the legitimacy of stylometry generally, but the Daubert factors require the reliability of the *specific* methodology

---

[3] Notably, a feature of GBN lends itself more readily to the identification of cultural trends than plagiarism: GBN only produces hits for phrases that appear "at least 40 times in the corpus." Jean-Baptiste Michel, et al., Quantitative Analysis of Culture Using Millions of Digitized Books., 331 Science 176 (2010).

9

SA-177

used by the expert, not the reliability of an entire field of study. For example, physics is a well-studied field, but not every methodology that uses some physics principles will automatically qualify as reliable.

Freeman therefore fails to demonstrate any of the factors that would establish the reliability of Juola's GBN methodology. She provides no evidence that Juola's GBN methodology can be, or has been, tested; she does not demonstrate that the methodology has been "subjected to peer review or publication"; Juola does not comment on the "known or potential rate of error" of his GBN methodology; and Freeman does not establish that anyone has ever applied this methodology outside of this case, let alone that the methodology has gained "general acceptance" in the fields of forensic linguistics or stylometry. Daubert, 509 U.S. at 593-94. Freeman therefore fails to establish the reliability of using GBN to identify plagiarism, as is her burden. Because Freeman fails to establish the reliability of Juola's methodology, and his "conclusions were not supported by other studies," the Court excludes the GBN-related portion of Juola's report. Coning v. Bayer Pharma AG, 982 F.3d 113, 124 (2d Cir. 2020); see also Mowry v. Viacom Int'l, Inc., No. 03-cv-3090 (AJP), 2005 WL 1793773, at *46 (S.D.N.Y. July 29, 2005) (excluding expert testimony because the plaintiff cited no cases of any other expert applying the methodology, and the methodology did not otherwise meet the Daubert factors).

Next, Juola searched the cluster "katm" in the Brown corpus to establish its rarity. In Freeman's materials, the "katm" cluster appears in just one set of notes. See ECF No. 276, Freeman Ex. 3. In the *Crave* series, the students attend a magical boarding school named "Katmere Academy." Juola writes that the Free Dictionary "identifies only five words with this cluster," and that the cluster "does not appear anywhere in the million-word Brown corpus."

10

SA-178

Juola Rep., ¶ 34. Based on this, Juola concludes that "the probability of this cluster appearing in both *BMR* and *Crave* is .213 (21.3%), which is unlikely-but-not-incredible." Id. at ¶ 35. But Juola ignores a crucial fact: both stories are set in Alaska, a state hosting a real national park named Katmai.[4] Juola therefore should be asking about the probability of two works *set in Alaska* both containing the "katm" cluster, rather than two works generally. Because Juola does not account for this important context when calculating probabilities, his conclusion undoubtedly misrepresents the probability of the parties' works sharing the "katm" cluster.

Finally, Juola "confirmed" the reliability of his first three methodologies by taking four phrases "shared" by the at-issue works – "tree stump seats," "Stonehenge lite," "air as I try to," and "katm" – and observing that none of the four phrases appears in ten "baseline" novels in the same genre as *BMR* and *Crave*.[5] Id. at ¶¶ 15, 36-37. Juola reasons that, because these four phrases appear in both Freeman's work and Wolff's work, but do not appear in the ten "baseline" novels, he can reject the hypothesis that the phrases reflect genre conventions.[6]

Problematically, Freeman's counsel selected the ten "baseline" novels for Juola. ECF No. 322, Ex. A, Juola Tr. 259:5-260:6. This undermines the notion that the novels constitute a representative baseline for the genre. Freeman's counsel has every incentive to select ten novels in the genre that are relatively dissimilar to *BMR* and *Crave*. Further, Freeman's counsel can

---

[4] The Court takes judicial notice of this fact. "Official government maps have long been held proper subjects of judicial notice." Gov. of Canal Zone v. Burjan, 596 F.2d 690, 693 (5th Cir. 1979). The Defendants link to a National Park Service government webpage that includes an official map of Katmai National Park in Alaska.

[5] The Court notes that "Stonehenge lite" does not actually appear in any of Freeman's works.

[6] As explained above, this method of "confirmation" fails to account for words that appear in both works because of shared setting, rather than genre conventions.

11

SA-179

consult with Freeman to ask which works influenced her most when writing *BMR* in order to exclude those novels from the "baseline" selection. Counsel's selection of the novels therefore embeds bias into Juola's "confirmation" method. Accordingly, the Court excludes this portion of Juola's report as unreliable. U.S. Info. Sys. v. IBEW Local Union No. 3, 313 F. Supp. 2d 213, 217, 233 (S.D.N.Y. 2004) (excluding expert testimony because the plaintiffs "failed to demonstrate that the data set upon which [the expert's] analysis was based was unbiased" and noting that "the reliability of any analysis depends upon an unbiased selection of sample data").

The Court, therefore, excludes Juola's report in its entirety.

### ii. Dr. Carole E. Chaski

Dr. Carole E. Chaski is a forensic linguist with decades of experience. ECF No. 315, Ex. 5, Chaski Rep., ¶¶ 21-23. Like Juola, Chaski used forensic linguistics to quantify the similarities shared by *BMR* and *Crave*. Specifically, Chaski focused on whether the similarities indicate "conceptual plagiarism" (essentially, advanced paraphrasing).[7] Id. at ¶ 5. To do this, Chaski selected 35 "keywords" "based on the similarities of plot, character, and setting outlined in the complaint." Id. at ¶ 23(e). Chaski then "calculated the way that the 35 keywords operate" in the *Crave* series, Freeman's six *BMR* manuscripts, and the same ten baseline novels used by Juola. Id. at ¶ 10. Specifically, Chaski calculated the "lexical overlap rates" for the 35 keywords. A high lexical overlap rate indicates that the authors "put the keyword with similar companion words." Id. at ¶ 11. Chaski concluded that, for 31 of the 35 keywords, Freeman and Wolff had

---

[7] Chaski also opines on "copy-paste plagiarism" (word-for-word copying) and "mosaic plagiarism" (paraphrasing), but Freeman no longer seeks to rely on those portions of Chaski's report. Pl. Exp. Opp. at n.5.

the highest lexical overlap rate – or used the keywords more similarly – than for any of the ten baselines authors. Id. at ¶ 120. Based on this, Chaski concluded that "it is virtually impossible that the two works could have been independently created." Id. at ¶ 135. Chaski's report suffers from three major problems: (1) she did not differentiate between different versions of *BMR*; (2) as with Juola's report, Freeman's counsel selected the ten baseline novels; and (3) Chaski selected the 35 keywords based on Freeman's complaint.

To prove "actual copying," Freeman must establish probative or striking similarity *for each distinct BMR* manuscript and set of notes. If Freeman fails to establish probative or striking similarity for a specific Freeman work, then that work cannot be considered at the substantial similarity stage. Chaski's analysis groups together all six *BMR* manuscripts and treats them as one large work. She then concludes that, as a whole, the *BMR* manuscripts are strikingly similar to the *Crave* series.

To illustrate the problem: Chaski reports that the word "Diego," as used in *BMR* in the aggregate, shares a higher "lexical overlap rate" with the *Crave* series than with any of the ten baseline authors. Chaski uses this finding to support her conclusion that *BMR* and *Crave* share meaningful similarities. But the word "Diego" does not appear once in *BMR 2013*, meaning that Chaski's Diego-related finding would not be relevant to whether the Defendants had access to that iteration of *BMR*. Her report misleadingly implies otherwise. Chaski's decision to aggregate Freeman's works therefore eliminates her report's utility for determining access to each specific *BMR* manuscript. For that reason, her report would not assist the trier of fact with the task of

13

SA-181

evaluating striking or probative similarity and is excluded on that basis alone. <u>Nimely</u>, 414 F.3d at 396-97.

Freeman seeks to cure this issue by submitting a supplemental affidavit from Chaski. ECF No. 336, Chaski Supplemental Declaration ("Chaski Supp. Decl."). In her supplemental affidavit, Chaski explains that excluding from her analysis the two most recent *BMR* versions – *BMR 2014* and *BMR 2016* – would not change her conclusions about the works' similarities. <u>Id</u>. at ¶ 4. This, however, does not actually cure the issue. Freeman has to establish access for each *BMR* material, not *BMR 2014*, *BMR 2016*, and everything else in the aggregate. Accordingly, even if Chaski removes *BMR 2014* and *BMR 2016*, her report still unreasonably groups together the first four *BMR* versions.[8]

Separately, Chaski uses the same ten "baseline" novels used by Juola and selected by Freeman's counsel. ECF No. 322, Ex. B, Chaski Tr., 39:11-16. Chaski's entire conceptual plagiarism relies on comparing the lexical overlap rates between Freeman's manuscripts and Wolff's series to those ten novels. As is explained above, counsel's selection of the baseline

---

[8] Even if Chaski's supplemental affidavit could cure the issues in her expert report, the supplemental affidavit would be inadmissible as untimely. An expert may supplement a report only when "the expert subsequently learns of information that was previously unknown or unavailable, and the new information renders the earlier report incomplete or inaccurate." <u>Anthem, Inc. v. Express Scripts, Inc.</u>, 660 F. Supp. 3d 169, 184-85 (S.D.N.Y. 2023). "To construe supplementation to apply whenever a party wants to bolster its expert opinions would wreak havoc on docket control and amount to unlimited expert opinion preparation." <u>Lewis v. FMC Corp.</u>, 786 F. Supp. 2d 690, 705 (W.D.N.Y. 2011) (cleaned up). Freeman does not argue that Chaski learned any new information that required her to supplement her report. Instead, Freeman offers Chaski's supplemental affidavit to cure issues and add information that should have been included in her initial report.

14

SA-182

novels embeds bias into Chaski's analysis and could easily skew Chaski's findings in favor of Freeman. Accordingly, Chaski's report is also excludable on this basis.

Finally, Chaski erred by selecting her 35 keywords based on Freeman's complaint, a document in which Freeman identified specific instances in which she and Wolff used the 35 keywords similarly. One would expect, then, for Freeman and Wolff to use those 35 words more similarly than other authors. The decision to select 35 keywords based on Freeman's complaint therefore seems designed to find that *Crave* and *BMR* share more similarities than other books. As with the issue of the "baseline" novels, this methodological decision improperly embeds bias into the data set and justifies exclusion.

The Court, therefore, excludes Dr. Chaski's report in its entirety.

### iii. Kathryn Reiss

Kathryn Reiss is an "award-winning author of twenty novels for children and young adults" who teaches English and creative writing at Mills College. ECF No. 278, Ex. 36, Reiss Rep., ¶ 1. In contrast to Juola and Chaski, Reiss took a qualitative approach to analyzing striking and probative similarity. She simply read the works, "took copious notes whenever [she] came across examples of similarities that went beyond genre convention or trope," and "drew on [her] knowledge and experience as a writer and professor to eliminate similarities which were the result of genre conventions and tropes." Id. at ¶¶ 7-8.

The Defendants argue that Reiss ignored relevant differences between the parties' works. Freeman claims that this is a non-issue, arguing that the purpose of "Reiss's testimony is to identify the similarities *not* attributable to trope or genre convention, so it would make no sense to address either differences or similarities attributable to tropes." Pl. Exp. Opp. at 6. Freeman,

15

SA-183

however, mischaracterizes Reiss's testimony. Reiss does not simply list similarities; rather, she concludes that "the similarities are so striking as to preclude the possibility of independent creation." Reiss Rep., ¶ 228. One cannot rationally reach this conclusion without comparing a works' differences and similarities. See, e.g., Klauber Bros. v. M.J.C.L.K., LLC, No. 21-cv-4523, 2022 WL 5108902, at *17 (S.D.N.Y. Oct. 4, 2022) (finding no striking similarity because "the works reflect several significant differences with respect to elements, arrangement, and overall layout"). Exclusion of expert testimony "is warranted where the expert fails to address evidence that is highly relevant to his or her conclusion." Acetaminophen, 2023 WL 8711617, at *53. Because Reiss does not identify or discuss the differences between the works, which are highly relevant to her conclusion on striking similarity, the Court excludes her report.

Insofar as Freeman plans to use Reiss's testimony to establish probative – rather than striking – similarity, Reiss offers no particular expertise. Expert testimony is only admissible if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Reiss's "specialized knowledge" relates to identifying which similarities stem from tropes or genre conventions, and which stem from original elements. But when evaluating probative similarity, the factfinder should consider "the entire work, not just the protectible elements." Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 123 (2d Cir. 1994). Unlike with substantial similarity, then, the factfinder may use trope-based similarities in deciding whether two works are probatively similar. Absent the need for an explanation of trope-based similarities, Reiss's report simply compares the works' similarities as a jury would. "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of

16

SA-184

understanding on his or her own." United States v. Mejia, 545 F.3d 179, 194 (2d Cir. 2008). Because, absent her trope-based expertise, Reiss's report simply makes "observation[s] that jurors could make as easily," she "usurp[s] the jury's role" on probative similarity. Chapman v. Universal Motown Records Grp., No. 08-cv-3255 (LAP), 2010 WL 517480, at *3 (S.D.N.Y. Feb. 4, 2010). Accordingly, Reiss's delineations about whether similarities relate to trope provide no assistance to the trier of fact at the probative similarity stage.

Finally, even if Reiss's testimony were not excludable for the above reasons, it would still be unreliable. To the extent that Reiss employs any methodology, it consists of separating out trope or genre-based similarities from other similarities. But throughout Reiss's report, she enumerates many similarities that are plainly genre conventions and tropes but fails to identify them as such. For example, Reiss identifies as a notable similarity that in both works, the romantic lead and the heroine "heal one another through their love, and he believes they have a special bond, that they are mates, and that she is the only one for him." Reiss Rep., ¶ 35(c). Similarly, Reiss notes that the *BMR* and *Crave* heroines both find the romantic leads to be "mysterious, dangerous, and alluring." Id. at ¶ 42. Any reasonable person would recognize these similarities as paradigmatic young adult romance genre conventions, but Reiss fails to identify them accordingly, significantly reducing the reliability of her report.

Like with Chaski, Freeman seeks to save Reiss's testimony by introducing a supplemental affidavit explaining that excluding *BMR 2014* and *BMR 2016* from her analysis would not alter her conclusions about similarity. Because the Court excludes Reiss's testimony

17

SA-185

for reasons unrelated to aggregation, her supplemental affidavit does not cure the identified issues.[9]

The Court, therefore, excludes Reiss's report in its entirety.

### iv. Rebuttal Experts

The Defendants offer expert testimony from Dr. Malcolm Coulthard to rebut the testimony of Juola and Chaski, as well as testimony from Emily Easton to rebut Reiss's testimony. Because the Court excludes the reports of Juola, Chaski, and Reiss, the rebuttal reports of Coulthard and Easton are unnecessary and therefore also excluded.

### D. State Law Experts

Freeman seeks to introduce expert testimony from Christine Witthohn to establish motive for her breach of contract and breach of fiduciary duty claims.[10] She also seeks to introduce expert testimony from Marlene Stringer and Eric Ruben to establish that literary agents owe their clients fiduciary duties. The Defendants offer testimony from Rose Hilliard to rebut Witthohn's and Stringer's reports. In my separate report and recommendation, I recommend granting the Defendants' motion for summary judgment on Freeman's breach of contract and breach of

---

[9] Like Chaski's report, Reiss's report discusses *BMR* in the aggregate. But the problem does not reach the severity of Chaski's because she cited each specific *BMR* version throughout her report, allowing a factfinder to piece together which *BMR* versions share which similarities with *Crave*. Because the Court excludes Professor Resiss's testimony on several other bases, the Court does not need to decide whether Reiss's level of aggregation requires exclusion.

[10] The Court's understanding is that Freeman does not seek to use Witthohn's report to establish that the Defendants had a motive to commit copyright infringement. But in the event that the Court misunderstands Freeman's position, the Court clarifies that she cannot use evidence of motive to prove copyright infringement liability. Louissier v. Universal Music Group, Inc., No. 02-cv-2447 (KMW), 2005 WL 5644420, at *5, n.1 (S.D.N.Y. Aug. 30, 2005) (excluding evidence relevant to intent because "a defendant's motive, intent or knowledge are not elements of proof of defendant's liability in a copyright action").

18

SA-186

fiduciary duty claims for reasons unrelated to motive or the scope of a literary agent's fiduciary duties. Accordingly, if Judge Stanton adopts my recommendations as to those claims, the motions *in limine* as to Witthohn, Ruben, Stringer, and Hilliard will be moot. If Judge Stanton declines to adopt my recommendation and denies the Defendants' motion for summary judgment on the breach of contract and breach of fiduciary duty claims, I will revisit the parties' motions *in limine* to decide the admissibility of affirmative and rebuttal experts on state law issues.

### E. Metadata Experts

The parties dispute whether Freeman ever sent Kim three *BMR* drafts. The Defendants argue that Freeman did not, and they cite a declaration from defense counsel CeCe Cole in support. Based on Cole's review of metadata, the creation dates of those three *BMR* versions post-date the Kim-Freeman professional relationship. ECF No. 300, Cole Decl., ¶¶ 16-20. Cole explains that, superficially, the metadata shows that all three drafts "were created in or after June 2021, likely in connection with document production in this case." Id. at ¶ 16. She then explains that she found the "native" versions of the documents "provided as deposit copies in connection with her copyright registrations." Id. at ¶ 17. Based on the metadata in the "native" versions, all three *BMR* versions were created after Kim and Freeman stopped working together. To rebut Cole's declaration, Freeman offers an affidavit from Ron Kaplan, an information technology consultant. Kaplan explains that Microsoft Word's "save as" function changes the "creation" date reflected in the metadata. ECF No. 333, Kaplan Decl., ¶ 6.

The Defendants ask the Court to exclude Kaplan's affidavit as undisclosed expert testimony. Freeman responds that if the Court excludes Kaplan's affidavit for that reason, it should exclude Cole's report for the same reason. But Kaplan's report constitutes expert

19

SA-187

testimony, while Cole's does not. Under Federal Rule of Civil Procedure 701, lay witnesses may only testify to matters that are: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." In her affidavit, Cole describes her perception of the metadata in the relevant documents, based on her own review. Although Cole did rely on some specialized knowledge to review the metadata, a "witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony expert as long as it was based on his investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise." United States v. Rigas, 490 F.3d 208, 224 (2d Cir. 2007) (cleaned up). Because Cole's declaration relied only minimally on specialized knowledge, the Court categorizes her testimony as lay testimony.

On the other hand, Kaplan's testimony relies only on the specialized knowledge he has gained as an information technology consultant. He does not testify about any matters based on his own perception; he never claims to have viewed the metadata in the at-issue documents. Accordingly, the Court categorizes his affidavit as expert testimony. In violation of Rule 26(a), Freeman did not disclose Kaplan's affidavit by the deadline set by the Court.[11] Under Rule 37, exclusion can be the proper sanction for a Rule 26(a) violation. To determine whether exclusion is appropriate, the Court must consider: "(1) the party's explanation for the failure to comply

---

[11] Freeman does not argue that the Defendants failed to timely disclose Cole's metadata-related testimony. Accordingly, Freeman has no excuse for failing to disclose Kaplan's affidavit during expert discovery.

20

with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006) (cleaned up). Those factors support excluding Kaplan's affidavit. Freeman fails to provide any explanation for failing to timely disclose Kaplan's testimony. The "save as" testimony does not significantly move the needle on the question of whether Freeman provided Kim the reports, because Freeman could have sent Kim the manuscripts after they stopped working together. Further, in the absence of a continuance, Freeman's late disclosure deprives the Defendants of the ability to depose Kaplan. Accordingly, the Court excludes Kaplan's affidavit but does not exclude Cole's.

Freeman also argues that "Kaplan's declaration relates to a ministerial fact that is not subject to reasonable dispute." The Court does not classify the innerworkings of Microsoft Word metadata as "ministerial" and accordingly rejects this argument.

## II. Motions to Strike

### A. Similarity Indexes

The parties dispute whether Freeman can rely on 14 "similarity indexes." Combined, the indexes comprise hundreds of pages of lists of the purported similarities between Freeman's works and the *Crave* series. The Defendants ask the Court to strike these indexes and all Rule 56.1 paragraphs citing to them.

The Defendants argue that Freeman's lists constitute undisclosed lay or expert testimony, but the Court disagrees. The lists are more appropriately classified as argument, rather than evidence. The lists simply draw from, recategorize, and reorganize portions of *actual* evidence:

21

SA-189

the at-issue works. Freeman, too, seems to understand the lists as argument rather than evidence, because she did not disclose the lists during fact or expert discovery. Accordingly, in the Court's view, the lists egregiously violate the briefing limits set by the Court. It is within the Court's "inherent discretion to strike excessive pages," but the Court also holds "reciprocal discretion to waive page limits." Nat'l Grid Corp. Servs., LLC v. Brand Energy Servs., LLC, No. 13-cv-1275 (DRH) (ARL), 2017 WL 1194499, at *10 (E.D.N.Y. Mar. 30, 2017); see also Perez v. United States Immigration & Customs Enforcement, No. 19-cv-3154 (PGG) (JLC), 2020 WL 5362356, at *9 (S.D.N.Y. Sept. 8, 2020) (declining to strike summary judgment memorandum of law that exceeded the page limits set by the Court). In Perez, the Court decided to deny the defendants' motion to strike because it found that the plaintiff had not filed the seven excess pages in bad faith. In other words, the plaintiff in that case "did not act with the intention of gaining an unfair advantage through his violations or otherwise benefit from the excess pages in his memoranda." Perez, No. 19-cv-3154 (PGG) (JLC), 2020 WL 4557387, at *4 (S.D.N.Y. Aug. 6, 2020), R. & R. adopted, 2020 WL 5362356, at *12 (S.D.N.Y. Sept. 8, 2020).

In the Court's view, Freeman filed the similarity indexes to gain an unfair advantage over the Defendants. Permitting them would grant Freeman hundreds of additional pages of argument. The Defendants could have filed hundreds of pages of lists describing the differences between the at-issue works, but they did not because they followed the Court's orders. Additionally, Freeman's indexes contain numerous frivolous similarities, further evincing bad faith. For example, Freeman points out that in both works: the authors use the phrases "the whooshing sound," "will be moot," and "crooked grin"; the heroine breathes and her heart pounds; the romantic lead is "hot" and is the heroine's boyfriend; and the villain disgusts the heroine. ECF

22

SA-190

No. 276, Ex. 49, *Court* Language Index, at 14, 21; Ex. 46, *Crave* Language Index, at 20; Ex. 38, Heroine Index, at 15, 20; Ex. 40, Romantic Lead Index, at 3, 9; Ex. 43, Villain Index at 11. These similarities, along with many others identified by Freeman, are shared by hundreds of other novels and hold little probative value. Because Freeman filed the similarity indexes in bad faith, the Court strikes them.

Striking the indexes should not meaningfully prejudice Freeman because even when courts do consider plaintiff-compiled lists of similarities, such lists are afforded minimal weight. Courts reason that such lists are "inherently subjective and unreliable,' particularly where 'the list emphasizes random similarities scattered throughout the works.'" Williams v. Crichton, 84 F.3d 581, 590 (2d Cir. 1996) (citing Litchfield v. Spielberg, 736 F.2d 1352, 1356 (9th Cir. 1984)). In Freeman's lists, she editorializes, arbitrarily highlights "similarities" in various colors, and uses ellipses to omit massive amounts of relevant text, distorting "similar" passages. Accordingly, even if the Court had decided to consider Freeman's indexes, it would have afforded them little weight.

In Freeman's statement of undisputed facts, she repeatedly cites her inadmissible similarity indexes. Under Local Rule 56.1, a party must only cite to "evidence which would be admissible." Local Rule 56.1(c). The Court therefore strikes all paragraphs in Freeman's Rule 56.1 statement that rely solely on her inadmissible similarity indexes. This, too, should not significantly prejudice Freeman because the Court has decided probative, striking, and

SA-191

substantial similarity based on the works themselves, not the parties' contrary descriptions of the works.

### B. Freeman's Additional Material Facts

When Freeman countered the Defendants' statement of undisputed facts, she also tacked on about 64 pages of "additional material facts." ECF No. 332. Under Local Rule 56.1(b), a party may add to their counterstatement only "additional material facts as to which it is contended that there exists a genuine issue to be tried." Freeman's additional facts relate to the similarity between the parties' works, a topic raised in her affirmative motion for summary judgment and discussed in her initial statement of undisputed facts. In Freeman's opposition to the Defendants' summary judgment motion, Freeman cites her additional facts to argue that the Court should grant her summary judgment; she does not argue that similarity is in dispute and should be decided by a jury. It is clear, then, that Freeman does not contend that the additional facts are in dispute, rendering the additional facts improper under Rule 56.1. Freeman should have, and could have, included the additional facts in her initial statement of undisputed facts. The Court therefore strikes Freeman's additional facts.

### D. *Tempest Rising* Evidence

Freeman asks the Court to strike paragraphs 26 to 30 of Defendant's statement of undisputed facts. Those paragraphs all relate to *Tempest Rising*, a prior work of Wolff's. In the parties' summary judgment briefing, *Tempest Rising* is relevant only to the Defendants' claims of independent creation. As explained in my report and recommendation, the Court should not, at this juncture, decide whether the Defendants have established the affirmative defense of independent creation. Accordingly, I do not rely on paragraphs 26 to 30 of the Defendants'

24

SA-192

statement of undisputed facts in the report and recommendation, and I accordingly do not need to decide whether to strike those paragraphs.

## III.    Sealing

The parties previously requested that the Court seal various summary judgment exhibits. The Court granted the parties' requests on an interim basis but noted that it may reconsider their applications when deciding the summary judgment motions. ECF No. 286. The documents currently under seal fall into two categories: (1) documents deemed confidential by the Defendants and filed under seal pursuant to a stipulated protective order; and (2) Freeman's manuscripts and notes. The parties' disputes over sealing primarily relate to the second category.

"The common law right of public access to judicial documents is firmly rooted in our nation's history." Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006). This strong presumption of access "is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." Id. (quoting United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995)). Documents are considered "judicial documents" if they are "relevant to the performance of the judicial function and useful in the judicial process." Brown v. Maxwell, 929 F.3d 41, 49 (2d Cir. 2019) (citation omitted). The presumption of public access is at its highest when the material is relevant to a court's decision on a dispositive motion, such as a motion for summary judgment. Id. at 50.

Freeman's manuscripts and notes are highly relevant to the Court's decision on the parties' cross-motions for summary judgment. In fact, aside from Wolff's *Crave* series, Freeman's *BMR* materials are the documents *most* central to the issues before the Court. The Court relies on the *BMR* materials to make recommendations about both probative and striking

25

SA-193

similarity. The Court therefore considers Freeman's materials judicial documents with the highest presumption of public access.

After finding that documents are judicial documents to which the common law presumption of access attaches, courts must "balance competing considerations against" that presumption. Lugosch, 435 F.3d at 120 (citation omitted). The sealing of judicial documents "may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." Id. at 124. The interests in favor of non-disclosure can include "the privacy interests of those resisting disclosure." Walker v. City of New York, No. 15-cv-500, 2017 WL 2799159, at *6 (E.D.N.Y. June 27, 2017); In re United States for Material Witness Warrant, No. 19-cv-447, 2020 WL 3959208, at *3 (S.D.N.Y. July 13, 2020) (citations omitted). The moving party must make a "particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection." Ashmore v. CGI Grp. Inc., 138 F. Supp. 3d 329, 351 (S.D.N.Y. 2015), aff'd, 923 F.3d 260 (2d Cir. 2019).

The Court recognizes that Freeman holds a privacy interest in her manuscripts and notes. Nevertheless, the right of public access far outweighs Freeman's privacy interest. When initially briefing the issue, Freeman identified two specific injuries that could flow from unsealing her manuscripts: an increased risk of other authors infringing her work and "diminished creative control" over the publication of her work. The Copyright Act, however, protects unsealed work with equal force as sealed work. Unsealing would not "undermine the entire goal of copyright law," as Freeman argues, because she can still sue for copyright infringement after the Court unseals her manuscripts. And any "diminished creative control" over future publication of

26

SA-194

Freeman's work flows naturally from her choice to file a public lawsuit litigating the substance of her work.

The parties now report that the case is garnering attention on social media, and Freeman puts forth new concerns about unsealing. She argues that social media posts siding with the Defendants "have already caused her substantial harm and prejudiced the jury pool against her," and that unsealing her manuscripts would only worsen both problems.[12] ECF No. 360 at 3. But Freeman does not specify the harm the social media posts have caused her, and the Court does not agree that the social media posts would hinder jury selection; courts in this district have successfully selected impartial juries in many higher-profile cases with more controversy.

In the Court's view, the case's newfound social media attention only strengthens the need for public access. To ensure the public's "confidence in the administration of justice," the public should have Freeman's manuscripts, which are materials central to today's decisions. Lugosch, 435 F.3d at 119 (citing United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995)). The public generally, and Wolff's fans particularly, have a right to look at Freeman's books to consider, for themselves, the validity of her publicly filed accusations. This is especially true in light of the reputational harm faced by Kim and Prospect. Accordingly, the Court orders the unsealing of Freeman's manuscripts and notes.

Freeman argues in the alternative that if the Court unseals her manuscripts, it should also unseal Wolff's unpublished early drafts and "the voluminous text messages" produced by the

---

[12] Freeman's letter also alleges that the Defendants started this social media controversy and speculates about the Defendants' specific tactics and related expenses. None of these arguments are relevant to the Court's analysis under Lugosch.

SA-195

Defendants. ECF No. 360 at 4. This kind of tit-for-tat unsealing is not consistent with <u>Lugosch</u>; instead, what matters is whether materials qualify as judicial documents, and whether any interests overcome the presumption of public access. Freeman does not cite to which specific exhibits she wants unsealed, and she does not explain why these materials qualify as judicial documents under <u>Lugosch</u>. The Court does not rely on any early Wolff drafts in either of the decisions it issues today, and accordingly, such drafts do not qualify as judicial documents.

Several text messages, however, do qualify as judicial documents. Doniger Exhibit 15 contains text messages central to the Court's conclusion that access is in dispute, and the Court cites those text messages in its report and recommendation. Additionally, Doniger Exhibits 5, 6, 11, 18, and 20 contain text messages related to the *Crave* writing process, and particularly, Kim's role. Because the question of Kim's involvement in *Crave*'s authorship is discussed in my report and recommendation, and those texts messages are relevant to that question, those sets of text messages also qualify as judicial documents. Additionally, the Court relies on Doniger Exhibit 4, Wolff's deposition transcript, to conclude that access is in dispute, rendering that transcript a judicial document. In large part, the text messages and Wolff's deposition transcript discuss non-confidential matters relevant Freeman's claims, and accordingly, the Court identifies no interests outweighing the presumption of public access. To the extent that these materials mention personal and irrelevant information, like Wolff's finances, the parties should redact that confidential information consistent with their protective order.

The Court ORDERS the parties to file unredacted versions of Freeman's manuscripts and notes, the relevant text messages, and Wolff's deposition transcript by August 9, 2024.

28

SA-196

## CONCLUSION

The Court STRIKES the affirmative expert testimony of Dr. Patrick Juola, Dr. Carole E. Chaski, Professor Kathryn Reiss, and the rebuttal testimony of Dr. Malcolm Coulthard, Emily Easton, and Ron Kaplan. The Court reserves decision with respect to the parties' requests to exclude the testimony of Christine Witthohn, Eric Ruben, Marlene Stringer, and Rose Hilliard, pending the Court's decision on whether to adopt my recommendations regarding Freeman's state law claims. Additionally, the Court GRANTS the Defendants' motion to strike Freeman's similarity indexes and additional statement of facts, DENIES Freeman's motion to seal her manuscripts, notes, text messages, and Wolff's deposition transcript, and otherwise GRANTS the parties' motions to seal. By August 9, 2024, the parties shall file unredacted versions of Freeman's manuscripts and notes, Wolff's deposition transcript, and the relevant text messages (currently under seal at: ECF No. 277, Freeman Exhibits 3-11 and 14-19; ECF No. 301, Cole Exhibits E, F, and CC; and ECF No. 279, Doniger Exhibits 4-6, 11, 15, 18, and 20).

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 297, 309, 314, and 321.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:     August 1, 2024
           New York, New York

29

SA-197

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

LYNNE FREEMAN,

                        **Plaintiff,**

        -against-

TRACY DEEBS-ELKENANEY, et al.,

                        **Defendants.**

-------------------------------------------------------------X

22-CV-02435 (LLS)(SN)

**REPORT &**
**RECOMMENDATION**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 8/1/2024 __

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE LOUIS L. STANTON:**

Between 2010 to 2014, Lynne Freeman, a lawyer and unpublished author, tried to publish a young adult paranormal romance novel. Freeman secured an agent, Emily Sylvan Kim of Prospect Agency, and Kim sent Freeman's manuscripts and queries to dozens of publishing houses, including Entangled Publishing. Over the next 40 months, Freeman and Kim collaborated to publish Freeman's novel. Ultimately, no publisher was interested, and the relation ended in March 2014. In April 2020, Kim's other client, author Tracy Deebs-Elkenaney (known professionally as Tracy Wolff), published *Crave*, the first installment in what would be a *New York Times* bestseller and a multi-book series. *Crave* is also a young adult paranormal romance novel.

Freeman contends that *Crave* is too similar to her unpublished manuscript to be anything other than a knock-off. She accuses the Defendants of direct, vicarious, and contributory copyright infringement. She also sues Kim and Prospect for breach of fiduciary duty, breach of contract, fraud, and fraudulent concealment. Freeman moves for summary judgment on her

**SA-198**

direct copyright infringement claim, and the Defendants cross-move for summary judgment on that claim. The Defendants also move for summary judgment on Freeman's state law claims. I recommend DENYING both parties summary judgment on the direct copyright infringement claim and GRANTING the Defendants summary judgment on Freeman's state law claims.

**BACKGROUND**

### I.      Factual Background

Freeman and Kim started working together in December 2010, when they executed a contract for Kim and Prospect to serve as Freeman's literary agent. ECF No. 278, Doniger Ex. 39. Freeman's book, *Blue Moon Rising* ("*BMR*"), is about Anna, a 16-year-old girl living in Anchorage, Alaska. Anna falls in love with a boy, Ash. She learns that Ash is a werewolf-like creature, that she is half-witch, half-werewolf, and that forces of good and evil have waged supernatural war since the beginning of time. Upon turning 17, Anna will hold the key to maintaining the balance of good and evil.

For more than three years, Freeman and Kim worked together to publish *BMR.* During that period, Freeman sent Kim at least 10-15 different versions of *BMR*, as well as many sets of notes. Kim provided Freeman with edits and sent *BMR* to various publishers. During rounds of revisions, Freeman changed her novel's title to *Masqued*. Kim sent that iteration to Stacy Abrams, Entangled's Executive Editorial Director, in 2013. ECF No. 290, Pl. Stmt. of Undisputed Facts ("PSUF"), ¶ 24. Ultimately, Kim and Freeman were unable to secure a publishing deal. In March 2014, Kim and Freeman terminated their contract and amicably parted ways. ECF No. 299, Def. Stmt. of Undisputed Facts ("DSUF"), ¶ 11. *BMR* remains unpublished.

Kim has represented Wolff since 2007. PSUF, ¶ 30. In 2019, Elizabeth Pelletier, Entangled's Chief Executive Officer, decided that Entangled should publish a young adult novel

2

**SA-199**

with a "fish out of water trope" or an "ordinary girl in a super rarified world" plot. PSUF, ¶¶ 5, 46. Pelletier instructed Abrams and other Entangled editors "to find an author to write a book in the paranormal genre for Entangled's teen line." DSUF, ¶ 83. Abrams reached out to Wolff directly to see if she could quickly write that book for Entangled. PSUF, ¶ 46. Wolff expressed interest and sent five plot ideas to Abrams, including a plot about a warlock or vampire boarding school. DSUF, ¶ 86. In May 2019, Entangled and Wolff officially decided to work together on that project, which would become *Crave*. Id. at 91.

The protagonist in *Crave* is Grace, a 17-year-old girl who moves from San Diego to remote Alaska following the death of her parents. Grace attends a magical Hogwarts-like boarding school and falls in love with Jaxon, a vampire. Grace learns that she is half-witch, half-gargoyle and participates in supernatural battles. She ends up in a love triangle with Jaxon and his believed-dead brother, Hudson. After hitting major commercial success, *Crave* became a four-book series, with *Crush*, *Covet,* and *Court* following the first book. All four books have been published by Entangled and distributed by Macmillan. PSUF, ¶¶ 10, 11. Universal Studios is planning a movie based on *Crave*.

The parties hold different views about who wrote *Crave*. According to the Defendants, Wolff wrote the series, Pelletier provided substantive edits, Abrams provided copy edits, and Kim provided moral support. DSUF, ¶¶ 92-99. Additionally, Kim suggested some chapter titles and contributed to the *Crave* series "bible," an internal guide detailing *Crave*'s many subplots and characters. Id. at ¶¶ 113, 117. Freeman suggests a different truth. Freeman asserts that Pelletier, Abrams, and Kim all helped write the *Crave* series. PSUF, ¶ 49.

Freeman offers six separate *BMR* manuscripts for the Court's substantial similarity analysis: *BMR 2010* (ECF No. 276, Freeman Ex. 18); *BMR 2011* (Freeman Ex. 14); *BMR 2012*

3

SA-200

(Freeman Ex. 19); *BMR 2013* (Freeman Ex. 17); *BMR 2014* (Freeman Ex. 16); and *BMR 2016* (Freeman Ex. 15). Freeman also claims that the Defendants infringed several sets of her notes (Freeman Exs. 3-11).

## II.      Procedural Background

Freeman filed this action on March 25, 2022. Two months later, she amended her complaint. After completing fact and expert discovery, Freeman filed her motion for summary judgment on her direct copyright infringement claim. The Defendants cross-moved and moved for summary judgment on Freeman's state law claims. Contemporaneous with this summary judgment motion, the Defendants seek to exclude the testimony of six affirmative experts offered by Freeman, and Freeman seeks to exclude the testimony of two rebuttal experts offered by the Defendants. Both parties also ask the Court to strike various summary judgment exhibits and to keep various summary judgment exhibits under seal. The Court decides these evidentiary issues today by separate opinion and order.

**DISCUSSION**

## I.      Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of establishing that no genuine issue of material fact exists. Id. at 256-57; see Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can

4

**SA-201**

point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (citing Celotex, 477 U.S. at 322-23).

To defeat summary judgment, the non-moving party must produce more than a "scintilla of evidence" and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Anderson, 477 U.S. at 252; Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); Flores v. United States, 885 F.3d 119, 122 (2d Cir. 2018) ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."). The non-moving party "must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (internal quotation marks omitted).

In ruling on a motion for summary judgment, the Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004). When both sides have moved for summary judgment, the district court is "required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party." Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 171 (2d Cir. 2011).

## II. Copyright Infringement

"The determination of the extent of similarity that will constitute a substantial, and hence infringing, similarity presents one of the most difficult questions in copyright law, and one that is the least susceptible of helpful generalizations." 4–13 Nimmer on Copyright § 13.03 (2009).

5

SA-202

Thus, the question of substantial similarity typically presents an extremely close question of fact, Arnstein v. Porter, 154 F.2d 464, 468-69 (2d Cir. 1946), and questions of non-infringement have traditionally been reserved for the trier of fact. See Warner Bros. Inc. v. Am. Broad. Companies, Inc., 720 F.2d 231, 239 (2d Cir. 1983) (the issue of substantial similarity "is frequently a fact issue for jury resolution"); Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980) ("[S]ummary judgment has traditionally been frowned upon in copyright litigation.").

To establish direct copyright infringement, a plaintiff must show that: (1) they own a valid copyright; (2) the defendant "actually copied" from the plaintiff's copyrighted work; and (3) the defendant's work is "substantially similar" to the plaintiff's copyrighted work, such that the defendant's copying amounts to "unlawful appropriation." Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc., 150 F.3d 132, 137 (2d Cir. 1998).

The parties do not dispute, for the purposes of this motion, that Freeman owns a valid copyright in her *BMR* manuscripts and notes. PSUF, ¶ 2. At issue, then, is whether the Defendants actually copied from Freeman, and if so, whether *BMR* and the *Crave* series share substantial similarities.

### A. Actual Copying

Direct evidence of actual copying is rare. Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003). For that reason, a plaintiff may establish actual copying circumstantially. Id. There are two ways for a plaintiff to circumstantially establish actual copying. In the first, the plaintiff must establish both that the "the person who composed the defendant's work had access to the copyrighted material and that there are similarities between the two works that are probative of copying." Id. In the second, if the plaintiff cannot establish that the author of the allegedly infringing work had access to the plaintiff's work, the plaintiff can nevertheless

6

**SA-203**

establish actual copying if the works are "so strikingly similar as to preclude the possibility of independent creation." Id. (citing Lipton v. Nature Co., 71 F.3d 464, 471 (2d Cir. 1995)). Like in most copyright cases, there is no direct evidence of copying. Accordingly, the Court must consider whether Freeman can establish actual copying through either a combination of access and probative similarity, or through striking similarity.

### i. Access

Freeman presents two theories for access. First, Freeman argues that Kim and Abrams – who both undisputedly had access to some *BMR* versions[1] – helped write *Crave*, thus establishing that those "who composed the defendant's work" had direct access. Jorgensen, 351 F.3d at 51. Second, Freeman presents a theory of intermediary access that, while Kim and Abrams did not help write *Crave*, they shared Freeman's materials with Wolff.

### a. Direct Access

The parties dispute who authored *Crave*. The Defendants argue that Kim and Abrams did not write Wolff's books; Freeman argues the opposite. Because the parties do not dispute that Kim and Abrams had access to some *BMR* versions, if Freeman could establish that Kim and Abrams helped author *Crave*, she could establish direct access. This factual dispute over *Crave*'s authorship is therefore highly relevant to the issue of actual copying.

Although Freeman argues that Abrams was "very involved in the writing of the *Crave* series," Freeman has no specific evidence showing that Abrams helped write Wolff's books. PSUF, ¶ 49. To support her claim, Freeman cites Wolff's deposition testimony. In response to a question about Abrams's contribution to the *Crave* series, Wolff responded "Stacy Abrams was

---

[1] The parties do not dispute that Kim had access to *BMR 2010*, *BMR 2011*, *BMR 2012*, and *BMR 2013*, as well as Freeman's notes. Additionally, the parties do not dispute that, in 2013, Kim forwarded Abrams a copy of *BMR*. PSUF, ¶ 24.

SA-204

the copy editor." ECF No. 278, Doniger Ex. 4, Wolff Tr., 180:1-4. Nowhere does Wolff testify that Abrams wrote any *Crave* material, and Freeman does not offer any evidence rebutting the Defendants' claim that Abrams only copyedited the books. Because copyediting does not amount to authoring, and Freeman does not point to any facts rebutting the Defendants' claim that Abrams only copyedited *Crave*, the parties do not genuinely dispute whether Abrams helped write *Crave*; the evidence shows that she did not. Accordingly, Freeman cannot establish direct access of *BMR 2013* through Abrams.

Whether Kim helped write *Crave* is, however, genuinely in dispute. Wolff testified that, aside from writing some chapter titles, Kim did not write, edit, or otherwise make changes to any *Crave* manuscripts.[2] Wolff Tr., 47:3-48:7. But Freeman questions the credibility of Wolff's testimony, pointing to these text messages Kim sent Abrams: "I'm feeling overwhelmed because I'm also helping Tracy write"; "Tracy and I are team speed writing new scenes"; "I convinced Tracy to let me help her write the guide"; and "I've stopped copy editing because I helped write all this." Doniger Ex. 15, at 3, 5-7. These text messages seem to imply that Kim helped write *Crave.* To explain away the messages, the Defendants assert that Kim simply sat with Wolff while she wrote, kept her awake, and motivated her. It will be the task of the jury, not the Court, to decide whether the Defendants' explanation sufficiently accounts for Kim's text messages. The Court cannot resolve this pivotal factual dispute on summary judgment.

Even if Freeman could establish that Kim helped write *Crave*, there would remain a dispute over Kim's access to *BMR 2014* and *BMR 2016*. Kim claims that "the last full version of [Freeman's] manuscript that [she] received was in July 2013." ECF No. 306, Kim Declaration ("Kim Decl."), ¶ 45. The Defendants point out that *BMR 2014*'s metadata shows a creation date

---

[2] Freeman does not allege that *Crave*'s chapter titles infringe Freeman's works.

**SA-205**

of July 20, 2014, and *BMR 2016*'s metadata shows a creation date of October 10, 2016.[3] ECF No. 300, Cole Declaration ("Cole Decl."), ¶¶ 18, 19. Based on Kim's sworn statements, she could not have received *BMR 2014* and *BMR 2016.* Freeman, however, claims that she "sent Kim drafts of *BMR* between July 2013 and approximately June, 2015," including *BMR 2014* and *BMR 2016.* ECF No. 329, Supplemental Freeman Declaration ("Supp. Freeman Decl."), ¶ 6. The parties present contradictory testimony, which should be resolved through a jury's credibility determination.

The Defendants argue that only *BMR 2011* and *BMR 2013* are at issue in the litigation. If the Defendants were correct, the factual disputes over *BMR 2014* and *BMR 2016* would be irrelevant. In the Defendants' view, the Court's January 11, 2023 Order for Freeman to select "two manuscripts to serve as the primary works that establish her copyright claim" limited Freeman's copyright claims to only the two versions of *BMR* (she later selected *BMR 2011* and *BMR 2013*). ECF Nos. 105, 111. But Judge Stanton has clarified that the selection of two manuscripts was meant only to "allow the parties a preliminary view of the works' similarities" and was a "practical way to start." Judge Stanton added that the "selection of the two test examples is not a ruling on the remainder of plaintiff's evidence." ECF Nos. 141, 181. Accordingly, Freeman can still assert copyright infringement as to *BMR 2010, BMR 2012, BMR 2014,* and *BMR 2016*, and her notes, making access to *BMR 2014* and *BMR 2016* relevant. Because the Court declines to address substantial similarities in this report and recommendation,

---

[3] The Defendants also claim that the metadata for a third *BMR* version (filed as Freeman Ex. 21) post-dates Kim's professional relationship with Freeman. Cole Decl., ¶ 20. That *BMR* manuscript is not one of the six that Freeman offers for substantial similarity analysis. Accordingly, whether Freeman sent Kim that particular *BMR* manuscript is immaterial.

SA-206

the question of *how* a jury will consider *BMR 2011* and *BMR 2013* vis a vis the other four versions should be decided through pretrial briefing, not at summary judgment.[4]

### b.      Intermediary Access

Freeman argues that, even if she cannot establish that Kim helped write *Crave*, she can still establish access via an intermediary theory. "A court may infer that the alleged infringer had a reasonable possibility of access if the author sent the copyrighted work to a third-party intermediary who has a close relationship with the infringer." Jorgenson, 351 F.3d at 51 (quoting Towler v. Sayles, 76 F.3d 579, 583 (4th Cir. 1996)). If Kim did not help write *Crave*, she would be a third-party intermediary with a close relationship to Wolff and with access to at least four versions of *BMR*. Additionally, Abrams is a third-party intermediary with access to *BMR 2013*. Even with these close relationships, however, Freeman would need to establish that Wolff "had a 'reasonable possibility' – not simply a 'bare possibility'" – of viewing Freeman's work. Jorgenson, 351 F.3d at 51. That reasonable possibility "cannot be based on 'mere speculation or conjecture,'" but rather must be based on "significant, affirmative and probative evidence." Id.

Complicating Freeman's theory of intermediary access is testimony from Wolff and Kim denying that anyone ever showed Freeman's work to Wolff. In Kim's declaration, she asserts that:

> Other than sending the submission copy of *Masqued* to Stacy Abrams at Entangled, neither I nor anyone else at Prospect Agency ever provided any of Freeman's manuscripts or other written material to Entangled Publishing. Nor did I or anyone else at Prospect Agency ever provide any of Freeman's manuscripts or other written material to Tracy Wolff. I also did not convey (nor did anyone else at Prospect) any content authored by Freeman to any third party (including Entangled or Wolff) verbally or through other means, other than the submissions we made to publishers during my time working as Freeman's agent. I also never even spoke to Wolff, Pelletier, Abrams or anyone else about Freeman or her manuscripts aside from my submission to them, until the start of this dispute.

---

[4] Relatedly, the parties dispute whether, at the substantial similarity analysis, Freeman's works should be aggregated or viewed individually. That, too, should be decided through pretrial briefing.

SA-207

Kim Decl., ¶ 46. Wolff likewise swears:

> I have never read any of Plaintiff's manuscripts. No one has ever shown me any of Plaintiff's manuscripts. I have never heard any passages from Plaintiff's manuscripts. The only knowledge I have of Plaintiff's manuscripts is what I read in the complaint that she filed in this case. I did not copy Plaintiff's manuscripts, or incorporate any of Plaintiff's material into my books, regardless of whether we're talking about the *Crave* Series, *Tempest Rising*, *Deserving of Luke*, or any of my other novels.

ECF No. 150, Wolff Decl., ¶ 27.

In the absence of specific contradictory evidence, the Court cannot simply disregard the testimony offered by the Defendants. See, e.g., Tomasini v. Walt Disney Co., 84 F. Supp. 2d 516, 520 (S.D.N.Y. 2000) (finding no access because the defendants "stated under oath that they personally never received, reviewed, or heard of" plaintiff's copyrighted material, and the plaintiff presented no evidence to rebut that testimony); Cox v. Abrams, No. 93-cv-6899 (RJW), 1997 WL 251532, at *4 (S.D.N.Y. May 14, 1997) (finding no access because accepting the plaintiff's theory of access would require the Court to assume that the purported intermediaries "lied when they swore under oath that they did not provide the manuscript or communicate its substance to any of the defendants"); Siskind v. Newton-John, No. 84-cv-2634 (TPG), 1987 WL 11701, at *5 (S.D.N.Y. May 22, 1987) (finding no access because the defendants "swor[e] in depositions and affidavits that they did not receive, hear or know of plaintiff's song"); see also Towler v. Sayles, 76 F.3d 579, 583 (4th Cir. 1996) (finding no access because the defendant testified that he had never received the copyrighted work, the plaintiff presented no evidence showing that the purported intermediary ever sent the defendant plaintiff's work, and plaintiff "presented no evidence upon which a jury could base an inference that [the defendant] was not truthful"). Kim's and Wolff's sworn testimony therefore reduces the possibility of Freeman's intermediary access theory from reasonable to bare because it would require the Court to

11

**SA-208**

speculate – without evidence – that Wolff and Kim both lied under oath. In light of this undisputed evidence, no reasonable jury could find access under a theory that Kim or Abrams shared Freeman's work with Wolff.

### ii. Similarity

If the at-issue works shared no probative similarities, access would become immaterial, Freeman would fail to establish actual copying, and her direct infringement claim would fail. If the at-issue works shared striking similarities, Freeman would no longer need to establish access, and the Court could proceed to the substantial similarity analysis. In either situation, the factual dispute over access would cease to be material. Accordingly, the Court must consider probative and striking similarity.

### a. Probative Similarity

"'Probative similarity' is a less demanding test than 'substantial similarity,' requiring only that there are similarities between the two works that would not be expected to arise if the works had been created independently." Odegard, Inc. v. Costikyan Classic Carpets, 963 F. Supp. 1328, 1337 (S.D.N.Y. 1997). When evaluating probative similarity, the Court should consider "the entire work, not just the protectible elements." Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 123 (2d Cir. 1994); see also Boone v. Jackson, 206 F. App'x 30, 32 (2d Cir. 2006) (summary order) (finding that "the district court erred by dissecting the works into protectable and non-protectable elements" when evaluating probative similarity).

*BMR 2010, 2011, 2012, 2013,* and *2014* each share probative similarities with the *Crave* series, and no reasonable juror could find otherwise. The similarities – some more probative than others – add up to raising an inference that *Crave*'s authors copied these Freeman works. In both sets of works: the heroine lives in Alaska after moving from California in the wake of losing

**SA-209**

close family members, including their fathers, in a tragic accident; the heroine believes she is human but later learns that she is a supernatural half-witch key to maintaining the balance between good and evil; an evil vampire kidnaps the heroine and bites her; an evil vampire has trapped the heroine's paternal family member in a non-human form; a mean girl spikes the heroine's drink; and more. Absent copying, one would not expect two works to share these kinds of similarities. Freeman has therefore established probative similarity as to these specific Freeman manuscripts. Ex. 3

*BMR 2016*, however, shares few similarities with Wolff's series. Between *BMR 2014* and *BMR 2016*, Freeman made significant changes to her manuscript, including cutting about 300 pages and most of the ideas she alleges Wolff stole. In Freeman's final edit, the story no longer includes: vampires; werewolves; the mean girl spiking the heroine's drink; the heroine hearing a voice in her head; the heroine's dead father being trapped in a non-human form; the heroine learning that she's magical (she knows from the outset); or supernatural war. Additionally, the heroine's family members were murdered, not killed in an accident. The only remaining similarities hold little probative value. For example, both books: feature a female main character who moved to Alaska from California; involve magic; reference ancient imagery and tarot cards; quote Shakespeare; mention gold double doors and lemon verbena tea; and discuss good and evil. These similarities are all either so commonplace or so minor that they do not rise to the level of indicating copying. Because Freeman has failed to establish probative similarity for *BMR 2016*, Freeman cannot establish actual copying for that manuscript, and I recommend excluding it from the substantial similarity analysis.

Finally, the Court considers the probative similarity of Freeman's notes. Some of those sets of notes – including Exhibits 3, 5 through 9, and 11 – reference the probative similarities

13

**SA-210**

described above for *BMR 2010, 2011, 2012, 2013*, and *2014*. Accordingly, Freeman has established probative similarities as to those sets of notes. Other sets of notes, however, share few or no similarities with Wolff's books. Exhibit 4 is dialogue of the heroine's mom and aunt discussing their desire for the heroine to have a normal life; Freeman points to no analogue dialogue in Wolff's books. Exhibit 10 is a half-page description of the heroine's ability to feel evil around her, which is not a similarity highlighted by Freeman. Accordingly, Freeman has failed to establish probative similarity for Exhibits 4 and 10, and I accordingly recommend excluding those from a substantial similarity analysis.

### b.  Striking Similarity

The bar for striking similarity is much higher than the bar for probative similarity. "At base, 'striking similarity' simply means that, in human experience, it is virtually impossible that the two works could have been independently created." L.A. T-Shirt & Print, Inc. v. Rue 21, Inc., No. 16-cv-5400 (RA), 2017 WL 3575699, at *12 (S.D.N.Y. Aug. 17, 2017) (citing Nimmer on Copyright § 13.02(B)). To establish striking similarity, the works "must be so identical as to preclude any reasonable possibility of independent creation." Dimmie v. Carey, 88 F. Supp. 2d 142, 150 (S.D.N.Y. 2000). Unlike with probative similarity, "mere multiple similarities are insufficient" to establish striking similarity, "and the relevance of a similarity is diminished if the similarity consists of 'stock elements' within a genre or otherwise non-protectable elements." Webb v. Stallone, 910 F. Supp. 2d 681, 687 (S.D.N.Y. 2012).

To establish striking similarity, Freeman primarily relies on the conclusions of experts that the Court has excluded as unreliable under the Daubert factors. That leaves the Court to decide striking similarity based on the works themselves. The works are far from identical, with their differences outweighing their similarities. Some major differences between the works

14

**SA-211**

include: in *BMR*, Anna has lived in Alaska since elementary school, while *Crave* starts with Grace's move to Alaska; Anna feels at home in Alaska, while Grace feels like an outsider; Anna attends a public high school with mostly human classmates, while Grace attends a Hogwarts-like magical boarding school with supernatural classmates; the romantic lead of *BMR* is a kind and sweet teenage werewolf, while the romantic lead of *BMR* is a brooding and angry centuries-old vampire; a major plot point in *Crave* is a love triangle with the romantic lead and his brother, while in *BMR*, there is no love triangle and the romantic lead's brother is dead; in *BMR*, Anna lives at home with her living mother, while in *Crave*, Grace lives at her boarding school and her mother is dead; and more. Additionally, *BMR* has a more serious and traditional tone, while *Crave* inserts more humor and is written more colloquially, making significant use of text-speak. Given these myriad differences, no reasonable juror could find Freeman's and Wolff's works "so identical as to preclude any reasonable possibility of independent creation." <u>Dimmie</u>, 88 F. Supp. 2d at 150. Accordingly, I find that no reasonable jury could conclude that the at-issue works share striking similarities.

Because the parties' works share probative, but not striking, similarities, the factual disputes over access remain material and should be resolved by a jury.

### iii. Independent Creation

The Defendants assert an "independent creation" affirmative defense, arguing that the evidence of independent creation precludes a finding of actual copying. At this juncture, however, the Court should not consider whether the Defendants have established the affirmative defense:

> To negate copying, a defendant can allege independent creation. No matter how credible such a claim is, and even absent any contrary evidence, a court should not grant defendant summary judgment on that basis. For, in the absence of the ability to construct a time machine capable of peeking back into defendant's atelier, the law has

15

**SA-212**

devised proof of access plus probative similarity as surrogates to prove copying as a factual matter. To the extent that defendant denies that copying and maintains independent creation, a factual issue arises, which it is for trial to resolve.

Nimmer on Copyright § 12.10(B); see also Repp v. Webber, 132 F.3d 882, 891 (2d Cir. 1997) ("Whether the evidence of independent creation here is sufficient to rebut the *prima facie* case established in this action is a question for the factfinder, whatever the contours of the burden of establishing the defense."). Because the Defendants' independent creation argument cannot resolve the summary judgment motions, I decline to comment on the strength of their affirmative defense.

**B.      Unlawful Appropriation**

If Freeman could establish actual copying, the next step would be for the Court to determine whether the copying amounted to unlawful appropriation. Copying becomes unlawful when "substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 63 (2d Cir. 2010). Substantial similarity "typically presents an extremely close question of fact." Id. For that reason, determination of substantial similarity has traditionally been reserved for the jury. Id.; see also Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980) ("[S]ummary judgment has traditionally been frowned upon in copyright litigation."). Courts decide substantial similarity on summary judgment only if "the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." Warner Bros. Inc. v. Am. Broad. Cos., 720 F.2d 231, 240 (2d Cir. 1983) (cleaned up). Where, as here, the similarities fall somewhere between probative and striking, substantial similarity presents a particularly close question of fact and should be decided by a jury.

**SA-213**

Aside from the close question of fact on substantial similarity, the issue should be decided by a jury because access is in dispute. "It is *only after* actual copying is established that one claiming infringement then proceeds to demonstrate that the copying was improper or unlawful by showing that the second work bears 'substantial similarity' to protected expression in the earlier work." Castle Rock, 150 F.3d at 137 (emphasis added). When courts find actual copying in dispute at summary judgment, they decline to discuss substantial similarity. See, e.g., Clonus Assocs. v. Dreamworks, LLC, 457 F. Supp. 2d 432, 443 (S.D.N.Y. 2006) (finding actual copying in dispute and therefore declining to discuss unlawful appropriation, noting that such questions are "fraught with fact-based disputes"); Michael Grecco Prods. v. Valuewalk LLC, 345 F. Supp. 3d 482, 501 (S.D.N.Y. 2018) (finding actual copying in dispute for one defendant and explaining that the Court "need not address" substantial similarity for that defendant). The factual dispute over access to *BMR 2014* particularly prevents the Court from prematurely discussing substantial similarity; the resolution of that dispute will determine which of Freeman's works the jury will consider in its substantial similarity analysis and could therefore alter the substantial similarity finding.[5] Accordingly, because access is in dispute, the Court should not determine whether the at-issue works are substantially similar.

---

[5] Freeman's five remaining manuscripts all tell essentially the same story. Freeman's own brief describes her manuscripts as "iterations and edits of *one overarching story*." Pl. Copy. Br. at 1 (emphasis added). Similarly, Freeman's counsel has represented on the record that the various manuscript are "a single story that has some revisions here and there." ECF No. 222, June 2, 2023 Tr. at 30:18-22. Accordingly, the inclusion or exclusion of *BMR 2014* should not impact a jury's finding regarding whether the at-issue works share "common themes, concepts, characters, and plots that formed part of their very meaning, context, and expression." Warner Bros., Inc. v. ABC, 530 F. Supp. 1187, 1193 (S.D.N.Y. 1982). But the inclusion or exclusion of *BMR 2014* could affect the jury's decision on fragmented literal similarity, which asks whether Wolff's work contains identical or closely paraphrased portions from Freeman's work. Castle Rock, 150 F.3d at 140.

SA-214

Due to the genuine factual disputes that are material to access, I recommend that the Court deny the parties' cross-motions for summary judgment on Freeman's direct copyright infringement claim and allow that claim to proceed to trial.

### III. State Law Claims

#### A. Breach of Contract

Freeman alleges that Kim and Prospect breached their contract with her by sharing "Freeman's work and ideas with Wolff and the other defendants." ECF No. 326, Plaintiff's State Law Opposition ("Pl. State Opp."), at 16. Kim stopped representing Freeman in March of 2014. That month, "Freeman terminated her agency agreement with Kim and Prospect Agency." DSUF, ¶ 151. Freeman argues that Kim and Prospect breached that agency agreement over five years later, when Entangled contracted with Wolff to write *Crave*. But "a contract cannot be breached after it has been terminated." Wall St. Sys. Swed. AB v. Hertz Global Holdings, Inc., No. 14-cv-7819 (KBF), 2015 WL 158887, at *8 (S.D.N.Y. Jan. 13, 2015); see also Twitchell v. Pittsford, 106 A.D.2d 903, 904 (3rd Dep't 1984) ("When a contract is terminated . . . the rights and obligations thereunder cease."). Because Freeman improperly asserts a post-termination breach, I recommend granting the Defendants summary judgment on her breach of contract claim.

#### B. Breach of Fiduciary Duty

Freeman claims that Kim and Prospect breached their fiduciary duty when they shared her work with Wolff without her permission and for personal gain. "The elements of a cause of action to recover damages for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." Rut v. Young Adult Inst., Inc., 74 A.D.3d 776, 777 (2nd Dep't 2010).

18

**SA-215**

The Defendants argue that the Court should grant them summary judgment on this claim because Kim and Prospect owed Freeman no fiduciary duty. In the alternative, the Defendants argue that even if Kim and Prospect did breach their fiduciary duty to Freeman, she has not established any resulting damages that are unique from her copyright claim.

Freeman has established the existence of a fiduciary relationship. "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Mandelblatt v. Devon Stores, 132 A.D.2d 162, 168 (1st Dep't 1987). Courts routinely find that literary agents fit squarely within this definition. See, e.g., Friedman v. Kuczkir, 272 F. Supp. 3d 613, 618 (S.D.N.Y. 2017) ("A literary agent has a fiduciary duty to the agent's client and is required to act in the best interests of the client."); Hay v. Gernert Co., No. 22-cv-698 (LGS), 2023 WL 402511, at *10 (S.D.N.Y. Jan 25, 2023) (finding that the complaint alleged sufficient facts to show that a literary agent owed their client "a fiduciary duty over and above, or independent of, any contractual obligations that existed"); see also, Jacqueline D. Lipton, Are Literary Agents (Really) Fiduciaries?, 86 Tenn. L. Rev. 825, 827 (2018) ("It seems to be accepted as common practice that a literary agent owes a fiduciary duty to their clients."). A fiduciary's duties of loyalty and confidentiality can persist "even after the relationship ends." Avco Corp. v. Turner, No. 22-cv-3448, 2024 WL 185678, at *1 (3d Cir. Jan. 17, 2024).

The Defendants argue that this Court has "clearly held that a literary agent holds no [fiduciary] duties to his or her client." Def. State Br. at 13 (citing Clifford v. Janklow, No. 22-cv-1259 (MKV), 2023 WL 2711353, at *6-7 (S.D.N.Y. Mar. 30, 2023)). The Defendants' claim misrepresents and broadens Clifford's holding. In that case, the Court found that the plaintiff had not adequately pleaded that her literary agent owed her a fiduciary duty. There, the plaintiff had

19

SA-216

failed to plead facts showing that her relationship with her agent amounted to more than a "purely commercial transaction." Clifford, 2023 WL 2711353, at *16. "When parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." Mid-Island Hosp., Inc. v. Empire Blue Cross and Blue Shield, 276 F.3d 123, 130 (2d Cir. 2002). Accordingly, Clifford's holding means only that a court cannot *automatically* assume that a literary agent is a client's fiduciary. See Oddo Asset Mgt. v Barclays Bank PLC, 19 N.Y.3d 584, 593 (2012) (explaining that a "a fiduciary relationship is 'necessarily fact-specific'"). Instead, the client must establish that they had more than an "arms length" relationship with their agent and that the agent and client "created their own relationship of higher trust." Id.

Kim and Freeman did create their own "relationship of higher trust." Over the course of their professional relationship, Freeman sent Kim at least 10-15 *BMR* manuscript drafts. PSUF, ¶ 17. Kim "worked with Freeman to bring the *BMR* manuscript into a form suitable for pitching to book editors." DSUF, ¶ 142. Kim gave Freeman advice about which publishing deals seemed most promising. PSUF, ¶ 24. After several editors rejected *BMR*, "Kim continued to offer suggestions and have readers review the book." DSUF, ¶ 148. Kim spent years giving Freeman advice and guidance on publishing-related matters. The two worked together closely, and Freeman placed significant trust in Kim. This relationship is a far cry from the kind of arms-length, commercial transaction that would not give rise to a fiduciary duty. Accordingly, Freeman has established that Kim and Prospect owed her a fiduciary duty.

Freeman argues that Kim and Prospect breached their fiduciary duty by "exploiting her work with a third-party competitor to her detriment." Pl. State Opp. at 14. She argues that Kim exploited her work either to help Wolff write the *Crave* series or by using the work herself to

20

SA-217

help write the series. Id. at 7-9. If true, this would amount to a breach of a fiduciary's duties of loyalty and confidentiality. Kim has denied these allegations under oath. But, as explained above, there are factual disputes regarding whether Kim helped write *Crave*. Additionally, although Kim denies sharing or using Freeman's material to write *Crave*, a reasonable juror could rely on the similarities between the works to infer otherwise. Accordingly, whether Kim and Prospect breached their fiduciary duty would need to be determined by a jury.

But even if a jury found that Kim and Prospect breached their fiduciary duty by sharing Freeman's manuscripts or using them to write *Crave*, Freeman has not established that she suffered any injury as a result. "[W]here damages are sought for breach of fiduciary duty under New York law, the plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability." LNC Invs. v. First Fid. Bank, N.A., 173 F.3d 454, 465 (2d Cir. 1999). Speculative damages are "insufficient to maintain a cause of action alleging breach of a fiduciary duty." Philip S. Schwartzman, Inc. v. Pliskin, Rubano, Baum & Vitulli, 215 A.D.3d, 701 (2nd Dep't 2023). Additionally, "[n]ominal damages cannot satisfy the 'damage' element of a breach of fiduciary duty claim." Yukos Capital S.A.R.L. v. Feldman, 977 F.3d 216, 243 (2d Cir. 2020).

The Defendants contend that Freeman has failed to establish the "damages" element because she offers no evidence of damages separate from her copyright infringement claim. Def. State Br. at 7. If accurate, that would warrant dismissal of her breach of fiduciary duty claim because "claims are duplicative of one another if they arise from the same facts and do not allege distinct damages." NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 175 (2d Cir. 2008); see, e.g., Townsquare Media, Inc. v. Regency Furniture, Inc., No. 21-cv-4695 (KMK), 2022 WL 4538954, at *22 (S.D.N.Y. Sept. 28, 2022) (dismissing a claim because it stemmed

21

SA-218

from "identical facts" and sought "identical damages" as another claim); <u>Biosafe-One, Inc. v.</u> <u>Hawks</u>, 639 F. Supp. 2d 358, 368 (S.D.N.Y. 2009) (dismissing conversion claim as duplicative of copyright and trademark infringement claims). In an attempt to cure this issue, Freeman clarifies that she claims the Defendants "breached their fiduciary duties by exploiting her work with a third-party competitor to her detriment regardless of whether that also constitutes copyright infringement." Pl. State Opp. at 14. She further clarifies that "her state law claims are *not* dependent" on her copyright claims. <u>Id</u>. at 1 (emphasis in original). But although Freeman correctly explains that a jury could find that Kim and Prospect breached their fiduciary duty by improperly using her material, even absent a substantial similarity or copyright infringement finding, Freeman never identifies any specific injury she suffered as a result.

When discussing damages for her breach of contract claim, Freeman explains that Kim and Prospect "likely destroyed any market for Freeman's work." <u>Id</u>. Even assuming that Freeman seeks the same damages on her breach of fiduciary duty claim, she has not offered any evidence to support such damages. For example, Freeman has not provided evidence that anyone in the publishing industry believes *BMR* and *Crave* are unusually similar, that she has attempted to publish *BMR* since *Crave* was published, or that she intends to publish *BMR* in the future. Without such evidence, no reasonable juror could find damages. Additionally, "likely" future publishing difficulty, without more, is too speculative to constitute recoverable damages. Accordingly, although Kim and Prospect owed Freeman a fiduciary duty, and may have breached that duty, Freeman has failed to identify or establish specific, non-speculative, non-copyright damages resulting from that breach. I therefore recommend that the Court grant the Defendants summary judgment on Freeman's breach of fiduciary duty claim.

SA-219

### C.     Fraud and Fraudulent Concealment

Freeman also sued Kim and Prospect for fraud and fraudulent concealment. In Freeman's state law opposition brief, she writes that she "maintains that the Prospect Defendants also defrauded her but to streamline the issues before the court and focus on the primary claims she agrees that her fraud claim may be dismissed." Pl. State. Opp. at 1, n.2. Accordingly, I recommend that the Court dismiss Freeman's fraud claims with prejudice.

### CONCLUSION

I recommend that the Court DENY the parties' cross-motions for summary judgment on Freeman's direct copyright infringement claim. I further recommend that the Court GRANT the Defendants' motion for summary judgment on Freeman's state law claims.

SARAH NETBURN
United States Magistrate Judge

DATED:     August 1, 2024
           New York, New York

23

SA-220

\*         \*         \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS**
**TO THIS REPORT AND RECOMMENDATION**

The parties shall have 14 days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 6(a), 6(d). A party may respond to another party's objections within 14 days after being served with a copy. Fed. R. Civ. P. 72(b)(2); see Fed. R. Civ. P. 6(a), 6(d). These objections shall be filed with the Court and served on any opposing parties. See Fed. R. Civ. P. 72(b)(2). Courtesy copies shall be delivered to the Honorable Louis L. Stanton if required by his Individual Rules and Practices. Any requests for an extension of time for filing objections must be addressed to Judge Stanton. See Fed. R. Civ. P. 6(b). The failure to file timely objections will waive those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. James, 712 F.3d 79, 105 (2d Cir. 2013).

SA-221