# 26-1016

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

LYNNE FREEMAN, an individual,
*Plaintiff-Appellant,*

v.

TRACY DEEBS-ELKENANEY, an individual; EMILY SYLVAN KIM, an individual; PROSPECT AGENCY, LLC, a New Jersey limited liability company; ENTANGLED PUBLISHING, LLC, a Delaware limited liability company; HOLTZBRINCK PUBLISHERS, LLC dba MACMILLAN, a New York limited liability company; UNIVERSAL CITY STUDIOS, LLC, a Delaware limited liability company,
*Defendants-Appellees,*

MACMILLAN PUBLISHERS, LLC; CRAZY MAPLE STUDIO, INC., a California Corporation,
*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, CASE NO. 1:22-CV-02435-CM-SN, HONORABLE COLLEEN MCMAHON

## BRIEF OF APPELLEES

Amy L. Nashon, Esq.
TroyGould PC
1801 Century Park East, 16th Floor
Los Angeles, CA 90067
(310) 553-4441
anashon@troygould.com
*Counsel for All Appellees*
[Additional Counsel Listed on Inside Cover]

Lacy H. Koonce, Esq.
Klaris Law, PLLC
161 Water Street, Suite 904
New York, NY 10038
(917) 612-5861
Lance.koonce@klarislaw.com
*Counsel for Appellees Prospect Agency, LLC and Emily Kim*

Dwayne K. Goetzel, Esq.
Kowert, Hood, Munyon, Rankin & Goetzel, P.C.
1120 S. Capital of TX Highway
Building 2, Suite 300
Austin, TX 78746
(512) 853-8860
dgoetzel@intprop.com
*Counsel for Appellee Tracy Deebs-Elkenaney*

Jennifer Pariser, Esq.
Oppenheim & Zebrak, LLP
461 5th Avenue, 19th Floor
New York, NY 10017
(212) 951-1156
JPariser@oandzlaw.com
*Counsel for All Appellees*

# TABLE OF CONTENTS

Page

STATEMENT OF THE CASE .......... 1

SUMMARY OF THE ARGUMENT .......... 3

ARGUMENT .......... 6

I. The District Court Did Not Err in Denying Summary Judgment on the Issues of

Copyright Ownership and Access .......... 6

A. The Court Was Well Within Its Discretion to Deny Summary Judgment on

Copyright Ownership .......... 7

B. The Court Properly Denied Freeman Summary Judgment on Access .......... 10

C. The Court Did Not Find in Freeman's Favor on Probative Similarity .......... 15

II. The District Court Did Not Abuse Its Discretion in Revisiting Substantial Similarity .......... 19

III. Under Any Test for Substantial Similarity, the District Court Properly Found the Works Were Not Substantially Similar .......... 25

A. The District Court Did Not "Dissect" Freeman's Work But Properly Engaged in the Filtering Required in Analyzing Substantial Similarity .......... 31

B. The Court Did Not Use BMR 2010 as a Template But Rather Aggregated Freeman's Drafts as She Requested .......... 33

C. The Works Are Not Substantially Similar Under the Ordinary Observer Test, Nor Under the Selection and Arrangement Test .......... 34

1. Themes .......... 35

2. Setting .......... 36

3. Characters .......... 36

4. Plot and Sequence .......... 37

5. Pace .......... 38

6. Total Concept and Feel .......... 39

**TABLE OF CONTENTS (cont.)**

**Page**

7. Selection and Arrangement .......................................39

D. The Claimed "Errors" in the Opinion Do Not Warrant Reversal .......................................40

IV. The District Court Did Not Abuse Its Discretion in Excluding Freeman's Experts .......................................42

CONCLUSION .......................................47

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Amorgianos v. National R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ....................47

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................8, 10

*Arica Int., Inc. v. Palmer*,
970 F.2d 1067 (2d Cir. 1992) ....................17, 29

*Attia v. Society of New York Hospital*,
201 F.3d 50 (2d Cir. 1999) ....................33

*Boisson v. Banian, Ltd.*,
273 F.3d 262 (2d Cir. 2001) ....................27, 32

*Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.*,
150 F.3d 132 (2d Cir. 1998) ....................25

*Cayuga Nation v. Tanner*,
6 F.4th 361 (2d Cir. 2021) ....................14

*Clonus Associates v. Dreamworks, LLC*,
457 F. Supp. 432 (S.D.N.Y. 2006) ....................10

*Colvin v. Keen*,
900 F.3d 63 (2d Cir. 2018) ....................19, 20, 21, 22

*Computer Associates Intern., Inc. v. Altai, Inc.*,
982 F.2d 693 (2d Cir. 1992) ....................43

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*,
424 F.3d 1293 (Fed. Cir. 2005) ....................9, 10

*Dean v. Cameron*,
53 F. Supp. 3d 641 (S.D.N.Y. 2014) ....................34

*Dictograph Products Co. v. Sonotone Corp.*,
230 F.2d 131 (2d Cir. 1956) ....................20

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

*Dimmie v. Carey*,
88 F.Supp.2d 142 (S.D.N.Y. 2000) ....................17

*Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*,
499 U.S. 340 (1991)....................27

*Hamad v. Woodcrest Condominium Ass'n*,
328 F.3d 224 (6th Cir. 2003) ....................9

*Higgins v. California Prune & Apricot Grower, Inc.*,
3 F.2d 896 (2d Cir. 1924) ....................21

*Hines v. BMG Rights Management (US) LLC*,
694 F.Supp.3d 341 (S.D.N.Y. 2023) ....................16

*In re Jackson*,
972 F.3d 25 (2d Cir. 2020) ....................16

*Keeling v. Hars*,
809 F.3d 43 (2d Cir. 2015) ....................7

*Kennedy v. Silas Mason Co.*,
334 U.S. 249 (1948)....................8

*Lipton v. Nature Co.*,
71 F.3d 464 (2d Cir. 1995) ....................30

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
602 F.3d 57 (2d Cir. 2010) ....................26, 31, 32, 42

*Repp v. Webber*,
132 F.3d 882 (2d Cir. 1997) ....................15

*Scott v. Harris*,
550 U.S. 372 (2007)....................14

*Shawe v. Wendy Wilson*,
25 F.R.D. 1 (S.D.N.Y. 1960)....................19

*Streetwise Maps, Inc. v. VanDam, Inc.*,
159 F.3d 739 (2d Cir. 1998) ....................6

## TABLE OF AUTHORITIES (cont.)

Page(s)

*Tisi v. Patrick*,
97 F. Supp. 2d 539 (S.D.N.Y. 2000) ....................15, 16, 17

*Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*,
338 F.3d 127 (2d Cir. 2003) ....................26

*U.S. v. Birney*,
686 F.2d 102 (2d Cir. 1982) ....................22

*U.S. v. Uccio*,
940 F.2d 753 (2d Cir. 1991) ....................22

*In re U.S.*,
733 F.2d 10 (2d Cir. 1984) ....................19, 20

*Update Art, Inc. v. Charnin*,
110 F.R.D. 26 (S.D.N.Y. 1986) ....................19

*Walker v. Time Life Films, Inc.*,
615 F. Supp. 430 (S.D.N.Y. 1985) ....................34, 43

*Williams v. Crichton*,
84 F.3d 581 (2d Cir. 1996) ....................26, 27, 33

*Wright v. Cayan*,
817 F.2d 199 (2d Cir. 1987) ....................25

**Federal Statutes**

Fed. R. Civ. P. Rule 54(b)....................4, 19

Fed. R. Civ. P. Rule 56 ....................3, 8, 7

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record for the following nongovernmental corporate defendants hereby files its corporate disclosure statement: Entangled Publishing LLC, Prospect Agency, LLC, Holtzbrinck Publishers, LLC d/b/a MacMillan, and Universal City Studios LLC.

Defendant Entangled Publishing LLC certifies that it has no parent corporation, and that no publicly traded corporation owns 10% or more of its stock.

Defendant Prospect Agency, LLC, certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Macmillan Holdings, LLC, is the parent corporation of defendant Holtzbrinck Publishers. There is no publicly held corporation owning 10% or more of the stock of Holtzbrinck Publishers.

Defendant Universal City Studios LLC is a wholly owned indirect subsidiary of Comcast Corporation, a publicly traded company. No other publicly held corporation owns 10% or more of the equity of Universal City Studios LLC.

## STATEMENT OF THE CASE

From 2010 to 2016, Alaskan attorney and aspiring author Lynne Freeman ("Freeman") wrote various drafts of a young adult romantasy manuscript which she intended to turn into a published novel called either *Blue Moon Rising* or *Masqued* ("BMR / Masqued"). (A-7222; AOB-3.[1]) She signed with literary agent Emily Kim ("Kim"), who worked with her to refine her manuscripts and submit them to potential publishers from late 2010 to early 2014 (Supp A-2231-2332[2]). Unsuccessful, they parted ways (Supp A 2231-2232, 2237-2238). In 2019, Entangled Publishing decided to create a series for its young adult romantasy imprint that was *Harry Potter* meets *Twilight,* and it selected one of its most successful authors, Tracy Wolff ("Wolff"), to write the series. (A-7222, 7267-7268.) Wolff was and is represented by Kim (Supp A-2256). The first book in the series, *Crave,* was published on April 7, 2020, to great success, and subsequent books in the series became *New York Times* bestsellers (SA-7[3]).

Freeman came across *Crave* and believed that it was similar to her unpublished manuscripts, and when she saw that Wolff shared the same literary agent she had, she concluded that Kim must have given her material to Wolff to create the *Crave* series (Dkt. No. 23, p. 11, ¶ 33). This copyright infringement lawsuit followed.

---

[1] "AOB" refers throughout to Appellant's Opening Brief.
[2] "Supp A" refers throughout to Appellees' Supplemental Appendix filed herewith.
[3] "SA" refers throughout to the Special Appendix filed with the AOB.

Freeman could not prove, even after extensive discovery and forensic investigation, that Wolff was ever given or had the opportunity to review Freeman's work, and the district court denied her motion for summary judgment on the question of access (SA-165). The district court also initially denied cross-motions for summary judgment on the question of substantial similarity, reserving the issue for trial by jury (SA-165). However, the district court revisited that decision on assignment to a new judge and invited both sides to move for summary judgment on the issue of substantial similarity alone (Supp A-2801).

Judge McMahon read the parties' extensive briefing (each motion alone was approximately 100 pages), and all of Freeman's draft manuscripts and notes, as well as all four of the *Crave* novels at issue – a total of approximately 6,000 pages of young adult romantasy fiction (SA-11). The Judge concluded, in an extraordinarily detailed, reasoned and well-supported 157-page opinion, that the parties' works were not substantially similar and entered judgment for defendants (SA-84). This appeal followed.

Freeman contends that the trial court erred in (i) denying her motion for summary judgment on the elements of her claim involving copyright ownership and access; (ii) revisiting its previous denial of the parties' cross-motions for summary judgment on the issue of substantial similarity; (iii) granting defendants' motion for summary judgment on substantial similarity; and, (iv) excluding her experts on probative similarity and substantial similarity (AOB-2).

Appellees contend that the trial court did not abuse its discretion in denying summary judgment on Freeman's claims, in excluding Freeman's experts, and in revisiting the issue of substantial similarity on renewed motions for summary judgment. Appellees further contend that a *de novo* review of the record will confirm that the trial court properly concluded that the disputed works were not substantially similar, under any cognizable theory of copyright law, and its decision to grant summary judgment in favor of Appellees on that issue should be affirmed.

## SUMMARY OF ARGUMENT

In her appeal, Freeman complains that the district court did not grant her summary judgment on the issues of copyright ownership and access, but those issues were rendered moot by the district court's finding that the disputed works lacked substantial similarity, without which Freeman's cause of action for copyright infringement failed as a matter of law. Even had the court declined to rule on substantial similarity, it still did not abuse its discretion in denying Freeman summary judgment on the elements of her claim involving copyright ownership and access.

The court has broad discretion under Federal Rule of Civil Procedure 56 to deny summary judgment, even where there are no disputed issues of material fact, and the court acted well within its discretion to deny summary judgment in this case where those issues were indeed contested. With respect to copyright ownership, the issue was not fully developed by either party on summary judgment, and in any event, was conceded in Freeman's favor for purposes of considering plaintiff's claims on access

and substantial similarity. With respect to access, Freeman did not meet her burden to establish by "significant, affirmative and probative evidence" that Wolff had access to her work and that *Crave* shared probative similarities with BMR/Masqued, and she certainly could not meet the more stringent "striking similarity" test applicable to cases like this one where direct access cannot be established. *See Jorgensen v. Epic / Sony Records,* 351 F.3d 46, 51 (2d Cir. 2003).

Freeman also complains that the district court should not have revisited the issue of substantial similarity but should have left that question for the jury to decide (AOB-16-17). She argues that the district court's interlocutory order denying summary judgment on substantial similarity established the law of the case, and that the court could not later take up the question once more and decide it in favor of Defendants (AOB-18). However, Federal Rule of Civil Procedure 54(b) provides that a court may revise an interlocutory order at any time, and well-established Second Circuit precedent holds that the district court has full discretion to revisit its prior rulings, including on summary judgment, particularly where – as here – the district court elucidates cogent and compelling reasons to do so (Supp A-2803). Moreover, in a case such as this one where the question of summary judgment was not actually considered but rather reserved for the jury, one may argue the law of the case doctrine is not implicated in the first instance (Supp A-2804).

Having established no legal impediment to revisiting the question of whether the disputed works are substantially similar to one another, the district court undertook to

review nearly 6,000 pages of written material and, finding that they contained both protected and unprotected elements, analyzed them under this Circuit's "more discerning ordinary observer" test (SA-11, 27). The district court considered whether the works were substantially similar in their protected expression of characters, theme, setting, plot and sequence, pace, and total concept and feel (SA-45-83). It even considered whether they were substantially similar under the alternative tests urged by Freeman, including the selection and arrangement test (SA-79). Ultimately, the court concluded that the works were only similar in the ways that all young adult romantasy novels are similar, but setting aside the kinds of stock characters, tropes, and scenes a faire that one would expect to find in any work within that genre, Freeman's case for substantial similarity was "easily disposed of" after comparing and considering the works in their totality (SA-84).

Aware that anyone actually reading the works and comparing them side-by-side would invariably reach the same result, Freeman urges this Court to reinstate her excluded expert witnesses, despite that expert testimony is not admissible when the test is what an ordinary layperson would perceive to be substantial similarities between the works (AOB-86). She cannot make a case for why the exclusion of her expert on substantial similarity was manifestly erroneous when that exclusion is mandated by well-established Second Circuit case law, nor can she explain why the exclusion of her expert on probative similarity was manifestly erroneous when the district court

properly found her expert opinions inherently biased and unreliable on several independent bases (SA-180-183).

The Court should affirm the decisions of the trial court and the dismissal of Freeman's claims in their entirety.

## ARGUMENT

### I. The District Court Did Not Err in Denying Summary Judgment on the Issues of Copyright Ownership and Access.

As a preliminary matter, the district court's early decision not to adjudicate questions of copyright ownership and access on summary judgment was – at most – harmless error, since the district court later assumed those facts in Freeman's favor for purposes of determining substantial similarity (SA-8). Because the district court properly decided, after reading every page of the parties' respective works – six draft manuscripts, nine sets of notes, and four novels – and giving Freeman every assumption that she asked for, the works were only similar in the way that all young adult romantasy novels are similar, and that no reasonable juror could find otherwise, the question of whether the district court first should have granted Freeman summary judgment on copyright ownership and access is moot (SA-3). Without substantial similarity, there is no infringement, regardless of the validity of the plaintiff's copyright or evidence of access. *See Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739, 747 (2d Cir. 1998).

### A. The Court Was Well Within Its Discretion to Deny Summary Judgment on Copyright Ownership.

With respect to the validity and scope of Freeman's copyright ownership in her "collected works," that issue was not briefed on summary judgment, but rather, the fact of her ownership was presumed for purposes of determining access and substantial similarity (A-7222, fn. 2). In fact, in advance of the first round of summary judgment briefing, Judge Stanton directed Freeman to identify two of her six draft manuscripts "to serve as the primary works to establish her copyright claim" (A-7263-7264, Dkt. No. 141). In response, Freeman identified *BMR 2011* and *BMR 2013* as her primary manuscripts (A-7263). The question of whether Freeman had a valid copyright in the other drafts, notes and outlines that she claimed were part of her collected "works" was not substantively briefed by the parties, nor was it explicitly ruled upon by the district court (SA-165).[4]

Even had the court considered and denied summary judgment on the issue of copyright ownership, which is but one element of a copyright infringement claim, it would have been well within its discretion to do so. The district court has the discretion to deny summary judgment under Rule 56, even when it appears there is no genuine

[4] In Freeman's summary judgment motion, she dedicated two sentences to the issue, averring that she held a valid copyright based upon her copyright registrations, and "[t]herefore, ownership is ripe for adjudication" (A-7195). Defendants did not address the question head on, although they did raise at least some factual question with respect to the originality of *BMR 2013,* as it contains 89 words that were lifted verbatim from the television show *Roswell* (A-7265, A-7356), and a work containing such plagiarism is not eligible for copyright protection. *See Keeling v. Hars,* 809 F.3d 43 (2d Cir. 2015).

issue as to any material fact. *See* the Committee Note to the 2010 amendment to Rule 56, vol. 12A, Appendix C, Fed. R. Civ. P. (2025):

> If it is readily apparent that the court cannot grant all the relief requested by the motion, it may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial. Even if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established. The court may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event.

(Emphasis added). *See also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) (holding the trial court may "deny summary judgment in a case in which there is reason to believe that the better course would be to proceed to a full trial"); 12 James WM. Moore, *Moore's Federal Practice,* § 56.41[3d][d] (3d ed. 1999) ("The trial court has the right to exercise its discretion to deny a motion for summary judgment, even if it determines that a party is entitled to it if in the court's opinion, the case would benefit from a full hearing. The court can perform this 'negative discretionary function' and deny summary judgment if policy considerations so warrant; absent a finding of abuse, the court's discretion will not be disturbed.")

Indeed, in *Kennedy v. Silas Mason Co.,* 334 U.S. 249, 257 (1948), the Supreme Court decided it was "part of good judicial administration to withhold decision of the ultimate questions involved until this or another record shall present a more solid basis of findings based on litigation…" than was before it on summary judgment, and where

though the Court "might be able, on the present record, to reach a conclusion that would decide the case, it might found later to be lacking in the thoroughness that should precede judgment of this importance and which it is the purpose of the judicial process to provide."

Given that the court has discretion to deny summary judgment on one element of a claim, whether solely for purposes of judicial efficiency or other reasons, one could argue that the standard of review most appropriately applied to that decision is the abuse of discretion standard, as has been adopted by the Sixth and Federal Circuit Courts, rather than the *de novo* standard frequently used for grants of summary judgment. *See, e.g., Hamad v. Woodcrest Condominium Ass'n,* 328 F.3d 224, 235-6 (6th Cir. 2003) (holding "where a motion for summary judgment is denied on the grounds that there exists a genuine issue of material fact, review of this ruling is under the abuse of discretion standard" but where "a denial of summary judgment is based solely on legal grounds, review is de novo"); *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293, 1302 (Fed. Cir. 2005) ("We review the grant of a motion for summary judgment *de novo.* However, we review the denial of a motion for summary judgment for abuse of discretion.")

Whatever standard is applied, the decision should be upheld because it was within the district court's discretion to deny summary judgment on a single element of a claim that could not otherwise be fully adjudicated, since Freeman failed to establish

the second essential element of her cause of action – "unauthorized copying of the copyrighted work." *See Jorgensen,* 351 F.3d at 51.

### B. The Court Properly Denied Freeman Summary Judgment on Access.

To establish access on summary judgment, a moving party must establish - as a matter of law - that "the person who composed the defendant's work had access to the copyrighted material… and that there are similarities between the two works that are 'probative of copying.'" *Jorgensen,* 351 F.3d at 51. "Access means that an alleged infringer had a 'reasonable possibility' – not simply a 'bare possibility'" of seeing the prior work," and a "reasonable opportunity…does not encompass any bare possibility in the sense that anything is possible." *Id.* (internal citations omitted). "[A]ccess cannot be based on mere 'speculation or conjecture'" but rather on "significant, affirmative and probative evidence." *Id.* (emphasis added). "In the Second Circuit, a plaintiff must generally prove that the creators themselves, and not only an affiliated corporation, had access to the work that was allegedly copied." *Clonus Associates v. Dreamworks, LLC,* 457 F. Supp. 432, 439 (S.D.N.Y. 2006). If a reasonable juror could find in favor of the non-moving party, summary judgment must be denied. *See Anderson,* 477 U.S. at 247-48.

Freeman thoroughly failed to meet her burden, as the moving party on summary judgment, to provide "significant, affirmative and probative" evidence to support her claim of access, and the district court properly denied her motion for that reason.

Freeman's access theory was never reasonable on its face, and as the evidence in the case accumulated, including via Defendants' production of nearly 50,000 pages of emails, text messages and drafts of the *Crave* novels showing the independent creation of the series – with not a single word mentioned about Freeman or her works - Freeman's theory of access grew ever more speculative (A-7223-7224, 7277-7279).

In her Complaint, Freeman alleged that her literary agent, Emily Kim, had manipulated Freeman for years into constantly revising and creating new material for her manuscript, so that Kim could simultaneously feed that material to another of her clients, author Tracy Wolff, to write the *Crave* series (Dkt. No. 23, p. 2, ¶1). But the uncontroverted evidence showed that Wolff did not begin writing *Crave* until <u>five years after</u> Freeman had ended her relationship with Kim (A-7274). There is no evidence that Kim provided Freeman's material to Wolff, or that Wolff has ever read a word of Freeman's work (A-7271-7272). As the district court stated:

> There was no evidence in the record that Tracy Wolff, the credited author of the *Crave* series, ever saw Plaintiff's drafts or notes, or that Emily Kim, who acted as literary agent for both Freeman and Wolff, ever sent more than a single manuscript to *Crave*'s publisher…Given what I have read (*i.e.,* everything in the record written by both Freeman and Wolff) and what I have held (not just no substantial similarity but no similarity beyond standard tropes of the genre at all), it can hardly be contended that I am of the view that Defendants copied anything from Freeman. Neither this Court nor either of my predecessor judges ever ruled that 'Defendants almost certainly copied BMR to create the *Crave* series,' and I am certainly not 'aware' that this much disputed contention of Plaintiff's is a fact. Had there been any genuine issue of fact about substantial similarity we would

> have tried the issue of copying. There was, of course, no such genuine issue.

(Supp A-3007, fn. 1).

Moreover, Freeman never offered a plausible explanation for why such a creative and successful author like Wolff (who had already published sixty books by the time she started writing *Crave*) would ever copy from Freeman's unpublished, unfinished drafts and notes, which Freeman herself admitted she could not turn into a workable story (Supp A-2248, 2252-2255). Nor could Freeman explain why Kim would ever feed such unworkable material to another author five years later, after never being able to get it completed, much less published.

In cases like this, where the theory of access relies entirely upon the fact that two writers, over five years apart, shared the same literary agent, "attempts to establish an inference of access through intermediaries such as literary agents … while theoretically possible, are seldom successful in practice. What must be established in each case is probative evidence that the individual(s) who actually created the allegedly infringing work had a reasonable opportunity to see, hear, or read the plaintiff's work." 1 William F. Patry, *Copyright Law & Practice* at 698-700 (1994). There is no such probative evidence in this case.

After discovery showed that her theory of access was wholly unsupportable, Freeman then argued at summary judgment that - because Wolff thanked her literary agent, her editor and her copyeditor for their support and encouragement in getting the

fourth book in the *Crave* series finished by the deadline (while her mother was gravely ill in the hospital), and texted them that the effort had been a "group project" (Supp A-1629-1630) - the entire series *must* have been co-written by all four women, who must have surreptitiously woven into the novels material they had stolen from Freeman's various notes and drafts (AOB-12-13).

To make such an incredible argument, Freeman ignored (i) Kim's immediate response to Wolff saying: "That is very kind, but the brilliant writing is the result of all your hard work on this book and the many that came before" (Supp A-2260); (ii) the uncontroverted evidence that neither Wolff nor Wolff's editor ever saw Freeman's manuscripts or notes (A-7271-7273); (iii) the uncontroverted evidence that Wolff's copyeditor likely never read the one Freeman draft manuscript that was submitted to her years before (which Freeman withdrew from submission[5]), and in any event, did not contribute to the substantive writing of *Crave* in any way (A-7274-7275); and, (iv) the uncontroverted evidence that Kim's contribution to the *Crave* series involved fixing typos, correcting punctuation, and passing back and forth (without changing) comments and re-writes to / from the editor - and that Kim only did so to help Wolff get the last few chapters of the fourth book finished by the deadline, while Wolff was working from the hospital where her mother was gravely ill.[6] (A-7275-7276; Supp A-2259-2264).

---

[5] Bare corporate receipt is insufficient to establish access. *Jorgensen,* 351 F.3d at 49.

[6] There is no evidence that Kim assisted even in this limited way while Wolff was

In ruling on Freeman's summary judgment motion, the district court was required to view the facts in the light most favorable to the Defendants. *See Cayuga Nation v. Tanner,* 6 F.4th 361, 373 (2d Cir. 2021) (in ruling on cross-motions for summary judgment, "a court must evaluate each party's own motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration"). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007). In considering the facts regarding access in the light most favorable to the Defendants, the district court was correct not to disregard Defendants' statements under oath in favor of just accepting Freeman's speculative version of events, particularly where the overwhelming evidence so thoroughly contradicted her theory.

Like in *Jorgensen,* Freeman ultimately resorted to the "assertion that 'anything and everything can very well happen'…[but] [s]uch speculation does not give rise to a triable issue of access." 351 F.3d at 53. Meanwhile, Defendants presented substantial evidence of independent creation, which on its own was sufficient to rebut any prima facie case that Freeman *could* have established with respect to access and infringement. At a minimum, the evidence of independent creation raised a genuine issue of material

---

writing any other book in the series, and by the fourth book, the district court found that "any suggestion of substantial similarity evaporates entirely" (SA-61).

fact which merited the denial of Freeman's motion. *See Repp v. Webber,* 132 F.3d 882, 891 (2d Cir. 1997) (holding that whether the evidence of independent creation was sufficient to rebut the plaintiff's *prima facie* case of access and striking similarity was a question of fact that was inappropriate for resolution on summary judgment).

### C. The Court Did Not Find in Freeman's Favor on Probative Similarity.

In order to prove copyright infringement through circumstantial evidence, as Freeman attempted to do in this case, a plaintiff must show both that "the person who composed the defendant's work had access to the copyrighted material and that there are similarities between the two works that are probative of copying." *Jorgensen,* 351 F.3d at 51 (internal citations omitted). "There is an inverse relationship between access and probative similarity such that 'the stronger the proof of similarity, the less the proof of access is required.'" *Id.* at 56. "[W]here the works in question are 'so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access.'" *Id.,* citing *Lipton v. Nature Co.,* 71 F.3d 464, 471 (2d Cir. 1995).

Having failed to prove access as a matter of law, Freeman was required to show more than probative similarity - she had to establish that the *Crave* series was strikingly similar to Freeman's own work in order to prevail on summary judgment. *See Tisi v. Patrick,* 97 F. Supp. 2d 539, 548 (S.D.N.Y. 2000). "Striking similarity exists when two works are so nearly alike that the only reasonable explanation for such a degree of similarity is that the later…was copied from the first." *Id.,* citing *Cox v. Abrams,* No.

93 Civ. 6899, 1997 WL 251532, at *3 (S.D.N.Y. May 14, 1997). The striking similarity test should be applied with even greater stringency when dealing with popular works such as genre fiction, where there are common themes and basic, non-protectable elements that a reader expects to see throughout the work in order to recognize it as belonging to that specific genre. *See Tisi,* 97 F. Supp. 2d at 548. For example, in young adult romantasy novels such as those at issue in this case, one would expect to find a tragic young heroine, a handsome, brooding hero, a diverse group of friends, fantastical creatures, magical settings, and a love story that overcomes all obstacles. The presence of such "basic, non-protectible" elements in two different works does not render them strikingly similar, and "an issue of fact cannot be created by merely reciting the magic words 'strikingly similar' and 'no possibility of independent creation'." *Id.* at 548-49.

The strikingly similar test is a "stringent" one that Freeman could not meet. *See id.*

In her brief, Freeman argues there are probative similarities between her manuscripts and the *Crave* series because they have "shared character names, pop culture references, word choices and descriptions" (AOB-14). But it is well established that "[w]ords and short phrases, such as names, titles, and slogans, are not copyrightable because they contain a de minimis amount of authorship." *In re Jackson,* 972 F.3d 25, 54 (2d Cir. 2020). Pop culture references are, by their nature, in the public domain and not copyrightable. *See Hines v. BMG Rights Management (US) LLC,* 694 F.Supp.3d 341, 349 (S.D.N.Y. 2023) (finding "phrases that enjoy a robust existence in

the public domain are not protectible"). Nor are ordinary words and common phrases. *See Arica Int., Inc. v. Palmer,* 970 F.2d 1067, 1072 (2d Cir. 1992); *see also,* SA-43 and Supp A-3010 (Freeman's "alleged similarities were based on the use of ordinary words and common phrases – including 'well, well, well,' 'pang of disappointment,' and 'things that go bump in the night' – which are, of course, not entitled to copyright protection.") This failed argument regarding probative similarity is representative of the kind of deficient showing that Freeman made when presenting her case on substantial similarity, as will be discussed *supra*.

Even had plaintiff been able to meet the stringent striking similarity test and create an inference of copying, "defendants could rebut this inference with evidence that the challenged work was independently created" – as they did here. *See Tisi,* 97 F. Supp. 2d at 549. "Where, as here, convincing proof of independent creation exists, prima facie copying (assuming it were established) may be rebutted" and summary judgment for the plaintiff should be denied. *See Dimmie v. Carey,* 88 F.Supp.2d 142, 150-51 (S.D.N.Y. 2000) (granting Defendants summary judgment based on substantial proof of independent creation).

Freeman claims that the district court found probative similarity as a matter of law, such that summary judgment should have been granted on that issue (AOB-14). But that was absolutely not the case, and indeed the district court held that Freeman's "argument [in that regard] rests on a distorted view of the record" (Supp A-3014). As stated by Judge McMahon, neither she nor any of her predecessor judges assigned to

the case found for Freeman on probative similarity, but rather, considered the issue a "much disputed contention" which would have been tried by a jury, but for the adverse ruling on substantial similarity (Supp A-3007, fn. 1). Judge McMahon specifically held that:

> Contrary to Freeman's assertion, access was not 'essentially established' at summary judgment. Rather, Judge Netburn denied the parties' cross-motions for summary judgment because she concluded that there was a genuine issue of fact concerning access that needed to be resolved by a jury. Dkt. No. 361 at 15. And while Judge Netburn found that the parties' works shared probative similarities, Judge Stanton vacated that finding when her Report and Recommendation was appealed to him….

(Supp A-3014-3015). Moreover, as Judge McMahon succinctly stated, "[i]n any event, the strength of Freeman's claims of probative similarity and access was, in the end, irrelevant, because 'the lack of [substantial] similarity between the works, by itself, doomed plaintiff's efforts from the outset" (Supp A-3015).

Judge McMahon's view of the summary judgment proceedings that predated her assignment to the case is entirely accurate. Judge Stanton denied summary judgment on the basis that there were material factual disputes that precluded a finding for either party, so he chose to reserve all issues for trial (SA-165). He did not abuse his discretion in denying Plaintiff summary judgment on access and probative similarity, and a *de novo* review of the record supports his decision.

## II. The District Court Did Not Abuse Its Discretion in Revisiting Substantial Similarity.

An order denying summary judgment is an interlocutory order and a matter of judicial discretion. The trial court's decision to change such a ruling is similarly a matter of judicial discretion and is reviewed under an abuse of discretion standard. *See Colvin v. Keen,* 900 F.3d 63, 69 (2d Cir. 2018).

Federal Rule 54(b) provides that "any order or other decision that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." (emphasis added). Freeman does not dispute that the order denying summary judgment was an interlocutory order that adjudicated fewer than all of the claims, rights and liabilities of all the parties. As such, it was subject to being set aside and a new order entered at any time prior to final judgment. *See Shawe v. Wendy Wilson,* 25 F.R.D. 1, 5 (S.D.N.Y. 1960); *Update Art, Inc. v. Charnin,* 110 F.R.D. 26, 35-36 (S.D.N.Y. 1986) (setting aside interlocutory order on the basis that it was subject to revision, at the judge's discretion, at any time before a final decree was entered).

"It is well established that the interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment, and may be modified to the same extent if the same case is reassigned to another judge." *In re U.S.,* 733 F.2d 10, 13 (2d Cir. 1984), citing *Slotkin v. Citizens*

*Casualty Co. of New York,* 614 F.2d 301, 312 (2d Cir. 1979); *Dictograph Products Co. v. Sonotone Corp.,* 230 F.2d 131, 134-36 (2d Cir. 1956).

In *In re US,* a judge of the district court dismissed all third-party claims against the government on the basis of sovereign immunity. 733 F.2d at 11. When the case was reassigned, the new judge expressed his disagreement with the dismissal of the third party-claims, and considered and granted a motion for reconsideration, ruling the doctrine was inadmissible to the claims for indemnity or contribution. *Id.* at 12. The government sought a writ of mandamus directing the district court to vacate the order and restore the previous dismissal as "law of the case." *Id.* The Second Circuit disagreed that the dismissal was "law of the case," as opposed to an interlocutory order subject to modification, and held: "Whether right or wrong, the Order is clearly within the power of the district court to act, and to reach the conclusion of law which it did…Since that court is not acting beyond its power, we need go no further in our analysis to satisfy ourselves that the petition for mandamus must be denied." *Id.* at 12-13.

Similarly, in *Colvin,* 900 F.3d at 67, the district court initially denied the defendants' motion for summary judgment regarding whether the plaintiff's speech was protected as a matter of public concern, but shortly before trial, indicated a readiness to reconsider whether summary judgment on the issue should be granted, and invited further briefing. The district court thereafter granted summary judgment in the defendants' favor and the plaintiff appealed, arguing that the law of the case doctrine

required the district court to "adhere to its initial denial." *Id.* at 67-68. The Second Circuit noted that the law of the case doctrine "is not a rule that bars courts from reconsidering prior rulings, but is rather 'a discretionary rule of practice [that] generally does not limit a court's power to reconsider an issue.'" *Id.* at 68, citing *In re PCH Assocs.,* 949 F.2d 585, 592 (2d Cir. 1991). It went on, "[a]s characterized by Judges L. Hand and Friendly, the doctrine "'does not rigidly bind a court to its former decisions, but is only addressed to its good sense.'" *Id.*, citing *Zdanok v. Glidden Co.,* 327 F.2d 944, 952-53 (2d Cir. 1964) and *Higgins v. California Prune & Apricot Grower, Inc.,* 3 F.2d 896, 898 (2d Cir. 1924).

Here too, Freeman argues that the denial of the cross-motions for summary judgment established the "law of the case" and prohibited Judge McMahon from subsequently ruling on substantial similarity. But as the Second Circuit expounded in *Colvin,* the doctrine "does not assert, as a general proposition, that it is bad for courts to correct their mistakes, much less that doing so will result in reversal. If that were the meaning of [the doctrine], it would be a foolish rule. In all forms of human endeavor, people make mistakes, and in most circumstances the best course of action is to correct them." 900 F.3d at 68. The law of the case doctrine

> does not say to judges, 'Once a ruling has been made, you should not change it.' It says rather, 'When deciding whether to change a ruling, you should consider whether making the change will cause problems that would make it preferable to adhere to the earlier ruling (even though you now consider it erroneous) or would at least make it advisable to take precautious measures to mitigate the bad effects of those problems.'

*Id.* at 68-69.

In application of the doctrine, the Second Circuit advised that, "[a]bsent a showing that the ultimate ruling was error, or that the change caused prejudice to the defendant or resulted in some other harm, we see no reason why the trial judge should have adhered to the erroneous previous ruling merely because of the undesirability of changing rulings." *Id.* at 69. The type of prejudice contemplated arises from lack of notice or detrimental reliance, not an adverse ultimate ruling on the merits. *See id.* at 69-72. In *Colvin,* the Court concluded that the plaintiff "suffered no harm or prejudice from the change of ruling" and rejected her argument that the order granting summary judgment in favor of the defendants should be vacated "solely because the district court initially denied the motion before becoming convinced that the motion should be granted." *Id.; see also, U.S. v. Birney,* 686 F.2d 102, 107 (2d Cir. 1982) (noting that the Second Circuit is of the "long-established view that the law of the case is, at best, a discretionary doctrine which 'does not constitute a limitation on the court's power but merely expresses the general practice of refusing to reopen what has been decided'"); *U.S. v. Uccio,* 940 F.2d 753, 758-59 (2d Cir. 1991) (holding that law of the case "informs the court's discretion" but "does not limit the tribunal's power" and was properly disregarded when the district court came to view its own prior ruling as wrong).

In this case, Judge McMahon acted fully within her discretion in determining that her predecessor's decision to not reach, and thus deny summary judgment on substantial similarity was one that she viewed as incorrect. In fact, it appeared to Judge McMahon after a fulsome review of the record before her, that her predecessors had "declined to reach the issue of substantial similarity" altogether, "or to rule on the issue of what aspects of the works in suit were copyrightable" (Supp A-2801, 2805-2806).

As Judge McMahon began reading the nearly 6,000 pages of works at issue, she concluded that "failing to address the parties' arguments on substantial similarity was unwise, from a purely case management standpoint" and at a minimum, "the court should have used the summary judgment motions to parse out what aspects of the works at issue are copyrightable and what aspects are not," since "[t]hat is a job for the court, not for the trier of fact" (Supp A-2802). She noted that in this case, where the parties "will present the trier of fact with voluminous material – in which the court will have to charge the jury that it must compare the copyrightable elements of the parties' works in order to find substantial similarity… sound case management suggests that at least that issue should be explored and disposed of well in advance of trial" (Supp A-2802-2803, internal citation omitted). In addition, she determined that she had "cogent and compelling reasons" for revisiting the issue of substantial similarity, because reading the material had made her "more convinced than ever that the court must make every effort to see whether the case can be made more manageable for the jury and less

expensive for the parties – which means giving serious consideration to the parties' complex and competing arguments about substantial similarity" (Supp A-2803, 2807).

Judge McMahon specifically considered whether the law of the case doctrine prevented her from re-opening the issue of substantial similarity, and after reviewing the applicable case law and the record on summary judgment, she determined that "there is no 'law of the case' on the issue of substantial similarity, because that issue has never been addressed and decided on the merits" (Supp A-2804, 2806-2807). She noted that Magistrate Judge Netburn had found actual copying to be in dispute and therefore concluded that "the court should not determine whether the at-issue works are substantially similar" and "[h]aving concluded that she 'should not' address the issue, she did not address the issue"[7] (Supp A-2805-2806). In his opinion affirming in part and overruling in part Judge Netburn's Report and Recommendation, Judge Stanton did not rule on the merits of substantial similarity either, but "simply said that he believed experienced lawyers could find a way to present this very complicated case to a jury. That is not a ruling on the merits" (Supp A-2806). Based on this record, Judge McMahon concluded that where "there has been no reasoned analysis of an issue raised on a motion for summary judgment, there can be no finding that the issue was

---

[7] Freeman's assumption that Judge Netburn must have undertaken a "detailed review" of <u>all</u> of the works at issue before issuing her recommendation to deny summary judgment is not only speculative, but actually impossible because the only Freeman works before her on summary judgment were the two test manuscripts Freeman had identified, and Freeman's self-serving "indices" of supposed similarities submitted along with her brief.

'actually decided by the court'" and, therefore, no law of the case as to substantial similarity (Supp A-2806-2807).

Judge McMahon further reasoned, based on *Wright v. Cayan,* 817 F.2d 199, 1002, fn. 3 (2d Cir. 1987) and the Second Circuit authority cited therein that, even if the prior denial of summary judgment *did* implicate law of the case, as a "second judge [she had] the power to grant summary judgment despite another judge's previous denial of summary judgment." She concluded that she had "cogent and compelling" reasons for "accepting defendants' invitation that [she] revisit the issue of substantial similarity," including that "[e]ven if the case could not be disposed of altogether, the issues for decision by a trier of fact might be narrowed and sharpened by a decision on such a motion" (Supp A-2803, 2807). Her decision to do so did not prejudice Freeman (and no prejudice is claimed) and was not an abuse of the district court's discretion warranting reversal on appeal.

## III. Under Any Test for Substantial Similarity, the District Court Properly Found the Works Were Not Substantially Similar.

Freeman has consistently attempted to avoid the application of the Second Circuit's "more discerning ordinary observer" test by suggesting alternative tests for substantial similarity that are inapplicable in cases like this one, where – under her own cited case law – the works at issue are equivalent in nature and "can be tested conventionally by comparing comparable elements of the two works." *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.,* 150 F.3d 132, 139 (2d Cir. 1998)

(applying alternative tests was appropriate because the original work (84 episodes of *Seinfeld*) and the secondary work (a trivia quiz book with 643 "fragments" taken from the TV series) were "of different genres" and "in different media" such that the "quantitative / qualitative approach" was the most helpful test to analyze substantial similarity). As much as Freeman has sought to avoid a side-by-side comparison of the works and a lay analysis of whether they are similar in their "total concept and feel, theme, characters, plot, sequence, pace, and setting" - that remains the well-established test for substantial similarity as it applies to literary works in this Circuit, and it was properly applied by the district court in this case. *See Williams v. Crichton,* 84 F.3d 581, 588 (2d Cir. 1996).

Freeman does not dispute that her draft manuscripts and notes consist largely of stock characters, tropes, scenes a faire, genre conventions, and other unprotectable elements that one would expect to find in young adult romantasy novels. She instead invokes the "selection and arrangement" test for copyright protection, arguing that she "selected and arranged" these unprotectable elements in a unique and original way and that the *Crave* series copied that selection and arrangement, and she mischaracterizes and misstates the case law to argue that this "selection and arrangement" test should apply to literary copyright cases such as this one. *See, e.g.,* Appellant's citation to *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,* 602 F.3d 57 (2d Cir. 2010), a case involving architectural design (which, incidentally, does not discuss the selection and arrangement theory); *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy,*

*Inc.,* 338 F.3d 127 (2d Cir. 2003), a case involving carpet design; *Boisson v. Banian, Ltd.,* 273 F.3d 262 (2d Cir. 2001), a case involving quilts; and, *Williams v. Crichton,* 84 F.3d 581, 590 (2d Cir. 1996), indeed a literary case, but one which does not refer to selection and arrangement anywhere in the opinion, but instead properly applies the ordinary observer test (*id.,* 588) – all of which she cites as precedent for the application of the selection and arrangement test to "works of art like literature" (AOB-23-24).

The selection and arrangement test for substantial similarity arose in the context of factual compilations, not literary fiction. The authority for the test is found in *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.,* 499 U.S. 340, 348-49 (1991), which held that factual compilations (such as, in that case, names and telephone numbers in a phone book) *may* be copyrightable if they have been compiled, selected and arranged in some new and creative way, and then, only the unique selection and arrangement of the data is copyrightable, and not the underlying facts themselves. This selection and arrangement test does not find a reasonable application to works of literary fiction, and certainly not to the works in this case – where Freeman seems to suggest that because she employed, amongst her years of disparate drafts and notes, nearly every mythical creature, romantic trope, stock character, magical setting, and young adult romantasy genre convention that exists, then *Crave* must share a substantial number of elements in common with her work (as would, under that test, *Twilight, Harry Potter,* and every other literary work in the genre).

Even so, giving Freeman the benefit of the doubt, the district court considered "whether *Crave* has appropriated 'the original way in which [Freeman] has selected, coordinated, and arranged the elements of her work'" (SA-79). The district court concluded *Crave* did not, because "the selection and arrangement of individually protected elements in BMR / Masqued is not sufficiently original to warrant copyright protection. In fact, her selection and arrangement of events is dictated by genre conventions and is consistent with what a reader would expect in any young adult paranormal romance story: loss; ignorance; young love; discovery; challenge; and overcoming challenge" (SA-79). Moreover, the district court noted that on summary judgment, as in her appeal brief, Freeman had not made "a concerted effort to demonstrate how her selection and arrangement of events in a single manuscript is substantially similar to the selection and arrangement of events across the four *Crave* books as a whole" (SA-80). For this reason, the district court concluded that: "Even if Plaintiff's selection and arrangement of elements in BMR / Masqued was original – and thus protectable – that selection and arrangement is not appropriated by *Crave* in any substantially similar way when the works are considered in their totality" (SA-81).

In addition to her selection and arrangement theory, on summary judgment Freeman also urged application of the "comprehensive nonliteral similarity" and the "fragmented literal similarity" tests as alternatives to the "more discerning ordinary observer" test. Even though she seems to have abandoned that argument on appeal, it bears noting that the district court considered whether, even under those clearly

inapplicable tests, Freeman could make a colorable case for substantial similarity, and determined that she could not. With respect to the former, the district court found that Freeman failed the "comprehensive nonliteral similarity" test because "Wolff did not appropriate the 'fundamental essence or structure' of Freeman's work. Both authors use tropes and scenes a faire that are common to all romantasy fiction book[s] for young adults. There any substantial similarity ends" (SA-40-41 and fn.13). With respect to the latter, the district court found that Freeman could not "prevail on a theory of fragmented literal similarity because the 'literal' similarities to which she points are simply ordinary words or common phrases that any author is free to use," *i.e.,* "pang of disappointment," "I don't have a clue," "that's when it hits me," and "like a sack of potatoes" – and Freeman's invocation of such common phrases to argue substantial similarity "trivializes copyright law" (SA-43). Similarly, the "close paraphrases" relied upon by Freeman were likewise made up of ordinary words and short phrases that were not subject to copyright protection, and the court's "close examination of the works reveals that the *Crave* books do not appropriate Freeman's 'sequence of thoughts, choice of words, emphasis and arrangement in such a way as to make actionable the use of single words and short phrases'" (SA-44, citing *Arica Inst.,* 970 F.2d at 1073).

In any event, as ultimately held by the district court, the "proper inquiry is 'whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same'" (SA-21, citing

*Sheldon Abend Revocable Tr. V. Spielberg,* 748 F. Supp. 2d 200, 204 (S.D.N.Y. 2010)). "Random similarities scattered throughout the works do not support a finding of substantial similarity, because 'such a scattershot approach…fails to address the underlying issue: whether a lay observer would consider the works *as a whole* substantially similar to one another'" (SA-21, citing *Williams v. Crichton,* 84 F.3d 581, 590 (2d Cir. 1996)). Furthermore, where a literary work "contains both protectable and unprotectable elements, courts apply the 'more discerning ordinary observer test,' which asks whether, after extracting the unprotected elements, the *protectible elements, standing alone,* are substantially similar'" (SA-28-29, citing *Knitwaves,* 71 F.3d 996, 1002 (2d Cir. 1995)).

This test "requires the court to consider 'the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting" and liability "will only result if the protectable elements are substantially similar" (SA-28, citing *Boisson,* 273 F.3d at 273). The district court thoroughly and accurately examined all the works and found that any protectable similarities were non-existent, and that an ordinary observer could not read both works and believe that the *Crave* series was appropriated from Freeman's unpublished drafts and notes. *See Knitwaves,* 71 F.3d at 1002.

In confirming that Judge McMahon was correct in granting defendants summary judgment, this Court will presumably undertake a *de novo* review of the works themselves and invariably reach the same conclusions she did. "[T]he works

themselves supersede and control contrary descriptions of them…including any contrary allegations, conclusions or descriptions of the works contained in the pleadings." *Peter Gaito,* 602 F.3d at 64 (internal citations omitted). Therefore, Defendants will not spend this Court's time reiterating their summary of the works and the myriad ways in which they lack similarity, as that was already provided to the district court during the second round of summary judgment and, in any event, this Court must reach its own conclusions based on the works themselves. Moreover, Judge McMahon did as thorough a job of summarizing the parties' works and analyzing them under the more discerning ordinary observer test in her 157-page opinion as one can possibly imagine, and Defendants do not presume to improve upon her work.

Defendants will instead limit themselves to addressing, at a high level, Freeman's objections to the district court's ruling on substantial similarity. Defendants are confident that this Court will conclude after reading both parties' respective works, as did Judge McMahon, that this "is a case that is easily disposed of once one reads the allegedly infringed and infringing works against each other and in light of the well-developed law in this Circuit on substantial similarity within literary works" (SA-84).

### A. The District Court Did Not "Dissect" Freeman's Work but Properly Engaged in the Filtering Required in Analyzing Substantial Similarity.

It is well-established in this Circuit that the first step in analyzing substantial similarity involves the trial court filtering out the unprotectible elements in the plaintiff's works, so that the comparison focuses on the protected content only. *See*

*Peter F. Gaito,* 602 F.3d at 66. The court "must attempt to extract the unprotectible elements from its consideration and ask whether the protectable elements, standing alone, are substantially similar." *Id.* The court must then examine the claimed similarities with respect to each aspect of the ordinary observer test - that is, total concept and feel, theme, characters, plot, sequence, pace and setting.

By engaging in this analysis, the district court did not, as Freeman and her counsel at NSEAL accuse, "dissect the works at issue into their separate components and compare only the protectable elements" while ignoring the original expression as a whole (Amicus Brief, Dkt. 75.2, pp. 16-17). Rather, the district court did exactly what it was supposed to do – it read *all* of the works in question and, guided by its "good eyes and common sense," analyzed whether there were any similarities in the works' total concept and feel, after filtering out the unprotectable elements. *See Boisson,* 273 F.3d at 273 (emphasis added). And rather than devoting a "single paragraph" to the "total concept and feel" analysis as the amicus alleges (dkt. 75.2, p. 17), the district court discussed the total concept and feel of the works and how they differ from one another in great detail throughout its 157-page opinion. *See, e.g.* SA-45, 54, 56, 67, 76, 79, 81.

In doing so, the district court properly concluded that all of the similarities Freeman alleged to exist, whether with respect to the works' total concept and feel, themes, characters, plots, sequences, paces, or settings, were either not – upon a comparison the actual works and not Freeman's tortured and misleading descriptions

of them - similarities at all, or were minor similarities that "arose from noncopyrightable elements, and thus …the works are not substantially similar." *See Williams,* 84 F.3d at 588-89. In finding Freeman's claimed similarities to be non-existent, the district court necessarily described how they were, in fact, different. This does not mean, as Freeman and NSEAL allege, that the district court improperly placed greater emphasis on the differences between the works than on the similarities (Dkt. 75.2, pp. 14-15). It did not. There simply are no similarities beyond what one would expect to find between two works in the same niche genre. Moreover, as Freeman's own cited case described:

> [D]issimilarity can be important in determining whether there is substantial similarity…Where, as here, a defendant's work is dissimilar in the very respects in which it is claimed to be similar, that can obviously influence the conclusion as to whether the claimed similarity in fact exists or is substantial. Furthermore, dissimilarity in realization or expression can make clear, as it does in this case, that the similarity extends only to unprotectible concepts or ideas.

*Attia v. Society of New York Hospital,* 201 F.3d 50, 58 (2d Cir. 1999).

### B. The Court Did Not Use BMR 210 as a Template but Rather Aggregated Freeman's Drafts as She Requested.

Freeman argues that the district court used BMR 2010 as its "template" and then failed to compare similarities that did not arise or were "not yet fully developed" until her later drafts. But that argument ignores what the district court actually did, which was precisely what Freeman asked it to do: aggregate five of Freeman's drafts, identify where they shared the same story and characters, and use that as the template for

purposes of comparison with the *Crave* series. *See* SA-39 ("Accordingly, for the purposes of the substantial similarity comparison, the Court will consider the first five drafts as a single aggregated work."). With respect to Freeman's sixth draft (which Freeman herself described as a completely new story), because it "does not follow the template of the five earlier drafts and is sufficiently different from the earlier versions that it cannot be aggregated with them," the court analyzed it separately (SA-39, 81-84, 112).

In addition to performing the aggregation requested by Freeman, the district court also separately summarized each of Freeman's drafts and expressly identified the changes that were reflected in each subsequent draft after *BMR 2010*, contrary to Freeman's assertion otherwise (SA-87).

After reading all of Freeman's various drafts and notes and considering them both in the aggregate as she urged, and separately as is the more appropriate method of analysis (*see Dean v. Cameron,* 53 F. Supp. 3d 641, 647 (S.D.N.Y. 2014); *Walker v. Time Life Films, Inc.,* 615 F. Supp. 430, 434, fn. 2 (S.D.N.Y. 1985)), the court concluded that under either method, "there is no substantial similarity between the alleged infringed and infringing works as a matter of law" (SA-45).

### C. The Works Are Not Substantially Similar Under the Ordinary Observer Test, Nor Under the Selection and Arrangement Test.

As a preliminary matter, the method in which Freeman attempts to show substantial similarity by demanding that all of her disparate drafts and notes be

(improperly) viewed as a single, unified work becomes particularly (and intentionally) problematic when trying to engage in a side-by-side comparison with the *Crave* series. For example, Freeman argues that Ronan is the heroine's "second love interest," just as Hudson is in *Crave,* but in three of her drafts, Ronan is the heroine's cousin or cousin "of a sort," in one draft he is no longer a cousin but someone she "chose for a reason," and in the last draft, he does not appear to be a plot thread at all (Supp A-2929). Similarly, in one draft, the heroine's love interest has a dead brother, as does Jaxon in *Crave* (although he is not really dead), but in another of Freeman's drafts, she does not (Supp A-2929). In some drafts, the heroine thinks her father died in an elevator accident, in one draft, a plane crash, in another draft, he was murdered (in all versions, he is not actually dead, but both of Grace's parents are dead in *Crave*) (Supp A-2928). These kinds of inconsistencies throughout Freeman's various draft manuscripts and notes means that she has can "cover all the bases," and find some random detail or plot point from one of her many versions of her story, or create an amalgamation of disparate details and plot points to create a wholly new story that never existed, in order to find a counterpart in *Crave.* Nevertheless, when one goes back to the material itself, there can be no other conclusion than that the works lack substantial similarity in every aspect of the ordinary observer test:

**1. Themes**

Freeman argues substantial similarity because both works allegedly contain themes of feminism, destiny, leadership, diversity, friendship and compassion –

although the district court found many of those "themes" are undeveloped tokenism in Freeman's work (SA-69-74). In any event, such themes by themselves are certainly not protected ideas, and as expressed by means of "highly generalized tropes" in both works, these themes have been similarly "explored in countless young adult paranormal romance novels and other types of fantasy fiction [and] are not entitled to copyright protection" (SA-46).

### 2. Setting

Freeman concedes that "no author can monopolize the idea of setting a story in Alaska" but then disingenuously tries to argue that depicting it as a remote, frozen wasteland is somehow a unique expression of that idea. Of course, that is the most common manner in which the state finds itself depicted. And as described at length by the district court, the settings of the works could actually not be more different (SA-46-49). Freeman's manuscripts are set in real-world Anchorage, the largest city in Alaska, with scenes that take place at recognizable locations around town. The first *Crave* novel is set at a magical boarding school in a castle hidden in the remote Alaskan wilderness, and subsequent novels in the series take the protagonists to both real and mythical lands all over the world.

### 3. Characters

Freeman concedes that her characters are largely based on tropes, and as such, they are unprotectable and not subject to the type of comparisons made by Freeman in her brief. Even were they not, as set forth at great length by the district court, the

alleged similarities relied upon by Freeman for purposes of her character comparisons are almost entirely inaccurate and misleading (SA-50-59, 146). As just a single example, the male lead in the first *Crave* novel is a dark and brooding vampire prince estranged from his abusive parents, and the male lead in BMR is a cheerful werewolf from a close-knit, loving family (SA-55). The district court properly found, upon a review of the actual works and not Freeman's self-serving descriptions, that it "is readily apparent that none of the characters in BMR / Masqued is 'substantially similar' to the characters in *Crave* when the proper test is applied" (SA-51).

Freeman argues that the characters, even to the extent they are tropes, were "selected and arranged" into an "original entourage of characters." But, the selection and arrangement of a heroine, her romantic love interest, an evil villain, a female nemesis, and supernatural friends and family members, is hardly original amongst young adult romantasy novels, and substantial similarity requires more than similarity at "the macro level one would expect of characters in a teen romantasy novel" (SA-59).

**4. Plot and Sequence**

The district court went "into considerable detail in order to illustrate that the plot of [Freeman's work] bears only the most tangential resemblance – certainly not substantial similarity – to the plot of the *Crave* novels" (SA-59). Judge McMahon also noted that, as Defendants pointed out in their summary judgment briefing, Freeman's purported similarities in plot and sequence – like her character descriptions - frequently

rest on mischaracterizations or even bald misrepresentations of her manuscripts and Defendants' novels, or constitute unprotectible ideas, genre tropes, or scenes a faire which flow naturally from the works' characterization as young adult romantasy novels with the kinds of generalized themes described above, and Freeman cannot "seriously argue that the plots of her book and Wolff's books are substantially the same" (SA-64).

The court properly declined to rely upon Freeman's own descriptions and would not "tick off each of Freeman's hundreds of suggested points of comparison between her works and Wolff's novels" because to do so would mean "simply falling into the trap of looking at discrete bits and pieces rather than examining the total look and feel of the allegedly infringed and infringing works" (SA-74). The court instead concluded that, after reading every word and considering the works as a whole, "no reasonable factfinder could conclude that their plots are substantially similar" (SA-74).

**5. Pace**

Freeman argues that the books share the same pace of a "Slow Burn" mystery that transitions into a "High-Octane" supernatural thriller" marked by "Attraction > Rejection (Warning) > Forced Proximity > Intimacy > Betrayal > Reunion" punctuated by "intense scenes of violence" (AOB-68-69). But as the district court noted, the "structure described by Freeman is by no means original to her; it is common to virtually all young adult romantasy novels…" (SA-75). The suggested similar pace and structure described by Freeman also largely mischaracterizes the actual works themselves, and in reality, "the stories are paced substantially differently" (SA-76).

### 6. Total Concept and Feel

Freeman argues that the two works are substantially similar because they share a distinctive "Alaskan Gothic" feel, but as the district court noted, "[t]here is nothing remotely unique or original about a supernatural romance that takes place in a remote, dark setting," particularly when writing about vampires, and *Twilight* is just one of the most obvious of many such examples (SA-77). Similarly, Freeman's invocation of substantial similarity because the heroines of both works use self-deprecating internal dialogue, sarcasm, and literary and pop culture references is unavailing, because none of those devices is novel or protectable, particularly in young adult fiction - as Freeman herself concedes - nor are they used in the same fashion in the works. In Freeman's work, the use is "sparse and subdued" and "offers a brief respite from the plot's foreboding, ominous tone," while in *Crave,* the use of humor is overt, the internal narration is sarcastic and relatable, and the witty banter is a "bonding mechanism and core feature of character chemistry…which has no counterpart in Freeman's work" (SA-77-79).

### 7. Selection and Arrangement

With respect to Freeman's selection and arrangement argument, even though that test's application is not appropriate to the works at issue for the reasons set forth *infra*, even when considering whether a case could be made for substantial similarity by applying that test, the district court correctly found that it could not. There is nothing unique about the way in which Freeman selected and arranged the unprotectible

elements of her work; to the contrary, they were selected and arranged in the precise way that most if not all works in the young adult romantasy fiction genre are selected and arranged: a heroine who does not know her own power, who tries but cannot resist falling in love with a handsome, mysterious, troubled hero; a diverse, supporting cast of friends and family who fall into danger, allowing the heroine to demonstrate her selflessness and bravery; the realization that the heroine is destined for something greater than she imagined; an evil villain who wants to destroy the heroine's world; and, an epic battle of good versus evil. None of these concepts are unique on their own or as "selected and arranged" in the parties' works.

### D. The Claimed "Errors" in the Opinion Do Not Warrant Reversal.

Freeman elevates form over substance by attacking the court's reference to certain details contained within the parties' 6,000 combined pages of writing. Most of her claimed "errors" in the court's opinion are simply incorrect, or they overlook that the court's reference is to a detail that is present in one or more of Freeman's conflicting drafts, but not in others. None of them are relevant to the court's overall analysis, nor do they alter the inescapable conclusion that the works are not substantially similar in the slightest. This brief will not address each and every such "error," because in any event, this Court will presumably undertake a *de novo* review of the underlying material itself and form its own conclusions. While only a few examples follow, suffice it to say, none of the "errors" Freeman has identified merits reversal of the district court's ruling.

As one example, Freeman argues that the court "effectively ignores and never compares" the "80's rocker assault" that is "developed through the various *BMR* drafts." But the Court did consider, and appropriately rejected, a finding of substantial similarity based on the "80's rocker" scene upon which Freeman heavily relies – claiming that there is an equivalent scene in *Crave* where "[t]he kidnapping, confrontation, rescue, and aftermath unfold in the same narrative order." The court correctly noted that "Freeman did not invent an attack scene that starts with a confrontation and capture, progresses to the heroine's rescue, and concludes with the aftermath of the attack. An attack sequence structured any other way would make little sense" (SA-80). Simply because the court found it less than compelling, does not mean that the court failed to consider it altogether.

Freeman similarly argues that the court failed to "fairly compare[] Athair to *Crave's* parallel character Alistair as he is developed across the first 4 books." But the district court devoted an entire page to that character comparison and ultimately found that "Freeman's grey-eyed wolf is dissimilar from Wolff's imprisoned gargoyle" (SA-57-58). Again, the court's finding of dissimilarity, with which Freeman disagrees, should not be turned into an accusation that no such comparison was made in the first instance.

Freeman also nitpicks drafting errors and uses minor discrepancies (*e.g.,* mistakenly referring to Anna as Grace on page 64) to attack the entire validity of the court's findings. For instance, she claims that, because the district court wrote that

Anna does not have telepathy (but did note that she hears her father's voice in a dream), the "court thus failed to properly compare these parallel characters and storylines, and erred in abstracting everything about them to 'unprotectable ideas'" (AOB-75). That is the same kind of leap that runs through her entire substantial similarity case: Freeman magnifies trivial details and treats them as proof of copying where the works themselves do not bear that out.

## IV. The District Court Did Not Abuse its Discretion in Excluding Freeman's Experts.

The Second Circuit considers whether there is unlawful copying of a work from the perspective of the ordinary lay observer, because copyright protects the value of the author's work to her audience. For this reason, the courts do not ask whether an expert, dissecting the works, could catalog the differences between them, but by asking whether a layperson would read the two works and, unless he specifically looked for differences between them, would find their aesthetic appeal the same. *See Peter Gaito,* 602 F.3d at 66.

Freeman knows that when lay observers read her works against the *Crave* series, they will inevitably reach the same conclusions reached by Judge McMahon and find there is no substantial similarity between them. For this reason, she urges that, instead of engaging in the fundamental process for comparing disputed works required in this Circuit, this Court should instead allow her to present her entire case on substantial similarity through expert testimony. In fact, while she argues throughout her brief that

the question of substantial similarity should be decided by a jury, she seeks to then abrogate the jury's responsibility and prevent them from reading and comparing the parties' actual works in lieu of relying entirely on her expert's "streamlining comparisons" of them (AOB-88). This incredible and unwarranted proposal would turn longstanding copyright law in this Circuit on its head. *See Walker,* 784 F.2d at 52 (holding that expert testimony on substantial similarity of protected material is inappropriate because the issue should be "judged by the spontaneous response of the ordinary lay observer…through detailed viewing or reading of the works themselves"); *Computer Associates Intern., Inc. v. Altai, Inc.,* 982 F.2d 693, 713 (2d Cir. 1992) ("Since the test for illicit copying is based upon the response of ordinary lay observers, expert testimony is thus 'irrelevant' and not permitted.")

In *Computer Associates,* the Second Circuit allowed expert testimony to assist with the comparison of "highly complicated and technical subject matter" involving "computer programs [that] are likely to be somewhat impenetrable by lay observers." *Id.* However, it expressly limited its holding to such specialized cases, finding that exclusion of expert testimony "well serve[s] its purpose when the material under scrutiny [i]s limited to art forms readily comprehensible and generally familiar to the average lay person." *Id.* Paranormal romance fiction geared toward teens and young adults is not so technical and complicated as to fall within the *Computer Associates* exception, and the sheer volume of the material does not make it so. Judge Netburn properly noted as much when first excluding Freeman's experts:

> Lay observers can easily understand the young adult paranormal romance novels at issue in this case. The factfinder – whether the Court or an appropriately selected jury – can grasp books written for middle and high schoolers. Accordingly, permitting expert testimony on substantial similarity would violate the 'ordinary lay observer test' and would usurp, rather than assist, the trier of fact.

(SA-173). She also correctly considered and rejected Freeman's request for an exception to "aid the factfinder's hefty task of reading thousands of pages" by "streamlin[ing] the evidence," finding that in copyright cases, "permitting expert testimony only to 'streamline' otherwise understandable evidence would disturb the ordinary lay observer test" (SA-173-174). On that basis, she excluded all expert testimony on substantial similarity, Judge Netburn upheld that ruling, and Judge McMahon followed suit.

With respect to Judge McMahon's summary judgment decision on substantial similarity, Freeman seems to argue that the court should have allowed her expert's testimony about "where tropes end and protectable expression of those tropes begin." But the district court did allow Professor Reiss's testimony on that issue, even after Judges Netburn and Stanton had excluded her altogether. *See* SA-30 (admitting testimony that identifies tropes / scenes a faire that occur with regularity in the genre and finding it "helpful in deciding which elements of BMR / Masqued qualify as protectable expression, as opposed to being unprotectable ideas."). Having done so, the court felt no need to then abrogate her own "good eyes and common sense" for that of Professor Reiss and properly refused to consider that expert's opinion when

considering the "ultimate question of whether Freeman's work and Wolff's are substantially similar" (SA-34). That decision was well within the district court's discretion, as well as in keeping with established Second Circuit law on application of the ordinary observer test to cases of literary fiction, and it should not be disturbed on appeal.

Nor should this Court disturb the trial court's decision to exclude Freeman's expert Dr. Chaski with respect to probative similarity. Not only is that decision irrelevant given the court's ruling on substantial similarity, but Dr. Chaski was properly excluded for a variety of reasons which Freeman conveniently fails to discuss on appeal.

One reason is that Dr. Chaski grouped together all six of Freeman's manuscripts into one work, so that the factfinder could not determine access and probative similarity with respect to each manuscript - and there was a genuine access dispute as to whether Freeman ever sent Kim her later manuscripts after their working relationship had ended, where there was no proof she did so and Kim denied ever receiving them (SA-181). Because Dr. Chaski aggregated all of Freeman's work together, Judge Netburn concluded that she had "eliminated [its] utility for determining access" and "her report would not assist the trier of fact with the task of evaluating striking or probative similarity [on a manuscript-by-manuscript basis] and is excluded on that basis alone" (SA-181-182).

The court also found that Dr. Chaski's untested methodology – created specifically for this case and which did not involve actually reading the works (which she did not do) (Supp A-2380-2381) was inherently biased and unreliable, because it relied entirely upon "baseline" novels selected for her by Freeman's counsel and keywords taken only from Freeman's complaint, and she acknowledged that the results could be different if she considered different "baseline" novels (Supp A-2380, SA-182-183). And ironically, despite never testing the methodology she employed in this case, Dr. Chaski herself proclaimed that a reliable scientific method must be "developed independent of any litigation," "tested for accuracy outside of any litigation," and "tested for accuracy on 'ground truth data'" – none of which she did here (Supp A-2387-2388, citing Carole E. Chaski, *Best Practices and Admissibility of Forensic Author Identification,* 21 J.L. & Pol'y 333, 334-337 (2013)). She conceded that she would have to test her methodology on cases of known non-plagiarism to confirm that it did not generate false positives, but she never did so (Supp A-2388). She also conceded that similarity of expression could be assessed "by "just read[ing] the books themselves and mak[ing] a judgment as the way a reader would," yet proclaimed (as does Freeman) that her methodology is superior because it avoids an ordinary reader's "subjective" impressions" (Supp A-2401). Of course, that contradicts the entire premise behind the ordinary observer test and further renders her opinion useless in determining literary copyright infringement.

This Court should affirm the trial court's decision, because the preclusion of Freeman's experts was not manifestly erroneous, but was rather a fitting exercise of its broad discretion on the matter. *See Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256, 265, 270 (2d Cir. 2002) (reviewing the exclusion of experts under the manifestly erroneous standard and recognizing the federal court's broad discretion to not only weight the reliability of a proposed expert, but to decide *how* to weigh that reliability as well.)

## CONCLUSION

Freeman was given every opportunity to prove her case for copyright infringement, but she was unable to do so. She was unable to prove access as a matter of law, and the district court properly denied her summary judgment on that basis. She was also unable to prove substantial similarity, and the district court did not abuse its discretion in revisiting that issue prior to trial and ultimately deciding it in favor of Appellees. Appellees are confident that after applying the more discerning ordinary observer test – which remains all that is required – and reviewing the works *de novo,* this Court will reach the same conclusion and will affirm the district court's rulings in their entirety.

Respectfully submitted,

Dated: October 28, 2026

*/s/ Amy L. Nashon*

Amy L. Nashon
California State Bar No. 316353
**TROYGOULD P.C.**
1801 Century Park East, Suite 1600

Los Angeles, CA 90067
Phone: (310) 553-4441
Fax: (310) 201-4746
anashon@troygould.com

Jennifer Pariser
**OPPENHEIM + ZEBRAK, LLP**
461 5th Avenue, 19th Floor
New York, NY 10017
Phone: (212) 951-1874
Fax: (866) 766-1678
JPariser@oandzlaw.com

*Attorneys for All Defendants/Appellees*

Lacy H. Koonce, III
**KLARIS LAW PLLC**
161 Water Street, Ste. 904
New York, NY 10038
Phone: (917) 612-5861
lance.koonce@klarislaw.com
*Attorneys for Defendants/Appellees Emily Silvan Kim and Prospect Agency, LLC*

Dwayne K. Goetzel
Texas State Bar No. 08059500
**KOWERT, HOOD, MUNYON, RANKIN & GOETZEL, P.C.**
1120 S. Capital of Texas, Bldg 2, #300
Austin, Texas 78746
Phone: (512) 853-8800
Fax: (512) 853-8801
dgoetzel@intprop.com
*Attorneys for Defendants/Appellees Tracy Deebs-Elkenaney p/k/a Tracy Wolff*

# CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(b) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,106 words.
2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word version 16.113.2 in font size 14 of the Times New Roman style.

/s/ *Amy L. Nashon*
Attorney for Respondents
Dated: October 28, 2026